# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| NOVO NORDISK A/S | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No: 06-1896 (CKK) |
| | ) | |
| JON W. DUDAS | ) | |
| Under Secretary of Commerce for | ) | |
| Intellectual Property and | ) | |
| Director of the United States Patent | ) | |
| & Trademark Office, | ) | |
| | ) | |
| Defendant. | ) | |

_____ )

## DEFENDANT USPTO'S MEMORANDUM IN SUPPORT OF OPPOSITION TO PLAINTIFF NOVO NORDISK'S MOTION REGARDING THE SCOPE OF DISCOVERY

In accordance with the Court's July 9, 2007 Scheduling and Procedures Order, defendant Jon W. Dudas, Undersecretary and Director of the United States Patent and Trademark Office ("USPTO"), through his undersigned counsel, hereby respectfully submits his opposition to the plaintiff Novo Nordisk A/S's ("Novo Nordisk") Motion Regarding the Scope of Discovery dated July 25, 2007 in the above-captioned matter. Novo Nordisk seeks to conduct discovery related to evidence and issues that it did not, but could have, submitted or raised to the USPTO. As discussed more fully below, such evidence and issues are improper and as such, Novo Nordisk's request to conduct discovery should be denied.

## BACKGROUND

This complaint stems from a patent application submitted by Novo Nordisk that was

denied by the USPTO. Specifically, Novo Nordisk's patent application[1] relates to a method of treating diabetes using inhaled insulin in dry powder form. The USPTO Examiner rejected each of Novo Nordisk's patent claims as obvious under 35 U.S.C. § 103 over the combined teachings of Schenk *et al.*, Int'l Patent Publication No. WO 90/07351 (July 12, 1990) ("Schenk"), and Velasquez, U.S. Patent No. 5,192,548 (March 9, 1993) ("Velasquez"). Final Office Action at 2 (attached as Exhibit 1). Novo Nordisk appealed the Examiner's rejection to the Board of Patent Appeals and Interferences (the "Board"). On September 7, 2006, the Board affirmed the Examiner's rejection. Board of Patent Appeals and Interferences Decision (attached as Exhibit 4). Novo Nordisk now appeals the Board's decision to this Court pursuant to 35 U.S.C. § 145.

## ARGUMENT

I.    **Novo Nordisk Does Not Have An Unlimited Right To Introduce New Evidence To This Court Absent A Valid Reason For Not First Presenting The Evidence To The USPTO**

The USPTO does not dispute that additional evidence, under certain circumstances, may be introduced in an action brought under 35 U.S.C. § 145. However, it is well settled that the right to introduce additional evidence is subject to limitations. In an action brought under 35 U.S.C. § 145, the ability to introduce new evidence is limited in several ways. First, a § 145 plaintiff cannot present new evidence regarding an issue that was not raised before the USPTO. *See DeSeversky v. Brenner*, 424 F.2d 857, 858 (D.C. Cir. 1970)). Second, a § 145 plaintiff cannot introduce new evidence if it was previously available, but the plaintiff either intentionally or <u>negligently</u> withheld it from the USPTO. *Hyatt v. Dudas*, No. 03-0901, 2006 WL 4606037, at

---

[1] A Method of Treating Diabetes Mellitus in a Patient, U.S. Serial No. 09/848,774 (filed May 3, 2001).

*2 (D.D.C. Sept. 30, 2006) (citing *Holloway v. Quigg*, 9 USPQ. 2d 1751, 1752 (D.D.C. 1988));

*see also DeSeversky v. Brenner*, 424 F.2d 857, 858 n.5 (D.C. Cir. 1970) (quoting *California*

*Research Corp. v. Ladd*, 356 F.2d 813, 821 n.18 (D.C. Cir. 1966)).  For example, the failure to

present expert testimony that could have been presented during patent prosecution is the sort of

negligent behavior that prevents a § 145 plaintiff from later introducing new evidence on that

same issue.  *Hyatt*, 2006 WL 4606037, at *2.

      Where a § 145 plaintiff fails to provide any reason or explanation as to why it failed to

present available evidence to the USPTO, a court is to presume that plaintiff's failure was gross

negligence:

> Plaintiff has not here made any explanation of his apparent refusal to offer, during this
> extended period in which the administrative decisions were consistently against him, the
> evidence which might have proven him right.  Accordingly, this court must consider him
> grossly negligent in that failure, and refuse to consider it now.

*Killian v. Watson*, 121 USPQ 507, 508 (D.D.C. 1958).  The policy rationale behind this

limitation is to encourage patent applicants to exhaust all of their administrative remedies before

the USPTO, and to encourage "full disclosure to the administrative tribunals primarily

responsible for just decision-making."  *Killian*, 121 USPQ at 508; *see also Newman v. Quigg*,

877 F.2d 1575, 1579 (Fed. Cir. 1989) (citing *DeSeversky* for the proposition that "[i]t is generally

improper to raise new issues in a § 145 action, on the principle of exhaustion of administrative

remedies.").  If such limits were not placed on the sort of evidence that could be introduced in a §

145 action, a patent applicant could simply avoid the technical expertise of the USPTO by

presenting the Examiner and the Board with only broad general arguments about the patentability

of its invention, and then bringing its evidence to the District Court to be examined in the first

3

instance.  Fortunately, this is not the law.

Novo Nordisk argues that this Court should not follow the standard set forth in the *Hyatt*
decision because it represents non-binding precedent from the District Court for the District of
Columbia, and is inconsistent with binding precedent from the Court of Appeals for the Federal
Circuit.  In particular, Novo Nordisk takes issue with the *Hyatt* court's reading of the *Killian*
decision.  Pl. Mot. at 12-13.  Novo Nordisk's argument is flawed for several reasons.

First, even though the Federal Circuit has not expressly adopted this District's precedent
on new evidence, this District has consistently maintained that new evidence is not always
admitted in a § 145 action and this general principle has not yet been overruled by the Federal
Circuit.  *See Holloway*, 9 USPQ. 2d at 1752 ("[E]vidence has been excluded if it was available to
the plaintiff during the PTO proceeding but was either intentionally or negligently withheld.").
Moreover, the Federal Circuit has expressly found no fault with the courts in this District
adhering to their own § 145 precedent, absent some contrary instruction from the Federal Circuit.
*See*, *e.g.*, *Titanium Metals Corp. of Am. v. Banner*, 778 F.2d 775, 779 (Fed. Cir. 1985) ("We do
not fault the district judge, however, for having stated the precedents of his own circuit in this
§ 145 case because this is one of the first occasions we have had to review a judgment in such a
case.  Nor do we need to determine whether we should apply those precedents here."); *see also*
*DeSeversky*, 424 F.2d at 858.

Second, although the Federal Circuit has not yet had a chance to review the *Hyatt*
decision, it has had the opportunity to comment on the *Killian* decision, but has not done so.  It
would be highly unlikely that the Federal Circuit would overturn this longstanding precedent
without at least addressing it squarely.

Third, the admissibility of new evidence in a § 145 action was not an issue in the cases upon which Novo Nordisk relies. Specifically, *Mazzari v. Rogan*, 323 F.3d 1000 (Fed. Cir 2003), concerned what standard of review should be applied in a § 145 case. *Mazzari v. Rogan*, 323 F.3d at 1004-1005. There is no indication in *Mazzari* that either party objected to the admission of new evidence. *See Id.* at 1002-03. To the contrary, Mazzari specifically argued and presented evidence before the Board about the prior art references cited to reject his patent claims. Similarly, *Fregeau v. Mossinghoff*, 776 F.2d 1034 (Fed. Cir. 1985), did not involve the admissibility of new evidence. Indeed, in her concurrence-in-part, Judge Newman described the majority view's related to § 145 actions as "*dicta* in that they apply to no issue raised by the parties or affect [the] decision." *Fregeau*, 776 F.2d at 1040. In *Fregeau*, a report was submitted to the court to show that magnetism could enhance the flavor of beverages in order to supplement declarations that had previously been submitted by the same individual to the USPTO. *Id*. at 1036.

Additionally, *Gould v. Quigg*, 822 F.2d 1074, 1077-78 (Fed. Cir. 1987), addressed the relevance and weight accorded to an expert's testimony, and not its admissibility. *Burlington Indus., Inc. v. Quigg*, 822 F.2d 1581, 1584 (Fed. Cir. 1987), addressed whether the District Court could come to a different decision than the Board in a § 145 action based upon the same evidence, not new evidence. *Id*. ("The Commissioner argues that *a fortiori* the district court can not reach a different conclusion on the same evidence that was before the [US]PTO.") Thus, the cases cited by Novo Nordisk merely state the general rule that new evidence may be admissible, and cannot be taken to overrule the long-settled precedent of this District that new evidence is to be excluded when the plaintiff had no justification for withholding it from the administrative

tribunals below.

Moreover, the present situation is more like those in *Hyatt* and *Killian*, *i.e.*, the USPTO objects to the admission of evidence "on the ground that . . . plaintiff had uniformly failed to offer any substantial evidence in support of the claim." *Killian*, 121 USPQ at 507.  As the *Killian* court acknowledged, the general rule that § 145 actions are *de novo* trials, in which each side may strengthen its case with additional material, does not "exhaust the principles bearing on [§ 145] case[s]." *Killian*, 121 USPQ at 507.

For all these reasons, this Court should not permit Novo Nordisk to introduce evidence and conduct discovery related to matters that it negligently withheld from the USPTO during prosecution of its patent application.  However, even assuming *arguendo* that the standard set forth in the *Hyatt* decision and other cases in this Circuit are in error, Novo Nordisk should not be allowed to enter evidence under the higher standard enunciated in its motion (*i.e.*, that only available evidence that was withheld from the USPTO "as a result of fraud, bad faith, or gross negligence") because its actions constituted gross negligence.  Pl. Mot. at 7-8.

## II.    Even Under The Higher Standard Novo Nordisk Proposes, Novo Nordisk's Failure To Introduce Evidence Before The USPTO Was The Kind Of Gross Negligence That Precludes Its Entry Now

Novo Nordisk argues that it should be allowed to introduce expert testimony on three issues for which it purportedly was not given a fair opportunity to be heard before the USPTO. The inadequacy of each of these arguments will be discussed in turn.

### A.    Novo Nordisk Had An Opportunity To Present Evidence On Whether Insulin Enters The Bloodstream During Prosecution But Negligently Chose To Present Only Attorney Argument Instead

A patent applicant must have the opportunity to respond to new grounds of rejection put

6

forth by the Board.  *See In re Waymouth*, 486 F.2d 1058, 1061 (CCPA 1973).  However, a

ground of rejection is new only if the Board provides a "wholly different basis" for the rejection.

*Hyatt v. Dudas*, No. 03-0901, 2005 WL 5569663, at *6 (D.D.C. 2005) (citing *Waymouth*, 486

F.2d at 1060-61).  Further, "a rejection is not based on new grounds if 'appellants have had [a]

fair opportunity to react to the thrust of the rejection.'"  *Hyatt*, 2005 WL 5569663, at *6 (quoting

*In re Kronig*, 539 F.2d 1300, 1302 (CCPA 1976); *accord id.* at 1303 (finding that an applicant

had fair opportunity to challenge a rejection because "[t]he basic thrust of the rejection at the

examiner and board level was the same")).

Here, Novo Nordisk argues that the Board's finding that inhaled insulin is absorbed by

the lungs into the bloodstream is a "new . . . ground of rejection."  Pl. Mot. at 11.  However,

contrary to Novo Nordisk's assertions, the Examiner made findings regarding this claim

limitation long before Novo Nordisk's patent application ever went before the Board.  Further,

Novo Nordisk should have presented rebuttal evidence to challenge the Examiner's findings on

this claim limitation before its application went to the Board.

More specifically, in rejecting Novo Nordisk's claims, the Examiner acknowledged that

one of the differences between the Schenk patent and the claims on appeal was that the Schenk

patent did not disclose insulin being absorbed into a patient's bloodstream.  Ex. 1 at 2.  However,

the Examiner found that this claim limitation would have easily been met through "mere routine

obvious experimentation and observation" by those of ordinary skill in the art:

> As to the recited intended result of the amount of insulin employed and the **amount of
> insulin being absorbed**, it is submitted that the amount of insulin employed and the
> amount absorbed **can be arrived at through mere routine obvious experimentation
> and observation**.  That is, the amount of insulin stored in the inhalation device and the
> amount being absorbed would vary in dependence upon the age, sex and severity of the

diabetes of the patient being treated.  Consequently, one of ordinary skill would realize that **the amount** stored and **absorbed would need to be tailored to the particular patient's medical needs**.

Ex. 1 at 4 (emphasis added.).  This finding clearly <u>identified</u> the issue.  The Examiner certainly <u>raised</u> the issue of the amount of inhaled insulin absorbed by the lungs into the bloodstream.

In this same rejection, the Examiner also made numerous additional statements regarding insulin being absorbed into a patient's bloodstream, for example:

- " ... repeated inhalation (administration) of insulin to maintain an adequate **concentration** of medicament **in a patient's bloodstream**."

- " ... **adequate to allow absorption** of a controlled amount of insulin **into a patient's blood stream**."

- " ... in a manner sufficient to cause the patient to **absorb a controlled quantity of insulin**"; and

- " ... thereby facilitating maximum **amounts** of medicament inhaled and **absorbed into a patient's bloodstream**."

Ex. 1 at 4-5 (emphasis added).  It is common knowledge that insulin works in the blood stream -- not the lungs -- to reduce blood glucose levels.  Consequently, it is absurd for Novo Nordisk to now argue that the issue of inhaled insulin being absorbed into the bloodstream was newly raised by the Board.  Novo Nordisk's position is even more shocking given that, during the prosecution of the 1993 patent application from which Novo Nordisk's present patent application claims priority, Novo Nordisk argued that it was known in the prior art that inhaled insulin enters the bloodstream:

> The declaration shows that [the claimed invention] actually delivers drug to the lungs and **based on what is known** with respect to insulin (via the prior art), the **insulin will enter the circulatory system**."

Amendment After Final in U.S. Application Serial No. 08/011,281 at 9 (attached as Exhibit 2)

(emphasis added).

Novo Nordisk had an opportunity to respond to the Examiner's rejection and enter whatever evidence it now seeks to enter. Ex. 1 at 6. Under USPTO Rule 132, patent applicants may present affidavits and declarations containing "evidence submitted to traverse [a] rejection or objection." 37 C.F.R. § 1.132. Nothing in the USPTO rules would have prohibited the inventors or any other Novo Nordisk employee from providing an affidavit or declaration under Rule 1.132 concerning the absorption of inhaled insulin into the bloodstream. Thus, Novo Nordisk certainly had the means and opportunity to present expert evidence on this issue before its application reached the Board.

