## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NOVO NORDISK A/S, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No: 06-1896 (CKK) |
| | ) | |
| JON W. DUDAS, | ) | Judge Colleen Kollar-Kotelly |
| Under Secretary of Commerce for | ) | |
| Intellectual Property and | ) | ECF |
| Director of the United States Patent | ) | |
| & Trademark Office, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

### NOVO NORDISK'S NOTICE OF ERRATA CONCERNING ITS STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE IN SUPPORT OF NOVO NORDISK'S MOTION FOR SUMMARY JUDGMENT ADJUDGING THAT NOVO IS ENTITLED TO A PATENT AND AUTHORIZING THE DIRECTOR TO ISSUE LETTERS PATENT

PLEASE TAKE NOTICE THAT Plaintiff Novo Nordisk hereby files this Notice of Errata Concerning its Statement of Material Facts as to Which There Is No Genuine Issue in Support of Novo Nordisk's Motion for Summary Judgment Adjudging that Novo is Entitled to a Patent and Authorizing the Director to Issue Letters Patent.

Novo hereby amends the following internal paragraph references:

In paragraph 112, the reference to ¶ 102, has been changed to ¶ 110;

In paragraph 121, the reference to ¶ 102, has been changed to ¶ 110;

In paragraph 123, the reference to ¶ 113, has been changed to ¶ 122;

In paragraph 139, the reference to ¶ 129, has been changed to ¶ 138;

In paragraph 141, the reference to ¶ 131, has been changed to ¶ 140;

In paragraph 153, the reference to ¶ 143, has been changed to ¶ 152;

In paragraph 154, the reference to ¶ 144, has been changed to ¶ 153; and

In paragraph 158, the reference to ¶ 148, has been changed to ¶ 157.

Attached as Exhibit A is a complete copy of Novo's Corrected Statement of Material Facts as to Which There Is No Genuine Issue in Support of Novo Nordisk's Motion for Summary Judgment Adjudging that Novo is Entitled to a Patent and Authorizing the Director to Issue Letters Patent.

Dated: Washington, D.C.
April 3, 2008

Respectfully submitted,

_____/s/_____
Margaret K. Pfeiffer  (D.C. Bar No. 358723)
Susan Kaufmann Nash  (D.C. Bar No. 484088)
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue, N.W.
Washington, D.C. 20006-5805
Tel.:  (202) 956-7500
Fax:  (202) 956-6330

*Counsel for Plaintiff Novo Nordisk A/S*

OF COUNSEL:

Robert Schaffer
Samuel S. Woodley
DARBY & DARBY P.C.
805 Third Avenue
New York, New York 10022
Tel.:  (212) 527-7700
Fax:  (212) 527-7701

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NOVO NORDISK A/S,  )
          )
          Plaintiff,  )
    v.      )     Case No: 06-1896 (CKK)
          )
JON W. DUDAS,    )     Judge Colleen Kollar-Kotelly
Under Secretary of Commerce for  )
Intellectual Property and    )     ECF
Director of the United States Patent  )
& Trademark Office,    )     (Opposition and Cross-Motion
          )     due May 19, 2008)
          )
          Defendant.  )
          )

## CORRECTED STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE IN SUPPORT OF NOVO NORDISK'S MOTION FOR SUMMARY JUDGMENT ADJUDGING THAT NOVO IS ENTITLED TO A PATENT AND AUTHORIZING THE DIRECTOR TO ISSUE LETTERS PATENT

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rules 7(h) and 56.1, Novo Nordisk A/S ("Novo") sets out below its statement of material facts as to which there are no genuine issues, in support of Novo Nordisk's Motion for Summary Judgment Adjudging that Novo Is Entitled to a Patent and Authorizing the Director to Issue Letters Patent.

**Parties**

1.      Novo is a corporation organized and existing under the laws of the Kingdom of Denmark, and has its principal place of business at Novo Allé, 2880 Bagsværd, Denmark.

2.      The Defendant is the Honorable Jon W. Dudas, in his official capacity as

Under Secretary of Commerce for Intellectual Property and Director of the United States

Patent and Trademark Office ("PTO"), having offices at 600 Dulany Street, Alexandria,

Virginia, 22314.

**Materials Relied Upon to Support Novo's Motion**

3.      In filing this Motion, Novo relies upon:

(i)      its Memorandum of Points and Authorities in Support of its

Motion for Summary Judgment Adjudging that Novo Is Entitled to a Patent and

Authorizing the Director to Issue Letters Patent;

(ii)      this Statement of Material Facts as to Which There is No Genuine

Issue in Support of Novo Nordisk's Motion for Summary Judgment Adjudging that Novo

Is Entitled to a Patent and Authorizing the Director to Issue Letters Patent;

(iii)      Declaration of Susan K. Nash, executed April 2, 2008, and

Exhibits thereto:

(a)      Expert Witness Report of Novo's expert Ronald G. Crystal,
dated Jan. 7, 2008, attached as Ex. A ("CR");

(b)      Expert Witness Report of the PTO's expert Professor
Myrna B. Dolovich dated Feb. 4, 2008, attached as Ex. B ("DR");

(c)      Transcript of Myrna B. Dolovich's Deposition, taken
Feb. 12, 2008, attached as Ex. C ("DT");

(d)      Gänsslen, M., *Über Inhalation von Insulin*, Klin.
Wochenschr. 4 (1925) and English translation, attached as Ex. D;

(e)      Myrna A. [sic] Dolovich, *Influence of Inspiratory Flow
Rate, Particle Size, and Airway Caliber on Aerosolized Drug Delivery to the Lung*, 45
Respiratory Care 597 (June 2000), Exhibit 3 to Deposition of the USPTO's Expert
Professor Myrna B. Dolovich, attached as Ex. E;

(f)    Defendant USPTO's Second Supplemental Objections and Responses to Plaintiff's Requests for Admission, dated March 14, 2008, attached as Ex. F ("Def. Resp. to Req. for Admis.");

(g)    Defendant USPTO's Second Supplemental Objections and Responses to Plaintiff's Interrogatories, dated Feb. 19, 2008, attached as Ex. G ("Def. Resp. to Pl.'s Interrog.");

(h)    U.S. Patent No. 5,643,868 (filed on Jun. 6, 1995), attached as Ex. H; and

(i)    Recorded Assignments of U.S. Patent Application 09/848,774, attached as Ex. I; and

(iv)    the Administrative Record for Application No. 09/848,774, filed by the PTO on March 21, 2008 (referenced by Tab and consecutive pagination numbers).