Despite the readily available means and opportunity to present evidence, Novo Nordisk instead submitted a scant two-and-a-half pages of attorney argument in response to the Examiner's rejection. Amendment After Final at 2 (attached as Exhibit 3). Novo Nordisk has offered no reason why it failed to provide this expert testimony to the Examiner. Novo Nordisk's failure to act before the Examiner constituted gross negligence. Accordingly, this Court should prohibit Novo Nordisk from introducing the expert testimony it proposes to admit on absorption of inhaled insulin by the lungs into the bloodstream.

**B.    That The Board Made Findings About The "2-10 Times Higher" Limitation In Addition To Those Made By The Examiner Does Not Convert The Dispute Concerning This Limitation Into A New Issue**

"A rejection is not new simply because the Board [does not use] the exact words of the Examiner in sustaining a rejection or if the Board simply elaborates on the Examiner's rationale." *Hyatt*, 2005 WL 556663, at *6 (citing *In re Oetiker*, 977 F.2d 1443, 1445-46 (Fed. Cir. 1992)).

Novo Nordisk erroneously argues that the Board's findings concerning the "2-10 times

9

higher" limitation were based "solely" on a calculation the Board made regarding the teaching of the Velasquez patent. Pl. Mot. at 9. Novo Nordisk also argues that because the Examiner had not made this same calculation earlier, Novo Nordisk should be allowed to enter expert testimony on this issue now. *Id*. This argument fails for two reasons.

First, as a pure factual matter, the Board's decision was not based "solely" on its calculations concerning the Velasquez patent. A fair reading of the Board's decision shows that the calculations made concerning the Velasquez patent were made by way of example to elaborate on what had <u>already been found</u> by the Examiner regarding what those of ordinary skill in the art knew about the respirable fraction. More specifically, the Board expressly noted the Examiner's position that "a person of ordinary skill in the art would know that the amount of aerolized [*sic* aerosolized] suspension would have to be substantially higher than the amount needed to be absorbed and that the specification shows no criticality for the range of 2-10 times the amount." Ex. 4 at 3, citing Examiner's Answer, at 5-8 (attached as Exhibit 5). The Board then found that "with inhaled substances, it is known to a person of ordinary skill in the art that not all of the amount that is inhaled will be absorbed. The fraction that will be absorbed relative to the total amount inhaled is referred to in the art as the 'respirable fraction.'" Ex. 4 at 4. Only after making these findings did the Board turn to the Velasquez patent and make the disputed calculation. Thus, in contrast to Novo Nordisk's assertions, the Board's ultimate legal conclusion about the "2-10 times higher" limitation was very clearly based on <u>all</u> of these evidentiary findings. That the Board merely elaborated on the findings that the Examiner already made does not somehow convert whether the prior art taught the "2-10 times higher" limitation into a new issue. *See Hyatt*, 2005 WL 5569663, at *6 (citing *In re Oetiker*, 977 F.2d 1443, 1445-

46 (Fed. Cir. 1992)).

Second, Novo Nordisk admits that the Examiner had already found that the "2-10 times higher" limitation could be easily obtained "through mere routine obvious experimentation."  Pl. Mot. at 9 (citing Ex. 1 at 3).  Because this issue was raised while Novo Nordisk's patent application was still before the Examiner, Novo Nordisk could have presented the kind of expert testimony it now seeks to offer.  37 C.F.R. § 1.132.  Nonetheless, as shown *supra*, Novo Nordisk instead chose to respond to the Examiner's findings and analysis with two-and-a-half pages of attorney argument lacking any supporting evidence.  *See* Ex. 3.  Novo Nordisk has offered no reason why it failed to provide its expert testimony to the Examiner.[2]  As before, Novo Nordisk's failure to timely act on this issue was gross negligence.  A civil action under 35 U.S.C. § 145 is not the proper forum for Novo Nordisk to correct the mistakes it made before the USPTO.

C.    **Novo Nordisk's Failure To Effectively Challenge The Examiner's Assertion That One Of Ordinary Skill In The Art Of Inhalable Insulin Is A Physician Did Not Somehow Preserve That Issue For Trial In The Present Action**

Novo Nordisk argues that it should be allowed to enter expert testimony on the level of skill in the art – the standard from which obviousness is determined – because the Board allegedly "never defined 'one of ordinary skill in the art.'"  Pl. Mot. at 10.  Although the Board made no explicit finding on the level of skill in the art, the Board is presumed to affirm the rejection of a claim on any of the grounds made by the Examiner, "except as to any ground specifically reversed."  37 C.F.R. § 41.50(a)(1) ("The Board, in its decision, may affirm or

---

[2]  Further, if Novo Nordisk believed that the Velasquez calculation was a new ground of rejection or erroneous, it could have asked the Board for reconsideration.  *See* 37 C.F.R. §§ 41.50(b)(2), 41.52 (a)(1)-(3).  Although there is no requirement that a patent applicant ask for reconsideration by the Board, Novo Nordisk's failure to seek reconsideration is consistent with a pattern of withholding rebuttal evidence from the USPTO.

reverse the decision of the examiner in whole or in part on the grounds and on the claims specified by the examiner.  The affirmance of the rejection of a claim on any of the grounds specified constitutes a general affirmance of the decision of the examiner on that claim, except as to any ground specifically reversed.").  Further, the Board is not required to use the exact words the Examiner uses when affirming the Examiner's findings.  *See Hyatt*, 2005 WL 5569663, at *6 (citing *In re Oetiker*, 977 F.2d 1443, 1445-46 (Fed. Cir. 1992)).

Throughout the prosecution of Novo Nordisk's application, the Examiner made repeated general references to the level of skill in the art, and pointed to physicians to illustrate the level of skill and knowledge within the art.  For example, even prior to the present rejection over Schenk and Velasquez, the Examiner cited HARRISON'S PRINCIPLES OF INTERNAL MEDICINE (Kurt J. Isselbacher M.D. *et al. eds.*, 13 ed. 1994) (attached as Exhibit 6) as evidence of what those of ordinary skill in the art knew about how many units of insulin are needed in the bloodstream to control blood glucose levels.  The title of this treatise refers to "Internal Medicine," each of the treatise's six editors has a medical degree, and the treatise was clearly written for physicians and medical students.  *Id*.  Thus, it is difficult to imagine that the Examiner was contemplating someone other than a physician being one of ordinary skill in the art.

Further, the Examiner expressly relied on the knowledge and experimentation of those of ordinary skill in the art to supplement the teachings of Schenk and Velasquez with respect to the two limitations presently in dispute, *i.e.*, the limitation directed to absorption of inhaled insulin into the bloodstream limitation, and the "2-10 times higher" limitation.  Ex. 1 at 3 ("[T]he amount of insulin employed and the amount absorbed can be arrived at through mere routine obvious experimentation and observation . . . one of ordinary skill would realize that the amount

stored and absorbed would need to be tailored to the particular patient's medical needs.")

In its decision, the Board expressly adopted the Examiner's findings with respect to HARRISON'S PRINCIPLES OF INTERNAL MEDICINE establishing the knowledge within the relevant art. Ex. 4 at 4 ("This recitation confirms the findings of the examiner as to the evidentiary value of Harrison's recitation of amounts."). As discussed *supra*, the Board also adopted the Examiner's findings regarding what a person of ordinary skill in the art would know about the two disputed limitations. Although the Board did not explicitly define one of ordinary skill as a physician, the Board clearly adopted the Examiner's findings about who a person of ordinary skill in the art was, and what that person would know. Accordingly, Novo Nordisk's argument that the Board never defined the level of skill in the art is unpersuasive.

Similarly unpersuasive is Novo Nordisk's implicit argument that it raised the level of skill in the art issue to the Board and, therefore, a more explicit finding by the Board was required. Pl. Mot. at 11 (citing *Nat'l Semiconductor Corp. v. Ramtron Int'l Corp.*, 265 F. Supp. 2d 71 (D.D.C. 2003)). This argument is legally and factually flawed. First, the Board implicitly affirmed the Examiner's finding that a person of ordinary skill in the art was a physician by not expressly overruling this finding. *See* 37 C.F.R. § 41.50 (a)(1).

Second, Novo Nordisk never argued before the Board that a person of ordinary skill in the art was someone other than a physician, only that one of the Examiner's reasons for identifying a physician as such was wrong. More specifically, in its brief to the Board, Novo Nordisk challenged the (admittedly incorrect) statement by the Examiner that insulin is a prescription drug, however, Novo Nordisk never argued that one of ordinary skill in the art was not a physician:

> Similarly, the [US]PTO contends that insulin "is a prescription medicine" and that one of ordinary skill is therefore a physician. [Citations omitted.]  This, too, is incorrect.  Insulin does not generally require a prescription in the U.S.

Novo Nordisk's Reply Brief at 8 (Attached as Exhibit 7).  In fact, throughout the entire prosecution of its application, Novo Nordisk <u>never identified who it believed was the ordinary artisan</u>, nor what it believed was the level of skill in the art.  If Novo Nordisk believed that the ordinary artisan was someone other than a physician, it had ample opportunity to say so but did not, despite its admission that the level of skill and knowledge in the art is a "key element in any analysis of the obviousness of an invention."  Pl. Mot. at 10.  Given its belief and admission that the level of skill in the art is a "key element" to an obviousness determination, it is difficult for Novo Nordisk to now argue that its failure to challenge the Examiner's findings on this point was not gross negligence.

Finally, even assuming *arguendo* that Novo Nordisk had actually disputed the Examiner's findings on the level of skill in the art, Novo Nordisk waived any right it may have had to be heard on this issue by waiting until its Reply brief to raise the subject.  Arguments not made in opening briefs are typically considered waived.  *See*, *e.g.*, *Optivus Technology, Inc. v. Ion Beam Applications S.A.*, 469 F.3d 978, 989 (Fed. Cir. 2006) ("Although Loma Linda argues in its reply brief that IBA has not shown that the combination meets the 'gantry' or 'controllable means' limitations, we consider this argument waived because it was not raised in Loma Linda's opening brief"); *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("Our law is well established that arguments not raised in the opening brief are waived.").  Further, as stated *supra*, Novo Nordisk did not adequately raise this issue in its Reply brief to the Board, instead Novo Nordisk merely stated its disagreement with the Examiner's position

without any explanation for its disagreement or assertion as to its beliefs regarding the level of skill in the art. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d at 1320 (holding that mere statements of disagreement with the district court as to the existence of factual disputes do not constitute a developed argument). Thus, the level of skill in the art is a "new issue" in this case. As Novo Nordisk readily admits, it may not introduce evidence related to new issues in a § 145 case. *See* Pl. Mot. at 7.

## CONCLUSION

Novo Nordisk had the opportunity to present to the USPTO the expert testimony that it now seeks to submit to this Court, but did not do so. Now, Novo Nordisk asks this Court to allow it to submit this withheld evidence without adequately explaining why it could not or did not present this evidence to the USPTO. Under the correct legal standard set forth in the *Hyatt* decision and other cases in this Circuit, Novo Nordisk waived its right to now submit this evidence to this Court. Even applying the higher standard, Novo Nordisk's actions clearly constituted gross negligence. The evidence that Novo Nordisk seeks to raise at this eleventh-hour is improper and thus, Novo Nordisk's request to conduct discovery related to this evidence is similarly improper. Accordingly, the USPTO respectfully asks the Court to deny Novo Nordisk's Motion Regarding The Scope of Discovery.[3]

---

[3]Should the Court determine that discovery shall proceed prior to summary judgment motions, the USPTO respectfully requests a period of 120 days for the parties to complete discovery. Defendant believes that such time will be necessary to address the various issues and experts raised in Novo Nordisk's motion.

Respectfully submitted,

____/s/_____

JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

____/s/_____

RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

____/s/_____

QUAN K. LUONG
Special Assistant United States Attorney
555 Fourth Street, N.W., Room E-4417
Washington, D.C. 20530
(202) 514-9150 (telephone)
(202) 514-8780 (facsimile)

OF COUNSEL:

Benjamin Wood
Mary L. Kelly
Associate Solicitors
U.S. Patent & Trademark Office

# EXHIBIT 1

 

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/848,774 | 05/03/2001 | Igor Gouda | AERX058CON3 | 8982 |

24353    7590    04/15/2003

BOZICEVIC, FIELD & FRANCIS LLP
200 MIDDLEFIELD RD
SUITE 200
MENLO PARK, CA  94025

| EXAMINER |
|---|
| LEWIS, AARON J |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3761 | 8 |

DATE MAILED: 04/15/2003

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 07-01)

| *Office Action Summary* | Application No.<br>09/848,774 | Applicant(s)<br>GONDA ET AL. | |
|---|---|---|---|
| | Examiner<br>AARON J. LEWIS | Art Unit<br>3761 | |

*— The MAILING DATE of this communication appears on the cover sheet with the correspondence address —*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If the period for reply specified above is less than thirty (30) days, a reply within the statutory minimum of thirty (30) days will be considered timely.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
- Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☒ Responsive to communication(s) filed on <u>30 December 2002</u> .

2a) ☒ This action is FINAL.     2b) ☐ This action is non-final.

3) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4) ☒ Claim(s) <u>22-38</u> is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5) ☐ Claim(s) _____ is/are allowed.

6) ☒ Claim(s) <u>22-38</u> is/are rejected.

7) ☐ Claim(s) _____ is/are objected to.

8) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9) ☐ The specification is objected to by the Examiner.

10) ☐ The drawing(s) filed on _____ is/are: a) ☐ accepted or b) ☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

11) ☐ The proposed drawing correction filed on _____ is: a) ☐ approved b) ☐ disapproved by the Examiner.

    If approved, corrected drawings are required in reply to this Office action.

12) ☐ The oath or declaration is objected to by the Examiner.

**Priority under 35 U.S.C. §§ 119 and 120**

13) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a) ☐ All  b) ☐ Some * c) ☐ None of:

      1. ☐ Certified copies of the priority documents have been received.

      2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

      3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

14) ☐ Acknowledgment is made of a claim for domestic priority under 35 U.S.C. § 119(e) (to a provisional application).

    a) ☐ The translation of the foreign language provisional application has been received.

15) ☐ Acknowledgment is made of a claim for domestic priority under 35 U.S.C. §§ 120 and/or 121.