4.    The experts are in agreement as to all material facts.  At the deposition of the PTO's expert, Myrna B. Dolovich, a professional engineer, Ms. Dolovich testified that she had addressed all of the statements in Dr. Crystal's Report that she considered to be "both important and incorrect."  (DT 93:11 – 94:5.)  She addressed only specific points in paragraphs 35, 36, 37, 53 and 54 of Dr. Crystal's Report in her own Report. (DR ¶¶ 12-17.)  Even as to the minor parts of Dr. Crystal's Report with which she took issue in her Report, on cross-examination Ms. Dolovich retracted these criticisms.  (*See* DT 135:10-18 (admitting Schenk was designed to treat diseases of the lung and to reach only the airways, not the alveoli); DT 171:11 – 172:5 (factors other than size of particles affect deposition in the lungs); DT 227:12 – 232:15 (cannot rely on Harrison for dosing without extensive experimentation in laboratory); DT 162:1-12 (Ms. Dolovich did not make the statement that "all of the medication on the peripheral airways is absorbed into the bloodstream," much less that all medication *inhaled* is absorbed (as the Board declared).  She said only that a "portion" of medication that reaches the peripheral airways "may be absorbed."  She was not prepared to take "a leap of faith" to say that

even once all of the medication that reaches and is deposited on the peripheral airways is absorbed into the bloodstream); DT 109:17-21, 106:16 – 107:5 (admitting that her Report's use of the term "peripheral airways" *excludes* the alveoli and that she does not mean that any device that is designed to treat asthma is necessarily designed to deliver medication to the alveoli.  Since Dr. Crystal addresses delivery of medication to the alveoli, Ms. Dolovich does not contradict him); DT 191:11-14 (the "methods" referred to in her Report as being in existence by January 29, 1993, and "familiar" to persons of skill in the art were methods "of being able to characterize an aerosol," for "capturing an emitted dose" and for "assaying drugs," not methods for administering insulin by inhalation to control blood glucose levels.).)

**'774 Patent Application**

5.      Novo is the assignee, from Aradigm Corporation, of U.S. Patent Application No. 09/848,774 ("the '774 Application"), entitled "Method of Treating Diabetes Mellitus in a Patient," which was filed with the PTO on May 3, 2001.  (Admin. R. Tabs 1-2; *see also* '774 Application as published, attached as Ex. 4 to Ex. A of the Nash Declaration.)

6.      The '774 Application claims methods whereby dry powder insulin is supplied to an inhalation device, aerosolized, and inhaled by the patient, in a way that allows the patient to absorb a controlled dose of insulin into his or her bloodstream. (Amendment After Final, dated May 10, 2004, Admin. R. Tab 23.)  These methods achieve consistent, reproducible dosing of the inhaled insulin.  (CR ¶ 31.)

7.     As presently amended by the Amendment After Final, dated May 10, 2004, the '774 Application contains pending claims 22, 23, 25, 26, 31, and 35, of which 22, 25, 31, and 35 are independent. (Admin. R. Tab 23.)

8.     The pending claims are as follows:

22.     A method for treating diabetes mellitus in a patient comprising the steps of:
a.  supplying a predetermined amount of dry insulin powder to an inhalation device;
b.  releasing a pressurized gas over the predetermined amount of dry insulin powder to create an aerosolized suspension comprising powder suspended in air, wherein the aerosolized suspension contains an amount of insulin that is 2-10 times higher than the amount needed to be absorbed in the bloodstream of the patient; and
c.  inhaling the aerosolized suspension at a flow rate and volume sufficient to allow the patient to absorb in the bloodstream a controlled dose of insulin that comprises between 1-50 units of insulin.

23.     The method of claim 22, wherein steps a-c may be repeated periodically as needed to treat the patient and wherein the amount of insulin supplied to the bloodstream in step c remains relatively constant for each repetition of steps a-c.

25.     A repeatable method of regulating blood glucose levels in a human patient, the method comprising the steps of:
a.  supplying a fixed quantity of dry insulin powder to a portion of a hand held inhalation delivery device;
b.  propelling a gas over the fixed quantity of dry power to produce, in a repeatable manner, an aerosolized suspension of insulin, the aerosolized suspension containing more insulin than is in the bloodstream of the patient to achieve a satisfactory blood glucose level; and
c.  flowing at least a portion of the aerosolized suspension through a mouth piece on the device and into the lungs of the patient in a manner sufficient to cause the patient to absorb in the patient's bloodstream a sufficient, controlled quantity of insulin to achieve acceptable blood glucose level following treatment.

26.     The method of claim 25, wherein steps a-c may be repeated periodically as needed to treat the patient and wherein the amount

of insulin supplied to the bloodstream in step c remains relatively constant for each repetition of steps a-c.

31.    A repeatable method of lowering a patient's serum glucose level to acceptable value, the method comprising the steps of:
   a.    supplying a predetermined amount of dry insulin powder to a medical device;
   b.    releasing a compressed gas over the dry insulin powder to form a suspension comprised of dry insulin powder and air; and
   c.    inhaling at least a portion of the suspension at a flow rate and volume sufficient to deposit a sufficient, controlled quantity of insulin in the patient's lungs so that the patient absorbs into the blood between 1 and 50 units of insulin, thereby lowering the patient's blood glucose level to an acceptable value between 50 mg/dl and 300 mg/dl.

35.    A method of administering insulin to a diabetic patient to control serum glucose levels via a hand held inhalation device, the method comprising the steps of:
   a.    supplying a predetermined quantity of insulin powder to a portion of the device;
   b.    aerosolizing the insulin powder to form a cloud of insulin within the device, the cloud comprised of air and suspended insulin particles, the quantity of insulin particles being 2-10 times the dosage of insulin required to be delivered into the patient's blood to achieve acceptable blood glucose level;
   c.    administering to the patient's bloodstream via the patient's lungs a sufficient controlled and repeatable quantity of insulin from the cloud to produce an acceptable blood glucose level in the patient.

(Admin. R. Tab 23.)

9.    The '774 Application claims priority from an application filed on January 29, 1993, now U.S. Patent No. 5,364,838.  ('774 App. ¶ 0001, Admin. R. Tab 2.)

10.    The effective date for evaluating the prior art is January 29, 1993, and Novo's expert, Dr. Ronald G. Crystal, and the PTO's expert, Myrna B. Dolovich, assumed January 29, 1993 as the priority date.  (CR ¶ 12; DR ¶ 10.)

11.    Ms. Dolovich, the PTO's expert, formed her own "views as to whether [the claims in the '774 application] were unique and novel."  (DT 18:11-12.)  She

concluded that "[t]his is a new method of delivering a drug – a novel method of delivering insulin by aerosol."  (DT 227:14-16.)

12.    Novo's expert has opined that the claimed invention is not obvious.  (CR ¶ 55).  The PTO's only expert has not disagreed with him on this point, although she filed a Report taking issue with—as she said—everything in Dr. Crystal's Report that she believed to be incorrect and important.  (DT 6:15 – 7:21; 93:11 – 94:5 (*see* DR ¶¶ 12-17); *see supra* ¶ 4.)

13.    Ms. Dolovich had an opportunity to offer an opinion on obviousness, but has never asserted or opined that the claims are obvious.

**The Underlying Science:  Diabetes Mellitus**

14.    Diabetes mellitus is a disease in which there is a lack of or insufficient production of insulin in the human body. (CR ¶ 15.)  Because insulin regulates blood sugar, diabetes is characterized by persistently high blood sugar levels.  Diabetic patients often require frequent insulin replacement treatment, which has traditionally been administered by injection, either subcutaneously or intravenously.  (CR ¶¶ 15, 18, 19; DT: 78:3-6; *see also* '774 App., Admin. R. Tab 2 at ¶ 0003.)

15.    Patients need to receive relatively precise amounts of insulin in the bloodstream, because either too much or too little insulin has harmful or even potentially fatal effects.  (CR ¶¶ 16-17; DT 80:10-20.)