**Attachment(s)**

| 1) ☒ Notice of References Cited (PTO-892) | 4) ☐ Interview Summary (PTO-413) Paper No(s). _____ . |
|---|---|
| 2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948) | 5) ☐ Notice of Informal Patent Application (PTO-152) |
| 3) ☐ Information Disclosure Statement(s) (PTO-1449) Paper No(s) _____ . | 6) ☐ Other: |

Application/Control Number: 09/848,774                                    Page 2
Art Unit: 3761

### Claim Rejections - 35 USC § 103

1.    The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and
> the prior art are such that the subject matter as a whole would have been obvious at the time the
> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

2.    Claims 22-38 are rejected under 35 U.S.C. 103(a) as being unpatentable over

Schenk et al.(WO 90/07351) in view of Velasquez et al.('548).

As to claim 22, Schenk et al. disclose a method of treating a patient comprising the

steps of: supplying a predetermined amount of dry powder (11) to an inhalation device;

releasing a pressurized gas (figs.1-6) over a predetermined amount of dry powder to

create an aerosolized suspension (16) comprising powder suspended in air; and

inhaling the aerosolized suspension at a flow rate and volume sufficient to allow the

patient to absorb in the bloodstream a controlled dose of medicament.

The differences between Schenk et al. and claim 22 are insulin as the dry powder

medicament and the recited intended result of the insulin containing 2-10 times higher

the amount needed to be absorbed in the blood stream of a patient and the intended

result of 1-50 units of insulin being absorbed into a patient's bloodstream.

Velasquez et al. teach a variety of dry powder medicaments as inhalable powders

including insulin as a dry powder medicament for inhalation by a patient.

It would have been obvious to modify the dry powder in Schenk et al. to employ dry

powder insulin as the medicament because it would have provided an easy and

painless manner of delivering insulin to patients as taught by Velasquez et al..

Application/Control Number: 09/848,774                                      Page 3
Art Unit: 3761

As to the recited intended result of the amount of insulin employed and the amount
of insulin being absorbed, it is submitted that the amount of insulin employed and the
amount absorbed can be arrived at through mere routine obvious experimentation and
observation. That is, the amount of insulin stored in the inhalation device and the
amount being absorbed would vary in dependence upon the age, sex and severity of
the diabetes of the patient being treated. Consequently, one of ordinary skill would
realize that the amount stored and absorbed would need to be tailored to the particular
patient's medical needs.

As to claim 23, inasmuch as Schenk et al. as modified by Velasquez et al. teach a
method and device for treating diabetes, is stands to reason that the administration
protocol would have included repeated inhalation (administration) of insulin to maintain
an adequate concentration of medicament in a patient's bloodstream.

As to claim 24, Schenk et al. as modified by Velasquez et al. as discussed above
with respect to claim 22 also discloses the inhalation in a single breath (page 10, lines
1-30) the aerosolized suspension adequate to allow absorption of a controlled amount
of insulin into a patient's blood stream.

As to claim 25, Schenk et al. as modified by Velasquez et al. as discussed above
also teach flowing at least a portion of the aerosolized suspension through a
mouthpiece (20) on the device and into the patient's lungs in a manner sufficient to
cause the patient to absorb a controlled quantity of insulin.

As to claim 26, inasmuch as Schenk et al. as modified by Velasquez et al. teach a
method and device for treating diabetes, is stands to reason that the administration

Application/Control Number: 09/848,774                                    Page 4
Art Unit: 3761

protocol would have included repeated inhalation (administration) of insulin to maintain

an adequate concentration of medicament in a patient's bloodstream.

As to claim 27, Schenk et al. as modified by Velasquez et al. as discussed above

also teach mechanically delivering a predetermined amount of dry insulin powder

(figs.1-6 of Schenk et al.); aerosolizing the dry powder to form a dust cloud (e.g. fig.1);

inhaling a single breath (page 10, lines 24-28).

As to claim 28, inasmuch as Schenk et al. as modified by Velasquez et al. teach a

method and device for treating diabetes, is stands to reason that the administration

protocol would have included repeated inhalation (administration) of insulin to maintain

an adequate concentration of medicament in a patient's bloodstream.

Claims 29-38 are substantially equivalent in scope to claims 22-28 and are included

in Schenk et al. as modified by Velasquez et al. for the reasons set forth above with

respect to claims 27-28.

As to the recited claimed limitations defining a controlled quantity of insulin which is

sufficient to achieve the desired result, Schenk et al. (page 3, lines 5-3; page 4, line 27-

37) disclose a device which maximizes the amount of aerosolized powder medicament

thereby facilitating maximum amounts of medicament inhaled and absorbed into a

patient's bloodstream. That is, given that Schenk et al. disclose aerosolizing most of the

medicament within the aerosolization chamber (16), the amount of medicament

available for inhalation by a patient is predictable.

As to claims 37 and 38, the rate and volume of in Schenk et al. (figs.1-6) includes

mechanical means (springs 27,32) for providing fixed rates and volumes as well as

Application/Control Number: 09/848,774                                   Page 5
Art Unit: 3761

means for varying the rate and volume by varying the spring constants and varying the

pressure being applied to pump (42).

### Response to Arguments

3.      Applicant's arguments with respect to claims 22-38 have been considered but are

moot in view of the new ground(s) of rejection.

### Conclusion

4.      Applicant's amendment necessitated the new ground(s) of rejection presented in

this Office action. Accordingly, THIS ACTION IS MADE FINAL. See MPEP

§ 706.07(a). Applicant is reminded of the extension of time policy as set forth in 37

CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action. In the event a first reply is filed within

TWO MONTHS of the mailing date of this final action and the advisory action is not

mailed until after the end of the THREE-MONTH shortened statutory period, then the

shortened statutory period will expire on the date the advisory action is mailed, and any

extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of

the advisory action. In no event, however, will the statutory period for reply expire later

than SIX MONTHS from the date of this final action.

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to AARON J. LEWIS whose telephone number is (703)

308-0716. The examiner can normally be reached on 9:30AM-6:00PM M-F.

Application/Control Number: 09/848,774                                        Page 6
Art Unit: 3761

    If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, WEILUN LO can be reached on (703) 308-1957. The fax phone numbers

for the organization where this application or proceeding is assigned are (703) 305-3590

for regular communications and (703) 305-3590 for After Final communications.

    Any inquiry of a general nature or relating to the status of this application or

proceeding should be directed to the receptionist whose telephone number is (703) 308-

0858.

AARON J. LEWIS
Primary Examiner
Art Unit 3761

Aaron J. Lewis
April 7, 2003

# EXHIBIT 2

Oerres. and Mail

BOX AF RECEIVED

JUN 1 3 1994

GROUP 1800

\18C

ATTORNEY DOCKET NO. 06513/002001

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant : Reid. M. Rubsamen         Art Unit: 1811
Serial No.: 08/011,281               Examiner: A. Davenport
Filed      : January 29, 1993
Title      : METHOD OF TREATING DIABETES MELLITUS

**Box AF**

Commissioner of Patents and Trademarks
Washington, DC  20231

Dear Sir:

<u>AMENDMENT AFTER FINAL</u>

<u>RESPONSIVE TO PAPER #7</u>

This amendment is responsive to the Final Office Action
dated April 19, 1994 for which a three-month period for response
was given, making this response due on or before July 19, 1994.
In view of the remarks put forth below, reconsideration and
allowance are respectfully requested.

For the convenience of the Examiner, all the pending claims
are reiterated below along with amended claims 9, 11, 14, 18 and
19.

1. (Reiterated) A method of intrapulmonary administration
of insulin, comprising:

measuring the inspiratory flow of a patient and
calculating a threshold level in an inhalation cycle at which
release of drug is to take place, the threshold level being
determined in a manner so as to maximize the repeatability of the
amount of insulin delivered to the patient on releasing insulin;

releasing a metered dose of aerosolized insulin from a
pressurized canister containing insulin in combination with a low

Date of Deposit
I hereby certify under 37 CFR 1.8(a) that this correspondence is
being deposited with the United States Postal Service as first class
mail with sufficient postage on the date indicated above and is
addressed to the Commissioner of Patents and Trademarks,
Washington, D.C. 20231.

Michelle Stagner
Michelle Stagner

boiling point propellant, the releasing being carried out upon
reaching the threshold level generated by the patient inhaling;

inhaling the metered dose of aerosolized insulin into
the lungs of a patient; and

monitoring serum glucose levels within the patient;

wherein the measuring, releasing, inhaling and
monitoring steps are continuously repeated in a manner so as to
maintain a desired serum glucose level in the patient. --

2̸1̸.    (Reiterated)  The method of claim 2̸3̸, wherein
information obtained from the monitoring is electronically
processed by a microprocessor programmed to release insulin in a
manner so as to maintain a desired serum glucose level in the
patient.

3̸2̸.    (Reiterated)  The method of claim 2̸3̸, further
comprising:

repeating the measuring prior to each releasing,
inhaling and monitoring step over a period of time so as to
maintain a desired serum glucose level in the patient.

4̸.    (Reiterated)  The method of claim 2̸3̸, wherein the
insulin is recombinantly produced human insulin.

5̸8̸.    (Reiterated)  The method of claim 2̸3̸, wherein the
insulin is extracted from an animal source selected from the
group consisting of bovine and porcine.

6̸9̸.    (Twice Amended)  A method of intrapulmonary
administration of insulin [treating a patient suffering from
diabetes mellitus], comprising:

measuring the inspiratory flow of a patient during an
inhalation cycle prior to administering insulin and calculating a
threshold level of airflow prior to administering insulin,
wherein the threshold level of inspiratory flow is determined in

a manner so as to maximize repeatability of the amount of insulin delivered to the patient on releasing insulin;

administering insulin to the patient by the intrapulmonary route, the insulin being administered from a hand-held, self-contained device which releases insulin on detecting the threshold level of inspiratory flow created by patient inhalation;

monitoring serum glucose levels in the patient; and

repeating the measuring, administering and monitoring steps a plurality of times over a period of time so as to maintain a desired serum glucose level in the patient.

10.    (Reiterated)  The method as claimed in claim 8, wherein the amount of insulin administered and the glucose level monitored are continually recorded electronically by the self-contained device and adjustments are made in the amount of insulin administered based on the effect of insulin administration on the glucose levels of the patient.

11.    (Amended)  The method as claimed in claim 9, [wherein the threshold level of inspiratory flow is determined in a manner so as to maximize repeatability of the amount of insulin delivered to the patient on releasing insulin and] wherein the amount of insulin administered is in the range of 1 unit per day to 50 units per day.

12.    (Reiterated)  The method as claimed in claim 9, wherein the desired serum glucose level in the patient is within the range of 50 mg/dl to 300 mg/dl.

13.    (Reiterated)  The method as claimed in claim 8, wherein the insulin is recombinantly produced human insulin.

14.    (Amended)  The method as claimed in claim 8, wherein the insulin is insulin extracted from an animal source

[or from the] group consisting of a bovine source and a porcine source.

15. (Reiterated) The method of claim 8, further comprising:

orally administering a sulfonylurea drug to the patient.

16. (Reiterated) The method of claim 15, wherein the sulfonylurea drug is selected from the group consisting of acetohexamide, chlorpropamide, tolazamide, tolbutamide, glipzide and glyburide.

18. (Amended) The method of claim 8, wherein the monitoring is carried out prior to each dosing event, wherein insulin is administered to the patient [and wherein the threshold level is a level calculated to obtain reproducibility in the amount of insulin delivered to the patient with each release of insulin].

19. (Amended) A method of <u>intrapulmonary administration of insulin</u> [treating a patient suffering from diabetes mellitus], comprising:

placing a mouthpiece of a hand-held, metered dose inhaler device in the mouth of a patient, wherein the device is comprised of a container having therein insulin and a low boiling point propellant, a valve for releasing insulin and propellant from the container to the mouthpiece, a means for measuring airflow created by drawing air from the mouthpiece and a means for opening the valve in response to a measured threshold of airflow;

drawing air from the mouthpiece until [the] <u>a</u> threshold is reached so as to cause the valve to open and release a controlled amount of insulin and propellant which is drawn into the lungs of the patient, wherein the device includes a microprocessor connected to the means for measuring airflow and

means for opening the valve, the microprocessor being programmed to control the amount of insulin released, based on the needs of the patient, wherein the threshold level is a level calculated to obtain maximum reproducibility in the amount of insulin delivered to the patient with each release of insulin.

## REMARKS

Claims 4, 6-16, 18, 19 and 23 are now pending in this application.

### Formal Matters (Claim Amendments)

Claims 9, 11, 14, 18 and 19 have been amended in order to more particularly point out and distinctly claim the invention. The amendments are believed to be a formal in nature, and not create new issues which would require further searching. Further, the amendments will narrow any issues on appeal and therefore their entry is respectfully requested under 37 CFR § 1.116.

Specifically, claim 9 has been amended to include the same preamble language already contained within the claim 23. The same amendment has been made to the preamble of claim 19. All of the claims now specifically claim a method of intrapulmonary administration of insulin, i.e., are not specifically claiming a method of treating diabetes mellitus. Claim 11 is amended to delete superfluous language, i.e., delete language already contained within claim 9. A similar amendment was made to claim 18. The amendment to claim 14 is formal in nature and has been made to eliminate superfluous language. No new matter has been added by these amendments.



<u>The Invention</u>

All the claims are now directed to a method of
intrapulmonary administration of insulin.  More specifically, the
claims are no longer specifically directed to a "method of
treating a patient suffering from diabetes mellitus."  The claims
generally cover a method of administering a specific drug (i.e.
insulin) to lung tissue.  The attached declaration shows that the
device can administer any drug to a human via the intrapulmonary
route.  It appears as though the claim amendments have rendered
moot all issues with respect to utility under 35 USC § 101 and
enablement under 35 USC § 112, first paragraph.  Insulin is a
known drug having a known utility and is known to enter the
circulatory system when brought into contact with lung tissue.
In that Applicant's invention brings the insulin into contact
with lung tissue (shown by the declaration under 37 CFR 1.132)
and in that Applicant is claiming a method of intrapulmonary
delivery of insulin, the claimed method is clearly useful and
enabled.

The claims are directed to a method wherein the inspiratory
flow of the patient is measured and, based on the measurement, a
threshold level in the inhalation cycle is calculated wherein the
threshold level is determined in a manner so as to <u>maximize</u>
<u>repeatability</u> of the amount of insulin delivered to the patient.
The optimal point or threshold level in the inspiratory cycle is
not calculated based on a point within the cycle likely to result
in the maximum delivery of insulin, but rather the point in the
cycle most likely to result in the delivery of the same amount of
insulin to the patient at each release of insulin from the
device.  This feature alone (i.e. notwithstanding other
distinguishing features) distinguishes applicant's invention from
the prior art, and provides for a step within applicant's claimed
method which makes it possible to administer drugs by the
intrapulmonary route even though it is important to administer
the drug within a fairly narrow therapeutic window.