16.    Insulin exhibits a narrow therapeutic range when compared to most other drugs, meaning that the difference between the maximum and minimum amounts of insulin that can be safely administered to a given patient is small.  (CR ¶ 16.)

17.    If a diabetic patient receives too little insulin, the blood glucose will not be effectively lowered, which can lead to serious conditions such as cardiovascular disease, circulatory problems, kidney failure and blindness.  On the other hand, too much insulin may cause hypoglycemia, a dangerous condition in which low blood sugar levels can cause a patient to lapse into a coma, suffer permanent brain damage, or even die.  (CR ¶ 16; DT 80:10-20.)

18.    The dose of insulin administered to the patient's bloodstream must be carefully monitored each time the patient takes insulin. (Harrison, Admin. R.Tab 13 at A268-69; CR ¶ 18)

19.    In treating diabetes, it is critical to control the amount that reaches the patient's bloodstream. (CR ¶ 17, 29; DT 206:7-11.)

20.    Traditional insulin replacement therapy has historically involved the injection of insulin.  This treatment supplies a consistent, reproducible and controlled dose of insulin into the bloodstream of the patient.  (*See* Harrison, Admin. R. Tab 13 at A268-69.)

21.    The PTO's expert described this method as one in which "the patient is drawing up an aliquot of insulin into a syringe and injecting it" (DT 87:3-7), or perhaps using a pre-filled pump from which the patient dispenses insulin via injection.  (DT 87:9-11.)

22.    Use of injection to deliver insulin means that the amount of insulin to be injected is readily reproducible as a means of controlling a patient's blood glucose within acceptable levels.  (DT 85:2, 85:10-11, 86:1-11.)

23.     Over the many years that this therapy has been in use, certain principles have been identified and accepted for determining how often to monitor a patient's blood sugar levels, and how much insulin to administer.  (*See* CR ¶¶ 17-18; Harrison, Admin. R. Tab 13 at A268-69.)

24.     In administering insulin by injection, the treating physician and the patient must work together to "titrate" the insulin dose appropriate for that patient.  (CR ¶ 18.)

25.     In order to titrate insulin dosage, it is essential that the insulin be administered in a manner that achieves a reproducible dose to the bloodstream.  (CR ¶ 18; DT 206:7-11.)

26.     As described by Novo's expert, Dr. Crystal (and agreed by Ms. Dolovich, the PTO's expert in this action (DT 93:11 – 94:5), titration is a process in which the physician starts the patient at a low dose, monitors the effect on blood sugar levels, and adjusts the dose as necessary.  (CR ¶ 18.)  This process is then repeated until the physician is able to arrive at a dosage range that is safe and effective.  (Id.)

27.     Even after the dosage range is established, the patient must measure his or her own blood glucose levels and make adjustments in the predetermined amount administered as needed. (CR ¶ 18.)   It is, for example, not uncommon for a patient to take an injection of short-acting insulin before a meal in order to counteract the expected rise in blood sugar levels associated with eating.  (*Id*.)

28.     So that the patient can achieve reproducible dosing, it is critical to control not only the absolute amount of insulin administered to the patient, but also the amount of insulin that reaches the patient's bloodstream.  (CR ¶ 17.)

**The Underlying Science:  Lung Physiology and Aerosols**

29.    The lungs are made up of the trachea, bronchi, and bronchioles (collectively 'the airways'), and approximately 300 million alveoli (the air sacs), where gases are exchanged between the bloodstream and the air within the lung.  The airways divide dichotomously, that is by twos, 23 times before the alveoli.  The structure can be analogized to an up-side-down tree, in which the trachea is the trunk, the bronchi and bronchioles are the branches and the alveoli are the leaves.  (CR ¶ 23; DT 107:8-22, 134:17-18.)

30.    Gas exchange between the bloodstream and the air within the lung takes place only through the alveoli; no gas exchange takes place through the airways, which act as conduits of air to the alveoli.  (CR ¶ 23; DT 107:11-13; 110:6-18.)

31.    Gas exchange, which is necessary for a drug to be absorbed from the lungs into the bloodstream, takes place at the "alveoli surface."  (DT 107:8-13.)

32.    The peripheral airways and the "peripheral areas of the lung," referred to in the Expert Report of the PTO's expert witness Myrna B. Dolovich, are not the same thing as the alveoli.  (DT 106:16-21; 106:22 – 109:9; 110:19-21.)

33.    It has long been known to treat diseases of the lung airways, such as asthma, by delivering medication in aerosol form to the affected airways.  (CR ¶ 20; DR ¶ 13.)

34.    Respiratory disease is susceptible to treatment by aerosols so long as the inhaled medication reaches the part of the lung that is affected by the disease, which, in the case of respiratory disease, is the airways.  (DR ¶ 13.)

35.    In determining the dose of medication to treat lung conditions, the focus is simply on getting medication to the airways, no farther.  (DR ¶ 13.)  Additionally, the exact location in the airways where the medication needs to be deposited is not necessarily critical for treating asthma.  (DR ¶ 13; DT 106:9-21.)

36.    It has also long been known that some inhaled medicines may end up in the bloodstream.  As early as 1925, experimental data was published indicating that administering insulin by inhalation could cause a reduction in blood glucose level. (Gänsslen, M., *Über Inhalation von Insulin*, Klin. Wochenschr. 4, 71 (1925), Ex. D to the Nash Declaration; s*ee also* CR ¶ 21.)

37.    Because the frequent injections entailed by traditional insulin therapy can be painful and invasive, there has been extensive research into alternative methods for administering insulin, including oral, buccal and nasal administration. Research into other methods such as oral, buccal, and nasal have been unsuccessful.  (CR ¶ 19; s*ee also, e.g.*, Harrison, Admin. R. Tab 13 at A269; '774 Application at ¶¶ 0004 - 0006.)

38.    Although research has been ongoing for decades, no success in administering insulin by inhalation had been achieved prior to January 29, 1993, the priority date to which the '774 application is entitled.  (CR ¶¶ 21, 12; '774 Application at ¶ 0007.)

39.    To be administered by inhalation, insulin must be "aerosolized," that is, the insulin formulation must be converted into small particles suspended in air. (CR ¶ 24.)

40.    The resulting aerosol will have particles that vary in size, and contain many millions of insulin molecules.  (CR ¶ 24.)

41.     To treat diabetes, the insulin aerosol must be inhaled by the patient and must reach the alveoli in order to be absorbed into the bloodstream in a sufficient quantity to be effective.  (CR ¶ 23.)

42.     Lung physiology presents a challenge to aerosolized insulin that is inhaled in order to treat diabetes. (CR ¶¶ 23-26; DT 118:7-12, 130:4-10, 139:8-16, 146:2.)  Much of an aerosol that is inhaled remains in the mouth and trachea.  (DT 130:4-5.)

43.     In 1993, then-current research showed that only about 3-15 percent of inhaled medication could get beyond the trachea into the peripheral airways, "due mainly to the efficient aerodynamic filtration of the airways."  (DT 139:2 – 140: 1.)  Medication that makes it into the airways is likely to remain there.  (DR ¶ 15.)