6

Individual different patients will have individual and different inhalation profiles. Applicant's invention makes it possible to take such into consideration and measures the inspiratory flow of each patient, and takes such measurement prior to and/or concurrently with each release of insulin so as to take into consideration differences in the inhalation profile of even the same patient at different points in time. By measuring the inspiratory flow and determined the inspiratory flow profile of the patient, it is possible to calculate a point within the flow profile curve at which maximum repeatability in administration of a drug will occur. At this point in the inhalation cycle, the insulin is released. The concept of calculating an optimal release point to maximize repeatability in dosing is not disclosed within the prior art.

Rejection under 35 USC § 101

Claims 4, 6-16, 18, 19 and 23 were rejected under 35 USC § 101. The rejection is traversed as applied and as it might be applied to the presently pending claims.

The claimed method is to administering insulin. This can be done by placing the device (as shown within the figures and described within the specification) into the mouth of the patient, and inhaling after which insulin will be automatically released in an aerosolized form and brought into contact with lung tissue. At this point, intrapulmonary delivery of insulin will take place. The ability to provide for intrapulmonary delivery of insulin is known and old. References previously cited by the Examiner clearly disclosed that insulin can be delivered by the intrapulmonary route. Applicant has provided a vastly improved method of administering insulin which essentially provides for a substantially higher degree of control of the dosing. Notwithstanding as such, the intrapulmonary delivery of insulin is useful and known by those skilled in the art to be useful.

Within the final action, the Examiner noted that the prior art did disclose methods of intrapulmonary delivery of insulin.

7

Thus, it appears to Applicant that the only manner in which the claims can be rejected under 35 USC § 101 is if the Examiner believes that Applicant's device is incapable of administering insulin even though prior art devices are capable of such. Although such appears to be a curious position, Applicant's respond thereto by the attached declaration under 37 CFR § 1.132.

The attached declaration demonstrates how a specific embodiment of a device described within the present application delivered a radioactively labelled drug to five different human patients. Although the details of such are described further within the declaration, in essence, the declaration shows how the methodology of the invention makes it possible to substantially increase the repeatability of dosing of any drug by releasing drug at an optimal point or threshold point calculated from measuring inspiratory flow and volume. Drugs such as insulin would be expected to be administered in the same manner as shown within the exhibits attached to the declaration under 37 CFR § 1.132. In view of such reconsideration and withdrawal of the rejection under 35 USC § 101 is respectfully requested.

<u>Rejection under 35 USC § 112, first paragraph</u>

The specification was objected to under 35 USC § 112, first paragraph. Based on the objection to the specification, claims 4, 6-16, 18, 19 and 23 were rejected under 35 USC § 112, first paragraph. The rejection is traversed as applied and as it might be applied to the presently pending claims.

The arguments put forth above traversing the 35 USC § 101 rejection are applied here with respect to applicant's traversal of the 35 USC § 112, first paragraph rejection. In order to disclose the invention within the meaning of 35 USC § 112, first paragraph, an Applicant needs to describe how to make and use the invention. In that the claimed invention is a method, the rejection must be arguing that Applicant has not taught how to use and or carry out the method. The method is easily carried out by placing the device as shown and described within the

8

specification into the user's mouth and inhaling. Upon inhaling the device measures inspiratory flow and volume, calculates a threshold or optimal point within the inspiratory profile and automatically releases drugs from the pressurized container which includes insulin and a low boiling point propellant.

If the rejection is questioning whether applicant's invention would actually be operative the attached declaration under 37 CFR § 1.132 shows that the methodology can be readily "used" to provide for intrapulmonary delivery of a drug to a patient. The declaration shows that the device actually delivers drug to the lungs and based on what is known with respect to insulin (via the prior art), the insulin will enter the circulatory system. Insulin is known to be useful in regulating glucose levels.

In view of the comments put forth above and the attached declaration under 37 CFR § 1.132 reconsideration and withdrawal of the rejection under 35 USC § 112, first paragraph is respectfully requested.

## SUMMARY

The claims have been amended to indicate that Applicant is claiming a method of intrapulmonary administration of insulin. Further, other claimed amendments have been entered to correct informalities. The 35 USC § 101 and 35 USC § 112, first paragraph rejections have been traversed. Applicant has pointed out that the invention is useful in that it is capable of administering insulin as claimed via the intrapulmonary route. Further, those skilled in the art would readily know how to use and or carry out the method. Definitive proof as to utility and enablement is apparent from Applicant's disclosure. Notwithstanding such Applicant's has attached a declaration under 37 CFR § 1.132 which shows how a device as described within the present application delivered a radio labelled drug to a human patient. In view of such, reconsideration and withdrawal of the rejections is respectfully requested.

9

In the event that the Examiner finds that minor issues remained unresolved, the Examiner is respectfully requested to contact the undersigned attorney at the indicated telephone number to arrange for an interview to expedite the disposition of this application.

This amendment is filed within the three-month period for response and with a transmittal letter/fee sheet. In the unlikely event the transmittal letter is separated from this document and/or the Patent Office determines that petitions and/or fees are required, applicant petitions for any required relief, including extensions of time, and authorizes the Commissioner to charge the cost of such petitions and/or other fees required to our Deposit Account No. 06,1050. The Commissioner is not authorized to charge issue fees to our deposit account.

Respectfully submitted,

Date: 6/7/94

Karl Bozicevic
Reg. No. 28,807

FISH & RICHARDSON
2200 Sand Hill Road, Suite 100
Menlo Park, CA 94025

Telephone No.:   415/854-5277
Facsimile No.:   415/854-0875

KB/scp

Attached:   Declaration Under 37 CFR 1.132

12966.P11

10

# EXHIBIT 3

   

**EXPRESS MAIL LABEL NO.: EV 334 001 683 US**

| AMENDMENT UNDER 37 C.F.R. §1.116 | Attorney Docket | AERX-058CON3 |
|---|---|---|
| | Confirmation No. | 8982 |
| | First Named Inventor | Igor Gonda et al. |
| Address to: | Application Number | 09/848,774 |
| **Box AF** | Filing Date | May 3, 2001 |
| Commissioner for Patents | Group Art Unit | 3761 |
| P.O. Box 1450 | Examiner Name | Lewis, Aaron J. |
| Alexandria, VA 22313-1450 | Title | METHOD FOR TREATING DIABETES MELLITUS IN A PATIENT |

Sir:

    This amendment is responsive to the Final Office Action dated April 15, 2003 for which a three-month period for response was given making this response due on or before July 15, 2003. The shortened period for response runs until June 15, 2003 which is a Sunday making this response filed within the two month period on Monday, June 16, 2003.

(REMAINDER OF PAGE LEFT BLANK)

TC 3700 MAIL ROOM  JUN 20 2003  RECEIVED

2



   

Atty Dkt. No.: AERX-058CON3
USSN: 09/848,774

## REMARKS

### Formal Matters

Claims 22-38 are pending after entry of the amendments set forth herein.

Claims 22-38 were examined. Claims 22-38 were rejected.

### Rejection under 35 U.S.C. §103

The pending claims 22-38 were rejected under 35 U.S.C. §103 as unpatentable over Schenk et al. (WO 90/07351) in view of Velasquez et al. ('548). The rejection is traversed in view of the comments put forth below.

Applicant is claiming a method of treating diabetes. Schenk et al. is not discussing, disclosing or contemplating the treatment of diabetes nor is the secondary reference to Velasquez et al. which merely lists insulin among many other drugs. Within applicant's method applicant claims a specific range with respect to the amount of insulin absorbed into the blood stream of the patient in terms of units of insulin. Based on the amount of insulin aerosolized and delivered to the patient by inhalation these concepts are not discussed contemplated or obvious in any manner in view of Schenk et al.

Within claim 24 applicant claims a method of regulating the blood glucose levels. Schenk et al. does not discuss, contemplate or in any manner render obvious methods of regulating blood glucose levels. Applicant specifically claims repeating steps periodically as needed in order to regulate the patient's blood glucose levels. Such is not discussed, disclosed or in any way rendered obvious in view of Schenk et al and, again Velasquez et al. merely lists insulin among many drugs and teach no method steps.

Within claim 25 applicant also claims a method of regulating blood glucose levels. Schenk et al. is not concerned with regulating blood glucose levels, and does not disclose or render obvious any such method. Further, applicant's method includes supplying a fixed quantity of dry insulin powder. Schenk et al. does not disclose such. Applicant has specifically claimed flowing at least a portion of the aerosolized suspension through a mouthpiece in a manner which causes the patient to absorb into the patient's blood stream a controlled quantity of insulin to achieve acceptable blood glucose levels following treatment. This is not disclosed or rendered obvious in view of Schenk et al.

Within claim 27 applicant claims a method of administering a sufficient amount of insulin to a patient to achieve blood glucose control. In claim 31 applicant claims a method of lowering a patient's serum glucose levels to an acceptable value. In claim 32 applicant claims administering a controlled and

2

1





Atty Dkt. No.: AERX-058CON3
USSN: 09/848,774

repeatable dose of insulin to produce an acceptable serum glucose level in a diabetic patient. In claim 35 applicant claims administering insulin to a diabetic patient to control serum glucose levels via a hand held inhalation device. These independent claims also claim additional features with respect to specific method steps and/or amounts which are not disclosed, discussed or rendered obvious in view of Schenk et al.

The rejection has cited Velasquez for its disclosure of insulin. Applicant's review of the patent shows that the word "insulin" is put forth at col. 6, line 32 of Velasquez et al. However, there is no discussion of any of the general methods claimed by applicant, no discussion of treating diabetes, maintaining serum glucose levels or administering a controlled and repeatable dose of insulin. Accordingly, the combined references do not teach the specifically claimed method steps.

In deciding the question or obviousness under 35 U.S.C. §103, it is not realistic to pick and choose from any one reference only so much of it as will support a given position, to the exclusion of other parts necessary to the full appreciation of what such a reference barely suggests to one of ordinary skill in the art. Here, Schenk et al. discloses general methodology with respect to the inhalation of drugs. It does not disclose specific methodology with respect to any of the methods claimed by applicant. It specifically does not disclose insulin or treating diabetes or maintaining glucose levels. Further, nothing within the disclose provides sufficient teachings which would allow one skilled in the art to utilize the technology to administer insulin in an effective and safe manner so as to treat a diabetic patient.

Applicant recognizes that the rejection has cited Velasquez for its disclosure of insulin. However, the mere existence in the prior art of individual features of a claimed in invention does not, without more, render that invention obvious within the meaning of 35 U.S.C. §103. Here, Velasquez does nothing more than list the word "insulin" among many other potential pharmaceuticals. Nothing within Velasquez et al. suggests that it might be combined with Schenk et al. in any manner let alone in some manner which would provide for applicant's specifically claimed methods. There must be positive evidence of how the bringing together of the disclosed features or steps would be obvious to an ordinarily skilled person in order to provide for a rejection under 35 U.S.C. §103.

Essentially no invention would be patentable if a rejection could, after disclosed and claimed, be subjected to rejections based on combining the prior art and piecing together portions of earlier patents while dropping other parts to put together the particular combination claimed by applicant. Here, the

 

Atty Dkt. No.: AERX-058CON3
USSN: 09/848,774

rejection simply does not explain how to effectively and safely treat a patient using the inhalation of insulin. In view of such applicant respectfully requests reconsideration and withdrawal of the rejection.

The relative insulin requirements, specific amount ranges, and steps claimed by applicant is important in terms of obtaining a safe and effective manner of treating patients and maintaining safe blood glucose levels. These steps and ranges are not taught within the cited references. Even assuming arguendo that the references showed the claimed elements (and they do not) the rejection has not presented a line of reasoning as to why the artisan viewing only the collective teachings of the references would have found it obvious to selectively pick and choose the insulin from Velasquez et al. among the various other drugs disclosed within that reference to combine it with Schenk et al. to obtain the method claimed by applicant. To obtain applicant's invention multiple modifications and variations of Schenk et al. would be necessary even if the insulin component of Velasquez et al. were combined with Schenk et al. Accordingly, the combination of the references is not obvious and even if made does not render obvious the claimed invention.

## Conclusion

Applicant submits that all of the claims are in condition for allowance, which action is requested. If the Examiner finds that a telephone conference would expedite the prosecution of this application, please telephone the undersigned at the number provided.

The Commissioner is hereby authorized to charge any underpayment of fees associated with this communication, including any necessary fees for extensions of time, or credit any overpayment to Deposit Account No. 50-0815, order number AERX-058CON3.

Respectfully submitted,
BOZICEVIC, FIELD & FRANCIS LLP

Date: _16/JUNE/03_                    By: _____
                                          Karl Bozicevic
                                          Registration No. 28,807

BOZICEVIC, FIELD & FRANCIS LLP
200 Middlefield Road, Suite 200
Menlo Park, CA 94025
Telephone: (650) 327-3400
Direct: (650) 833-7735

4

3



# EXHIBIT 4

(NN1998)

6809.220 – VS

MLK Copy
RETURN

The opinion in support of the decision being entered today was not written
for publication in and is *not* binding precedent of the Board.

SEP 12 2006

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES

*Ex parte* IGOR GONDA, REID M. RUBSAMEN and STEPHEN J. FARR

Appeal No. 2006-1762
Application No. 09/848,774
Technology Center 3700

MAILED
SEP 07 2006
U.S. PATENT AND TRADEMARK OFFICE
BOARD OF PATENT APPEALS
AND INTERFERENCES

ON BRIEF

Before BAHR, LEVY, and FETTING, *Administrative Patent Judges.*

FETTING, *Administrative Patent Judge.*

DECISION ON APPEAL

This is a decision on appeal under 35 U.S.C. §134 from the examiner's final rejection of claims 22 through 28, which are all of the claims pending in this application.

We AFFIRM.

Appeal Number: 2006-1762
Application Number: 09/848,774


## BACKGROUND

The appellants' invention relates to an insulin inhaler. An understanding of the invention can be derived from a reading of exemplary claim 22, which is reproduced below.

22. A method for treating diabetes mellitus in a patient comprising the steps of:
    a.  supplying a predetermined amount of dry insulin powder to an inhalation device;
    b.  releasing a pressurized gas over the predetermined amount of dry insulin powder to create an aerosolized suspension comprising powder suspended in air, wherein the aerosolized suspension contains an amount of insulin that is 2-10 times higher than the amount needed to be absorbed in the bloodstream of the patient; and
    c.  inhaling the aerosolized suspension at a flow rate and volume sufficient to allow the patient to absorb in the bloodstream a controlled dose of insulin that comprises between 1-50 units of insulin.