44.     Ms. Dolovich stated that as one breathes, the "breath travels through the lung [and] particles reign [sic] out depending on their properties in different parts of the lung." (DT 118:9-12.)

45.     Particle size is one of the most important factor in determining whether an aerosolized drug reaches the alveoli.  (DT 173:19 – 174:1, 118:2-22.)

46.     The "respirable fraction" is the fraction of the particles in an aerosol suspension that are of a size that are respirable, *i.e.*, that when inhaled, *may* reach the alveoli.  Only particles that are of respirable size -- .5 to 5 micrometers (perhaps up to 6 micrometers) -- are of a size that *may* reach the alveoli.  (CR ¶ 25; DT 66:11-17; DT 67:14-20, 77:4-15.)

47.     Consistent with her published work, Ms. Dolovich testified that the respirable particle size is "below five micrometers."  (DT 65: 8-10.)  For example, in her publication Myrna A.[sic] Dolovich, *Influence of Inspiratory Flow Rate, Particle Size,*

*and Airway Caliber on Aerosolized Drug Delivery to the Lung*, 45 Respiratory Care 597-608 (June 2000), attached as Ex. E to the Nash Decl., she defines this size as "less than five micrometers, sometimes defined as less than six micrometers." (DT 66:11-17.) According to Dr. Crystal, 6 micrometers is the outer boundary of the respirable particle range. (CR ¶ 25.)

48.    Once inhaled, particles grow in size by taking up water, a process called hygroscopic growth. Such growth may render particles no longer respirable. (DT 143:9-145:22.)

49.    Because of hygroscopic growth, particles of aerosolized drugs that are initially within the respirable fraction may no longer be of a respirable size after they get below the larynx. (DT 143:16-20.)

50.    Whether hygroscopic growth occurs and to what degree it affects the number of respirable particles depends on the drug itself. (DT 144:5 – 144:4.)

51.    The humidity inside the lung is 100 percent. (DT 145:21-22.)

52.    Not all respirable particles are carried to the alveoli. (CR ¶ 26.)

53.    In addition to particle size, the flow rate and volume of inhalation of air and aerosolized insulin directly affect where the particles are deposited in the lungs and therefore the amount of insulin that reaches the alveoli. (CR ¶ 26.)

54.    Among the other factors affecting whether the aerosolized insulin particles that are inhaled reach the alveoli are: velocity of inhalation, the nature or health of the patients' airways, and the charge and shape of the aerosol particles. (CR ¶ 26; DT 130:20 – 131:3.)

55.     Not all insulin particles that are deposited in the alveoli are absorbed into the bloodstream.  (CR ¶ 27.)

56.     Insulin particles must impact the alveolar walls for insulin molecules to be absorbed into the bloodstream.  When the dry powder particle comes into contact with the alveolar walls, it dissolves.  (CR ¶ 27; DT 118:13-22.)

57.     Unless insulin enters the bloodstream, it cannot act to lower blood glucose levels.  (CR ¶¶ 23, 27.)

58.     When an insulin particle dissolves after coming into contact with the alveolar walls, whether the molecules from that particle are absorbed from the alveoli into the bloodstream depends on a number of factors, of which the principal ones relate to the characteristics of the insulin molecules themselves.  (CR ¶ 27.)  These factors include, *e.g.*, molecular weight, the molecules' electrical charge, solubility in lipids due to surfactants, shape, hydrophilicity, hydrophobicity, and pH.  (CR ¶ 28.)

59.     Even where an inhaled drug reaches "the receptor site"—the area where treatment is to be effected—it may not absorbed, effective or bioavailable to treat the target condition.  (CR ¶¶ 27-28; DT 118:13-22, 140:10 – 143:8.)

60.     Ms. Dolovich testified that receptors for asthma medicine are located on the airways but not on the alveoli.  (DT 102:9-16.)

61.     There is a considerable difference between the aerosol of medicine generated by an inhaler and the medicine's bioavailability, that is, its availability at the target site where it is needed to treat a medical condition.  (CR ¶ 25-28; DT 140:10 – 143:8.)

62.    Various factors affect the absorption of insulin into the bloodstream and the reproducibility of a dose of inhaled insulin.  These include molecular size, weight, charge (positive or negative), solubility in lipids or surfactants, shape, affinity or aversion to water, and relative acidity.  (CR ¶¶ 27-28.)  Even small changes in any of these molecular properties can profoundly alter the molecules' ability to be absorbed from the alveolar regions of the lungs into the bloodstream.   (CR ¶ 28.)  The PTO's expert has not disagreed.  (DT 93:11 – 94:5; 172:7-8, 12-20.)

63.    The amount of insulin absorbed in the bloodstream must be within a reproducible, narrow, safe, and effective therapeutic range.  (CR ¶¶ 17, 29; DT 206:7-11.)

64.    Whereas traditional dosing by injection is predictable, easily repeatable, and well documented (*e.g*., in Harrison), with inhaled insulin, only a potentially variable fraction of the insulin inhaled by a patient will ultimately reach the alveoli and be absorbed into the bloodstream.  (CR ¶ 29.)

65.    The amount of insulin that needs to be delivered via inhalation to achieve an effective reproducible dose is a complex determination.  (CR ¶ 29.)

66.    In determining the dose of medication to treat respiratory conditions such as asthma, the focus is simply on getting medication to the airways, rather than causing it to be absorbed into the bloodstream. (DR ¶ 13.)

67.    As of January 1993, no reference taught how to determine the amount of insulin that needs to be delivered via inhalation to achieve an effective reproducible dose. (DT 88:6-9.)  As Ms. Dolovich, the PTO's expert testified, knowing the traditional dosages set out in Harrison would, at best, suggest that some portion or "fraction" of those doses -- "[m]aybe 50 percent, maybe 25 percent" -- could be used as a starting

point to determine the proper dosage for administering inhaled insulin.  (DT 227:9 –

228:14.)  Using this fractional dose as a starting point would entail extensive follow-on

experimentation.  (DT 228:21 – 232.15.)

68.     Taking into account, as one treating diabetes must, the narrow therapeutic

range of insulin (as compared to the broad range of drugs used to treat lung disease),

means that dosages used in inhalation devices designed to treat asthma are of little or no

use.  (DT 78:10 – 80:3.)

69.     In her Report, Ms. Dolovich states that "the doses administered by

subcutaneous injection that are discussed in Harrison, or some fraction thereof, would

suggest a starting point for the administration of inhalable insulin."  (DR ¶ 17.)  In her

deposition, however, she did not support this statement.  When asked how one would use

Harrison, Ms. Dolovich explained that, to determine an inhaled dose, it would be

necessary to perform a series of experiments using Harrison as a benchmark for the

maximum amount of insulin that could end up in the bloodstream.  (DT 227:3 – 230:5.)

She in no way explained how much insulin would be put in an inhaler. (*Id.*)  And she

stated that even the elaborate experiments she described as needed to translate Harrison

into a treatment using inhaled insulin could not be used "to treat [patients] at the time."

(DT 230:10-11.)  "We are talking about collecting information to support a method of

inhaling insulin *that is different from the subcutaneous route*."  (DT 232:1-3 (emphasis

added).)  As she explained, "it is a leap from a laboratory set of experiments to . . .

treat[ing]" diabetes.  (DT 216:4-6.)