## PRIOR ART

The prior art references of record relied upon by the examiner in rejecting the appealed claims are:

| | | |
|---|---|---|
| Velasquez | 5,192,548 | March 9, 1993 |
| Schenk | PCT WO 90/07351 | July 12, 1990 |

Isselbacher et al. (ed.), Harrison's Principles of Internal Medicine, 13th Edition, Vol. 2, pp. 1986-1987, 1994 (Harrison)


## REJECTION

Rather than reiterate the conflicting viewpoints advanced by the examiner and the appellants regarding the above-noted rejection, we make reference to the examiner's answer (mailed Aug 12, 2004) for the reasoning in support of the rejection, and to appellants' brief (filed May 10, 2004) and reply brief (filed Oct 12, 2004) for the arguments thereagainst.

Claims 22 through 38 stand rejected under 35 U.S.C. § 103 as obvious over Schenk in view of Velasquez.

Appeal Number: 2006-1762
Application Number: 09/848,774

## OPINION

In reaching our decision in this appeal, we have given careful consideration to appellants' specification and claims, to the applied prior art references, and to the respective positions articulated by appellants and the examiner. As a consequence of our review, we make the determinations that follow.

### Claims 22 through 38 rejected under 35 U.S.C. § 103 as obvious over Schenk in view of Velasquez.

As to claims 22 and 23, the appellants argue that the art fails to show the claim elements of "the aerosolized suspension contains an amount of insulin that is 2-10 times higher than the amount needed to be absorbed in the bloodstream of the patient" and "inhaling the aerosolized suspension at a flow rate and volume sufficient to allow the patient to absorb in the bloodstream a controlled dose of insulin that comprises between 1-50 units of insulin." [See Brief at p. 13]. The appellants go on to argue that the law does not recognize an "obvious to try"/ "routine experimentation" standard for proof of obviousness. [See Brief at p. 14].

The examiner responds that the claimed dose of 1-50 units is that which is administered to patients in typical administration, as evidenced by Harrison. The examiner goes on to argue that the examiner has not applied an "obvious to try" argument, but has applied the taught application of Velasquez' insulin powder to Schenk's inhaler, and that a person of ordinary skill in the art would know the standard guidelines for the number of units that are needed to be absorbed and would adjust the amount inhaled to achieve that amount accordingly. The examiner also responds that a person of ordinary skill in the art would know that the amount of aerolized suspension would have to be substantially higher than the amount needed to be absorbed and that the specification shows no criticality for the range of 2-10 times the amount. [See Answer at p. 5-8]

The appellants responded that neither reference discloses delivery to the bloodstream through inhalation let alone in controlled doses. [See Reply Brief at p. 5-6]. The appellants further argue that any guidelines that might be found in the art, including Harrison, refer to injected rather than inhaled insulin. [See Reply Brief at p. 6].

3

Appeal Number: 2006-1762
Application Number: 09/848,774

We first note that none of the claims contain limitations specifying structural characteristics that control the amount of insulin inhaled or actually absorbed. Instead, the claims recite the results to be achieved, *viz.* the amount to be inhaled and absorbed, and are consequently broad enough to embrace any technique for achieving those amounts. We further note that the ranges specified in the claims for such amounts are very broad, suggesting minimal criticality for any particular subset of such ranges.

As to the limitation regarding the number of units to be absorbed, we further note that the appellants' disclosure supports the examiner's finding that an absorption of 1-50 units would be that which a person of ordinary skill in the art would ordinarily use. [See Specification at p. 21]. This recitation confirms the findings of the examiner as to the evidentiary value of Harrison's recitation of amounts. Therefore, we find the appellants' arguments as to the limitation of an absorption of 1-50 units to be unpersuasive.

As to the limitation regarding the amount of insulin in the aerosolized suspension, we next note that with inhaled substances, it is known to a person of ordinary skill in the art that not all of the amount that is inhaled will be absorbed. The fraction that will be absorbed relative to the total amount inhaled is referred to in the art as the "respirable fraction". We note that Velasquez describes the range that such respirable fractions may embrace for the various medicaments it describes at col. 5 lines 7-15. Velasquez mentions the fraction may be in the range of 10% to 65%. Taking the inverse of this range to determine the amount of medicament that would need to be inhaled yields a range of 1.54 to 10 times the amount needed to be absorbed, which we note substantially overlaps the claimed range of 2 to 10 times. Therefore, we find the appellants' arguments as to the claim limitation of "the aerosolized suspension contains an amount of insulin that is 2-10 times higher than the amount needed to be absorbed in the bloodstream of the patient" to be unpersuasive.

We next note that medicament that is inhaled is absorbed into the blood stream by the lungs. Therefore, we find the appellants' arguments as to the claim being toward delivery through inhalation rather than to the bloodstream to be unpersuasive.

We next note that the appellants make much of the argument that the applied art fails to show how insulin is to be inhaled in controlled delivery. However, we note that, contrary to this

Appeal Number: 2006-1762
Application Number: 09/848,774

argument by the appellants, both applied references describe structural devices to precisely
control the amount of a medicament delivered. Velasquez resorts to precise measuring of small
amounts in equal sized depressions for use in an inhaler. Schenk resorts to a metering chamber.
To the extent the appellants mean to argue that neither reference teaches how to translate those
structural controls into the precise amounts of insulin needed to be deposited for inhalation, we
again note the broad ranges both disclosed and claimed in the appellants' application that suggest
the precise amount is not critical to the invention, or more properly, the precise amount is highly
dependent on the individual patient and therefore cannot be claimed with precision. Again, we
note that the appellants' disclosure at p. 21 supports this high degree of variability among
patients. We further note that the claim does not recite any structural mechanism for precisely
matching the amounts of insulin with the patient. Therefore the appellants' arguments that
neither reference teaches how to translate those structural controls into the precise amounts of
insulin needed to be deposited for inhalation are unpersuasive.

. We further note that the appellants have attempted to portray the examiner's rejection as an
obvious to try application, followed by an admonition that the law does not support such a
theory. However, our reviewing court has stated that "it is not inventive to discover the optimum
or workable ranges by routine experimentation." *In re Geisler*, 116 F.3d 1465, 43 USPQ2d
1362 (Fed. Cir. 1997). Therefore, we find the appellant's arguments as to such optimization to
be unpersuasive.

As to claims 25, 26, 31 and 35, the appellants repeat the above arguments and they are
equally unpersuasive as to these claims. The appellants further argue claim limitations of
repetition (claim 25, 26 and 31 - [See Brief at p. 14-17]) and of lowering the glucose level to an
acceptable level (claim 31 - [See Brief at p. 16]) and of controlling the glucose levels (claims 25,
26, 31 and 35 - [See Brief at p. 14-17]). We note Shenk's inhaler is inherently repeatable in
operation, and that the lowering of glucose levels to an acceptable level and controlling the
glucose levels are both highly dependent upon the particular patient and a person of ordinary
skill in the art would monitor the patient's vital statistics to achieve the desired result in view of
the high variability among patients as a matter of course. Therefore, we find the appellant's
arguments to be unpersuasive.

Appeal Number: 2006-1762
Application Number: 09/848,774

As to the remaining claims, the appellants present no arguments to them separate from those indicated above, and therefore those claims stand or fall with claim 22.

Accordingly we sustain the examiner's rejection of claims 22 through 38 rejected under 35 U.S.C. § 103 as obvious over Schenk in view of Velasquez.

## REMARKS

We note that the phrase "respirable fraction" is a term of art that may be pertinent in resolving any further patentability issues concerning the amount of a medicament needed to be inhaled to achieve appropriate absorption.

## CONCLUSION

To summarize,

- The rejection of claims 22 through 38 rejected under 35 U.S.C. § 103 as obvious over Schenk in view of Velasquez is sustained.

No time period for taking any subsequent action in connection with this appeal may be extended under 37 CFR § 1.136 (a) (1) (iv).

6

Appeal Number: 2006-1762
Application Number: 09/848,774

## AFFIRMED

JENNIFER D. BAHR
Administrative Patent Judge                      )
                                                 )
                                                 )
                                                 )
                                                 )
STUART S. LEVY                                   ) BOARD OF PATENT
Administrative Patent Judge                      )    APPEALS
                                                 )    AND
                                                 )  INTERFERENCES
                                                 )
                                                 )
ANTON W. FETTING                                 )
Administrative Patent Judge                      )

NOVO NORDISK, INC.
PATENT DEPARTMENT
100 COLLEGE ROAD WEST
PRINCETON, NJ 08540

7

# EXHIBIT 5

  



UNITED STATES PATENT AND TRADEMARK OFFICE

COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
P.O. BOX 1450
ALEXANDRIA, VA 22313-1450
www.uspto.gov

# BEFORE THE BOARD OF PATENT APPEALS
## AND INTERFERENCES

Application Number: 09/848,774
Filing Date: May 03, 2001
Appellant(s): GONDA ET AL.

**MAILED**

AUG 1 3 2004

Group 3700

---
Scott T. Weingaertner
For Appellant

## EXAMINER'S ANSWER

This is in response to the appeal brief filed 05/10/2004.

## (1)    *Real Party in Interest*



Application/Control Number: 09/848,774                                    Page 2
Art Unit: 3743

A statement identifying the real party in interest is contained in the brief.

**(2)    *Related Appeals and Interferences***

A statement identifying the related appeals and interferences which will directly

affect or be directly affected by or have a bearing on the decision in the pending appeal

is contained in the brief.

**(3)    *Status of Claims***

The statement of the status of the claims contained in the brief is correct.

**(4)    *Status of Amendments After Final***

The appellant's statement of the status of amendments after final rejection

contained in the brief is correct.

The amendment after final rejection filed on 05/10/2004 has been entered.

**(5)    *Summary of Invention***

The summary of invention contained in the brief is correct.

**(6)    *Issues***

The appellant's statement of the issues in the brief is correct.

**(7)    *Grouping of Claims***

Appellant's brief includes a statement that claims 22,23,25,26,31,35 do not stand

or fall together and provides reasons as set forth in 37 CFR 1.192(c)(7) and (c)(8).

**(8)    *Claims Appealed***

The copy of the appealed claims contained in the Appendix to the brief is correct.

**(9)    *Prior Art of Record***

WO90/07351                    SCHENK ET AL.              7-1990

3



5,192,548                    VELASQUEZ ET AL.                3-1993

### *(10)  Grounds of Rejection*

The following ground(s) of rejection are applicable to the appealed claims:

### *Claim Rejections - 35 USC § 103*

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

Claims 22, 23,25,26,31,35 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Schenk et al. (WO 90/07351) in view of Velasquez et al. ('548).

As to claim 22, Schenk et al. disclose a method of treating a patient comprising the

steps of: supplying a predetermined amount of dry powder (11) to an inhalation device;

releasing a pressurized gas (figs.1-6) over a predetermined amount of dry powder to

create an aerosolized suspension (16) comprising powder suspended in air; and

inhaling the aerosolized suspension at a flow rate and volume sufficient to allow the

patient to absorb in the bloodstream a controlled dose of medicament.

The differences between Schenk et al. and claim 22 are insulin as the dry powder

medicament and the recited intended result of the insulin containing 2-10 times higher

the amount needed to be absorbed in the blood stream of a patient and the intended

result of 1-50 units of insulin being absorbed into a patient's bloodstream.

Velasquez et al. teach a variety of dry powder medicaments as inhalable powders

including insulin as a dry powder medicament for inhalation by a patient.

4



Art Unit: 3743

It would have been obvious to modify the dry powder in Schenk et al. to employ dry powder insulin as the medicament because it would have provided an easy and painless manner of delivering insulin to patients as taught by Velasquez et al..

As to the recited intended result of the amount of insulin employed and the amount of insulin being absorbed, it is submitted that the amount of insulin employed and the amount absorbed can be arrived at through mere routine obvious experimentation and observation. That is, the amount of insulin stored in the inhalation device and the amount being absorbed would vary in dependence upon the age, sex and severity of the diabetes of the patient being treated. Consequently, one of ordinary skill would realize that the amount stored and absorbed would need to be tailored to the particular patient's medical needs.

As to claim 23, inasmuch as Schenk et al. as modified by Velasquez et al. teach a method and device for treating diabetes, is stands to reason that the administration protocol would have included repeated inhalation (administration) of insulin to maintain an adequate concentration of medicament in a patient's bloodstream.

As to claim 25, Schenk et al. as modified by Velasquez et al. as discussed above also teach flowing at least a portion of the aerosolized suspension through a mouthpiece (20) on the device and into the patient's lungs in a manner sufficient to cause the patient to absorb a controlled quantity of insulin.

As to claim 26, inasmuch as Schenk et al. as modified by Velasquez et al. teach a method and device for treating diabetes, is stands to reason that the administration



Application/Control Number: 09/848,774                                              Page 5

Art Unit: 3743

protocol would have included repeated inhalation (administration) of insulin to maintain

an adequate concentration of medicament in a patient's bloodstream.

Claims 31,35 are substantially equivalent in scope to claims 22,23,25,26 and are

included in Schenk et al. as modified by Velasquez et al. for the reasons set forth above

with respect to claims 22,23,25,26.

As to the recited claimed limitations defining a controlled quantity of insulin which is

sufficient to achieve the desired result, Schenk et al. (page 3, lines 5-3; page 4, line 27-

37) disclose a device which maximizes the amount of aerosolized powder medicament

thereby facilitating maximum amounts of medicament inhaled and absorbed into a

patient's bloodstream. That is, given that Schenk et al. disclose aerosolizing most of the

medicament within the aerosolization chamber (16), the amount of medicament

available for inhalation by a patient is predictable.

**(11)    Response to Argument**

As pointed in the summary of the invention hereinabove, the instant (claimed)

invention defines a method of treating diabetes mellitus through the controlled inhalation

of insulin powder.

Extrinsic evidence to support the positions taken in the rejection above is taken from

Harrison's Principles of Internal Medicine, 13th edition, vol.2, pp.1986-1987 is as follows:

A patient suffering from this disease presents symptoms including an abnormally high

concentration of blood glucose; accordingly, the purpose of a treatment regimen is to

bring the concentration of blood glucose back to a value that is within a "normal" range

of blood glucose concentration values. In an effort to achieve the goal of "normal" blood





Application/Control Number: 09/848,774 Page 6
Art Unit: 3743

glucose a physician typically prescribes the administration of insulin. The quantity of

insulin that is administered to patients is defined in Units of insulin. Factors which

physicians into account when determining how many units of insulin to administer to a

given patient include a patient's age and body weight (e.g. adults of normal weight may

be started on 15-20 units a day); however, the administered amount is typically adjusted

when significant extra activity or exercise is anticipated.