70.     If a patient is given an insufficient dose of an asthma medication, *e.g.*,

another dose can be given, with the ultimate risk of side-effects such as bruising or

thinning of the skin or tremors (from an overdose).  A risk to the life of the patient is not

a side-effect of asthma medications.  (DT 79:5-13, 80:21 – 82:10, 89:16-22, 91:6-9.)

**Proceedings in the PTO**

71.      In a Final Office Action, dated April 15, 2003, the patent examiner

("Examiner") assigned to examine the '774 Application rejected all of the claims then

pending, on the ground that they were unpatentable as obvious to a person having

ordinary skill, under 35 U.S.C. § 103(a), in light of two prior art references:  U.S. Letters

Patent No. 5,192,548 to Velasquez et al., issued on March 9, 1993 ("Velasquez")

(Admin. R. Tab 18) and International Patent Publication No. WO 90/07351 to Schenk, et

al., published on July 12, 1990 ("Schenk") (Admin. R. Tab 17). (Admin. R. Tab 16 at

A292.)

72.      The Examiner stated that the "differences between Schenk et al. and claim

22 are [1] insulin as the dry powder medicament and [2] the recited intended result of the

insulin containing 2-10 times higher the amount needed to be absorbed in the blood

stream of a patient."  (Admin. R. Tab 16 at A292.)

73.      The Examiner concluded that Velasquez satisfies the difference of dry

insulin powder because "Velasquez et al. teach a variety of dry powder medicaments as

inhalable powders including insulin," and therefore "[i]t would have been obvious to

modify the dry powder in Schenk et al. to employ dry powder insulin."  (Admin. R. Tab

16 at A292.)

74.      The Examiner concluded that "[a]s to the recited intended result of the

amount of insulin employed and the amount of insulin being absorbed . . . [this] . . . can

be arrived at through mere routine obvious experimentation and observation . . . to be tailored to the particular patient's medical needs."  (Admin. R. Tab 16 at A293.)

75.    The Examiner also stated that "[a]s to the recited claimed limitations defining a controlled quantity of insulin which is sufficient to achieve the desired result, Schenk et al. (page 3, lines 5-3 [sic]; page 4, lines 27-37) disclose a device which . . . facilitate[es] maximum amounts of medicament inhaled and absorbed into a patient's bloodstream.  That is, given that Schenk et al. disclose aerosolizing most of the medicament within the aerosolization chamber (16), the amount of medicament available for inhalation by a patient is predictable." (Admin. R. Tab 16 at A294.)

76.    As for the limitation of repeating the administration of insulin in a reproducible, consistent manner, without citation, the Examiner stated, "is [sic] stands to reason that the administration protocol would have included repeated inhalation (administration) of insulin." (Admin. R. Tab 16 at A293.)  The Examiner stated this three times. (*Id*. at A293, A293-94, A294.)

77.    In an Amendment After Final, dated May 10, 2004, Novo amended the claims for appeal.  (Admin. R. Tab 23, A346-348), as set out *supra* ¶ 8.

78.    Also on May 10, 2004, Novo appealed the Examiner's rejection to the Board of Patent Appeals and Interferences ("Board").  (Appeal Brief, Admin. R. Tab 24.)

79.    In the Examiner's Answer, dated January 25, 2006, the Examiner cited Harrison's Principles of Internal Medicine, Ch. 337 "Diabetes Mellitus" (Kurt Isselbacher et al. eds., 13th ed., Vol. 2 1994) pp. 1986-87 ("Harrison") (Admin. R. Tab 13) as "[e]xtrinsic evidence to support the positions taken in the rejection." in addition to Schenk and Velasquez.  (Examiner's Answer, Admin. R. Tab 32 at A421.)

-18-

80.     In his Answer, with the same typographical error, the Examiner reiterated his argument for rejecting the repetition limitations by stating that "is [sic] stands to reason that the administration protocol would have included repeated inhalation (administration) of insulin to maintain an adequate concentration of medicament in a patient's bloodstream." (Admin. R. Tab 32 at A420.)

81.     The Board, in its Decision mailed Sept. 7, 2006, in Appeal No. 2006-1762, focused on Claim 22 in sustaining the Examiner's rejection of all of the pending claims, rejecting "Claims 22 through 38" (even though Novo had appealed only pending claims 22, 23, 25, 26, 31, and 35).  (Board Decision, Admin. R. Tab 36 at A447, A451.)

82.     The Board found all rejected claims to be unpatentable under 35 U.S.C. § 103 as "obvious over Schenk in view of Velasquez."  (Admin. R. Tab 36 at A447, A451.)

83.     The Board concluded that, by using dry insulin powder, as suggested in Velasquez, with a standard asthma drug inhaler, like those in Schenk, and by consulting Harrison, the claims of the '774 Application would have been obvious to one of skill in the art.  (Admin. R. Tab 36; CR ¶ 39.)

84.     In support of its obviousness determination, the Board also cited "the evidentiary value of Harrison's recitation of amounts" of insulin to treat diabetes by injection.  (Admin. R. Tab 36 at A449.)

**The Prior Art Relied Upon by the PTO**

**The Schenk Inhalers, International Patent Publication No. WO 90/07351**

85.    Schenk describes oral inhalers used to administer aerosolized medicine into the bronchi to treat diseases of the lungs, such as asthma.  (Admin. R. Tab 17 at A300, ll. 4-7; CR ¶ 35; DT 133:1-15.)

86.    Schenk's oral inhalers operate by supplying a product reservoir with powdered medicine, which medicine is drawn into a gas flow passage containing a throat (or restriction) through which air is propelled at a high velocity by a pressure gas source. The medical product is thereby aerosolized and flows into a mouthpiece for inhalation by the patient.  (CR ¶ 35; Admin. R. Tab 17, A302, ll. 8-25, *see* DT 61:17 – 62:15.)

87.    Schenk is not designed to deliver drugs to the alveoli, but only to the peripheral airways.  (DT 106:1-4; 133:6 - 135:18; DR ¶ 13.)

88.    Ms. Dolovich could not identify any statement in Schenk that describes his invention as "designed to deliver medication to the alveoli to provide systemic treatment."  (DT 95:14-18.)

89.    Schenk is not designed to deliver medication to the alveoli to provide systemic treatment.  (CR ¶ 36; DT 133:6 – 135:18.)

90.    The design of the inhaler affects its function:  the percentage of an aerosol that gets below the larynx "depends on your inhaler – inhaler design."  (DT 120:1-11.)

91.    The PTO's expert admitted that there is no indication that Schenk contemplated treatment of any systemic disease, that is, of any disease outside the lung. (DT 133:6 – 135:18.)  As the PTO's expert also testified, a device designed to treat

asthma is not necessarily a design that will deliver medication to the alveoli.  (DT 109:17 - 110:10.)

92.     Schenk states that "only particles having a diameter of less than 7 μm have a chance to penetrate completely into the bronchial tubes."  (Admin. R. Tab 7 at A300, ll. 9-11.)

93.     The PTO's expert testified that there is no way to determine whether Schenk would produce the same respirable fraction of insulin that it produced of asthma medicine.  (DT 98:9 – 99:11.)