Appellant's assertion that the PTO has not established a prima facie showing of

obviousness based upon Schenk et al. in view of Velasquez et al. and in light of known

treatment for diabetes mellitus with insulin is not persuasive. The propriety of the prior

art combination is not based upon an "obvious to try" motivation; rather it is based upon

the substitution of powdered insulin for the powdered medicament which is administered

using the inhaler of Schenk et al.. Additionally, one of ordinary skill would also recognize

that any powdered insulin administered using the inhaler of Schenk et al. as modified by

Velasquez et al. must be administered to patients under known guidelines of standard

medical practice in the treatment of diabetes mellitus.

Appellant's argument that a treatment for diabetes mellitus is not implicit in the

administration of powdered insulin using the inhaler of Schenk et al. as modified by

Velasquez et al. is not accurate because the use of the prior art inhaler to administer

powdered insulin would necessarily result in and would be exemplary of a treatment

method for diabetes mellitus by the administration of insulin.

Appellant's argument alleging a lack of express disclosure of an "effective amount" of

insulin being delivered to a patient is disagreed with because one of ordinary skill (i.e. a

7



▓▓▓▓▓▓▓▓▓    ▓▓▓▓    ▓▓▓▓▓▓▓

Application/Control Number: 09/848,774                                      Page 7
Art Unit: 3743

physician since insulin is prescription medicine) would realize the absolute criticality for

administering an amount of insulin that would effectively bring a patient's blood glucose

values into a "normal" range. While the prior art combination may not expressly disclose

a particular amount one of ordinary skill being equipped with known medical guidelines

for treatment of diabetes mellitus would know to make adjustments in the quantity of

powdered medicament in order to provide a dose which would effectively bring a

patient's blood glucose within a "normal" range.

As to appellant's arguments regarding the claimed dose of insulin (i.e. 1-50 units of

insulin), one of ordinary skill would realize the need to administer sufficient powdered

insulin to bring a diabetic patient's blood glucose within a "normal" range. Such a dose

amount can be arrived at through mere routine obvious experimentation and

observation in dependence upon patient's age and weight; moreover, extrinsic evidence

above shows that an adult of normal weight is started on 15-20 units per day. Finally, a

review of the instant specification reveals no criticality for a dose of insulin being 1-50

units.

As to appellant's arguments regarding the claimed amount of insulin in the

aerosolized suspension being 2-10 times higher than the amount needed to be

absorbed in the bloodstream, it is submitted that the amount of any aerosolized

medicament in any inhaler would need to exceed that which is intended to be absorbed

into a patient's bloodstream due to known losses of medicament to internal surfaces of

the inhaler, losses of medicament to nasal cavities, inside surfaces of a patient's mouth,

the back of a patient's throat. Extrinsic evidence to support these losses as well known

    

Application/Control Number: 09/848,774                          **Page 8**

Art Unit: 3743

to one of ordinary skill is found in Laube et al. U.S. Patent 5,320,094 at col.5, lines 35–

48. Finally, a review of the instant specification reveals no criticality for the amount of

insulin in the aerosolized suspension being 2-10 times higher than the amount needed

to be absorbed into a patient's bloodstream.

For the above reasons, it is believed that the rejections should be sustained.

Respectfully submitted,

AARON J. LEWIS

Primary Examiner

Art Unit 3743

Aaron J. Lewis

August 9, 2004

Conferees:

Henry A. Bennett

Supervisory Primary Examiner

Art Unit 3743

Henry Bennett

Supervisory Patent Examiner

Group 3700

Denise Esquivel

Supervisory Primary Examiner

Art Unit 3744

BOZICEVIC, FIELD & FRANCIS LLP

200 MIDDLEFIELD RD

SUITE 200

MENLO PARK, CA 94025

# EXHIBIT 6

BEST AVAILABLE COPY

RETURN

# THIRTEENTH EDITION

# HARRISON'S
# PRINCIPLES
# OF
# INTERNAL
# MEDICINE

## Volume 2

## Editors

**KURT J. ISSELBACHER**, A.B., M.D.

Mallinckrodt Professor of Medicine, Harvard Medical School; Physician and Director, Cancer Center, Massachusetts General Hospital, Boston

**EUGENE BRAUNWALD**, A.B., M.D., M.A. (Hon.), M.D. (Hon.), Sc.D. (Hon.)

Hersey Professor of the Theory and Practice of Medicine, Harvard Medical School; Chairman, Department of Medicine, Brigham and Women's Hospital, Boston

**JEAN D. WILSON**, M.D.

Charles Cameron Sprague Distinguished Chair and Professor of Internal Medicine; Chief, Division of Endocrinology and Metabolism, The University of Texas Southwestern Medical Center, Dallas

**JOSEPH B. MARTIN**, M.D., Ph.D., F.R.C.P. (C), M.A. (Hon.)

Professor of Neurology and Chancellor, University of California, San Francisco

**ANTHONY S. FAUCI**, M.D.

Director, National Institute of Allergy and Infectious Diseases; Chief, Laboratory of Immunoregulation; Director, Office of AIDS Research, National Institutes of Health, Bethesda

**DENNIS L. KASPER**, M.D.

William Ellery Channing Professor of Medicine, Harvard Medical School; Chief, Division of Infectious Diseases, Beth Israel Hospital; Co-Director, Channing Laboratory, Brigham and Women's Hospital, Boston

**McGRAW-HILL**
H alth Pr fessions Division

New York  St. Louis  San Francisco  Auckland  Bogotá  Caracas  Lisbon  London  Madrid
Mexico City  Milan  Montr al  New Delhi  San Juan  Singapore  Sydney  Tokyo  Toronto

*McGraw-Hill* 

*A Division of The McGraw-Hill Companies*

*Note:* Dr. Fauci's work as editor and author was performed outside the scope of his employment by the U.S. government. This work represents his personal and professional views and not necessarily those of the U.S. government.

HARRISON'S
# PRINCIPLES OF INTERNAL MEDICINE
Thirteenth Edition

Copyright © 1994, 1991, 1987, 1983, 1980, 1977, 1974, 1970, 1966, 1962, 1958 by McGraw-Hill, Inc. All rights reserved. Copyright 1954, 1950 by McGraw-Hill, Inc. All rights reserved. Copyright renewed 1978 by Maxwell Myer Wintrobe and George W. Thorn. Printed in the United States of America. Except as permitted under the United States Copyright Act of 1976, no part of this publication may be reproduced or distributed in any form or by any means, or stored in a data base or retrieval system, without the prior written permission of the publisher.

4 5 6 7 8 9 0   DOW DOW     9 8 7 6

F reign Language Editions

**ARABIC** (Thirteenth Edition)—McGraw-Hill Libri Italia srl (Est. 1996)
**CHINESE** (Twelfth Edition)—McGraw-Hill Book Company-Singapore © 1994
**CROATIAN** (Thirteenth Edition)—McGraw-Hill Libri Italia srl (Est. 1996)
**FRENCH** (Thirteenth Edition)—McGraw-Hill Libri Italia srl © 1995
**GERMAN** (Thirteenth Edition)—McGraw-Hill Libri Italia srl © 1995
**GREEK** (Twelfth Edition)—Parissianos © 1994
**ITALIAN** (Thirteenth Edition)—McGraw-Hill Libri Italia srl © 1995
**JAPANESE** (Eleventh Edition)—Hirokawa © 1991
**PORTUGUESE** (Thirteenth Edition)—McGraw-Hill/Nueva Editorial Interamericana © 1995
**SPANISH** (Thirteenth Edition)—McGraw-Hill Interamericana de España © 1994
**TURKISH** (Thirteenth Edition)—McGraw-Hill Libri Italia srl (Est. 1996)

This book was set in Times Roman by Monotype Composition Company. The editors were J. Dereck Jeffers and Stuart D. Boynton. The indexer was Irving Tullar; the production supervisor was Roger Kasunic; the designer was Marsha Cohen; R. R. Donnelley & Sons Company was printer and binder.

Library of Congress Cataloging-in-Publication Data

Harrison's principles of internal medicine—13th ed./editors,
    Kurt J. Isselbacher . . . [et al.]
        p.     cm.
    Includes bibliographical references and index.
    ISBN 0-07-032370-4 (1-vol. ed.) : 98.00 — ISBN 0-07-911169-6 (2
vol. ed. set) : 127.00 — ISBN 0-07-032371-2 (bk. 1). — ISBN
0-07-032372-0 (bk. 2)
    1. Internal medicine.  I. Harrison, Tinsley Randolph, 1900–
II. Isselbacher, Kurt J.  III. Title: Principles of internal
medicine.
    [DNLM: 1. Internal Medicine.     WB 115 P957 1994]
RC46.H333   1994
616—dc20
DNLM/DLC
for Library of Congress                          93-47393

with a reference standard of defined composition such as bread. Although in principle the approach is attractive because it measures actual glycemic response to foods, its applicability to the general diabetic population is not established. One of the problems is that a glycemic index determined for a food ingested by itself may not apply in a normal mixed meal.

The importance of diet in the management of diabetes varies with type of disease. In insulin-dependent patients, particularly those on intensive insulin regimens, the composition of the diet is not of critical importance, since adjustment of insulin can cover wide variations in food ingestion. In non-insulin-dependent patients not treated with exogenous insulin, more rigorous adherence to a fixed diet is required, since endogenous insulin reserve is limited. Such patients cannot respond to increased demand produced by excess calories or increased intake of rapidly absorbed carbohydrate.

**Insulin**  Insulin is required for treatment of all patients with IDDM and many patients with non-insulin-dependent disease. If the physician does not use oral agents (see below), all diet-unresponsive NIDDM subjects must be given the hormone. It is fairly easy to control the symptoms of diabetes with insulin, but it is difficult to maintain a normal blood sugar throughout 24 h even if one utilizes multiple injections of regular insulin or infusion pumps. In the Diabetes Control and Complications Trial (see below), where teams of health care workers attempted to return the blood glucose level to normal or near normal with much more frequent professional input than is usual in clinical situations, blood glucose levels and hemoglobin $A_{1c}$ concentrations remained above normal in most subjects. It is even more difficult to maintain normal blood sugars utilizing traditional insulin therapy given as one or two injections a day. Nondiabetic subjects maintain the plasma glucose concentration within a narrow range at all times despite episodic food intake. When a meal is eaten, a prompt rise in insulin release occurs such that absorbed carbohydrate is rapidly transported into the liver and other tissues. Even after meals, therefore, the plasma glucose level in normal subjects does not rise into the hyperglycemic or glycosuric range. As the plasma glucose level falls under the influence of insulin, release of the hormone is damped, and counterregulatory hormones enter the circulation to prevent hypoglycemia, ensuring smooth control of plasma glucose throughout the absorptive process. The patient treated with insulin by injection cannot reproduce these physiologic responses. If enough insulin is given to keep the postprandial glucose normal, inevitably too much insulin will be present during the postabsorptive phase, and hypoglycemia will result.

No single standard exists for patterns of administration of insulin, and treatment plans vary from physician to physician and with a given physician in different patients. Three treatment regimens will be described: conventional, multiple subcutaneous injections (MSI), and continuous subcutaneous insulin infusion (CSII). MSI or CSII is required in intensive treatment schedules designed to protect against complications. *Conventional insulin therapy* involves the administration of one or two injections a day of intermediate-acting insulin such as zinc insulin (lente insulin) or isophane insulin (NPH insulin) with or without the addition of small amounts of regular insulin. If the newly diagnosed subject is not in acute distress, therapy can be started as an outpatient, provided instructions in diet, insulin use, and monitoring are adequate and the physician or nurse-clinician can be reached by telephone for consultation. Adults of normal weight may be started on 15 or 20 units a day (the estimated daily insulin production rate in nondiabetic subjects of normal size is about 25 units a day). Obese patients, because of insulin resistance, may be started on 25 to 30 units a day. It is preferable to use the same quantity of insulin for several days before changing, the one exception being the hypoglycemic patient, for whom the dose should be decreased immediately unless a nonrecurrent cause of hypoglycemia (such as excessive exercise) is present. Generally, changes should be no more than 5 or 10 units per step. It is probable that a single injection of insulin provides adequate control only in patients who have some residual capacity for insulin secretion. Poorly controlled

| Blood glucose | | Regular insulin, units | |
|---|---|---|---|
| mmol/L | mg/dL | Breakfast (to be mixed with intermediate dosage) | Supper |
| 2.8–5.5 | 51–100 | 8 | 4 |
| 5.6–8.3 | 101–150 | 10 | 5 |
| 8.4–11.1 | 151–200 | 12 | 6 |
| 11.2–13.9 | 201–250 | 14 | 7 |
| 14.0–16.6 | 251–300 | 16 | 8 |
| >16.6 | >300 | 20 | 10 |

**TABLE 337-6  Adjusting Insulin Dosage in Conventional Insulin Therapy**

* Once the patient has mixed blood sugars in the reasonable range, a prescription can be written for varying the regular insulin dosage as illustrated. The prescription in this case was for a patient in reasonable control on 25 units of NPH plus 10 units of regular before breakfast and 10 units of NPH plus 5 units of regular before supper. Change in metabolic status may require adjustments in both intermediate insulin and the sliding scale of regular insulin.

patients should be placed on split therapy, with about two-thirds of the total insulin given before breakfast and the remainder before supper. Two injections are almost always used when the total dose reaches 50 or 60 units a day but are helpful at smaller doses as well, since the peak action of intermediate insulins appears to be dose-related; i.e., a low dose may exhibit maximal activity earlier and disappear sooner than a large dose. Many physicians routinely add regular insulin to the intermediate dose even at initiation of therapy. Thus, in a single-dose schedule, one might begin with 20 units of intermediate and 5 units of regular insulin rather than 25 units of intermediate alone. This practice is based on the concept that the regular insulin lowers the plasma glucose level rapidly, after which the more slowly absorbed insulin maintains the lowered level. Most patients on twice-daily insulin injections are also treated with a mixture of intermediate and regular insulin; e.g., 25 units NPH plus 10 units of regular before breakfast and 10 units of NPH plus 5 units of regular before supper. Commercial premixed insulin (70/30 intermediate/regular) is acceptable and convenient for many patients. All patients should be taught to decrease insulin when significant extra activity or exercise is anticipated. The proper decrement must be determined by trial and error, although a reduction of 5 to 10 units is a reasonable first step. The blood glucose–lowering effect of exercise is due primarily to increased energy demands in previously noncontracting muscle. Extra regular insulin can be taken before a meal that contains extra calories or food ordinarily not allowed (e.g., when the diabetic must eat out at a banquet or the teenager goes out on a date). For patients willing to self-monitor plasma glucose level, an algorithm for adjusting insulin can be provided. A typical protocol is shown in Table 337-6. Patients with complicated control problems may require hospitalization, where frequent plasma glucose determinations can guide therapy.