94.     The Schenk devices are designed to deliver drug to the peripheral airways, (DR ¶ 13), which does not refer to alveoli, (DT 133: 6-15).  They are not designed to deliver medication to the alveoli to provide systemic treatment.  (CR ¶ 36; DT 133:6 - 35:18.)

95.     The behavior of insulin in inhalers like Schenk's is not predictable.  (DT 98:19-21, 99:3-4, 99:9.)

96.     The amount of medication the Schenk device would cause to be carried to the alveoli -- and thus, into the bloodstream -- is also unpredictable.  (DT 119:11-12, 119:21-22, DT 120:3, DT 120:10-11.)

**The Velasquez Sheet Material, U.S. Letters Patent No. 5,192,548**

97.     Velasquez describes a sheet material having discrete depressions that are filled with powdered medicine, referred to in Velasquez as "medicament."  According to Velasquez, this sheet material allows for aerosolization of the medicine "in a relatively deagglomerated state so that such may be administered by inhalation."  (CR ¶ 37; Admin. R. Tab 18 at A328, Abstract and col. 2, ll. 21-25; DT 93:11 – 94:5.)

98.    The sheet material dispenser, in which the depression depths can be varied, is filled with dry powder medicament, and then when placed in an inhaler, the material is impacted from the back causing the powder to be forced out of the sheet material into the air to become aerosolized.  (Velasquez, Admin. R. Tab 18 at A330, col. 5, ll. 52-54.)

99.    Velasquez lists insulin as one of approximately fifty "[e]xemplary drugs which may be employed" in the use of his sheet material.  (Admin. R. Tab 18 at A330, col. 6, ll. 25-41; CR ¶ 37.)  All the drugs listed by Velasquez, except insulin, are simpler and much smaller molecules than insulin, and none except insulin is a protein.  (CR ¶ 37.)

100.    One of skill in the art is taught by Velasquez that the respirable fraction generated by Velasquez's sheet material will vary based on varying substrate depression depths. (CR ¶ 46.)

101.    Ms. Dolovich testified, using Velasquez as a reference, that the percentage of insulin that one could get deposited in the lungs and absorbed into the bloodstream is "anybody's guess at this point.  We are not saying that – I am not saying that I know what percentage of a drug inhaled is actually picked up in the blood."  (DT 224:10 – 225:4.)

**Harrison's Principles of Internal Medicine, Excerpt on Insulin**

102.    Harrison discusses the treatment of diabetes by conventional injection, multiple subcutaneous injections, and continuous subcutaneous infusion of insulin. (Harrison, Admin. R. Tab 13 at A268-69.)

103.    Harrison does not teach anything about the use of inhaled insulin to treat diabetes.  (CR ¶ 38; First Amended Response to Req. for Admis. No. 4.)

104.    The PTO admitted that "Harrison does not teach the administration of insulin through inhalation."  (Def. Resp. to Req. for Admis, Response to Req. for Admis. No. 5.)

105.    The PTO's expert admitted that Harrison would not teach the administration of insulin through inhalation because "nobody was using inhalable insulin in 1994 . . . [s]o it would not be in there."  (DT 88:6-9, 232:1 – 235:10; *see* CR ¶ 21.)

106.    As the Harrison reference (relied upon by the Examiner and the Board) itself states, as of January 29, 1993, "[n]o single standard exist[ed] for patterns of administration of insulin, and treatment plans var[ied]."  (Harrison, Admin. R. Tab 13 at A268.)

107.    The amount of insulin needed to be put in an inhaler for eventual absorption into the bloodstream cannot be determined by consulting Harrison.  (CR ¶ 38; DT 227:3 - 230:11.)

**Undisputed Errors**

108.    The Board attached no significance to the fact that both Schenk and Velasquez deal with delivery of drugs to the lungs for treatment of lung conditions, and not for systemic treatment of any disease, let alone diabetes.  (Admin. R. Tab 36; CR ¶¶ 39, 47; Schenk, Admin. R. Tab 17, at A300, ll. 4-5; Velasquez, Admin. R. Tab 18 at 328, col. 1, ll. 9-10.)

109.    In combining Velasquez's suggestion of putting insulin into his sheet material, with Schenk's inhaler designed to deliver asthma medicine to the lungs, the Board incorrectly equated the amount of insulin supplied to the inhaler with the amount of insulin available to the patient's bloodstream to treat diabetes.  (CR ¶ 39, 47.)

110.    The Board stated, in rejecting the claims of the '774 Application, that "medicament that is inhaled is absorbed into the bloodstream by the lungs." (Admin. R. Tab 36 at A449; CR ¶ 41.)

111.    This statement incorrectly assumes that all medicine of all kinds that is inhaled will be absorbed into the patient's bloodstream. (CR ¶ 41; DT 93:11 – 94:5 (*see* DR ¶¶ 12-17); DT 161:22 – 162:12, 129:21 – 130:7.)

112.    The Board cited no authority for the statement quoted in ¶ 110. (Def. Resp. to Pl.'s Interrogs., Resp. to Interrog. No. 8.)

113.    In this action, the PTO admitted that "when medicament is inhaled, a portion of the medicament may not reach the alveoli," thus admitting that not all inhaled medicine is absorbed into the bloodstream. (Def. Resp. to Req. for Admis., First Amended Resp. to Req. for Admis. No. 8.)

114.    In this action, the PTO also admitted that "of the medicament that does reach the alveoli, a portion . . . may not be absorbed into the bloodstream." (Def. Resp. to Req. for Admis., First Amended Resp. to Req. for Admis. No. 8 and Resp. to Req. for Admis. No. 9.)

115.    Much less aerosolized medicine is deposited on the peripheral airways than is inhaled. (*See generally* CR ¶¶ 22-29; DT 129:21 – 130:7.) The "peripheral airways" do not include the alveoli. (DT 135:10-18.)

116.    Although the Report of the PTO's expert appeared at first blush to support the Board, by stating that "[a]ll or a portion" of "medication" that "reaches the peripheral airways" and that "may be deposited on peripheral airway surfaces" "may be absorbed into the bloodstream," (DR ¶ 13), she admitted, when questioned at her deposition, that

-24-

the peripheral airways are, by definition, different from the alveoli.  (DT106:16– 107:5, 135:10-18.)

117.    The "treatment" that the PTO's expert referred to in ¶ 13 of her Report as being "effect[ed]" by the deposit of medicine on the "peripheral airway surfaces" was the treatment of asthma by asthma medicine, not a medicine that acts by being absorbed into the bloodstream.  (DT 106:6-21.)

118.    The PTO's expert admitted that it would take a "leap of faith" to say that "all" medication that is inhaled reaches the bloodstream.  (DT 161:22 – 162:12.)

119.    The Board purported to find in Velasquez the claim limitations regarding the amount of insulin in the aerosolized suspension, including the limitation of claim 22 that "the aerosolized suspension contains an amount of insulin that is 2-10 times higher than the amount needed to be absorbed in the bloodstream of the patient" ("the 2-10 range").  (Admin. R. Tab 36 at A448-449.)

120.    The Board also stated that the "2-10 range" and controlled delivery limitations of the claim could be determined by "routine experimentation" in light of the references.  (Admin. R. Tab 36 at A450.)