The *multiple subcutaneous insulin injection technique* most commonly involves administration of intermediate- or long-acting insulin in the evening as a single dose together with regular insulin prior to each meal. Home glucose monitoring by the patient is necessary if the goal is the return of the plasma glucose level to normal. One approach to initiation of therapy involves administration of 25 percent of the previous daily insulin dose in the patient's conventional regimen at bedtime as intermediate insulin (NPH or lente insulin), with the other 75 percent given as regular insulin divided such that 40, 30, and 30 percent is given 30 min before breakfast, lunch, and supper, respectively. Alternatively, a three-injection schedule can be utilized by omitting the night intermediate insulin and giving a long-acting insulin, such as insulin zinc extended (ultralente insulin) or protamine zinc insulin (PZI insulin), before the evening meal. Adjustments of dosage depend on response of the plasma glucose. A number of different protocols have been utilized, all of which represent sliding scales of insulin based on the plasma glucose level. A typical schedule based on home monitoring of the plasma glucose level is shown in

TABLE 337-7  Adjusting insulin dosage in a multiple-injection schedule*

**Initiation of therapy**
1  0.6 to 0.7 units insulin per kilogram body weight
2  25% NPH at 9 P.M.; 75% regular in divided doses
   (40% before breakfast, 30% before lunch, 30% before supper)
3  Adjust NPH every 48 h based on fasting blood glucose
   <3.3 mmol/L (<60 mg/dL)      −2 units
   >5.0 mmol/L (>90 mg/dL)      +2 units
4  Adjust regular insulin every 48 h based on 1-h postprandial glucose
   <3.3 mmol/L (<60 mg/dL)      −2 units
   >7.8 mmol/L (>140 mg/dL)     +2 units

**Daily therapy**
Preprandial glucose

| mmol/L | mg/dL | Regular insulin, units |
|---|---|---|
| <3.3 | <60 | −2 |
| 3.4–5.0 | 61–90 | No change |
| 5.1–6.7 | 91–120 | +1 |
| 6.8–8.3 | 121–150 | +2 |
| 8.4–11.0 | 151–200 | +3 |
| 11.1–13.9 | 201–250 | +4 |
| >13.9 | >250 | +6 |

* With initiation of therapy insulin dosage is changed until target range is reached (see Table 337-8). After initial stabilization a variable insulin schedule is prescribed to maintain tight control. For example, if the patient after initiation is found to generally require 12 units of regular insulin before breakfast but has a prebreakfast blood sugar of 8.9 mmol/L (160 mg/dL), 15 units of regular insulin instead of the usual 12 would be taken.

SOURCE: Adapted from Schiffrin and Belmonte.

Table 337-7. Individual patients may require different dosages. For specific details, the reader should consult one of the published papers utilizing the technique (e.g., Schiffrin and Belmonte). MSI can be effective in controlling the plasma glucose level and in some studies appears to match goals achieved with CSII.

*Continuous subcutaneous insulin infusion* involves use of a small battery-driven pump that delivers insulin subcutaneously into the abdominal wall, usually through a 27-gauge butterfly needle. With CSII, insulin is delivered at a basal rate continuously throughout the day, with increased rates programmed prior to meals. Adjustments in dosage are made in response to measured capillary glucose values in a fashion similar to that used in MSI. Ordinarily, about 40 percent of the total daily dose is given at the basal rate, the remainder being administered as preprandial boluses. There is little question that CSII can improve diabetic control relative to conventional therapy. Most patients report positive feelings of well-being as control improves. The danger of hypoglycemia is real, especially during the night in patients who maintain the plasma glucose consistently below 5.5 mmol/L (100 mg/dL). A fall in plasma glucose of 2.7 mmol/L (50 mg/dL) may not be important if the starting value is 8.3 mmol/L (150 mg/dL) but may be fatal if it occurs against a steady-state level of 3.3 mmol/L (60 mg/dL). Several deaths from hypoglycemia have occurred in pump users. There is also an increased frequency of diabetic ketoacidosis in persons utilizing CSII. Pumps should be prescribed only in disciplined and motivated patients who are followed by physicians with extensive experience in their use.

In some centers, catheters for the insulin infusion pumps have been placed intravenously rather than subcutaneously. While few difficulties have been reported, this procedure appears unwise for routine use. Intraabdominal insulin pumps with reservoirs refillable from outside the body have been tried on experimental protocols. At present, no advantage is apparent except that a pump does not have to be worn externally. Administration of insulin by nasal insufflation, although attractive in principle, has not proved practical and is no longer under commercial development.

For surgical procedures in diabetic patients, intermediate insulin is omitted and treatment is carried out with regular insulin alone. An effective method is to add 10 to 20 units of insulin to a liter of 5% glucose in water with infusion at a rate of 100 to 150 mL/h. Measurement of plasma glucose in capillary blood allows change of rate to avoid significant hypo- or hyperglycemia. It is also possible

to administer 10 units of regular insulin subcutaneously and infuse 5% or 10% glucose at rates sufficient to avoid major changes in glucose concentration. Following surgery, a sliding scale can be constructed for use in postoperative management.

**Types of Insulin**  A variety of insulins are available for use in the treatment of diabetes. Rapidly acting preparations are used in diabetic emergencies and in CSII and MSI programs. Intermediate-acting preparations are used in conventional and MSI regimens. Long-acting formulations are used almost exclusively in three-injection MSI schedules. Peak effects and duration vary from patient to patient and depend not only on route of administration but on dose. Insulin action in patients treated for long periods appears to be delayed, probably because of the presence of anti-insulin antibodies in plasma. In one study in diabetic subjects, regular insulin given subcutaneously had its onset of action at about 1 h, reached a peak at 6 h, and had measurable effects on average for 16 h, whereas in normal persons onset is within minutes, maximal action is around 2 h, and duration is only 6 to 8 h. With NPH insulin, diabetic patients exhibited an onset of action at 2.5 h, a peak at 11 h, and a total period of action of 25 h, more closely approximating values in normal subjects.

Commercial insulins are prepared in concentrations of 100 units per milliliter (U100), although higher concentrations can be obtained (e.g., U500). All animal insulins are purified such that proinsulin contamination is extremely low. Most patients are now treated with synthesized "human" insulin. The amino acid sequence is identical to that of the human hormone, and biologic activity appears to be equivalent. Complications of insulin therapy such as insulin allergy, fat atrophy, and fat hypertrophy are less common than with animal insulins but still occur.

Lente and NPH insulin are used in most conventional therapy and are roughly equivalent in biologic effects, although lente appears to be slightly more immunogenic and to mix less well with regular insulin than does NPH.

**Self-monitoring of glucose**  For many years, effectiveness of treatment for diabetes was followed by reviewing symptoms (such as frequency of nocturia) and measurement of glucose in the urine by semiquantitative techniques. Since the renal threshold for glucose in normal persons is in the range of 10 to 11 mmol/L (180 to 200 mg/dL) plasma glucose and may increase with the appearance of renal disease, assessment of glycosuria is of little value. Most insulin-requiring patients now monitor control and alter therapy based on self-measurement of the capillary blood sugar. In addition to the fact that such measurements are necessary in all treatment schedules utilizing variable insulin dosage, the ability to assess the blood glucose as needed has other positive benefits. It bestows a sense of confidence and independence in the patient, has a reinforcing effect on therapeutic goals (e.g., the effect of dietary indiscretion can be immediately seen), serves to give early warning of incipient hypoglycemia, and allows documentation of hypoglycemia when suggestive symptoms are present.

Although the blood glucose level can be estimated visually utilizing reagent strips, it is generally preferable to use an instrument for readings. This is so because it is difficult for many patients to extrapolate accurately between the color changes and because subjective wishes may influence the extrapolation. It is harder to ignore a number appearing in a machine. A variety of glucose analyzers are available. Cost of equipment is reasonable, and many insurance carriers reimburse its purchase. The patient needs to have supervised training in the technique, and simultaneous checks of the blood sugar in a laboratory should be done periodically to test the accuracy of the self-analysis. Repeated studies show that patients can measure blood glucose accurately using these techniques.

Although urine testing for glucose is now rarely used to follow diabetes, the measurement of ketones in the urine remains important.

**Goals of therapy**  Intensive insulin therapy designed to control the blood glucose level as near normal as possible has for many years been considered mandatory during pregnancy and after renal transplantation. Maintenance of a normal blood glucose level during

# EXHIBIT 7

AERX058CON3

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Applicants | : | Gonda et al. |
| Serial No. | : | 09/848,774 |
| Filed | : | May 3, 2001 |
| For | : | A METHOD OF TREATING DIABETES MELLITUS IN A PATIENT |
| Examiner | : | Aaron J. Lewis |
| Group Art Unit | : | 3761 |

---

**EXPRESS MAIL LABEL No. EL 914760385US**

**CERTIFICATE OF TRANSMISSION UNDER 37 C.F.R. 1.10**

Date of Deposit: October 12, 2004.

I hereby certify that this paper is being deposited with the United States Postal Service as "EXPRESS MAIL POST OFFICE TO ADDRESSEE" under 37 C.F.R. 1.10 on the date indicated above and is addressed to MAIL STOP APPEAL BRIEF - PATENTS, Commissioner for Patents
P.O. Bo 1450
Alexandria, VA 22313-1450.

| _Brian Arnold_ | |
|---|---|
| Name | |
| _Brian Arnold_ | October 12, 2004 |
| Signature of Person mailing Paper or Fee | Date of Signature |

---

### REPLY BRIEF

Sir:

Appellants hereby reply to the Examiner's Answer, pursuant to 37 C.F.R. § 1.193, in their appeal of the final rejection of the claims presently pending in the above-referenced application. This Reply Brief is being submitted as of right within two months of the date of the Examiner's Answer, which was mailed in error to the previous attorney of record in the application. Appellants request that future correspondence be directed to the address identified in the most recent Request for Change of Correspondence Address (Customer Number 23650, copy enclosed), rather than to the prior representative.

Serial No.: 09/848,774, filed May 3, 2001                    Docket No: AERX058CON3
Page 2 of 13

The PTO is hereby authorized to charge any necessary payments, or credit any

overpayments, to Deposit Account No. 23-1703.

### I.    NATURE AND STAGE OF THE APPEAL

This is an appeal from the decision of the Primary Examiner in an Office Action dated

April 15, 2003, finally rejecting claims 22-38, all of the claims of the above-referenced

application, and the Advisory Action dated July 3, 2003, denying Appellants' request for

reconsideration.

Claims 22-38 have been rejected under 35 U.S.C. § 103(a) as unpatentable over Schenk,

WO 90/07351 in view of Velasquez, U.S. Patent No. 5,192,548.

The Application was amended concurrently with the filing of the present appeal. Now

claims 22, 23, 25, 26, 31 and 35 remain pending in the application, as amended.

Appellants filed a Notice of Appeal on October 10, 2003, with the corresponding fee, and

an Appeal Brief, fee, and Amendment on May 10, 2004.

An Examiner's Answer was mailed on August 12, 2004, to an incorrect address.

### II.    SUMMARY

#### A.    The Claimed Invention

The claimed invention relates to the delivery of a controlled dose of insulin to the

*bloodstream* of a patient *via inhalation*. The invention is not directed merely to the delivery of a

medicament to a patient's lungs, as the rejection of the claims and the Examiner's Answer both,

in effect, suppose.

The claims require not only this key feature, but also call out additional limitations:



Serial No.: 09/848,774, filed May 3, 2001                    Docket No: AERX058CON3
Page 3 of 13

- claim 23 requires for each treatment that the dose delivered to the blood remains relatively constant;

- claim 25 requires a controlled dose sufficient to achieve satisfactory blood glucose control;

- claim 31 requires absorption of 1-50 units of insulin; and

- claim 35 requires the dose absorbed into the blood be controlled and repeatable.

### B.   Appeal Brief

Appellants' Appeal Brief described in detail how:

- the rejection of the claims failed to establish a *prima facie* case of unpatentability;

- the applied references fail to teach or suggest the invention as a whole, which includes *controlled delivery of insulin to the bloodstream* of a patient *through inhalation,* as well as other limitations; indeed the references neither recognize the problems associated with this delivery, which is critical for the treatment of diabetes with insulin, nor even begin to provide a solution;

- in an attempt to supply disclosure missing from the applied references the PTO erred as a matter of law in applying an "obvious to try" standard; and

- the PTO's rejection of the pending claims also relies impermissibly on an "implicit" or inherent obviousness standard.

### C.   Examiner's Answer

The Examiner's Answer does not address or overcome Appellants' arguments and

overlooks many of them.   In the Examiner's Answer the PTO:

- fails to show that the cited references, whether alone or in combination, recognized or disclosed getting medicament into the *bloodstream* of a patient *through inhalation,* much less getting into the bloodstream a *controlled dose* of insulin necessary for the safe treatment of diabetes, and explicity required by the pending claims;

- acknowledges the deficiencies of the rejection by attempting to include a third reference into the combination of references relied upon in support of the rejections:  Harrison's Principles of Internal Medicine, which was discussed by Appellants in the pending application at para. 00235, and which does not relate to delivery of insulin through inhalation;



- contends that "one of ordinary skill would also recognize that [Schenk] as modified by [Velasquez] must be administered to patients under known guidelines of standard medical practice in the treatment of diabetes mellitus" – despite that there were *no such guidelines* for treatment of diabetes through administration of powdered insulin to the bloodstream via inhalation prior to the claimed invention;

- asserts, without factual basis and contrary to the teachings of the involved application, that any delivery of insulin using an inhaler would "necessarily result in and would be exemplary of a treatment for diabetes"  (Answer at 6);

- incorrectly contends that insulin "is a prescription medicine" and that one of ordinary skill is therefore a physician (Answer, bridging pp.6-7);

- admits the prior art combination does not expressly disclose any amounts of insulin being delivered to the bloodstream;

- argues, again without any factual basis, that in the course of treatment of diabetes through insulin inhalation "one of ordinary skill being equipped with known medical guidelines for treatment of diabetes mellitus would know to make adjustments in the quantity of powdered medicament in order to provide a dose which would effectively bring a patient's blood glucose within a 'normal' range";

- fails to identify any legal authority in support of its persistent reliance on the legally erroneous "obvious to try" standard, ignoring the claimed subject matter as a whole and, without any factual support whatsoever, arguing that the recited controlled dose "can be arrived at through mere routine obvious experimentation" (Answer at 7), when the references do not even suggest or hint that it is possible to deliver a controlled dose into the bloodstream via inhalation of powdered insulin;

- similarly, fails to identify any legal authority in support of its legally erroneous use of an implicit or inherent obviousness standard and argues, without any factual basis and contrary to the teachings of the involved application, that any inhalation of insulin would "necessarily result in and would be exemplary of a treatment for diabetes" (Answer at 7), when none of the applied references so much as hints at a treatment for diabetes that comprises delivery into the bloodstream of a controlled dose of insulin via the lungs; and

- raises apparently new grounds in support of the rejection, without designating them as such under 37 C.F.R. §§ 41.39(a)(2), (b), in particular:  (1) adding Harrison to the combination of Schenk and Velasquez; (2) alleging that specific values and ranges recited in the pending claims are not critical; and (3) alleging that Laube, which relates to liquid aerosolization, has a direct and relevant bearing on powdered insulin inhalation (Answer at pp. 7-8).