121.    The Board relied on the statement quoted in ¶ 110 in finding the claims obvious.  (Admin. R. Tab 36 at A449.)

122.    The passage from Velasquez that the Board relied upon simply describes the change in the respirable fraction that is produced by increasing or decreasing the depth of the substrate depressions in the claimed sheet material:

> [t]he percentage of medicament retained on the sheet material . . . decreases as depression depth increases, this being about 95% at 14 µm, about 60% at 28 µm and about 35% at 45µm.  Further, the respirable fraction . . . similarly decreases as depression depth increases, this being about **65% at 14 µm**,

about 30% at 28 μm and about **10% at 37 μm**. These two trends result in the proportion of total medicament released in particles of respirable size remaining generally similar for the depression depths studied (this being about 5% to 15% of total medicament).

Velasquez, Tab 18 at col. 5, ll. 7-19 (emphasis added). (Board Decision, Admin. R. Tab 36 at A449.)

123.    The passage cited above in ¶ 122 from Velasquez teaches one of skill in the art that "the respirable fraction generated by Velasquez's sheet material will vary based on varying substrate depression depths. (CR ¶ 46.)

124.    The Board created its own definition of "respirable fraction," stating that the term meant "[t]he fraction that will be absorbed relative to the total amount inhaled." (Admin. R. Tab 36 at A449.)

125.    The "term 'respirable fraction,' as generally understood by persons of ordinary skill in the art, is the percentage of aerosolized particles that are of respirable size, *i.e.*, that are of a size that, when inhaled, *may* reach the alveoli." (CR ¶ 42; DT 66:11-17; 67:1-5; 67:21 – 68:7; *see supra* ¶ 44.)

126.    Velasquez defines "respirable fraction" as "the percentage of drug which is in particles of aerodynamic diameter of equal to or less than about 6.4" micrometers. (Admin. R. Tab 18 at A330, col. 5, ll. 11-13.)

127.    The Board used its own definition, not Velasquez's, as a basis for deciding that Velasquez taught the "2-10 limitation." (Admin. R. Tab 36 at A449).

128.    The Board Decision did not refer to Velasquez's definition of "respirable fraction," although it used the term in the context of its discussion of Velasquez. (CR ¶ 43; Admin. R. Tab 36 at A449.)

129.    The Board did not use the definition of "respirable fraction" used by persons of ordinary skill in the art.  (CR ¶ 43; DT 66:11-17; 67:1-5; 67:21 – 68:7.)

130.    The Board's definition of "respirable fraction" differs from the understanding of that term by persons of ordinary skill in the art.  (CR ¶ 42; DT 77:6-7.)

131.    The PTO's expert agrees that "[t]he fraction of the aerosol containing particles, less than five micrometers, sometimes defined as less than six micrometers in diameter is termed the fine particle or respirable fraction (FPF), and has been used more widely recently to describe the quality of the aerosol and its potential for delivery to the lower respiratory tract."  (DT 66:11-17.)  The lower respiratory tract means the bronchioles and the alveoli.  (DT 67:6-13.)

132.    The Board cited no authority for its definition.  (Def. Resp. to Pl.'s Interrog., Resp. to Interrog. No. 7.)

133.    "Respirable fraction" is different from the concept of the fraction of medicaments that reach the alveoli that *may* be absorbed.  (CR ¶ 42.)

134.    The Board confused the percentage of inhaled insulin particles that *may* reach the alveoli with the percentage of inhaled insulin that is absorbed into the bloodstream.  These concepts are entirely different.  (CR ¶ 44; DT 93:11 – 94.5; DR ¶¶ 12-17.)

135.    Deposition and absorption are two separate processes.  (DT 183:19 – 184:2.)

136.    The PTO admitted that the respirable fraction which Velasquez observed as varying with the depth of the depression in the sheet material pertains only to "albuterol sulfate," and refused to "comment on the respirable fraction for drugs other

than 'albuterol sulfate,' including insulin.  (Resp. to Req. for Admis., Res. to Req. for Admis. No. 12.)

137.    The PTO admitted that "albuterol sulfate and insulin have different chemical compositions and molecular weights" and that the two drugs "likely differ in other chemical properties."  (Resp. to Req. for Admis., Res. to Req. for Admis. No. 13.)

138.    The Board noted that "Velasquez describes the range that such respirable fractions may embrace for the various medicaments it describes at col. 5 lines 7-15. Velasquez mentions the fraction may be in the range of 10% to 65%.  Taking the inverse of this range to determine the amount of medicament that would need to be inhaled yields a range of 1.54 to 10 times the amount needed to be absorbed, which we note substantially overlaps the claimed 2 to 10 times."  (Board Decision, Admin. R. Tab 36 at A449.)

139.    The Board treated the calculations in ¶ 138, *supra*, as pertaining to insulin. (Admin. R. Tab 36 at A449.)

140.    Dr. Crystal pointed out the following errors in the Board's attempt to find support for the claimed "2-10 range" in Velasquez:

(a)    The Board misinterpreted Velasquez's teaching that respirable fractions ranging from 65% to 10% can be obtained by increasing the depth of the sheet depressions from 14 μm  to 37 μm.  Based on its erroneous view that *all* medicament of a respirable size that is produced in an inhaler ends up in the bloodstream, it arbitrarily decided that the inverse of the Velasquez percentages—which it calculated as 'a range of 1.54 to 10 times the amount needed to be absorbed'—represented the amount of a medicament that should be placed in an inhaler to treat diabetes.  The Board incorrectly

declared that this range could be meaningfully compared to the claimed 2-10 range.  (CR ¶ 47.)

        (b)     The ranges of respirable fractions described in Velasquez do not prescribe an 'amount' of medicament to be used to treat a patient, in part because the percentage has no predictable relationship to the amount to be absorbed in the bloodstream.  (CR ¶ 48; DT 223:1-10; 224:8-10.)

        (c)     The supposed overlap of the 1.54 to 10 times range that the Board purported to derive from Velasquez and the 2 to 10 range claimed in the '774 Application is not correlative.  A person of ordinary skill in the art would not read Velasquez as the Board did.  (CR ¶ 49.)

141.     The PTO's expert does not disagree with Dr. Crystal's statements *supra* ¶ 140.  (DT 93:11 – 94:5 (*see* DR ¶¶ 12-17).)

142.     The PTO's expert could not explain the Board's reasoning regarding the "inverse" of the Velasquez percentages, or replicate it.  (DT 218:14 – 224:10.)

143.     Both the PTO's expert and the PTO have admitted that "Velasquez does not teach specific dosages of insulin to be administered through inhalation to treat diabetes."  (Resp. to Req. for Admis., First Am. Resp. to Req. for Admis. No. 10.)  The PTO's expert at first testified that Velasquez does teach how much inhaled medicine will be absorbed into the bloodstream.  (DT 224:8-10.)  Later she admitted, "[y]ou would need to do another set of experiments using human subjects, taking this delivery system, measuring the dose -- the emitted dose at the mouth, deposition and guesstimating or estimating what percentage would get into the lung."  (DT 224:15-19.)

144.    The Board purported to find the limitation regarding controlled delivery of inhaled insulin in Schenk and Velasquez.  (Bd. Dec., Admin. R. Tab 36 at A450.)