Serial No.: 09/848,774, filed May 3, 2001
Page 5 of 13

Docket No: AERX058CON3

### III.    REPLY

#### A.    The Examiner's Answer Reflects a Continuing Misapprehension of the Applied References

The PTO has misread and incorrectly applied the references against the pending claims. None of the three references now relied on in rejecting the claims (Schenk, Velasquez or Harrison), whether alone or in combination, discloses or suggests delivery of anything to the *bloodstream* of a patient through inhalation, let alone a controlled dose of insulin.

Schenk merely discloses an inhaler. At most this would suggest delivery of a substance to the *lungs* of a patient. Schenk has nothing to do with delivery to a patient's *bloodstream* of a controlled dose of medication and does not recognize or mention a need to maintain any level of delivery of a drug to the *bloodstream* of a patient, much less a controlled delivery of specific quantities.

Disclosing only that a blister pack can contain insulin, Velasquez, too, lacks any disclosure of delivery of anything, and certainly discloses nothing about delivery of a medicament *via the lungs* and into the *bloodstream* in a precisely controlled manner. In fact, Velasquez makes only passing reference to insulin as only one in a long list of forty or so other medications that can be supplied in a powdered form and does not suggest anything about how they may be administered via an inhaler to achieve a controlled bloodstream dose.

Harrison, identified by Appellants in their application and now for the first time relied on by the PTO in the Examiner's Answer, has nothing to do with inhalation of insulin and is without relevance to the pending claims. Harrison relates only to conventional subcutaneous injection of insulin and does not teach anything with respect to absorption of inhaled powdered insulin.

EXPRESS MAIL LABEL NO.: EL 914760385US
NEWYORK 4375010 (2X)



Serial No.: 09/848,774, filed May 3, 2001          Docket No: AERX058CON3
Page 6 of 13

There is absolutely no teaching in the cited references that inhaled, powdered insulin could be used safely and effectively to treat diabetes. Similarly, the references provide no teaching that an inhaler could be used in delivering controlled doses of a powdered medicament to the bloodstream of a patient. Still further, the references fail to teach that, by inhaling powdered insulin, one could get a controlled dose into the *bloodstream* with the precision necessary to treat diabetes. The applied references completely fail to disclose how one would be able to use an insulin inhaler to do so, much less to deliver certain quantities to the lungs and, by virtue of this delivery, controlled quantities to the bloodstream.

In the absence of any suggestion in the prior art of the claimed subject matter as a whole, the PTO's rejection has relied on the knowledge of Applicants' invention to pick and choose among the cited disclosures, and even to find disclosures in the art where none is actually present, in order to deprecate the claimed invention.

These shortcomings are fatal to the rejection. They cannot be, and are not, overcome by the PTO's vague, factually unsupportable, and legally erroneous "obvious to try"/routine experimentation and "implicit obviousness" arguments.

**B.    PTO Erroneously Relies on Non-Existent "Known Guidelines"**

In an attempt to plug the gaps in the applied references, the PTO alludes to "known guidelines." (Answer at 6). But the PTO has not identified *any* guidelines for the delivery of powdered insulin to the *bloodstream* of a patient through *inhalation.* To the extent the "known guidelines" are intended to refer to the Harrison reference, those contemplate delivery through *injection*, not *inhalation.* If anything, Harrison teaches away from inhalation by focusing specifically on injection as necessary for the type of control necessary for effective and safe treatment of diabetes.

EXPRESS MAIL LABEL NO.: EL 914760385US

NEWYORK 4375010 (2K)



Serial No.: 09/848,774, filed May 3, 2001                    Docket No: AERX058CON3
Page 7 of 13

## C.  No Legal Authority Supports the PTO's Actual Use of "Obvious to Try" and "Implicit" or Inherent Obviousness Standards

In their Appeal Brief, Appellants explained in detail and with citation to appropriate legal

authority how the PTO, in lodging the present rejections, applied erroneous legal standards. In

an attempt to supply the acknowledged deficiencies in the applied references, the PTO applied

(1) an impermissible "obvious to try" legal standard when relying on "mere routine obvious

experimentation and observation", and (2) an equally inappropriate "implicit" or inherent

obviousness standard with respect to any inhalation of insulin "necessarily" resulting in a

controlled delivery of insulin to the bloodstream for purposes of treating for diabetes.

The PTO has not addressed these legal issues, as it is required to do by MPEP § 1208.

Though it now contends that "[t]he propriety of the prior art combination is not based

upon an 'obvious to try' motivation...," this is not what Appellant argued. That combination,

even if made, does not show controlled delivery of insulin via inhalation to the bloodstream of a

patient. What Appellant argued was that the PTO's contention that "the amount of insulin

employed and the amount of insulin being absorbed...can be arrived at through mere routine

obvious experimentation and observation" represents a legally prohibited "obvious to try"

standard of Patentability. (Appeal Brief at 11). Indeed, there can be no other way to view the

PTO's rejection given that the references (1) fail to offer any hint or suggestion that one could

treat diabetes through inhalation of powdered insulin and (ii) fail to show that inhalation of

powdered insulin would result in absorption of a controlled dose into the bloodstream. The

references offer no suggestion of a quantity of insulin, a relationship between inhaled insulin and

absorbed insulin, or a method for achieving a controlled dose of insulin to the bloodstream based

on inhalation of insulin in powdered form.

Serial No.: 09/848,774, filed May 3, 2001                    Docket No: AERX058CON3
Page 8 of 13

The PTO has ignored this argument and its supporting legal authority, in disregard of MPEP § 1208, and has persisted with arguments of the following sort: "[o]ne of ordinary skill being equipped with known medical guidelines for treatment of diabetes mellitus would know to make adjustments in the quantity of powdered medicament in order to provide a dose which would effectively bring a patient's blood glucose within a 'normal' range." (Answer at 7). Yet the PTO remains silent as to *how* one would "know to make adjustments" through inhalation without the benefit of the present application, and *how* one would go about making the "adjustments" even if it had been known they could be made. The PTO does not state what in the references would motivate one even to attempt to treat diabetes by inhaling powered insulin. That powdered insulin could be inhaled would, at best, be a suggestion to try, which the Appeal Brief made clear is an impermissible standard for rejection of patent claims.

Also in disregard of MPEP § 1208, the PTO has overlooked Appellants' argument that the PTO's reliance on an implicit or inherent obviousness standard constitutes legal error.

**D.    The Examiner's Answer is Based, in Part, on Misstatements of Fact**

The PTO has asserted without any factual basis, and contrary to the teachings of the involved application, that any delivery of insulin using an inhaler would "necessarily result in and would be exemplary of a treatment for diabetes." (Answer at 6). This contention is gravely mistaken. If followed, it could lead either to harmfully ineffective diabetes treatment or to the injury and possible death of the diabetic patient.

Similarly, the PTO contends that insulin "is a prescription medicine" and that one of ordinary skill is therefore a physician. (Answer, bridging pp. 6-7). This, too, is incorrect. Insulin does not generally require a prescription in the U.S.

EXPRESS MAIL LABEL NO.: EL 914760385US

NEWYORK 4175010 (2X)

Serial No.: 09/848,774, filed May 3, 2001                    Docket No: AERX058CON3
Page 9 of 13

### E.    New Grounds of Rejection

New grounds for rejection may not be raised in an Examiner's Answer. 37 C.F.R. §

1.193(a)(2); MPEP § 1208.01. The Examiner's Answer nevertheless contains several apparent

new grounds of rejection.

The Examiner's Answer, for the first time, relies on the following reasoning:

i.    "one of ordinary skill would also recognize that any powdered insulin
administered using the inhaler of Schenk et al as modified by Velasquez et al.
must be administered to patients under *known guidelines of standard medical
practice* in the treatment of diabetes mellitus." (Examiner's Answer at 6,
emphasis added);

ii.    "review of the instant specification reveals no criticality for a dose of insulin
being 1-50 units" (Examiner's Answer at 7);

iii.    "review of the instant specification reveals no criticality for the amount of insulin
in the aerosolized suspension being 2-10 time higher than the amount needed to
be absorbed into a patient's bloodstream" (Examiner's Answer at 8);

iv.    "it is submitted that the amount of any aerosolized medicament in any inhaler
would need to exceed that which is intended to be absorbed into a patient's blood
stream due to losses of medicament" (Examiner's Answer at 7, citing Laube).

None of these new grounds of rejection were necessitated by the Appeal Brief and each of them

is without merit. Appellants respectfully request that they be withdrawn.


## IV.    CONCLUSION

As is described in detail above, the Examiner's Answer fails to adequately address, or in

several instances address at all, the points raised in Appellants' Brief. In particular, there are

three references now apparently relied upon by the Examiner. All three when read together fail

to teach that a controlled dose of insulin can be delivered to the patient's bloodstream via

inhalation of a powdered insulin. Even assuming, without conceding, that Schenk and Velasquez

could be understood to suggest inhalation of powdered insulin, they still would not suggest that it

EXPRESS MAIL LABEL NO.: EL 914760385US

NEW YORK 4375010 (2X)



  

is possible to get absorption of the controlled quantities of insulin into the bloodstream necessary

to control blood glucose levels in a diabetic patient. Harrison merely discloses treatment of

diabetes to achieve normal blood glucose levels through subcutaneous injection, but has nothing

to do with inhalation of insulin.

In addition to the above flaws, the rejection and the Examiner's Answer rely on erroneous

legal standards, misstatements of fact, and impermissible newly-raised grounds of rejection. In

view of the many errors and omissions in the Examiner's Answer, and for the reasons set forth

above, Appellants respectfully submit that, claims 22, 23, 25, 26, 31 and 35 were improperly

rejected as unpatentably obvious and are allowable over the cited art. The PTO has erred.

Applicants request reversal of the rejection.


Dated: October 12, 2004                          Respectfully submitted,

                                                 Scott T. Weingaertner
                                                 Reg. No. 37,756
                                                 Attorney for Applicants

                                                 Customer No. 007470
                                                 White & Case LLP
                                                 Direct Line: (212) 819-8404



Serial No.: 09/848,277 filed May 3, 2001                    Docket No: AERX058CON3
Page 11 of 13

OCT 1 2 2004

## APPENDIX OF CLAIMS

22.    A method for treating diabetes mellitus in a patient comprising the steps of:

    a.    supplying a predetermined amount of dry insulin powder to an inhalation device;

    b.    releasing a pressurized gas over the predetermined amount of dry insulin powder to create an aerosolized suspension comprising powder suspended in air, wherein the aerosolized suspension contains an amount of insulin that is 2-10 times higher than the amount needed to be absorbed in the bloodstream of the patient; and

    c.    inhaling the aerosolized suspension at a flow rate and volume sufficient to allow the patient to absorb in the bloodstream a controlled dose of insulin that comprises between 1-50 units of insulin.

23.    The method of claim 22, wherein steps a-c may be repeated periodically as needed to treat the patient and wherein the amount of insulin supplied to the bloodstream in step c remains relatively constant for each repetition of steps a-c.

25.    A repeatable method of regulating blood glucose levels in a human patient, the method comprising the steps of:

    a.    supplying a fixed quantity of dry insulin powder to a portion of a hand held inhalation delivery device;

    b.    propelling a gas over the fixed quantity of dry powder to produce, in a repeatable manner, an aerosolized suspension of insulin, the aerosolized suspension

Serial No.: 09/848,774, filed May 3, 2001                    Docket No: AERX058CON3
Page 12 of 13

containing more insulin than is required in the bloodstream of the patient to

achieve a satisfactory blood glucose level; and

c.  flowing at least a portion of the aerosolized suspension through a mouth piece on

the device and into the lungs of the patient in a manner sufficient to cause the

patient to absorb in the patient's bloodstream a sufficient, controlled quantity of

insulin to achieve acceptable blood glucose level following treatment.

26.    The method of claim 25, wherein steps a-c may be repeated periodically as needed to

treat the patient and wherein the amount of insulin supplied to the bloodstream in step

c remains relatively constant for each repetition of steps a-c.

31.    A repeatable method of lowering a patient's serum glucose level to acceptable value,

the method comprising the steps of:

a.  supplying a predetermined amount of dry insulin powder to a medical device;

b.  releasing a compressed gas over the dry insulin powder to form a suspension

comprised of dry insulin powder and air; and

c.  inhaling at least a portion of the suspension at a flow rate and volume sufficient to

deposit a sufficient, controlled quantity of insulin in the patient's lungs so that the

patient absorbs into the blood between 1 and 50 units of insulin, thereby lowering

the patient's blood glucose level to an acceptable value between 50 mg/dl and

300mg/dl.

35.  (Amended) A method of administering insulin to a diabetic patient to control serum

glucose levels via a hand held inhalation device, the method comprising the steps of:

EXPRESS MAIL LABEL NO.: EL 914760385US

NEW YORK 457501O (2X)

Serial No.: 09/848,774, filed May 3, 2001                    Docket No: AERX058CON3
Page 13 of 13

    a.   supplying a predetermined quantity of insulin powder to a portion of the device;

    b.   aerosolizing the insulin powder to form a cloud of insulin within the device, the cloud comprised of air and suspended insulin particles, the quantity of insulin particles being 2-10 times the dosage of insulin required to be delivered into the patient's blood to achieve acceptable blood glucose level;

    c.   administering to the patient's bloodstream via the patient's lungs a sufficient controlled and repeatable quantity of insulin from the cloud to produce an acceptable blood glucose level in the patient.