145.    The Board also purported to find the limitation regarding the "repeatable" nature of the method was taught by Schenk and Velasquez.  (Admin. R. Tab 36 at A449-450.)

146.    The Board stated that Schenk and Velasquez "describe structural devices to precisely control the amount of a medicament delivered."  (Admin. R. Tab 36 at A450.)

147.    Schenk may control the amount of a powder that is aerosolized, but that is the extent of its control.  (CR ¶ 50.)

148.    Velasquez describes how much medicament should be put into the subject sheet material, and describes how much of the aerosolized medicament will be of respirable size, depending on the depth of the depressions in the sheet material, but that is the extent of its control.  (CR ¶ 50.)

149.    While Schenk and Velasquez may allow one of ordinary skill in the art to control the amount of insulin that is coming out of a device, they do not control in any way the amount of insulin that is inhaled by the patient and, in particular, do not control the amount inhaled that reaches the alveoli or will actually be absorbed into the bloodstream.  (CR ¶ 50; DT 224:18 – 225:4.)

150.    In its discussion of whether the element of controlling the dosage is taught by Schenk and Velasquez, the Board makes the statement that the "precise amount is not critical to the invention."  (CR ¶ 51; Admin. R. Tab 36 at A450.)

151.    The amounts of insulin administered to each patient for absorption are absolutely critical.  (CR ¶ 51; DT 80:10-20; 232:3-8.)

152.    The Board stated that "S[c]henk's inhaler is inherently repeatable in operation," so that claim limitations of repeatability were taught by Schenk.  (Admin. R. Tab 36 at A450.)

153.    The Board's statement to which reference is made in ¶ 152 is incorrect, because many factors influence whether a reproducible dose is administered to the bloodstream by insulin inhalation, even if the same amount of insulin is aerosolized in a device in the same manner each time.  These factors include, among others, the flow rate and volume with which a patient would inhale each dose of insulin, the speed of the inhalation, the particle size, the concentration of the drug in the carrier, and the point in the respiration cycle where the patient initiates inhalation.  (CR ¶ 52; DT 93:11 – 94:5, 96:22 – 98:1, 130:20 – 131:3, 172:7-8, 172:12-20.)

154.    These factors in ¶ 153 could differ widely with a device such as those in Schenk.  Such differences would result in a wide and unpredictable range of insulin that would reach the bloodstream.  (CR ¶ 52; DT 93:11 – 94:5; DR ¶¶ 12-17.)

155.    The Board implicitly concluded that the inventions claimed in the '774 Application could be realized with "routine experimentation."  (Admin. R. Tab 36 at A450.)

156.    As for the limitation of achieving acceptable blood glucose level following treatment, the Board stated that one of ordinary skill in the art "would monitor the patient's vital statistics to achieve the desired result in view of the high variability among patients."  (Admin. R. Tab 36 at A450.)

157.    The Board also cited the Examiner's position that "standard guidelines for the number of units [of insulin] that are needed to be absorbed" were known to one of ordinary skill in the art, who "would adjust the amount inhaled to achieve that amount." (Admin. R. Tab 36 at A448.)

158.    Concerning the so-called "standard guideline" as referred to in ¶ 157, the Board did not identify any such guidelines.  (Admin. R. Tab 36 at A448.)

159.    The Examiner did not cite any such guidelines in his reference to them, which was cited by the Board.  (Examiner's Answer, Admin. R. Tab 25 at A384.)

160.    The PTO has failed to identify such guidelines, just as the Board failed to cite them.  (Def. Resp. to Pl.'s Interrog, First Supp. Resp. to Interrog. No. 6; Resp. to Req. for Admis., First Amended Resp. to Request for Admission No. 7.)

161.    After discovery closed, the PTO provided for the first time specific citations to three related references, that were buried in the 5000 pages previously provided without explanation.  (Resp. to Req. for Admis., First Amended Resp. to Req. for Admis. No 7.)  These do not teach the claimed invention, which requires inhaling insulin to control blood glucose levels.  Each reference states that the claimed invention will *not* eliminate the need for insulin injections in diabetic patients.  *See, e.g.* U.S. Patent No. 5,643,868, col. 6 ll. 3-6, attached as Ex. H to the Nash Declaration ("the methods of the present invention will not eliminate the need for parenteral insulin therapy").

162.    Dr. Crystal attests to the lack of such guidelines and the PTO's expert has not identified any.  (CR ¶ 54; DT 93:11 – 94:5 (*see* DR ¶¶ 12-17); *see also* DT 87:21 – 88:9 (stating that Harrison does not discuss inhalable insulin)).

163.    The reason that a person of ordinary skill could not experiment with the insulin powder, suggested in Velasquez and used in conjunction with the inhaler taught in Schenk, to determine the claimed "2-10 range," or to lower or control glucose levels, is the lack of guidelines or an "administration protocol" for administering inhaled insulin. (CR ¶ 54.)

164.    Dosage administration of *injectable* insulin is well known, and the effective and safe dosage of injectable insulin can be arrived at by titration using various techniques, as described in Harrison.  But injectable dosing as taught in Harrison has no relevance to, and cannot be applied to, *inhalable* insulin.  (CR ¶ 54; DT 226:13 – 235:10.)

165.    A person of ordinary skill in the art, with the information available in Schenk, Velasquez, and Harrison could not have engaged in routine experimentation to arrive at the claimed 2-10 limitation, or have been able to safely, effectively, and reproducibly lower or control glucose levels to treat diabetes mellitus in a patient.  (CR ¶ 54; DT 93:11 – 94:5.)

166.    Ms. Dolovich testified that one of skill could not treat diabetes with the inhaler in Schenk and the suggestion of insulin in Velasquez:  "[J]ust show[ing] up at the door, so to speak, with an inhaler filled with insulin and say[ing], I am going to treat you with this . . . would be foolish."  (DT 232:3-8.)

167.    Given the narrow therapeutic range within which insulin must be administered, such experimentation would be unethical and dangerous.  (CR ¶ 54; DT 232:1-8.)

**A Person of Ordinary Skill in the Art**

168.    As of 1993, a person of ordinary skill in the art would have been one who had either an M.D. or a Ph.D. in a related field, and several years of experience in pharmaceutical aerosols, lung physiology, and pulmonary drug delivery or the equivalent training and experience.  (CR ¶ 33; DR ¶ 16; DT 190:1-6.)  Both experts applied this standard.


Dated: Washington, D.C.
            April 3, 2008


                                                        Respectfully submitted,


                                                        _____/s/_____
                                                        Margaret K. Pfeiffer  (D.C. Bar No. 358723)
                                                        Susan Kaufmann Nash  (D.C. Bar No. 484088)
                                                        SULLIVAN & CROMWELL LLP
                                                        1701 Pennsylvania Avenue, N.W.
                                                        Washington, D.C. 20006-5805
                                                        Tel.:  (202) 956-7500
                                                        Fax:  (202) 956-6330

                                                        *Counsel for Plaintiff Novo Nordisk A/S*


OF COUNSEL:

Robert Schaffer
Samuel S. Woodley
DARBY & DARBY P.C.
805 Third Avenue
New York, New York 10022
Tel.:  (212) 527-7700
Fax:  (212) 527-7701