## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                    )
NOVO NORDISK A/S                    )
                                    )
   Plaintiff,       )
                                    )
   v.               )   Case No: 06-1896 (CKK)
                                    )
JON W. DUDAS                        )
  Under Secretary of Commerce for )
  Intellectual Property and   )
  Director of the United States Patent )
  & Trademark Office,        )
                                    )
   Defendant.        )
_____)

### DEFENDANT USPTO'S COMBINED MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT OF PLAINTIFF NOVO NORDISK A/S

Pursuant to Rule 56, Federal Rules of Civil Procedure, Defendant Jon W. Dudas, Under Secretary of Commerce for Intellectual Property and Director of the U.S. Patent and Trademark Office ("USPTO" or "Defendant") respectfully moves that summary judgment be entered in favor of Defendant. Plaintiff Novo Nordisk A/S ("Novo" or "Plaintiff") brought this action under 35 U.S.C. § 145 to challenge the decision of the Board of Patent Appeals and Interferences ("Board"), which affirmed the rejection of claims 22-23, 25-26, 31 and 35 (the "Appealed Claims") of Novo's U.S. Patent Application No. 09/848,774 ("the '774 application") as unpatentable under 35 U.S.C. § 103. Novo moved for summary judgment as to the patentability of the Appealed Claims, which Defendant hereby opposes. As set forth in Defendant USPTO's Statement of Points and Authorities in Support of its Combined Motion for Summary Judgment and in Opposition to Novo's Motion for Summary Judgment, there are no genuine issues of

material fact as to the unpatentability of the Appealed Claims under 35 U.S.C. § 103.  Further,

the Board's decision is supported by substantial evidence, and Defendant is entitled to judgment

as a matter of law.  Accordingly, Defendant respectfully requests that this Court grant its motion

for summary judgment.

Respectfully submitted,


___/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


___/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


___/s/_____
BLANCHE BRUCE, D.C. BAR # 960245
Assistant United States Attorney
555 Fourth Street, N.W., Room E-4417
Washington, D.C. 20530
(202) 514-9150 (telephone)
(202) 514-8780 (facsimile)

Date:   May 19, 2008                        ATTORNEYS FOR DEFENDANT

OF COUNSEL:

STEPHEN WALSH
Acting Solicitor
MARY L. KELLY
FRANCES LYNCH
BENJAMIN WOOD
Associate Solicitors
U.S. Patent & Trademark Office

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| NOVO NORDISK A/S | ) | |
|  | ) | |
| Plaintiff, | ) | |
|  | ) | |
| v. | ) | Case No: 06-1896 (CKK) |
|  | ) | |
| JON W. DUDAS | ) | |
| Under Secretary of Commerce for | ) | |
| Intellectual Property and | ) | |
| Director of the United States Patent | ) | |
| & Trademark Office, | ) | |
|  | ) | |
| Defendant. | ) | |
| _____ | ) | |

**DEFENDANT USPTO'S STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF ITS COMBINED MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT OF PLAINTIFF NOVO NORDISK A/S**

JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

BLANCHE BRUCE, D.C. BAR # 960245
Assistant United States Attorney

Of Counsel:

STEPHEN WALSH
Acting Solicitor
MARY L. KELLY
FRANCES LYNCH
BENJAMIN D. M. WOOD
Associate Solicitors
U.S. Patent & Trademark Office

May 19, 2008

# TABLE OF CONTENTS

I.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   OVERVIEW OF PATENT LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.    The '774 Application and Family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

            1.    The Invention Disclosure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

            2.    The Appealed Claims.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      B.    The Prior Art. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            2.    Velasquez. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            3.    Harrison. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      C.    The Examination of the '774 Application. . . . . . . . . . . . . . . . . . . . . . . . 13

      D.    Novo's Brief to the Board. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      E.    The Board Decision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      F.    The Present Action and Novo's New Evidence.. . . . . . . . . . . . . . . . . . . . 16

IV.   SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

V.    ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      A.    Standard for Summary Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      B.    35 U.S.C. § 145 Review.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

            1.    Novo Bears the Burden of Showing Reversible Error by the Board. . . . . 20

            2.    Novo's Ability To Present New Evidence In This Court Is Limited By
                  Novo's Conduct Before The USPTO. . . . . . . . . . . . . . . . . . . . . . . . . 21

      C.    The Determination of Obviousness Under 35 U.S.C. § 103. . . . . . . . . . . . . . . 23

i

D.     The Board Correctly Found That Claim 25 Would Have Been Obvious in View of Schenk and Velasquez. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    1.     The Schenk Device Is Capable of Generating an Aerosol of Dry Insulin Powder That Can Reach the Peripheral Areas of the Lungs, Including the Alveoli. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    2.     Valesquez Teaches That Dry Insulin Powder Existed at the Time of the Invention and That it Can Be Used in a Device Also Used for the Delivery of Asthma Medication. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    3.     Novo Admits That One of Ordinary Skill Would Know How to Control the Flow Rate and Volume of Inhalation, and Other Factors, to Achieve a Reproducible Dose to the Bloodstream. . . . . . . . . . . . . . . . . . . . . . . . . . . 29

E.     The Board Correctly Found That Claim 22 Would Have Been Obvious in View of Schenk, Velasquez and Harrison. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    1.     The 2-10 Range Limitation in Claim 22 Does Not Patentably Distinguish Claim 22 from the Prior Art. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        a.     The '774 Application Admits That Prior Art Inhalers Fell Within the 2-10 Range. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

        b.     The Examiner Correctly Found That a Person of Ordinary Skill Could Have Determined the 2-10 Range Limitation Through Routine Experimentation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

        c.     Novo Has Failed to Show Any Legal Criticality as to the 2-10 Range Limitation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    2.     The 1-50 Units of Insulin Limitation in Claim 22 Is Also Insufficient to Patentably Distinguish Claim 22 from the Prior Art. . . . . . . . . . . . . . . . . 41

F.     Novo's New Argument as to Long Felt Need Should Not Be Admitted. . . . . . . . 42

VI.     CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

# TABLE OF AUTHORITIES

## CASES

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
    239 F.3d 1343 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*California Research Corp. v. Ladd*,
    356 F.2d 813 (D.C. Cir. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Consolidated Edison Co. v. NLRB*,
    305 U.S. 197 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Constant v. Advanced Micro-Devices*,
    848 F.2d 1560 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*DeSeversky v. Brenner*,
    424 F.2d 857 (D.C. Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Dickinson v. Zurko*,
    527 U.S. 150 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Fregeau v. Mossinghoff*,
    776 F.2d 1034 (Fed. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

*Gallagher v. Quigg*,
    8 USPQ 2d 1437 (D.D.C. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Hyatt v. Dudas*,
    No. 03-0901, 2005 WL 5569663 (D.D.C. Sept. 30, 2005) . . . . . . . . . . . . . . . . . . . . . 2, 22

*Holloway v. Quigg*,
    9 USPQ2d 1751 (D.D.C. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 42

*In re Aller*,
    220 F.2d 454 (CCPA 1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*In re Cruciferous Sprout Litig.*,
    301 F.3d 1343 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*In re Gartside*,
    203 F.3d 1305 (Fed. Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Geisler*,
    116 F.3d 1465 (Fed. Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 40

*In re Jolley*,
    308 F.3d 1317 (Fed. Cir. 2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re Merck & Co., Inc.*,
    800 F.2d 1091 (Fed. Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Killian v. Watson*,
    121 USPQ 507 (D.D.C. 1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*KSR Int'l Co. v. Teleflex, Inc.*,
    __ U.S. __, 127 S. Ct. 1727 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 33

*Laningham v. U.S. Navy*,
    813 F.2d 1236 (D.C.Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*MacKay v. Quigg*,
    231 USPQ 907 (D.D.C. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Mazzari v. Rogan*,
    323 F.3d 1000 (Fed. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-22

*Merck & Co. Inc. v. Biocraft Laboratories, Inc.*,
    874 F.2d 804 (Fed. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Monsanto Co. v. Kamp*,
    269 F. Supp. 818 (D.D.C. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*National Steel Car, Ltd. v. Canadian Pacific Railway, Ltd..*,
    357 F.3d 1319 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Para-Ordnance*,
    73 F.3d 1085 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Pfizer, Inc. v. Apotex, Inc.*,
    480 F.3d 1348 (Fed. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Stratoflex, Inc. v. Aeroquip Corp*,
    713 F.2d 1530 (Fed. Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Syntex (U.S.A.) LLC v. Apotex, Inc.*,
    407 F.3d 1371 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Takeda Pharma. Co. v. Dudas*,
    511 F.Supp.2d 81 (D.D.C. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Titanium Metals Corp. v. Banner*,
    778 F.2d 775 (Fed. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 41

*United States v. Diebold, Inc.*,
    369 U.S. 654 (1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Telectronics, Inc.*,
    857 F.2d 778 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## STATUTES

35 U.S.C. § 102. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

35 U.S.C. § 103. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 23

35 U.S.C. § 112, first para.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

35 U.S.C. § 112, second para.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

35 U.S.C. § 134. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

35 U.S.C. § 141. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

35 U.S.C. § 145. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 20

5 U.S.C. § 706. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## RULES

Fed. R. Civ. P. 56 (c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## LIST OF EXHIBITS

Exhibit 1:      Patents claiming priority to '281 application (cover sheets only

Exhibit 2:      Transcript of Deposition of Dr. Ronald Crystal

Exhibit 3:      U.S. Patent No. 5,320,094 to Laube *et al.*

Exhibit 4:      John Patton, Pulmonary Delivery of Peptides and Proteins (1992)

Exhibit 5:      Novo Press Release

Exhibit 6:      Pfizer Press Release

Exhibit 7:      Lilly & Co. Press Release

Exhibit 8:      Amendment After Final (June 13, 1994), filed in connection with the '281 application

Exhibit 9:      Declaration of Reid Rubsamen (June 13, 1994), filed in connection with the '281 application

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

)
NOVO NORDISK A/S                                    )
                                                    )
                    Plaintiff,                      )
                                                    )
            v.                                      )        Case No: 06-1896 (CKK)
                                                    )
JON W. DUDAS                                        )
        Under Secretary of Commerce for             )
        Intellectual Property and                   )
        Director of the United States Patent        )
        & Trademark Office,                          )
                                                    )
                    Defendant.                      )
_____)

**DEFENDANT USPTO'S STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT
OF ITS COMBINED MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
THE MOTION FOR SUMMARY JUDGMENT OF PLAINTIFF NOVO NORDISK A/S**

**I.    INTRODUCTION**

This is a patent case.  At issue is U.S. Patent Application No. 09/848,774 ("the '774

application").  The '774 application is but the most recent attempt of Plaintiff Novo Nordisk A/S

("Novo") to exploit a 15-year-old patent application – to which the '774 application claims

priority – that Novo says fully describes the pending claims in the '774 application.  While Novo

has already received almost two dozen patents based on this 15-year-old application, the

appealed claims of the '774 application do not deserve the same protection.  As discussed in

detail below, the claimed methods impermissibly extend to what would have been obvious to a

person of ordinary skill when the invention was made:  the claims are directed to methods that

encompass a huge variation in the amount of medicine delivered to a patient; they can be

performed by known inhalation devices; they use known dry powder insulin formulations and

known dosage guidelines for the treatment of diabetes by injection; and they rely on breathing techniques (primarily controlling the volume and flow rate of the patient's inhalation) and other factors (primarily the size of the particles comprising the aerosol) that Novo's *own expert* admits were well known by those of ordinary skill at the time of the invention.  Accordingly, the appealed claims are unpatentable under 35 U.S.C. § 103, and Defendant Jon W. Dudas, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office ("USPTO" or "Defendant") respectfully requests that summary judgment be entered for Defendant.

## II.    OVERVIEW OF PATENT LAW

An inventor seeking a patent must file a patent application with the USPTO.  The application is, essentially, a draft patent.  Like a patent, it contains two primary parts:  (1) a "specification" or "disclosure;" and (2) one or more "claims."  The specification describes what the invention is.  By law, it must describe the invention, and how to make and use it, in sufficient detail to enable "any person skilled in the art [technology] to which [the invention] pertains" to make and use the invention.  35 U.S.C. § 112, first para.

The claims, on the other hand, identify what the applicant regards as his invention; *i.e.*, the scope of legal protection the applicant believes his invention is entitled to receive.  35 U.S.C. § 112, second para.  Each claim is a single sentence that contains a number of "limitations" directed to the various features of the subject matter claimed.  35 U.S.C. § 112; *Hyatt v. Dudas*, No. 03-0901, 2005 WL 5569663, at *2 (D.D.C. Sept. 30, 2005).  Several claims in a single application may share many of the same limitations.  *Id.*

When the application is received by the USPTO, it is given to a patent examiner for

examination. The examiner determines whether each claim satisfies certain statutory patentability requirements. For example, the examiner will determine whether each claim is "novel," *i.e.*, new, and also whether it would have been "nonobvious" to a person of ordinary skill in the relevant art. 35 U.S.C. §§ 102, 103. Section 102 of the Patent Statute sets forth the types of evidence – *e.g.*, earlier-issued patents, articles published in relevant technical journals, etc. – that the examiner may properly rely upon in rejecting a claim as "anticipated" (not novel) or obvious. This evidence is referred to as "prior art." *See* 37 C.F.R. § 1.104(a)(1).

If the examiner believes that a claim does not comply with the statutory patentability requirements, the examiner will reject the claim and issue an "office action" setting forth the grounds for the rejection. 37 C.F.R. § 1.104(a). In response, the applicant may (i) amend the rejected claim to distinguish it over the prior art that the examiner relied upon; and/or (ii) argue against the rejection. 37 C.F.R. § 1.111. The examiner will eventually issue a "final office action" (or "final rejection") if the examiner and the applicant cannot agree on the patentability of one or more claims. Otherwise, the examiner will "allow" the pending claims, and the USPTO will issue a patent for the claimed invention.

An applicant may appeal a final office action to the Board. 35 U.S.C. § 134. The Board will either affirm or reverse the examiner's rejections. 35 U.S.C. § 134(a). If the Board affirms the examiner's rejections, the applicant may either appeal directly to the Court of Appeals for the Federal Circuit ("Federal Circuit") under 35 U.S.C. § 141 or, as in the present case, proceed with an action in the District Court for the District of Columbia under 35 U.S.C. § 145.

III.    **STATEMENT OF FACTS**

A.    **The '774 Application and Family**

At issue in this case are claims 22-23, 25-26, 31 and 35 of U.S. patent application no. 09/848,774 ("the '774 application").

Novo filed the '774 application on May 3, 2001.[1]  The '774 application "claims priority," via a long chain of intermediate applications, to U.S. Patent Application No. 08/011,281 ("the '281 application"), which was filed on January 29, 1993.[2]  Novo has obtained 23 patents based on the '281 application.  *See* Exhibit 1 hereto (cover pages of Novo's patents that claim priority to the '281 application).

In prosecuting the '281 application, the named inventor of that application, Dr. Reid Rubsamen, filed a declaration with the USPTO.  *See* Declaration Under 37 CFR 1.132 of Reid Rubsamen (June 13, 1994) ("Rubsamen Decl.") (Exhibit 9 hereto).  In his declaration Dr. Rubsamen disclosed that he conducted certain experiments to "demonstrate the usefulness of [his] invention" for inhalable insulin. Ex. 9 (Rubsamen Decl.) at NN-625.  Instead of administering insulin to human patients, however, he administered radio labeled albuterol, a bronchodilator useful for the treatment of lung diseases such as asthma.  *Id.*; *see also* the Deposition of Dr. Ronald G. Crystal, M.D. ("Crystal Tr.") (Exhibit 2 hereto) at 91:14-92:14.

Also in prosecuting the '281 application, the applicant admitted that many aspects of the

---

[1]  The '774 application was actually filed by Aradigm Corp., Novo's predecessor in interest in the '774 application.  *See* Novo Mem., Ex. I (showing chain of assignment of the '774 application).  For simplicity, both Aradigm and Novo will be referred to as Novo.

[2]  The USPTO disputes Novo's claim of priority to the '281 application.  However, for purposes of this motion only, the USPTO assumes that the effective filing date for the '774 application is January 29, 1993.

4

invention were known in the art: "The claims generally cover a method of administering a specific drug (i.e., insulin) to lung tissue. . . . Insulin is a known drug having a known utility and is known to enter the circulatory system when brought into contact with lung tissue." Amendment After Final filed in connection with the '281 application (June 13, 1994) ("Amendment After Final") (Exhibit 8 hereto) at 1310. The applicant further admitted that "[t]he ability to provide for intrapulmonary delivery of insulin is known and old. References previously cited by the Examiner clearly disclosed that insulin can be delivered by the intrapulmonary route." *Id.* at NN-1311. Finally, the applicant admitted that Dr. Rubsamen's declaration "shows that the device actually delivers [insulin] to the lungs and based on what is known with respect to insulin (via the prior art), the insulin will enter the circulatory system." *Id.* at NN-1313.

### 1.    The Invention Disclosure

The specification of the '774 application (Admin. R., Tab 2) describes a method of controlling the dosage of aerosolized insulin delivered to a patient's circulatory system by measuring and controlling the total volume of air inhaled by the patient. Tab 2 at A5, ¶ 10; A7, ¶ 17. According to the specification, the "primary factor addressed by the present invention relating to the consistency of dosing insulin by inhalation is the total air volume inhaled by the patient." Tab 2 at A17, ¶ 83; *see also* A47, ¶¶ 173-76 (discussing the effect on repeatability of dosing due to total inhaled volume); Tab 2 at A18, ¶ 83 ("if the patient merely inhales the same volume for each drug delivery event, the dosing will be consistent"). The specification also identifies the inspiratory flow rate, or speed,[3] of the patient's inhalation at which the device fires

---

[3]  The disclosure defines "inspiratory flow rate" as "a value of air flow rate measured, calculated and/or determined based on the ***speed*** of the air passing a given point in a measuring device assuming atmospheric pressure +- .5% and a temperature in the range of about 10.degree.

5

as another factor affecting the repeatability of dosing.  Tab 2 at A52, ¶¶ 187, 190.  The specification acknowledges that even when these factors are controlled, variations in doses administered to the patient will occur, and teaches that such variations "are calculated by monitoring serum glucose levels in response to known amounts of insulin released from the device."  Tab 2 at A25 at ¶ 116.

The specification teaches that "different mechanisms will be necessary in order to deliver different formulations. . . .  [A] device suitable to carry out the methods of the invention would be one that "provide[s] for the mechanical movement of a predetermined amount of dry powder to a given area," and energy from compressed gas would "cause the dry powder to form a dry dust cloud" for inhalation.  Tab 2 at A66, ¶ 238.

The specification also states that "[d]elivery is improved by providing a system which creates particles for systemic delivery wherein the particles are in the range of about 0.5 to about 12.0 microns, preferably 0.5 to 6 microns and more preferably 0.5 to about 3 microns."  Tab 2 at A53, ¶ 191; *see also* Tab 2 at A60, ¶ 222 ("Regardless of the type of drug or the form of the drug formulation, it is preferable to create drug particles having a size in the range of about 0.5 to 12 microns.").  The specification asserts that "[w]hen insulin is deposited on mucus membranes of the respiratory tract and particularly in the peripheral areas of the lung it is later absorbed into the circulatory system."  Tab 2 at A17, ¶ 81.  The '774 application never mentions the word "alveoli," but instead teaches the need to deliver insulin particles "peripherally into the lung" (A5), "deeply into the lung (A6), "in the peripheral areas of the lung" (A17) or "on the outer peripheral areas of the lung." (A24).

_____

C. to 40.degree. C."  Tab 2 at A13, ¶ 64 (emphasis added).

The specification describes using the invention in conjunction with the administration of insulin by injection. Tab 2 at A36, ¶ 149. It teaches that "it will be understood by those skilled in the art that a plurality of different treatments and means of administration can be used to treat a single patient. For example, a patient can be simultaneously treated with insulin by injection, insulin via intrapulmonary administration in accordance with the present invention, and sulfonylurea drugs, which are orally administered." Tab 2 at A36, ¶ 149; *see also* (stating that an object of the invention is to provide a method of delivering insulin that is sufficiently consistent to "eliminate, at least in part, the need for injecting insulin"). Tab 2 at A7, ¶ 19.

The invention makes use of insulin formulations known as of January 29, 1993 (Tab 2 at A23, ¶ 110; A45-46, ¶¶ 169-72; A59, ¶ 220). The invention also makes use of conventional dosing methodologies for dosing insulin via injection known to a person of ordinary skill in the art at that time, particularly those set forth in Harrison. *See, e.g.*, A26-27, ¶¶ 121-122; A51, ¶ 186; A65, ¶ 235 (incorporating Harrison by reference for its disclosure of "conventional information regarding dosing insulin via injection"). For example, the specification states that "[b]ased on the information disclosed *in combination with what is known about insulin dosing* and serum glucose levels, computer readable programs can be readily developed which can be used in connection with the insulin delivery device of the present invention." A57, ¶ 211 (emphasis added); *compare* Tab 2, A22-23, ¶ 109 (specific insulin dosages and protocols taught by '774 specification) *with* Tab 13 at A268 (virtually identical insulin dosages and protocols taught by Harrison).

The specification states that:

> The differential between the amount of insulin actually released

7

from the device and the amount actually delivered to the patient varies due to a number of factors.  In general, devices used with the present invention can have an efficiency as low as 10% and as high as 50% or more meaning that as little as 10% of the released insulin may actually reach the circulatory system of the patient and as much as 50% or more might be delivered.  The efficiency of the delivery will vary somewhat from patient to patient and ***must be taken into account when programming the device for the release of insulin***.  In general, a conventional metered (propellant-driven) dose inhaling device is about 10% efficient.

Tab 2 at A64-65, ¶ 233 (emphasis added).

## 2.     The Appealed Claims

There are six claims on appeal:  claims 22, 23, 25, 26, 31, and 35 (the "Appealed Claims").  Each of the Appealed Claims relates to a method for treating diabetes mellitus with inhaled dry insulin powder.  Novo has agreed that claims 25 and 22 are exemplary.  Novo Mem. at 9.  Claim 25, Novo's broadest claim, which is not limited to any particular quantity of insulin, reads as follows:

> 25.  A repeatable method of regulating blood glucose levels in a human patient, the method comprising the steps of:
>
> a.  supplying a fixed quantity of dry insulin powder to a portion of a hand held inhalation delivery device;
>
> b.  propelling a gas over the fixed quantity of dry powder to produce, in a repeatable manner, an aerosolized suspension of insulin, the aerosolized suspension containing more insulin than is required in the bloodstream of the patient to achieve satisfactory blood glucose level; and
>
> c.  flowing at least a portion of the aerosolized suspension through a mouth piece on the device and into the lungs of the patient in a manner sufficient to cause the patient to absorb in the patient's bloodstream a sufficient, controlled quantity of insulin to achieve acceptable blood glucose level following treatment.

8

Tab 24 at A372-A373.

Claim 22 contains two additional limitations not found in claim 25: First, claim 22 limits the amount of dry powder insulin in the aerosolized suspension to "2-10 times higher than the amount needed to be absorbed in the bloodstream of the patient" ("2-10 range limitation"). Second, claim 22 defines the amount of insulin needed to be absorbed into the bloodstream as "between 1-50 units of insulin." Claim 22 reads as follows:

> 22. A method for treating diabetes mellitus in a patient comprising the steps of:
>
> a. supplying a predetermined amount of dry insulin powder to an inhalation device;
>
> b. releasing a pressurized gas over the predetermined amount of dry insulin powder to create an aerosolized suspension comprising powder suspended in air, wherein the aerosolized suspension contains an amount of insulin that is 2-10 times higher than the amount needed to be absorbed in the bloodstream of the patient; and
>
> c. inhaling the aerosolized suspension at a flow rate and volume sufficient to allow the patient to absorb in the bloodstream a controlled dose of insulin that comprises between 1-50 units of insulin.

Tab 24 at A372.

Claim 26, which depends from and further limits claim 25, indicates that the steps of claim 25 may be "repeated periodically as needed to treat the patient" provided that the amount of insulin delivered to the bloodstream remains "relatively constant." Tab 24 at A373. Similarly, claim 23, which depends from and further limits claim 22, indicates that the steps of claim 22 may be "repeated periodically as needed to treat the patient" provided that the amount of insulin delivered to the bloodstream remains "relatively constant." Tab 24 at A372.

9

B.    **The Prior Art**

1.    **Schenk**

International Patent Publication No. WO 90/07351 to Schenk *et al.* ("Schenk") (Admin

R., Tab 17, A298-A321) discloses an "oral inhaler for use in inhaling a powdered or particulate

medical product." *See* Tab 17 at A300, ll.1-2. Schenk teaches that his inhaler is designed to

deliver dry powder medicines to treat "bronchial asthma and *other diseases*." Tab 17 at A300,

ll.4-5 (emphasis added).

As depicted in Figure 1 of Schenk (Tab 17 at A317), the metering chamber **14** has a fixed

volume, so it measures out a fixed, precise, and controlled dose of powdered medicine with each

inhalation. The metering chamber **14** connects to a gas flow passage **17** via a connecting passage

**15**; the gas flow passage **17** has a restriction or throat **18** at the point of connection. A302, A307,

A317. In operation, the Schenk inhaler is positioned with the mouthpiece pointing upward,

which allows the powdered medical product to flow from the product reservoir **11** and fill the

metering chamber **14**. A308-09. The patient places her mouth on the mouthpiece **20** and

operates an actuator.[4] This causes piston **12** to move toward restriction **18** to "obtain a short,

quick pressure stroke," which creates fast-moving air, and a consequent drop in pressure, in

restriction **18**. A308-09; A317. The resulting vacuum causes the powdered product to be drawn

from the metering chamber **14** and into the air flow through passage **15** and restriction **18**, and

then into the mixing chamber **16**, where the particles move more slowly. A306, A309, A317. In

the process, the powder is broken up into "respirable" particles: "The high velocity of the air

---

[4]  The actuator is shown best in Figure 3, Tab 17 at A317.

flow and the vigorous turbulence created thereby cause that almost all of the product is disintegrated into respirable particles." A309. Schenk defines "respirable particles" as those particles of less than 7 µm in diameter. A300.

Schenk discloses that his inhaler is superior to others because it creates a "drastic increase of the proportion of respirable particles dispersed in the gas or air flow." A302, ll.19-22. Further, the "provision of such dispersed respirable particles is not dependent on the ability of the patient to inhale vigorously," but instead permits the patent to inhale the medicine slowly, a breathing technique known to facilitate the drug reaching the peripheral areas of the lungs. A302, ll.19-22; *see also* A301, ll.20-24 ("it is necessary to inhale rather slowly in order to get particles into the outer branches of the bronchial tubes.").

### 2.    Velasquez

U.S. Patent No 5,192,548 to Velasquez *et al.* ("Velasquez") (Tab 18 at A322-A331) relates to a dimpled sheet material to be used in an inhaler for dry powder drug delivery. (*See*, *e.g.*, Tab 18 at A322, Abstract.) Velasquez teaches that his invention is "particularly useful with medicaments having high potency for either local treatment of, for example, the lung or *systemic treatment*." Tab 18 at A328, col.2, ll.29-32 (emphasis added). Velasquez specifically lists insulin as an "exemplary drug" that may be employed in the practice of the invention, as well as drugs for the treatment of respiratory disorders such as bronchodilators. Velasquez also expressly teaches the administration of particles that are "preferably in the particle size range of 1 to 10 µm." Tab 18 at A330, col.6, ll.32-45.

### 3.    Harrison

Harrison (Tab 13, A266-A269) is a standard text book of internal medicine, and is cited

multiple times in the '774 application as a resource for "information regarding dosing with insulin" via injection.  *See, e.g.*, Tab 2 at A51, ¶ 186.  Harrison discloses that "conventional insulin therapy" involved "one or two injections a day of intermediate-acting insulin."  Tab 13 at A268, lt.col., ¶ 3.  However, Harrison discloses that "[n]o single standard exists for patterns of administration of insulin, and treatment plans vary from physician to physician and with a given physician in different patients."  *Id.*  Consequently, Harrison recommends (1) that normal weight patients be "started on 15 to 20 units [of insulin] a day;" (2) that "it is preferable to use the same quantity of insulin for several days before changing," and (3) that such changes should be made of "no more than 5 or 10 units per step."  *Id.*  Similar guidance is given for obese patients, with the initial insulin dose starting at "25 to 30 units a day."  *Id.*

Harrison also teaches that a variety of factors other than weight can affect the number and size of doses administered each day, including food intake, activity levels, and insulin responsiveness.  Tab 13 at A268, rt.col., para.1.  Consequently, Harrison advises that the proper dose adjustment in response to these factors "must be determined by *trial and error . . . .* "  *Id.* (emphasis added.)  Harrison concludes by stating that "[m]ost insulin-requiring patients now monitor control and alter therapy based on self-measurement of the capillary blood sugar." A269, rt.col., para.4.

The specific insulin dosages and protocols taught by the specification of the '774 application are virtually identical to those taught by Harrison.  *Compare* Tab 2 at A22-23, ¶ 9 *with* Tab 13 at A268.

C.    **The Examination of the '774 Application**

Following an initial rejection and amendment, the Examiner rejected Novo's claims as being obvious under 35 U.S.C. § 103 over the combined teachings of Schenk and Velasquez. Tab 16 at A292-A295.  The Examiner cited Schenk for disclosing "a method of treating a patient comprising the steps of: supplying a predetermined amount of dry powder (11) to an inhalation device; releasing a pressurized gas (figs. 1-6) over a predetermined amount of dry powder to create an aerosolized suspension (16) comprising powder suspended in air; and inhaling the aerosolized suspension at a flow rate and volume sufficient to allow the patient to absorb in the bloodstream a controlled dose of medicament."  Tab 16 at A292.  The Examiner cited Velasquez for teaching "dry powder medicaments as inhalable powders including insulin as a dry powder medicament for inhalation by a patient."  *Id.*  In the Examiner's view, it would have been obvious to use the dry powder insulin of Velasquez with Schenk's inhaler "because it would have provided an easy and painless manner of delivering insulin to patients."  *Id.*  As to the 2-10 range limitation, the Examiner stated that "the amount of insulin employed and the amount absorbed can be arrived at through mere routine obvious experimentation and observations . . . Consequently, one of ordinary skill would realize that the amount stored and absorbed would need to be tailored to the particular patient's medical needs."  Tab 16 at A293.

With respect to the requirement for repeated administrations in claims 23 and 26 (Tab 24 at A372-A373), the Examiner reasoned that Schenk, as modified by Velasquez's teaching of dry insulin powder, would be used to treat diabetes, a disease that requires repeated administration of insulin: "[it] stands to reason that the administration protocol would have included repeated inhalation (administration) of insulin to maintain adequate concentration of medicament in a

13

patient's bloodstream" Tab 16 at A293.

In his answer to Novo's appeal brief, the Examiner cited Harrison as extrinsic evidence regarding the use of insulin to treat diabetes mellitus. Tab 25 at A383. The Examiner then stated that "[w]hile the prior art combination [*i.e.*, Schenk and Velasquez] may not expressly disclose a particular amount [of insulin] one of ordinary skill being equipped with known medical guidelines for treatment of diabetes mellitus would know to make adjustments in the quantity of powdered medicament in order to provide a dose which would effectively bring a patient's blood glucose within a 'normal' range." Tab 25 at A385. Further, the Examiner stated that upon examining the '774 application, he could find "no criticality" to either the 2-10 range limitation or the limitation in claim 22 that "the dose of insulin [is] 1-50 units." Tab 25 at A386.

### D.    Novo's Brief to the Board

Novo appealed the examiner's final rejection to the Board of Patent Appeals and Interferences ("Board"). Tab 24 at A354-74. Novo argued, *inter alia*, that the Schenk reference does not refer to diabetes or insulin or any other substance for use in controlling blood glucose. Tab 24 at A361-2; A368. Novo criticized Velasquez for only making a single reference to insulin among a list of other drugs, and further argued that neither Schenk nor Velasquez disclose the treatment of diabetes using inhaled insulin. Tab 24 at A362.[5] Novo did not submit any evidence to the Board, in the form of an expert declaration, test data, or otherwise, to show that the Schenk device was not capable of producing a controlled, repeatable dose of insulin to the

---

[5] Novo also argued to the Board that the examiner's rejections were based on improper "obvious to try" and "inherency" standards. Tab 24 at A364-66. Novo has apparently abandoned these legal arguments in the present proceeding.

14

bloodstream.  Moreover, Novo did not disagree with the examiner's statement that "[g]iven that Schenk *et al.* disclose aerosolizing most of the medicament within the aerosolization chamber 16, the amount of medicament available for inhalation by a patient is predictable."  Tab 24 A369; *see also* A370 (acknowledging that the combination of Schenk and Velasquez may "disclose the possibility of delivering insulin into the patient's lungs").

### E.    The Board Decision

The Board rejected Novo's argument that the applied art fails to show how insulin is to be inhaled in controlled delivery, finding that "both applied references describe structural devices to precisely control the amount of a medicament delivered."  Tab 36 at A449-50.[6]  In particular, the Board found that Velasquez uses "precise measuring of small amounts in equal sized depressions for use in an inhaler," and Schenk uses "a metering chamber."  *Id.*  The Board also found that Schenk's device is "inherently repeatable in operation."  Tab 36 at A450.

Although the Board acknowledged that "neither reference teaches how to translate [its] structural controls into the precise amounts of insulin needed to be deposited for inhalation," the Board found that the broad ranges recited in Novo's claims suggest that "the precise amount is not critical to the invention, or more properly, *the precise amount* is highly dependent on the individual patient and therefore *cannot be claimed with precision*."  Tab 36 at A450 (emphasis added).  On similar grounds, the Board also rejected Novo's arguments related to claim limitations requiring lowering glucose to an "acceptable level," and "controlling glucose levels." Tab 36 at A450.  Specifically, the Board found that "lowering of glucose levels to an acceptable level and controlling the glucose levels are both highly dependent upon the particular patient,"

---

[6]  As Novo notes, the examiner's final rejection and answer are incorporated into the Board's decision.  Novo Mem. at 3 n.4 (citing *In re Webb*, 916 F.2d 1553, 1556 (Fed. Cir. 1990).

and that one would have to "monitor the patient's vital statistics to achieve the desired results in view of the high variability among patients as a matter of course." *Id.*.

Turning to claims 22, 23, and 31, the Board rejected Novo's arguments regarding the limitation that the aerosolized suspension is inhaled in such a manner that the dose absorbed into a patient's bloodstream "comprises between 1-50 units of insulin." Tab 36 at A448. The Board found that the '774 application admits that a person of ordinary skill would "ordinarily use" such a dose. Tab 36 at 449 (citing the '774 application at 21 (Tab 2 at A22)).

Finally, the Board rejected Novo's arguments regarding the limitation recited in claims 22, 23, and 35 that "the aerosolized suspension contains 2-10 times higher than needed to be absorbed into the bloodstream of a patient." Tab 36 at A448. Citing legal precedent holding that "it is not inventive to discover the optimum or workable ranges by routine experimentation" (A450, citing *In re Geisler*, 116 F.3d 1465 (Fed. Cir. 1997)), the Board expressly noted that it was "known . . . in the art that not all of the amount [of insulin] that is inhaled will be absorbed. " A449. The Board also opined that Velasquez may describe the claimed range. A449.

## F.    The Present Action and Novo's New Evidence

In the present action Novo proffers new evidence in the form of the testimony of its expert, Dr. Ronald Crystal, that the Board did not have the opportunity to consider. *See* Expert Witness Report of Dr. Ronald G. Crystal ("Crystal Report," or "Crystal Rep.") (Novo Mem., Ex. A). In his report Dr. Crystal describes the general physiology of the lung as comprised of the trachea, bronchi, bronchioles and alveoli. Crystal Rep. at 8, ¶ 23. He asserts that in order to treat diabetes through the inhalation of insulin, "the insulin must reach the alveoli in order to be absorbed into the bloodstream in a sufficient quantity to be effective." *Id.* He states that insulin

16

must be "aerosolized" to be administered by inhalation, meaning that it is converted into small particles and impacted with compressed air. *Id*. at 8, ¶ 24.

Dr. Crystal goes on to identify several factors that he believes must be controlled to accomplish "predictable and reproducible" doses of insulin by inhalation: (1) the volume with which the patient inhales the dose of insulin; (2) the flow rate with which the patients inhales the dose of insulin; (3) the size of the insulin particles inhaled; (4) the speed of the inhalation;[7] and (5) the point in the respiration cycle where the patient initiates inhalation. *Id.* at 16, ¶ 52 (citing '774 application, ¶¶ 86-111).

At his deposition, Dr. Crystal testified that at the time of the invention a person of ordinary skill in the art would have known that each of the above factors affected the reproducibility of administering insulin by inhalation, and would also have known how to control these factors to achieve reproducibility. Ex. 2 hereto (Crystal Tr.) at 164:14-18; 165:22-166:9; 167:20-168:12; 174:12-175:7; 181:4-10; 182:5-11; 185:19-186:12.

## IV.    SUMMARY OF THE ARGUMENT

Novo's claims 25 and 22 are exemplary of all of the appealed claims. Claim 25 is generally directed to a method for delivering a "controlled" and "repeatable" dose of insulin to the bloodstream of a diabetic patient via inhalation of an aerosol of dry insulin powder containing more insulin than is needed in the bloodstream. According to the specification of the '774 application and Novo's expert, this can be accomplished by (1) an inhaler device that generates

---

[7]   At his deposition Dr. Crystal initially defined speed "in terms of flow rate, that is, volume per unit time." Crystal Tr. at 125:17-19. As noted above, this is consistent with the specification of the '774 application, which equates speed and flow rate. Tab 2 at A13, ¶ 64. Later in the deposition he changed his testimony, defining speed as the overall "time" of the inhalation. Crystal Tr. at 156:17-157:18.

aerosolized insulin powder containing sufficiently small, *i.e.*, "respirable," particles, and (2) controlling the flow rate and volume of the inhalation, as well as other factors, to facilitate deposition of the respirable particles in the peripheral areas of the lungs where the insulin can then be absorbed into the bloodstream.

There is no genuine dispute that the Schenk inhaler, using the dry insulin powder disclosed by Velasquez, meets the first requirement, in that it would generate a controlled quantity of aerosolized insulin containing respirable particles, *i.e.*, those that can reach the peripheral areas of the lungs for absorption into the bloodstream. Further, since it is always the case that some aerosolized medicine is lost between its generation in an inhaler and absorption into the bloodstream, it is necessarily true that the quantity of aerosolized medicine generated by the Schenk device would need to be greater than that needed to be absorbed in the bloodstream.

There is also no genuine dispute that a person of ordinary skill would have been well aware of all of the factors, including the flow rate and volume of inhalation, necessary to deliver a controlled and repeatable dose of insulin to the bloodstream. Novo's own expert witness testified that a person of ordinary skill would know how to control all of the factors necessary to deliver a "reproducible" (*i.e.*, controlled and repeatable) dose of insulin to the bloodstream.

Novo's claim 22 mirrors claim 25, and is further limited by (1) the "2-10 range limitation," *i.e.*, creating an aerosol of insulin powder that is 2-10 greater than the amount needed to be absorbed in the bloodstream; and (2) delivering 1-50 units of insulin to the bloodstream.

As to the 2-10 range limitation of claim 22, a person of ordinary skill would have been able to determine this limitation via routine experimentation, as the examiner properly found. Additionally, the '774 application *admits* that conventional inhalers in the prior art fell within

18

this range and thus satisfied this limitation.  Thus, the 2-10 range limitation cannot patentably

distinguish claim 22.  As to the limitation of claim 22 calling for the administration of between

1-50 units of insulin to the bloodstream, administration of such doses was well known in the art

before the claimed invention was made, as made clear by Harrison.

Finally, Novo's arguments as to the secondary consideration of long-felt need are

unpersuasive.  Novo cannot show that its claimed invention has met any alleged long-felt need,

because, among other things, it has no commercial product encompassing the claimed invention:

as a result of the commercial failure of the inhalable insulin product of one of its competitors,

Novo has shelved its own commercial inhalable insulin product.

## V.    ARGUMENT

### A.    Standard for Summary Judgment

Summary judgment is appropriate when the "pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (c).

In deciding a motion for summary judgment, the Court must view all facts, and inferences

drawn therefrom, in the light most favorable to the non-moving party.  *United States v. Diebold,*

*Inc.*, 369 U.S. 654, 655 (1962).  The mere existence of a factual dispute will not defeat summary

judgment; it must be genuine and material to the case.  A factual dispute is genuine when the

non-moving party presents evidence such that a reasonable jury could return a verdict in its favor.

*Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C.Cir. 1987).  Thus, "[m]ere denials or

conclusory statements" by the non-moving party are insufficient to create a genuine issue of

material fact.  *See, e.g., Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731

F.2d 831, 836 (Fed. Cir. 1984).

**B.    35 U.S.C. § 145 Review**

**1.    Novo Bears the Burden of Showing Reversible Error by the Board**

A §145 action "is conducted as a trial; however, it is in essence a suit *to set aside* the final

decision of the board, like the bill in equity from which it was derived." *Fregeau v. Mossinghoff*,

776 F.2d 1034, 1037 (Fed. Cir. 1985) (emphasis in original).  As such, Novo carries the burden

of showing that the board committed reversible error.  *Id*. at 1038 ("the applicant has the laboring

oar to establish error by the board.")

When no new evidence supplements the administrative record, the board's legal

conclusions can only be set aside if they are "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law." 5 U.S.C. § 706.  The board's findings of fact are reviewed

for substantial evidence.  *Mazzari v. Rogan*, 323 F.3d 1000, 1005 (Fed. Cir. 2003).  Substantial

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938).  Where "two

different, inconsistent conclusions may reasonably be drawn from the evidence in record, an

agency's decision to favor one conclusion over the other is the epitome of a decision that must be

sustained upon review for substantial evidence."  *In re Jolley*, 308 F.3d 1317, 1328-9 (Fed. Cir.

2002).

Even if this Court decides to admit new evidence, the record before the USPTO remains

the "evidentiary nucleus" of the case.  *Fregeau*, 776 F.2d at 1037.  Novo is not entitled to "start

over" prosecution of its application before this Court "unfettered by what happened in the PTO."

*Id*. at 1038.  Only where new evidence offered by the parties is conflicting is the Court permitted

20

to make *de novo* factual findings.  *Mazzari*, 323 F.2d at 1005.

> **2.    Novo's Ability To Present New Evidence In This Court Is Limited By Novo's Conduct Before The USPTO**

In order to encourage "full disclosure to the administrative tribunals primarily responsible for just decision-making," *Killian v. Watson*, 121 USPQ 507, 508 (D.D.C. 1958), this Court has established two limitations on the ability of Section 145 plaintiffs to present new evidence in district court.

First, a Section 145 plaintiff cannot present new evidence on new issues - that is, issues not raised before the Examiner or the Board.  *See, e.g., DeSeversky v. Brenner*, 424 F.2d 857, 858 (D.C. Cir. 1970).  Novo agrees that "no new issues may be raised in a Section 145 action." Novo Mem. at 22, fn. 26.

Second, a Section 145 plaintiff cannot present new evidence that was "previously available to a party but, either because of intentional suppression by or negligence of the party, was withheld during the initial patent proceedings."  *See, e.g., California Research Corp. v. Ladd*, 356 F.2d 813, 821, n.18 (D.C. Cir. 1966) ("[a]lthough each side may strengthen its case with additional material, the plaintiff may not submit for the first time evidence which he was negligent in failing to submit to the Patent Office");  *Monsanto Co. v. Kamp*, 269 F. Supp. 818, 822 (D.D.C. 1967) (evidence available to the parties but "withheld from the Patent Office as a result of fraud, bad faith, or gross negligence, may be excluded at the trial"); *Holloway v. Quigg*, 9 USPQ2d 1751, 1752 (D.D.C. 1988) ("evidence has been excluded if it was available to the plaintiff during the PTO proceeding but was either intentionally or negligently withheld").

When plaintiffs fail to offer a reasonable explanation for withholding evidence from the

agency, Courts in this district have precluded them from presenting new evidence in district court. *Killian*, 121 USPQ at 508 ("Plaintiff has not here made any explanation of his apparent refusal to offer, during this extended period in which the administrative decisions were consistently against him, the evidence which might have proven him right. Accordingly, this court must consider him grossly negligent in that failure, and refuse to consider it now."); *Hyatt v. Dudas*, No. 3-0901, 2006 WL 4606037, at *3 (D.D.C. 2006) (Hyatt's declaration "properly excluded" because the information in his declaration was "available to him during the PTO proceedings" and he has not "provided a persuasive explanation for why he withheld that information").

Novo seeks to introduce the expert report of Dr. Crystal, even though Novo failed to present it – or any other evidence – to the Board in the proceedings below. But the failure to present expert testimony that could have been presented during patent prosecution is the sort of negligent behavior that prevents a §145 plaintiff from later introducing new evidence on that same issue. *Hyatt*, 2006 WL 4606037, at *3. Without this limitation, a patent applicant could simply avoid the technical expertise of the USPTO by presenting it with only broad general arguments about patentability and then bringing its evidence to the District Court to be examined in the first instance. This is exactly what Novo is attempting to do here.

Novo cites five cases in support of its argument that its new evidence should be admitted. Novo Mem. at 21-22. But in four of the cases, admissibility of new evidence was not at issue. *See, Mazzari v. Rogan*, 323 F.3d 1000 (Fed. Cir. 2003); *Gallagher v. Quigg*, 8 USPQ 2d 1437 (D.D.C. 1988); *Dickinson v. Zurko*, 527 U.S. 150 (1999); *Fregeau v. Mossinghoff*, 776 F.2d 1034 (Fed. Cir. 1985). In the one case where admissibility was at issue, the district court admitted

plaintiff's declaration discussing two patents because the plaintiff had submitted one patent to the Board and did not learn of the second patent until after briefing to the Board was complete. *Takeda Pharma. Co. v. Dudas*, 511 F.Supp.2d 81, 87 (D.D.C. 2007). Novo makes no such argument about its new evidence here and, accordingly, *Takeda*, along with the other cases on which Novo relies, is inapposite.

### C.     The Determination of Obviousness Under 35 U.S.C. § 103

Section 103 of the Patent Act, 35 U.S.C. § 103, forbids issuance of a patent when "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103; *KSR Int'l Co. v. Teleflex, Inc.*, __ U.S. __, 127 S. Ct. 1727, 1734 (2007).

Whether a claimed invention is unpatentable as obvious under 35 U.S.C. § 103 is a question of law based on underlying findings of fact. *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000). These factual inquiries include: (a) the scope and content of the prior art; (b) differences between the prior art and the claims at issue; (c) the level of ordinary skill in the pertinent art; and (d) objective indicia of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966). "What a reference teaches or suggests must be examined in the context of the knowledge, skill, and reasoning ability of a skilled artisan." *Syntex (U.S.A.) LLC v. Apotex, Inc.*, 407 F.3d 1371, 1380 (Fed. Cir. 2005). Where "the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate" notwithstanding the presence in the record of contrary expert testimony. *KSR*, 127 S. Ct. at

23

1745-46.

The obviousness analysis must be performed on a claim-by-claim basis. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001). Because claim 25 is broader than claim 22, it will be discussed first.

> **D.    The Board Correctly Found That Claim 25 Would Have Been Obvious in View of Schenk and Velasquez**

The Board correctly found that claim 25 would have been obvious in view of Schenk as modified by Velasquez. First, Schenk describes specific structure for generating a precise quantity of aerosolized powder. Second, Schenk produces particles of a "respirable" size, such that they may travel deeply into the lung where absorption to the bloodstream may occur. Third, Velasquez teaches that dry insulin powder was known in the art at the time of the invention, and would have given a person of ordinary skill at that time the reasonable expectation that dry insulin powder would behave no differently in prior art inhalation devices than dry powder medicines used for the treatment of asthma. (Indeed, one of the named inventors of the '774 application used an asthma drug to predict the behavior of inhaled aerosolized insulin). Fourth, as Novo's expert admits, all of the factors that must be taken into account to ensure that a controlled and repeatable dose of inhaled medicine reaches the bloodstream of the patient – primarily the volume and flow rate of inhalation, and the size of the medicine particles in the aerosol – were known by those skilled in the art at the time of the invention.

1.     **The Schenk Device Is Capable of Generating an Aerosol of Dry Insulin Powder That Can Reach the Peripheral Areas of the Lungs, Including the Alveoli**

The Schenk device, as depicted in various forms in figures 1-4 of Schenk, is capable of generating an aerosol of dry insulin powder that can reach the peripheral areas of the lungs, including the alveoli, for absorption into the bloodstream.  As the Board found, Schenk describes structure that "precisely control[s]" the amount of medicine delivered to a patent, *i.e.*, the fixed-volume metering chamber from which each dose of powdered medicine is efficiently drawn and turned into particles of respirable size.  Tab 36 at A450.[8]  Schenk defines as "respirable" those particles less than 7 μm in diameter.  Tab 17 at A300; A302, ll.19-20; A309, ll.14-16.

It is undisputed that particles of the size generated by the Schenk device are suitable for delivering insulin to the peripheral areas of the lungs, and from there to the bloodstream. The specification of Novo's '774 application makes clear that particles less than 7 μm are capable of reaching deeply into the lung so that medicine can be absorbed into the bloodstream:

> Delivery [of insulin powder] is improved by providing a system which creates particles for systemic delivery wherein the particles are in the range of about 0.5 to about 12 microns, preferably 0.5 to 6 microns and more preferably 0.5 to about 3 microns."

Tab 2 at A53, ¶ 191; *see also* Tab 2 at A60, ¶ 222 ("regardless of the type of drug or the form of the drug formulation, it is preferable to create drug particles having a size in the range of about 0.5 to 12 microns.").  Novo's expert, Dr. Crystal, agrees that particles of the size generated by the Schenk inhaler are capable of reaching that part of the lung at which absorption into the bloodstream takes place.  Crystal Rep at 8, ¶¶ 23, 25 (particles must reach the alveoli to be

---

[8]  Because Novo has proffered no evidence to rebut this finding, and because it is supported by substantial evidence (specifically, Tab 17 at A300-09, where the Schenk inhalers are described, and Tab 17 at A317, where they are depicted), it must be affirmed.

absorbed into the bloodstream, and "Studies have shown that the *ideal* particle size for reaching the alveoli is approximately 0.5 μm - 6 μm in diameter" (emphasis added)).

In his expert report Dr. Crystal focuses needlessly on whether absorption occurs exclusively in the alveoli. He asserts that it is "critical that the insulin particles reach the alveoli" and that "particles of insulin that reach only the airways of the lungs are not available to the bloodstream and cannot effect systemic treatment." Novo Mem. at 11. In contrast, the USPTO's expert, Prof. Dolovich, believes that the absorption of insulin takes place in the alveoli and may also take place in the peripheral lung where "alveoli are starting to appear." Dolovich Tr. 107.

As an initial matter, Prof. Dolovich's position is more closely aligned with that of the inventors of the '774 application. In fact, the '774 application never even mentions the word "alveoli," but instead, teaches the need to deliver insulin particles "peripherally into the lung" (Tab 2 at A5), "deeply into the lung" (Tab 2 at A6), "in the peripheral areas of the lung" (Tab 2 at A17) or "on the outer peripheral areas of the lung." (A24). It is also more closely aligned with that of the applicant prosecuting the '281 application. The applicant admitted that "[i]nsulin is a known drug having a known utility and is known to enter the circulatory system when brought into contact with lung tissue. Ex. 8 (Amendment After Final) at NN-1310.

But more importantly, this difference of opinion between the experts is an immaterial dispute that this Court need not resolve in order to grant summary judgment for the USPTO. This is because there is *no* dispute that particles up to 6 microns in diameter – the size of particles generated by the Schenk inhaler – are respirable, *i.e.*, that they can reach *that part of the lung from which insulin can be absorbed into the bloodstream*. *See* Novo Mem. at 19 n.23 ("Both parties' experts agree that particles in the size range of .5 -6 micrometers are in the

26

respirable range"); Novo Mem. at 12 ("Particle size is perhaps one of the most important factors in determining whether the aerosolized drug reaches beyond the airways and into the alveoli in sufficient quantities to treat diabetes. Only particles that are of respirable size – .5 to 5 micrometers (perhaps up to 6 micrometers) – are of a size that *may* reach the alveoli" (emphasis in original)). Thus, the issue whether the absorption of particles up to 6 µm takes place exclusively from the alveoli, or whether it may also take place in the small peripheral airways leading up to the alveoli – while perhaps interesting to the experts – is not a genuine issue of material fact that this Court need resolve in rendering summary judgment.[9]

---

[9] Novo engages in a bit of cut-and-paste creativity with the transcript of Prof. Dolovich's deposition in order to cast doubt on whether Prof. Dolovich believes the Schenk inhaler could be used to practice the claimed methods. On page 30, footnote 33 of Novo's Memorandum, Novo alleges that Prof. Dolovich testified as follows: "'Do you believe that if you put insulin into Schenk it would produce powder having the same particle range as asthma medicine put into Schenk?' (DT 98:19-21.) Do you know whether that would happen as a result?' (DT 99:3-4.) 'My answer would be no.'" (DT 99:10.). Setting it up this way naturally would lead the reader to believe that Prof. Dolovich answered "no" to both questions. But this is not the case. The transcript actually reads:

> Q.    All right. Do you believe that if you put insulin into Schenk it would produce powder having the same particle range as asthma medicine put into Schenk?

> Mr. Wood: Objection as to form.

> The Witness: ***It is possible***.

> Q.    Do you know whether that would happen as a result?

> A.    The Schenk patent was filed in 1990. I have had no hands-on experience with this prototype inhaler. So I, myself, have not used it as a test inhaler for insulin.

> Q.    Okay. So the answer to my question is no?

> A.    No – yes, it is. My answer would be no, but yes, to your question.

27

      2.     **Valesquez Teaches That Dry Insulin Powder Existed at the Time of the Invention and That it Can Be Used in a Device Also Used for the Delivery of Asthma Medication**

Velasquez discloses a mechanism by which precise doses of a variety of dry powdered medicines, including dry insulin powder, can be delivered to a patient via inhalation. Tab 18 at A330, col. 5, lines 47-51. Velasquez specifically lists insulin as an "exemplary drug" that may be employed in the practice of the invention, as well as drugs for the treatment of respiratory disorders such as bronchodilators. Tab 18 at A330, col. 6, lines 25-41. In so doing, Velasquez teaches a person of ordinary skill in the art that dry insulin powder existed at the time of Novo's invention, and that it can be used in a device that is also useful for the administration of other powdered medicines, including asthma medicines. Considering that it was also well known that at least a portion of inhaled dry insulin powder would be absorbed into the bloodstream, Velasquez would have given a person of ordinary skill in the art the reasonable expectation that aerosolized insulin powder will behave in a manner similar to those of the other drugs listed in Velasquez in a device such as the Schenk inhaler.

Indeed, there is no genuine dispute as to this point. Novo concedes the possibility that Schenk and Velasquez "allow one of ordinary skill in the art to control the amount of insulin that comes out of an inhalation device." Novo Mem. at 27. Further, in demonstrating the usefulness of the *very invention* at issue in this case, the inventor of the '281 application used an *asthma* drug (albuterol) to show how inhaled aerosolized *insulin* would behave in the lungs. Ex. 9 (Rubsamen Decl.) at NN-625.

---

Dolovich Tr. at 98:19-1 (emphasis added).

### 3. Novo Admits That One of Ordinary Skill Would Know How to Control the Flow Rate and Volume of Inhalation, and Other Factors, to Achieve a Reproducible Dose to the Bloodstream

Novo's expert, Dr. Crystal, does not disagree that "Schenk and Velasquez may allow one of ordinary skill in the art to control the amount of insulin that is coming out of the device." Crystal Rep. at 15-16, ¶ 50. However, Novo argues that Schenk and Velasquez "do not control the amount inhaled that actually reaches the alveoli or will actually be absorbed into the bloodstream." Crystal Rep. at 16, ¶¶ 50, 52; Novo Mem. at 27-28. Dr. Crystal sets forth various factors that he believes are necessary to achieve a controlled, reproducible dose of insulin to the bloodstream:

> [M]any factors influence whether a reproducible dose is administered to the bloodstream by insulin inhalation, even if the same amount of insulin is aerosolized in a device in the same manner each time. These factors include, among others, the ***flow rate*** and ***volume*** with which a patient would inhale each dose of insulin, the speed[10] of the inhalation, the ***particle size***, the ***concentration*** of the drug in the carrier, and the ***point in the respiration cycle*** where the patient initiates inhalation.

Crystal Rep. at 16, ¶ 52 (emphasis added); *see also* Mem. at 27-28.

However, Dr. Crystal admitted at his deposition, unequivocally, that a person of ordinary skill in the art in 1993 would not only have been aware of all of these factors, but *would have known how to control them to achieve controlled insulin dosing by inhalation*:

> Q.    Would a person of ordinary skill in the art in 1993 understand that a ***flow rate*** is a factor that influences whether a reproducible dose is administered to the bloodstream by insulin inhalation?

---

[10]   While Dr. Crystal was equivocal as to whether the "speed" of the inhalation is the same thing as the "flow rate" of the inhalation, Crystal Tr. at 125:15-19; 157:3-13, Novo's '774 application is not: It defines "flow rate" *as* the speed. Tab 2 at A13, ¶ 64. Thus, these terms are synonymous.

A.     Yes.

\* \* \* \*

Q:     Would a person of ordinary skill in the art as of January 1993 understand how *flow rate* influences whether a reproducible dose is administered to the bloodstream by inhalation?

MS. PFEIFFER:     Objection to form.

THE WITNESS:     Using the term reproducibility referring to dosing to the blood?

BY MR. WOOD:

Q:     Yes.

A:     Yes.

\* \* \* \*

Q.     Okay.  Would a person of ordinary skill in the art as of January 1993 understand that the *volume* with which a patient inhales each dose of insulin influences whether a reproducible dose is administered to the bloodstream by insulin inhalation?

MS. PFEIFFER:     Objection to form.

THE WITNESS:     Yes.

Q:     Would a person of ordinary skill in the art in January 1993 know how to *control the volume* with which a patient would inhale each dose of insulin in order to achieve a reproducible dose administered to the bloodstream by inhalation?

MS. PFEIFFER:     Objection to form.

THE WITNESS:     Yes.

\* \* \* \*

30

Q:     Would a person of ordinary skill in the art as of January 1993 understand that ***particle size*** is a factor that influences whether a reproducible dose of insulin is administered to the bloodstream by inhalation?

MS. PFEIFFER:     Objection to form.

THE WITNESS:     Again, for all of this discussion, I can assume the ordinary skilled person or ordinary skilled in the art as we have defined it?

BY MR. WOOD:

Q.     Yes.

A.     Yes.  Then the answer is yes.

Q.     Would a person of ordinary skill in the art as of January 1993 know how to control ***particle size*** to influence whether a reproducible dose of insulin is administered to the bloodstream by inhalation?

MS. PFEIFFER:     Objection to form.

THE WITNESS:     Yes.

* * * *

Q:     Would a person of ordinary skill in the art in January 1993 understand that ***the concentration of the drug in the carrier*** influences whether a reproducible dose of insulin is administered to the bloodstream by inhalation?

MS. PFEIFFER:     Objection to form.

THE WITNESS:     Yes.

* * * *

Q.     Would a person of ordinary skill in the art know how to control ***the concentration of the drug in the carrier*** to influence whether a reproducible dose of insulin is

31

administered to the bloodstream by inhalation?

MS. PFEIFFER:          Objection to form.

THE WITNESS:          Yes.

* * * *

Q:     Would a person of ordinary skill in the art as of January 1993 understand that *the point in the respiration cycle where the patient initiates inhalation* influences whether a reproducible dose of insulin is administered to the bloodstream by inhalation?

MS. PFEIFFER:          Objection to form.

THE WITNESS:          Yes.

BY MR. WOOD:

Q.     Would a person of ordinary skill in the art as of January 1993 understand how to control *the point in the respiration cycle where the patient initiates inhalation* in order to achieve a reproducible dose of insulin administered to the bloodstream by inhalation?

MS. PFEIFFER:          Objection to form.

THE WITNESS:          Yes.

Crystal Tr. at 164:14-18; 165:22-166:9; 167:20-168:12; 174:12-175:7; 181:4-10; 182:5-11; 185:19-186:12 (emphasis added).[11]

A conclusion of obviousness can be supported by the express teaching of a prior art reference in combination with the general knowledge of a person of ordinary skill. *See Para-*

---

[11]  While Dr. Crystal did not specifically testify as to the "speed" of inhalation, as noted above, inhalation speed is the same as inhalation flow rate, to which he did testify.  To the extent that he maintains that "speed" means time, he has stated that flow rate is simply "volume per unit time," so controlling the flow rate and volume of the inhalation, as he admits a person of ordinary skill would have known how to do, would be tantamount to controlling the time of the inhalation.

32

*Ordnance*, 73 F.3d 1085, 1090 (Fed. Cir. 1995) (finding no error in the district court basing its

conclusion of obviousness on the teachings of the prior art in combination with the general

knowledge of one skilled in the art); *KSR*, 127 S. Ct. at 1739 ("The combination of familiar

elements according to known methods is likely to be obvious when it does not more than yield

predictable results.").

Here, the conclusion of obviousness as to claim 25 is based on the combination of (1) the

express teachings of Schenk and Velasquez – which Novo concedes may teach a person of

ordinary skill to control the amount of insulin generated by an inhalation device (Novo Mem. at

27) – with (2) the general knowledge of a person of ordinary skill as to all of the factors that Dr.

Crystal identified as necessary to achieve a controlled dose of insulin to the bloodstream – which

is admitted by Novo's own expert.  There are thus no genuine issues of material fact as to the

obviousness of claim 25.

> **E.    The Board Correctly Found That Claim 22 Would Have Been Obvious in View of Schenk, Velasquez and Harrison**
>
> > **1.    The 2-10 Range Limitation in Claim 22 Does Not Patentably Distinguish Claim 22 from the Prior Art**

As noted above, claim 22 recites, in addition to those limitations  present in claim 25, the

so-called 2-10 range limitation:  the amount of insulin aerosolized in the device must be 2-10

times higher than the amount of insulin needed to be absorbed in bloodstream.  This limitation

recognizes that losses will occur as the aerosol cloud progresses from the device to the peripheral

areas of the lungs, and then as the insulin is absorbed from the lungs to the bloodstream.  The

2-10 range limitation cannot patentably distinguish claim 22 from the prior art for three reasons:

(1) the specification admits that prior art inhalers fell within the 2-10 range; (2) as the examiner

found, a person of ordinary skill could have determined the 2-10 range by routine experimentation; and (3) Novo has failed to show any legal criticality with respect to the 2-10 range limitation.[12]

### a.     The '774 Application Admits That Prior Art Inhalers Fell Within the 2-10 Range

The 2-10 range limitation cannot patentably distinguish claim 22 from the prior art because the specification of the '774 application admits that prior art inhalers fell within the 2-10 range. *See Constant v. Advanced Micro-Devices*, 848 F.2d 1560, 1570 (Fed. Cir. 1988) ("A statement in a patent that something is in the prior art is binding on the applicant and patentee for determinations of anticipation and obviousness."). The specification expressly states:

> There is a differential between the amount of insulin actually released from the device and the amount of insulin actually delivered to the patient. The present device is two to ten times more efficient than *conventional inhalation devices (i.e., MDIs or metered dose inhalers) which have an efficiency as low as 10% meaning that as little as 10% of the released insulin may actually reach the circulatory system of the patient*.

Tab 2 at A24, ¶ 112 (emphasis added).

In admitting that for conventional inhalers "as little as" 10% of the released insulin may actually reach the circulatory system (*i.e.*, the bloodstream), the '774 specification admits that the amount of the insulin aerosolized in a "conventional inhalation device" must be "10 times higher than the amount needed to be absorbed in the bloodstream." Tab 24 at A372 (claim 22). Thus, the specification admits that a conventional inhalation device fell within the 2-10 range specified

---

[12]   In addition to affirming the examiner's finding that a person of ordinary skill would be able to determine the 2-10 limitation through routine experimentation, the Board presented an alternative argument why the 2-10 limitation does not patentability distinguish claim 22: That the 2-10 limitation is taught by Velasquez. Tab 36 at A449. For purposes of this summary judgment motion, the USPTO does not rely on this alternative argument.

in claim 22, because disclosure in the prior art of *any* specific value within a claimed range expressly discloses the claimed range.  *See Titanium Metals Corp. v. Banner*, 778 F.2d 775, 781-2 (Fed. Cir. 1985) (holding that prior art disclosing titanium base alloy containing 0.25% Mo and 0.75% Ni anticipates claims to a titanium base alloy containing from 0.2 - 0.4% Mo and from 0.6-0.9% Ni); *In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1350-51 (Fed. Cir. 2002) (applying *Titanium Metals* to method claims).

> **b.** **The Examiner Correctly Found That a Person of Ordinary Skill Could Have Determined the 2-10 Range Limitation Through Routine Experimentation**

In addition, the examiner correctly recognized that the 2-10 range limitation is insufficient to confer patentability on claim 22 because "the amount of insulin employed and the amount absorbed can be arrived at through mere routine obvious experimentation and observation."  Tab 16 at A293.  In his Answer (Tab 25), the examiner specifically identifies U.S. Patent No. 5,320,094 to Laube et al. ("Laube") for its teaching of "known losses" of aerosolized insulin administered to human patients (*e.g.*, on the surfaces of the inhaler, inside the patient's mouth, etc.), which would make it a *necessity* to put more insulin in the inhaler than is intended to be absorbed in the bloodstream.  Tab 25 at A385-6.

Novo argues that the examiner is wrong as a matter of law because a routine-experimentation rejection "is appropriate only when 'one skilled in the art would have had a reasonable expectation of success at the time the invention was made, and merely had to verify that expectation.'"  Novo Mem. at 28-29 (citing *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1367 (Fed. Cir. 2007)).  Novo asserts that a "person of ordinary skill in the art could not have conducted routine experimentation using insulin powder (listed in Velasquez) with the Schenk

35

inhaler to determine the claimed '2-10 range'" because there is no "administration protocol" for inhaled insulin. Novo Mem. at 29. Novo further argues that "guidelines for dosage of *injectable* insulin, *e.g.*, in Harrison, do not provide doses for *inhalable* insulin. *Id.* (emphasis in original). As a result, argues Novo, "such experimentation would be unethical and dangerous." Novo Mem. at 29-30.

As an initial matter, Novo's argument is based primarily on the testimony of its expert, Dr. Crystal. Novo could have, but did not, present such testimony to the Board, because the examiner had made the routine-experimentation argument below. Novo should be precluded from presenting this evidence here for the first time because it has offered no reason why it did not submit it to the USPTO. *See supra*, section V.B.2.

Even considering Dr. Crystal's testimony in this regard, Novo cannot prevail. Far from being "unethical and dangerous," the type of experimentation contemplated by the Examiner, dose response studies, are routine to one skilled in the art. *Merck & Co. Inc. v. Biocraft Laboratories, Inc.*, 874 F.2d 804, 809 (Fed. Cir. 1989) (rejecting nonobviousness argument based upon dosage calculations because "though requiring time and care, the experimentation needed to arrive at the claimed dosages was nothing more than routine"); *United States v. Telectronics, Inc.*, 857 F.2d 778, 786 (Fed. Cir. 1988) (no undue experimentation because the "only impediments are the time and cost of a dose response study, which the district court found could be performed by . . . those skilled in the art"). Indeed, researchers had been experimenting with the administration of inhalable insulin in humans for decades prior to January 1993. The prior art is replete with examples, including the administration of aerosolized insulin to humans as early as 1925. *See* Gänsslen, M., *Über Inhalation von Insulin* (Ex. D to Novo's Memorandum).

36

In fact, the Laube patent, cited by the Examiner, sets forth a very detailed example of such a study:  insulin was administered by inhalation to eight subjects, and measurements of blood glucose and insulin levels were taken.  Laube, col. 6, line 47- col.7, line 25.  The eight subjects gave informed consent, and the study was approved by the Institutional Review Board at Johns Hopkins.  Laube, col. 8, ln.6-10.  There was nothing "unethical"or "dangerous" about her study or any other properly designed study.[13]

More importantly, Dr. Crystal's argument about "administration protocols" rests on a false assumption:  that there must be an "administration protocol" in place to meet the standard of routine experimentation.  This is not the case.  Instead, as Novo acknowledges, the standard of "routine experimentation" is met when "one skilled in the art would have had a reasonable expectation of success at the time the invention was made, and merely had to verify that expectation."  *Pfizer*, 480 F.3d at 1367.  Obviousness under 35 U.S.C. § 103 does *not* require "absolute predictability."  *In re Merck & Co., Inc.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986).  Here, the parties agree that one of skill in the art was a person with a "M.D. or a Ph.D. in a related field, and several years of experience in pharmaceutical aerosols, lung physiology, and

---

[13]  Moreover, the USPTO identified three additional pieces of prior art that contain protocols for administering inhalable insulin; namely, U.S. Patent No. 5,643,868, U.S. Patent No. 5,843,886 and U.S. Patent No. 5,763,396 to Weiner *et al.* (collectively "Weiner").  USPTO Response to RTA No. 7.  Novo complains that the USPTO "buried" these references in its document production.  Novo Mem. at 29, n.31.  On the contrary, counsel for the USPTO only learned of these references in January of this year, when Novo identified them in an "Information Disclosure Statement" that Novo submitted with a related patent application.  Novo further argues that Weiner does not teach the claimed invention because the claims require inhaling insulin to control blood glucose levels.  *Id.*  However, claims 22 and 23 do not have this requirement.  *See* Tab 24 at A372.  Finally, Novo argues that Weiner "teaches away" from the claimed invention because it will not eliminate the need for insulin injection in diabetic patients.  Novo Mem. at 29 n.31.  But Novo's claims do not require the total elimination of insulin injections; indeed, the '774 specification specifically contemplates using the invention in conjunction with such injections.  Tab 2 at A36, ¶ 149.

pulmonary drug delivery or the equivalent training and experience."  Crystal Rep. at 11, para. 33.

This is a high level of skill indeed, and such a person would have the necessary skills to safely

expose humans to inhalable insulin.

In addition, Novo's assertion that the injectable dosing taught in Harrison is irrelevant to

determining doses of inhalable insulin is flatly contradicted by the evidence in the record.  Laube

specifically states that she "chose to deliver" a particular dose "because this is the dose given by

subcutaneous administration."  Laube, col.3, ln 19-21.  This subcutaneous dose is set forth in

Harrison.  Harrison is also relevant because both Harrison and Novo's claims are directed to the

administration of insulin to the *bloodstream*, and it is clear from the disclosure of the invention

that the inventors sought to emulate, via inhalation, Harrison's teaching of the administration by

injection of insulin to the bloodstream.  Indeed, the specification of the '774 application cites to

Harrison no less than three times.  *See* Tab 2 at A27, ¶ 122; A51, ¶ 185; A65, ¶ 235.  Even more

significantly, the specification's teaching of the proper doses to be administered via the claimed

*inhalation* methods is copied practically *verbatim* from Harrison, as evidenced by a comparison

of the following excerpts shown in this table:

38

| From the '774 application (Tab 2 at A22-23, ¶ 109). | From Harrison (Tab 13 at A268) |
|---|---|
| "A normal-weight adult may be started on about a **15-20 units a day** in that the estimated daily insulin production rate in non-diabetic subjects of normal size is approximately **25 units per day**." | "Adults of normal weight may be started on **15 to 20 units a day** (the estimated daily insulin production rate in nondiabetic subjects of normal size is about **25 units a day**)." |
| "It is preferable to administer approximately **the same quantity of insulin for several days** before changing the dosing regime . . ." | "It is preferable to use **the same quantity of insulin for several days** before changing, . . ." |
| ". . . except with hypoglycemic patients for which **the dose should be immediately decreased** . . ." | ". . . the one exception being the hypoglycemic patient, for whom **the dose should be decreased immediately** . . ." |
| " . . . unless a clearly evident **nonrecurrent cause of hypoglycemia** (such as not eating, i.e., missing a typical meal) is present." | ". . . unless a **nonrecurrent cause of hypoglycemia** (such as excessive exercise) is present." |
| "In general, the changes should not be more than **five to ten units** per day." | "Generally, changes should be no more than **5 or 10 units** per step." |
| "It is typical to administer **about two-thirds of the total insulin** daily dosage **before breakfast** and administer the **remainder before supper**." | "Poorly controlled patients should be placed on split therapy, with **about two-thirds of the total insulin** given **before breakfast** and the **remainder before supper**." |

The '774 application thus makes abundantly clear that not only is Harrison relevant to the Appealed Claims, it is the very source of the '774 application's disclosure of the dosage guidelines.

Finally, Novo's own application concedes that even one practicing Novo's claimed invention would not know whether the efficiency would be as low as 10% or as high as 50% and would *need* to experiment for each patient and each inhalation device.  As Novo's application states:

> [T]he differential between the amount of insulin actually released

from the device and the amount actually delivered to the patient varies due to a number of factors. In general, devices used with the present invention can have an efficiency as low as 10% and as high as 50% or more meaning that as little as 10% of the released insulin may actually reach the circulatory system of the patient and as much as 50% or more might be delivered. **The efficiency of the delivery will vary somewhat from patient to patient and must be taken into account when programming the device for the release of insulin.**

Tab 2 at A64-65 (emphasis added).

### c. Novo Has Failed to Show Any Legal Criticality as to the 2-10 Range Limitation

Finally, as the Examiner correctly noted, there is no evidence of any "criticality for the amount of insulin in the aerosolized suspension being 2-10 times higher than the amount needed to be absorbed into a patient's bloodstream." Tab 25 at A386. If an applicant seeking to avoid a finding of obviousness of a claim that includes a range that overlaps with a range disclosed in the prior art (as the '774 application admits), the applicant must "show that the [claimed] range is *critical*, generally by showing that the claimed range achieves unexpected results relative to the prior art range." *In re Geisler*, 116 F.3d 1465, 1469-70 (Fed. Cir. 1997) (emphasis in original); *see also In re Aller*, 220 F.2d 454, 456 (CCPA 1955).

Novo has not put forth any evidence that the 2-10 range limitation is critical in this regard. Indeed, as the Examiner also noted, this limitation is simply a consequence of the inherent losses of medicine from the inhaler to the lungs and bloodstream, which *requires* more medicine to be aerosolized in the inhaler than is desired to be absorbed in the bloodstream.

40

2.    **The 1-50 Units of Insulin Limitation in Claim 22 Is Also Insufficient to Patentably Distinguish Claim 22 from the Prior Art**

Claim 22 recites an additional limitation not present in claim 25: the absorption into the bloodstream of a controlled dose of insulin that comprises between 1-50 units of insulin.  Tab 24 at A372.  As discussed above, a person of ordinary skill would have been able to produce a controlled, reproducible dose of insulin to the bloodstream.  *See supra*, section V.D.  Further, it has long been known to deliver doses of 1-50 units to the bloodstream.  Harrison, for example, discloses that total daily doses of 50-60 units of insulin are administered in two injections, or 25-30 units per individual dose.  Tab 13 at A268.  As noted above, disclosure of any value within a claimed range constitutes disclosure of the entire range.  *See supra* at 34 (citing *Titanium Metals*, 778 F.3d at 781-2).

Novo argues that the Board made the "shocking wrong" statement that the precise amount [of insulin] is not critical to the invention."  Novo Mem. at 26.  Novo counters that "the absolute amount of insulin administered to a diabetic patient is critical."  Novo misses the point entirely.  The Board's point was that the precise amount of insulin was not critical to the *claim* ("invention").  *See Geisler*, 116 F.3d at 1469-70.  The Board was not referring to the criticality of a specific dose to a specific patient.  The lack of criticality of the 1-50 units limitation to claim 22 is clear, since the huge range of doses claimed (1-50 units) encompasses practically *all* reasonable doses that might be administered to a patient's bloodstream.  *See* Harrison, Tab 13 at A268-69.

41

**F.    Novo's New Argument as to Long Felt Need Should Not Be Admitted**

In its summary judgment papers, Novo argues, for the first time, that its claimed invention met a "long felt but unsolved need." Novo Mem. at 31. Novo never argued long felt need (or any other secondary consideration) before the agency. Because long felt need is a new issue, this Court should preclude Novo from presenting this new evidence on long felt need here. *See DeSeversky*, 424 F.2d at 858.

Moreover, even if long felt need is not determined to be a new issue, this Court should still preclude Novo from presenting this evidence. Novo's new evidence was available to Novo during prosecution, yet Novo withheld it from the agency with no explanation. *Holloway v. Quigg*, 9 USPQ2d 1751, 1752 (D.D.C. 1988) (excluding new evidence of secondary considerations because "plaintiff has not demonstrated that either the issue of unsuccessful attempts by others or the issue of surprise, skepticism or disbelief was raised in the proceeding below," or "demonstrated that the failure to raise these issues was neither intentional nor negligent."); *MacKay v. Quigg*, 231 USPQ 907, 909 (D.D.C. 1986) (excluding new evidence of secondary considerations "because plaintiffs failed to present and support contentions of commercial success or copying during the PTO proceedings, and have not set forth any reasons for this omission").

Even if this Court admits Novo's new evidence, Novo would still not prevail.

First, Novo argues that others had failed to administer insulin by inhalation because of "the poor reproducibility of the inhaled dose [of insulin]." Novo Mem at 32. Contrary to Novo's arguments, Laube had succeeded in administering a reproducible dose of insulin by inhalation before January 1993. Laube administered a specific dose of insulin by inhalation to both normal

42

and non-insulin dependant diabetic (NIDDM) subjects and calculated that a "mean of 89.8 +/-
5% of the inhaled dose was actually deposited in the lungs." Laube, col.5 , lines 58-60. Laube
concluded that the "glucose response to the dose of insulin administered as an aerosol was
*predictable* when the dose was calculated on a per kilogram basis, and there *did not appear to be*
*significant variability* between normal subjects and NIDDM subjects in absorption across the
lung mucosa." Laube, col 6, lines 28-33 (emphasis added).

Second, Novo has not demonstrated a nexus between the merits of its claimed invention
and the alleged long felt need. *Stratoflex, Inc. v. Aeroquip Corp*, 713 F.2d 1530 (Fed. Cir. 1983).
In other words, Novo failed to show that its claimed invention *met* the alleged long-felt need by,
for example, achieving some sort of commercial success with its claimed invention.

Indeed, Novo does not even attempt to establish the required nexus. Nor could it. Novo
has never commercialized the claimed invention, and, in January of this year, Novo abandoned
all attempts to do so. Novo's press release announcing the termination of its inhalable insulin
product, AERx®, acknowledged that AERx® was "unlikely to offer significant clinical or
convenience benefits" over insulin injections. Exhibit 5 hereto, Novo January 14, 2008 Press
Release. Thus, Novo admits that AERx® fails to meet any long felt need that may have existed
among patients treated with injections of insulin.

Novo's press release merely confirms what others in the industry had already discovered:
that inhalable insulin is a commercial failure. For example, Pfizer pulled its inhalable insulin
product, Exubera®, off the market, stating that it "did not meet customers' needs or financial
expectations." Exhibit 6 hereto, Pfizer press release, October, 2007. Lilly & Co., Inc. recently
followed suit, terminating the development of its inhalable insulin product in March of this year.

43

Exhibit 7 hereto, Lilly Press Release, March, 2008.

Novo's acknowledgment of the lack of customer demand for AERx®, as well as similar acknowledgments from Novo's competitors as to their respective inhalable insulin products, dooms its argument that its claimed invention meets a long felt need. *See National Steel Car, Ltd. v. Canadian Pacific Railway, Ltd.*, 357 F.3d 1319 (Fed. Cir. 2004) (a "finding of no customer demand is flatly contradictory with [the] conclusion that a long-felt need existed.") It also raises serious questions about whether such a need existed in the first place. Accordingly, Novo has not - and cannot - establish a long-felt need for its claimed invention.

## VI.    CONCLUSION

For the foregoing reasons, defendant requests that the Court enter an order granting summary judgment to defendant.

Respectfully submitted,


/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


/s/_____
BLANCHE BRUCE, D.C. BAR # 960245
Assistant United States Attorney
555 Fourth Street, N.W., Room E-4417
Washington, D.C. 20530
(202) 514-9150 (telephone)
(202) 514-8780 (facsimile)

Date:  May 19, 2008                    ATTORNEYS FOR DEFENDANT

OF COUNSEL:

STEPHEN WALSH
Acting Solicitor
MARY L. KELLY
FRANCES LYNCH
BENJAMIN WOOD
Associate Solicitors
U.S. Patent & Trademark Office

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                            )
**NOVO NORDISK A/S**                        )
                                                            )
                    **Plaintiff,**                         )
                                                            )
            **v.**                                           )          **Case No: 06-1896 (CKK)**
                                                            )
**JON W. DUDAS**                               )
        **Under Secretary of Commerce for  )**
        **Intellectual Property and            )**
        **Director of the United States Patent)**
        **& Trademark Office,**                 )
                                                            )
                    **Defendant.**                      )
_____)

**ORDER**


Upon consideration of Defendant USPTO's Combined Motion for Summary Judgment

and Opposition to the Motion for Summary Judgment of Plaintiff Novo Nordisk A/S, and the

entire record in this matter, it is hereby

ORDERED that Defendant's motion for summary judgment is GRANTED.



Dated:_____




                                        _____
                                        COLLEEN KOLLAR-KOTELLY
                                        United States District Judge

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
NOVO NORDISK A/S                        )
                                        )
            Plaintiff,                  )
                                        )
       v.                               )        Case No: 06-1896 (CKK)
                                        )
JON W. DUDAS                            )
      Under Secretary of Commerce for   )
      Intellectual Property and         )
      Director of the United States Patent )
      & Trademark Office,                )
                                        )
            Defendant.                   )
_____ )

## DEFENDANT USPTO'S STATEMENT OF MATERIAL
## FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

**A.    The '774 Application and Family**

1.      U.S. Patent Application No. 09/848,774 (the "'774 application") was filed by

Aradigm Corp., Novo's predecessor in interest in the '774 application, on May 3, 2001.  *See*

Novo Mem., Ex. I (showing chain of assignment of the '774 application).

2.      The '774 application "claims priority," via a long chain of intermediate

applications, to U.S. Patent Application No. 08/011,281 ("the '281 application"), which was filed

on January 29, 1993.  Tab 2 at A2.

3.      Novo has obtained 23 patents based on the '281 application.  *See* Exhibit A to

Defendant's Statement of Points and Authorities in Support of its Combined Motion for

Summary Judgment and Opposition to the Motion for Summary Judgment of Plaintiff Novo

Nordisk A/S ("USPTO Stmt.").

4.    In prosecuting the '281 application, the named inventor of that application, Dr. Reid Rubsamen, filed a declaration with the USPTO.  *See* Declaration Under 37 CFR 1.132 of Reid Rubsamen (June 13, 1994) ("Rubsamen Decl.") (Exhibit 9 to the USPTO's Statement of Point and Authorities ("USPTO Stmt.")).  In his declaration Dr. Rubsamen disclosed that he conducted certain experiments to "demonstrate the usefulness of [his] invention" for inhalable insulin. Ex. 9 (Rubsamen Decl.) at NN-625.  Instead of administering insulin to human patients, however, he administered radiolabeled albuterol, a bronchodilator useful for the treatment of lung diseases such as asthma.  *Id.*; *see also* the Deposition of Dr. Ronald G. Crystal, M.D. ("Crystal Tr.") (Exhibit 2 to the USPTO's Statement of Points and Authorities) at 91:14-92:14.

5.    Also in prosecuting the '281 application, the applicant stated that "The claims generally cover a method of administering a specific drug (*i.e.*, insulin) to lung tissue. . . . Insulin is a known drug having a known utility and is known to enter the circulatory system when brought into contact with lung tissue."  Amendment After Final filed in connection with the '281 application (June 13, 1994) ("Amendment After Final") (Exhibit 8 hereto) at NN-1310.

6.    Prior to January 29, 1993, a person of ordinary skill in the art knew that insulin would enter the circulatory system when brought into contact with lung tissue.  USPTO Stmt. Ex. 8 at NN-1310.

7.    In prosecuting the '281 application, the applicant stated that "[t]he ability to provide for intrapulmonary delivery of insulin is known and old.  References previously cited by the Examiner clearly disclosed that insulin can be delivered by the intrapulmonary route."  *Id.* at NN-1311.

8.    The ability to provide for intrapulmonary delivery of insulin was known to a

2

person of ordinary skill prior to January 29, 1993, and therefore old as of that date.  USPTO

Stmt, Ex. 8 at NN-1311.

9.      Finally, the applicant admitted that Dr. Rubsamen's declaration "shows that the

device actually delivers [insulin] to the lungs and based on what is known with respect to insulin

(via the prior art), the insulin will enter the circulatory system."  *Id.* at NN-1313.

## 1.      The Invention Disclosure

10.     The specification of the '774 application describes a method of controlling the

dosage of aerosolized insulin delivered to a patient's circulatory system by measuring and

controlling the total volume of air inhaled by the patient.  Tab 2 at A5, ¶ 10; A7, ¶ 17.

11.     According to the specification, the "primary factor addressed by the present

invention relating to the consistency of dosing insulin by inhalation is the total air volume

inhaled by the patient."  Tab 2 at A17, ¶ 83; *see also* A47, ¶¶ 173-76 (discussing the effect on

repeatability of dosing due to total inhaled volume); A18, ¶ 83 ("if the patient merely inhales the

same volume for each drug delivery event, the dosing will be consistent").

12.     The specification also identifies the inspiratory flow rate, or speed, of the patient's

inhalation at which the device fires as another factor affecting the repeatability of dosing.  Tab 2

at A52, ¶¶ 187, 190.

13.     The specification acknowledges that even when inhalation volume and flow rate

are controlled, variations in doses administered to the patient will occur, and teaches that such

variations "are calculated by monitoring serum glucose levels in response to known amounts of

insulin released from the device."  Tab 2 at A25 at ¶ 116.

14.     The specification teaches that the methods of the invention can be carried out by

any known inhaler capable of administering dry powder to a patient.  A device suitable to carry

out the methods of the invention would be one that "provide[s] for the mechanical movement of

a predetermined amount of dry powder to a given area," and energy from compressed gas would

"cause the dry powder to form a dry dust cloud" for inhalation."  Tab 2 at A66, ¶ 238.

15.    The specification also states that "[d]elivery is improved by providing a system

which creates particles for systemic delivery wherein the particles are in the range of about 0.5 to

about 12.0 microns, preferably 0.5 to 6 microns and more preferably 0.5 to about 3 microns."

A53, ¶ 191; *see also* A60, ¶ 222 ("Regardless of the type of drug or the form of the drug

formulation, it is preferable to create drug particles having a size in the range of about 0.5 to 12

microns.").

16.    The specification states that "[w]hen insulin is deposited on mucus membranes of

the respiratory tract and particularly in the peripheral areas of the lung it is later absorbed into the

circulatory system."  Tab 2 at A17, ¶ 81.

17.    The '774 application never mentions the word "alveoli," but instead teaches the

need to deliver insulin particles "peripherally into the lung" (A5), "deeply into the lung (A6), "in

the peripheral areas of the lung" (A17) or "on the outer peripheral areas of the lung" (A24).

18.    The specification describes using the invention in conjunction with the

administration of insulin by injection.  Tab 2 at A36, ¶ 149.  It teaches that "it will be understood

by those skilled in the art that a plurality of different treatments and means of administration can

be used to treat a single patient.  For example, a patient can be simultaneously treated with

insulin by injection, insulin via intrapulmonary administration in accordance with the present

invention, and sulfonylurea drugs, which are orally administered."  A36, ¶ 149; *see also* (stating

4

that an object of the invention is to provide a method of delivering insulin that is sufficiently consistent to "eliminate, at least in part, the need for injecting insulin"). A7, ¶ 19.

19.    The invention utilizes insulin formulations known as of January 29, 1993.  Tab 2 at A23, ¶ 110; A45-46, ¶¶ 169-72; A59, ¶ 220.

20.    The invention utilizes conventional dosing methodologies for dosing insulin via injection known to a person of ordinary skill in the art as of January 29, 1993, particularly those set forth in Harrison.  *See, e.g.*, Tab 2 at A26-27, ¶¶ 121-122; A51, ¶ 186; A65, ¶ 235 (incorporating Harrison by reference for its disclosure of "conventional information regarding dosing insulin via injection").

21.    The specific dosages taught by the specification of the '774 application are almost *verbatim* those recited in Harrison.  *Compare* Tab 2 at A22-23 *with* Tab 13 at A268.

22.    The specification states that "[b]ased on the information disclosed in combination with what is known about insulin dosing and serum glucose levels, computer readable programs can be readily developed which can be used in connection with the insulin delivery device of the present invention."  Tab 2 at A57, ¶ 211.

23.    The specification states that:

> The differential between the amount of insulin actually released from the device and the amount actually delivered to the patient varies due to a number of factors.  In general, devices used with the present invention can have an efficiency as low as 10% and as high as 50% or more meaning that as little as 10% of the released insulin may actually reach the circulatory system of the patient and as much as 50% or more might be delivered.  The efficiency of the delivery will vary somewhat from patient to patient and must be taken into account when programming the device for the release of insulin.  In general, a conventional metered (propellant-driven) dose inhaling device is about 10% efficient.

5

Tab 2 at A64-65, ¶ 233.

24.    The specification further states that:

There is a differential between the amount of insulin actually
released from the device and the amount of insulin actually
delivered to the patient.  The present device is two to ten times
more efficient than conventional inhalation devices (i.e., MDIs or
metered dose inhalers) which have an efficiency as low as 10%
meaning that as little as 10% of the released insulin may actually
reach the circulatory system of the patient.

Tab 2 at A24, ¶ 112.

25.    The disclosure defines "inspiratory flow rate" as "a value of air flow rate

measured, calculated and/or determined based on the speed of the air passing a given point in a

measuring device assuming atmospheric pressure +- .5% and a temperature in the range of about

10.degree. C. to 40.degree. C."  Tab 2 at A13, ¶ 64.

26.    The inventors state that "after dosing a patient with insulin it is desirable to

measure glucose (invasively or non-invasively) and make adjustments as needed to obtain the

desired glucose level."  A64, ¶ 232.

## 2.    The Appealed Claims

27.    There are six claims on appeal:  claims 22, 23, 25, 26, 31, and 35 (the "Appealed

Claims").  Each of the Appealed Claims relates to a method for treating diabetes mellitus with

inhaled dry insulin powder.

28.    Novo has agreed that claims 25 and 22 are exemplary.  Novo Mem. at 9.

29.    Claim 25, Novo's broadest claim, reads as follows:

25.  A repeatable method of regulating blood glucose levels in a
human patient, the method comprising the steps of:

6

a.  supplying a fixed quantity of dry insulin powder to a portion of a hand held inhalation delivery device;

b.  propelling a gas over the fixed quantity of dry powder to produce, in a repeatable manner, an aerosolized suspension of insulin, the aerosolized suspension containing more insulin than is required in the bloodstream of the patient to achieve satisfactory blood glucose level; and

c.  flowing at least a portion of the aerosolized suspension through a mouth piece on the device and into the lungs of the patient in a manner sufficient to cause the patient to absorb in the patient's bloodstream a sufficient, controlled quantity of insulin to achieve acceptable blood glucose level following treatment.

Tab 24 at A372-A373.

30.    Claim 22 contains two additional limitations not found in claim 25:  First, claim 22 limits the amount of dry insulin powder in the aerosolized suspension to "2-10 times higher than the amount needed to be absorbed in the bloodstream of the patient" ("2-10 range limitation").  Second, claim 22 defines the amount of insulin needed to be absorbed into the bloodstream as "between 1-50 units of insulin."  Tab 24 at A372.

31.    Claim 22 reads as follows:

22.  A method for treating diabetes mellitus in a patient comprising the steps of:

a.  supplying a predetermined amount of dry insulin powder to an inhalation device;

b.  releasing a pressurized gas over the predetermined amount of dry insulin powder to create an aerosolized suspension comprising powder suspended in air, wherein the aerosolized suspension contains an amount of insulin that is 2-10 times higher than the amount needed to be absorbed in the bloodstream of the patient; and

c.  inhaling the aerosolized suspension at a flow rate and volume

7

> sufficient to allow the patient to absorb in the bloodstream a
> controlled dose of insulin that comprises between 1-50 units of
> insulin.

Tab 24 at A372.

32.    Claim 26, which depends from and further limits claim 25, indicates that the steps

of claim 25 may be "repeated periodically as needed to treat the patient" provided that the

amount of insulin delivered to the bloodstream remains "relatively constant."  Tab 24 at A373.

33.    Claim 23, which depends from and further limits claim 22, indicates that the steps

of claim 22 may be "repeated periodically as needed to treat the patient" provided that the

amount of insulin delivered to the bloodstream remains "relatively constant."  Tab 24 at A372.

**B.    The Prior Art**

**1.    Schenk**

34.    International Patent Publication No. WO 90/07351 to Schenk *et al.* ("Schenk")

(Tab 17, A298-A321) discloses an "oral inhaler for use in inhaling a powdered or particulate

medical product."  *See* Tab 17 at A300, ll.1-2.

35.    Schenk teaches that his inhaler is designed to deliver dry powder medicines to

treat "bronchial asthma and other diseases."  A300, ll.4-5.

36.    As depicted in Figure 1 of Schenk (Tab 17 at A317), the metering chamber **14** has

a fixed volume, so it measures out a fixed, precise, and controlled dose of powdered medicine

with each inhalation.  The metering chamber **14** connects to a gas flow passage **17** via a

connecting passage **15**; the gas flow passage **17** has a restriction or throat **18** at the point of

connection.  Tab 17 at A302, A307, A317.

37.    In operation, the Schenk inhaler is positioned with the mouthpiece pointing

8

upward, which allows the powdered medical product to flow from the product reservoir **11** and fill the metering chamber **14**. Tab 17 at A308-09.

38.     The patient using the Schenk inhaler places her mouth on the mouthpiece **20** and operates an actuator. This causes piston **12** to move toward restriction **18** to "obtain a short, quick pressure stroke," which creates fast-moving air, and a consequent drop in pressure, in restriction **18**. A308-09; A317. The resulting vacuum causes the powdered product to be drawn from the metering chamber **14** and into the air flow through passage **15** and restriction **18**, and then into the mixing chamber **16**, where the particles move more slowly. A306, A309, A317. In the process, the powder is broken up into "respirable" particles: "The high velocity of the air flow and the vigorous turbulence created thereby cause that almost all of the product is disintegrated into respirable particles." A309.

39.     Schenk defines "respirable particles" as those particles of less than 7 $\mu$m in diameter. Tab 17 at A300.

40.     Schenk discloses that his inhaler is superior to others because it creates a "drastic increase of the proportion of respirable particles dispersed in the gas or air flow." Tab 17 at A302, ll.19-22.

41.     Schenk discloses that the "provision of such respirable particles is not dependent on the ability of the patient to inhale vigorously," but instead permits the patent to inhale the medicine slowly, a breathing technique known to facilitate the drug reaching the peripheral areas of the lungs. A302, ll.19-22; *see also* A301, ll.20-24 ("it is necessary to inhale rather slowly in order to get particles into the outer branches of the bronchial tubes.").

42.     Schenk is prior art with respect to the '774 application. *See* Tab 17 at A298

(showing publication date of July 12, 1990).

43.    Both parties' experts agree that particles in the size range of .5 -6 micrometers are in the respirable range.  Novo Mem. at 19 n.23.

### 2.    Velasquez

44.    U.S. Patent No 5,192,548 to Velasquez *et al.* ("Velasquez") (Tab 18 at A322-A331) relates to a dimpled sheet material to be used in an inhaler for dry powder drug delivery. (*See*, *e.g.*, A322, Abstract.)

45.    Velasquez teaches that his invention is "particularly useful with medicaments having high potency for either local treatment of, for example, the lung or systemic treatment." A328, col.2, ll.29-32.

46.    Velasquez specifically lists insulin as an "exemplary drug" that may be employed in the practice of the invention, as well as drugs for the treatment of respiratory disorders such as bronchodilators.  A330, col.6, ll.32-45.

47.    Velasquez also expressly teaches the administration of particles that are "preferably in the particle size range of 1 to 10 μm."  A330, col.6, ll.32-45.

48.    Velasquez is prior art with respect to the '774 application.  *See* Tab 18 at A322 (showing application filing date of April 30, 1990).

49.    Velasquez discloses a mechanism by which precise doses of a variety of dry powdered medicines, including dry insulin powder, can be delivered to a patient via inhalation. Tab 18 at A330, col. 5, lines 47-51.

50.    Dr. Crystal, Novo's expert, has admitted that "Schenk and Velasquez may allow one of ordinary skill in the art to control the amount of insulin that is coming out of the device."

Crystal Rep. at 15-16, ¶ 50.

### 3.    Harrison

51.    Harrison (Tab 13, A266-A269) is a standard text book of internal medicine, and is cited multiple times in the '774 application as a resource for "information regarding dosing with insulin via injection" *See, e.g.*,Tab 2 at A51, ¶ 186.

52.    Harrison discloses that "conventional insulin therapy" involved "one or two injections a day of intermediate-acting insulin." Tab 13 at A268, lt.col., ¶ 3.

53.    Harrison discloses that "[n]o single standard exists for patterns of administration of insulin, and treatment plans vary from physician to physician and with a given physician in different patients." *Id.*  Consequently, Harrison recommends that normal weight patients be "started on 15 to 20 units [of insulin] a day," and that step-wise adjustments to dose should be made of "no more than 5 or 10 units per step." *Id.*  Similar guidance is given for obese patients, with the initial insulin dose starting at "25 to 30 units a day." *Id.*

54.    Harrison also teaches that a variety of factors other than weight can affect the number and size of doses administered each day, including food intake, activity levels, and insulin responsiveness.  Tab 13 at A268, rt.col., para.1.  Consequently, Harrison advises that the proper dose adjustment in response to these factors "must be determined by trial and error . . . . " *Id.*

55.    Harrison states that "[m]ost insulin-requiring patients now monitor control and alter therapy based on self-measurement of the capillary blood sugar."  Tab 13 at A269, rt.col., para.4.

56.    The specification of the '774 application cites to Harrison three times.  *See* Tab 2

11

at A27, ¶ 122; A51, ¶ 185; A65, ¶ 235.

57.     The specification's teaching of the proper doses to be administered via the claimed inhalation methods is copied practically *verbatim* from Harrison, as evidenced by a comparison of the following excerpts shown in this table:

| From the '774 application (Tab 2 at A22-23, ¶ 109). | From Harrison (Tab 13 at A268) |
|---|---|
| "A normal-weight adult may be started on about a **15-20 units a day** in that the estimated daily insulin production rate in non-diabetic subjects of normal size is approximately **25 units per day**." | "Adults of normal weight may be started on **15 to 20 units a day** (the estimated daily insulin production rate in nondiabetic subjects of normal size is about **25 units a day**)." |
| "It is preferable to administer approximately **the same quantity of insulin for several days** before changing the dosing regime . . ." | "It is preferable to use **the same quantity of insulin for several days** before changing, . . ." |
| ". . . except with hypoglycemic patients for which **the dose should be immediately decreased** . . ." | ". . . the one exception being the hypoglycemic patient, for whom **the dose should be decreased immediately** . . ." |
| " . . . unless a clearly evident **nonrecurrent cause of hypoglycemia** (such as not eating, i.e., missing a typical meal) is present." | ". . . unless a **nonrecurrent cause of hypoglycemia** (such as excessive exercise) is present." |
| "In general, the changes should not be more than **five to ten units** per day." | "Generally, changes should be no more than **5 or 10 units** per step." |
| "It is typical to administer **about two-thirds of the total insulin** daily dosage **before breakfast** and administer the **remainder before supper**." | "Poorly controlled patients should be placed on split therapy, with **about two-thirds of the total insulin** given **before breakfast** and the **remainder before supper**." |

Tab 2 at A22-23, ¶ 109; Tab 13 at A268.

58.     Harrison, for example, discloses that total daily doses of 50-60 units of insulin are administered in two injections, or 25-30 units per individual dose.  Tab 13 at A268.

59.     Harrison is prior art with respect to the '774 application.  Tab 2 at A51, ¶ 186,

12

A22-23, ¶ 9; Tab 13 at A268 (showing that the '774 application cites to, and copies from, Harrison).

### 4.    Laube

60.    U.S. Patent No. 5,320,094 to Laube *et al.* ("Laube") issued from an application filed on January 10, 1992.  USPTO Stmt., Ex. 3 cover page.

61.    Laube disclosed the performance of experiments in which inhalable insulin was administered to eight patients, two without diabetes and six with non-insulin dependent diabetes mellitus ("NIDDM").  USPTO Stmt, Ex. 3, col. 6, line 47 - col. 7, line 25.

62.    Each of the patients who participated in the Laube studies provided informed consent to a written description of the study.  *Id.* at col. 8, lines 7-9.

63.    The experiments were approved by the Institutional Review Board at Johns Hopkins Outpatient Clinical Research Center, where the studies were conducted.  *Id.* at col. 8, lines 6-10.

64.    Laube states in her patent that she "chose to deliver" a particular dose of inhalable insulin to the subjects of her experiment "because this is the dose given by subcutaneous administration."  Laube, col.3, ln 19-21.

65.    Laube is prior art with respect to the '774 application.  *See* USPTO Stmt. Ex. 3, cover page (showing application filing date of January 10, 1992).

66.    In her experiments that are disclosed in the Laube patent, Laube administered a specific dose of insulin by inhalation to both normal and non-insulin dependant diabetic (NIDDM) subjects and calculated that a "mean of 89.8   +/- 5% of the inhaled dose was actually deposited in the lungs." Laube, col.5 , lines 58-60.  she concluded that the "glucose response to

13

the dose of insulin administered as an aerosol was predictable when the dose was calculated on a per kilogram basis, and there did not appear to be significant variability between normal subjects and NIDDM subjects in absorption across the lung mucosa." Laube, col 6, lines 28-33.

### C.    The Examination of the '774 Application

67.    Following an initial rejection and amendment, the Examiner rejected Novo's claims as being obvious under 35 U.S.C. § 103 over the combined teachings of Schenk and Velasquez. Tab 16 at A292-A295.

68.    The Examiner cited Schenk for disclosing "a method of treating a patient comprising the steps of: supplying a predetermined amount of dry powder (11) to an inhalation device; releasing a pressurized gas (figs. 1-6) over a predetermined amount of dry powder to create an aerosolized suspension (16) comprising powder suspended in air; and inhaling the aerosolized suspension at a flow rate and volume sufficient to allow the patient to absorb in the bloodstream a controlled dose of medicament." Tab 16 at A292.

69.    The Examiner cited Velasquez for teaching "dry powder medicaments as inhalable powders including insulin as a dry powder medicament for inhalation by a patient." *Id.*

70.    In the Examiner's view, it would have been obvious to use the dry powder insulin of Velasquez with Schenk's inhaler "because it would have provided an easy and painless manner of delivering insulin to patients." *Id.*

71.    As to the 2-10 range limitation, the Examiner stated that "the amount of insulin employed and the amount absorbed can be arrived at through mere routine obvious experimentation and observations . . . Consequently, one of ordinary skill would realize that the amount stored and absorbed would need to be tailored to the particular patient's medical needs."

14

Tab 16 at A293.

72.     With respect to the requirement for repeated administrations in claims 23 and 26 (A372-A373), the Examiner reasoned that Schenk, as modified by Velasquez's teaching of dry insulin powder, would be used to treat diabetes, a disease that requires repeated administration of insulin: "[it] stands to reason that the administration protocol would have included repeated inhalation (administration) of insulin to maintain adequate concentration of medicament in a patient's bloodstream" Tab 16 at A293.

73.     In his answer to Novo's appeal brief, the Examiner cited Harrison as extrinsic evidence regarding the use of insulin to treat diabetes mellitus.  Tab 25 at A383.  The Examiner then stated that "[w]hile the prior art combination [*i.e.*, Schenk and Velasquez] may not expressly disclose a particular amount [of insulin] one of ordinary skill being equipped with known medical guidelines for treatment of diabetes mellitus would know to make adjustments in the quantity of powdered medicament in order to provide a dose which would effectively bring a patient's blood glucose within a 'normal' range."  A385.

74.     The Examiner stated that upon examining the '774 application, he could find "no criticality" to either the 2-10 range limitation or the limitation in claim 22 that "the dose of insulin [is] 1-50 units."  A386.

75.     In his Answer in opposition to Novo's Brief to the Board, the examiner identified U.S. Patent No. 5,320,094 to Laube et al. ("Laube") for its teaching of "known losses" of aerosolized insulin administered to human patients (*e.g.*, on the surfaces of the inhaler, inside the patient's mouth, etc.), which would make it a necessity to put more insulin in the inhaler than is intended to be absorbed in the bloodstream.  Tab 25 at A385-6.

**D.    Novo's Brief to the Board**

76.    Novo appealed the examiner's final rejection to the Board of Patent Appeals and Interferences ("Board").  Novo argued, *inter alia*, that the Schenk reference does not refer to diabetes or insulin or any other substance for use in controlling blood glucose.  Tab 24 at A361-2; A368.

77.    Novo criticized Velasquez for only making a single reference to insulin among a list of other drugs, and further argued that neither Schenk nor Velasquez disclose the treatment of diabetes using inhaled insulin.  Tab 24 at A362.

78.    Novo did not submit any evidence to the Board, in the form of an expert declaration, test data, or otherwise, to show that the Schenk device was not capable of producing a controlled, repeatable dose of insulin to the bloodstream.  *See generally* Tab 24, Tab 26.

79.    In its brief to the Board, Novo did not disagree with the examiner's statement that "[g]iven that Schenk *et al.* disclose aerosolizing most of the medicament within the aerosolization chamber 16, the amount of medicament available for inhalation by a patient is predictable."  Tab 24 at A369; *see also* A370 (acknowledging that "the combination of Schenk and Velasquez may "disclose the possibility of delivering insulin into the patient's lungs").

**E.    The Board Decision**

80.    The Board rejected Novo's argument that the applied art fails to show how insulin is to be inhaled in controlled delivery, finding that "both applied references describe structural devices to precisely control the amount of a medicament delivered."  Tab 36 at A449-50.

81.    The Board found that Velasquez uses "precise measuring of small amounts in

equal sized depressions for use in an inhaler," and Schenk uses "a metering chamber." *Id.* The Board also found that Schenk's device is "inherently repeatable in operation." Tab 36 at A450.

82.    Although the Board acknowledged in its Decision that "neither reference teaches how to translate [its] structural controls into the precise amounts of insulin needed to be deposited for inhalation," the Board found that the broad ranges recited in Novo's claims suggest that "the precise amount is not critical to the invention, or more properly, the precise amount is highly dependent on the individual patient and therefore cannot be claimed with precision." Tab 36 at A450.

83.    The Board also rejected Novo's arguments related to claim limitations requiring lowering glucose to an "acceptable level," and "controlling glucose levels." A450. Specifically, the Board found that "lowering of glucose levels to an acceptable level and controlling the glucose levels are both highly dependent upon the particular patient," and that one would have to "monitor the patient's vital statistics to achieve the desired results in view of the high variability among patients as a matter of course." Tab 36 at A450.

84.    Turning to dependent claims 22, 26, and 31, the Board rejected Novo's arguments regarding the limitation that the aerosolized suspension is inhaled in such a manner that the dose absorbed into a patient's bloodstream "comprises between 1-50 units of insulin." Tab 36 at A448. The Board found that the '774 application admits that a person of ordinary skill would "ordinarily use" such a dose. Tab 36 at 449 (citing the '774 application at 21 (A22)).

85.    Finally, the Board rejected Novo's arguments regarding the limitation recited in claims 22, 23, and 35 that "the aerosolized suspension contains 2-10 times higher than needed to be absorbed into the bloodstream of a patient." A448.

17

86.     In addition to findings already adopted from the Examiner (*see* A447) and legal precedent holding that "it is not inventive to discover the optimum or workable ranges by routine experimentation" (A450, citing *In re Geisler*, 116 F.3d 1465 (Fed. Cir. 1997)), the Board expressly noted that it was "known . . . in the art that not all of the amount [of insulin] that is inhaled will be absorbed. " Tab 36 at A449.

87.     The Board opined in its Decision that Velasquez may describe the claimed range. Tab 36 at A449.

### F.     The Present Action and Novo's New Evidence

88.     In his report Dr. Crystal describes the general physiology of the lung as comprised of the trachea, bronchi, bronchioles and alveoli.  Crystal Rep. at 8, ¶ 23.  He asserts that in order to treat diabetes through the inhalation of insulin, "the insulin must reach the alveoli in order to be absorbed into the bloodstream in a sufficient quantity to be effective." *Id.*  He states that insulin must be "aerosolized" to be administered by inhalation, meaning that it is converted into small particles and impacted with compressed air.  *Id*. at 8, ¶ 24.

89.     In his expert report Dr. Crystal identifies several factors that he believes must be controlled to accomplish "predictable and reproducible" doses of insulin by inhalation: (1) the volume with which the patient inhales the dose of insulin; (2) the flow rate with which the patients inhales the dose of insulin; (3) the size of the insulin particles inhaled; (4) the speed of the inhalation; and (5) the point in the respiration cycle where the patient initiates inhalation.  *Id.* at 16, ¶ 52 (citing '774 application, ¶¶ 86-111).

90.     At his deposition, Dr. Crystal initial defined speed "in terms of flow rate, that is, volume per unit time."  Crystal Tr. at 125:17-19.  Later in the deposition he changed his

18

testimony, defining speed as the overall "time" of the inhalation.  Crystal Tr. at 156:17-157:18.

91.    At his deposition Dr. Crystal defined "flow rate" as "volume per unit time."

Crystal Tr. at 125:18-19.

92.    At his deposition, Dr. Crystal testified that at the time of the invention a person of

ordinary skill in the art would have known that each of the above factors affected the

reproducibility of administering insulin by inhalation, and would also have known how to control

these factors to achieve reproducibility.  Crystal Tr. at 164:14-18; 165:22-166:9; 167:20-168:12;

174:12-175:7; 181:4-10; 182:5-11; 185:19-186:12.

93.    Dr. Crystal testified at his deposition:

> Q.    Would a person of ordinary skill in the art in 1993
> understand that a flow rate is a factor that influences
> whether a reproducible dose is administered to the
> bloodstream by insulin inhalation?
>
> A.    Yes.
>
> * * * *
>
> Q:    Would a person of ordinary skill in the art as of January
> 1993 understand how flow rate influences whether a
> reproducible dose is administered to the bloodstream by
> inhalation?
>
> MS. PFEIFFER:    Objection to form.
>
> THE WITNESS:    Using the term reproducibility referring to
> dosing to the blood?
>
> BY MR. WOOD:
>
> Q:    Yes.
>
> A:    Yes.

Crystal Tr. at 164:14-18; 165:22-166:9.

94.    Dr. Crystal testified at his deposition:

Q.    Okay.  Would a person of ordinary skill in the art as of January 1993 understand that the volume with which a patient inhales each dose of insulin influences whether a reproducible dose is administered to the bloodstream by insulin inhalation?

MS. PFEIFFER:    Objection to form.

THE WITNESS:    Yes.

Q:    Would a person of ordinary skill in the art in January 1993 know how to control the volume with which a patient would inhale each dose of insulin in order to achieve a reproducible dose administered to the bloodstream by inhalation?

MS. PFEIFFER:    Objection to form.

THE WITNESS:    Yes.

Crystal Tr. at 167:20-168:12.

95.    Dr. Crystal testified at his deposition:

Q:    Would a person of ordinary skill in the art as of January 1993 understand that particle size is a factor that influences whether a reproducible dose of insulin is administered to the bloodstream by inhalation?

MS. PFEIFFER:    Objection to form.

THE WITNESS:    Again, for all of this discussion, I can assume the ordinary skilled person or ordinary skilled in the art as we have defined it?

BY MR. WOOD:

Q.    Yes.

20

A.      Yes.  Then the answer is yes.

Q.      Would a person of ordinary skill in the art as of January 1993 know how to control particle size to influence whether a reproducible dose of insulin is administered to the bloodstream by inhalation?

MS. PFEIFFER:          Objection to form.

THE WITNESS:          Yes.

Crystal Tr. at 174:12-175:7.

96.      Dr Crystal testified at his deposition:

Q:      Would a person of ordinary skill in the art in January 1993 understand that the concentration of the drug in the carrier influences whether a reproducible dose of insulin is administered to the bloodstream by inhalation?

MS. PFEIFFER:          Objection to form.

THE WITNESS:          Yes.

Crystal Tr. at 181:4-10.

97.      Dr. Crystal testified at his deposition:

Q.      Would a person of ordinary skill in the art know how to control the concentration of the drug in the carrier to influence whether a reproducible dose of insulin is administered to the bloodstream by inhalation?

MS. PFEIFFER:          Objection to form.

THE WITNESS:          Yes.

Crystal Tr. at 182:5-11.

98.      Dr. Crystal testified at his deposition:

Q:      Would a person of ordinary skill in the art as of January 1993 understand that the point in the respiration cycle

21

where the patient initiates inhalation influences whether a
reproducible dose of insulin is administered to the
bloodstream by inhalation?

MS. PFEIFFER:          Objection to form.

THE WITNESS:          Yes.

BY MR. WOOD:

Q.     Would a person of ordinary skill in the art as of January
       1993 understand how to control the point in the respiration
       cycle where the patient initiates inhalation in order to
       achieve a reproducible dose of insulin administered to the
       bloodstream by inhalation?

MS. PFEIFFER:          Objection to form.

THE WITNESS:          Yes.

Crystal Tr. at 185:19-186:12.

99.     Dr. Crystal is not aware of any study of the inhalation of aerosolized insulin into

the lungs in which insulin was not found to enter the bloodstream.  Crystal Tr. at 156:1-6.

100.     Novo never argued long felt need (or any other secondary consideration of

nonobviousness) before the agency.  *See generally* Tabs 24, 26.

### 1.     Treating Patients with Diabetes

101.     The dose of insulin to be delivered to a diabetic patent varies with a number of

factors, most important of which is the patient's blood glucose level and the size of the patient.

Tab 2 at A6, ¶ 12; A22, ¶ 109; A24, ¶ 114; A26, ¶ 121.

102.     To obtain systemic delivery of insulin to a patient, it is desirable to get the

aerosolized insulin formulation deeply into the lung.  Tab 2 at A6, ¶ 14.

103.     The inventors stated in their disclosure that "[i]t will be understood by those

22

skilled in the art that levels of about 50 mg/dl are considered law and that levels of about 300 mg/dl are considered high, although acceptable in the sense that these levels are generally not fatal." Tab 2 at A12, ¶ 59.

104.    Researchers had been experimenting with the administration of inhalable insulin in humans since 1925. *See*, *e.g.*, Gänsslen, M., *Über Inhalation von Insulin* (Ex. D to Novo's Memorandum).

105.    U.S. Patent Nos. 5,643,868; 5,843,886; and 5,763,396; all to Weiner *et al.* ("Weiner") disclose protocols for administering inhalable insulin.

### G.    Knowledge of a person of ordinary skill in the art at the time of the invention

106.    The parties agree that one of skill in the art was a person with a "M.D. or a Ph.D. in a related field, and several years of experience in pharmaceutical aerosols, lung physiology, and pulmonary drug delivery or the equivalent training and experience." Crystal Rep. at 11, ¶ 33.

107.    A person of ordinary skill in the art at the time of the invention (i.e., as of January 1993) understood that the ideal insulin particle size for reaching the alveoli is approximately 0.5 microns to six microns in diameter. Crystal Tr. at 115:6-10.

108.    A person of ordinary skill in the art, as of January 1993, would have understood that particle size, and the flow rate and volume of the inhalation of air and aerosolized insulin directly affect where in the lung a respirable insulin particle will be deposited in the lungs and therefore the amount of inhaled insulin that reaches the alveoli. Crystal Tr. at 122:9 - 123:10 (referring to Crystal Dep. at 8, ¶ 26).

109.    A person of ordinary skill in the art in January 1993 would know how to evaluate

whether a particular inhalation device produces the same amount of aerosolized insulin in the device from dose to dose. Crystal Tr. at 150:12-17.

110. There are standard laboratory parameters for determining whether an inhalation device produces the same amount of aerosolized insulin in the device from dose to dose with which a person of ordinary skill in the art in January 1993 would have been familiar. Crystal Tr. at 151:6 - 152:12.

111. Dr. Crystal testified that the efficiency of an inhalation device can be determined in the laboratory. Crystal Tr. at 151:16-19; 152:13 - 153:15.

112. There are two ways to determine whether a patient is receiving a reproducible dose of insulin to the bloodstream: By measuring the amount of insulin in the bloodstream after inhalation, and by measuring blood sugar levels in the blood after inhalation. Crystal Tr. at 187:4-22.

113. According to Dr. Crystal, the "critical" consideration in administering insulin via inhalation to a diabetic patient is that the doses by "reproducible." Crystal Tr. at 158:18-19; 161:11-16; 163:18-20; 180:6-8.

114. The '774 application teaches that the flow rate of an inhalation is the same as the "speed" of the inhalation. *See* Tab 2 at A13, ¶ 64 ("The term 'inspiratory flow rate' shall mean a value of air flow measured, calculated and/or determined based on the speed of the air passing a given point in a measuring device assuming atmospheric pressure .+- .5% and a temperature in the range of about 10.degree. C. to 40.degree. C."

115. At his deposition Dr. Crystal could not think of any other factors beyond those listed in paragraph 52 of his expert report that influence whether a reproducible dose is

administered to the bloodstream by inhalation.  Crystal Tr. at 124:19-125:13.

### 1.    Flow Rate of the Inhalation

116.    The flow rate with which a patient would inhale each dose of insulin may be controlled by "instructing the patient in a way that they would reproducibly breathe in, in exactly the same way each time and in a way that was compatible with getting the aerosolized material in the device to the alveoli in a reproducible manner."  Crystal Tr. at 159:13-21.

117.    A person of ordinary skill in the art as of January 1993 would understand how flow rate influences whether a reproducible dose is administered to the bloodstream by inhalation.  Crystal Tr. at 165:22 - 166:9.

### 2.    The Volume of the Inhalation

118.    The volume of the inhalation with which a patient inhales each dose of inhalation can be controlled by instructing the patient.  Crystal Tr. at 167:2-6.

119.    A person of ordinary skill in the art as of January 1993 would understand that the volume with which a patient inhales each dose of insulin influences whether a reproducible dose is administered to the bloodstream by inhalation.  Crystal Tr. at 167:20 - 168:2.

120.    A person of ordinary skill in the art in January 1993 would know how to control the volume with which a patient would inhale each dose of insulin in order to achieve a reproducible dose administered to the bloodstream by inhalation.  Crystal Tr. at 168:6-12.

### 3.    Particle Size

121.    The size of the particles of aerosolized insulin powder is controlled by the device. Crystal Tr. at 169:6-18.

122.    How an inhalation device controls particle size is an inherent characteristic of the

device. Crystal Tr. at 170:21 - 171:4.

123. The size of the insulin particles can be controlled by controlling the formulation of the dry insulin powder, *i.e.*, what is added to the insulin to make the powder. Crystal Tr. at 175:16 - 176:4.

124. The optimal range of particle sizes for powdered insulin would be between 0.5 μm and 6 μm. Crystal Tr. at 169:20 - 170:7.

125. A person of ordinary skill in the art as of January 1993 would understand that particle size is a factor that influences whether a reproducible dose of insulin is administered to the bloodstream by inhalation. Crystal Tr. at 174:12 - 175:1.

126. A person of ordinary skill in the art as of January 1993 would know how to control particle size to influence whether a reproducible dose of insulin is administered to the bloodstream by inhalation. Crystal Tr. at 175:2-7.

### 4. Concentration of Insulin in the Carrier

127. The "concentration of the drug in the carrier," as Dr. Crystal used that phrase in paragraph 52 of his expert report, means the amount of insulin in the formulation. Crystal Tr. at 177:8-15.

128. The concentration of insulin in the formulation can be controlled by using the same dry insulin powder formulation across multiple doses. Crystal Tr. at 180:20 - 181:3.

129. A person of ordinary skill in the art in January 1993 would understand that the concentration of the drug in the carrier would influence whether a reproducible dose of insulin is administered to the bloodstream by inhalation. Crystal Tr. at 181:4-10.

130. A person of ordinary skill in the art would know how to control the concentration

of the drug in the carrier to influence whether a reproducible dose of insulin is administered to the bloodstream by inhalation.  Crystal Tr. at 182:5-11.

> 5.    The Point in the Respiration Cycle Where the Patient Initiates Inhalation

131.    The "respiration cycle" means an inhalation and an exhalation.  Crystal Tr. at 182:17 - 183:1.

132.    The point in the respiration cycle where the patient initiates the inhalation of insulin can be controlled by instructing the patient or by controlling it at the inhalation device. Crystal Tr. at 183:16-22.

133.    A person of ordinary skill in the art as of January 1993 would understand that the point in the respiration cycle where the patient initiates inhalation influences whether a reproducible dose of insulin is administered to the bloodstream by inhalation.  Crystal Tr. at 185:19-186:4.

134.    A person of ordinary skill in the art as of January 1993 would understand how to control the point in the respiration cycle where the patient initiates inhalation in order to achieve a reproducible dose of insulin administered to the bloodstream by inhalation.  Crystal Tr. at 186:6-12.

> H.    Lack of Commercial Success of Inhalable Insulin

135.    On January 14, 2008, Novo discontinued development of its inhalable insulin product, AERX®.  USPTO Stmt, Ex. 5 at 1.

136.    In January 2008, Pfizer, Inc. stopped marketing its inhalable insulin product, Exubera®, "because it did not meet customers' needs or financial expectations."  USPTO Stmt,

Ex. 6 at 1.

137.    On March 7, 2008, Eli Lilly & Co. announced the termination of its AIR®

inhalable insulin product.  USPTO Stmt., Ex. 7 at 1.

Respectfully submitted,


___/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


___/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


___/s/_____
BLANCHE BRUCE, D.C. BAR # 960245
Assistant United States Attorney
555 Fourth Street, N.W., Room E-4417
Washington, D.C. 20530
(202) 514-9150 (telephone)
(202) 514-8780 (facsimile)

Date:   May 19, 2008                ATTORNEYS FOR DEFENDANT

OF COUNSEL:

STEPHEN WALSH
Acting Solicitor
MARY L. KELLY
BENJAMIN WOOD
FRANCES LYNCH
Associate Solicitors
U.S. Patent & Trademark Office

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NOVO NORDISK A/S | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| JON W. DUDAS | ) |
| Under Secretary of Commerce for | ) |
| Intellectual Property and | ) |
| Director of the United States Patent | ) |
| & Trademark Office, | ) |
| | ) |
| Defendant. | ) |

Case No: 06-1896 (CKK)

**DECLARATION OF MARY L. KELLY IN SUPPORT OF DEFENDANT
USPTO'S COMBINED MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT OF
PLAINTIFF NOVO NORDISK A/S**

Mary L. Kelly declares and says:

1.    I am an associate solicitor in the Office of Solicitor, Office of the General

Counsel, U.S. Patent and Trademark Office ("USPTO").

2.    I submit this declaration in support of Defendant's Combined Motion for

Summary Judgment and Opposition to the Motion for Summary Judgment of Plaintiff Novo

Nordisk A/S.

3.    Attached hereto are true and correct copies of the following:

Exhibit 1:    Cover pages of U.S. Patents that claim priority to U.S. Application
No. 08/011,281 ("the '281 application");

Exhibit 2:    Transcript of Deposition of Ronald Crystal;

Exhibit 3:    U.S. Patent No. 5,320,094 to Laube *et al.*;

Exhibit 4:     Article by John Patton and Robert Platz entitle "Pulmonary delivery of peptides and proteins for systemic action;

Exhibit 5:     Novo Press Release dated 14 January 2008;

Exhibit 6:     Pfizer article obtained from the website "Exubera.com" on May 16, 2008;

Exhibit 7:     Lilly & Co. Press release dates March 7, 2008 obtained from newsroom.lilly.com website;

Exhibit 8:     Amendment After Final (June 13, 1994) filing in connection with the '281 application; and

Exhibit 9:     Declaration of Reid Rubsamen (June 13, 1994) filed in connection with the '281 application.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Respectfully submitted,

Mary Kelly
Associate Solicitor, USPTO

2

Exhibit 1



US005364838A

# United States Patent [19]

Rubsamen

[11] Patent Number: **5,364,838**

[45] Date of Patent: **Nov. 15, 1994**

[54] **METHOD OF ADMINISTRATION OF INSULIN**

[75] Inventor: **Reid M. Rubsamen,** Berkeley, Calif.

[73] Assignee: **Miris Medical Corporation,** Hayward, Calif.

[21] Appl. No.: **11,281**

[22] Filed: **Jan. 29, 1993**

[51] Int. Cl.⁵ ...................... **A61K 37/26; A61K 37/18; A61K 37/00**

[52] U.S. Cl. ........................................... **514/3; 514/2; 514/4**

[58] Field of Search ..................................... 514/2, 3, 4

[56] **References Cited**

U.S. PATENT DOCUMENTS

5,011,678  4/1991  Wang et al. .......................... 424/45

OTHER PUBLICATIONS

Laube et al, *J. Aerosol Med.,* vol. 4(3) p. 286, 1991.
Wigley et al., *Diabetes,* vol. 20 No. 8, pp. 552–556, 1971
Köhler, *Lung:Suppl,* pp. 677–684, 1990.
Laube et al., *Jama,* vol. 269, No. 16, Apr. 28, 1993, pp. 2106–2109.

*Primary Examiner*—Lester L. Lee
*Assistant Examiner*—A. M. Davenport
*Attorney, Agent, or Firm*—Fish & Richardson

[57]        **ABSTRACT**

A method for treating a patient suffering from diabetes mellitus and a programmed, portable, hand-held device and formulations used in such treatment methodology is disclosed. The programmed device is loaded with a container which includes a formulation comprised of insulin dispersed in a suitable propellant such as a low boiling point propellant. The container may be completely sealed and may be punctured on insertion in the device but preferably includes a single valve which can be opened to release insulin forced from the container by the propellant. A valve for releasing formulation is controlled by an electronic means for opening the valve in response to a measured threshold of airflow which airflow is measured by an airflow detection means positioned between the valve and a mouthpiece. Insulin is administered when the patient inspiratory flow exceeds a preset threshold. The airflow is measured and when a threshold amount of airflow is achieved, the valve opening means is actuated and a controlled amount of insulin is released from the container. The device includes a microprocessor connected to the means for measuring airflow and the means for opening the valve. The microprocessor is programmed to control the amount of insulin released, based on the particular needs of the patient. The device is electronically connectable to a device which measures serum glucose level and can adjust insulin release amounts based of measured glucose levels.

**15 Claims, 2 Drawing Sheets**





US005672581A

## United States Patent [19]

### Rubsamen et al.

[11] **Patent Number:**     **5,672,581**

[45] **Date of Patent:**     *Sep. 30, 1997

[54] **METHOD OF ADMINISTRATION OF INSULIN**

[75] Inventors: **Reid M. Rubsamen**, Berkeley; **Lester John Lloyd**, Orinda, both of Calif.

[73] Assignee: **Aradigm Corporation**, Hayward, Calif.

[ * ] Notice:     The term of this patent shall not extend beyond the expiration date of Pat. No. 5,364,838.

[21] Appl. No.: **331,056**

[22] Filed:     **Oct. 28, 1994**

**Related U.S. Application Data**

[63] Continuation-in-part of Ser. No. 11,281, Jan. 29, 1993, Pat. No. 5,364,838.

[51] Int. Cl.$^6$ .......................... **A61K 38/26; A61K 38/02; C07K 5/00; C07K 7/00**

[52] U.S. Cl. ................................... **514/3;** 514/4; 530/303; 424/489; 424/43

[58] **Field of Search** ....................... 514/2, 3, 4; 424/489, 424/43, 145; 435/4, 810; 530/303; 128/200.14, 200.16, 200.23, 200.24, 203.12, 203.15

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,812,854 | 5/1974 | Michaels et al. ...................... | 128/194 |
| 3,991,304 | 11/1976 | Hillsman ............................. | 235/151.34 |
| 4,106,503 | 8/1978 | Rosenthal et al. ...................... | 128/194 |
| 4,361,401 | 11/1982 | Smith et al. . | |
| 4,604,847 | 8/1986 | Moulding, Jr. et al. ...................... | 53/75 |
| 4,627,432 | 12/1986 | Newell et al. . | |
| 4,677,975 | 7/1987 | Edgar et al. ...................... | 128/200.14 |
| 4,686,231 | 8/1987 | Bender et al. ...................... | 514/333 |
| 4,819,629 | 4/1989 | Jonson et al. ...................... | 128/203.32 |
| 4,877,989 | 10/1989 | Drews et al. . | |
| 4,926,852 | 5/1990 | Zoltan et al. . | |
| 4,984,158 | 1/1991 | Hillsman ...................... | 364/413.04 |
| 5,011,678 | 4/1991 | Wang et al. ...................... | 424/45 |
| 5,167,506 | 12/1992 | Kilis et al. ...................... | 434/262 |
| 5,364,838 | 11/1994 | Rubsamen ...................... | 514/3 |
| 5,497,944 | 3/1996 | Weston et al. ...................... | 239/321 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0 186 280 | 10/1985 | European Pat. Off. ....... A61M 13/00 |
| 0 232 235 A2 | 8/1987 | European Pat. Off. ....... A61M 15/00 |
| 2 104 393 | 3/1983 | United Kingdom ... A61M 11/00 |
| 2 1 53 0 81 | 8/1985 | United Kingdom ........... A61M 5/14 |
| 2 255 918 | 11/1992 | United Kingdom . |
| 2 256 805 | 12/1992 | United Kingdom ........... A61M 11/00 |
| WO 91/14468 | 10/1991 | WIPO ...................... A61M 15/00 |
| 91/01868 | 5/1992 | WIPO ...................... A61M 15/00 |
| WO 92/09322 | 6/1992 | WIPO ...................... A61M 15/00 |
| 92/01815 | 9/1992 | WIPO ...................... A61M 11/00 |
| WO 93/17728 | 9/1993 | WIPO ...................... A61M 15/00 |

OTHER PUBLICATIONS

Colthorpe, P. et al., "The pharmacokinetics of Pulmonary-–Delivered Insulin:A comparison of intratracheal and aerosol administration to the rabbit", 1992. Pharmaceutical Research, 9:764–768.

Elliott, R.B. et al., "Parenteral absorption of insulin from the lung in diabetic children", 1987. Aust. Paediatr. J. 23:293–297.

Kohler, D., "Aerosols for Systemic Treatment", 1990. Lung, Suppl.:677–684.

Lauber, B.L. et al., "Deposition, Clearance, and Effects in the Lung", Journal of Aerosol Medicine, 4:286.

Lauber, B.L. et al., "Preliminary Study of the Efficacy of insulin aerosol delivered by oral inhalation in diabetic patients," 1994. JAMA, 269:2106–2109.

Moses, A.C. et al., "Insulin administered intranasally as an insulin–bile salt aerosol–Effectiveness and Reproducibility in Normal and Diabetic Subjects", 1983. Diabetes, 32:1040–1047.

Newman, S.P. et al., "Deposition of pressurized aerosols in the human respiratory tract", 1981. Thorax, 36:52–55.

Newman, S.P. et al., "How should a pressurized β–adrenergic bronchodilator be inhaled?", 1981. Eur. J. Respir. Dis. 62:3–21.

Newman, S.P. et al., "Deposition of pressurized suspension aerosols inhaled through extension devices", 1981. Am. Rev. Respir. Dis. 124:317–320.

Newman, S.P., "Deposition and Effects of Inhalation Aerosols", 1983.

Remington's Pharmaceutical Sciences, A.R. Gennaro, ed., 1985, Mack Publishing Co.

Salzman, R.,"Intranasal aerosolized insulin mixed–meal studies and long–term use in type 1 diabetes", 1985, New England Journal of Medicine, 213:1078–1084.

Wigley, F.M. et al., "Insulin across respiratory mucosae by aerosol delivery", 1971. Diabetes, 20:552–556.

Yoshida, H. et al., "Absorption of insulin delivered to rabbit trachea using aerosol dosage form", 1979. J. Pharmaceutical Sciences 68:670–671.

*Primary Examiner*—Avis M. Davenport

*Attorney, Agent, or Firm*—Karl Bozicevic; Fish & Richardson P.C.

[57] **ABSTRACT**

A method for treating a patient suffering from diabetes mellitus by delivering aerosolized insulin to the patient and a programmed, portable, hand-held device used in such treatment methodology is disclosed. Two basic types of drug delivery devices are disclosed for use in connection with the present invention. In accordance with the first type of device the insulin is contained within a low boiling point propellant which is held within a canister under pressure. In accordance with the second type of device the insulin is present within a container in solution and the solution is moved through a porous membrane to create an aerosolized formulation which is inhaled by the patient. In accordance with both devices a measured amount of insulin containing formulation is automatically released into the inspiratory flow path of a patient in response to information obtained from determining the inspiratory flow rate and inspiratory volume of a patient. The determination of values and release of drugs are carried out in real time. Reproducibly dosing of insulin to the patient is obtained by repeatedly providing for automatic release of insulin formulation at the same inspiratory flow rate and inspiratory volume. To maximize the efficiency of the delivery of the insulin formulation the formulation is released at an inspiratory flow rate in the range of from about 0.1 to about 2.0 liters/second and a measured inspiratory volume in the range of about 0.1 to about 0.8 liters.

**20 Claims, 10 Drawing Sheets**

US005743250A

## United States Patent [19]

### Gonda et al.

| [11] | Patent Number: | 5,743,250 |
|---|---|---|
| [45] | Date of Patent: | Apr. 28, 1998 |

[54] **INSULIN DELIVERY ENHANCED BY COACHED BREATHING**

[75] Inventors: **Igor Gonda**, San Francisco; **Reid M. Rubsamen**, Oakland, both of Calif.

[73] Assignee: **Aradigm Corporation**, Hayward, Calif.

[21] Appl. No.: **754,423**

[22] Filed: **Nov. 22, 1996**

**Related U.S. Application Data**

[63] Continuation-in-part of Ser. No. 549,343, Oct. 27, 1995, which is a continuation-in-part of Ser. No. 331,056, Oct. 28, 1994, which is a continuation-in-part of Ser. No. 11,281, Jan. 29, 1993, Pat. No. 5,364,838.

[51] Int. Cl.[6] ............................................. **A61M 11/00**
[52] U.S. Cl. ............................... **128/200.14**; 128/200.22; 128/203.12
[58] Field of Search ..................... 128/200.14, 200.22, 128/200.23, 203.12, 204.23

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| 3,812,854 | 5/1974 | Michaels et al. | 128/200.16 |
|---|---|---|---|
| 3,991,304 | 11/1976 | Hillsman | 128/725 |
| 4,106,503 | 8/1978 | Rosenthal | 128/200.18 |
| 4,361,401 | 11/1982 | Smith et al. | 356/36 |
| 4,604,847 | 8/1986 | Moulding, Jr. et al. | 53/75 |
| 4,627,432 | 12/1986 | Newell et al. | 128/203.15 |
| 4,677,975 | 7/1987 | Edgar et al. | 128/200.14 |
| 4,686,231 | 8/1987 | Bender et al. | 514/333 |
| 4,819,629 | 4/1989 | Jonson et al. | 128/203.22 |
| 4,877,989 | 10/1989 | Drews et al. | 310/323 |
| 4,926,852 | 5/1990 | Zoltan et al. | 128/200.23 |
| 4,984,158 | 1/1991 | Hillsman | 128/200.14 |

(List continued on next page.)

**FOREIGN PATENT DOCUMENTS**

| 0 186 280 | 10/1985 | European Pat. Off. . |
| 0 232 235 A2 | 8/1987 | European Pat. Off. . |
| 2 104 393 | 3/1983 | United Kingdom . |
| 2 1 53 0 81 | 8/1985 | United Kingdom . |
| 2 255 918 | 11/1992 | United Kingdom . |

| 2 256 805 | 12/1992 | United Kingdom . |
| WO 90/12814 | 11/1990 | WIPO . |

(List continued on next page.)

**OTHER PUBLICATIONS**

Colthorpe, P., et al., 1992. "The pharmacokinetics of pulmonary delivered insulin: a comparison of intratracheal and aerosol administration to the rabbit." *Pharmaceutical Research* 9:764–8.

Elliott, R.B. et al., "Parenteral absorption of insulin from the lung in diabetic children." 1987. Aust. Paediatr. J. 23: 293–297.

Kohler, D., 1990. "Aerosols for systemic treatment," *Lung*, Suppl.:677–84.

Lauber, B.L. et al., 1991. "Deposition, clearance, and effects in the Lung," *Journal Aeorsol Medicine* 4:286.

(List continued on next page.)

*Primary Examiner—Aaron J. Lewis*
*Attorney, Agent, or Firm—Karl Bozicevic*

[57] **ABSTRACT**

The need for the delivery of insulin by injection can be reduced or eliminated by a method whereby an aerosolized insulin formulation is delivered to a patient's lungs and the rate at which the insulin is absorbed into the blood is increased by the use of an inhale-exhale breathing maneuver. Particles of insulin delivered to the surface of lung tissue will be absorbed into the circulatory system. The rate of absorption is enhanced by instructing the patient to inhale maximally and thereafter exhale maximally. This maneuver causes a spike in the rate at which insulin enters the circulatory system thereby increasing the rate at which glucose is removed from the circulatory system. The insulin may be a dry powder but is preferably in a liquid formulation delivered to the patient from a hand-held, self-contained device which automatically releases an aerosolized burst of formulation. The device includes a sensor which is preferably electronic which measures inspiratory flow and volume which measurement can be used to control the point of drug release. The sensor can also assist the patient in the inhale-exhale maneuver.

**20 Claims, 12 Drawing Sheets**



US005873358A

# United States Patent [19]

## Gonda et al.

[11] Patent Number: 5,873,358

[45] Date of Patent: Feb. 23, 1999

[54] **METHOD OF MAINTAINING A DIABETIC PATIENT'S BLOOD GLUCOSE LEVEL IN A DESIRED RANGE**

[75] Inventors: **Igor Gonda**, San Francisco; **Reid M. Rubsamen**, Berkeley, both of Calif.

[73] Assignee: **Aradigm Corporation**, Hayward, Calif.

[21] Appl. No.: **69,891**

[22] Filed: **Apr. 29, 1998**

### Related U.S. Application Data

[60] Division of Ser. No. 792,616, Jan. 31, 1997, which is a continuation-in-part of Ser. No. 754,423, Nov. 22, 1996, Pat. No. 5,473,250, which is a continuation-in-part of Ser. No. 549,343, Oct. 27, 1995, which is a continuation-in-part of Ser. No. 331,056, Oct. 28, 1994, Pat. No. 5,672,581, which is a continuation-in-part of Ser. No. 11,281, Jan. 29, 1993, Pat. No. 5,364,838.

[51] Int. Cl.⁶ ................................................. A61M 11/00

[52] U.S. Cl. ................................ 128/200.14; 128/200.22; 128/203.12

[58] Field of Search ........................ 128/200.14, 200.22, 128/200.23, 203.12

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,812,854 | 5/1974 | Michaels et al. ................... 128/200.16 |
| 3,991,304 | 11/1976 | Hillsman ............................... 600/538 |
| 4,106,503 | 8/1978 | Rosenthal .......................... 128/200.18 |
| 4,343,798 | 8/1982 | Fawri ................................... 424/240 |
| 4,361,401 | 11/1982 | Smith et al. ............................ 356/36 |
| 4,468,464 | 8/1984 | Cohen et al. ........................... 435/317 |
| 4,604,847 | 8/1986 | Moulding, Jr. et al. ................... 53/75 |
| 4,624,251 | 11/1986 | Miller ................................. 128/200.14 |

(List continued on next page.)

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0 186 280 | 10/1985 | European Pat. Off. . |
| 0 200 383 | 12/1986 | European Pat. Off. . |
| 0 232 235 A2 | 8/1987 | European Pat. Off. . |
| 0272469 | 6/1988 | European Pat. Off. . |
| 2 673 142 | 8/1992 | France . |

| | | |
|---|---|---|
| 2 104 393 | 3/1983 | United Kingdom . |
| 2 153 0 81 | 8/1985 | United Kingdom . |

(List continued on next page.)

#### OTHER PUBLICATIONS

Barker et al., "Acidic Precursor Revealed in Human Eosinophil Granule Major Basic Protein cDNA," *J. Exp. Med.*, 168:1493–1498 (1988).

Berger et al., "Guide to Molecular Cloning Techniques," *Methods in Enzymology*, 152:664–704 (1987).

Collins et al., "Continuous Growth and Differentiation of Human Myeloid Leukaemic Cells in Suspension Culture," *Nature*, 270:347–349 (1977).

(List continued on next page.)

*Primary Examiner*—Aaron J. Lewis
*Attorney, Agent, or Firm*—Karl Bozicevic; Bozicevic & Reed LLP

[57] **ABSTRACT**

The need for the delivery of insulin by injection can be reduced or eliminated by a method whereby an aerosolized insulin formulation is delivered to a patient's lungs and the rate at which the insulin is absorbed into the blood is increased by the use of monomeric insulin and/or an inhale-exhale breathing maneuver. Particles of insulin and in particular monomeric insulin delivered to the surface of lung tissue will be absorbed into the circulatory system. The rate of absorption is enhanced by the monomeric form of insulin and by instructing the patient to inhale maximally and thereafter exhale maximally. This maneuver causes a spike in the rate at which insulin enters the circulatory system thereby increasing the rate at which glucose is removed from the circulatory system. The insulin or insulin analog may be a dry powder but is preferably in a liquid formulation delivered to the patient from a hand-held, self-contained device which automatically releases an aerosolized burst of formulation. The device includes a sensor which is preferably electronic which measures inspiratory flow and volume which measurement can be used to control the point of drug release. The sensor can also assist the patient in the inhale-exhale maneuver.

**7 Claims, 12 Drawing Sheets**





US005884620A

# United States Patent [19]

## Gonda et al.

[11] Patent Number: 5,884,620

[45] Date of Patent: Mar. 23, 1999

[54] **INHALED INSULIN DOSAGE CONTROL DELIVERY ENHANCED BY CONTROLLING TOTAL INHALED VOLUME**

[75] Inventors: **Igor Gonda**, San Francisco; **Reid M. Rubsamen**, Oakland; **Stephen J. Farr**, Orinda, all of Calif.

[73] Assignee: **Aradigm Corporation**, Alameda, Calif.

[21] Appl. No.: **846,243**

[22] Filed: **Apr. 25, 1997**

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 754,423, Nov. 22, 1996, Pat. No. 5,743,250, which is a continuation-in-part of Ser. No. 549,343, Oct. 27, 1995, which is a continuation-in-part of Ser. No. 331,056, Oct. 28, 1994, Pat. No. 5,672,581, which is a continuation-in-part of Ser. No. 11,281, Jan. 29, 1993, Pat. No. 5,364,838.

[51] **Int. Cl.⁶** .................................................. **A61M 11/00**

[52] **U.S. Cl.** ................................ **128/200.14**; 128/200.22; 128/204.23

[58] **Field of Search** ........................ 128/200.24, 200.14, 128/200.22, 200.16, 203.12, 204.23

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,812,854 | 5/1974 | Michaels et al. | 128/200.16 |
| 3,991,304 | 11/1976 | Hillsman | 128/725 |
| 4,361,401 | 11/1982 | Smith et al. | 356/36 |
| 4,604,847 | 8/1986 | Moulding, Jr. et al. | 53/75 |
| 4,627,432 | 12/1986 | Newell et al. | 128/203.15 |
| 4,677,975 | 7/1987 | Edgar et al. | 128/200.14 |
| 4,686,231 | 8/1987 | Bender et al. | 514/333 |
| 4,819,629 | 4/1989 | Jonson et al. | 128/203.22 |
| 4,877,989 | 10/1989 | Drews et al. | 310/323 |
| 4,926,852 | 5/1990 | Zoltan et al. | 128/200.23 |
| 4,984,158 | 1/1991 | Hillsman | 128/200.14 |
| 5,006,343 | 4/1991 | Benson et al. | 424/450 |
| 5,011,678 | 4/1991 | Wang et al. | 424/45 |
| 5,167,506 | 12/1992 | Kilis et al. | 434/262 |

| | | | |
|---|---|---|---|
| 5,364,838 | 11/1994 | Rubsamen | 514/3 |
| 5,394,866 | 3/1995 | Ritson et al. | 128/200.14 |
| 5,404,871 | 4/1995 | Goodman et al. | 128/200.14 |
| 5,450,336 | 9/1995 | Rubsamen et al. | 364/571.01 |
| 5,497,944 | 3/1996 | Weston et al. | 239/321 |
| 5,529,055 | 6/1996 | Gueret | 128/200.22 |
| 5,694,920 | 12/1997 | Abrams et al. | 128/200.16 |
| 5,743,250 | 4/1998 | Gonda et al. | 128/200.14 |
| 5,758,637 | 6/1998 | Ivri et al. | 128/200.14 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0 186 280 | 10/1985 | European Pat. Off. . |
| 0 232 235 A2 | 8/1987 | European Pat. Off. . |
| 2 104 393 | 3/1983 | United Kingdom . |
| 2 153 081 | 8/1985 | United Kingdom . |
| 2 255 918 | 11/1992 | United Kingdom . |
| 2 256 805 | 12/1992 | United Kingdom . |
| WO 90/12814 | 11/1990 | WIPO . |
| WO 91/14468 | 10/1991 | WIPO . |
| GB 91/01868 | 5/1992 | WIPO . |
| WO 92/07599 | 5/1992 | WIPO . |
| WO 92/09322 | 6/1992 | WIPO . |
| US 92/01815 | 9/1992 | WIPO . |
| WO 92/15353 | 9/1992 | WIPO . |
| WO 93/17728 | 9/1993 | WIPO . |

*Primary Examiner*—Aaron J. Lewis
*Attorney, Agent, or Firm*—Karl Bozicevic; Bozicevic & Reed LLP

[57] **ABSTRACT**

Dosages of inhaled insulin are controlled within a narrow range by controlling the total volume of air inhaled by a patient. By repeatedly delivering aerosolized insulin with the same total inhaled volume of air, the amount of insulin delivered to the patient each time is consistent. A device for delivering insulin by inhalation is disclosed which device comprises a means for measuring inhaled volume and for halting inhalation at a pre-determined point. The device also comprises an adjustable means for applying various amounts of force to a container of formulation to expel different amounts of drug from the container based on the force applied.

**20 Claims, 8 Drawing Sheets**



US005888477A

# United States Patent [19]

## Gonda et al.

[11] Patent Number: 5,888,477

[45] Date of Patent: *Mar. 30, 1999

[54] **USE OF MONOMERIC INSULIN AS A MEANS FOR IMPROVING THE BIOAVAILABILITY OF INHALED INSULIN**

[75] Inventors: **Igor Gonda**, San Francisco; **Reid M. Rubsamen**, Berkeley; **Stephen J. Farr**, Orinda, all of Calif.

[73] Assignee: **Aradigm Corporation**, Hayward, Calif.

[ * ] Notice: The term of this patent shall not extend beyond the expiration date of Pat. No. 5,364,838 and Pat. No. 5,672,581.

[21] Appl. No.: **792,616**

[22] Filed: **Jan. 31, 1997**

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 754,423, Nov. 22, 1996, Pat. No. 5,473,250, which is a continuation-in-part of Ser. No. 549,343, Oct. 27, 1995, which is a continuation-in-part of Ser. No. 331,056, Oct. 28, 1994, Pat. No. 5,672,581, which is a continuation-in-part of Ser. No. 11,281, Jan. 29, 1993, Pat. No. 5,364,838.

[51] Int. Cl.[6] .............................. A61K 9/12; A61K 38/28

[52] U.S. Cl. .................................. 424/45; 424/489; 514/3; 514/4; 514/866

[58] Field of Search ......................... 424/45, 489; 514/3, 514/4, 866; 530/303

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,812,854 | 5/1974 | Michaels et al. . |
| 3,991,304 | 11/1976 | Hillsman . |
| 4,106,503 | 8/1978 | Rosenthal . |
| 4,343,798 | 8/1982 | Fawri . |
| 4,361,401 | 11/1982 | Smith et al. . |
| 4,468,464 | 8/1984 | Cohen et al. . |
| 4,604,847 | 8/1986 | Moulding, Jr. et al. . |
| 4,624,251 | 11/1986 | Miller . |
| 4,627,432 | 12/1986 | Newell et al. . |
| 4,639,435 | 1/1987 | Fujii et al. . |
| 4,677,975 | 7/1987 | Edgar et al. . |
| 4,686,231 | 8/1987 | Bender et al. . |
| 4,727,028 | 2/1988 | Santerre et al. . |
| 4,755,383 | 7/1988 | Fujii et al. . |
| 4,819,629 | 4/1989 | Jonson et al. . |
| 4,877,989 | 10/1989 | Drews et al. . |
| 4,926,852 | 5/1990 | Zoltan et al. . |
| 4,984,158 | 1/1991 | Hillsman . |

(List continued on next page.)

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0 186 280 | 10/1985 | European Pat. Off. . |
| 0 200 383 | 12/1986 | European Pat. Off. . |
| 0 232 235 A2 | 8/1987 | European Pat. Off. . |
| 0272469 | 6/1988 | European Pat. Off. . |
| 2 673 142 | 8/1992 | France . |
| 2 104 393 | 3/1983 | United Kingdom . |
| 2 153 0 81 | 8/1985 | United Kingdom . |
| 2 255 918 | 11/1992 | United Kingdom . |
| 2 256 805 | 12/1992 | United Kingdom . |
| 88/02700 | 8/1988 | WIPO . |
| WO 89/01486 | 2/1989 | WIPO . |
| 90/00837 | 2/1990 | WIPO . |
| 90/12814 | 11/1990 | WIPO . |
| WO 90/12814 | 11/1990 | WIPO . |
| 91/14468 | 10/1991 | WIPO . |
| WO 91/14468 | 10/1991 | WIPO . |
| WO 92/03535 | 3/1992 | WIPO . |
| 91/01868 | 5/1992 | WIPO . |
| 92/07599 | 5/1992 | WIPO . |
| 92/09322 | 6/1992 | WIPO . |
| WO 92/09322 | 6/1992 | WIPO . |
| 92/01815 | 9/1992 | WIPO . |
| 92/15353 | 9/1992 | WIPO . |
| 93/17728 | 9/1993 | WIPO . |
| WO 93/17728 | 9/1993 | WIPO . |

### OTHER PUBLICATIONS

Barker et al., "Acidic Precursor Revealed in Human Eosinophil Granule Major Basic Protein cDNA," *J. Exp. Med.*, 168:1493–1498 (1988).

Berger et al., "Guide to Molecular Cloning Techniques," *Methods in Enzymology*, 152:664–704 (1987).

Collins et al., "Continous Growth and Differentiation of Human Myeloid Leukaemic Cells in Suspension Culture," *Nature*, 270:347–349 (1977).

Colthorpe, P., et al., 1992, "The pharmacokinetics of pulmonary delivered insulin: a comparison of intratracheal and aerosol administration to the rabbit," *Parmaceutical Research* 9:764–8.

Drazin et al., "Fungicidal Properties of a Chymotrypsin–Like Cationic Protein from Human Neutrophils: Absorption to Candida parapsilosis," *Infect. Immun.*, 382–388 (1977).

Elliott, R.B. et al., "Parenteral absorption of insulin from the lung in diabetic children," 1987, Aust. Paediatr. J. 23: 293–297.

(List continued on next page.)

*Primary Examiner*—Raj Bawa
*Attorney, Agent, or Firm*—Karl Bozicevic; Bozicevic & Reed LLP

[57] **ABSTRACT**

The need for the delivery of insulin by injection can be reduced or eliminated by a method whereby an aerosolized insulin formulation is delivered to a patient's lungs and the rate at which the insulin is absorbed into the blood is increased by the use of monomeric insulin and/or an inhale-exhale breathing maneuver. Particles of insulin and in particular monomeric insulin delivered to the surface of lung tissue will be absorbed into the circulatory system. The rate of absorption is enhanced by the monomeric form of insulin and by instructing the patient to inhale maximally and thereafter exhale maximally. This maneuver causes a spike in the rate at which insulin enters the circulatory system thereby increasing the rate at which glucose is removed from the circulatory system. The insulin or insulin analog may be a dry powder but is preferably in a liquid formulation delivered to the patient from a hand-held, self-contained device which automatically releases an aerosolized burst of formulation. The device includes a sensor which is preferably electronic which measures inspiratory flow and volume which measurement can be used to control the point of drug release. The sensor can also assist the patient in the inhale-exhale maneuver.

**21 Claims, 12 Drawing Sheets**

US005915378A

# United States Patent [19]

Lloyd et al.

[11] Patent Number: 5,915,378

[45] Date of Patent: *Jun. 29, 1999

[54] **CREATING AN AEROSOLIZED FORMULATION OF INSULIN**

[75] Inventors: **Lester J. Lloyd**, Orinda; **Peter M. Lloyd**, Oakland; **Reid M. Rubsamen**; **Jeffrey A. Schuster**, both of Berkeley, all of Calif.

[73] Assignee: **Aradigm Corporation**, Hayward, Calif.

[ * ] Notice: This patent is subject to a terminal disclaimer.

[21] Appl. No.: **08/549,343**

[22] Filed: **Oct. 27, 1995**

### Related U.S. Application Data

[63] Continuation-in-part of application No. 08/331,056, Oct. 28, 1994, Pat. No. 5,672,581, which is a continuation-in-part of application No. 08/011,281, Jan. 29, 1993, Pat. No. 5,364, 838.

[51] Int. Cl.$^6$ ................................................. **A61M 11/00**
[52] U.S. Cl. ................................. **128/200.22**; 128/200.14; 128/204.23
[58] Field of Search .......................... 128/200.14, 200.22, 128/203.12, 204.23; 222/95; 239/102.2, 145

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,812,854 | 5/1974 | Michaels et al. | 128/200.16 |
| 3,991,304 | 11/1976 | Hillsman | 600/538 |
| 4,106,503 | 8/1978 | Rosenthal et al. | 128/200.18 |
| 4,343,798 | 8/1982 | Fawri | 424/240 |

(List continued on next page.)

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0 186 280 | 10/1985 | European Pat. Off. . |
| 0 200 383 | 12/1986 | European Pat. Off. . |

(List continued on next page.)

#### OTHER PUBLICATIONS

Barker et al., "Acidic Precursor Revealed in Human Eosinophil Granule Major Basic Protein cDNA," *J. Exp. Med.,* 168:1493–1498 (1988).

Collins et al., "Continuous Growth and Differentiation of Human Myeloid Leukaemic Cells in Suspension Culture," *Nature,* 270:347–349 (1977).

(List continued on next page.)

*Primary Examiner*—Aaron J. Lewis
*Attorney, Agent, or Firm*—Karl Bozicevic; Bozicevic, Field & Francis LLP

[57] **ABSTRACT**

Devices, packaging and methodology for efficiently and repeatably creating aerosolized bursts of an insulin containing formulation are disclosed. Devices are hand-held, self-contained units which are automatically actuated at the same release point in a patient's inspiratory flow cycle. The release point is automatically determined either mechanically or, more preferably calculated by a microprocessor which receives data from a sensor making it possible to determine inspiratory flow rate and inspiratory volume. The device is loaded with a cassette comprised of an outer housing which holds a package of individual disposable collapsible containers of an insulin containing formulation for systemic delivery. Actuation of the device forces insulin formulation through a porous membrane of the container which membrane has pores having a diameter in the range of about 0.25 to 3.0 microns, preferably 0.25 to 1.5 microns. The porous membrane is positioned in alignment with a surface of a channel through which a patient inhales air. The flow profile of air moving through the channel is such that the flow at the surface of the channel is less than the flow rate at the center of the channel. The membrane is designed so that it protrudes outward at all times or made flexible so that when an insulin formulation is forced against and through the membrane the flexible membrane protrudes outward beyond the flow boundary layer of the channel into faster moving air. Because the membrane protrudes into the faster moving air of the channel the particles of aerosol formed are less likely to collide allowing for the formation of a burst of fine aerosol mist with uniform particle size.

**17 Claims, 10 Drawing Sheets**



US005941240A

## United States Patent [19]

### Gonda et al.

[11] Patent Number: 5,941,240

[45] Date of Patent: *Aug. 24, 1999

[54] **INHALED INSULIN DOSAGE CONTROL DELIVERY ENHANCED BY CONTROLLING TOTAL INHALED VOLUME**

[75] Inventors: **Igor Gonda**, San Francisco; **Reid M. Rubsamen**, Oakland; **Stephen J. Farr**, Orinda, all of Calif.

[73] Assignee: **Aradigm Corporation**, Hayward, Calif.

[ * ] Notice: This patent is subject to a terminal disclaimer.

[21] Appl. No.: **09/160,909**

[22] Filed: **Sep. 25, 1998**

#### Related U.S. Application Data

[63] Continuation of application No. 08/846,243, Apr. 25, 1997, Pat. No. 5,884,620, which is a continuation-in-part of application No. 08/754,423, Nov. 22, 1996, which is a continuation-in-part of application No. 08/549,343, Oct. 27, 1995, which is a continuation-in-part of application No. 08/331,056, Oct. 28, 1994, which is a continuation-in-part of application No. 08/011,281, Jan. 29, 1993, Pat. No. 5,364,838.

[51] Int. Cl.⁶ .................................................. A61M 11/00
[52] U.S. Cl. .............................. 128/200.14; 128/200.22; 128/204.23; 128/203.12
[58] Field of Search ........................ 128/200.14, 200.22, 128/200.23, 203.12, 204.23

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,812,854 | 5/1974 | Michaels et al. .................. 128/200.16 |
| 3,991,304 | 11/1976 | Hillsman .................................. 600/538 |
| 4,106,503 | 8/1978 | Rosenthal et al. ................. 128/200.16 |
| 4,361,401 | 11/1982 | Smith et al. ............................. 356/36 |
| 4,604,847 | 8/1986 | Moulding, Jr. et al. .................... 53/75 |
| 4,627,432 | 12/1986 | Newell et al. ..................... 128/203.15 |
| 4,677,975 | 7/1987 | Edgar et al. ....................... 128/200.14 |
| 4,686,231 | 8/1987 | Bender et al. .......................... 514/333 |
| 4,796,614 | 1/1989 | Nowacki et al. .................. 128/200.14 |
| 4,819,629 | 4/1989 | Jonson ................................. 128/200.14 |
| 4,877,989 | 10/1989 | Drews et al. .......................... 310/323 |
| 4,907,581 | 3/1990 | King ..................................... 128/200.14 |
| 4,926,852 | 5/1990 | Zoltan et al. ..................... 128/200.23 |
| 4,984,158 | 1/1991 | Hillsman ........................... 128/200.14 |
| 5,006,343 | 4/1991 | Benson et al. ......................... 424/450 |
| 5,011,678 | 4/1991 | Wang et al. ............................. 424/45 |
| 5,167,506 | 1/1991 | Kilis et al. ............................. 434/262 |
| 5,284,133 | 2/1994 | Burns et al. ...................... 128/203.15 |
| 5,364,838 | 11/1994 | Rubsamen .................................. 514/3 |
| 5,394,866 | 3/1995 | Ritson et al. ..................... 128/200.14 |
| 5,404,871 | 4/1995 | Goodman et al. ................. 128/200.14 |
| 5,450,336 | 9/1995 | Rubsamen et al. ............... 364/571.01 |
| 5,497,944 | 3/1996 | Weston et al. ........................ 239/321 |
| 5,743,250 | 4/1998 | Gonda et al. ..................... 128/200.14 |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0 186 280 | 10/1985 | European Pat. Off. . |
| 0 232 235 A2 | 8/1987 | European Pat. Off. . |
| 2 104 393 | 3/1983 | United Kingdom . |

(List continued on next page.)

#### OTHER PUBLICATIONS

Colthrope, P., et al., 1992, "The pharmacokinetics of pulmonary delivered insulin: a comparison of intratracheal and aerosol administration to the rabbit," *Parmaceutical Research* 9:764–8.

(List continued on next page.)

*Primary Examiner*—Aaron J. Lewis
*Attorney, Agent, or Firm*—Karl Bozicevic; Bozicevic, Field & Francis LLP

[57] **ABSTRACT**

Dosages of inhaled insulin are controlled within a narrow range by controlling the total volume of air inhaled by a patient. By repeatedly delivering aerosolized insulin with the same total inhaled volume of air, the amount of insulin delivered to the patient each time is consistent. A device for delivering insulin by inhalation is disclosed which device comprises a means for measuring inhaled volume and for halting inhalation at a pre-determined point. The device also comprises an adjustable means for applying various amounts of force to a container of formulation to expel different amounts of drug from the container based on the force applied.

**26 Claims, 8 Drawing Sheets**



US005970973A

# United States Patent [19]

## Gonda et al.

[11] **Patent Number:** **5,970,973**

[45] **Date of Patent:** *Oct. 26, 1999

[54] **METHOD OF DELIVERING INSULIN LISPRO**

[75] Inventors: **Igor Gonda**, San Francisco; **Reid M. Rubsamen**, Berkeley, both of Calif.

[73] Assignee: **Aradigm Corporation**, Hayward, Calif.

[ * ] Notice: This patent is subject to a terminal disclaimer.

[21] Appl. No.: **09/069,721**

[22] Filed: **Apr. 29, 1998**

### Related U.S. Application Data

[60] Division of application No. 08/792,616, Jan. 31, 1997, which is a continuation-in-part of application No. 08/754, 423, Nov. 22, 1996, Pat. No. 5,473,250, which is a continuation-in-part of application No. 08/549,343, Oct. 27, 1995, which is a continuation-in-part of application No. 08/331, 056, Oct. 28, 1994, which is a continuation-in-part of application No. 08/011,281, Jan. 29, 1993, Pat. No. 5,364, 838.

[51] **Int. Cl.⁶** ................................................. A61M 11/00

[52] **U.S. Cl.** ................................ 128/200.14; 128/200.22; 128/204.23

[58] **Field of Search** ......................... 222/95; 239/102.2, 239/145; 128/200.14, 200.22, 203.12, 204.23

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,812,854 | 5/1974 | Michaels et al. .................. 128/200.16 |
| 3,991,304 | 11/1976 | Hillsman . |
| 4,106,503 | 8/1978 | Rosenthal . |
| 4,343,798 | 8/1982 | Fawri . |
| 4,361,401 | 11/1982 | Smith et al. . |
| 4,468,464 | 8/1984 | Cohen et al. . |
| 4,604,847 | 8/1986 | Moulding, Jr. et al. . |
| 4,624,251 | 11/1986 | Miller . |
| 4,627,432 | 12/1986 | Newell et al. . |
| 4,639,435 | 1/1987 | Fujii et al. . |
| 4,677,975 | 7/1987 | Edgar et al. . |
| 4,686,231 | 8/1987 | Bender et al. . |
| 4,727,028 | 2/1988 | Santerre et al. . |
| 4,755,383 | 7/1988 | Fujii et al. . |

(List continued on next page.)

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0 186 280 | 10/1985 | European Pat. Off. . |
| 0 200 383 | 12/1986 | European Pat. Off. . |
| 0 232 235 A2 | 8/1987 | European Pat. Off. . |
| 0272489 | 6/1988 | European Pat. Off. . |
| 2 673 142 | 8/1992 | France . |

(List continued on next page.)

### OTHER PUBLICATIONS

Barker et al., "Acidic Precursor Revealed in Human Eosinophil Granule Major Basic Protein cDNA," *J. Exp. Med.,* 168:1493–1498 (1988).

(List continued on next page.)

*Primary Examiner—*Aaron J. Lewis
*Attorney, Agent, or Firm—*Karl Bozicevic; Bozicevic, Field & Francis LLP

[57] **ABSTRACT**

The need for the delivery of insulin by injection can be reduced or eliminated by a method whereby an aerosolized insulin formulation is delivered to a patient's lungs and the rate at which the insulin is absorbed into the blood is increased by the use of monomeric insulin and/or an inhale-exhale breathing maneuver. Particles of insulin and in particular monomeric insulin delivered to the surface of lung tissue will be absorbed into the circulatory system. The rate of absorption is enhanced by the monomeric form of insulin and by instructing the patient to inhale maximally and thereafter exhale maximally. This maneuver causes a spike in the rate at which insulin enters the circulatory system thereby increasing the rate at which glucose is removed from the circulatory system. The insulin or insulin analog may be a dry powder but is preferably in a liquid formulation delivered to the patient from a hand-held, self-contained device which automatically releases an aerosolized burst of formulation. The device includes a sensor which is preferably electronic which measures inspiratory flow and volume which measurement can be used to control the point of drug release. The sensor can also assist the patient in the inhale-exhale maneuver.

**15 Claims, 12 Drawing Sheets**



US006024090A

# United States Patent [19]

## Gonda et al.

[11] **Patent Number:** **6,024,090**

[45] **Date of Patent:** *Feb. 15, 2000

[54] **METHOD OF TREATING A DIABETIC PATIENT BY AEROSOLIZED ADMINISTRATION OF INSULIN LISPRO**

[75] Inventors: **Igor Gonda**, San Francisco; **Reid M. Rubsamen**, Oakland; **Stephen J. Farr**, Orinda, all of Calif.

[73] Assignee: **Aradigm Corporation**, Hayward, Calif.

[ * ] Notice: This patent is subject to a terminal disclaimer.

[21] Appl. No.: **09/088,534**

[22] Filed: **Jun. 1, 1998**

### Related U.S. Application Data

[63] Continuation of application No. 09/004,756, Jan. 8, 1998, which is a continuation-in-part of application No. 08/792,616, Jan. 31, 1997, Pat. No. 5,888,477, which is a continuation-in-part of application No. 08/754,423, Nov. 22, 1996, Pat. No. 5,743,250, which is a continuation-in-part of application No. 08/549,343, Oct. 27, 1995, Pat. No. 5,915,378, which is a continuation-in-part of application No. 08/331,056, Oct. 28, 1994, Pat. No. 5,672,581, which is a continuation-in-part of application No. 08/011,281, Jan. 29, 1993, Pat. No. 5,364,838.

[51] Int. Cl.[7] ............................................. A61M 11/00

[52] U.S. Cl. ................................. 128/204.23; 128/203.12; 128/200.14

[58] Field of Search .......................... 222/95; 239/102.21, 239/145; 128/200.14, 200.22, 203.12, 204.23

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,812,854 | 5/1974 | Michaels et al. | 128/200.16 |
| 3,929,132 | 12/1975 | Itiguchi | 222/95 |
| 3,991,304 | 11/1976 | Hillsman | 600/538 |
| 3,995,632 | 12/1976 | Nakano et al. | 222/95 |

(List continued on next page.)

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0 186 280 | 10/1985 | European Pat. Off. . |
| 0 200 383 | 12/1986 | European Pat. Off. . |
| 0 232 235 A2 | 8/1987 | European Pat. Off. . |
| 0 272 489 | 6/1988 | European Pat. Off. . |

(List continued on next page.)

#### OTHER PUBLICATIONS

Barker et al., "Acidic Precursor Revealed in Human Eosinophil Granule Major Basic Protein cDNA," *J. Exp. Med.*, 168:1493–1498 (1988).

Berger et al., "Guide to Molecular Cloning Techniques," *Methods in Enzymology*, 152:664–704 (1987).

Collins et al., "Continuous Growth and Differentiation of Human Myeloid Leukaemic Cells in Suspension Culture," *Nature*, 270:347–349 (1977).

Drazin et al., "Fungicidal Properties of a Chymotrypsin–Like Cationic Protein from Human Neutrophils: Absorption to *Candida parapsilosis,*" *Infect. Immun.*, 382–388 (1977).

(List continued on next page.)

*Primary Examiner*—Aaron J. Lewis
*Attorney, Agent, or Firm*—Karl Bozicevic; Paula A. Borden; Bozicevic, Field & Francis LLP

[57] **ABSTRACT**

The need for the delivery of insulin by injection can be reduced or eliminated by delivering an aerosolized monomeric insulin formulation. Repeatability of dosing and more particularly the repeatability of the blood concentration versus time profile is improved relative to regular insulin. The blood concentration versus time profile is substantially unaffected by specific aspects of the patient's breathing maneuver at delivery. Further, the rate at which blood glucose is lowered is increased by the use of monomeric insulin. Particles of insulin and in particular monomeric insulin delivered to the surface of lung tissue will be absorbed into the circulatory system. The monomeric insulin may be a dry powder but is preferably in a liquid formulation delivered to the patient from a handheld, self-contained device which automatically releases an aerosolized burst of formulation. The device includes a sensor which is preferably electronic which measures inspiratory flow and volume which measurement can be used to control the point of drug release.

**10 Claims, 3 Drawing Sheets**





US006085753A

# United States Patent [19]

## Gonda et al.

[11] **Patent Number:** **6,085,753**

[45] **Date of Patent:** *****Jul. 11, 2000**

[54] **INSULIN DELIVERY ENHANCED BY COACHED BREATHING**

[75] Inventors: **Igor Gonda**, San Francisco; **Reid M. Rubsamen**, Oakland, both of Calif.

[73] Assignee: **Aradigm Corporation**, Hayward, Calif.

[ * ] Notice: This patent is subject to a terminal disclaimer.

[21] Appl. No.: **09/064,809**

[22] Filed: **Apr. 22, 1998**

**Related U.S. Application Data**

[63] Continuation of application No. 08/754,423, Nov. 22, 1996, Pat. No. 5,743,250, which is a continuation-in-part of application No. 08/549,343, Oct. 27, 1995, Pat. No. 5,915,378, which is a continuation-in-part of application No. 08/331,056, Oct. 28, 1994, Pat. No. 5,672,581, which is a continuation-in-part of application No. 08/011,281, Jan. 29, 1993, Pat. No. 5,364,838.

[51] **Int. Cl.**[7] ......................................... **A61B 19/00**

[52] **U.S. Cl.** .......................... **128/898; 128/200.14; 514/3**

[58] **Field of Search** .............................. 128/898, 200.14, 128/200.22, 203.12, 200.23, 204.23; 514/3

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | |
|---|---|---|
| 3,812,854 | 5/1974 | Michaels et al. . |
| 3,991,304 | 11/1976 | Hillsman . |
| 4,106,503 | 8/1978 | Rosenthal . |
| 4,343,798 | 8/1982 | Fawri . |
| 4,361,401 | 11/1982 | Smith et al. . |

(List continued on next page.)

**FOREIGN PATENT DOCUMENTS**

| | | |
|---|---|---|
| 0 186 280 | 10/1985 | European Pat. Off. . |
| 0 200 383 | 12/1986 | European Pat. Off. . |
| 0 232 235 A2 | 8/1987 | European Pat. Off. . |
| 0272489 | 6/1988 | European Pat. Off. . |
| 2 673 142 | 8/1992 | France . |

(List continued on next page.)

## OTHER PUBLICATIONS

Barker et al., "Acidic Precursor Revealed in Human Eosinophil Granule Major Basic Protein cDNA," *J. Exp. Med.,* 168:1493–1498 (1988).

Berger et al., "Guide to Molecular Cloning Techniques," *Methods in Enzymology,* 152:664–704 (1987).

Collins et al., "Continuous Growth and Differentiation of Human Myeloid Leukaemic Cells in Suspension Culture," *Nature,* 270:347–349 (1977).

Colthorpe, P., et al., 1992, "The pharmacokinetics of pulmonary delivered insulin: a comparison of intratracheal and aerosol administration to the rabbit," *Parmaceutical Research* 9:764–8.

(List continued on next page.)

*Primary Examiner*—Mickey Yu
*Assistant Examiner*—Kelly O'Hara
*Attorney, Agent, or Firm*—Karl Bozicevic; Bozicevic, Field & Francis LLP

[57] **ABSTRACT**

The need for the delivery of insulin by injection can be reduced or eliminated by a method whereby an aerosolized insulin formulation is delivered to a patient's lungs and the rate at which the insulin is absorbed into the blood is increased by the use of an inhale-exhale breathing maneuver. Particles of insulin delivered to the surface of lung tissue will be absorbed into the circulatory system. The rate of absorption is enhanced by instructing the patient to inhale maximally and thereafter exhale maximally. This maneuver causes a spike in the rate at which insulin enters the circulatory system thereby increasing the rate at which glucose is removed from the circulatory system. The insulin may be a dry powder but is preferably in a liquid formulation delivered to the patient from a hand-held, self-contained device which automatically releases an aerosolized burst of formulation. The device includes a sensor which is preferably electronic which measures inspiratory flow and volume which measurement can be used to control the point of drug release. The sensor can also assist the patient in the inhale-exhale maneuver.

**9 Claims, 12 Drawing Sheets**





US006131567A

# United States Patent [19]

## Gonda et al.

[11] Patent Number: 6,131,567

[45] Date of Patent: *Oct. 17, 2000

[54] **METHOD OF USE OF MONOMERIC INSULIN AS A MEANS FOR IMPROVING THE REPRODUCIBILITY OF INHALED INSULIN**

[75] Inventors: **Igor Gonda**, San Francisco; **Reid M. Rubsamen**, Oakland; **Stephen J. Farr**, Orinda, all of Calif.

[73] Assignee: **Aradigm Corporation**, Hayward, Calif.

[ * ] Notice: This patent is subject to a terminal disclaimer.

[21] Appl. No.: **09/004,756**

[22] Filed: **Jan. 8, 1998**

### Related U.S. Application Data

[63] Continuation-in-part of application No. 08/792,616, Jan. 31, 1997, Pat. No. 5,888,477, which is a continuation-in-part of application No. 08/754,423, Nov. 22, 1996, Pat. No. 5,473, 250, which is a continuation-in-part of application No. 08/549,343, Oct. 27, 1995, which is a continuation-in-part of application No. 08/331,056, Oct. 28, 1994, Pat. No. 5,672, 581, which is a continuation-in-part of application No. 08/011,281, Jan. 29, 1993, Pat. No. 5,364,838.

[51] Int. Cl.[7] .................................................. A61M 11/00

[52] U.S. Cl. .............................. 128/200.14; 128/200.22; 128/204.23

[58] Field of Search .......................... 222/95; 239/102.2, 239/145; 128/200.14, 200.22, 203.12, 204.23

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,812,854 | 5/1974 | Michaels et al. | 128/200.16 |
| 3,991,304 | 11/1976 | Hillsman | 600/538 |
| 4,106,503 | 8/1978 | Rosenthal | 128/200.18 |
| 4,343,798 | 8/1982 | Fawri | 514/179 |
| 4,361,401 | 11/1982 | Smith et al. | 356/36 |
| 4,468,464 | 8/1984 | Cohen et al. | 435/320.1 |
| 4,604,847 | 8/1986 | Moulding, Jr. et al. | 53/75 |
| 4,624,251 | 11/1986 | Miller | 128/200.14 |
| 4,627,432 | 12/1986 | Newell et al. | 128/203.15 |

(List continued on next page.)

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0 186 280 | 10/1985 | European Pat. Off. . |
| 0 200 383 | 12/1986 | European Pat. Off. . |
| 0 232 235 A2 | 8/1987 | European Pat. Off. . |
| 0 272 489 | 6/1988 | European Pat. Off. . |
| 2673142 | 8/1992 | France . |
| 2 104 393 | 3/1983 | United Kingdom . |

(List continued on next page.)

### OTHER PUBLICATIONS

Barker et al., "Acidic Precursor Revealed in Human Eosinophil Granule Major Basic Protein cDNA," *J. Exp. Med.,* 168:1493–1498 (1988).

Berger et al., "Guide to Molecular Cloning Techniques," *Methods in Enzymology,* 152:664–704 (1987).

(List continued on next page.)

*Primary Examiner*—Aaron J. Lewis
*Attorney, Agent, or Firm*—Karl Bozicevic; Bozicevic, Field & Francis LLP

[57] **ABSTRACT**

The need for the delivery of insulin by injection can be reduced or eliminated by delivering an aerosolized monomeric insulin formulation. Repeatability of dosing and more particularly the repeatability of the blood concentration versus time profile is improved relative to regular insulin. The blood concentration versus time profile is substantially unaffected by specific aspects of the patient's breathing maneuver at delivery. Further, the rate at which blood glucose is lowered is increased by the use of monomeric insulin. Particles of insulin and in particular monomeric insulin delivered to the surface of lung tissue will be absorbed into the circulatory system. The monomeric insulin may be a dry powder but is preferably in a liquid formulation delivered to the patient from a hand-held, self-contained device which automatically releases an aerosolized burst of formulation. The device includes a sensor which is preferably electronic which measures inspiratory flow and volume which measurement can be used to control the point of drug release.

**16 Claims, 3 Drawing Sheets**



US006167880B1

(12) **United States Patent**
Gonda et al.

(10) Patent No.: **US 6,167,880 B1**
(45) Date of Patent: *Jan. 2, 2001

(54) **INHALED INSULIN DOSAGE CONTROL DELIVERY ENHANCED BY CONTROLLING TOTAL INHALED VOLUME**

(75) Inventors: **Igor Gonda**, San Francisco; **Reid M. Rubsamen**, Oakland; **Stephen J. Farr**, Orinda, all of CA (US)

(73) Assignee: **Aradigm Corporation**, Hayward, CA (US)

( * ) Notice: Under 35 U.S.C. 154(b), the term of this patent shall be extended for 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/378,638**

(22) Filed: **Aug. 20, 1999**

**Related U.S. Application Data**

(63) Continuation of application No. 09/160,909, filed on Sep. 25, 1998, now Pat. No. 5,941,240, which is a continuation of application No. 08/846,243, filed on Apr. 25, 1997, now Pat. No. 5,884,620, which is a continuation-in-part of application No. 08/754,423, filed on Nov. 22, 1996, now Pat. No. 5,743,250, which is a continuation-in-part of application No. 08/549,343, filed on Oct. 27, 1995, now Pat. No. 5,915,378, which is a continuation-in-part of application No. 08/331, 056, filed on Oct. 28, 1994, now Pat. No. 5,672,581, which is a continuation-in-part of application No. 08/011,281, filed on Jan. 29, 1993, now Pat. No. 5,364,838.

(51) Int. Cl.[7] ..................................... A61M 11/00

(52) U.S. Cl. ................................ 128/200.14; 128/200.22; 128/203.12; 128/204.23

(58) Field of Search ........................ 128/200.14, 200.22, 128/203.12, 204.21, 204.23

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,812,854 | 5/1974 | Michaels et al. | 128/200.16 |
| 3,991,304 | 11/1976 | Hillsman | 600/538 |
| 4,106,503 | 8/1978 | Rosenthal et al. | 128/200.16 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0 232 235 A2 | 8/1987 | (EP) . |
| 0 186 280 | 10/1995 | (EP) . |
| 2 104 393 | 3/1983 | (GB) . |
| 2 153 081 | 8/1985 | (GB) . |
| 2 255 918 | 11/1992 | (GB) . |
| 2 256 805 | 12/1992 | (GB) . |
| WO 92/01815 | 9/1972 | (WO) . |
| WO 90/12814 | 11/1990 | (WO) . |
| WO 90/14468 | 11/1990 | (WO) . |
| WO 91/01868 | 2/1991 | (WO) . |
| WO 92/07599 | 5/1992 | (WO) . |
| WO 92/09322 | 6/1992 | (WO) . |
| WO 92/15353 | 9/1992 | (WO) . |
| WO 93/17728 | 9/1993 | (WO) . |

OTHER PUBLICATIONS

Colthrope, P. et al., "The pharmacokinetics of pulmonary delivered insulin: a comparison of intratracheal and aerosol administration to the rabbit," *Pharmaceutical Research* 9:764–8.

Elliott, R.B. et al., (1987), "Parenteral absorption of insulin from the lung in diabetic children." *Aust. Paediatr. J.* 23:298–297.

(List continued on next page.)

*Primary Examiner*—Aaron J. Lewis
(74) *Attorney, Agent, or Firm*—Karl Bozicevic; Bozicevic, Field & Francis LLP

(57) **ABSTRACT**

Dosages of inhaled insulin are controlled within a narrow range by controlling the total volume of air inhaled by a patient. By repeatedly delivering aerosolized insulin with the same total inhaled volume of air, the amount of insulin delivered to the patient each time is consistent. A device for delivering insulin by inhalation is disclosed which device comprises a means for measuring inhaled volume and for halting inhalation at a pre-determined point. The device also comprises an adjustable means for applying various amounts of force to a container of formulation to expel different amounts of drug from the container based on the force applied.

**11 Claims, 8 Drawing Sheets**



US006250298B1

(12) **United States Patent**
Gonda et al.

(10) Patent No.: **US 6,250,298 B1**
(45) Date of Patent: *Jun. 26, 2001

(54) **METHOD OF USE OF MONOMERIC INSULIN AS A MEANS FOR IMPROVING THE REPRODUCIBILITY OF INHALED INSULIN**

(75) Inventors: **Igor Gonda**, San Francisco; **Reid M. Rubsamen**, Oakland; **Stephen J. Farr**, Orinda, all of CA (US)

(73) Assignee: **Aradigm Corporation**, Hayward, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 41 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/656,535**

(22) Filed: **Sep. 7, 2000**

**Related U.S. Application Data**

(60) Division of application No. 09/004,756, filed on Jan. 8, 1998, now Pat. No. 6,131,567, which is a continuation-in-part of application No. 08/792,616, filed on Jan. 31, 1997, now Pat. No. 5,888,477, which is a continuation-in-part of application No. 08/754,423, filed on Nov. 22, 1996, now Pat. No. 5,743,250, which is a continuation-in-part of application No. 08/549,343, filed on Oct. 27, 1995, now Pat. No. 5,915,378, which is a continuation-in-part of application No. 08/331,056, filed on Oct. 28, 1994, now Pat. No. 5,672,581, which is a continuation-in-part of application No. 08/011,281, filed on Jan. 29, 1993, now Pat. No. 5,364,838.

(51) Int. Cl.[7] ................................................. **A61M 11/00**

(52) U.S. Cl. ............................... **128/200.14**; 128/200.22; 128/204.23

(58) Field of Search ........................ 128/200.14, 200.22, 128/203.12, 204.23

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,812,854    5/1974    Michaels et al. .............. 128/200.16

3,991,304    11/1976    Hillsman .............................. 400/538

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| 0 186 280 | 10/1985 | (EP) . |
| 0 200 383 | 12/1986 | (EP) . |
| 0 233 235 A2 | 8/1987 | (EP) . |

(List continued on next page.)

OTHER PUBLICATIONS

Barker et al., *J. Exp. Med.*, 168:1493–1498 (1988).
Berger et al., *Methods in Enzymology*, 152:664–704 (1987).
Collins et al., *Nature*, 270:347–349 (1977).

(List continued on next page.)

*Primary Examiner*—Aaron J. Lewis
(74) *Attorney, Agent, or Firm*—Karl Bozicevic; Bozicevic, Field & Francis LLP

(57)    **ABSTRACT**

The need for the delivery of insulin by injection can be reduced or eliminated by delivering an aerosolized monomeric insulin formulation. Repeatability of dosing and more particularly the repeatability of the blood concentration versus time profile is improved relative to regular insulin. The blood concentration versus time profile is substantially unaffected by specific aspects of the patient's breathing maneuver at delivery. Further, the rate at which blood glucose is lowered is increased by the use of monomeric insulin. Particles of insulin and in particular monomeric insulin delivered to the surface of lung tissue will be absorbed into the circulatory system. The monomeric insulin may be a dry powder but is preferably in a liquid formulation delivered to the patient from a hand-held, self-contained device which automatically releases an aerosolized burst of formulation. The device includes a sensor which is preferably electronic which measures inspiratory flow and volume which measurement can be used to control the point of drug release.

**15 Claims, 3 Drawing Sheets**





US006408854B1

(12) **United States Patent**
Gonda et al.

(10) **Patent No.:**     **US 6,408,854 B1**
(45) **Date of Patent:**     *Jun. 25, 2002

(54) **INSULIN DELIVERY ENHANCED BY COACHED BREATHING**

(75) Inventors: **Igor Gonda**, San Francisco; **Reid M. Rubsamen**, Oakland, both of CA (US)

(73) Assignee: **Aradigm Corporation**, Hayward, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/553,693**

(22) Filed: **Apr. 21, 2000**

**Related U.S. Application Data**

(60) Division of application No. 09/064,809, filed on Apr. 22, 1998, now Pat. No. 6,085,753, which is a continuation of application No. 08/754,423, filed on Nov. 22, 1996, now Pat. No. 5,743,250, which is a continuation-in-part of application No. 08/549,343, filed on Oct. 27, 1995, now Pat. No. 5,915,378, which is a continuation-in-part of application No. 08/331,056, filed on Oct. 28, 1994, now Pat. No. 5,672,581, which is a continuation-in-part of application No. 08/011, 281, filed on Jan. 29, 1993, now Pat. No. 5,364,838.

(51) **Int. Cl.**[7] .............................................. **A61B 19/00**
(52) **U.S. Cl.** ................................... **128/898;** 128/200.14
(58) **Field of Search** ........................... 128/200.14, 200, 128/220, 203.12, 200.23, 204.23, 898; 514/3

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,812,854 A | 5/1974 | Michaels et al. |
| 3,991,304 A | 11/1976 | Hillsman |
| 4,106,503 A | 8/1978 | Rosethal |
| 4,343,798 A | 8/1982 | Fawri |
| 4,361,401 A | 11/1982 | Smith et al. |
| 4,468,464 A | 8/1984 | Cohen et al. |
| 4,604,847 A | 8/1986 | Moulding, Jr et al. |
| 4,624,251 A | 11/1986 | Miller |
| 4,627,432 A | 12/1986 | Newell et al. |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 186 280 | 10/1986 |
| EP | 0 200 383 | 12/1986 |
| EP | 0 232 235 A2 | 8/1987 |

(List continued on next page.)

OTHER PUBLICATIONS

Barker et al., *J. Exp. Med.*, 168:1493–1498 (1988).
Berger et al., *Methods in Enzymology*, 152:664–704 (1987).
Collins et al., *Nature*, 270:347–349 (1977).

(List continued on next page.)

*Primary Examiner*—Corrine McDermott
*Assistant Examiner*—Thomas C. Barrett
(74) *Attorney, Agent, or Firm*—Karl Bozicevic; Field & Francis LLP

(57)     **ABSTRACT**

The need for the delivery of insulin by injection can be reduced or eliminated by a method whereby an aerosolized insulin formulation is delivered to a patient's lungs and the rate at which the insulin is absorbed into the blood is increased by the use of an inhale-exhale breathing maneuver. Particles of insulin delivered to the surface of lung tissue will be absorbed into the circulatory system. The rate of absorption is enhanced by instructing the patient to inhale maximally and thereafter exhale maximally. This maneuver causes a spike in the rate at which insulin enters the circulatory system thereby increasing the rate at which glucose is removed from the circulatory system. The insulin may be a dry powder but is preferably in a liquid formulation delivered to the patient from a hand-held, self-contained device which automatically releases an aerosolized burst of formulation. The device includes a sensor which is preferably electronic which measures inspiratory flow and volume which measurement can be used to control the point of drug release. The sensor can also assist the patient in the inhale-exhale maneuver.

**13 Claims, 12 Drawing Sheets**



US006427681B1

(12) **United States Patent**
Gonda et al.

(10) Patent No.:     **US 6,427,681 B1**
(45) Date of Patent:     *Aug. 6, 2002

(54) **METHOD OF USE OF MONOMERIC INSULIN AS A MEANS FOR IMPROVING THE REPRODUCIBILITY OF INHALED INSULIN**

(75) Inventors: **Igor Gonda**, San Francisco; **Reid M. Rubsamen**, Oakland; **Stephen J. Farr**, Orinda, all of CA (US)

(73) Assignee: **Aradigm Corporation**, Hayward, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/888,094**

(22) Filed:     **Jun. 21, 2001**

**Related U.S. Application Data**

(63) Continuation of application No. 09/656,535, filed on Sep. 7, 2000, now Pat. No. 6,250,298, which is a division of application No. 09/004,756, filed on Jan. 8, 1998, now Pat. No. 6,131,567, which is a continuation-in-part of application No. 08/792,616, filed on Jan. 31, 1997, now Pat. No. 5,888,477, which is a continuation-in-part of application No. 08/754,423, filed on Nov. 22, 1996, now Pat. No. 5,743,250, which is a continuation-in-part of application No. 08/549,343, filed on Oct. 27, 1995, now Pat. No. 5,915,378, which is a continuation-in-part of application No. 08/331,056, filed on Oct. 28, 1994, now Pat. No. 5,672,581, which is a continuation-in-part of application No. 08/011,281, filed on Jan. 29, 1993, now Pat. No. 5,364,838.

(51) Int. Cl.[7] ............................................. A61M 11/00

(52) U.S. Cl. ............................ **128/200.14**; 128/200.22; 128/204.23

(58) Field of Search ...................... 128/200.14, 200.22, 128/203.12, 204.23; 239/102.2, 145

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,812,854 A | 5/1974 | Michaels et al. |
| 3,991,304 A | 11/1976 | Hillsman |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 186 280 | 10/1985 |
| EP | 0 200 383 | 12/1986 |

(List continued on next page.)

OTHER PUBLICATIONS

Barker et al., *J. Exp. Med.*, 168:1493–1498 (1988).
Berger et al., *Methods in Enzymology*, 152:664–704 (1987).

(List continued on next page.)

*Primary Examiner*—Aaron J. Lewis
(74) *Attorney, Agent, or Firm*—Karl Bozicevic; Bozicevic, Field & Francis LLP

(57)     **ABSTRACT**

The need for the delivery of insulin by injection can be reduced or eliminated by delivering an aerosolized monomeric insulin formulation. Repeatability of dosing and more particularly the repeatability of the blood concentration versus time profile is improved relative to regular insulin. The blood concentration versus time profile is substantially unaffected by specific aspects of the patient's breathing maneuver at delivery. Further, the rate at which blood glucose is lowered is increased by the use of monomeric insulin. Particles of insulin and in particular monomeric insulin delivered to the surface of lung tissue will be absorbed into the circulatory system. The monomeric insulin may be a dry powder but is preferably in a liquid formulation delivered to the patient from a hand-held, self-contained device which automatically releases an aerosolized burst of formulation. The device includes a sensor which is preferably electronic which measures inspiratory flow and volume which measurement can be used to control the point of drug release.

**10 Claims, 3 Drawing Sheets**





US006431166B2

(12) **United States Patent**       (10) Patent No.:        **US 6,431,166 B2**
Gonda et al.                         (45) Date of Patent:      *Aug. 13, 2002

(54) **METHOD OF USE OF MONOMERIC INSULIN AS A MEANS FOR IMPROVING THE REPRODUCIBILITY OF INHALED INSULIN**

(75) Inventors: **Igor Gonda**, San Francisco; **Reid M Rubsamen**, Oakland; **Stephen J. Farr**, Orinda, all of CA (US)

(73) Assignee: **Aradigm Corporation**, Hayward, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/784,861**

(22) Filed: **Feb. 15, 2001**

**Related U.S. Application Data**

(63) Continuation of application No. 09/656,535, filed on Sep. 7, 2000, now Pat. No. 6,250,296, which is a continuation of application No. 09/004,756, filed on Jan. 8, 1998, now Pat. No. 6,131,567, which is a continuation-in-part of application No. 08/792,616, filed on Jan. 31, 1997, which is a continuation-in-part of application No. 08/754,423, filed on Nov. 22, 1996, now Pat. No. 5,473,250, which is a continuation-in-part of application No. 08/549,343, filed on Oct. 27, 1995, now Pat. No. 5,915,378, which is a continuation-in-part of application No. 08/331,056, filed on Oct. 28, 1994, now Pat. No. 5,672,581, which is a continuation-in-part of application No. 08/011,281, filed on Jan. 29, 1993, now Pat. No. 5,364,838.

(51) Int. Cl.$^7$ ............................................ A61M 11/00

(52) U.S. Cl. ............................. **128/200.14**; 128/200.22; 128/204.23

(58) Field of Search ........................ 128/200.14, 200.22, 128/203.12, 203.15, 203.21, 204.23

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 3,812,854 A | 5/1974 | Michaels et al. | ...... | 128/200.16 |
| 3,991,304 A | 11/1976 | Hillsman | .................... | 600/538 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 186 280 | 10/1985 |
| EP | 0 200 383 | 12/1986 |

(List continued on next page.)

OTHER PUBLICATIONS

Barker et al., *J. Exp. Med.*, 168:1493–1498 (1988).
Berger et al., *Methods in Enzymology*, 152:664–704 (1987).

(List continued on next page.)

*Primary Examiner*—Aaron J. Lewis
(74) *Attorney, Agent, or Firm*—Karl Bozicevic; Bozicevic, Field & Francis LLP

(57) **ABSTRACT**

The need for the delivery of insulin by injection can be reduced or eliminated by delivering an aerosolized monomeric insulin formulation. Repeatability of dosing and more particularly the repeatability of the blood concentration versus time profile is improved relative to regular insulin. The blood concentration versus time profile is substantially unaffected by specific aspects of the patient's breathing maneuver at delivery. Further, the rate at which blood glucose is lowered is increased by the use of monomeric insulin. Particles of insulin and in particular monomeric insulin delivered to the surface of lung tissue will be absorbed into the circulatory system. The monomeric insulin may be a dry powder but is preferably in a liquid formulation delivered to the patient from a hand-held, self-contained device which automatically releases an aerosolized burst of formulation. The device includes a sensor which is preferably electronic which measures inspiratory flow and volume which measurement can be used to control the point of drug release.

**13 Claims, 3 Drawing Sheets**





US006431167B1

(12) **United States Patent**　　　　(10) **Patent No.:**　　**US 6,431,167 B1**
Gonda et al.　　　　　　　　　　　　(45) **Date of Patent:**　　*Aug. 13, 2002

(54) **METHOD OF USE OF MONOMERIC INSULIN AS A MEANS FOR IMPROVING THE REPRODUCIBILITY OF INHALED INSULIN**

(75) Inventors: **Igor Gonda**, San Francisco; **Reid M. Rubsamen**, Oakland; **Stephen J. Farr**, Orinda, all of CA (US)

(73) Assignee: **Aradigm Corporation**, Hayward, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/975,085**

(22) Filed: **Oct. 9, 2001**

**Related U.S. Application Data**

(63) Continuation of application No. 09/888,094, filed on Jun. 21, 2001, which is a continuation of application No. 09/656, 535, filed on Sep. 7, 2000, now Pat. No. 6,250,298, which is a division of application No. 09/004,756, filed on Jan. 8, 1998, now Pat. No. 6,131,567, which is a continuation-in-part of application No. 08/792,616, filed on Jan. 31, 1997, now Pat. No. 5,888,477, which is a continuation-in-part of application No. 08/754,423, filed on Nov. 22, 1996, now Pat. No. 5,473,250, which is a continuation-in-part of application No. 08/549,343, filed on Oct. 27, 1995, now Pat. No. 5,915,378, which is a continuation-in-part of application No. 08/331,056, filed on Oct. 28, 1994, now Pat. No. 5,672,581, which is a continuation-in-part of application No. 08/011, 281, filed on Jan. 29, 1993, now Pat. No. 5,364,838.

(51) Int. Cl.[7] ........................................... **A61M 11/00**

(52) U.S. Cl. ........................... **128/200.14**; 128/200.22; 128/204.23

(58) Field of Search ..................... 128/200.14, 200.22, 128/200.16, 203.26, 204.23

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,812,854 A * 5/1974 Michaels et al. ...... 128/200.16
3,991,304 A  11/1976 Hillsman

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

EP　　0 186 280　　10/1985
EP　　0 200 383　　12/1986

(List continued on next page.)

OTHER PUBLICATIONS

Barker et al., *J. Exp. Med.*, 168:1493–1498 (1988).
Berger et al., *Methods in Enzymology*, 152:664–704 (1987).

(List continued on next page.)

*Primary Examiner*—Aaron J. Lewis
(74) *Attorney, Agent, or Firm*—Karl Bozicevic; Bozicevic, Field & Francis LLP

(57) **ABSTRACT**

The need for the delivery of insulin by injection can be reduced or eliminated by delivering an aerosolized monomeric insulin formulation. Repeatability of dosing and more particularly the repeatability of the blood concentration versus time profile is improved relative to regular insulin. The blood concentration versus time profile is substantially unaffected by specific aspects of the patient's breathing maneuver at delivery. Further, the rate at which blood glucose is lowered is increased by the use of monomeric insulin. Particles of insulin and in particular monomeric insulin delivered to the surface of lung tissue will be absorbed into the circulatory system. The monomeric insulin may be a dry powder but is preferably in a liquid formulation delivered to the patient from a hand-held, self-contained device which automatically releases an aerosolized burst of formulation. The device includes a sensor which is preferably electronic which measures inspiratory flow and volume which measurement can be used to control the point of drug release.

**18 Claims, 3 Drawing Sheets**



US006647987B2

(12) **United States Patent**
Gonda et al.

(10) **Patent No.:** US 6,647,987 B2
(45) **Date of Patent:** *Nov. 18, 2003

(54) **INSULIN DELIVERY ENHANCED BY COACHED BREATHING**

(75) Inventors: **Igor Gonda**, South Yarra (AU); **Reid M. Rubsamen**, Alamo, CA (US)

(73) Assignee: **Aradigm Corporation**, Hayward, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/175,597**

(22) Filed: **Jun. 18, 2002**

(65) **Prior Publication Data**

US 2002/0157677 A1 Oct. 31, 2002

**Related U.S. Application Data**

(63) Continuation of application No. 09/553,693, filed on Apr. 21, 2000, now Pat. No. 6,408,854, which is a division of application No. 09/064,809, filed on Apr. 22, 1998, now Pat. No. 6,085,753, which is a continuation of application No. 08/754,423, filed on Nov. 22, 1996, now Pat. No. 5,743,250, which is a continuation-in-part of application No. 08/549,343, filed on Oct. 27, 1995, now Pat. No. 5,915,378, which is a continuation-in-part of application No. 08/331,056, filed on Oct. 28, 1994, now Pat. No. 5,672,581, which is a continuation-in-part of application No. 08/011,281, filed on Jan. 29, 1993, now Pat. No. 5,364,838.

(51) **Int. Cl.[7]** .............................................. A61B 19/00

(52) **U.S. Cl.** ..................................... 128/898; 128/203.12

(58) **Field of Search** ................ 128/898, 203.12–204.14

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,812,854 A | 5/1974 | Michaels et al. |
| 3,991,304 A | 11/1976 | Hillsman |
| 4,106,503 A | 8/1978 | Rosenthal |
| 4,343,798 A | 8/1982 | Fawri |
| 4,361,401 A | 11/1982 | Smith et al. |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 186 280 | 10/1985 |
| EP | 0 200 383 | 12/1986 |
| EP | 0 232 235 A2 | 8/1987 |
| EP | 0 272 489 | 6/1988 |
| FR | 2 673 142 | 8/1992 |
| GB | 2 104 393 A | 3/1983 |

(List continued on next page.)

OTHER PUBLICATIONS

Barker et al., *J. Exp. Med.*, 168:1493–1498 (1988).
Berger et al., *Methods in Enzymology*, 152:664–704 (1987).
Collins et al., *Nature*, 270:347–349 (1977).

(List continued on next page.)

Primary Examiner—David H. Willse
Assistant Examiner—Thomas Barrett
(74) *Attorney, Agent, or Firm*—Karl Bozicevic; Bozicevic, Field & Francis LLP

(57) **ABSTRACT**

The need for the delivery of insulin by injection can be reduced or eliminated by a method whereby an aerosolized insulin formulation is delivered to a patient's lungs and the rate at which the insulin is absorbed into the blood is increased by the use of an inhale-exhale breathing maneuver. Particles of insulin delivered to the surface of lung tissue will be absorbed into the circulatory system. The rate of absorption is enhanced by instructing the patient to inhale maximally and thereafter exhale maximally. The insulin is delivered to the patient from a hand-held, self-contained device which automatically releases an aerosolized burst of formulation. The device includes a sensor which is preferably electronic which measures inspiratory flow and volume which measurement can be used to control the point of drug release. The sensor can also assist the patient in the inhale-exhale maneuver.

**11 Claims, 12 Drawing Sheets**



US006688304B2

(12) **United States Patent**
Gonda et al.

(10) Patent No.: **US 6,688,304 B2**
(45) Date of Patent: *****Feb. 10, 2004**

(54) **INHALED INSULIN DOSAGE CONTROL DELIVERY ENHANCED BY CONTROLLING TOTAL INHALED VOLUME**

(75) Inventors: **Igor Gonda**, San Francisco, CA (US); **Reid M. Rubsamen**, Alamo, CA (US); **Stephen J. Farr**, Orinda, CA (US)

(73) Assignee: **Aradigm Corporation**, Hayward, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/950,562**

(22) Filed: **Sep. 10, 2001**

(65) **Prior Publication Data**

US 2002/0046750 A1 Apr. 25, 2002

**Related U.S. Application Data**

(63) Continuation of application No. 09/686,212, filed on Oct. 10, 2000, now abandoned, which is a continuation of application No. 09/378,638, filed on Aug. 20, 1999, now Pat. No. 6,167,880, which is a division of application No. 09/160, 909, filed on Sep. 25, 1998, now Pat. No. 5,941,240, which is a continuation-in-part of application No. 08/846,243, filed on Apr. 25, 1997, now Pat. No. 5,884,620, which is a continuation-in-part of application No. 08/754,423, filed on Nov. 22, 1996, now Pat. No. 5,743,250, which is a continuation-in-part of application No. 08/549,343, filed on Oct. 27, 1995, now Pat. No. 5,915,378, which is a continuation-in-part of application No. 08/331,056, filed on Oct. 28, 1994, now Pat. No. 5,672,581, which is a continuation-in-part of application No. 08/011,281, filed on Jan. 29, 1993, now Pat. No. 5,364,838.

(51) **Int. Cl.**[7] .............................................. **A61M 11/00**

(52) **U.S. Cl.** ............................ **128/200.14**; 128/200.22; 128/203.12; 128/204.23

(58) **Field of Search** ...................... 128/200.14, 200.22, 128/200.16, 200.18, 203.12, 204.23; 600/529, 541

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,812,854 A * 5/1974 Michaels et al. ...... 128/200.16
3,977,394 A * 8/1976 Jones et al. ................. 600/541

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

EP    0 232 235 A2    8/1987
EP    0 186 280    10/1995

(List continued on next page.)

OTHER PUBLICATIONS

Newman et al., "How Should a Pressurized Beta Adrenergic Bronchodilator be Inhaled?", 1981, Eur. J. Respir. Dis., 62, PP. 3–21.*

Colthrope, P. et al., (1992), "The pharmacokinetics of pulmonary delivered insulin: a comparison of intratracheal and aerosol administration to the rabbit." *Pharmaceutical Research* 9:764–8.

(List continued on next page.)

*Primary Examiner*—Aaron J. Lewis
(74) *Attorney, Agent, or Firm*—Karl Bozicevic; Bozicevic, Field & Francis LLP

(57) **ABSTRACT**

Dosages of inhaled insulin are controlled within a narrow range by controlling the total volume of air inhaled by a patient. By repeatedly delivering aerosolized insulin with the same total inhaled volume of air, the amount of insulin delivered to the patient each time is consistent. A device for delivering insulin by inhalation is disclosed which device comprises a means for measuring inhaled volume and for halting inhalation at a pre-determined point. The device also comprises an adjustable means for applying various amounts of force to a container of formulation to expel different amounts of drug from the container based on the force applied.

**13 Claims, 8 Drawing Sheets**





US007021309B2

(12) **United States Patent**
Gonda et al.

(10) Patent No.: **US 7,021,309 B2**
(45) Date of Patent: **Apr. 4, 2006**

(54) **METHOD OF USE OF MONOMERIC INSULIN AS A MEANS FOR IMPROVING THE REPRODUCIBILITY OF INHALED INSULIN**

(75) Inventors: **Igor Gonda**, Melbourne (AU); **Reid M. Rubsamen**, Alamo, CA (US); **Stephen J. Farr**, Orinda, CA (US)

(73) Assignee: **Aradigm Corporation**, Hayward, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/682,529**

(22) Filed: **Oct. 8, 2003**

(65) **Prior Publication Data**

US 2004/0062722 A1    Apr. 1, 2004

**Related U.S. Application Data**

(60) Continuation of application No. 10/212,897, filed on Aug. 5, 2002, now abandoned, which is a continuation of application No. 09/975,085, filed on Oct. 9, 2001, now Pat. No. 6,431,167, which is a continuation of application No. 09/888,094, filed on Jun. 21, 2001, now Pat. No. 6,427,681, which is a continuation of application No. 09/656,535, filed on Sep. 7, 2000, now Pat. No. 6,250,298, which is a division of application No. 09/004,756, filed on Jan. 8, 1998, now Pat. No. 6,131,567, which is a continuation-in-part of application No. 08/792,616, filed on Jan. 31, 1997, now Pat. No. 5,888,477, which is a continuation-in-part of application No. 08/754,423, filed on Nov. 22, 1996, now Pat. No. 5,743,250, which is a continuation-in-part of application No. 08/549,343, filed on Oct. 27, 1995, now Pat. No. 5,915,378, which is a continuation-in-part of application No. 08/331,056, filed on Oct. 28, 1994, now Pat. No. 5,672,581, which is a continuation-in-part of application No. 08/011,281, filed on Jan. 29, 1993, now Pat. No. 5,364,838.

(51) Int. Cl.
*A61M 11/00*    (2006.01)

(52) **U.S. Cl.** .......................... **128/200.14**; 128/203.12; 128/204.23

(58) **Field of Classification Search** ........... 128/200.14, 128/200.22, 200.23, 203.12, 204.23
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,812,854 A * 5/1974 Michaels et al. ...... 128/200.16
(Continued)

FOREIGN PATENT DOCUMENTS

EP    0 186 280    10/1985
(Continued)

OTHER PUBLICATIONS

Barker et al., *J. Exp. Med.*, 168:1493-1498 (1988).
(Continued)

*Primary Examiner*—Aaron J. Lewis
(74) *Attorney, Agent, or Firm*—Karl Bozicevic; Bozicevic, Field & Francis LLP

(57) **ABSTRACT**

The need for the delivery of insulin by injection can be reduced or eliminated by delivering an aerosolized monomeric insulin formulation. Repeatability of dosing and more particularly the repeatability of the blood concentration versus time profile is improved relative to regular insulin. The blood concentration versus time profile is substantially unaffected by specific aspects of the patient's breathing maneuver at delivery. Further, the rate at which blood glucose is lowered is increased by the use of monomeric insulin. Particles of insulin and in particular monomeric insulin delivered to the surface of lung tissue will be absorbed into the circulatory system. The monomeric insulin may be a dry powder but is preferably in a liquid formulation delivered to the patient from a hand-held, self-contained device which automatically releases an aerosolized burst of formulation. The device includes a sensor which is preferably electronic which measures inspiratory flow and volume which measurement can be used to control the point of drug release.

**12 Claims, 3 Drawing Sheets**





US007028686B2

(12) **United States Patent**
Gonda et al.

(10) Patent No.: **US 7,028,686 B2**
(45) Date of Patent: **Apr. 18, 2006**

(54) **INHALED INSULIN DOSAGE CONTROL DELIVERY ENHANCED BY CONTROLLING TOTAL INHALED VOLUME**

(75) Inventors: **Igor Gonda**, San Francisco, CA (US); **Reid M. Rubsamen**, Oakland, CA (US); **Stephen J. Farr**, Orinda, CA (US)

(73) Assignee: **Aradigm Corporation**, Hayward, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 214 days.

(21) Appl. No.: **10/701,967**

(22) Filed: **Nov. 4, 2003**

(65) **Prior Publication Data**

US 2004/0089290 A1    May 13, 2004

**Related U.S. Application Data**

(63) Continuation of application No. 09/950,562, filed on Sep. 10, 2001, now Pat. No. 6,688,304, which is a continuation of application No. 09/686,212, filed on Oct. 10, 2000, now abandoned, which is a continuation of application No. 09/378,638, filed on Aug. 20, 1999, now Pat. No. 6,167,880, which is a division of application No. 09/160,909, filed on Sep. 25, 1998, now Pat. No. 5,941,240, which is a continuation-in-part of application No. 09/846,243, filed on Apr. 25, 1997, now Pat. No. 5,884,620, which is a continuation-in-part of application No. 08/754,423, filed on Nov. 22, 1996, now Pat. No. 5,743,250, which is a continuation-in-part of application No. 08/549,343, filed on Oct. 27, 1995, now Pat. No. 5,915,378, which is a continuation-in-part of application No. 08/331,056, filed on Oct. 28, 1994, now Pat. No. 5,672,581, which is a continuation-in-part of application No. 08/011,281, filed on Jan. 29, 1993, now Pat. No. 5,364,838.

(51) Int. Cl.
*A61M 11/00* (2006.01)

(52) U.S. Cl. ............................ **128/200.14**; 128/200.22; 128/203.12; 128/204.23

(58) **Field of Classification Search** ............ 128/200.14, 128/200.22, 200.23, 203.12, 204.23
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,812,854 A | * | 5/1974 | Michaels et al. ...... 128/200.16 |
| 3,977,394 A | * | 8/1976 | Jones et al. ................. 600/541 |
| 3,991,304 A | | 11/1976 | Hillsman |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 232 235 A2 | 8/1987 |
| EP | 0 186 280 | 10/1995 |
| GB | 2 104 393 | 3/1983 |

(Continued)

OTHER PUBLICATIONS

Newman et al., "How Should a Pressurized Beta–Adrenergic Bronchodilator be Inhaled?", 1981, Eur. J. Respir. Dis. 62:3–21.*

(Continued)

*Primary Examiner*—Aaron J. Lewis
(74) *Attorney, Agent, or Firm*—Karl Bozicevic; Bozicevic, Field & Francis LLP

(57) **ABSTRACT**

Dosages of inhaled insulin are controlled within a narrow range by controlling the total volume of air inhaled by a patient. By repeatedly delivering aerosolized insulin with the same total inhaled volume of air, the amount of insulin delivered to the patient each time is consistent. A device for delivering insulin by inhalation is disclosed which device comprises a means for measuring inhaled volume and for halting inhalation at a pre-determined point. The device also comprises an adjustable means for applying various amounts of force to a container of formulation to expel different amounts of drug from the container based on the force applied.

**55 Claims, 8 Drawing Sheets**





US007278419B2

(12) **United States Patent**
    Gonda et al.

(10) Patent No.:     **US 7,278,419 B2**
(45) Date of Patent:     *Oct. 9, 2007

(54) **METHOD FOR TREATING DIABETES MELLITUS IN A PATIENT**

(75) Inventors: **Igor Gonda**, San Francisco, CA (US); **Reid M. Rubsamen**, Oakland, CA (US); **Stephen J. Farr**, Orinda, CA (US)

(73) Assignee: **Novo Nordisk A/S**, Bagsvaerd (DK)

( * ) Notice:    Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/768,371**

(22) Filed:    **Jan. 30, 2004**

(65)         **Prior Publication Data**

US 2004/0182383 A1    Sep. 23, 2004

**Related U.S. Application Data**

(63) Continuation of application No. 09/848,772, filed on May 3, 2001, now abandoned, which is a continuation of application No. 09/656,535, filed on Sep. 7, 2000, now Pat. No. 6,250,298, which is a continuation of application No. 09/004,756, filed on Jan. 8, 1998, now Pat. No. 6,131,567, which is a continuation-in-part of application No. 08/792,616, filed on Jan. 31, 1997, now Pat. No. 5,888,477, which is a continuation-in-part of application No. 08/754,423, filed on Nov. 22, 1996, now Pat. No. 5,743,250, which is a continuation-in-part of application No. 08/549,343, filed on Oct. 27, 1995, now Pat. No. 5,915,378, which is a continuation-in-part of application No. 08/331,056, filed on Oct. 28, 1994, now Pat. No. 5,672,581, which is a continuation-in-part of application No. 08/011,281, filed on Jan. 29, 1993, now Pat. No. 5,364,838.

(51) Int. Cl.
    *A61M 11/00*    (2006.01)

(52) U.S. Cl. ........................... **128/200.14**; 128/203.12; 128/200.24

(58) Field of Classification Search .......... 128/200.14, 128/200.22, 200.23, 203.12, 203.15, 203.21, 128/200.24, 204.23
    See application file for complete search history.

(56)         **References Cited**

U.S. PATENT DOCUMENTS

3,362,405 A    1/1968   Hazel

(Continued)

FOREIGN PATENT DOCUMENTS

| WO | 90/07351 | | 1/1990 |
|----|----------|---|--------|
| WO | WO90/07351 | * | 7/1990 |
| WO | 92/07599 | | 10/1991 |
| WO | 93/00951 | | 7/1992 |
| WO | 93/12823 | | 12/1992 |

OTHER PUBLICATIONS

U.S. Appl. No. 08/011,281.

(Continued)

*Primary Examiner*—Teena Mitchell
(74) *Attorney, Agent, or Firm*—Marc A. Began

(57)         **ABSTRACT**

The need for the delivery of insulin by injection can be reduced or eliminated by delivering aerosolized insulin. Repeatability of dosing is obtainable by using either regular insulin or monomeric insulin. When delivering insulin (not monomeric) by inhalation, the total inhaled volume should be about the same at each delivery to obtain repeatable results. The patient can be coached (by teaching) to inhale a given amount of air and can also be coached (by teaching) to inhale at a given flow rate. Further, the rate at which blood glucose is lowered is increased by the use of monomeric insulin. Particles of insulin and monomeric insulin delivered to the surface of lung tissue will be absorbed into the circulatory system. A dry powder or a liquid insulin formulation is delivered to the patient from a mechanical or electronic hand-held, self-contained device.

**24 Claims, 3 Drawing Sheets**



# Exhibit 2
## Part 1 of 3

Ronald G. Crystal, M.D.

January 22, 2008

Washington, DC

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - X

NOVO NORDISK A/S                    :

      Plaintiff,                  :

   v.                              : Case No.:

JON W. DUDAS,                       : 06-1896 (CKK)

Under Secretary of Commerce for  : Judge Colleen

Intellectual Property and          :    Kollar-Kotelly

Director of the United States    .  :   ECP

Patent & Trademark Office,          :

     Defendant.                  :

- - - - - - - - - - - - - - - X

Washington, D.C.

Tuesday, January 22, 2008

     Deposition of RONALD G. CRYSTAL, M.D., called
for examination by counsel for the Defendant in the
above-entitled matter, pursuant to notice, the witness
being duly sworn by CARLA L. ANDREWS, a Notary Public
in and for the District of Columbia, taken at the
offices of Sullivan & Cromwell, LLP, 1701 Pennsylvania
Avenue, N.W., Suite 700, Washington, D.C. 20006, at
3:00 p.m., Tuesday, January 22, 2008, and the
proceedings being taken down by Stenotype by CARLA L.
ANDREWS and transcribed under her direction.

Ronald G. Crystal, M.D.

Washington, DC

January 22, 2008

---

**Page 2**

```
 1    APPEARANCES:
 2      On behalf of the Plaintiff:
 3        MARGARET PFEIFFER, ESQ.
 4        SUSAN KAUFMANN NASH, ESQ.
 5        Sullivan & Cromwell, LLP
 6        1701 Pennsylvania Avenue, N.W.
 7        Suite 700
 8        Washington, D.C. 20006
 9        (202) 956-7055
10
11        JAMES T. WILLIAMS, ESQ.
12        Sullivan & Cromwell, LLP
13        125 Broad Street
14        New York, New York 10004-2498
15        (212) 558-3130
16
17        SAMUEL S. WOODLEY, ESQ.
18        Darby & Darby
19        7 World Trade Center
20        250 Greenwich Street
21        New York, New York 10007-0042
22        (212) 527-7700
```

**Page 3**

```
 1    APPEARANCES (Continued):
 2      On behalf of the Defendant:
 3        BENJAMIN WOOD, ESQ.
 4        JANET A. GONGOLA, ESQ.
 5        United States Patent and Trademark Office
 6        Office of the Solicitor
 7        600 Dulany Street, Madison West, 8D21
 8        Alexandria, Virginia 22314
 9        (571) 272-8734
10
11        BLANCHE L. BRUCE, ESQ.
12        United States Attorney's Office
13        555 4th Street, N.W.
14        Washington, D.C. 20530
15        (202) 307-6078
16
17
18
19
20
21
22
```

**Page 4**

```
 1                    C-O-N-T-E-N-T-S
 2    WITNESS         EXAMINATION BY COUNSEL FOR
 3    RONALD G. CRYSTAL, M.D.        DEFENDANT
 4    By Mr. Wood              5
 5
 6
 7                    E-X-H-I-B-I-T-S
 8    NO.                   IDENT.
 9    Crystal Exhibit Nos. 1 through 10.................... 5
10    Crystal Exhibit No. 11............................. 75
11
12
13
14
15
16
17
18
19
20
21
22
```

**Page 5**

```
 1                    P-R-O-C-E-E-D-I-N-G-S
 2        (Crystal Exhibit Nos. 1 through 10, marked
 3    for identification.)
 4        Thereupon,
 5           RONALD G. CRYSTAL, M.D.
 6    was called as a witness and, after being duly sworn by
 7    the notary, was examined and testified as follows:
 8       EXAMINATION BY COUNSEL FOR THE DEFENDANT
 9          BY MR. WOOD:
10       Q   Good morning, Dr. Crystal.  My name is Ben
11    Wood, and I will be taking your deposition this
12    afternoon.
13           Have you ever been deposed before?
14       A   Yes, I have.
15       Q   How many times?
16       A   I don't know what the total number is.  I
17    probably do something relating to a medical/legal issue
18    twice a year, perhaps once a year.  And I have probably
19    been doing that for 25 years, so probably 25 --
20    probably 30 to 50 times.
21       Q   Well, I am going to make a few comments sort
22    of setting the ground rules.  And I believe that you
```

Alderson Reporting Company
1-800-FOR-DEPO

Ronald G. Crystal, M.D.

January 22, 2008

Washington, DC

Page 6

1    should be familiar with these. But if you have any
2    questions, please let me know.
3        A    Thank you.
4        Q    I will ask you questions. And my questions
5    and your answers will be recorded by the court
6    reporter. You understand that you need to speak up and
7    to answer orally in giving your answers so that you can
8    be heard clearly?
9        A    Yes.
10       Q    All right. On occasion I may ask a question
11   that I don't state very well or that for some reason
12   you don't understand. If you don't understand my
13   question for any reason, please let me know and I will
14   try to clarify. Is that okay?
15       A    Yes.
16       Q    If you need a break at any time for any
17   reason, you should tell me or tell your attorney. And
18   we will finish your answer if we are in the middle of
19   it and then see what we can do about taking a break.
20          Is that okay?
21       A    Yes.
22       Q    Okay. It may happen that you will give an

Page 7

1    answer as completely as you can and then later on you
2    remember some additional information in response to an
3    earlier question or perhaps some clarification comes to
4    mind. If that happens to you, please tell us that you
5    would like to add something to the earlier answer and
6    we can do that right then while it is on your mind.
7          Is that all right with you?
8        A    Yes.
9        Q    When you are answering, you may think of some
10   documents that might help you remember the answer or it
11   might help give you a more accurate answer. If you do,
12   tell us and we may have those documents here or we may
13   be able to get them to help you answer completely and
14   accurately.
15          Is that okay?
16       A    Yes.
17       Q    Are you taking any medication or drugs of any
18   kind that might make it difficult for you to understand
19   and answer my questions today?
20       A    No.
21       Q    The court reporter has marked exhibits
22   entitled Crystal Exhibit 1 through Crystal Exhibit 10.

Page 8

1    And these are -- Crystal Exhibit 1 is your expert
2    witness report and Crystal Exhibit 9 or --
3    correction -- 2 through 10 are the attachments to your
4    report. I am going to hand those to you. And if you
5    could look those over just to verify that that is your
6    report with the attached exhibits.
7        A    Yes, they are.
8        Q    Thank you. If we could start with Crystal
9    Exhibit 1, please, which is your expert report. Is
10   there anything about your expert report that you would
11   like to correct at this time?
12       A    No.
13       Q    Okay. Is there any opinion on which you
14   expect to testify that is not expressed in your expert
15   report?
16       A    No.
17       Q    Is there any opinion that you have formulated
18   about the issues in this case that's not expressed in
19   your expert witness report?
20       A    No.
21       Q    Did dry insulin powder exist in January
22   1993? Was it known?

Page 9

1        MS. PFEIFFER: Objection to form.
2        THE WITNESS: I am not sure what you mean by
3    the question. Are you asking whether it was known
4    whether you could dry -- whether you could form an
5    insulin powder or whether a dry insulin powder was
6    available for human use or whether it was used
7    available for commercial use?
8          Can you clarify?
9        BY MR. WOOD:
10       Q    Sure. Was dry insulin powder available for
11   human use in January 1993?
12       A    You mean that a doctor could order?
13       Q    Yes. Well, I don't know -- let's try this.
14   Was dry insulin powder manufactured for any purpose in
15   January 1993?
16       A    I don't know whether I can answer that
17   question. I mean, the dry insulin powder was -- became
18   available recently for human use -- approved human
19   use. When it was first developed, I don't know the
20   date.
21       Q    All right. Was it available for any purpose
22   as of January 1993?

3  (Pages 6 to 9)

Ronald G. Crystal, M.D.                                         January 22, 2008
                        Washington, DC

| Page 10 | Page 12 |
|---|---|

**Page 10**

1    MS. PFEIFFER: Objection. Asked and
2  answered.
3        THE WITNESS: I am not sure I can answer the
4  question the way you asked it. Are you referring to
5  human insulin, recombinant-produced human insulin,
6  animal insulin?
7        BY MR. WOOD:
8    Q   Any kind of insulin.
9    A   I don't know specifically. I assume it must
10  have been, but I don't have any specific knowledge of
11  the dates when it was available.
12   Q   Why do you assume it must have been
13  available?
14   A   Because insulin was discovered in the 1920s.
15  And the concept of forming a dry powder of a protein,
16  which insulin is, is commonly done in the laboratory.
17  And so I am sort of assuming that someone may have done
18  it at some point, but I have no specific knowledge of
19  that. And I don't know the history of the development
20  of the commercial product.
21   Q   How do you develop a dry powder of a protein
22  in the laboratory?

**Page 11**

1        MS. PFEIFFER: Objection to form.
2        THE WITNESS: There's various ways you can do
3  it. But, basically, a dry powder is removing the water
4  from the protein. So first you would purify the
5  protein. And then there are various ways that you
6  could do it. The general jargon is lyophilization,
7  that is, removal of the water. But whether or not that
8  would work for a specific protein would depend on the
9  characteristics of the protein. And some you can do
10  easily; and some you can't do easily. And some you may
11  have to put other materials in with the protein to be
12  able to do it and maintain its function. And I am not
13  an expert in that area.
14       BY MR. WOOD:
15   Q   All right. Do you know whether dry insulin
16  powder was made in the laboratory as of January 1993?
17       MS. PFEIFFER: Objection. Asked and
18  answered.
19       THE WITNESS: I don't know specifically. To
20  my general knowledge of biomedical research, my
21  assumption is that it was, but I don't know
22  specifically.

**Page 12**

1        BY MR. WOOD:
2    Q   All right. If you could turn to paragraph 12
3  of your expert report, which is on page four.
4    A   Okay.
5    Q   And if you could just read that to yourself,
6  that paragraph.
7    A   Okay.
8    Q   You say in paragraph 12 that you have been
9  asked to assume for present purposes that the '774
10  application was filed on May 3, 2001, and claims the
11  priority of an application filed on January 29, 1993,
12  now U.S. Patent No. 5,364,838 and therefore that
13  January 29, 1993, is the effective date for evaluating
14  the prior art.
15       How did this assumption affect your opinion
16  expressed in your expert report?
17   A   Well, the material -- it is relevant in that
18  the materials before January 29, 1993, are the -- the
19  prior art before that time is what is relevant in terms
20  of assessment, and what comes after that is not.
21   Q   If we could turn now to paragraph 33 of your
22  expert report, which is on page 11. There you state,

**Page 13**

1  It is my opinion that, as of 1993, a person of ordinary
2  skill in the art would have been one who had either an
3  M.D. or a Ph.D in a related field, and several years of
4  experience in pharmaceutical aerosols, lung physiology,
5  and pulmonary drug delivery or the equivalent training
6  and experience.
7        What is the basis for your opinion about a
8  person of ordinary skill in the art?
9    A   Well, I wrote that irrelevant to the
10  discussion that this deposition is related to, which is
11  aerosolization of insulin and transfer of the insulin
12  to the blood. And so I was defining what I believe, in
13  my opinion, that as of 1993 a person of ordinary skill
14  in the art would have to be, to be able to accomplish
15  that.
16   Q   Did you write your expert report?
17   A   The original -- what I did was met with the
18  attorneys relating to this issue on several occasions
19  and gave them what my opinions were. Then they drafted
20  the report, and then I reviewed the draft on two
21  different occasions -- actually, the third, which was
22  some minor changes.

                                            4  (Pages 10 to 13)

Ronald G. Crystal, M.D.

January 22, 2008

Washington, DC

Page 14

1    Q   All right. So, for example, paragraph 33, is
2   that your language? Is that something that you wrote
3   the first draft of?
4        MS. PFEIFFER: Objection to form.
5        THE WITNESS: I didn't write the first
6   draft. I gave my opinions, and then I asked the
7   attorneys to draft the report. And then I reviewed the
8   drafts in details.
9        BY MR. WOOD:
10   Q   I see. Paragraph 33, you say, A person of
11  ordinary skill in the art has either an M.D. or a Ph.D
12  in a related field. What are the other related fields
13  that you are referring to?
14   A   The interrelated field I used in reference to
15  the Ph.D, that is, a related field to pharmaceutical
16  aerosols, lung physiology, and pulmonary drug delivery.
17   Q   So would one have to have a Ph.D in all three
18  of pharmaceutical aerosols, lung physiology, and
19  pulmonary drug delivery in order to be a person of
20  ordinary skill in the art as of 1993?
21   A   No. But they could have it in one of those,
22  but they would have to have several years of experience

Page 15

1   in the others.
2    Q   Okay. A Ph.D in one and several years of
3   experience in the other two?
4    A   And experience of all three.
5    Q   I see. I see. Are you able to testify as to
6   what a person of ordinary skill in the art would have
7   found to be obvious in 1993?
8    A   Yes.
9    Q   And how are you able to do that?
10   A   Because as of 1993 I was a person of ordinary
11  skill in the art.
12   Q   Were you a person of what I would call above
13  ordinary skill of the art in 1993?
14       MS. PFEIFFER: Objection to form.
15       THE WITNESS: No. No, I would say I was a
16  person of ordinary skill in the art.
17       BY MR. WOOD:
18   Q   Would you say that you are a person of
19  ordinary skill in the art today?
20   A   Yes.
21   Q   Okay. Would you say you are a person of
22  above ordinary skill in the art today?

Page 16

1        MS. PFEIFFER: Objection to form.
2        THE WITNESS: No. I would say I would be a
3   person of ordinary skill in the art.
4        BY MR. WOOD:
5    Q   All right. We talked a little bit about dry
6   insulin powder. Where would you go to learn about dry
7   insulin powder? What reference or other source of
8   information would you look to?
9    A   I am sure there is a great deal of
10  information in the medical -- biomedical literature on
11  dry insulin powders.
12   Q   Where would you go? What sort of sources
13  would you look to?
14   A   I would look in the medical literature.
15   Q   Is there that particular treatise?
16   A   No. No, I would go into the medical
17  literature or the published literature, review it
18  thoroughly, and come to an opinion.
19   Q   Now, would that give you information about
20  dry insulin powder that was known as of 1993 --
21   A   Yes.
22       MS. PFEIFFER: Objection to form.

Page 17

1    Q   -- for a person of ordinary skill in the art?
2        MS. PFEIFFER: Hypothetical, lacks
3   foundation.
4        THE WITNESS: Yes. He would look at the
5   literature prior to the relevant date to this issue in
6   1993.
7        BY MR. WOOD:
8    Q   Are there any particular journals that you
9   would expect to find literature relevant to dry insulin
10  powder?
11   A   No. It could be in multiple different
12  places.
13   Q   Is it safe to say that a person of ordinary
14  skill in the art in 1993 would be aware of the
15  existence of dry insulin powder?
16       MS. PFEIFFER: Objection to form.
17       THE WITNESS: Not necessarily.
18       BY MR. WOOD:
19   Q   Would a person of ordinary skill in the art
20  in January 1939 know how to make dry insulin powder?
21       MS. PFEIFFER: I am sorry. I couldn't hear
22  that.

5 (Pages 14 to 17)

Ronald G. Crystal, M.D.

January 22, 2008

Washington, DC

---

Page 18

1    BY MR. WOOD:
2       Q   Would a person of ordinary skill in the art
3   in January 1993 know how to make dry insulin powder?
4       A   I don't know whether I can answer that
5   question in terms of -- as I said before, I am not an
6   expert in making dry powders or proteins. I know the
7   general principles, but I am not an expert in the area
8   to answer the question. I don't know whether I can
9   answer that. I mean, I could go in the literature and
10  figure it out for you. But I don't know that I can
11  answer it here.
12      Q   All right. I am not sure if I understand
13  your answer. Are you saying you don't know whether a
14  person of ordinary skill in the art in January 1993
15  would know how to make dry insulin powder sitting here
16  today?
17      A   I would have to look at the literature and
18  see. I am not an expert in making dry insulin
19  powders. And so I would have to look in the literature
20  to be able to answer that question for you.
21      Q   Can you describe for me what happens to
22  aerosolized dry insulin powder as it travels from an

---

Page 19

1   inhalation device to the bloodstream?
2       MS. PFEIFFER: Objection to form.
3       THE WITNESS: You would have to be more
4   specific about what you mean by dry insulin powder. I
5   mean, that's a very complex question the way you are
6   asking it. I can describe for you in general what
7   happens to aerosols. But to put in the dry insulin
8   powder, you would have to give me more information.
9       BY MR. WOOD:
10      Q   Well, let's talk about it in general terms,
11  then, in terms -- generally in terms of aerosols. Can
12  you tell me what happens to aerosolized insulin as it
13  travels from an inhalation device to the bloodstream?
14      MS. PFEIFFER: Objection to form.
15      THE WITNESS: Theoretically you are asking me
16  the question?
17      BY MR. WOOD:
18      Q   Yes.
19      A   Well, theoretically, you would develop a
20  device that could aerosolize the insulin in a form
21  where the insulin would remain active and in a form
22  that would be able to in a reproducible fashion and

---

Page 20

1   sufficient quantities reach the lower respiratory
2   tract. And the medical jargon would be the alveoli
3   because that is where the large surface area of the
4   lung is capable of absorbing proteins.
5       You would have to ensure that sufficient
6   amounts, you know, again, in reproducible fashion,
7   could reach the alveoli. You would have to ensure that
8   the aerosolized insulin would impact upon the walls of
9   the alveoli and then that the formulation that you used
10  and the insulin itself would be able to travel across
11  the cells lining the alveoli, which we refer to as
12  alveoli epithelium, move across the connective tissue,
13  which is underlying that, which is called a basement
14  membrane, and then the connective tissue in the alveoli
15  walls, which is referred to as the interstitial space.
16  And then move across the linings of the blood vessel of
17  the capillaries in the alveoli, which those cells are
18  called endothelium, and reach the bloodstream.
19      Because insulin has a very narrow therapeutic
20  range, you would have to be able to do it in a fashion
21  that was reproducible, that was safe, highly
22  controlled, and when you know specifically the amounts

---

Page 21

1   that you could deliver.
2       Q   Would you expect all of the insulin that's
3   aerosolized by the device to reach the lungs?
4       A   You would have to define what you mean by
5   lungs.
6       Q   Well, what do you mean by lungs?
7       A   The lungs are the structure within your chest
8   that go from -- we usually define the lungs from the
9   trachea usually from the vocal cords down. And so it
10  is the structures within the chest from the vocal cords
11  down that include the general piece. Parts of the
12  lung are the airways, the alveoli, and then the
13  vasculature coming to the lung. And then there is
14  connective tissue and a variety of other things that
15  sort of hold it all in place and provide the
16  appropriate structure.
17      Q   Is there a definition for -- you said the
18  lung includes the trachea?
19      A   Usually we define the lung as below the
20  trachea -- the vocal cords, yes.
21      Q   So --
22      A   The trachea is the large airway, yes.

6 (Pages 18 to 21)

Ronald G. Crystal, M.D.                                                    January 22, 2008
                              Washington, DC

| Page 22 | Page 24 |
|---|---|

**Page 22**

1    Q   All right. So using your definition, let's
2    go back to my question. Would you expect all of the
3    insulin aerosolized in the device to reach the lungs?
4    A   No.
5    Q   Why not?
6    A   Because it depends on the device. It depends
7    on the molecule. It depends on how it is formulated.
8    It depends on the molecule's chemical characteristics.
9    It depends on the mechanisms by which you are
10   aerosolizing it, what the form of the aerosol is, and
11   then the device itself, and then how you are
12   administering to the subject.
13   Q   Well, what happens to the aerosol that does
14   not reach the lungs?
15   A   Well, it depends how you are delivering it.
16   I mean, if you give it to an individual and you don't
17   instruct them properly in terms of how to use your
18   device, they may not put their mouth around the mouth
19   piece appropriately and it may go into their nose.
20   There's all kinds of -- or it may impact on the sides
21   of the device in the mouth, the back of the mouth, the
22   nasopharynx or the structures leading to the trachea.

**Page 23**

1    And there's many different characteristics of
2    both the -- how the procedure is performed, the device,
3    and the formulation that impact upon those parameters.
4    Q   You said the nasopharynx. Did I catch that
5    correctly?
6    A   You didn't tell me how you were going to
7    administer it. Sometimes aerosols can be administered
8    through the mouth. They can be administered by mask.
9    There's a variety of ways that you could do it. And so
10   you weren't being specific.
11   Q   All right. Are you familiar with the claims
12   that are at issue in this litigation?
13   A   In general.
14   Q   Let's take a look at those claims. It should
15   be marked as Crystal Exhibit 6. Do you understand
16   these claims?
17   MS. PFEIFFER: Objection to form.
18   THE WITNESS: This is the appendix of
19   claims --
20   BY MR. WOOD:
21   Q   Right.
22   A   -- to the '774 patent, which is the Exhibit

**Page 24**

1    6. I mean, I have read the claims.
2    Q   All right. Do you understand that these are
3    claims to particular methods?
4    MS. PFEIFFER: Objection to form.
5    THE WITNESS: I am not sure what you mean by
6    that. I mean, some of it refers to treating patients.
7    Some refer to regulating blood glucose. I don't know
8    what you mean by the word method.
9    BY MR. WOOD:
10   Q   All right. Well, let's look at Claim 22. It
11   says -- begins, rather, A method of treating diabetes
12   mellitus in a patient comprising the steps of. And
13   then below that are three steps labeled A, B, and C.
14   Do you see what I am pointing to?
15   A   Yes.
16   Q   Have you read this claim before?
17   A   Yes.
18   Q   Would a person of ordinary skill in the art
19   in January 1993 understand how to perform the method of
20   Claim 22?
21   MS. PFEIFFER: Objection to form.
22   THE WITNESS: I didn't look at this -- these

**Page 25**

1    claims in the context of whether or not in terms of the
2    way you are asking the question. I looked at these
3    claims in the context of the decisions relating to this
4    case only. And so I can't answer your questions
5    regarding as to whether these are valid, not valid,
6    understandable or not in terms of -- I just didn't look
7    at them in that context. I looked at them only in
8    terms of the Board's decision relating to these claims
9    in the context of the prior art, which was Schenk,
10   Velasquez, and Harrison.
11   Q   Well, let's go back to our discussion about
12   aerosolized insulin. And let's assume that the insulin
13   is being taken in by the mouth. Does that -- is that
14   understandable to you?
15   A   In an aerosol form?
16   Q   Yes.
17   A   Yes.
18   Q   So let me ask again since that wasn't clear.
19   What happens to the aerosolized insulin that is
20   aerosolized in the device that does not reach the
21   lungs?
22   MS. PFEIFFER: Objection to form.

Ronald G. Crystal, M.D.
Washington, DC

January 22, 2008

Page 26

1    THE WITNESS: Well, it depends on how it is
2    being aerosolized. It depends on how the patient is
3    being asked to perform the maneuvers. So you have to
4    be a little more clear in terms of the way you are
5    asking me the question and then I can answer it.
6        So, for example, if the device is
7    aerosolizing and the patient is hooked up to the --
8    their mouth to the device but the patient doesn't
9    breathe in, then no insulin is going to go into the
10   lung. So if you could be a little more specific.
11   Q   Sure. Well, let's assume that the patient
12   does breathe in. Let's -- if the patient does breathe
13   in, would all of the insulin that is aerosolized in the
14   device reach the lungs?
15   A   Not necessarily.
16   Q   All right. And let's go with that
17   assumption, you know, going forward, if you will,
18   because I will be asking more questions. So let's
19   assume that the patient does inhale or breathe in. I
20   assume breathe in is the same as inhale?
21   A   Yes. But there are various ways to breathe
22   in that are relevant to getting an aerosol into the

Page 27

1    lung where it could be -- the protein could be absorbed
2    into the bloodstream. So that specific -- in other
3    words, if you took a little breath or if you did a
4    variable breathe or if it was different than a breath
5    each time, all of those are factors. So you would have
6    to be more specific in terms of if you want me to
7    assume something.
8    Q   All right. Well, is there -- all right.
9    Let's go back to the original question. Assuming the
10   patient breathes in after -- or after the insulin is
11   aerosolized in the device, what happens to the
12   aerosolized insulin that does not reach the lungs?
13   A   Well, some -- depending on how the procedure
14   is done, some may never leave the device. If you are
15   asking me to assume that the material has left the
16   device?
17   Q   No.
18   A   Some may stay in the device. Some of the
19   material may reach the mouth -- the back of the mouth.
20   Depending on the device, it may absorb to the
21   mouthpiece. It could go into the trachea. It could be
22   swallowed. There is a whole variety of things that

Page 28

1    could happen to it.
2    Q   What happens to the aerosolized insulin after
3    it reaches the lungs?
4    A   Well, you have to be more clear about what
5    you mean by lungs. We define what the lungs are. And
6    from the air side of the lungs, the lungs are comprised
7    of the tracheobronchial tree, that is, the airways and
8    then the alveoli, which are the air sacs. The lung is
9    like an upside down tree with a large trunk that's a
10   trachea and multiple branches. It branches
11   dichotomously, that is, by twos. And it branches to 23
12   times. It branches 23 times approximately into the
13   alveoli. And a young adult would have approximately
14   300 million air sacs.
15       So it depends on where the insulin goes,
16   whether it goes into just the airways or some of it
17   goes into the alveoli or all of it goes into the
18   alveoli. So you would have to be more specific for me
19   to answer it.
20   Q   What factors determine whether or not
21   insulin -- aerosolized insulin is, I will say, retained
22   in the mouth rather than flowing to the lungs?

Page 29

1        MS. PFEIFFER: Objection to form.
2        THE WITNESS: Probably the major -- well,
3    partly, it would depend on the device. Secondary would
4    be the maneuver that the patient uses to inhale the
5    insulin. The third would be the form of the aerosol.
6    It would depend on whether is it dry? Is it a
7    droplet? What are the other materials, if any, that
8    are placed with the insulin? What is the biochemical
9    characteristics of that dry or particle or droplet in
10   terms of charge and shape and size, mass? There is
11   many, many different parameters that would be involved.
12   Q   What about what factors would influence or
13   affect whether or not insulin is retained by the
14   trachea or the back of the mouth?
15   A   The same parameters -- well, except for the
16   device. I think the way you are asking the question,
17   you are asking me to assume that it has gotten out of
18   the device. I assume we are talking about the material
19   that's left in the device.
20   Q   What factors affect whether or not material
21   is retained in the device?
22   A   It depends on the device. In other words,

8 (Pages 26 to 29)

Ronald G. Crystal, M.D.

January 22, 2008

Washington, DC

Page 30

1  how it is being aerosolized and then the physical
2  chemical characteristics of the insulin.
3      Q    What factors affect whether or not
4  aerosolized insulin reaches the alveoli?
5      A    The same parameters.
6      Q    Anything else?
7      A    No.
8      Q    What are they biochemical characteristics
9  that you referred to in your previous answer?
10      A    It depends on the form of the insulin. Is it
11  a particle? Is it droplet? What is the shape? What
12  is the charge? What are other materials that may or
13  may not be placed with the insulin? What is the mass
14  overall?
15      Q    When you say form, are you referring to
16  whether it is a dry powder versus in aqueous form?
17      A    Yes.
18      Q    When you say shape, are you referring to the
19  shape of the particle?
20      A    Yes.
21      Q    And when you refer to charge, you are
22  referring to the charge of the particle?

Page 31

1      A    Yes.
2      Q    And when you talk about -- or you mentioned
3  mass. Are you referring to the mass of the particle?
4      A    Yes.
5      Q    And particle can refer to either dry powder
6  or an aqueous droplet; is that correct?
7      A    In the context that we are using it here,
8  yes.
9      Q    Now, you also use the term physical chemical
10  characteristic of insulin. What are the physical
11  chemical characteristic of insulin that you are
12  referring to?
13      MS. PFEIFFER: Objection to form.
14      THE WITNESS: The ones that we just
15  discussed. The only other parameter that would be
16  relevant is that we are talking about an active
17  biological, that is, an active molecule that has to be
18  in an intact form to be able to function. So that if
19  that aerosol device alters the form, charge, a whole
20  variety of parameters so that it is not active or some
21  fraction thereof is not active, that's very relevant.
22  It might get into the alveoli and eventually may or may

Page 32

1  not get into the bloodstream. But if it is not active,
2  then it doesn't matter in regard to the patient.
3      Q    Would the molecular weight of the insulin
4  molecule be one of those physical chemical
5  characteristics that you just mentioned?
6      A    Basically, yes. I mean, insulin is -- I
7  mean, although there's some minor modification of
8  insulin, it is basically approximately the same
9  molecular weight. But there may be other things added
10  to the insulin in terms of the aerosols that would be
11  to stabilize the insulin or generate the aerosol. We
12  are speaking theoretically, so there could be other
13  things that would add to the mass.
14      Q    Well, would the molecular -- so would the
15  molecular weight of the insulin molecule affect the
16  mass of the dry insulin -- correction -- the mass of
17  the insulin particle?
18      MS. PFEIFFER: Objection to form.
19      THE WITNESS: Insulin itself, yes, it would.
20      BY MR. WOOD:
21      Q    And how so?
22      A    Because insulin is a protein and it has

Page 33

1  mass. I am not sure I am understanding your question.
2      Q    Do you understand how insulin particle mass
3  would be determined by an inhalation device?
4      MS. PFEIFFER: Objection to form.
5      THE WITNESS: I am not sure I understand what
6  you mean by "would be determined by." I don't see how
7  the device itself would determine the mass. I
8  understand how the mass may influence it in terms of
9  how it is aerosolized, but the device itself would not
10  determine the mass.
11      BY MR. WOOD:
12      Q    You mentioned form of aerosol as one of the
13  factors. Is that the same thing as what we talked
14  about a minute ago about whether it is a dry powder
15  versus an aqueous particle?
16      MS. PFEIFFER: Objection to form, lack of
17  foundation.
18      THE WITNESS: You asked me that. That's the
19  way I answered it, yes.
20      BY MR. WOOD:
21      Q    Let's start with the device. You said the
22  device itself will affect whether or not -- and correct

9  (Pages 30 to 33)

Ronald G. Crystal, M.D.                                    January 22, 2008
                    Washington, DC

Page 34

1  me if I am wrong here. You said the device itself will
2  affect whether or not an aerosolized insulin will be
3  retained by either the device, the mouth, the back of
4  the mouth, the trachea, the bronchial tree, or whether
5  it will reach the alveoli; is that correct?
6       MS. PFEIFFER: Objection to form.
7       THE WITNESS: That's correct.
8       BY MR. WOOD:
9    Q  So how does the device affect that process?
10   A  Well, the device is generating the aerosol
11  and the characteristics of the aerosol, plus the
12  physical chemical characteristics we have already
13  discussed. But the device -- the characteristic of the
14  aerosol, per se, is what determines what's the fate of
15  the particles when they are inhaled into the lung or
16  inhaled in the back of the mouth or into the lung.
17   Q  What are the characteristics of aerosol that
18  determine whether or not the aerosol -- as you put it,
19  the fate of the aerosol?
20       MS. PFEIFFER: Objection to form.
21       THE WITNESS: Size and form and what's
22  contained within the aerosol.

Page 35

1       BY MR. WOOD:
2    Q  What do you mean by size?
3    A  How big it is.
4    Q  How do you characterize the size of an
5  aerosol particle?
6    A  There's various ways to do it. But it is
7  usually referred to in -- there's a lot of different
8  ways to do it. But, in general, the field is discussed
9  in the context of the diameter of the particles.
10  Partly this depends on the form of the particle, shape,
11  and so on. And usually it is discussed in terms of the
12  apparent diameter that it takes.
13   Q  I'm sorry. You said --
14   A  Apparent diameter -- the measurable diameter,
15  if you will. Partly that depends on mass and shape and
16  a variety of things. And there is a lot of different
17  ways to measure it. But, in general, these are
18  parameter of diameter.
19   Q  I see.
20   A  So if you think of it as a ball, the aerosol
21  as a ball, it is how wide is the ball. In lay terms,
22  that would be the concept.

Page 36

1    Q  And, again, you mentioned form. And that is
2  whether or not it is dry versus aqueous?
3       MS. PFEIFFER: Objection to form.
4       THE WITNESS: Yes. Because a dry powder will
5  get hydrated, whereas the aqueous form is already
6  hydrated. It already has water.
7       BY MR. WOOD:
8    Q  What does hydration have to do with the fate
9  of the aerosol?
10       MS. PFEIFFER: Objection to form.
11       THE WITNESS: Because it would change the --
12  it may or may not change the -- if I can use the word
13  diameter just for communication even though it is
14  somewhat more complex than that -- but basically change
15  the diameter of the particle. That is, if it requires
16  water, it may swell.
17       BY MR. WOOD:
18    Q  How does size affect whether or not, as you
19  mentioned in terms of diameter, affect whether or not
20  the aerosol particle reaches the alveoli?
21    A  Well, there is a range of sizes or diameters
22  that are more effective at reaching the alveoli. And

Page 37

1  that's between approximately point five micrometers and
2  six micrometers.
3    Q  What factors affect the size of an insulin
4  aerosol particle?
5       MS. PFEIFFER: Objection to form.
6       THE WITNESS: The device and the form of the
7  formulation.
8       BY MR. WOOD:
9    Q  Okay. Any other factors affect the size of
10  the particle?
11    A  No. I think we have discussed all of them.
12    Q  Like what?
13       MS. PFEIFFER: Objection. Asked and
14  answered.
15       THE WITNESS: Well, it is the device, I guess
16  the form you put the material into the device, what you
17  mix with the insulin. And then it's those physical
18  chemical characteristics.
19       BY MR. WOOD:
20    Q  What sort of substances would be mixed with
21  the insulin?
22    A  I am not an expert in that area. But I am

Alderson Reporting Company
1-800-FOR-DEPO

Ronald G. Crystal, M.D.

January 22, 2008

Washington, DC

---

Page 38

1  aware that for stabilizing and modifying -- stabilizing
2  proteins that you sometimes mix them with things. And
3  what they might be or whether it is necessary, I am not
4  an expert on.
5      Q   You said you are not an expert in that area.
6  What area are you referring to?
7      A   What to mix with insulin to be able to
8  aerosolize it.
9      Q   Is there a particular field that would be
10 interested in that question?
11     A   Well --
12         MS. PFEIFFER: Objection to form.
13         THE WITNESS: It's the same field that I
14 could become expert in it by just reading the
15 literature. I didn't come prepared for that.
16         BY MR. WOOD:
17     Q   All right. You mentioned breathing maneuver
18 as a factor that affects whether or not aerosolized
19 insulin travels all the way from the device to the
20 alveoli; is that correct?
21     A   That's correct.
22     Q   What do you mean by breathing maneuver?

---

Page 39

1      A   Well, when you breathe, you breathe in and
2  out. So you would have to breathe in and not out. And
3  then where you start the respiration, how deep a
4  respiration, whether you hold your breath or not, how
5  reproducible that maneuver is. All of those are very
6  relevant to the aerosolization of insulin.
7      Q   What do you mean reproducible?
8      A   Is that you can -- well, the critical thing
9  for insulin is that it has a very narrow therapeutic
10 range. If you don't get enough, there are both acute
11 and chronic complications. If you give too much, there
12 is acute complications. So you have to be sure that
13 you are giving the precise amount delivered to the
14 bloodstream. And so it's critical in regard to
15 aerosolization of insulin is the maneuver that the
16 patient uses for the given device, and that may differ
17 from different devices. But the maneuver that the
18 patient uses can be always done again and again so that
19 a precise amount of insulin is being delivered to the
20 bloodstream, which is the critical thing for dosing the
21 patient appropriately.
22     Q   Does all of the insulin that reaches -- let's

---

Page 40

1  say the insulin particles that reaches the alveoli
2  thereafter enter the bloodstream?
3          MS. PFEIFFER: Objection to form.
4          THE WITNESS: The answer is no. And there's
5  many, many different variables related to that.
6          BY MR. WOOD:
7      Q   All right. What happens to the insulin that
8  reaches the alveoli that does not enter the
9  bloodstream?
10     A   Well, some may remain suspended in the air.
11 Some may impact upon the walls of the alveoli and stay
12 there; some way not move. Some may or may not move
13 across the epithelium. Some may or may not move across
14 the connective tissue. Some may or may not move across
15 the endothelium into the bloodstream.
16     Q   What are the factors that affect whether or
17 not insulin that reaches the alveoli is thereafter
18 absorbed in the bloodstream?
19     A   Well, first, it has to impact upon the
20 alveoli wall. And that depends, in part, in terms of
21 both the breathing maneuver that's done and also the
22 size of the aerosol or the range and size of the

---

Page 41

1  aerosol. And another parameter is the physical
2  chemical characteristics of the insulin.
3      Q   What physical chemical characteristics are
4  you referring to?
5      A   It would depend on issues like what is in the
6  aerosol, charge are the primary parameters.
7      Q   When you say what is in the aerosol, do you
8  mean the other substances that we talked about?
9      A   Yes.
10     Q   All right. How would those substances affect
11 whether or not insulin is absorbed into the
12 bloodstream?
13         MS. PFEIFFER: Objection to form.
14         THE WITNESS: It depends whether they are
15 bound to the insulin or not. It would depend on
16 whether or not they would be dissolved in the fluid
17 that's lining the epithelium or whether it would reach
18 the epithelium itself. The charge may affect the
19 ability to move across the epithelium or the connective
20 tissue or the endothelium.
21         BY MR. WOOD:
22     Q   You mentioned that insulin may be bound

11 (Pages 38 to 41)

Ronald G. Crystal, M.D.                                          January 22, 2008
                          Washington, DC

| Page 42 | Page 44 |
|---|---|

**Page 42**

1   within another substance?
2        MS. PFEIFFER: Objection to form.
3        THE WITNESS: We were talking theoretically.
4   And I said that other substances could be added to the
5   insulin in terms of generation of the aerosol. And the
6   insulin might interact with that material, whatever it
7   is, theoretically and therefore be larger or change its
8   shape or size.
9        BY MR. WOOD:
10   Q   Now, what did you mean by bound to the
11   insulin?
12        MS. PFEIFFER: Objection to form.
13        THE WITNESS: There are in different ways
14   where things can interact with proteins that could be
15   through ionic interactions, that is, charge. It could
16   be through specific bonds. One might want to mix the
17   insulin or not with a lipid-related substance. There
18   are many, many different parameters because we are
19   talking theoretically, not about a specific product.
20        BY MR. WOOD:
21   Q   What's a lipid substance?
22   A   Fat.

**Page 43**

1    Q   Why --
2    A   Fat-like.
3    Q   Why would the insulin particle be bound to a
4   lipid substance?
5    A   Well, we are talking theoretically. I said
6   theoretically you might want to -- someone might
7   develop an aerosol where insulin was associated with a
8   lipid substance. There are -- the lining fluid of the
9   air sacs of the alveoli is very lipid rich. And that
10   might -- again, we are speaking theoretically. But it
11   might provide characteristics that would be
12   advantageous or it might not be advantageous.
13    Q   When you say advantageous, advantageous in
14   what regard?
15    A   Well, the goal is to aerosolize insulin for a
16   therapeutic, that is, for treatment of diabetes where
17   you have to reproducibly safely and precisely deliver
18   the insulin to the bloodstream. So the goal -- with
19   that goal in mind, you might develop the insulin
20   formulation in a certain way that will help you achieve
21   those goals.
22    Q   So are you saying that the lipid substance

**Page 44**

1    might assist the insulin in passing from the alveoli
2   into the bloodstream?
3        MS. PFEIFFER: Objection to form.
4        THE WITNESS: I have no idea whether it would
5   or not. I was speaking theoretically. It might make
6   it worse. It might make it better. But since I
7   brought up -- because I know that the lining fluid of
8   the epithelium is lipid rich and you were asking me
9   things that could be put into the insulin formulation
10   that might affect its ability to be absorbed onto the
11   epithelial surface and, also, its ability to then pass
12   across to the bloodstream, I was speaking
13   theoretically.
14    Q   All right. Are there any other substances
15   that you are aware of that might be -- that someone may
16   want to associate with the insulin?
17        MS. PFEIFFER: Objection to form.
18        THE WITNESS: I didn't come prepared to
19   answer that. So I am sure there are. But I didn't
20   come prepared to answer.
21        MR. WOOD: Would you like to take a break,
22   sir?

**Page 45**

1        THE WITNESS: Sure.
2        MR. WOOD: Let's go ahead and take a break.
3   We have been going an hour.
4        THE WITNESS: Okay.
5        (A recess was held.)
6        BY MR. WOOD:
7    Q   We are back on the record. Take a look at
8   your CV, which is marked as Crystal Exhibit 2, please.
9    A   Yes.
10    Q   Is there anything that you would like to add
11   to that at this time?
12    A   No.
13    Q   Is your list of publications, which is
14   Crystal Exhibit 3, complete?
15    A   Well, this curriculum vitae that you have was
16   printed out on November 16, '07, so it is complete up
17   through then. There is probably a few other articles
18   since then but nothing that's relevant to this
19   litigation.
20    Q   If you could go back, please, to your expert
21   report and paragraph seven on page two.
22    A   Yes.

                                              12  (Pages 42 to 45)

Ronald G. Crystal, M.D.
Washington, DC
January 22, 2008

Page 46

1    Q   You state that, My research work has included
2   research into the delivery of certain therapeutic
3   agents, including proteins to the lungs as aerosols.
4        Have you ever done any research into the
5   delivery of insulin to the lungs as aerosols?
6    A   No.
7    Q   What sort of therapeutic agents are you
8   referring to in paragraph seven?
9    A   Alpha-1 antitrypsin, T-r-y-p-s-i-n.  Both
10  the human alpha-1 antitrypsin purified from human
11  plasma as well as recombinant human alpha-1
12  antitrypsin.  Glutathione.
13   Q   What is that again?
14   A   Glutathione, G-l-u-t-a-t-h-i-o-n-e, I think.
15  Prostaglandin E -- I think it was E-1.  And I have also
16  done a considerable amount of research on
17  aerosolization of therapeutic viruses.
18   Q   What's a therapeutic virus?
19   A   I have worked in the area of gene therapy.
20  And we use viruses as a means for delivering the
21  therapeutic gene that we are interested in.
22   Q   Would that -- the therapeutic agents you

Page 47

1   mentioned, the research into the delivery of those
2   therapeutic agents to the lungs as aerosols, was that
3   delivery to the lungs, per se, or to the bloodstream?
4        MS. PFEIFFER:  Objection to form.
5        THE WITNESS:  Some were specifically for the
6   lung, per se.  Some were specifically for the
7   bloodstream.  Some were both.
8        BY MR. WOOD:
9    Q   Were any of these particular therapeutic
10  agents specifically to the bloodstream?
11       MS. PFEIFFER:  Objection.  Asked and
12  answered.
13       BY MR. WOOD:
14   Q   We could take one at a time if it would help?
15   A   Well, the alpha-1 antitrypsin was specific
16  for the lung, but we used the delivery in the
17  bloodstream as part of the assessment of the
18  therapeutic ethicacy because the important thing for
19  that particular protein is delivery across the entirety
20  of the alveoli wall.  And so the fact that it reached
21  the bloodstream is very important in that consideration
22  because we are interested in the gradient of the

Page 48

1   protein across the alveoli wall.
2        We also carried out studies of aerosolization
3   of therapeutic viruses where the specific goal was
4   delivery of the product of the virus, that is, the
5   protein product to the bloodstream.
6    Q   Is it safe to say with respect to -- I think
7   you said the alpha-1 antitrypsin; is that right?
8    A   Yes.
9    Q   You checked to see whether it was absorbed in
10  the blood?
11   A   Yes.
12   Q   And that was a way to tell whether it reached
13  the entire surface of the lung?
14       MS. PFEIFFER:  Objection to form.
15       THE WITNESS:  Not the surface.  For that
16  particular protein, the target to protect -- that the
17  protein protects is the wall of the air sac.  And so it
18  was important to demonstrate that the protein would
19  move across the wall of the air sac and reach the
20  blood.
21       BY MR. WOOD:
22   Q   Why was it important to determine that?

Page 49

1        MS. PFEIFFER:  Objection.  Asked and
2   answered.
3        THE WITNESS:  Because the protein functions
4   to protect the alveoli wall from destruction from
5   enzymes from white blood cells.
6        BY MR. WOOD:
7    Q   Do you use the terms air sac and alveoli
8   interchangeably?
9    A   Yes, I do.
10   Q   What about the glutathione, if I pronounced
11  that correct?  Was that research to deliver that
12  substance to the lung for eventual absorption into the
13  bloodstream?
14       MS. PFEIFFER:  Objection to form.
15       THE WITNESS:  No.  That was for delivery to
16  the air sacs themselves.
17       BY MR. WOOD:
18   Q   Do you know if -- is that particular research
19  we just talked about with the glutathione, is it
20  recorded in a publication that's listed in your list of
21  publications?
22   A   Yes.

Ronald G. Crystal, M.D.                                    January 22, 2008
                        Washington, DC

---

Page 50

1    Q   Could you identify that for me, please?
2    A   It is probably both in the articles and in
3  the abstracts, so I will look in the articles. I
4  believe there are several.
5    Q   Okay.
6    A   I don't know whether this is the first one,
7  but No. 310. I believe I have to spend some time and
8  look back whether that was the first. But let me --
9  with the assumption that was the first. Let me look
10 beyond that. That particular study, I believe, was in
11 experimental animals. Sorry. I just saw an article
12 that I realized I forgot to tell you about. I also did
13 studies in aerosolization of secretory leukoprotease,
14 L-e-u-k-o-p-r-o-t-e-a-s-e, inhibitor.
15   Q   Which one was that?
16   A   That is No. 329. I am still looking for the
17 glutathione articles because I know there are several
18 others. I would have to look. But in an article,
19 which was a review article that I wrote, No 349, which
20 is titled Oxidants and Respiratory Tract Epithelial
21 Injury; Pathogenesis and Strategies for Therapeutic
22 Intervention, I may have discussed our work relating to

---

Page 51

1  glutathione. And I have to look at that article. That
2  was published in 1991.
3        Number 352, Effect of glutathione Aerosol on
4  Oxidant, Anti-Oxidant Imbalance in Idiopathic Pulmonary
5  Fibrosis. While we are at it because I am going by it,
6  No. 354, Augmentation of Functional Prostaglandin,
7  P-r-o-s-t-a-g-l-a-n-d-i-n, E, capital E, Levels on the
8  Respiratory Epithelial Surface by Aerosol
9  Administration of Prostaglandin E.
10       I am sorry. I also forgot another one. No.
11 364 is A Preliminary Study of Aerosolized Recombinant
12 Human DNase -- that's Capital D, Capital N, small
13 a-s-e, -- Therapy on the Treatment of Cystic Fibrosis.
14 That's another molecule that I aerosolized to humans.
15       I am sorry. There is another one I forgot.
16   Q   No problem.
17   A   Number 389, Augmentation of Respiratory
18 Epithelial Lining Fluid Anti-Oxidant Screen by
19 Aerosolization of Recombinant Human copper, Zinc Super
20 Oxide Dismutase, D-i-s-m-u-t-a-s-e. Another one, 391,
21 pharmakinetics -- Pharmacokinetics of Recombinant
22 Secretory Leucoprotease Inhibitor Aerosolized To

---

Page 52

1  Normals in Individuals with Cystic Fibrosis.
2        Number 392 was another one of the glutathione
3  articles -- Systemic Delivery. I'm sorry. Systemic
4  Deficiency of Glutathione in Cystic Fibrosis. I am
5  sorry. That was not an aerosolized. That was showing
6  a deficiency. So delete that one.
7        I believe I am not -- I would have to look at
8  the article. But I believe 393, Recombinant Secretory
9  Leukoprotease Inhibitor Augments Glutathione Levels in
10 Lung Epithelial Lining Fluid is demonstrating that the
11 aerosolization of the secretary leukoprotease inhibitor
12 also augments glutathione.
13       Number 395, Correction of the Glutathione
14 Deficiency in the Lower Respiratory Tract of HIV
15 Seropositive Individuals by Glutathione Aerosol
16 Treatment.
17       I am looking. I believe there is one other
18 glutathione aerosol, which is the original question you
19 asked me. And I am looking for that. I am sorry to be
20 taking so long. I think there is one other.
21   Q   Take your time.
22   A   I am sorry. I just can't find it. I think I

---

Page 53

1  gave you two of the human ones. There was one in
2  Idiopathic pulmonary fibrosis. There is one in cystic
3  fibrosis, and one in HIV individuals. And I think I
4  gave you two of them. I think there is one other.
5    Q   All right. Well, why don't we just talk
6  about those for the time being. And if you run across
7  it, just let me know.
8    A   Okay.
9    Q   Number 310?
10   A   Okay.
11   Q   Was that a study performed on animals? I
12 believe you indicated that.
13   A   I believe so. But I would have to look at
14 the article. That was 17 years ago.
15   Q   Is glutathione a protein?
16   A   It is a peptide. It is made up three amino
17 acids.
18   Q   What's the difference between a peptide and a
19 protein?
20   A   It depends on the number of amino acids. And
21 the breakoff where you talk about peptide versus
22 protein can vary. But something with three would be

---

Ronald G. Crystal, M.D.

January 22, 2008

Washington, DC

Page 54

1  usually referred to as a peptide.
2      Q   Did you identify your alpha-1 antitrypsin
3  research in any of these articles?
4      A   I don't believe you asked me.
5      Q   I don't think I did. I apologize for that.
6  Well, let's go ahead and do that. If you could
7  identify which article or articles memorialized your
8  research into the alpha-1 antitrypsin.
9      A   I would have to go back way in terms of
10 looking at what the first one was.
11     Q   I just caught it at No. 299. No, actually
12 that doesn't have anything -- well, I will let you
13 answer that.
14     A   No, that's a review article. The first
15 one -- I believe the first article was a recombinant
16 alpha-1 antitrypsin aerosol to animals. So that would
17 be the one I would be looking for. It was in the '80s
18 at some point. I am guessing, so I am starting up
19 about 190, something like that. I would have to look
20 at the article to be sure. I think first one of the
21 aerosols, I think, is 233. The title doesn't say
22 aerosol in it, so I am not sure. But it is

Page 55

1  Augmentation of Lung Anti-neutrophil Elastase Capacity
2  with Recombinant Human Alpha-1 Antitrypsin. I am not
3  sure whether that was aerosol or intravenous. I would
4  have to look.
5      Q   What are you up to, sir?
6      A   I am up to 207.
7      Q   I just caught No. 284, if you don't mind
8  jumping ahead there.
9      A   270 is one. Fate of Aerosolized Recombinant
10 DNA Produced alpha-1 Antitrypsin: Use of the Epithelial
11 Surface of the Lower Respiratory Tract to Administer
12 Proteins of Therapeutic Importance. Number 278,
13 Anti-neutrophil Elastase Defenses of the Lower
14 Respiratory Tract in Alpha-1 Antitrypsin Deficiency,
15 Directly Augmented with an Aerosol of Alpha-1
16 Antitrypsin.
17         Number 284, Recombinant DNA-Produced Alpha-1
18 Antitrypsin Administered by Aerosol Augments Lower
19 Respiratory Tract, Anti-neutrofil Elastase Defenses in
20 Individuals with Alpha-1 Antitrypsin Deficiency.
21         Number 293, Strategies for Aerosol Therapy of
22 Alpha-1 Antitrypsin Deficiency by the Aerosol Route.

Page 56

1      Q   Sir, why don't I stop you there if you don't
2  mind. And let me ask a few questions at this point.
3  And --
4      A   Excuse me. I just found at another one.
5      Q   Okay.
6      A   Number 333, Aerosol Alpha-1 Antitrypsin
7  Treatment for Cystic Fibrosis.
8      Q   All right. Let's go ahead and stop, if you
9  will. And let's talk about a few of these. Is the
10 alpha-1 antitrypsin -- is that a protein?
11     A   Yes.
12     Q   How big is it?
13     A   The human form -- purified human plasma is
14 52,000.
15     Q   Fifty-two thousand what?
16     A   Daltons.
17     Q   Is the recombinant version any different in
18 size?
19     A   The version we use does not have
20 carbohydrates attached. So it is smaller. If I
21 remember, it is 45,000 apparently molecular weight,
22 something like that, maybe a little larger.

Page 57

1      Q   If you could turn to No. 270.
2      A   Okay.
3      Q   Do you remember if this research was
4  performed on humans?
5      A   Yes, it was.
6      Q   Is the alpha-1 antitrypsin --
7      A   Excuse me. I believe that's the human
8  article. I know we aerosolize both plasma human. I
9  know we aerosolized -- and I have no article -- on
10 alpha-1 antitrypsin purified from human plasma and then
11 another article on recombinant alpha-1 antitrypsin
12 aerosolized to humans. So there are at least two
13 articles. I haven't looked at this in years, so I
14 don't know whether -- you know, which of these this is.
15     Q   It was alpha-1 antitrypsin delivered to the
16 lungs for the purpose of its absorption into the
17 bloodstream?
18     A   Well, as I mentioned before, the purpose of
19 the therapy for alpha-1 antitrypsin is to deliver it
20 across the wall of the air sac. So that's where the
21 therapeutic ethicacy would be. But because of
22 issues -- technical issues related to how would you

15 (Pages 54 to 57)

Ronald G. Crystal, M.D.                                        January 22, 2008
                        Washington, DC

Page 58

1   prove that, you would have to prove that it would move
2   into the blood to be able to demonstrate that.
3        So one of the parameters we used that's in
4   that article -- I am sure I would have to look at
5   it -- is measurement in the blood. So transfer to the
6   blood was one of the purposes of the study, although
7   the therapy itself is for the wall of the air sacs.
8        Q   Do you remember if you detected alpha-1
9   antitrypsin being transferred to the bloodstream?
10       A   I believe we did in both the studies that I
11  am referring to -- both human studies.
12       Q   Do you remember any alpha-1 antitrypsin
13  study, animal or human, in which you did not detect
14  alpha-1 antitrypsin being absorbed into the
15  bloodstream?
16       A   We didn't look for it or we didn't detect it?
17       Q   In which you didn't look for it?
18       A   I don't remember. Probably, but I would have
19  to look at the specific articles.
20       Q   Do you remember any study in which you looked
21  for it but did not defect it?
22       A   No. But, again, I would have to look at the

Page 59

1   article -- specific articles.
2        Q   What about glutathione? Specifically, if you
3   could look at No. 310.
4        A   Okay.
5        Q   Did you check to see if glutathione was
6   absorbed into the bloodstream?
7        A   I don't know the -- as I remember, that study
8   was for -- the purpose was to augment the levels in the
9   epithelial lining. Whether we looked in blood or not,
10  I don't know. I don't remember.
11       Q   Do you remember whether you looked for
12  glutathione in the blood in any of your other
13  glutathione studies?
14       A   I don't remember.
15       Q   All right. Let's look at No. 329.
16       A   Okay.
17       Q   And you mentioned secretory leukoprotease
18  inhibitor. Is that a protein?
19       A   Yes.
20       Q   And how big is that?
21       A   I would have to look. It is a protein with
22  two halfs that are connected. And I forget the

Page 60

1   molecular weight.
2        Q   Would you consider it a large protein?
3        A   I don't remember. It is probably somewhere
4   in the 20 to 50,000 dome range. But I don't remember.
5        Q   Do you remember if you checked to see whether
6   that substance was absorbed into the bloodstream from
7   the lungs?
8        A   No, I don't.
9        Q   Number 364, please.
10       A   Okay.
11       Q   And the substance in question is the DNase;
12  is that correct?
13       A   That's correct.
14       Q   Is that a protein?
15       A   Yes, it is.
16       Q   And how big is that protein?
17       A   I don't remember.
18       Q   Is it larger than, say, 10,000 daltons?
19       A   I am sure it is a larger than 10,000. It is
20  probably in the 20 to 50 range, but I don't remember.
21       Q   Do you remember if you in that study checked
22  whether that protein was absorbed into the bloodstream?

Page 61

1        A   I don't remember. The purpose was to get it
2   onto the epithelial surface of the lung. So, of
3   course, it's what we were trying to treat. So I don't
4   remember whether we checked it in the blood.
5        Q   The epithelial surface of the alveoli?
6        A   Actually, for that particular one, the
7   purpose was to get it into the epithelial surface of
8   the airways all the way down to the small airways.
9        Q   The bronchioles?
10       A   That's correct.
11       Q   Would you expect -- no, never mind. Strike
12  that. All right. 389, please. And the substance in
13  question is the copper zinc super oxide dismutase?
14       A   Yes.
15       Q   Is that a protein?
16       A   Yes.
17       Q   How large is that protein?
18       A   I don't remember. It is probably in the same
19  general size as the others.
20       Q   And do you remember if you checked to see
21  whether that was absorbed into the bloodstream?
22       A   No, I don't.

                                    16  (Pages 58 to 61)

Ronald G. Crystal, M.D.                                          January 22, 2008
                        Washington, DC

Page 62

1    Q   And you had performed research into the
2  delivery of prostaglandin E-1 to the lungs as an
3  aerosol?
4    A   I said prostaglandin E, and I think it was
5  E-1, but I don't remember.  It could have been E-2.
6    Q   Is prostaglandin E-1 a protein?
7    A   No.
8    Q   What is it?
9    A   It is in the general group of molecules
10  called the cosanoids, which are naturally-produced
11  molecules in the body that this particular form is more
12  suppressive of immune processes.  So they dampen down
13  immunity and inflammation, that particular one.  Other
14  ones have other functions.
15    Q   Is it a peptide?
16    A   No.
17    Q   It is not composed of amino acids?
18    A   No.
19    Q   All right.  Did you check to see -- in your
20  research with respect to that prostaglandin E
21  substance, did you check to see whether it was absorbed
22  into the bloodstream --

Page 63

1    A   I don't remember.  The purpose was for the
2  lining of the lungs, so I don't remember.
3    Q   All right.  Do you know about when you
4  performed your research with respect to that substance?
5    A   It was probably the early '90s.
6    Q   Can you quickly look through -- well, as
7  quickly as possible, I guess, look through your list of
8  publications and identify the article where that
9  research is memorialized?
10    A   Number 354, Augmentation of Functional
11  Prostaglandin E Levels on the Respiratory Epithelial
12  Surface by Aerosol Augmentation of Prostaglandin E,
13  1991.
14    Q   Any other articles?
15    A   The prostaglandin?
16    Q   Yes.
17    A   I don't believe so.
18    Q   And you mentioned that you performed research
19  in the delivery of aerosolized therapeutic viruses to
20  the lungs; is that right?
21    A   That's correct.
22    Q   And viruses are proteins?

Page 64

1    A   They include proteins.  I mean, they are much
2  more complex, but they include proteins.
3    Q   Was the purpose of delivering aerosolized
4  therapeutic viruses to the lungs to ultimately get
5  those therapeutic viruses into the bloodstream?
6       MS. PFEIFFER:  Objection to form.
7       THE WITNESS:  Some of the studies were
8  specifically for the cells lining the airways.  Some
9  were specifically for the walls of the air sacs -- the
10  alveoli.  And at least one of the articles was directed
11  toward systemic administration of proteins.
12       BY MR. WOOD:
13    Q   Can you identify that particular article?
14    A   It would have been after '93 because it was
15  after I went to Cornell.  It was published in Nature
16  Biotechnology, I think I remember.  No. 487,
17  Augmentation of Blood Platelet Levels By Intratracheal
18  Administration of an Adenovirus Vector Encoding Human
19  Thrombopoietin, T-h-r-o-m-b-o-p-o-i-e-t-i-n cDNA, small
20  C, capital D-N-A.
21    Q   All right.  In that research, did you check
22  to see whether a particular virus, I believe, was

Page 65

1  absorbed into the bloodstream from the lungs?
2       MS. PFEIFFER:  Objection to form.
3       THE WITNESS:  No.  The purpose was not to get
4  the virus into the bloodstream.  The purpose was to get
5  the protein into the bloodstream.
6       BY MR. WOOD:
7    Q   Which protein is that?
8    A   The human thrombopoietin.
9    Q   So did you check to see whether the human
10  thrombopoietin was absorbed into the bloodstream?
11    A   I assume we did, but it depends on whether
12  the asset was available at the time.  What we did do, I
13  am positive of, is thrombopoietin functions by -- I'm
14  sorry.  It acts in the bone marrow, so the only way it
15  could function is if the protein reached the blood.
16  And it acts in the bone marrow to tell the bone marrow
17  to produce more platelets, p-l-a-t-e-l-e-t-s.
18       And we show that there were increased
19  platelet levels.  Whether we measured thrombopoietin
20  levels depends on whether the acid was available.  And
21  I would have to look at the article.
22    Q   Okay.  How large is a human thrombopoietin

                                    17 (Pages 62 to 65)

Ronald G. Crystal, M.D.

January 22, 2008

Washington, DC

---

Page 66

1  protein?
2     A  I don't remember.
3     Q  Is it larger than 10,000 daltons?
4     A  I am sure it is larger than 10,000, yes.
5  Somewhere probably between 10 or 50.
6     Q  Ten and 15?
7     A  Fifty. I am guessing, but I am pretty sure.
8     Q  In any of your research into the delivery of
9  therapeutic agents to the lungs as aerosols in which
10  you checked to see if that agent was absorbed into the
11  bloodstream, did you find that it was not absorbed into
12  the bloodstream?
13     A  You asked me that before.
14     MS. PFEIFFER: Objection to form.
15     MR. WOOD: I think it is a little different,
16  but go ahead.
17     THE WITNESS: I answered it by saying I don't
18  believe so.
19     BY MR. WOOD:
20     Q  Are you aware of any research -- let me just
21  leave it at that. Let me ask you. Are you aware of
22  any research into the administration of a protein into

---

Page 67

1  the lungs as an aerosol in which that protein was not
2  absorbed into the bloodstream?
3     MS. PFEIFFER: Objection to form.
4     THE WITNESS: I believe that's the question
5  you just asked me.
6     BY MR. WOOD:
7     Q  Well, actually, I am not referring to your
8  personal research.
9     A  I understand. I understand. I didn't do a
10  literature search to that. But I certainly could
11  imagine that would be the case. But I didn't to a
12  literature search to look, so I can't answer your
13  question the way you asked it.
14     MR. WOOD: Okay. This might be a good time
15  for a break. Are you ready for a break?
16     THE WITNESS: Sure.
17     (A recess was held.)
18     BY MR. WOOD:
19     Q  Is your research into the delivery of certain
20  therapeutic agents, including proteins to the lungs as
21  aerosols, relevant to this case?
22     MS. PFEIFFER: Objection to form.

---

Page 68

1     THE WITNESS: I believe so.
2     BY MR. WOOD:
3     Q  And why is that?
4     A  Because I have spent a considerable amount of
5  time pondering the issues that are relevant to delivery
6  of proteins to the lower respiratory tract and then
7  having them absorbed into the alveoli.
8     Q  Okay. So would you say, you know, pondering
9  the absorption of the agents that we had talked about
10  last hour is relevant to the absorption of insulin into
11  the alveoli?
12     MS. PFEIFFER: Objection to form.
13     THE WITNESS: Yes.
14     BY MR. WOOD:
15     Q  And why is that?
16     A  Because insulin is a protein, an
17  approximate -- it is a protein.
18     Q  How big is insulin?
19     A  I have to look up specifically what the
20  molecular weight is.
21     Q  Do you have an estimate?
22     A  I would have to look it up.

---

Page 69

1     Q  Does 6,000 daltons sound about right?
2     A  Well, it is certainly smaller than alpha-1
3  antitrypsin. It is made as a precursor protein that's
4  split. It bonds to itself. I would have to look it
5  up. But if you tell me that's what it is, I accept it.
6     Q  Okay. Do you still see patients?
7     A  Yes.
8     Q  Do you treat patients with diabetes?
9     A  Yes.
10     Q  How do you treat them with diabetes?
11     MS. PFEIFFER: Objection to form.
12     THE WITNESS: I am not sure what you mean.
13  You mean what agents or by what route or --
14     BY MR. WOOD:
15     Q  Both.
16     A  In what setting or --
17     Q  Yeah.
18     A  Well, I'm both of a pulmonary critical care
19  doctor. I see patients in the outpatient setting,
20  also, in the Intensive Care Unit setting. Diabetes is
21  a common illness, so it is quite frequent that patients
22  that we see have diabetes, sometimes problems with

---

18 (Pages 66 to 69)

Ronald G. Crystal, M.D.
Washington, DC

January 22, 2008

Page 74

1      THE WITNESS: They are very reproducible.
2   And there is some variation from patient to patient.
3      BY MR. WOOD:
4   Q   Would there be variation from dose to dose
5   within a particular patient?
6      MS. PFEIFFER: Objection to form, vague.
7      THE WITNESS: In terms of absorption to the
8   bloodstream or -- could you be more specific?
9      BY MR. WOOD:
10  Q   Yes, in terms of absorption into the
11  bloodstream.
12  A   There could be some minor variations, but it
13  is usually not very much for the same patient.
14  Q   Can you quantify those variations?
15     MS. PFEIFFER: Objection to form.
16     THE WITNESS: Well, I am sure there are
17  studies on it. But they are not -- they are within the
18  range that is acceptable for the therapy of insulin. I
19  mean, you can modify it depending for the patient. But
20  usually it is sufficiently precise to be able to use it
21  to treat the patients.
22     MR. WOOD: Okay. I would like to mark this

Page 75

1   as Crystal Exhibit 11.
2      (Crystal Exhibit No. 11, marked for
3   identification.)
4      BY MR. WOOD:
5   Q   If you could turn to what I believe is -- if
6   you look down at the bottom of that document, you will
7   see page numbers beginning with the prefix NN. Do you
8   see those numbers?
9   A   Yes.
10  Q   If you could turn to what I believe is page
11  number NN dash 1013. First of all, are you familiar
12  with John Patton and Robert Platz, the author of these
13  articles?
14     MS. PFEIFFER: Objection.
15     THE WITNESS: I know John.
16     BY MR. WOOD:
17  Q   How do you know John?
18     MS. PFEIFFER: You need to give me time to
19  object.
20     THE WITNESS: I first met John Platz -- I
21  don't know Platz. I first met Patton when he worked at
22  Genentech in the probably late '80s or early '90s.

Page 76

1      BY MR. WOOD:
2   Q   For the record, let me identify Crystal
3   Exhibit 11 as an article by John S. Patton and Robert
4   M. Platz entitled Aerosol Insulin, a Brief Review. If
5   you could turn to Table 2, which is on page NN 1013.
6   A   I am there.
7   Q   All right. It shows the table is labeled
8   Variability of Insulin Delivery. And the top of that
9   table is labeled Subcutaneous. And the very top line
10  is Insulin Peak Intrasubject. And there is a
11  coefficient of variation.
12  A   I'm sorry. I am not following you.
13  Q   All right. Do you see Table 2?
14  A   Yes.
15  Q   And do you see the word subcutaneous --
16  A   Yes.
17  Q   -- below that?
18     MS. PFEIFFER: You mean next to Galloway, et
19  al?
20     MR. WOOD: Yes.
21     THE WITNESS: I see that.
22     By MR. WOOD:

Page 77

1   Q   And then first row, if you will, below the
2   heading Subcutaneous?
3   A   Yes.
4   Q   And the other row is labelled Insulin Peak
5   dash Intrasubject?
6   A   Yes.
7   Q   And if you continue over to the right of
8   that, there is the number 64 percent?
9   A   Yes.
10  Q   And that appears under a column headed
11  Coefficient of Variation?
12  A   Yes.
13  Q   Do you know what -- first of all, have you
14  seen this article before?
15  A   No.
16  Q   Do you have any understanding of what is
17  meant by coefficient of variation?
18     MS. PFEIFFER: Objection to form.
19     THE WITNESS: Yes.
20     MS. PFEIFFER: Lack of foundation.
21     BY MR. WOOD:
22  Q   What does that mean?

20 (Pages 74 to 77)

Ronald G. Crystal, M.D.                                                                  January 22, 2008
                              Washington, DC

---

Page 70

1  their diabetes. And so I treat patients with diabetes
2  from everything from no therapy, that is, by diet and
3  exercise to oral agents to insulin.
4      Q   Okay. Is insulin a prescription medication?
5      A   Yes.
6      Q   Did you treat patients for diabetes in 1993?
7      A   Yes.
8      Q   Did you prescribe insulin for diabetic
9  patients in 1993?
10     A   Yes.
11     Q   And how was that insulin administered to the
12  patient?
13     A   Usually subcutaneously; sometimes
14  intravenously.
15     Q   What does subcutaneous mean?
16     A   Under the skin into the tissues just under
17  the skin.
18     Q   How would you determine -- well, let me ask
19  you this. Who would administer the insulin doses to
20  your patients?
21     MS. PFEIFFER: Objection to form.
22     THE WITNESS: Usually the patient would

---

Page 71

1  administer it to themselves. In the Intensive Care
2  Unit, usually the nurse would administer it.
3      BY MR. WOOD:
4      Q   When patients would administer insulin to
5  themselves, how would they know how much insulin to
6  take?
7      MS. PFEIFFER: Objection to form.
8      THE WITNESS: It is based on a combination of
9  multiple factors relating to the patient's condition --
10  the age, size, blood sugar, hemoglobin, A1C levels,
11  and, of course, the guidance that we have from the
12  history of the use of insulin by those routes over
13  many, many, many years.
14     BY MR. WOOD:
15     Q   Okay. If you could look at Crystal Exhibit
16  10, please.
17     A   I have it.
18     Q   Have you read Crystal Exhibit 10?
19     A   Yes.
20     Q   I will identify it, for the record. It is
21  entitled Harrison's Principles of Internal Medicine,
22  13th Edition, Volume Two, and pages 1986 and 1987. Did

---

Page 72

1  you contribute to the 13th Edition of Harrison's
2  Principles of Internal Medicine?
3      A   I believe I did. What year was that? This
4  is the 13th Edition. I would have to look in the
5  curriculum vitae, but my guess is yes.
6      Q   All right.
7      MS. PFEIFFER: 1994.
8      THE WITNESS: The answer is yes.
9      BY MR. WOOD:
10     Q   If you look on page 1986 and the first
11  column -- first of all, let me ask you. In reading
12  Crystal Exhibit 10, did you read anything with which
13  you disagreed?
14     A   No.
15     Q   Again, referring you to the first column of
16  page 1986 beginning there at least. There is a
17  reference to conventional insulation therapy?
18     A   Conventional insulin therapy.
19     Q   I'm sorry. It is late. I apologize.
20  Conventional insulin therapy?
21     A   Yes.
22     Q   Involving the administration of one or two

---

Page 73

1  injections a day of intermediate-acting insulin. Did
2  you ever utilize what is referred to here as a
3  conventional insulin therapy for any of your diabetes
4  patients?
5      MS. PFEIFFER: Objection to form.
6      THE WITNESS: I am sure I did at some time in
7  the past. I have been seeing diabetic patients for
8  many years.
9      BY MR. WOOD:
10     Q   And under that conventional insulin therapy
11  administration regime, would you have instructed your
12  patients to take between 10 and -- correction -- 15 and
13  20 units a day of insulin?
14     MS. PFEIFFER: Objection to form.
15     THE WITNESS: Well, in the context of who are
16  using this kind of strategy and the patient was of
17  normal weight and there was no other issues, that would
18  be approximately right.
19     BY MR. WOOD:
20     Q   How reproducible are subcutaneous injections
21  of insulin?
22     MS. PFEIFFER: Objection to form.

---

Ronald G. Crystal, M.D.

January 22, 2008

Washington, DC

Page 78

1    A   Well, it is defined in the footnote.
2    Q   How is that a definition of coefficient of
3  variation?
4        MS. PFEIFFER: Objection to form.
5        THE WITNESS: That's what it is.
6        BY MR. WOOD:
7    Q   All right. Well, does the 46 percent refer
8  to or relate to differences in the intrasubject insulin
9  peak of the subjects that are being tested?
10   A   Well, first, this is a review article. This
11 is not a peer review article. And my understanding --
12 I have never seen this before. But it is -- this is
13 some data that they are taking from another article. I
14 have no idea -- since the way the data is being
15 presented at least in this table, I have no idea
16 whether what you have just said is correct or not
17 because they are not telling us what the variations are
18 of the coefficient of variations. And it could be the
19 same. It could be different. I have no way of
20 telling.
21   Q   All right. In treating patients with
22 diabetes, did you instruct them -- did your patients

Page 79

1  generally monitor their blood glucose levels?
2        MS. PFEIFFER: Objection to form.
3        THE WITNESS: Yes.
4        BY MR. WOOD:
5    Q   And why did they do that?
6        MS. PFEIFFER: Objection to form.
7        THE WITNESS: Because blood glucose levels
8  are an important parameter in terms of the function of
9  insulin. It is not the only, but it is an important
10 parameter. And there are levels of normal blood
11 glucose, both in fasting and nonfasting situations.
12 And if the blood glucose levels go too low, it can be
13 very risky. The patient can go into a hypoglycemic
14 coma and die, brain damage, and other problems.
15       If the levels are not sufficiently lowered by
16 the insulin, then there can be long-range consequences
17 if this is a chronic situation. And if the levels go
18 too high acutely, that is, over days, it also can be a
19 medical emergency in some situations. So measuring
20 blood sugar is very important in terms of therapeutic
21 ethicacy of insulin.
22       BY MR. WOOD:

Page 80

1    Q   Would you instruct a patient to try to
2  maintain their blood glucose range in a particular --
3  at a particular level?
4    A   Yes.
5    Q   And what level would you instruct them to try
6  to achieve?
7        MS. PFEIFFER: Objection to form.
8        THE WITNESS: That would be very dependent on
9  the patient.
10       BY MR. WOOD:
11   Q   How would it be dependent on the patient?
12   A   Well, we know there are normal levels -- and
13 this varies from lab to lab, so we would have to be
14 specific about that, given a laboratory. But for a
15 given individual, there may be levels that would be for
16 that individual too low or too high, and so you would
17 adjust it for the individual.
18   Q   I see. Is there a particular number that
19 generally would be sort of a target value that you
20 would advise your patients?
21       MS. PFEIFFER: Objection to form.
22       THE WITNESS: Well, it depends on the

Page 81

1  patient. You would have to get a history from the --
2  you would have to see the levels for that given
3  patient. Another parameter that we use is the
4  hemoglobin A1C, which is -- hemoglobin A1C capital A,
5  which is an integrated measure of the amount of blood
6  glucose levels over a period of somewhere between two
7  and three months.
8        And we know from large studies following
9  patients over time of what the risk is for
10 complications of diabetes -- kidney disease, blindness,
11 cardiovascular disease, for example, in relation to the
12 hemoglobin A1C levels. And so we try to keep the
13 hemoglobin A1C levels for that patient below a certain
14 level above which there is a risk -- they are at risk.
15   Q   How is blood glucose quantified?
16   A   It is --
17   Q   What units is it expressed in?
18   A   It varies depending on the lab. There are
19 units. There are milligrams per unit volume. It
20 depends on the specific lab.
21   Q   All right. Can it be expressed in milligrams
22 per deciliter? Does that sound right?

21  (Pages 78 to 81)

Ronald G. Crystal, M.D.                                                          January 22, 2008
                              Washington, DC

| Page 82 | Page 84 |
|---|---|

**Page 82**

1    A   Yes. That's what I said.

2    Q   Would you advise your patients to try to

3  maintain a blood glucose level around 100 milligrams

4  per deciliter?

5        MS. PFEIFFER: Objection to form.

6        THE WITNESS: That would depend on the

7  patient and the laboratory that was being used and also

8  the measure -- the patients usually measure

9  themselves. And the various kits that are used vary a

10 bit. And they also vary a bit in relationship to the

11 blood glucose levels as measured by the laboratory.

12       BY MR. WOOD:

13   Q   I see. And prior to January 1993, did you

14 ever advise a patient to try to maintain blood glucose

15 somewhere between 50 and 300 milligrams per deciliter?

16       MS. PFEIFFER: Objection to form.

17       BY MR. WOOD:

18   Q   Somewhere within that range?

19   A   Fifty would be a very low level. Three

20 hundred would be usually too high. Again, it depends

21 on the individual. And it depends also on the context

22 of fasting morning versus post-eating, how long

**Page 83**

1  post-eating. It depends for a patient. What we

2  usually do is we try to get an assessment of that

3  patient by having the patient measure their blood sugar

4  levels frequently, part those, or come in with a chart

5  with them so you can get a sense for part of the levels

6  they are maintaining and try to put that in combination

7  with what they are eating, when they eat, and what they

8  are eating. And from that you try to get an integrated

9  picture of what you can do with that patient and what

10 is safe and what's risky.

11   Q   So prior to January of 1993, is it safe to

12 say that you advised your diabetic patients to try to

13 achieve or maintain a blood glucose level above 50

14 milligrams per deciliter?

15       MS. PFEIFFER: Objection to form.

16       THE WITNESS: Well, you just asked me that,

17 and I answered what the levels would be. I mean, the

18 goal is to try to maintain blood glucose levels in the

19 normal range. And that's what you would like to do,

20 including not only when they are fasting but also after

21 eating so that they maintain -- you would like to turn

22 a diabetic into a normal. That's what your ultimate

**Page 84**

1  goal is. That could be easily achieved. It can be

2  sometimes be very, very difficult to achieve. It

3  depends on the specific individual.

4        BY MR. WOOD:

5    Q   So what is the normal range as you just said?

6        MS. PFEIFFER: Objection to form. Asked and

7  answered.

8        THE WITNESS: It depends on the laboratory.

9  And it depends on whether you are talking about fasting

10 or after eating. It varies during the day.

11       BY MR. WOOD:

12   Q   All right. Can you give me a normal range

13 for a non-fasting blood glucose level?

14       MS. PFEIFFER: Objection to form. Asked and

15 answered.

16       THE WITNESS: It would depend very much on

17 what the patient eats, in other words, what the balance

18 of carbohydrates, proteins, and fats are. And then,

19 also, it depends on when after eating.

20       BY MR. WOOD:

21   Q   All right. When you would advise -- let me

22 just see if I understand. And I apologize if I asked

**Page 85**

1  this before. So you would advise a diabetic patient

2  prior to January 1993 to maintain a certain blood

3  glucose level; is that right?

4        MS. PFEIFFER: Objection. Misstates the

5  record.

6        THE WITNESS: Not a specific blood glucose

7  level. I would try to maintain it within a range. And

8  then we would discuss whether the fasting versus after

9  eating, how long after eating, what they have eaten,

10 and so on.

11       BY MR. WOOD:

12   Q   Would you advise or did you advise any of

13 your diabetic patients prior to January 1993 to

14 maintain a specific blood glucose range -- specific

15 number or a range of numbers?

16   A   Yeah, I am sure I did. A broad range.

17   Q   A broad range?

18   A   Yeah.

19   Q   Do you recall what specific broad range of

20 blood glucose values you advised any patient to

21 maintain prior to January 1993?

22   A   No, because that depends on the individual

Page 86

1   patient.
2       Q   Do you recall advising a diabetic patient
3   prior to January 1993 to maintain their blood glucose
4   levels in a range that was above 50 milligrams per
5   deciliter?
6       MS. PFEIFFER: Objection.
7       THE WITNESS: Well, you have asked me that.
8       MR. WOOD: I have not. But go ahead and
9   answer.
10      MS. PFEIFFER: Could the reporter read the
11  question back?
12      (The record was read back as follows:
13      "Q: Do you recall advising a diabetic patient
14      prior to January 1993 to maintain their
15      blood glucose levels in a range that was
16      above 50 milligrams per deciliter?")
17      MS. PFEIFFER: Objection to form.
18      THE WITNESS: I don't specifically recall it,
19  but that's rational. I mean, it seems reasonable to me
20  since that's a level below which it would be risky. So
21  that's a rational thing. But I don't remember any
22  specific patients saying that.

Page 87

1       BY MR. WOOD:
2       Q   Do you recall prior to January 1993 advising
3   any of your diabetic patients to maintain their blood
4   glucose levels in a range below 300 milligrams per
5   deciliter?
6       MS. PFEIFFER: Objection to form.
7       THE WITNESS: Again, it would depend on the
8   patient because there are other factors involved in
9   terms of making these decisions. But I am sure I did
10  because that would be a level too high.
11      BY MR. WOOD:
12      Q   What would happen to someone whose blood
13  glucose levels were consistently at 300 milligrams per
14  deciliter?
15      MS. PFEIFFER: Objection to form.
16      THE WITNESS: Consistently at 300?
17      BY MR. WOOD:
18      Q   Yes.
19      A   All the time?
20      Q   Well, maybe not all of the time but at least
21  say, you know, at some point during any given day.
22      A   Well, that's a very --

Page 88

1       MS. PFEIFFER: Objection to form.
2       THE WITNESS: That's a very different thing.
3   I mean, all the time or most of the time is very
4   different than one hour a day. So if you could be more
5   precise.
6       BY MR. WOOD:
7       Q   All right. Say most of the time.
8       MS. PFEIFFER: Objection to form. This is a
9   hypothetical question.
10      MR. WOOD: Yes.
11      THE WITNESS: Well, that would be likely --
12  if it went on for a long period of time, it would be
13  associated with increased risk to the patient in terms
14  of developing complications of diabetes.
15      BY MR. WOOD:
16      Q   What sort of complications?
17      A   The complications that you worry about in
18  diabetes are eye, heart, kidney, increased
19  susceptibility to infections are some of the
20  complications.
21      Q   Circulatory problems perhaps?
22      A   Circulatory, yes.

Page 89

1       Q   Any other complications?
2       A   Those are the major ones.
3       Q   And when you say eye, it would be damage to
4   the eye?
5       A   Usually to the retina.
6       Q   And damage to the kidney, I believe you said?
7       A   Yes.
8       Q   And, again, hypothetically, what would happen
9   to a person whose blood glucose levels were
10  consistently -- well, let me say most of the time was
11  at or around 50 milligrams per deciliter?
12      MS. PFEIFFER: Objection to form.
13      THE WITNESS: For some people, they couldn't
14  tolerate a level of 50. Some people might not be
15  conscious at a level of 50. It would depend on the
16  individual.
17      BY MR. WOOD:
18      Q   Did any of your diabetic patients suffer any
19  complications as a result of their diabetes?
20      A   Yes.
21      Q   The complications that you just mentioned?
22      MS. PFEIFFER: Objection to form.

23 (Pages 86 to 89)

Ronald G. Crystal, M.D.                                                    January 22, 2008
                              Washington, DC

Page 90

1    THE WITNESS: Yes.
2    BY MR. WOOD:
3    Q    Did you instruct your diabetic patients how
4    to titrate their dose?
5    MS. PFEIFFER: Objection to form.
6    THE WITNESS: Based on administration of
7    subcutaneous insulin?
8    BY MR. WOOD:
9    Q    Yes.
10   A    Yes.
11   Q    How did you do that?
12   A    I didn't go back and look at all of my
13   patients. But based on the subsequent guidelines -- we
14   are talking about 1993?
15   Q    Yes.
16   A    I think the Harrison article is a reasonable
17   guideline.
18   Q    Okay. If you could turn the paragraph 20 in
19   your expert report, which is Crystal Exhibit 1,
20   please.
21   A    I am there.
22   Q    The second sentence in paragraph 20 states,

Page 91

1    Most inhaled medicines are meant to remain in the lungs
2    in order to treat diseases of the lungs?
3    MS. PFEIFFER: Objection to form. Misstates
4    the paragraph.
5    BY MR. WOOD:
6    Q    Did I read that incorrectly?
7    MS. PFEIFFER: I believe you represented that
8    that's what the paragraph says.
9    BY MR. WOOD:
10   Q    Certainly what I meant to represent was it is
11   the second sentence of paragraph 20. Do you see that,
12   Doctor?
13   A    Yes.
14   Q    As of January 1993, what inhaled medicines
15   were meant to remain in the lungs in order to treat
16   diseases of the lungs?
17   A    As of 1993?
18   Q    Yes.
19   A    These were almost entirely, I believe,
20   bronchodilators.
21   Q    Can you give me an example of the
22   bronchodilator?

Page 92

1    A    Bronchodilators are medications that act on
2    the smooth muscle cells surrounding our airways to help
3    open them. And they are used to treat patients with
4    asthma and also patients with chronic obstructive
5    pulmonary disease.
6    Q    Are there specific bronchodilators that
7    existed in as of January 1993?
8    A    I would have to go back and look at the
9    list. All the ones that were available at that time, I
10   mean, undoubtedly they included beta agonists --
11   B-e-t-a, agonists. But the specific ones, I would have
12   to go back and look at the list at that time.
13   Q    Is albuterol a bronchodilator?
14   A    Yes.
15   Q    Anything other than -- would any medicines,
16   other than bronchodilators, you know, be administered
17   to the lungs by inhalation?
18   A    In 1993 approved medications? I believe that
19   would be all.
20   Q    Were there any steroids that were approved
21   for inhalation by January 1993?
22   A    I believe there were, yes.

Page 93

1    Q    Can you recall any specific steroids that
2    were approved for inhalation?
3    A    For the commercial names in '93 I would have
4    to go back and look.
5    Q    Were steroids approved or administered to the
6    lungs in order to treat disease of the lungs?
7    A    Yes.
8    Q    The bronchodilators that you mentioned when
9    they were inhaled into the lungs, were they or any
10   portion that was inhaled into the lungs subsequently
11   absorbed into the bloodstream?
12   A    Yes.
13   Q    The steroids that were approved for
14   inhalation as of January 1993, when they were inhaled
15   into the lungs, were they subsequently or at least a
16   portion thereof subsequently absorbed into the lung or
17   absorbed into the bloodstream?
18   A    It could or could not depending on the dose
19   and the patient.
20   Q    Okay. How would the dose affect whether or
21   not it is absorbed into the bloodstream after it is
22   inhaled into the lungs?

Alderson Reporting Company
1-800-FOR-DEPO

Ronald G. Crystal, M.D.
Washington, DC
January 22, 2008

---

Page 94

1    A   A higher dose would increase the chances.
2    Q   All right. What sort of dose would be
3  necessary in order to -- in order for the inhaled
4  steroid to be absorbed into the bloodstream after it is
5  inhaled into the lung?
6    A   I can't answer the question the way you asked
7  it. It would depend on what specific corticosteroid
8  was, what the formulation was, the patient.
9    Q   Do you remember any specific steroid --
10  corticosteroid, I believe you said?
11       MS. PFEIFFER: Objection. Asked and
12  answered.
13       THE WITNESS: Glucocorticoids are the proper
14  term. In 1993? I don't remember the commercial names.
15       BY MR. WOOD:
16    Q   Do you remember any of the -- any specific
17  name for any specific steroid -- inhaled steroid?
18       MS. PFEIFFER: Objection. Misstates his
19  testimony. And the question has been asked and
20  answered.
21       THE WITNESS: I didn't go back and look in
22  preparation for this testimony for 1993.

---

Page 95

1        BY MR. WOOD:
2    Q   That's fine. You mentioned bronchodilators,
3  and we talked about steroids. Are there any other
4  medicines that were inhaled into the lungs as of
5  January 1993?
6    A   Specifically in 1993?
7    Q   Well, as of or by January 1993.
8    A   That were available then?
9    Q   Yes.
10    A   I believe that was all.
11    Q   All right.
12    A   I may be wrong, but I believe that was all at
13  that time.
14       MR. WOOD: This might be a good time to break
15  for the evening and to begin again in the morning if
16  there are no objections to that.
17       MS. PFEIFFER: That's fine. As long as -- I
18  mean, Dr. Crystal has to leave at noon, right?
19       MS. NASH: No, 11:30. He has a 12:30 flight.
20       MS. PFEIFFER: Oh, so 11:30. 11:30 at the
21  latest, 11:15.
22       MR. WOOD: That shouldn't be a problem. I

---

Page 96

1  think we have scheduled to begin tomorrow at 8:30; is
2  that correct?
3       MS. PFEIFFER: Yes.
4       MR. WOOD: I don't see that as a problem at
5  all.
6       MS. PFEIFFER: Okay. Good. That's our only
7  concern. He has to get back to New York.
8       MR. WOOD: I think we are done for the
9  evening.
10       (At 5:45 p.m., the deposition was adjourned.)
11
12
13
14
15
16
17
18
19
20
21
22

---

Page 97

1           AFFIDAVIT OF DEPONENT
2
3      I have read the foregoing deposition, which
4  contains a correct transcription of the answers given
5  by me to the questions therein recorded, except as to
6  errors which may be indicated on any attached errata
7  sheet.
8
9
                _____
                RONALD G. CRYSTAL, M.D.
10
11     Subscribed and sworn to before me this _____
12  day of_____, 20___, in _____.
13
14
15
                _____
16         Notary Public
17
18
19         My Commission Expires:
20         _____, 20___
21
22

---

Alderson Reporting Company
1-800-FOR-DEPO

# Exhibit 2
## Part 2 of 3

Ronald G. Crystal, M.D.

Washington, DC

January 23, 2008

Page 98

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - -  X

NOVO NORDISK A/S              :

      Plaintiff,            :

    v.                       : Case No.:

JON W. DUDAS,                 : 06-1896 (CKK)

Under Secretary of Commerce for  : Judge Colleen

Intellectual Property and     :   Kollar-Kotelly

Director of the United States :  ECP

Patent & Trademark Office,    :  VOLUME II

      Defendant.           :

- - - - - - - - - - - - - - -  X

Washington, D.C.

Wednesday, January 23, 2008


     Continued deposition of RONALD G. CRYSTAL,
M.D., called for examination by counsel for the
Defendant in the above-entitled matter, pursuant to
notice, the witness being duly sworn by CARLA L.
ANDREWS, a Notary Public in and for the District of
Columbia, taken at the offices of Sullivan & Cromwell,
LLP, 1701 Pennsylvania Avenue, N.W., Suite 700,
Washington, D.C. 20006, at 8:24 a.m., Wednesday,
January 23, 2008, and the proceedings being taken down
by Stenotype by CARLA L. ANDREWS and transcribed under
her direction.

Ronald G. Crystal, M.D.
Washington, DC
January 23, 2008

---

Page 99

1   APPEARANCES:
2     On behalf of the Plaintiff:
3       MARGARET PFEIFFER, ESQ.
4       SUSAN KAUFMANN NASH, ESQ.
5       Sullivan & Cromwell, LLP
6       1701 Pennsylvania Avenue, N.W.
7       Suite 700
8       Washington, D.C. 20006
9       (202) 956-7055
10
11      JAMES T. WILLIAMS, ESQ.
12      Sullivan & Cromwell, LLP
13      125 Broad Street
14      New York, New York 10004-2498
15      (212) 558-3130
16
17      SAMUEL S. WOODLEY, ESQ.
18      Darby & Darby
19      7 World Trade Center
20      250 Greenwich Street
21      New York, New York 10007-0042
22      (212) 527-7700

---

Page 100

1   APPEARANCES (Continued):
2     On behalf of the Defendant:
3       BENJAMIN WOOD, ESQ.
4       JANET A. GONGOLA, ESQ.
5       United States Patent and Trademark Office
6       Office of the Solicitor
7       600 Dulany Street, Madison West, 8D21
8       Alexandria, Virginia 22314
9       (571) 272-8734
10
11      BLANCHE L. BRUCE, ESQ.
12      United States Attorney's Office
13      555 4th Street, N.W.
14      Washington, D.C. 20530
15      (202) 307-6078
16
17
18
19
20
21
22

---

Page 101

1         C-O-N-T-E-N-T-S
2   WITNESS       EXAMINATION BY COUNSEL FOR
3   RONALD G. CRYSTAL, M.D.       DEFENDANT
4
5   By Mr. Wood          102
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

---

Page 102

1         P-R-O-C-E-E-D-I-N-G-S
2     Thereupon,
3         RONALD G. CRYSTAL, M.D.
4   was previously called as a witness and, after being
5   duly sworn by the notary, was examined and testified as
6   follows:
7       EXAMINATION BY COUNSEL FOR THE DEFENDANT
8       BY MR. WOOD:
9     Q   Good morning, Dr. Crystal.
10    A   Good morning.
11    Q   Did you discuss the subject matter of your
12   testimony with counsel last night or between when we
13   adjourned yesterday and this morning?
14    A   No.
15    Q   Did you review any documents relating to your
16   testimony between when we adjourned last night and this
17   morning?
18    A   No.
19    Q   You understand that you are still under
20   oath --
21    A   Yes, I do.
22    Q   -- this morning. If you could turn in

---

2  (Pages 99 to 102)

Ronald G. Crystal, M.D.                                                January 23, 2008
                              Washington, DC

| Page 103 | Page 105 |
|---|---|
| 1 Crystal Exhibit 1, which is your expert report of | 1 But I don't remember it by number, so. |
| 2 Dr. Ronald G. Crystal. And turn to paragraph 14, | 2   Q   Okay. Do you remember reviewing what you |
| 3 please. | 3 understood to be an application that was filed on |
| 4   A   Yes. | 4 January 29, 1993? |
| 5   Q   And paragraph 14, the first line or sentence, | 5   A   I am not sure that I am following you in |
| 6 rather, states, In formulating my opinion, I have | 6 terms of the numbers. This is the initial application |
| 7 considered my professional experience and knowledge as | 7 of this? |
| 8 well as the following documents. And then below that | 8   Q   Yes. |
| 9 you list the '774 patent application, which is marked | 9   A   Of the '774 application? |
| 10 as Exhibit 4; the pending claims as amended for appeal, | 10   Q   Yes. |
| 11 which is attached to your expert report as Exhibit 5; | 11   A   Yeah. If it was in the file wrapper, I read |
| 12 and then excerpts from the record of proceedings of the | 12 it. But the things that were important for me in terms |
| 13 '774 application in the PTO, including the Board | 13 of what I was asked to do in forming my opinion, they |
| 14 decision -- Schenk, Velasquez, and Harrison. | 14 are the ones listed in paragraph 14. |
| 15   Is that a complete list of the documents you | 15   Q   Okay. And also on that line there is a |
| 16 considered in formulating your opinion? | 16 reference to Patent No. 5,364,838. Did you review that |
| 17   A   Well, I also had the file wrapper for the -- | 17 patent in formulating your opinions? |
| 18 that I also read. | 18   A   And I answer it in the same way. If it is in |
| 19   Q   The file wrapper for the '774 application? | 19 the file wrapper, I read it. The things that I was |
| 20   A   For the '774 application. | 20 asked to consider in relation to my opinion were the |
| 21   Q   All right. Do you recall anything in that | 21 items that are in paragraph 14. |
| 22 file wrapper other than what's listed in paragraph 14 | 22   Q   Okay. Thanks. Have you done any consulting |

| Page 104 | Page 106 |
|---|---|
| 1 that you considered in formulating your opinion? | 1 work for Novo Nordisk? |
| 2   A   Well, I read through the entire document. | 2   MS. PFEIFFER: Objection to form. |
| 3 And there are a whole bunch of things in it that aren't | 3   THE WITNESS: There was another patent issue |
| 4 listed here. I don't have it here, but. | 4 that I was involved with about a year and a half ago |
| 5   Q   Do you remember anything specifically that | 5 with Novo Nordisk. |
| 6 you found to be relevant or that informed your opinion? | 6   BY MR. WOOD: |
| 7   A   No, nothing that was different. I mean, the | 7   Q   That's the litigation with Pfizer? |
| 8 critical things are the things that are listed in | 8   A   That's correct. |
| 9 paragraph 14. | 9   Q   Have you done any consulting work for |
| 10   Q   Thanks. Could you turn to what I believe is | 10 Aerodyne, Incorporated? |
| 11 marked as Crystal Exhibit 5. And it is the Exhibit 4 | 11   A   No. |
| 12 to your expert report. | 12   Q   Have you engaged in any research that was |
| 13   A   I have it. | 13 funded at least, in part, by Aerodyne, Incorporated? |
| 14   Q   All right. If you look on the front page, | 14   A   No. |
| 15 the second column, the end of the section that begins | 15   Q   Yesterday we talked about inhalable steroids |
| 16 in the first column entitled Related U.S. Application | 16 of which I understand glucocorticoid is one; is that |
| 17 Data. | 17 correct? |
| 18   A   Yes. | 18   MS. PFEIFFER: Objection to form. |
| 19   Q   There is a reference to an Application No. | 19   BY MR. WOOD: |
| 20 08/011,281 filed on January 29, 1993. Did you review | 20   Q   Well, let me break that up. Yesterday do you |
| 21 that document in formulating your opinion? | 21 remember that we talked about inhalable steroids? |
| 22   A   If it was in the file wrapper, I read it. | 22   A   Yes. |

3  (Pages 103 to 106)

Ronald G. Crystal, M.D.

Washington, DC

January 23, 2008

---

Page 107

1    Q    And glucocorticoid is one example of an
2    inhalable steroid?
3    A    It is the form of steroids that are used in
4    inhalation.
5    Q    I see. Have you done any research into
6    inhalable steroids?
7    A    I am hesitating because I don't remember
8    whether I -- anything I have ever done relates to
9    inhalable steroids. And I don't think so. I have a
10   study that I am considering doing that's not related to
11   this at all but related to inhalable steroids. But I
12   don't believe so, although there may be something on my
13   curriculum vitae with inhalable steroids at some
14   point. I don't think I have ever done anything in
15   humans.
16   Q    Can you recall at this time a particular
17   publication that discusses inhalable steroids?
18   A    On my curriculum vitae?
19   Q    No, not necessarily only on your curriculum
20   vitae but in general?
21      MS. PFEIFFER: Objection to form.
22      THE WITNESS: I didn't review that for this.

---

Page 108

1    There's thousands of publications related to inhalable
2    steroids.
3       BY MR. WOOD:
4    Q    But there isn't one in particular that you
5    can recall at this time?
6       MS. PFEIFFER: Objection to form. Asked and
7    answered.
8       THE WITNESS: No.
9       BY MR. WOOD:
10   Q    You indicated yesterday that whether or not
11   inhalable steroids entered the bloodstream after being
12   inhaled into the lungs depended on the level of dose
13   inhaled. Do you recall that?
14      MS. PFEIFFER: Objection to form.
15      THE WITNESS: Among other factors, yes.
16      BY MR. WOOD:
17   Q    What are the other factors that might affect
18   whether inhalable steroids entered the bloodstream
19   after being inhaled into the lungs?
20   A    The form of the steroid that's being inhaled,
21   the device that's being used, whether it is
22   particular -- that it's a liquid or a solid, the shape,

---

Page 109

1    the mass are the things that may be associated with it,
2    what part of the lung it goes to.
3    Q    What is the purpose of inhaling steroids?
4       MS. PFEIFFER: Objection to form. Lack of
5    foundation.
6       MR. WOOD: Let me finish the question,
7    Counsel. It will be easier, I think, as we go
8    forward.
9       BY MR. WOOD:
10   Q    Let's focus on what was available in January
11   or as of January 1993. What was the purpose of
12   inhaling steroids?
13      MS. PFEIFFER: Objection to form, lack of
14   foundation.
15      THE WITNESS: Well, I didn't review that for
16   this deposition. I can tell you now the current
17   concepts of using inhaling steroids. And it has
18   basically been in general the same, although the data
19   has evolved over the past, I guess, 15 years.
20      The basic concept of using inhaled
21   corticosteroids is as in a general concept of
22   anti-inflammation, anti-immune mechanisms in the

---

Page 110

1    airways. The disorders like asthma and also I think I
2    mentioned yesterday chronic obstructive pulmonary
3    disease are disorders that are associated with
4    inflammation and corticosteroids will, by multiple
5    different mechanisms, suppress inflammation. And so
6    corticosteroids are used to suppress inflammation
7    locally in the airways.
8    Q    Okay. If you could turn to your expert
9    report, page seven, paragraph 22, please. Actually, if
10   you could turn to page eight in paragraph 24.
11   A    Okay.
12   Q    In paragraph 24 you state, To be administered
13   by inhalation, insulin must be aerosolized, that is to
14   say, the insulin formulation must be converted into
15   small particles suspended in air. The particles can be
16   either droplets, where insulin is dissolved in a
17   liquid, or dry particles containing insulin molecules,
18   which can be produced by impacting a dry powder insulin
19   formulation with compressed air.
20      What do you mean by dry powder insulin
21   formulation?
22   A    As we discussed yesterday, proteins can be

---

4 (Pages 107 to 110)

Ronald G. Crystal, M.D.
Washington, DC
January 23, 2008

| Page 111 | Page 113 |
|---|---|
| 1  dried. And so what I mean by dry powder insulin | 1    When you say size there, do you mean |
| 2  formulation is that's dry, that does not contain | 2  diameter? |
| 3  water. When it is dry, it is a powder. It is | 3    MS. PFEIFFER: Objection to form. And also |
| 4  formulated so that when it is aerosolized, it would be | 4  to -- you didn't exactly read what's stated in the |
| 5  in the size that you will reach to where you want it to | 5  paragraph in the sentence. |
| 6  reach depending on what the application is. For this | 6    MR. WOOD: I am happy to reread it or correct |
| 7  it would be the alveoli. And then insulin is insulin. | 7  the record, Counsel, if there is something that's |
| 8    Q    And what specifically are you referring to | 8  significant. |
| 9  when you say formulation? | 9    MS. PFEIFFER: Yes, you can decide to whether |
| 10    A    Well, as we discussed yesterday, the insulin | 10  you want to or not. |
| 11  could be insulin by itself or it could be insulin | 11    BY MR. WOOD: |
| 12  together with other things that might be used to help | 12    Q    So do you remember the question, Dr. Crystal? |
| 13  form the size of the particle, keep the particle | 13    A    Yes. We discussed yesterday diameter. I |
| 14  intact, not breaking up, keeping the insulin | 14  said the concept was a little complex. But for all |
| 15  stabilized, maintaining the appropriate physical | 15  intensive purposes, it is diameter of a sphere. |
| 16  chemical properties of pH and charge that would be | 16    Q    All right. So just the clarify when you use |
| 17  advantageous for the product in terms of enabling it to | 17  the term size in paragraph 25, you are referring to |
| 18  reach the alveoli in sufficient quantities in a form | 18  diameter? |
| 19  that was reproducible that would impact to the alveoli | 19    MS. PFEIFFER: Objection to form. |
| 20  walls and help the insulin move across the alveoli | 20    THE WITNESS: With the caveats that I |
| 21  walls. | 21  mentioned yesterday, yes. |
| 22    Q    What are these other things, as you say, that | 22    BY MR. WOOD: |

| Page 112 | Page 114 |
|---|---|
| 1  insulin can be formulated with to achieve those goals? | 1    Q    The next -- well, the third sentence in |
| 2    MS. PFEIFFER: Objection to form. | 2  paragraph 25, Studies have shown that the ideal |
| 3    THE WITNESS: I didn't review that for this | 3  particle size for reaching the alveoli is approximately |
| 4  deposition. | 4  0.5 in micrometers; is that correct? That symbol |
| 5    BY MR. WOOD: | 5  refers to micrometers? |
| 6    Q    I know. So sitting here today, do you know | 6    A    Yes, or micrometers would be another way to |
| 7  what those other things are? | 7  say it. |
| 8    A    No. And I was speaking theoretically. It | 8    Q    Or micron? |
| 9  may or may not be used. | 9    A    Or micron. |
| 10    Q    Do you know if those formulations existed as | 10    Q    "Studies have shown that the ideal particle |
| 11  of January 1993? | 11  size for reaching the alveoli is approximately |
| 12    MS. PFEIFFER: Objection to form. | 12  0.5 micron to six micron in diameter." |
| 13    THE WITNESS: No. | 13    Do you see that? |
| 14    BY MR. WOOD: | 14    A    Yes. |
| 15    Q    You don't know? | 15    Q    What studies are you referring to? |
| 16    A    I do not know. | 16    A    There are -- that's from my general knowledge |
| 17    Q    If you could look at paragraph 25, please. | 17  of the field. There are large numbers of studies that |
| 18    A    Okay. | 18  have evaluated in both experimental animals and humans |
| 19    Q    You state, Only a fraction of the particles | 19  the ideal particle size. And it is approximately in |
| 20  in an aerosol suspension are of a size that is | 20  that range. |
| 21  respirable, i.e., are of a size that, when inhaled, may | 21    Q    Can you recall any specific study at this |
| 22  reach the alveoli. | 22  time? |

5 (Pages 111 to 114)

Ronald G. Crystal, M.D.
Washington, DC

January 23, 2008

Page 115

1    A    I didn't bring -- I didn't review that for
2    this deposition.
3    Q    So I will take that as a, no, you cannot
4    recall at this point any specific study?
5    A    No.
6    Q    Did or would a person of ordinary skill in
7    the art in January 1993 understand that the ideal
8    particle size for reaching the alveoli is approximately
9    0.5 microns to six microns in diameter?
10   A    Yes.
11   Q    And that would be based on studies that
12   existed as of January 1993?
13   A    Yes.
14   Q    Okay.  All right.  If you could look at
15   paragraph 26, please.
16   A    Okay.
17   Q    Not all -- and I am reading from paragraph 26
18   of your expert report on page eight.  Not all
19   respirable particles, however, are carried to the
20   alveoli.  In addition to particle size, the flow rate
21   and volume of the inhalation of air and aerosolized
22   insulin directly affect where the particles are

Page 116

1    deposited in the lungs and therefore the amount of
2    inhaled insulin that reaches the alveoli.
3    Are there any other factors besides size,
4    flow rate, and volume that affect where respirable
5    particles are deposited into the lungs?
6    A    Well, as we discussed yesterday, particles
7    can be of different shapes.  And that can play a role.
8    Charge can play a role, mass.  There is a variety of
9    parameters that are relevant.  These are the most
10   important.
11   Q    Are there any others that you can think of,
12   other than the ones that you have listed in paragraph
13   26 and the ones you just mentioned?
14       MS. PFEIFFER:  Objection to form.
15       THE WITNESS:  Also, whether it is dry powder
16   or whether it is a liquid droplet is relevant.
17       BY MR. WOOD:
18   Q    Would you say that a dry powder is less
19   likely to reach the alveoli than a liquid?
20   A    Not necessarily.
21   Q    Is it more likely to reach the alveoli?
22   A    Not necessarily.  It would depend on the

Page 117

1    specific application.
2    Q    If you could look at paragraph 27, please.
3    The third sentence of paragraph 27 of your expert
4    report on page nine states, If a aerosolized insulin is
5    in the form of a dry powder when a particle comes into
6    contact with the alveoli walls, it dissolves.
7        Do you see that sentence, sir?
8    A    Yes.
9    Q    What do you mean dissolves?
10   A    Combines with water.
11   Q    All right.  Would the particle --
12   A    As I mentioned yesterday, this can occur also
13   higher up.  But what I was referring to here was if it
14   is still a dry powder when it reaches the alveoli.
15   Q    When it reaches the alveoli.  We talked a few
16   minutes ago about insulin -- correction -- insulin
17   particle being combined with other things for various
18   reasons.  Would such a particle need to be combined
19   with these other things in order for it to dissolve as
20   you indicated?
21       MS. PFEIFFER:  Objection to form.
22       THE WITNESS:  No.

Page 118

1        BY MR. WOOD:
2    Q    If you could look at paragraph 28, please.
3    A    Okay.
4    Q    Well, actually, if you could begin with the
5    last sentence of paragraph 27 and then paragraph 28.
6    My understanding -- let me ask you this.  Are you
7    expressing in paragraph 28 those factors which control
8    whether or not molecules that impact the alveoli walls
9    are thereafter absorbed into the bloodstream?
10       MS. PFEIFFER:  Objection to form.
11       THE WITNESS:  Yes.
12       BY MR. WOOD:
13   Q    And in paragraph 28 you state that those
14   factors -- let me strike that.  Let's start with this.
15   The first sentence of paragraph 28 states, The size of
16   the molecules affect their absorption.  Generally,
17   large proteins do not cross the alveoli structures into
18   the blood.
19       What's a large protein?
20       MS. PFEIFFER:  Objection to form.
21       THE WITNESS:  Well, proteins can be,
22   depending on their form, up to very, very large in

6  (Pages 115 to 118)

Ronald G. Crystal, M.D.                                                    January 23, 2008
                        Washington, DC

Page 119

1    size. For example, one of the immunoglobulins that are
2    naturally in our body called IgM's -- capital I, small
3    G, capital M -- has a molecular weight of over
4    700,000. And that would not cross over into the blood
5    at all.
6         At the other end of the spectrum, urea, which
7    is not a protein, but it is a small molecule as an
8    example, diffuses across all structures in the body,
9    including the lung freely. But proteins are comprised
10   of amino acids. So the number of amino acids, the type
11   of amino acids, whether they are carbohydrates
12   attached, there can be lipids attached, there can be
13   proteins interacting with other proteins, proteins
14   interacting with themselves. And all of those factors
15   are relevant in terms of size.
16        And there is extensive data relating to how
17   proteins of varying size will pass across the alveoli
18   wall in both directions and the mechanisms by which --
19   that control the movement of proteins.
20        So large proteins -- the spectrum I gave you
21   is the broad spectrum. And there's a variable between
22   those extremes.

Page 120

1    Q   Did you have a particular molecular weight in
2    mind when you used the term large protein?
3    A   No.
4    Q   So would a protein of 50,000 daltons be a
5    large protein?
6         MS. PFEIFFER: Objection to form.
7         THE WITNESS: Moderate size protein.
8         BY MR. WOOD:
9    Q   Moderate size?
10   A   If you put a protein of -- again, there are
11   caveats, depending on charge and carbohydrates and a
12   variety of things. But what I am going to tell you is
13   a general concept. A protein of 50,000, which is
14   approximately the molecular weight of alpha-1
15   antitrypsin that we talked about yesterday, if you put
16   that in the blood, about 5 percent of the blood level
17   will be in the lung and the same in the other
18   direction.
19        So there is more of a barrier for a 50,000
20   dalton protein than there is for -- yesterday you gave
21   6,000 as insulin, so I will accept that as the number.
22   And 6,000 would be more than 1,000, which would be more

Page 121

1    than 500.
2    Q   All right. Thank you. You continue in
3    paragraph 28, Other factors include the molecules'
4    weight, electric charge (positive, negative, or
5    neutral), solubility in lipids due to surfactants,
6    shape, hydrophilicity, hydrophobicity, and pH. And you
7    continue, The half-life of the molecules is also a
8    factor.
9         Are there any other factors that you can
10   think of that would affect whether a molecule that
11   impacts the alveoli wall is thereafter absorbed into
12   the bloodstream?
13        MS. PFEIFFER: Objection to form.
14        THE WITNESS: Those are the major ones.
15        BY MR. WOOD:
16   Q   Can you think of any others at this time?
17   A   No.
18   Q   Would a person of ordinary skill in the art
19   in 19 -- as of January 1993 understand that these are
20   the factors that affect whether or not a molecule is
21   absorbed from the aerosol alveoli wall into the
22   bloodstream?

Page 122

1         MS. PFEIFFER: Objection to form. Vague,
2    among other things.
3         THE WITNESS: Yes.
4         BY MR. WOOD:
5    Q   If we go back to paragraph 26 where -- if we
6    go back to paragraph 26 in our discussion about where
7    we talked about those factors that affect whether a
8    respirable particle is deposited. Let me start over
9    again. Going back to 26 where we talked about the
10   factors that affect where in the lung a respirable
11   particle will be deposited.
12        Would a person of ordinary skill in the art
13   understand that those are the factors that affect where
14   in the lung a respirable particle will be deposited?
15        MS. PFEIFFER: Objection to form.
16        THE WITNESS: As of 1993?
17        BY MR. WOOD:
18   Q   Yes. Thank you. As of January 1993?
19   A   Yes, with the one caveat that it is important
20   to define for whatever application that you are
21   discussing what you mean by respirable fraction. So if
22   you were designing a drug to impact on the airways, you

7  (Pages 119 to 122)

Ronald G. Crystal, M.D.

January 23, 2008

Washington, DC

---

Page 123

1  might for that application define respirable fraction
2  as being that fraction which impacted -- was capable of
3  impacting on the airways, whereas if you were designing
4  something -- a drug that would be for the alveoli, you
5  might define the respirable fraction in that context.
6  So with that caveat, yes.
7      Q    And would a person of ordinary skill in the
8  art in January 1993 understand which size would be
9  respirable into the alveoli?
10     A    Yes.
11         MS. PFEIFFER: Objection.
12         BY MR. WOOD:
13     Q    And a person of ordinary skill in the art in
14  January 1993 would be aware of what size would be
15  respirable into other parts of the lungs?
16         MS. PFEIFFER: Objection to form.
17         THE WITNESS: By other parts of the lungs,
18  you mean airways?
19         BY MR. WOOD:
20     Q    Yes.
21     A    Yes.
22     Q    Could you turn to paragraph 30, please.  In

---

Page 124

1  paragraph 30 you state, Because of the narrow
2  therapeutic range of insulin, it is essential that the
3  dosing be predictable and reproducible.  Otherwise, the
4  titration process that I described above cannot be
5  effectively implemented.  Reproducibility may be
6  accomplished by controlling multiple factors, such as
7  the flow rate and volume at which the patient inhales
8  the aerosolized suspension of insulin.  The dose and
9  form of the insulin being aerosolized are also
10  important factors.
11         What other factors can be controlled to
12  achieve reproducibility?
13         MS. PFEIFFER: Objection to form.
14         THE WITNESS: Those are the major ones.
15         BY MR. WOOD:
16     Q    Can you think of any other factors at this
17  time?
18     A    No.
19     Q    If you could turn to paragraph 52, please.
20  Paragraph 52, the second sentence states, in part, Many
21  factors influence whether a reproducible dose is
22  administered to the bloodstream by insulin inhalation

---

Page 125

1  even if the same amount of insulin is aerosolized in a
2  device in the same manner each time.  These factors
3  include, among others, the flow rate and volume with
4  which a patient would inhale each dose of insulin, the
5  speed of the inhalation, the particle size,
6  concentration of the drug in the carrier, and the point
7  in the respiration cycle where the patient initiates
8  inhalation.
9         Can you think of any additional factors that
10  influence whether a reproducible dose is administered
11  to the bloodstream by insulin inhalation?
12         MS. PFEIFFER: Objection to form.
13         THE WITNESS: No.
14         BY MR. WOOD:
15     Q    What do you mean by the speed of the
16  inhalation?
17     A    By speed I usually refer to that in lung
18  physiology in terms of flow rate, that is, volume per
19  unit time.
20     Q    So would that be the same thing as the flow
21  rate with which a patient would inhale each dose of
22  insulin?

---

Page 126

1      A    Yes.
2      Q    All right.  So you mentioned -- you also
3  mentioned the flow rate with which a patient would
4  induce -- correction -- would inhale each dose of
5  insulin.  So those are basically the same thing; is
6  that right?
7      A    Yes.
8      Q    And, again, particle size refers to diameter?
9         MS. PFEIFFER: Objection to form.
10         THE WITNESS: With the caveats we have
11  discussed before, yes.
12         BY MR. WOOD:
13     Q    Thank you.  Okay.  Let's turn back to
14  paragraph 30, please.  This last sentence in that
15  paragraph, The dose and form of the insulin being
16  aerosolized are also important factors.
17         What do you mean by the dose and form of the
18  insulin being aerosolized?
19     A    Dose refers to how much and form refers to
20  dry powder versus liquid, shape, charge, and all the
21  various physical chemical characteristics that we have
22  been discussing for the past two days.

8 (Pages 123 to 126)

Ronald G. Crystal, M.D.

Washington, DC

January 23, 2008

Page 127

1    Q    When you say the dose refers to how much, do
2    you mean how much is aerosolized into the inhalation
3    device?
4          MS. PFEIFFER: Objection to form.
5          THE WITNESS: Yes.
6          BY MR. WOOD:
7    Q    So if you control the amount of insulin that
8    is aerosolized in the inhalation device, you are
9    controlling one of the factors that, as you say,
10   accomplishes reproducibility?
11         MS. PFEIFFER: Objection to form.
12         BY MR. WOOD:
13   Q    Is that correct?
14   A    Not necessarily because reproducibility may
15   be, depending on the device, a function of the amount
16   you are trying to aerosolize.
17   Q    I am not sure I understand that. So let me
18   back up a little bit. The dose, I understand from your
19   previous answer, is the amount of insulin that is
20   aerosolized in the device?
21         MS. PFEIFFER: Objection to form.
22         THE WITNESS: That's correct.

Page 128

1          BY MR. WOOD:
2    Q    So if you control the amount of insulin --
3    and you said that dose is one of the factors -- one of
4    the important factors that accomplishes
5    reproducibility; is that correct?
6    A    Yes, but let's not -- perhaps we are having
7    confusion about the word reproducibility. I am
8    referring to dosing to the -- that reaches the
9    bloodstream as being the dosing in the first sentence.
10   And you asked me about the dose in terms of the device,
11   which is a different parameter.
12         So the dose that you need to aerosolize in
13   the device is dependent on the dose that you want to
14   deliver to the individual. The critical thing is the
15   first sentence in paragraph 30 just because of the
16   narrow therapeutic range of insulin, it is essential
17   that the dosing, that is, the dosing to the patient's
18   bloodstream be predictable and reproducible. That's
19   the critical thing. So that that predictability and
20   reproducibility is dependent on a
21   number of factors, including of which is in the last
22   sentence of that paragraph, the dose that is -- we are

Page 129

1    talking about a different dose now. We are talking
2    about a dose within the device and the form of the
3    insulin being aerosolized.
4    Q    Okay. So when you say in the last sentence
5    that the dose of the insulin being aerosolized, I am
6    paraphrasing and correct me if I am wrong. But you are
7    saying that the dose aerosolized in the device is an
8    important factor in accomplishing reproducibility?
9          MS. PFEIFFER: Objection to form.
10         BY MR. WOOD:
11   Q    Is that a correct interpretation of the last
12   sentence of paragraph 30?
13   A    Well, but it is also -- don't confuse it with
14   the concept that the critical thing is the dosing to
15   the patient's bloodstream. And depending on the amount
16   required to reach in a predictable and reproducible
17   fashion to the patient's bloodstream, depending on the
18   device and all of these other factors we have been
19   discussing, you may have to vary the dose that is being
20   aerosolized.
21   Q    I see.
22   A    And that may or may not be reproducible. You

Page 130

1    may not be able to with a specific device achieve
2    reproducibility of the dose that's required with that
3    device and all the other factors that we are talking
4    about to get precise dosing to the bloodstream.
5    Q    Well, I just -- I understand that there are
6    other factors in addition to the dose aerosolized in
7    the device. But I understand from your last sentence
8    of paragraph 30 -- and correct me if I am wrong -- that
9    the dose aerosolized in the device is an important
10   factor in accomplishing the reproducibility. Is that a
11   correct interpretation of only that one sentence in
12   paragraph 30?
13         MS. PFEIFFER: Objection to form.
14         THE WITNESS: No, because it depends very
15   much on the device and the dose that you want to
16   deliver to the bloodstream.
17         So let me give you an example. If you had a
18   device that was not very effective in terms of
19   aerosolizing insulin in the form that would reach the
20   bloodstream, whether it is size or all these other
21   factors we have talked about, you may have to in that
22   device, then -- you would get a dose that would be

9  (Pages 127 to 130)

Ronald G. Crystal, M.D.
Washington, DC

January 23, 2008

| Page 131 | Page 133 |
|---|---|
| 1 much, much, much larger. And that might not be | 1 because that may for a given device, they may vary -- |
| 2 reproducible. | 2 it all depends, as I keep saying, it all depends on the |
| 3 So it depends on -- the critical factor is | 3 concept of this narrow therapeutic range of insulin. |
| 4 the precise dose that has to reach the bloodstream. | 4 And it's critical that the dosing to the blood be |
| 5 And just because a device can reproducibly generate a | 5 precisely controlled. And so for the amount -- for a |
| 6 certain range of size and charge and whatever the other | 6 given aerosol generator, for the amount or dose that is |
| 7 parameters are that you are using may or may not be | 7 generated, the form may change with that aerosol device |
| 8 reproducible for the doses that you need to precisely | 8 depending on the amount with the ultimate parameter |
| 9 reach the bloodstream. | 9 being what you can deliver precisely to the blood. So |
| 10 Q Those other factors that you mentioned -- | 10 dose -- in the last sentence, dose and form are |
| 11 well, charge specifically -- I understood that those | 11 intertwined. |
| 12 factors are captured in the term form, as you used it, | 12 Q So the device can affect the shape of the |
| 13 in the last sentence of paragraph 30; is that correct? | 13 particles? |
| 14 A That's correct. | 14 MS. PFEIFFER: Objection to form. |
| 15 Q So what I am asking is just isolating the | 15 THE WITNESS: It may or may not. |
| 16 word dose, as you used in the last sentence of | 16 BY MR. WOOD: |
| 17 paragraph 30, because you are the one who wrote this. | 17 Q Can the device affect the charge of the |
| 18 Dose means dose aerosolized in the device, correct? | 18 particles? |
| 19 A Yes, but I don't want you to confuse the use | 19 A It may or may not. |
| 20 in this paragraph of the word dose as being used in two | 20 Q Can the device affect the pH of the |
| 21 different context in the first sentence and the last | 21 particles? |
| 22 sentence. The critical thing is dosing to the | 22 MS. PFEIFFER: Objection to form. |

| Page 132 | Page 134 |
|---|---|
| 1 patient's bloodstream. In the last sentence, it refers | 1 THE WITNESS: Depending on -- it may or may |
| 2 to the amount. I use the word dose. The amount being | 2 not, depending on what you would have to do, the |
| 3 aerosolized. | 3 formulation you would have to use to achieve the dose |
| 4 The point I am trying to get across -- and | 4 to be able to achieve the eventual dose that goes into |
| 5 perhaps I am not being very articulate about it -- is | 5 the bloodstream. |
| 6 that because the critical thing is dosing to the | 6 BY MR. WOOD: |
| 7 bloodstream, if you have a device that is reproducible | 7 Q If you use the same formulation from one dose |
| 8 in terms of the dose it generates, that dose may not be | 8 to another, is there a way for the device to change to |
| 9 applicable to the -- that reproducible dose may not -- | 9 pH of the dose? |
| 10 in the aerosol device may not be apply to precise | 10 MS. PFEIFFER: Objection to form. |
| 11 dosing that is required for the bloodstream. | 11 THE WITNESS: No, unless it changes the |
| 12 Q All right. And just moving on to the word | 12 insulin in some -- you know, physically changes |
| 13 form. And just to clarify, the form refers to the | 13 it. |
| 14 charge of the particle, the pH of the particle, the | 14 BY MR. WOOD: |
| 15 shape of the particle, whether or not it is dry versus | 15 Q Are you aware of an inhalation device that |
| 16 liquid; is that correct? | 16 would change the insulin that way? |
| 17 MS. PFEIFFER: Objection to form. | 17 A I didn't look for this. You know, I am just |
| 18 THE WITNESS: That is correct. | 18 speaking theoretically. |
| 19 BY MR. WOOD: | 19 Q So you are not aware of a device at this time |
| 20 Q And you want to control those factors to | 20 that would change the pH in that manner? |
| 21 achieve reproducibility; is that correct? | 21 MS. PFEIFFER: Objection to form. |
| 22 A Yes. And that is linked to the word dose | 22 THE WITNESS: No, but it is theoretically |

10 (Pages 131 to 134)

Ronald G. Crystal, M.D.                                                    January 23, 2008
                                        Washington, DC

| Page 135 | Page 137 |
|---|---|

**Page 135**

1  possible.

2      BY MR. WOOD:

3      Q   How would a device change the charge of the

4  dose?

5      MS. PFEIFFER: Objection to form.

6      THE WITNESS:   Well, depending on how the

7  device works, it may change the molecule itself. And

8  depending on the shape of the molecule, whether the

9  molecule is broken or some fraction of the molecules

10 are broken, that may change the charge.

11     BY MR. WOOD:

12     Q   Are you aware of an inhalation device that

13 would change the shape of the molecule?

14     A   Again, I was speaking theoretically.

15     Q   So you are not aware of a device?

16     A   No.

17     Q   Specific device at this time?

18     MS. PFEIFFER: Objection to form.

19     THE WITNESS: No.

20     BY MR. WOOD:

21     Q   So when you are referring to charge, are you

22 referring to charge of the molecule?

**Page 137**

1  aggregate. And if they aggregate, they could be a very

2  different size and never reach the alveoli.

3      Q   And the inhalation device can affect the

4  charge of the particles.

5      A   Theoretically.

6      MS. PFEIFFER: Objection to form.

7      THE WITNESS: Theoretically.

8      BY MR. WOOD:

9      Q   How does the shape of the particle affect

10 where in the lungs the particle is deposited?

11     A   The lung, as we discussed yesterday, is a

12 dichotomous, that is, branching by two tree. So it is

13 branching and branching and branching down to 23

14 times. And to deliver particles to the air sacs, you

15 have to negotiate or the aerosol that has been

16 generated has to negotiate, if you can imagine sitting

17 on a particle, a very complex path to be able to reach

18 the alveoli.

19     The particles -- and that's part of the

20 defenses of the lung because we inhale particles all

21 the time. The next breath, all of us are inhaling

22 various particles that we don't see. And our lungs

| Page 136 | Page 138 |
|---|---|

**Page 136**

1      A   No. The important thing for delivery is the

2  charge of the particle.

3      Q   All right. So when we just talked about --

4      A   Excuse me. That's for delivery to the

5  alveoli and impaction upon the alveoli. Once it is

6  impacted upon the alveoli wall, then charge of the

7  insulin molecule itself would be very relevant.

8      Q   We were talking about the charge in terms of

9  the form of the insulin. And were you referring to

10 charge of the molecule or charge of the particle?

11     MS. PFEIFFER: Objection to form.

12     THE WITNESS: It could be both because,

13 again, the critical parameter is the precise dosing to

14 the blood. And both are important parameters in terms

15 of the ability of the device to generate insulin that

16 will eventually in a precise manner reach the blood.

17     BY MR. WOOD:

18     Q   Okay. How does the charge of the particle

19 affect where in the lungs the particle is deposited?

20     A   Okay. I am speaking theoretically.

21 Depending on the charge of the particles generated by

22 the device, the particles being aerosolized could

**Page 138**

1  defend that by the particles being impacted in the back

2  of the mouth, the trachea, along the walls of the

3  airways, and very important in the branch points of the

4  branching of the airways. And so the shape of the

5  molecule is a relevant parameter in terms of whether

6  the particle will stay within the airstream and not

7  impact upon the walls of the airways, which would

8  obviate the efficiency of delivering to the alveoli.

9      Q   At the end -- well, let me just make sure I

10 understand. So the factors we talked about in terms of

11 form are shape, charge, pH, and whether the dose is dry

12 or liquid. Are there any other --

13     A   And whether the particle likes water or not.

14     Q   That's the hydrophilicity versus

15 hydrophobicity?

16     A   Yeah.

17     Q   What determines whether the particle is

18 hydrophobic or hydrophilic?

19     A   It is the inherent qualities of the molecule

20 itself and then dependent on what you may or may not

21 add to the insulin to generate the aerosol.

22     Q   Okay. So one way to control the

Ronald G. Crystal, M.D.                                    January 23, 2008
                          Washington, DC

---

Page 139

1   hydrophobicity or hydrophilicity of your particles
2   would be how you formulate the dry insulin powder?
3        MS. PFEIFFER: Objection to form.
4        THE WITNESS: Yes.
5        BY MR. WOOD:
6   Q   How would you control the pH?
7   A   In the same way.
8   Q   How would you control the charge?
9   A   In the same way.
10  Q   How would you control the shape?
11  A   That might be partly dependent on what
12  formulation you use and then the inherent properties of
13  the molecule and the inherent properties of the aerosol
14  generator.
15  Q   So if you use the same formulation from one
16  dose to the next, you would be controlling the charge,
17  pH, hydrophobicity, and hydrophilicity of the dose?
18       MS. PFEIFFER: Objection to form.
19       THE WITNESS: You may or may not depending
20  on what dose. In other words, these parameters
21  possibly -- and, again, I am speaking theoretically --
22  could change depending on the dose. And when we are

---

Page 140

1   talking about dose now, I am understanding that we are
2   talking about dose of the aerosol being generated.
3        BY MR. WOOD:
4   Q   Well, we were talking about -- I think what
5   my question -- and we can read the question back. My
6   question was in terms of the shape, charge, pH, and
7   hydrophobicity, hydrophilicity of the insulin
8   formulation. And so my question is, if we control the
9   formulation, we control at least the charge and the pH
10  and the hydrophobicity, hydrophilicity of that
11  formulation?
12       MS. PFEIFFER: Objection to form.
13       THE WITNESS: You would control the
14  formulation, but you may not control what the dose --
15  again, I am speaking of the generator of the dose that
16  would come out of it. In other words, again, I am
17  speaking purely theoretically now, not necessarily what
18  we are talking about in this case. But the generator
19  itself might change these parameters even though you
20  are using the same formulation, depending on the dose
21  that was being generated.
22       In other words, if you put in one molecule

---

Page 141

1   compared to 100 billion molecules, it may might deal
2   with them differently. So, again, we are speaking
3   theoretically. It is just these things are important
4   to evaluate because, again, the important thing is not
5   the dose that comes out of the generator. The
6   important thing is the precise dose that reaches the
7   bloodstream.
8   Q   But you are not aware of a device that,
9   sitting here today, that would change the charge or the
10  pH or the hydrophobicity, hydrophilicity of an insulin
11  formulation?
12       MS. PFEIFFER: Objection to form.
13       THE WITNESS: No.
14       BY MR. WOOD:
15  Q   If you could turn to paragraph 52, again,
16  please.
17  A   Okay.
18  Q   Referring to the same part of paragraph 52
19  that we referred to earlier today, you state that one
20  of the factors that influence whether a reproducible
21  dose is administered to the bloodstream by
22  inhalation -- correction -- insulin inhalation is the

---

Page 142

1   flow rate and volume with which a patient would inhale
2   each dose of insulin.
3        Let me ask first. Do you consider flow rate
4   and volume to be two separate factors?
5        MS. PFEIFFER: Objection to form.
6        THE WITNESS: Yes.
7        BY MR. WOOD:
8   Q   How does the flow rate influence whether a
9   reproducible dose is administered into the bloodstream
10  by insulin inhalation?
11       MS. PFEIFFER: Objection to form. Lack of
12  foundation.
13       THE WITNESS: Because the characteristics --
14  these characteristics are relevant to delivery to the
15  lower respiratory tract.
16       BY MR. WOOD:
17  Q   And how is that relevant?
18  A   If the flow rate was very, very low compared
19  to moderate versus very high, the relative amount of
20  the aerosol or given aerosol may well change -- the
21  amount delivered to the alveoli.
22  Q   How would it change?

---

                                    12  (Pages 139 to 142)

Ronald G. Crystal, M.D.                                January 23, 2008
                    Washington, DC

| Page 143 | Page 145 |
|---|---|

**Page 143**

1    MS. PFEIFFER: Objection to form.

2    THE WITNESS: The amount of the aerosol that

3    would be delivered to the alveoli would change.

4    BY MR. WOOD:

5    Q   Can you tell me in what way the flow rate

6    changes the amount of insulin delivered to the alveoli?

7    MS. PFEIFFER: Objection to form.

8    THE WITNESS: Because of different flow

9    rates, it may impact upon the back of the mouth. It

10   may impact upon the bronchi. The physiology of the

11   lung is such that you need a reproducible flow and

12   volume to be able to reproducibly deliver whatever you

13   are breathing into the alveoli.

14   BY MR. WOOD:

15   Q   Can you tell me whether a low flow rate

16   increases the likelihood that a dry insulin powder

17   molecule reaches the alveoli?

18   MS. PFEIFFER: Objection to form.

19   THE WITNESS: It may or may not. That would

20   be dependent on the device, the formulation, and all of

21   these other factors that we are discussing.

22   BY MR. WOOD:

**Page 144**

1    Q   Is it safe to say that you have to control

2    all of these factors, then, in order to achieve a

3    reproducible dose of dry insulin powder to the

4    bloodstream?

5    MS. PFEIFFER: Objection.

6    THE WITNESS: Yes.

7    BY MR. WOOD:

8    Q   Controlling one of those factors would not be

9    sufficient to achieve a reproducible dose of insulin to

10   the bloodstream via inhalation?

11   MS. PFEIFFER: Objection to form.

12   THE WITNESS: Of the various factors that I

13   list, they probably have a different hierarchy, but

14   that would be a different -- the hierarchy would be

15   different for each device and dose and all of these

16   other factors.

17   BY MR. WOOD:

18   Q   I see. So there's -- you cannot point to one

19   of these factors as, in general, more important than

20   the other factors in terms of achieving a reproducible

21   dose of insulin to the bloodstream via inhalation?

22   MS. PFEIFFER: Objection to form.

**Page 145**

1    THE WITNESS: No. You would have to -- you

2    would have to evaluate it for your specific

3    application. It would mean device and the dose

4    formulation and so on.

5    BY MR. WOOD:

6    Q   How would you do that evaluation?

7    MS. PFEIFFER: Objection to form.

8    THE WITNESS: You are asking if I was

9    developing this as a therapeutic?

10   BY MR. WOOD:

11   Q   Well, I am just following on your answer you

12   would have to evaluate for your particular device and

13   formulation, I believe you said.

14   A   Well, just because you have a device and that

15   device can generate a certain amount of insulin does

16   not mean that you can deliver a precise dose of insulin

17   to the bloodstream, which is the critical factor for a

18   diabetic. And so in developing that as a therapeutic

19   strategy, you would have to evaluate all of these

20   factors.

21   Q   If you used the same device in the same

22   formulation from one dose to another, do you control

**Page 146**

1    any of the factors that influence the reproducibility

2    of the dose of insulin to the bloodstream via

3    inhalation?

4    MS. PFEIFFER: Objection to form.

5    THE WITNESS: I am not sure what you mean by

6    do you control.

7    BY MR. WOOD:

8    Q   Well, let me --

9    A   Are you asking me -- well, why don't you pose

10   the question.

11   Q   Well, if you go back to paragraph 30 on page

12   10 of your expert report, you state, Reproducibility

13   may be accomplished by controlling multiple factors.

14   Do you see that?

15   A   Yes, I do.

16   Q   All right. What did you mean by controlling

17   multiple factors?

18   A   Exactly what I said -- controlling or --

19   controlling various factors. And then I say such as,

20   and I talk about those factors.

21   Q   So if you use the same inhalation device and

22   the same dry insulin powder formulation across multiple

13  (Pages 143 to 146)

Ronald G. Crystal, M.D.

January 23, 2008

Washington, DC

Page 147

1  doses, do you thereby control any of the factors that
2  influence the reproducibility of the insulin dose to
3  the bloodstream?
4       MS. PFEIFFER: Objection to form.
5       THE WITNESS: Well, you are controlling some
6  of the factors, which are that for a given dose that
7  you can generate the aerosol. But the aerosol
8  generation is only a very small part of the precise
9  delivery to the blood. The factors that I talk about
10  here -- flow rate, volume, dose, and form -- are also
11  important factors.
12       BY MR. WOOD:
13  Q   So if you used the same device in insulin
14  formulation, you are controlling some of the factors;
15  is that correct?
16       MS. PFEIFFER: Objection to form.
17       THE WITNESS: Yes, but it is only some of the
18  factors. And that may vary, depending on the dose of
19  aerosol that you are -- that you want to deliver to the
20  bloodstream.
21       BY MR. WOOD:
22  Q   And so what are the factors that you are

Page 148

1  controlling by using the same device and the same dry
2  insulin powder formulation?
3       MS. PFEIFFER: Objection to form.
4       THE WITNESS: Well, that depends on the
5  device and formulation.
6       BY MR. WOOD:
7  Q   Well, when I asked you if you are
8  controlling -- whether or not you are controlling the
9  factors that influence reproducibility by using the
10  same device and the same insulin formulation, you said
11  that, yes, you are controlling some of the factors that
12  influence reproducibility of the dose; is that right?
13       MS. PFEIFFER: Objection to form.
14       THE WITNESS: But you are using the word dose
15  now as dose of aerosol.
16       BY MR. WOOD:
17  Q   You are controlling some of the factors that
18  influence the reproducibility of the dose of the
19  insulin into the bloodstream; is that correct?
20       MS. PFEIFFER: Objection to form.
21       THE WITNESS: And I said, yes, they are some
22  of the factors.

Page 149

1       BY MR. WOOD:
2  Q   So when you answered that question, did you
3  have in mind certain factors that you are, in fact,
4  controlling?
5  A   Yes. What you are doing by that is you are
6  controlling the form of the aerosol, but that's all you
7  are doing.
8  Q   Are you controlling the amount of dose that
9  is aerosolized in the device?
10  A   As long as you can show that that is
11  reproducible for the doses that you require to be able
12  to precisely dose the blood.
13  Q   My question was phrased in terms of dose --
14  the amount of aerosolized insulin in the device. So if
15  you used the same device across multiple doses, are you
16  thereby controlling the amount of insulin aerosolized
17  in the device?
18       MS. PFEIFFER: Objection to form.
19       THE WITNESS: As long as you validate that
20  you are controlling a reproducible amount of insulin
21  that is in the same form that is being generated. In
22  other words, if it varies from dose to dose, then that

Page 150

1  is not acceptable because then you can't use that
2  parameter to be able to even begin to estimate how much
3  you will dose to the blood.
4       BY MR. WOOD:
5  Q   How would you evaluate whether your device
6  produces the same amount of aerosolized insulin in the
7  device itself from dose to dose?
8       MS. PFEIFFER: Objection to form.
9       THE WITNESS: You are asking me if I was
10  developing this, how would I do it in the laboratory?
11       BY MR. WOOD:
12  Q   Well, would a person of ordinary skill in the
13  art in January 1993 know how to evaluate whether a
14  particular inhalation device produces the same amount
15  of aerosolized insulin in the device from dose to dose?
16       MS. PFEIFFER: Objection.
17       THE WITNESS: Yes.
18       BY MR. WOOD:
19  Q   How would that person do that?
20  A   In the laboratory one would evaluate all of
21  the parameters that we have discussed as a function of
22  dose that you put into the device.

14 (Pages 147 to 150)

Ronald G. Crystal, M.D.                                                January 23, 2008
                          Washington, DC

---

**Page 151**

1  Q  Right. So I am -- the question is specific
2  to the amount of device aerosolized in the device
3  itself?
4        MS. PFEIFFER: Objection to form.
5        BY MR. WOOD:
6  Q  How would a person of ordinary skill in the
7  art evaluate whether the device produces a -- produces
8  the same amount of aerosolized insulin in the device
9  from dose to dose?
10       MS. PFEIFFER: Objection to form.
11       MR. WOOD: So let me just leave the question
12 that way.
13       THE WITNESS: And can I accept as a part of
14 this concept that the doses that we are talking about
15 within the device are applicable to treating a
16 diabetic? The reason I am asking that is because let's
17 say you had a very inefficient device relevant to a
18 diabetic, then you might have to have huge amounts of
19 insulin and the device may not function as well.
20       So can I assume that we are talking about
21 doses within the aerosol device that are relevant to
22 treating a diabetic, that is, relevant to getting

---

**Page 152**

1  eventually the amounts of insulin into the bloodstream
2  in a reproducible manner?
3        BY MR. WOOD:
4  Q  Yes.
5  A  One would do it in a laboratory as a function
6  of different doses that you would put into the device
7  of insulin. And then you would measure what comes out
8  of the device in terms of all the parameters that we
9  have discussed. These are standard laboratory
10 parameters that one can evaluate in the laboratory. So
11 if we are talking only about the device, that's
12 something that could be done.
13 Q  You mentioned the term inefficient. I am
14 sorry. Yes, I believe you said inefficient device.
15 How do you characterize the inefficiency of an
16 inhalation device?
17       MS. PFEIFFER: Objection to form.
18       THE WITNESS: You mean as if I am developing
19 it as a manufacturer?
20       BY MR. WOOD:
21 Q  Yes.
22 A  Because there are important parameters there,

---

**Page 153**

1  such as reproducibility, cost, and complexity of the
2  device and so on. So efficiency and inefficiency is a
3  variable. So the critical thing for developing a
4  device like this is the amounts that you have to -- the
5  range of amounts that you have to deliver to the
6  bloodstream. And if I was developing such a device, I
7  would use that as my gold standard, that is, I know I
8  want to eventually deliver so much reproducibly this
9  range reproducibly to the bloodstream.
10       And then I would evaluate what my device
11 would require to be able to do the first step, which
12 would be the generation of the aerosol. But that's
13 only a first step of multiple steps that would need to
14 be done. And that's something that you could do in the
15 laboratory.
16 Q  Is there a way of characterizing the
17 efficiency of an inhalation device?
18       MS. PFEIFFER: Objection to form.
19       THE WITNESS: In the context you are asking,
20 which is amount in, versus the amount out, that's
21 sufficiency. And with all of the caveats, that is,
22 that the device doesn't destroy the insulin and so on,

---

**Page 154**

1  if I assume all of that is taken into account, then it
2  is basically the amount aerosolized versus the amount
3  you put in.
4        BY MR. WOOD:
5  Q  So the amount aerosolized in a device as
6  compared to the amount that eventually is absorbed into
7  the bloodstream?
8        MS. PFEIFFER: Objection to form.
9        THE WITNESS: No, not at all, no. The amount
10 in the context we are discussing it now is the amount
11 that's aerosolized in the device versus the amount that
12 you put into the device.
13       BY MR. WOOD:
14 Q  I see. I see. When you say put into the
15 device, what are you referring to?
16 A  The amount you put into the device. I don't
17 know how -- I mean, the device -- the purpose of the
18 device in the context that we are discussing it is to
19 generate -- is to convert the insulin from the form you
20 put it into the device into the aerosol. And so the
21 amount that you put in is what I am referring to.
22 Q  So the amount you put in the device would, if

---

15 (Pages 151 to 154)

Ronald G. Crystal, M.D.                                      January 23, 2008
                          Washington, DC

Page 155

1   I can use this term, would be the amount prior to
2   aerosolization versus the amount that eventually gets
3   aerosolized in the device?
4       MS. PFEIFFER: Objection to form.
5       THE WITNESS: I guess so. I am not sure why
6   you are having difficulty understanding the amount you
7   put into the device. You know, you start off and you
8   put in a certain amount of insulin into your device,
9   you turn it on, it generates an aerosol. The amount
10  that is generated is the amount that's generated. And
11  those are the two parameters. That's what efficiency
12  is.
13      BY MR. WOOD:
14      Q   So it's the amount that -- it's the
15  unaerosolized amount versus the aerosolized amount. Is
16  that --
17      A   No. Well, it is the total amount that you
18  put in versus the aerosolized amount. If you subtract
19  the aerosolized amount from the total amount, then that
20  gives you, I guess, the unaerosolized amount. But
21  efficiency is the aerosolized amount with all the
22  caveats we have discussed versus the total amount.

Page 156

1       Q   Are you aware of any study into the
2   inhalation of aerosolized insulin into the lungs in
3   which insulin was not found to enter the bloodstream?
4       A   Any amount?
5       Q   Correct.
6       A   No.
7       THE WITNESS: We can keep going. Do you mind
8   if I get another soda?
9       MR. WOOD: We can take a break now if you
10  would like.
11      THE WITNESS: Okay.
12      (A recess was held.)
13      BY MR. WOOD:
14      Q   Dr. Crystal, could you turn again to
15  paragraph 52 on page 16, please.
16      A   Okay.
17      Q   In paragraph 52, as we discussed, one of the
18  factors that influences whether a reproducible dose is
19  administered to the bloodstream by insulin inhalation
20  is the flow rate with which a patient would inhale each
21  dose of insulin; is that correct?
22      MS. PFEIFFER: Objection to form.

Page 157

1       THE WITNESS: That is correct.
2       BY MR. WOOD:
3       Q   And that's the same as the speed of
4   inhalation?
5       A   No, I think I misspoke. I thought about it
6   after I said that. The speed is what I was referring
7   to as the time. The flow rate varies. You can't keep
8   the flow rate. It is very, very difficult for a human
9   to keep can a flow rate constant for the entirety of an
10  inhalation. And speed is the overall time. So flow
11  rate could vary. But you want to do that in a
12  reproducible manner, and you would want the amount of
13  time that you are inhaling also to be controlled.
14      Q   So if I can paraphrase, the speed of the
15  inhalation might refer to the total time of the
16  inhalation?
17      A   I think that's actually how I meant it when I
18  wrote it, yes.
19      Q   How would the flow rate be controlled?
20      MS. PFEIFFER: Objection to form.
21      BY MR. WOOD:
22      Q   Let me rephrase that question. How would the

Page 158

1   flow rate with which a patient inhales each dose of
2   insulin be controlled?
3       MS. PFEIFFER: Objection to form.
4       THE WITNESS: Well, there are various ways
5   one could do it, depending on how you strategize. The
6   most important thing is always to keep in mind the
7   reproducibility or repeatability of the delivery of the
8   insulin to the blood. That's what's critical in
9   diabetes. You would want to develop a strategy where
10  the inhalation maneuver for the patient was
11  reproducible. So that you would look for a point in
12  respiration where it was easy for the patient to do it
13  and always could be done in a reproducible manner.
14      You could also theoretically develop your
15  device so that it would control flow rate. And that
16  would also be possible. There would be strategies one
17  could do. But flow rate is an important parameter.
18  The critical thing is reproducibility is what you are
19  trying to do. In regard to flow rate and volume and
20  speed and time is you are trying to control the
21  reproducible amount of insulin that will reach the
22  alveoli.

16 (Pages 155 to 158)

Ronald G. Crystal, M.D.

Washington, DC

January 23, 2008

Page 159

1    Q   How would you control the reproducibility of
2    the inhalation maneuver? Actually, strike that. What
3    do you mean by inhalation maneuver?
4    A   Breathing in.
5    Q   Does it include breathing out as well?
6    A   No, because what you are doing, although that
7    might be part of the maneuver would ask the patient
8    to do in terms of getting the drug into the lungs, it
9    is an inhalation process, not an exhalation process,
10   although exhalation to reach the point where you would
11   then have the patient breathe in the drug may be
12   important.
13   Q   So how would you control the inhalation
14   maneuver such that it is reproducible?
15       MS. PFEIFFER: Objection to form.
16       THE WITNESS: Well, theoretically what you
17   would do would be to be able to instruct the patient in
18   a way that they would reproducibly breathe in, in
19   exactly the same way each time and in a way that was
20   compatible with getting the aerosolized material in the
21   device to the alveoli in a reproducible manner.
22       BY MR. WOOD:

Page 160

1    Q   And you indicated that the device itself can
2    control flow rate; is that correct?
3        MS. PFEIFFER: Objection to form.
4        THE WITNESS: You might be able to develop.
5    Now, we are talking about after you generate the
6    aerosol. So what we have talked about up to this point
7    is the aerosol generation within the device. What I
8    just referred to in terms of you might develop a device
9    that could control flow, you might be able -- that
10   would be, then, distal after the generation of the
11   aerosol. You possibly could theoretically -- I am not
12   sure this is a good idea. But you could theoretically
13   control flow.
14       BY MR. WOOD:
15   Q   Okay.
16   A   At least you could limit flow to not go over
17   a maximum.
18   Q   Okay. Would you instruct a patient to do a
19   particular kind of inhalation maneuver?
20       MS. PFEIFFER: Objection to form.
21       THE WITNESS: Well, again, what you are
22   trying to achieve is reproducible delivery of the drug

Page 161

1    to the bloodstream. And so it is critical that the
2    patient do the same maneuver.
3        BY MR. WOOD:
4    Q   From one dose -- it is critical that the
5    patient do the same maneuver from one dose to another?
6        MS. PFEIFFER: Objection to form. Vague.
7        BY MR. WOOD:
8    Q   Is that correct?
9    A   It would depend on your device. I mean, the
10   critical thing is that the patient is -- we are
11   speaking theoretically now. The critical thing is that
12   you have to be able to get a reproducible and precise
13   dose to the bloodstream. So how you do it is not as
14   critical -- it is not the critical factor. The
15   critical factor is reproducibility of a precise dose to
16   the bloodstream.
17   Q   So when you instruct the patient as to the
18   patient's inhalation maneuver, what are you telling the
19   patient to do?
20       MS. PFEIFFER: Objection to form.
21       THE WITNESS: That would depend on your
22   device and a variety of other parameters. I can't be

Page 162

1    specific about it. But the critical thing is you would
2    have to instruct the patient and be able to demonstrate
3    that you can deliver a reproducible dose to the
4    bloodstream because that is what is critical in
5    diabetes.
6        BY MR. WOOD:
7    Q   Is there a specific inhalation maneuver that
8    will achieve a reproducible dose into the bloodstream
9    that would work across different inhalation devices?
10       MS. PFEIFFER: Objection to form.
11       THE WITNESS: There may or may not be. I
12   would have to be specific. I mean, the important
13   concept is what is delivering the drug to the
14   bloodstream. The patient and the physician ordering
15   the drug would control the amount of insulin that is
16   put into the device. It is then in developing such a
17   device, you would have to then develop a device and
18   strategy that would allow reproducibility at all of
19   these steps, the critical thing being delivery to the
20   bloodstream.
21   Q   Sitting here today, are you aware of a
22   specific inhalation maneuver that a patient can be

17 (Pages 159 to 162)

Ronald G. Crystal, M.D.
Washington, DC
January 23, 2008

Page 163

1  instructed to perform that would achieve a reproducible
2  dose of insulin to the bloodstream regardless of the
3  inhalation device used?
4      A    No.
5      Q    If the patient uses the same inhalation
6  device from one dose to another, is there a specific
7  inhalation maneuver that the patient would be
8  instructed to do in order to achieve a reproducible
9  dose to the bloodstream?
10         MS. PFEIFFER: Objection to form.
11         THE WITNESS: It would depend on the device.
12         BY MR. WOOD:
13     Q    When you say it would depend on the device,
14  do you mean that the patient would be instructed as to
15  a particular inhalation maneuver for Device A but might
16  be instructed to do a different inhalation device for
17  Device B?
18     A    It is possible theoretically.  The critical
19  thing is reproducibility of delivery to the
20  bloodstream.
21     Q    Paragraph 52.  My understanding is that you
22  are saying that flow rate is a factor that influences

Page 164

1  whether a reproducible dose is administered to the
2  bloodstream by insulin inhalation.  If you achieved the
3  same flow rate from one dose to another dose, will you
4  have achieved a reproducible dose of insulin to the
5  bloodstream?
6          MS. PFEIFFER: Objection to form.
7          THE WITNESS: It depends on the device and
8  the application.
9          BY MR. WOOD:
10     Q    So the answer is no?
11         MS. PFEIFFER: Objection to form.
12         THE WITNESS: No.
13         BY MR. WOOD:
14     Q    Would a person of ordinary skill in the art
15  in 1993 understand that a flow rate is a factor that
16  influences whether a reproducible dose is administered
17  to the bloodstream by insulin inhalation?
18     A    Yes.
19     Q    Would a person of ordinary skill in the
20  art --
21     A    Excuse me.  I want to make sure that we are
22  defining what person of ordinary skill in the art.  I

Page 165

1  am using the definition we talked about yesterday.
2      Q    Yes.
3      A    We are not talking about the physician or the
4  patient?
5      Q    No.  Okay.  Would the physician who in
6  January 1993 understand that flow rate is a factor that
7  influences whether a reproducible dose is administered
8  to the bloodstream by insulin inhalation?
9          MS. PFEIFFER: Objection to form.
10         THE WITNESS: No.
11         BY MR. WOOD:
12     Q    So a physician is, in your opinion --
13  actually, let me rephrase that.  Would the physician be
14  someone who is below the level of ordinary skill in the
15  art?
16     A    We defined skill in the art yesterday
17  relating to this litigation and this patent.  A
18  physician would not be expected to know that.
19     Q    Would a person of ordinary skill in the art
20  as of January 1993 understand how flow rate influences
21  the reproducibility of -- let me start over again.
22  Would a person of ordinary skill in the art as of

Page 166

1  January 1993 understand how flow rate influences
2  whether a reproducible dose is administered to the
3  bloodstream by insulin inhalation?
4          MS. PFEIFFER: Objection to form.
5          THE WITNESS: Using the term reproducibility
6  referring to dosing to the blood?
7          BY MR. WOOD:
8      Q    Yes.
9      A    Yes.
10     Q    All right.  Let's talk about volume with
11  which a patient would inhale each dose of insulin.
12  And, again, I am referring to paragraph 52.  How would
13  the volume with which a patient would inhale each dose
14  of insulin be controlled?
15         MS. PFEIFFER: Objection to form.
16         THE WITNESS: Theoretically?
17         BY MR. WOOD:
18     Q    As opposed to what?
19     A    I mean, in comparison to what is more
20  practical.  There are various ways one would do it,
21  including a device as an example.  But the most
22  practical way to do it is to control it by the maneuver

18  (Pages 163 to 166)

Ronald G. Crystal, M.D.                                      January 23, 2008
                          Washington, DC

Page 167

1  that the patient does.
2      Q   How would you control the volume by which a
3  patient inhales each dose of insulin by inhalation
4  maneuver?
5      MS. PFEIFFER: Objection to form.
6      THE WITNESS: By instructing the patient.
7      BY MR. WOOD:
8      Q   Is there a particular instruction that you
9  would give a patient?
10     MS. PFEIFFER: Objection to form.
11     THE WITNESS: This would depend on the device
12  because your goal, again, is precise delivery to the
13  bloodstream. So it depends on your device and all of
14  these other parameters that we have discussed in regard
15  to how much volume you want the patient to bring in.
16  It would have to be reproducible because it is one of
17  the factors in terms of reproducibility of delivery of
18  the insulin to the bloodstream.
19     BY MR. WOOD:
20     Q   Okay. Would a person of ordinary skill in
21  the art as of January 1993 understand that the volume
22  with which a patient inhales each dose of insulin

Page 168

1  influences whether a reproducible dose is administered
2  to the bloodstream by insulin inhalation?
3      MS. PFEIFFER: Objection to form.
4      THE WITNESS: Yes.
5      BY MR. WOOD:
6      Q   Would a person of ordinary skill in the art
7  in January 1993 know how to control the volume with
8  which a patient would inhale each dose of insulin in
9  order to achieve a reproducible dose administered to
10  the bloodstream by inhalation?
11     MS. PFEIFFER: Objection to form.
12     THE WITNESS: Yes.
13     BY MR. WOOD:
14     Q   Again, in paragraph 52 you indicate that
15  particle size is a factor that influences whether a
16  reproducible dose is administered to the bloodstream by
17  insulin inhalation; is that correct?
18     MS. PFEIFFER: Objection to form.
19     THE WITNESS: I am sorry. I am looking at
20  paragraph 52. And I don't see the word particle. I am
21  sorry. Oh, I see it. Yes, I indicate that. That's
22  correct.

Page 169

1      BY MR. WOOD:
2      Q   And as we talked about earlier, particle size
3  refers to the particle diameter, subject to a number of
4  caveats, which you explained earlier?
5      A   That's correct.
6      Q   How would you control particle size to
7  achieve a reproducible dose of insulin administered to
8  the bloodstream by inhalation?
9      MS. PFEIFFER: Objection to form.
10     THE WITNESS: That would be controlled by the
11  device.
12     BY MR. WOOD:
13     Q   And how would the device control particle
14  size?
15     MS. PFEIFFER: Objection to form.
16     THE WITNESS: By the mechanics of the
17  device. The strategy that was used would influence
18  particle size.
19     BY MR. WOOD:
20     Q   What size of particles would you want to
21  obtain in order to achieve a reproducible dose
22  administered to the bloodstream by inhalation --

Page 170

1  correction -- in order achieve a reproducible dose of
2  insulin administered to the bloodstream by inhalation?
3      MS. PFEIFFER: Objection to form and asked
4  and answered.
5      THE WITNESS: As we discussed previously, the
6  range of doses that would be optimal would be point
7  five to six micrometers. You would want to make sure
8  that was reproducible in regard to not only the range
9  but the relative amounts of particles within each of
10  those sizes within that range. I mean, what would
11  probably be optimal to do would be to have a very
12  narrow range that you administered in terms of the
13  concept of reproducibility. So that if you knew you
14  always had three microns, for example, or two microns,
15  that would be -- and you could always achieve that --
16  that would be desirable. Often with these device you
17  cannot do that, so you have a range. But you want the
18  range to always be the same because that's important
19  in terms of reproducibility of delivery to the
20  bloodstream.
21     Q   How would the device be able to control
22  particle size?

19 (Pages 167 to 170)

Ronald G. Crystal, M.D.                                                January 23, 2008
                            Washington, DC

| Page 171 | Page 173 |
|---|---|
| 1      MS. PFEIFFER: Objection to form. | 1   deposition. |
| 2      THE WITNESS: That's an inherent | 2   BY MR. WOOD: |
| 3   characteristic of the device in regard to generation of | 3      Q   Well, would particle size be controlled by |
| 4   the aerosol. | 4   the device in order to achieve a reproducible dose of |
| 5      BY MR. WOOD: | 5   insulin administered to the bloodstream by inhalation? |
| 6      Q   Do you know any specific techniques that | 6      MS. PFEIFFER: Objection to form and asked |
| 7   devices have used in order to control particle size? | 7   and answered. |
| 8      MS. PFEIFFER: Objection to form. Lack of | 8      THE WITNESS: You would want the device to be |
| 9   foundation. | 9   able to generate the aerosol that would be optimal for |
| 10     THE WITNESS: I didn't review that for this | 10  the efficiency of delivery to the alveoli. And you |
| 11  deposition. | 11  would want that to be reproducible from dose to dose. |
| 12     BY MR. WOOD: | 12     BY MR. WOOD: |
| 13     Q   Is there any other way besides the inhalation | 13     Q   Are you aware of any specific techniques by |
| 14  device by which particle size can be controlled to | 14  which a device can control the particle size of dry |
| 15  influence whether a reproducible dose of insulin is | 15  insulin powder in order to achieve a reproducible dose |
| 16  administered to the bloodstream by inhalation? | 16  of insulin administered to the bloodstream by |
| 17     MS. PFEIFFER: Objection to form. | 17  inhalation? |
| 18     THE WITNESS: It would be the device itself. | 18     MS. PFEIFFER: Objection to form. |
| 19  I mean, theoretically one might be able to develop a | 19     THE WITNESS: I didn't review that for this |
| 20  device that generated an aerosol; and then after the | 20  deposition. |
| 21  aerosol is generated, filter out the ranges that you | 21     BY MR. WOOD: |
| 22  wanted. That would be theoretically possible. Whether | 22     Q   Are you aware any of ways besides the device |

| Page 172 | Page 174 |
|---|---|
| 1   it is practical or not is another issue. It would be | 1   to control the particle size of dry insulin powder to |
| 2   theoretically possible. | 2   influence whether a reproducible dose of insulin is |
| 3      BY MR. WOOD: | 3   administered to the bloodstream by inhalation? |
| 4      Q   Let's focus specifically on dry insulin | 4      MS. PFEIFFER: Objection to form and asked |
| 5   powder. How would one be able to control the particle | 5   and answered. |
| 6   size of dry insulin powder in order to influence | 6      THE WITNESS: As I answered before, I could |
| 7   whether a reproducible dose of insulin is administered | 7   theoretically -- I didn't review that for this |
| 8   to the bloodstream by inhalation? | 8   deposition. But, theoretically, one would filter the |
| 9      MS. PFEIFFER: Objection to form. | 9   aerosol prior to being inhaled and therefore modulate |
| 10     THE WITNESS: It doesn't matter how you do | 10  the sizes that were being inhaled. |
| 11  it. The important thing is it is reproducible and in | 11     BY MR. WOOD: |
| 12  the ranges that we discussed. | 12     Q   Would a person of ordinary skill in the art |
| 13     BY MR. WOOD: | 13  as of January 1993 understand that particle size is a |
| 14     Q   I am asking you how the particle size of dry | 14  factor that influences whether a reproducible dose of |
| 15  insulin powder can be controlled -- | 15  insulin is administered to the bloodstream by |
| 16     MS. PFEIFFER: Objection to form. | 16  inhalation? |
| 17     Q   -- in order to influence whether a | 17     MS. PFEIFFER: Objection to form. |
| 18  reproducible dose of insulin is administered to the | 18     THE WITNESS: Again, for all of this |
| 19  bloodstream by inhalation? | 19  discussion, I can assume the ordinary skilled person or |
| 20     MS. PFEIFFER: Objection to form. | 20  ordinary skilled in the art is as we have defined it? |
| 21     THE WITNESS: You are asking me about design | 21     BY MR. WOOD: |
| 22  of the device. And I didn't review that for this | 22     Q   Yes. |

                                                      20  (Pages 171 to 174)

Ronald G. Crystal, M.D.                                                    January 23, 2008
                              Washington, DC

---

**Page 175**

1    A   Yes. Then the answer is yes.

2    Q   Would a person of ordinary skill in the art

3  as of January 1993 know how to control particle size to

4  influence whether a reproducible dose of insulin is

5  administered to the bloodstream by inhalation?

6        MS. PFEIFFER: Objection to form.

7        THE WITNESS: Yes.

8        BY MR. WOOD:

9    Q   In paragraph 52, you indicate that the

10 concentration of the drug in the carrier influences

11 whether a reproducible dose of insulin is administered

12 to the bloodstream by inhalation.

13       Do you see that?

14   A   Yes.

15   Q   Let me back up and go back to particle size.

16 Can you control particle size by controlling the

17 formulation of the dry insulin powder?

18       MS. PFEIFFER: Objection to form.

19       THE WITNESS: Possibly.

20       BY MR. WOOD:

21   Q   How would you do that?

22       MS. PFEIFFER: Objection to form.

---

**Page 176**

1        THE WITNESS: I didn't review that for this

2  deposition. But depending on what you added to the

3  insulin, you can influence all the factors that we

4  discussed before.

5        BY MR. WOOD:

6    Q   I just want to clarify that as of January

7  1993, you did not know whether dry insulin powder was

8  made; is that correct?

9        MS. PFEIFFER: Objection to form. Lack of

10 foundation.

11       THE WITNESS: You asked me whether or not one

12 could dry. I said before that period, you could --

13 drying proteins was not -- it was a technology that was

14 widely used. Whether or not that was applicable to

15 insulin, whether it would keep insulin in the proper

16 form and so on, I don't know.

17       BY MR. WOOD:

18   Q   Do you know or did you know as of January

19 1993 about specific dry insulin powder formulations?

20   A   I don't know specifically.

21   Q   You did not know in January 1993

22 specifically — well, let me strike that. You are

---

**Page 177**

1  saying you don't know sitting here today about insulin

2  specific formulations of dry insulin powder?

3    A   That's correct.

4    Q   And you don't know sitting here today about

5  specific formulations of dry insulin powder that may

6  have existed as of January 1993?

7    A   That's correct.

8    Q   The concentration of the drug in the carrier

9  influences whether a reproducible dose of insulin is

10 administered to the bloodstream by inhalation; is that

11 correct?

12   A   That is correct.

13   Q   What do you mean the concentration of the

14 drug in the carrier?

15   A   The amount of insulin in the formulation.

16   Q   The dry insulin powder formulation?

17       MS. PFEIFFER: Objection to form.

18       THE WITNESS: If that's what you are asking

19 me to refer to, yes.

20       BY MR. WOOD:

21   Q   Is that -- I am just asking you if that's

22 what you meant by saying the amount of insulin in the

---

**Page 178**

1  formulation?

2    A   It could be dry insulin powder or it could be

3  liquid. It could be anything.

4    Q   Okay. How does the concentration of the drug

5  in the carrier influence whether a reproducible dose of

6  insulin is administered to the bloodstream?

7    A   Because it would influence -- it may

8  influence the amount that would could be aerosolized in

9  a reproducible fashion in the form that would be

10 efficiently delivered to the alveoli. It could have a

11 major effect on all of those factors.

12   Q   How would you control the concentration of

13 the drug in the carrier in order to influence whether a

14 reproducible dose of insulin is administered to the

15 bloodstream by inhalation?

16       MS. PFEIFFER: Objection to form.

17       THE WITNESS: I am not sure I understand what

18 you mean. I mean, what you would do, you would have to

19 determine for your device whether your device was

20 generating in an aerosol with all the various

21 parameters we have discussed relevant to reproducibly

22 delivering insulin to the bloodstream. You would then

---

21 (Pages 175 to 178)

Ronald G. Crystal, M.D.                                                    January 23, 2008
                              Washington, DC

Page 179

1  say what are the concentrations of insulin in the
2  carrier that I would need to be able to achieve that.
3  And then you would ask the question, do you deliver a
4  reproducible amount of insulin over this whole range of
5  concentrations to the aerosol, in other words, because
6  the concentration may significantly affect the ability
7  of the device to aerosolize the insulin in a
8  reproducible fashion.
9      Q   How would the concentration significantly
10 influence the reproducibility of the dose?
11     MS. PFEIFFER: Objection to form.
12     THE WITNESS: By dose we are talking about
13 aerosol?
14     BY MR. WOOD:
15     Q   Yes.
16     A   The dose of the aerosol. Because at high
17 concentrations, it may aggregate. At low
18 concentrations, it might never leave the device. It
19 may impact on the walls. There are multiple different
20 factors that would have to be evaluated.
21     Q   If you used the same dry insulin powder
22 formulation across multiple doses, would that be a way

Page 180

1  to control the concentration of the drug in the carrier
2  in order to achieve a reproducible dose of insulin
3  administered to the bloodstream by inhalation?
4      MS. PFEIFFER: Objection to form.
5      THE WITNESS: It may or may not. But it
6  would have to be evaluated. The critical thing is the
7  amount that you can reproducibly deliver to the
8  bloodstream.
9      BY MR. WOOD:
10     Q   If you use the same dry insulin powder
11 formulation across multiple doses, would you be
12 controlling the concentration of the drug in the
13 carrier?
14     MS. PFEIFFER: Objection to form.
15     THE WITNESS: I am not sure I understand the
16 question. You are asking me if you put in a certain
17 amount, does that control the amount you put in? I
18 think you are asking me the same question.
19     BY MR. WOOD:
20     Q   It is not exactly the same question, so let
21 me try it again. If you use the same dry insulin
22 powder formulation across multiple doses for each of

Page 181

1  the multiple doses, would that be a way to control the
2  concentration of the drug in the carrier?
3      A   Yes.
4      Q   Would a person of ordinary skill in the art
5  in January 1993 understand that the concentration of
6  the drug in the carrier influences whether a
7  reproducible dose of insulin is administered to the
8  bloodstream by inhalation?
9      MS. PFEIFFER: Objection to form.
10     THE WITNESS: Yes. But let me just clarify
11 my answer to the prior question. You asked me whether
12 or not using the same formulation whether you could
13 achieve the same concentration within the device.
14 That's true as I answered with the caveat that at very
15 low doses, it may adhere to the walls. And, therefore,
16 the concentration within what you are going to
17 aerosolize might differ.
18     Likewise, at very high concentration, at
19 higher concentrations, it might aggregate it as an
20 example. And then it could not be aerosolized in an
21 appropriate fashion. So there is a caveat to the
22 answer.

Page 182

1      BY MR. WOOD:
2      Q   Okay. Did you fully answer the question that
3  I just posed?
4      A   I believe I did, yes.
5      Q   Would a person of ordinary skill in the art
6  know how to control the concentration of the drug in
7  the carrier to influence whether a reproducible dose of
8  insulin is administered to the bloodstream by
9  inhalation?
10     MS. PFEIFFER: Objection to form.
11     THE WITNESS: Yes.
12     BY MR. WOOD:
13     Q   Let's move on to the factor you have
14 identified in paragraph 52, the point in the
15 respiration cycle where the patient initiates
16 inhalation. How does the point in -- first of all,
17 what do you mean by the point in the respiration cycle
18 where the patient initiates inhalation?
19     A   The respiration cycle refers to the process
20 of -- the normal process of breathing. And so when we
21 breathe in and out, that is a cycle -- in, out; in,
22 out. So the air comes in, and then at some point the

22 (Pages 179 to 182)

Ronald G. Crystal, M.D.                                                                January 23, 2008
Washington, DC

| Page 183 | Page 185 |
|---|---|

**Page 183**

1  air comes out. That's the respiratory cycle.
2      Q   So I take it a patient can initiate
3  inhalation at different points in the respiration
4  cycle?
5      A   Theoretically, yes.
6      Q   And if you control the point in the
7  respiration cycle where the patient initiates
8  inhalation, you can influence whether a reproducible
9  dose of insulin is administered to the bloodstream by
10  inhalation; is that correct?
11      MS. PFEIFFER: Objection to form.
12      THE WITNESS: Yes. I mean, at points in the
13  respiratory cycle, that may be better. But it would be
14  device dependent.
15      BY MR. WOOD:
16      Q   Okay. How would you control the point in the
17  respiration cycle where the patient initiates
18  inhalation?
19      MS. PFEIFFER: Objection to form.
20      THE WITNESS: Well, theoretically you could
21  do it by instructing the patient or by controlling it
22  at the device. I guess, theoretically you could devise

**Page 185**

1      THE WITNESS: No, because the devices may
2  vary in terms of their sort of strategy they would
3  use. They may vary.
4      BY MR. WOOD:
5      Q   Okay. So for one device you would instruct
6  the witness to -- strike that. So for one particular
7  device, you would -- or the patient would be instructed
8  to initiate inhalation at one point in the respiration
9  cycle in order to achieve a reproducible dose of
10  insulin administered to the bloodstream by inhalation,
11  but the patient might be instructed to initiate
12  inhalation at a different point in the respiration
13  cycle for a different device?
14      MS. PFEIFFER: Objection to form.
15      THE WITNESS: It is theoretically possible.
16  It would depend very much on the devices in terms of
17  the way you would strategize it.
18      BY MR. WOOD:
19      Q   Would a person of ordinary skill in the art
20  as of January 1993 understand that the point in the
21  respiration cycle where the patient initiates
22  inhalation influences whether a reproducible dose of

**Page 184**

1  a device that would only allow inhalation at certain
2  points during the respiratory cycle.
3      BY MR. WOOD:
4      Q   Is there a particular point in the
5  inhalation -- I am sorry. Let's start again. Is there
6  a particular point in the respiration cycle at which
7  the patient can initiate insulation which would
8  influence -- correction -- would achieve a reproducible
9  dose of insulin administered to the bloodstream by
10  inhalation that would work across different inhalation
11  devices?
12      MS. PFEIFFER: Objection to form.
13      THE WITNESS: It may or may not. It depends
14  on the devices.
15      BY MR. WOOD:
16      Q   Are you aware of any such point in the
17  respiration cycle at which the patient can initiate the
18  inhalation that would achieve reproducible doses of
19  insulin administered to the bloodstream by inhalation
20  that would work across any subset of inhalation
21  devices?
22      MS. PFEIFFER: Objection to form.

**Page 186**

1  insulin is administered to the bloodstream by
2  inhalation?
3      MS. PFEIFFER: Objection to form.
4      THE WITNESS: Yes.
5      BY MR. WOOD:
6      Q   Would a person of ordinary skill in the art
7  as of January 1993 understand how to control the point
8  in the respiration cycle where the patient initiates
9  inhalation in order to achieve a reproducible dose of
10  insulin administered to the bloodstream by inhalation?
11      MS. PFEIFFER: Objection to form.
12      THE WITNESS: Yes.
13      BY MR. WOOD:
14      Q   Can a reproducible dose of insulin
15  administered to the bloodstream by inhalation be
16  achieved without controlling the factors identified in
17  paragraph 52 of your expert report, which is marked as
18  Crystal Exhibit 1?
19      MS. PFEIFFER: Objection to form.
20      THE WITNESS: By the word reproducible, we
21  are talking about the reproducible dose that reaches
22  the bloodstream?

23  (Pages 183 to 186)

Ronald G. Crystal, M.D.
Washington, DC
January 23, 2008

## Page 187

1     BY MR. WOOD:
2     Q   Yes.
3     A   No.
4     Q   How could you tell if you are getting
5   reproducible doses?
6     A   To the bloodstream?
7     Q   Yes.
8     A   Of insulin?
9     Q   Yes.
10    A   You mean as you are developing the device and
11  the strategy?
12    Q   Sure.
13    A   You measure it.
14    Q   And how would you measure it?
15    A   You measure the amount of insulin.
16    Q   Amount of insulin where?
17    A   In the blood.
18    Q   Would you measure anything else?
19    A   Well, I am making the -- assuming that the
20  insulin is active that you are measuring it.  But you
21  would also evaluate the consequences of the insulin,
22  which would be the levels of blood sugar.

## Page 188

1     Q   Are there any other ways that you could tell
2   if you are getting reproducible doses of insulin?
3     A   No.
4     Q   If you -- can you administer insulin to the
5   bloodstream by inhalation to animals and reach a
6   conclusion as to whether or not you would be able to
7   achieve reproducible dosing to humans?
8       MS. PFEIFFER:  Objection to form.
9       THE WITNESS:  With the device, maneuvers,
10  everything?  Taking everything in consideration?  No,
11  you would have to do the studies eventually in humans.
12      BY MR. WOOD:
13    Q   Can you use computer modeling to determine
14  whether or not you are achieving reproducible dosing?
15      MS. PFEIFFER:  Objection to form.
16      THE WITNESS:  No.  I mean, you can use
17  computer modelling to give you some general estimates.
18  But that's a far cry from actually achieving the
19  results that you want in a reproducible fashion.  You
20  would have to do the studies in humans.
21      BY MR. WOOD:
22    Q   In humans?

## Page 189

1     A   Eventually, yes.
2       MR. WOOD:  Why don't we take a quick break,
3   and I might be able to finish up here pretty quickly.
4       (A recess was held.)
5       BY MR. WOOD:
6     Q   Regarding the factors that are identified in
7   paragraph 52, can you identify any factor or factors
8   that are more important than the others?
9     A   No.  You could set up a hierarchy, but it
10  would be device dependent.
11    Q   So for one device, one factor would be the
12  most important.  But for another device, a different
13  factor would be the most important?
14    A   That's correct.
15    Q   Do you know Igor Gonda on Reid Rubsamen or
16  Stephen Farr?
17    A   Igor Gonda --
18      MS. PFEIFFER:  Objection to form.
19      THE WITNESS:  The second name is?
20      BY MR. WOOD:
21    Q   Well, let me list the names again.  Igor
22  Gonda, Reid Rubsamen, and Stephen Farr.  Do you know

## Page 190

1   any of those individuals?
2       MS. PFEIFFER:  Objection.
3       THE WITNESS:  Of those three individuals, I
4   know Gonda.
5       BY MR. WOOD:
6     Q   How do you know Igor Gonda?
7     A   I met him at Genentech when I was consulting
8   there in the late '80s, I think it was.  And he wrote a
9   chapter in a book that I edited relating to his
10  expertise.  I haven't had any contact with him in
11  years.
12    Q   Okay.  So you have not talked with any of
13  those gentlemen in connection with the preparation of
14  your expert report or the formulation of your expert
15  opinions in this case?
16      MS. PFEIFFER:  Objection to form.
17      THE WITNESS:  No, no.
18      BY MR. WOOD:
19    Q   If you could turn to Crystal Exhibit 4,
20  please.
21    A   Could you tell me what it is?
22    Q   Oh, yes.  It is your list of testimonies.

24 (Pages 187 to 190)

Ronald G. Crystal, M.D.

January 23, 2008

Washington, DC

Page 191

1    A    Okay.

2    Q    With the exception of Novo Nordisk versus

3  Pfizer, which is the fifth item on this list, did any

4  of the other items involve the administration of

5  insulin to the bloodstream via inhalation to the lungs?

6    A    No.

7    Q    And prior to 2003, you provided testimony in

8  other cases; is that correct?

9        MS. PFEIFFER: Objection to form.

10       BY MR. WOOD:

11   Q    Prior to 2003, you provided testimony in

12  cases that are not listed in Crystal Exhibit 4?

13   A    Yes.

14   Q    Did any of those cases involve the

15  administration of insulin to the bloodstream via

16  inhalation to the lungs?

17   A    No.

18   Q    Did they involve the administration of any

19  medicine to the bloodstream via inhalation to the

20  lungs?

21   A    Not that I am aware of.

22   Q    Okay. If you could turn to paragraph 40 of

Page 192

1  your expert report.

2    A    Okay.

3    Q    In paragraph 40, you state, I then address --

4  well, in paragraph 40, you are stating that the Board

5  erred in concluding that the referenced Velasquez

6  taught the claim limitation quote, The aerosolized

7  suspension contains an amount of insulin that is 2 to

8  10 times higher than the amount need to be absorbed

9  into the bloodstream of the patient, closed quote.

10       And you refer to that as the 2 to 10

11  limitation; is that correct?

12       MS. PFEIFFER: Objection to form.

13       THE WITNESS: Yes.

14       BY MR. WOOD:

15   Q    In formulating your opinion, did you

16  formulate an opinion as to the meaning of the 2 to 10

17  limitation?

18   A    Yes.

19   Q    And what is that opinion?

20   A    That in Velasquez it is referring to -- what

21  the Board is referring to is the amount of aerosolized

22  suspension, based on the device, and erroneously

Page 193

1  concluded that that was equivalent to the amount that

2  would be delivered to the blood.

3    Q    Did you formulate an opinion as to the

4  meaning of the 2 to 10 limitation as it is used in the

5  claims on appeal?

6        MS. PFEIFFER: Objection to form.

7        THE WITNESS: I would have to look

8  specifically. I wasn't asked to evaluate that. I

9  evaluated the Board decision only. So I didn't

10  evaluate it in that context that you are asking.

11       BY MR. WOOD:

12   Q    Okay. Well, let's take a look at Crystal

13  Exhibit 6, the front page which is entitled Amendment

14  After Final.

15   A    I have it.

16   Q    All right. And Crystal Exhibit 6 was

17  attached as Exhibit 5 to your expert report.

18       MS. PFEIFFER: Objection to form.

19       BY MR. WOOD:

20   Q    Is that correct?

21   A    I don't -- I will accept that if you say it's

22  true. I don't know.

Page 194

1    Q    If you could look at Claim 22.

2    A    Okay.

3    Q    And, specifically, I think the subparagraph B

4  of Claim 22.

5    A    Yes.

6    Q    And the phrase "wherein the aerosolized

7  suspension contains an amount of insulin that is 2 to

8  10 times higher than the amount needed to be absorbed

9  into the bloodstream of the patient"?

10   A    Yes.

11   Q    Did you formulate an opinion as to -- first

12  of all, is that what you are considering, the 2 to 10

13  limitation, that phrase that I just read into the

14  record?

15       MS. PFEIFFER: Objection to form.

16       THE WITNESS: Well, I am not -- I didn't look

17  at this in the context of the -- specifically at this.

18  If I -- just so I understand what you are asking, in

19  terms of what we just talked about before, which is

20  paragraph 40 on page 12 of my report, this is claim

21  Velasquez -- I was asked to look at what the Board's

22  view of what Velasquez taught relating to this. And

25  (Pages 191 to 194)

Ronald G. Crystal, M.D.

January 23, 2008

Washington, DC

| Page 195 | Page 197 |
|---|---|
| 1 what this talks about is a 2 to 10 times higher. Then, | 1 AFFIDAVIT OF DEPONENT |
| 2 yes, I think we are saying the same thing. | 2 |
| 3 BY MR. WOOD: | 3 I have read the foregoing deposition, which |
| 4 Q Let me try to ask it in this way. Did you | 4 contains a correct transcription of the answers given |
| 5 formulate an opinion about what the phrase quote, | 5 by me to the questions therein recorded, except as to |
| 6 wherein the aerosolized suspension contains an amount | 6 errors which may be indicated on any attached errata |
| 7 of insulin that is 2 to 10 times higher than the amount | 7 sheet. |
| 8 needed to be absorbed in the bloodstream of the | 8 |
| 9 patient, closed quote, means in the context of Claim | 9 _____ |
| 10 22? | 10 RONALD G. CRYSTAL, M.D. |
| 11 MS. PFEIFFER: Objection to form. | 11 |
| 12 THE WITNESS: No. What I was saying was that | 12 Subscribed and sworn to before me this _____ |
| 13 the Board erroneously concluded that Velasquez by that | 13 day of_____, 20___, in _____. |
| 14 2 to 10 referred to, in the context of Velasquez, was | 14 |
| 15 the amount that was aerosolized. In contrast, | 15 |
| 16 Velasquez does not teach anything about delivery of a | 16 _____ |
| 17 precise amount to the blood. What's referred to as the | 17 Notary Public |
| 18 2 to 10 times higher in paragraph 22, which I discuss | 18 |
| 19 here, is specifically talking about delivery to the | 19 |
| 20 blood. | 20 My Commission Expires: |
| 21 MR. WOOD: I see. That's all I have. | 21 _____, 20___ |
| 22 MS. PFEIFFER: I have nothing. | 22 |

Page 196

1 (Discussion was held off the record.)

2 (At 11:02 a.m., the deposition was

3 concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

26 (Pages 195 to 197)

# Exhibit 2
## Part 3 of 3

Ronald G. Crystal, M.D.

Washington, DC

January 23, 2008

Page 198

| **A** | 144:20 188:14 | 142:20 143:2 | 197:1 | 142:19,21 |
|---|---|---|---|---|
| ability 136:15 | 188:18 | 147:7,7,19 | aggregate 137:1 | 143:2,6 145:15 |
| 179:6 | acids 119:10,10 | 148:15 149:6 | 137:1 179:17 | 149:8,14,16,20 |
| able 130:1 134:4 | 119:11 | 151:21 153:12 | 181:19 | 150:6,14 151:2 |
| 137:17 143:12 | active 187:20 | 154:20 155:9 | ago 106:4 | 151:8 153:20 |
| 149:11 150:2 | add 138:21 | 160:6,7,11 | 117:16 | 153:20 154:2,2 |
| 153:11 159:17 | added 176:2 | 171:4,20,21 | air 110:15,19 | 154:5,6,9,10 |
| 160:4,9 161:12 | addition 115:20 | 173:9 174:9 | 115:21 137:14 | 154:11,16,21 |
| 162:2 170:21 | 130:6 | 178:20 179:5 | 182:22 183:1 | 154:22 155:1,2 |
| 171:19 172:5 | additional 125:9 | 179:13,16 | airstream 138:6 | 155:6,8,9,10 |
| 173:9 179:2 | address 192:3 | aerosolization | airways 110:1,7 | 155:14,15,15 |
| 188:6 189:3 | adhere 181:15 | 155:2 | 122:22 123:3 | 155:17,18,19 |
| above-entitled | adjourned | aerosolize | 123:18 138:3,4 | 155:19,20,21 |
| 98:18 | 102:13,16 | 127:16 128:12 | 138:7 | 155:22 156:4 |
| absorbed 118:9 | administer | 179:7 181:17 | Alexandria | 157:12 158:21 |
| 121:11,21 | 188:4 | aerosolized | 100:8 | 162:15 177:15 |
| 154:6 192:8 | administered | 110:13 111:4 | allow 162:18 | 177:22 178:8 |
| 194:8 195:8 | 110:12 124:22 | 115:21 117:4 | 184:1 | 179:4 180:7,17 |
| absorption | 125:10 141:21 | 124:8,9 125:1 | alpha-1 120:14 | 180:17 187:15 |
| 118:16 | 142:9 156:19 | 126:16,18 | alveoli 111:7,18 | 187:16 192:7,8 |
| accept 120:21 | 164:1,16 165:7 | 127:2,8,20 | 111:19,20 | 192:21 193:1 |
| 151:13 193:21 | 166:2 168:1,9 | 129:3,5,7,20 | 112:22 114:3 | 194:7,8 195:6 |
| acceptable | 168:16 169:7 | 130:6,9 131:18 | 114:11 115:8 | 195:7,15,17 |
| 150:1 | 169:22 170:2 | 132:3 136:22 | 115:20 116:2 | amounts 151:18 |
| accomplished | 170:12 171:16 | 149:9,14,16 | 116:19,21 | 152:1 153:4,5 |
| 124:6 146:13 | 172:7,18 173:5 | 150:6,15 151:2 | 117:6,14,15 | 170:9 |
| accomplishes | 173:16 174:3 | 151:8 154:2,5 | 118:8,17 | **ANDREWS** |
| 127:10 128:4 | 174:15 175:5 | 154:11 155:3 | 119:17 121:11 | 98:19,22 |
| accomplishing | 175:11 177:10 | 155:15,18,19 | 121:21 123:4,9 | animals 114:18 |
| 129:8 130:10 | 178:6,14 180:3 | 155:21 156:2 | 136:5,5,6 | 188:5 |
| account 154:1 | 181:7 182:8 | 159:20 178:8 | 137:2,18 138:8 | answer 105:18 |
| achieve 112:1 | 183:9 184:9,19 | 181:20 192:6 | 142:21 143:3,6 | 127:19 145:11 |
| 124:12 130:1 | 185:10 186:1 | 192:21 194:6 | 143:13,17 | 164:10 175:1 |
| 132:21 134:3,4 | 186:10,15 | 195:6,15 | 158:22 159:21 | 181:11,22 |
| 144:2,9 160:22 | administration | aerosolizing | 173:10 178:10 | 182:2 |
| 162:8 163:1,8 | 191:4,15,18 | 130:19 | amended 103:10 | answered 108:7 |
| 168:9 169:7,21 | advantageous | affect 108:17 | **Amendment** | 149:2 170:4 |
| 170:1,15 173:4 | 111:17 | 115:22 116:4 | 193:13 | 173:7 174:5,6 |
| 173:15 179:2 | Aerodyne | 118:16 121:10 | amino 119:10,10 | 181:14 |
| 180:2 181:13 | 106:10,13 | 121:20 122:7 | 119:11 | answers 197:4 |
| 184:8,18 185:9 | aerosol 112:20 | 122:10,13 | amount 116:1 | antitrypsin |
| 186:9 188:7 | 121:21 132:10 | 133:12,17,20 | 125:1 127:7,15 | 120:15 |
| achieved 164:2 | 133:6,7 137:15 | 136:19 137:3,9 | 127:19 128:2 | anti-immune |
| 164:4 186:16 | 138:21 139:13 | 179:6 | 129:15 132:2,2 | 109:22 |
| achieving | 140:2 142:20 | **AFFIDAVIT** | 133:5,6,8 | anti-inflamma... |

Ronald G. Crystal, M.D.

Washington, DC

109:22
**appeal** 103:10
  193:5
**APPEARAN...**
  99:1 100:1
**applicable** 132:9
  151:15 176:14
**application**
  103:9,13,19,20
  104:16,19
  105:3,6,9
  111:6 117:1
  122:20 123:1
  145:3 164:8
**apply** 132:10
**appropriate**
  111:15 181:21
**approximately**
  114:3,11,19
  115:8 120:14
**art** 115:7 121:18
  122:12 123:8
  123:13 150:13
  151:7 164:14
  164:20,22
  165:15,16,19
  165:22 167:21
  168:6 174:12
  174:20 175:2
  181:4 182:5
  185:19 186:6
**articulate** 132:5
**asked** 105:13,20
  108:6 128:10
  148:7 170:3
  173:6 174:4
  176:11 181:11
  193:8 194:21
**asking** 131:15
  145:8 146:9
  150:9 151:16
  153:19 172:14
  172:21 177:18
  177:21 180:16
  180:18 193:10

194:18
**associated** 109:1
  110:3
**assume** 151:20
  154:1 174:19
**assuming**
  187:19
**asthma** 110:1
**attached** 103:11
  119:12,12
  193:17 197:6
**Attorney's**
  100:12
**available** 109:10
**Avenue** 98:20
  99:6
**aware** 123:14
  134:15,19
  135:12,15
  141:8 156:1
  162:21 173:13
  173:22 184:16
  191:21
**a.m** 98:21 196:2
**A/S** 98:4

_____ **B** _____
**B** 163:17 194:3
**back** 122:5,6,9
  126:13 127:18
  138:1 140:5
  143:9 146:11
  175:15,15
**barrier** 120:19
**based** 115:11
  192:22
**basic** 109:20
**basically** 109:18
  126:5 154:2
**begins** 104:15
**behalf** 99:2
  100:2
**believe** 104:10
  107:12 145:13
  152:14 182:4

**BENJAMIN**
  100:3
**better** 183:13
**billion** 141:1
**bit** 127:18
**BLANCHE**
  100:11
**blood** 118:18
  119:4 120:16
  120:16 133:4,9
  136:14,16
  147:9 149:12
  150:3 158:8
  166:6 187:17
  187:22 193:2
  195:17,20
**bloodstream**
  108:11,18
  118:9 121:12
  121:22 124:22
  125:11 128:9
  128:18 129:15
  129:17 130:4
  130:16,20
  131:4,9 132:1
  132:7,11 134:5
  141:7,21 142:9
  144:4,10,21
  145:17 146:2
  147:3,20
  148:19 152:1
  153:6,9 154:7
  156:3,19 161:1
  161:13,16
  162:4,8,14,20
  163:2,9,20
  164:2,5,17
  165:8 166:3
  167:13,18
  168:2,10,16
  169:8,22 170:2
  170:20 171:16
  172:8,19 173:5
  173:16 174:3
  174:15 175:5

175:12 177:10
  178:6,15,22
  180:3,8 181:8
  182:8 183:9
  184:9,19
  185:10 186:1
  186:10,15,22
  187:6 188:5
  191:5,15,19
  192:9 194:9
  195:8
**Board** 103:13
  192:4,21 193:9
  195:13
**Board's** 194:21
**body** 119:2,8
**book** 190:9
**branch** 138:3
**branching**
  137:12,13,13
  137:13 138:4
**break** 106:20
  156:9 189:2
**breaking** 111:14
**breath** 137:21
**breathe** 159:11
  159:18 182:21
**breathing**
  143:13 159:4,5
  182:20
**bring** 115:1
  167:15
**broad** 99:13
  119:21
**broken** 135:9,10
**bronchi** 143:10
**BRUCE** 100:11
**bunch** 104:3

_____ **C** _____
**called** 98:18
  102:4 119:2
**capable** 123:2
**capital** 119:2,3
**captured** 131:12

**carbohydrates**
  119:11 120:11
**CARLA** 98:19
  98:22
**carried** 115:19
**carrier** 125:6
  175:10 177:8
  177:14 178:5
  178:13 179:2
  180:1,13 181:2
  181:6 182:7
**case** 98:6 140:18
  190:15
**cases** 191:8,12
  191:14
**caveat** 122:19
  123:6 181:14
  181:21
**caveats** 113:20
  120:11 126:10
  153:21 155:22
  169:4
**Center** 99:19
**certain** 131:6
  145:15 149:3
  155:8 180:16
  184:1
**change** 133:7
  134:8,16,20
  135:3,7,10,13
  139:22 140:19
  141:9 142:20
  142:22 143:3
**changes** 134:11
  134:12 143:6
**chapter** 190:9
**characteristic**
  171:3
**characteristics**
  126:21 142:13
  142:14
**characterize**
  152:15
**characterizing**
  153:16

Ronald G. Crystal, M.D.

Washington, DC

116:8 120:11
121:4 126:20
131:6,11
132:14 133:17
135:3,10,21,22
136:2,6,8,10
136:10,18,21
137:4 138:11
139:8,16 140:6
140:9 141:9
**chemical** 111:16
126:21
**chronic** 110:2
**CKK** 98:7
**claim** 192:6
194:1,4,20
195:9
**claims** 103:10
193:5
**clarify** 113:16
132:13 176:6
181:10
**closed** 192:9
195:9
**Colleen** 98:8
**Columbia** 98:2
98:20
**column** 104:15
104:16
**combined**
117:17,18
**Combines**
117:10
**come** 140:16
**comes** 117:5
141:5 152:7
182:22 183:1
**Commerce** 98:8
**Commission**
197:20
**compared** 141:1
142:18 154:6
**comparison**
166:19
**compatible**

159:20
**complete** 103:15
**complex** 113:14
137:17
**complexity**
153:1
**compressed**
110:19
**comprised** 119:9
**computer**
188:13,17
**concentration**
125:6 175:10
177:8,13 178:4
178:12 179:6,9
180:1,12 181:2
181:5,13,16,18
182:6
**concentrations**
179:1,5,17,18
181:19
**concept** 109:20
109:21 113:14
120:13 129:14
133:3 151:14
162:13 170:13
**concepts** 109:17
**concluded** 193:1
195:13 196:3
**concluding**
192:5
**conclusion**
188:6
**confuse** 129:13
131:19
**confusion** 128:7
**connection**
190:13
**consequences**
187:21
**consider** 105:20
142:3
**consideration**
188:10
**considered**

103:7,16 104:1
**considering**
107:10 194:12
**constant** 157:9
**consulting**
105:22 106:9
190:7
**contact** 117:6
190:10
**contain** 111:2
**containing**
110:17
**contains** 192:7
194:7 195:6
197:4
**context** 123:5
131:21 133:19
154:10,18
193:10 194:17
195:9,14
**continue** 121:2,7
**Continued**
98:17 100:1
**contrast** 195:15
**control** 118:7
119:19 127:7
128:2 132:20
138:22 139:6,8
139:10 140:8,9
140:13,14
144:1 145:22
146:6 147:1
158:15,20
159:1,13 160:2
160:9,13
162:15 166:22
167:2 168:7
169:6,13
170:21 171:7
172:5 173:14
174:1 175:3,16
178:12 180:1
180:17 181:1
182:6 183:6,16
186:7

**controlled**
124:11 133:5
157:13,19
158:2 166:14
169:10 171:14
172:15 173:3
**controlling**
124:6 127:9
139:16 144:8
146:13,16,18
146:19 147:5
147:14 148:1,8
148:8,11,17
149:4,6,8,16
149:20 175:16
180:12 183:21
186:16
**convert** 154:19
**converted**
110:14
**correct** 106:8,17
113:6 114:4
127:13,22
128:5 129:6,11
130:8,11
131:13,14,18
132:16,18,21
147:15 148:19
156:5,21 157:1
160:2 161:8
168:17,22
169:5 176:8
177:3,7,11,12
183:10 189:14
191:8 192:11
193:20 197:4
**correction**
117:16 126:4
141:22 170:1
184:8
**corticosteroids**
109:21 110:4,6
**cost** 153:1
**counsel** 98:18
101:2 102:7,12

109:7 113:7
**COURT** 98:1
**critical** 104:8
128:14,19
129:14 131:3
131:22 132:6
133:4 136:13
145:17 153:3
158:8,18 161:1
161:4,10,11,14
161:14,15
162:1,4,19
163:18 180:6
**Cromwell** 98:20
99:5,12
**cross** 118:17
119:4
**cry** 188:18
**Crystal** 98:17
101:3 102:3,9
103:1,2 104:11
113:12 156:14
186:18 190:19
191:12 193:12
193:16 197:10
**current** 109:16
**curriculum**
107:13,18,19
**cycle** 125:7
182:15,17,19
182:21 183:1,4
183:7,13,17
184:2,6,17
185:9,13,21
186:8
**C-O-N-T-E-N...**
101:1

---

**D**
**dalton** 120:20
**daltons** 120:4
**Darby** 99:18,18
**data** 104:17
109:18 119:16
**day** 197:13

Ronald G. Crystal, M.D.

Washington, DC

January 23, 2008

Page 201

| | | | | |
|---|---|---|---|---|
| **days** 126:22 | 143:20 183:14 | **device** 108:21 | 178:19,19 | **Director** 98:10 |
| **deal** 141:1 | 189:10 | 125:2 127:3,8 | 179:7,18 | **discuss** 102:11 |
| **decide** 113:9 | **depending** | 127:15,20 | 181:13 183:14 | 195:18 |
| **decision** 103:14 | 111:6 118:22 | 128:10,13 | 183:22 184:1 | **discussed** |
| 193:9 | 120:11 127:15 | 129:2,7,18 | 185:5,7,13 | 110:22 111:10 |
| **defend** 138:1 | 129:15,17 | 130:1,3,7,9,15 | 187:10 188:9 | 113:13 116:6 |
| **Defendant** 98:12 | 133:8 134:1,2 | 130:18,22 | 189:10,11,12 | 126:11 137:11 |
| 98:18 100:2 | 135:6,8 136:21 | 131:5,18 132:7 | 192:22 | 150:21 152:9 |
| 101:3 102:7 | 139:19,22 | 132:10 133:1,7 | **devices** 162:9 | 155:22 156:17 |
| **defenses** 137:20 | 140:20 147:18 | 133:12,17,20 | 171:7 184:11 | 167:14 170:5 |
| **define** 122:20 | 158:5 176:2 | 134:8,15,19 | 184:14,21 | 172:12 176:4 |
| 123:1,5 | **depends** 130:14 | 135:3,7,12,15 | 185:1,16 | 178:21 |
| **defined** 165:16 | 131:3 133:2,2 | 135:17 136:15 | **devise** 183:22 | **discusses** 107:17 |
| 174:20 | 148:4 164:7 | 136:22 137:3 | **diabetes** 158:9 | **discussing** |
| **defining** 164:22 | 167:13 184:13 | 141:8 143:20 | 162:5 | 122:21 126:22 |
| **definition** 165:1 | **DEPONENT** | 144:15 145:3 | **diabetic** 145:18 | 129:19 143:21 |
| **deliver** 128:14 | 197:1 | 145:12,14,15 | 151:16,18,22 | 154:10,18 |
| 130:16 133:9 | **deposited** 116:1 | 145:21 146:21 | **diameter** 113:2 | **discussion** 122:6 |
| 137:14 143:12 | 116:5 122:8,11 | 147:13 148:1,5 | 113:13,15,18 | 174:19 196:1 |
| 145:16 147:19 | 122:14 136:19 | 148:10 149:9 | 114:12 115:9 | **disease** 110:3 |
| 153:5,8 162:3 | 137:10 | 149:14,15,17 | 126:8 169:3 | **disorders** 110:1 |
| 179:3 180:7 | **deposition** 98:17 | 150:5,7,14,15 | **dichotomous** | 110:3 |
| **delivered** 142:21 | 109:16 112:4 | 150:22 151:2,2 | 137:12 | **dissolve** 117:19 |
| 143:3,6 178:10 | 115:2 171:11 | 151:7,8,15,17 | **differ** 181:17 | **dissolved** 110:16 |
| 193:2 | 173:1,20 174:8 | 151:19,21 | **different** 104:7 | **dissolves** 117:6 |
| **delivering** 138:8 | 176:2 196:2 | 152:6,8,11,14 | 110:5 116:7 | 117:9 |
| 162:13 178:22 | 197:3 | 152:16 153:2,4 | 128:11 129:1 | **distal** 160:10 |
| **delivery** 136:1,4 | **described** 124:4 | 153:6,10,17,22 | 131:21 137:2 | **District** 98:1,2 |
| 142:14 147:9 | **design** 172:21 | 154:5,11,12,15 | 143:8 144:13 | 98:19 |
| 158:7 160:22 | **designing** | 154:16,17,18 | 144:14,15 | **document** 104:2 |
| 162:19 163:19 | 122:22 123:3 | 154:20,22 | 152:6 162:9 | 104:21 |
| 167:12,17 | **desirable** 170:16 | 155:3,7,8 | 163:16 179:19 | **documents** |
| 170:19 173:10 | **destroy** 153:22 | 158:15 159:21 | 183:3 184:10 | 102:15 103:8 |
| 195:16,19 | **determine** | 160:1,7,8 | 185:12,13 | 103:15 |
| **demonstrate** | 178:19 188:13 | 161:9,22 | 189:12 | **doing** 107:10 |
| 162:2 | **determines** | 162:16,17,17 | **differently** | 149:5,7 159:6 |
| **depend** 116:22 | 138:17 | 163:3,6,11,13 | 141:2 | **dose** 108:12 |
| 161:9,21 | **develop** 158:9 | 163:15,16,17 | **difficult** 157:8 | 124:8,21 125:4 |
| 163:11,13 | 158:14 160:4,8 | 164:7 166:21 | **difficulty** 155:6 | 125:10,21 |
| 167:11 185:16 | 162:17 171:19 | 167:11,13 | **diffuses** 119:8 | 126:4,15,17,19 |
| **depended** | **developing** | 169:11,13,17 | **direction** 98:22 | 127:1,18 128:3 |
| 108:12 | 145:9,18 | 170:16,21 | 120:15 | 128:10,12,13 |
| **dependent** | 150:10 152:18 | 171:3,14,18,20 | **directions** | 128:22 129:1,2 |
| 128:13,20 | 153:3,6 162:16 | 172:22 173:4,8 | 119:18 | 129:5,7,19 |
| 138:20 139:11 | 187:10 | 173:14,22 | **directly** 115:22 | 130:2,6,9,15 |

Ronald G. Crystal, M.D.

Washington, DC

January 23, 2008

130:22 131:4
131:16,18,18
131:20 132:2,8
132:8,9,22
133:6,10,10
134:3,4,7,9
135:4 138:11
139:16,17,20
139:22 140:1,2
140:14,15,20
141:5,6,21
142:2,9 144:3
144:9,15,21
145:3,16,22
146:2 147:2,6
147:10,18
148:12,14,15
148:18 149:8
149:12,13,22
149:22 150:3,7
150:7,15,15,22
151:9,9 156:18
156:21 158:1
161:4,5,13,15
162:3,8 163:2
163:6,9 164:1
164:3,3,4,16
165:7 166:2,11
166:13 167:3
167:22 168:1,8
168:9,16 169:7
169:21 170:1
171:15 172:7
172:18 173:4
173:11,11,15
174:2,14 175:4
175:11 177:9
178:5,14
179:10,12,16
180:2 181:7
182:7 183:9
184:9 185:9,22
186:9,14,21
**doses** 131:8
147:1 149:11

149:15 151:14
151:21 152:6
170:6 179:22
180:11,22
181:1,15
184:18 187:5
188:2
**dosing** 124:3
128:8,9,17,17
129:14 130:4
131:22 132:6
132:11 133:4
136:13 166:6
188:7,14
**Dr** 102:9 103:2
113:12 156:14
**dried** 111:1
**droplet** 116:16
**droplets** 110:16
**drug** 122:22
123:4 125:6
159:8,11
160:22 162:13
162:15 175:10
177:8,14 178:4
178:13 180:1
180:12 181:2,6
182:6
**dry** 110:17,18
110:20 111:1,2
111:3 116:15
116:18 117:5
117:14 126:20
132:15 138:11
139:2 143:16
144:3 146:22
148:1 172:4,6
172:14 173:14
174:1 175:17
176:7,12,19
177:2,5,16
178:2 179:21
180:10,21
**drying** 176:13
**DUDAS** 98:7

**due** 121:5
**Dulany** 100:7
**duly** 98:19 102:5
**D.C** 98:14,21
99:8 100:14

——————
**E**
——————
**earlier** 141:19
169:2,4
**easier** 109:7
**easy** 158:12
**ECP** 98:10
**edited** 190:9
**effect** 178:11
**effective** 130:18
**effectively** 124:5
**efficiency** 138:8
153:2,17
155:11,21
173:10
**efficiently**
178:10
**eight** 110:10
115:18
**either** 110:16
**electric** 121:4
**enabling** 111:17
**engaged** 106:12
**enter** 156:3
**entered** 108:11
108:18
**entire** 104:2
**entirety** 157:9
**entitled** 104:16
193:13
**equivalent** 193:1
**errata** 197:6
**erred** 192:5
**erroneously**
192:22 195:13
**errors** 197:6
**ESQ** 99:3,4,11
99:17 100:3,4
100:11
**essential** 124:2

128:16
**estimate** 150:2
**estimates** 188:17
**evaluate** 141:4
145:2,12,19
150:5,13,20
151:7 152:10
153:10 187:21
193:8,10
**evaluated**
114:18 179:20
180:6 193:9
**evaluation** 145:6
**eventual** 134:4
**eventually**
136:16 152:1
153:8 154:6
155:2 188:11
189:1
**evolved** 109:19
**exactly** 113:4
146:18 159:19
180:20
**examination**
98:18 101:2
102:7
**examined** 102:5
**example** 107:1
119:1,8 130:17
166:21 170:14
181:20
**exception** 191:2
**excerpts** 103:12
**Excuse** 136:4
164:21
**exhalation** 159:9
159:10
**Exhibit** 103:1,10
103:11 104:11
104:11 186:18
190:19 191:12
193:13,16,17
**existed** 112:10
115:12 177:6
**expected** 165:18

**experience**
103:7
**experimental**
114:18
**expert** 103:1,11
104:12 110:8
115:18 117:3
146:12 186:17
190:14,14
192:1 193:17
**expertise** 190:10
**Expires** 197:20
**explained** 169:4
**expressing**
118:7
**extensive** 119:16
**extremes** 119:22

——————
**F**
——————
**fact** 149:3
**factor** 121:8
129:8 130:10
131:3 145:17
161:14,15
163:22 164:15
165:6 168:15
174:14 182:13
189:7,11,13
**factors** 108:15
108:17 116:3
118:7,14
119:14 121:3,9
121:20 122:7
122:10,13
124:6,10,11,16
124:21 125:2,9
126:16 127:9
128:3,4,21
129:18 130:3,6
130:21 131:10
131:12 132:20
138:10 141:20
142:4 143:21
144:2,8,12,16
144:19,20

Ronald G. Crystal, M.D.

Washington, DC

January 23, 2008

Page 203

145:20 146:1
146:13,17,19
146:20 147:1,6
147:9,11,14,18
147:22 148:9
148:11,17,22
149:3 156:18
167:17 176:3
178:11 179:20
186:16 189:6,7
**far** 188:18
**Farr** 189:16,22
**fashion** 129:17
178:9 179:8
181:21 188:19
**field** 114:17
**fifth** 191:3
**file** 103:17,19,22
104:22 105:11
105:19
**filed** 104:20
105:3
**filter** 171:21
174:8
**Final** 193:14
**finish** 109:6
189:3
**first** 103:5
104:16 118:15
128:9,15
131:21 142:3
153:11,13
182:16 194:11
**five** 170:7
**flow** 115:20
116:4 124:7
125:3,18,20
126:3 142:1,3
142:8,18 143:5
143:8,11,15
147:10 156:20
157:7,8,9,10
157:19 158:1
158:15,17,19
160:2,9,13,16

163:22 164:3
164:15 165:6
165:20 166:1
**focus** 109:10
172:4
**following** 103:8
105:5 145:11
**follows** 102:6
**foregoing** 197:3
**form** 106:2,18
107:3,21 108:6
108:14,20
109:4,13
111:13,18
112:2,12 113:3
113:19 116:14
117:5,21
118:10,20,22
120:6 121:13
122:1,15
123:16 124:9
124:13 125:12
126:9,15,17,19
127:4,11,21
129:2,9 130:13
130:19 131:12
132:13,13,17
133:7,10,14,22
134:10,21
135:5,18 136:9
136:11 137:6
138:11 139:3
139:18 140:12
141:12 142:5
142:11 143:1,7
143:18 144:11
144:22 145:7
146:4 147:4,10
147:16 148:3
148:13,20
149:6,18,21
150:8 151:4,10
152:17 153:18
154:8,19 155:4
156:22 157:20

158:3 159:15
160:3,20 161:6
161:20 162:10
163:10 164:6
164:11 165:9
166:4,15 167:5
167:10 168:3
168:11,18
169:9,15 170:3
171:1,8,17
172:9,16,20
173:6,18 174:4
174:17 175:6
175:18,22
176:9,16
177:17 178:9
178:16 179:11
180:4,14 181:9
182:10 183:11
183:19 184:12
184:22 185:14
186:3,11,19
188:8,15
189:18 190:16
191:9 192:12
193:6,18
194:15 195:11
**forming** 105:13
**formulate** 139:2
192:16 193:3
194:11 195:5
**formulated**
111:4 112:1
**formulating**
103:6,16 104:1
104:21 105:17
192:15
**formulation**
110:14,19,21
111:2,9 134:3
134:7 139:12
139:15 140:8,9
140:11,14,20
141:11 143:20
145:4,13,22

146:22 147:14
148:2,5,10
175:17 177:15
177:16 178:1
179:22 180:11
180:22 181:12
190:14
**formulations**
112:10 176:19
177:2,5
**forward** 109:8
**found** 104:6
156:3
**foundation**
109:5,14
142:12 171:9
176:10
**fraction** 112:19
122:21 123:1,2
123:5 135:9
**freely** 119:9
**front** 104:14
193:13
**fully** 182:2
**function** 127:15
150:21 151:19
152:5
**funded** 106:13

_____
**G**
**G** 98:17 101:3
102:3 103:2
119:3 197:10
**Genentech**
190:7
**general** 107:20
109:18,21
114:16 120:13
144:19 188:17
**Generally**
118:16
**generate** 131:5
136:15 138:21
145:15 147:7
154:19 160:5

173:9
**generated** 133:7
136:21 137:16
140:2,21
149:21 155:10
155:10 171:20
171:21
**generates** 132:8
155:9
**generating**
178:20
**generation**
147:8 153:12
160:7,10 171:3
**generator** 133:6
139:14 140:15
140:18 141:5
**gentlemen**
190:13
**getting** 151:22
159:8,20 187:4
188:2
**give** 130:17
167:9 188:17
**given** 133:1,6
142:20 147:6
197:4
**gives** 155:20
**glucocorticoid**
106:16 107:1
**go** 109:7 122:5,6
146:11 160:16
175:15
**goal** 167:12
**goals** 112:1
**goes** 109:2 134:4
**going** 120:12
122:9 156:7
181:16
**gold** 153:7
**Gonda** 189:15
189:17,22
190:4,6
**GONGOLA**
100:4

Ronald G. Crystal, M.D.                                                                January 23, 2008
                                        Washington, DC

good 102:9,10
    160:12
Greenwich
    99:20
guess 109:19
    155:5,20
    183:22

**H**
half 106:4
half-life 121:7
happy 113:6
Harrison 103:14
held 156:12
    189:4 196:1
help 111:12,20
hesitating 107:7
hierarchy
    144:13,14
    189:9
high 142:19
    179:16 181:18
higher 117:13
    181:19 192:8
    194:8 195:1,7
    195:18
huge 151:18
human 157:8
humans 107:15
    114:18 188:7
    188:11,20,22
hydrophilic
    138:18
hydrophilicity
    121:6 138:14
    139:1,17 140:7
    140:10 141:10
hydrophobic
    138:18
hydrophobicity
    121:6 138:15
    139:1,17 140:7
    140:10 141:10

**I**

idea 160:12
ideal 114:2,10
    114:19 115:7
identified
    182:14 186:16
    189:6
identify 189:7
IgM's 119:2
Igor 189:15,17
    189:21 190:6
II 98:11
imagine 137:16
immunoglobu...
    119:1
impact 111:19
    118:8 122:22
    138:7 143:9,10
    179:19
impacted 123:2
    136:6 138:1
impacting
    110:18 123:3
impaction 136:5
impacts 121:11
implemented
    124:5
important
    105:12 116:10
    122:19 124:10
    126:16 128:4
    129:8 130:9
    136:1,14 138:3
    141:3,4,6
    144:19 147:11
    152:22 158:6
    158:17 159:12
    162:12 170:18
    172:11 189:8
    189:12,13
include 121:3
    125:3 159:5
including
    103:13 119:9
    128:21 166:21
Incorporated

106:10,13
increases 143:16
indicate 168:14
    168:21 175:9
indicated 108:10
    117:20 160:1
    197:6
individual
    128:14
individuals
    190:1,3
induce 126:4
inefficiency
    152:15 153:2
inefficient
    151:17 152:13
    152:14
inflammation
    110:4,5,6
influence 124:21
    125:10 141:20
    142:8 146:1
    147:2 148:9,12
    148:18 169:17
    171:15 172:6
    172:17 174:2
    175:4 176:3
    178:5,7,8,13
    179:10 182:7
    183:8 184:8
influences
    156:18 163:22
    164:16 165:7
    165:20 166:1
    168:1,15
    174:14 175:10
    177:9 181:6
    185:22
informed 104:6
inhalable
    106:15,21
    107:2,6,9,11
    107:13,17
    108:1,11,18
inhalation 107:4

110:13 115:21
    124:22 125:5,8
    125:11,16
    127:2,8 134:15
    135:12 137:3
    141:22,22
    142:10 144:10
    144:21 146:3
    146:21 150:14
    152:16 153:17
    156:2,19 157:4
    157:10,15,16
    158:10 159:2,3
    159:9,13
    160:19 161:18
    162:7,9,22
    163:3,5,7,15
    163:16 164:2
    164:17 165:8
    166:3 167:3
    168:2,10,17
    169:8,22 170:2
    171:13,16
    172:8,19 173:5
    173:17 174:3
    174:16 175:5
    175:12 177:10
    178:15 180:3
    181:8 182:9,16
    182:18 183:3,8
    183:10,18
    184:1,5,10,10
    184:18,19,20
    185:8,10,12,22
    186:2,9,10,15
    188:5 191:5,16
    191:19
inhale 125:4,21
    126:4 137:20
    142:1 156:20
    166:11,13
    168:8
inhaled 108:12
    108:13,19,20
    109:20 112:21

116:2 174:9,10
inhales 124:7
    158:1 167:3,22
inhaling 109:3
    109:12,17
    137:21 157:13
inherent 138:19
    139:12,13
    171:2
initial 105:6
initiate 183:2
    184:7,17 185:8
    185:11
initiates 125:7
    182:15,18
    183:7,17
    185:21 186:8
instruct 159:17
    160:18 161:17
    162:2 185:5
instructed 163:1
    163:8,14,16
    185:7,11
instructing
    167:6 183:21
instruction
    167:8
insulation 184:7
insulin 110:13
    110:14,16,17
    110:18,20
    111:1,7,7,10
    111:11,11,14
    111:20 112:1
    115:22 116:2
    117:4,16,16
    120:21 124:2,8
    124:9,22 125:1
    125:4,11,22
    126:5,15,18
    127:7,19 128:2
    128:16 129:3,5
    130:19 133:3
    134:12,16
    136:7,9,15

Ronald G. Crystal, M.D.

Washington, DC

January 23, 2008

Page 205

138:21 139:2
140:7 141:10
141:22 142:2
142:10 143:6
143:16 144:3,9
144:21 145:15
145:16 146:2
146:22 147:2
147:13 148:2
148:10,19
149:14,16,20
150:6,15 151:8
151:19 152:1,7
153:22 154:19
155:8 156:2,3
156:19,21
158:2,8,21
162:15 163:2
164:2,4,17
165:8 166:11
166:14 167:3
167:18,22
168:2,8,17
169:7 170:2
171:15 172:4,6
172:7,15,18
173:5,15,16
174:1,2,15
175:4,11,17
176:3,7,15,15
176:19 177:1,2
177:5,9,15,16
177:22 178:2,6
178:14,22
179:1,4,7,21
180:2,10,21
181:7 182:8
183:9 184:9,19
185:10 186:1
186:10,14
187:8,15,16,20
187:21 188:2,4
191:5,15 192:7
194:7 195:7
**intact** 111:14

**Intellectual** 98:9
**intensive** 113:15
**interacting**
  119:13,14
**interpretation**
  129:11 130:11
**intertwined**
  133:11
**involve** 191:4,14
  191:18
**involved** 106:4
**isolating** 131:15
**issue** 106:3
  172:1
**item** 191:3
**items** 105:21
  191:4
**i.e** 112:21

_____
### J

**JAMES** 99:11
**JANET** 100:4
**January** 98:15
  98:21 104:20
  105:4 109:10
  109:11 112:11
  115:7,12
  121:19 122:18
  123:8,14
  150:13 165:6
  165:20 166:1
  167:21 168:7
  174:13 175:3
  176:6,18,21
  177:6 181:5
  185:20 186:7
**JON** 98:7
**Judge** 98:8

_____
### K

**KAUFMANN**
  99:4
**keep** 111:13
  133:2 156:7
  157:7,9 158:6

176:15
**keeping** 111:14
**kind** 160:19
**knew** 170:13
**know** 112:6,6,10
  112:15,16
  134:12,17
  150:13 153:7
  154:17 155:7
  165:18 168:7
  171:6 175:3
  176:7,16,18,18
  176:20,21
  177:1,4 182:6
  189:15,22
  190:4,6 193:22
**knowledge**
  103:7 114:16
**Kollar-Kotelly**
  98:9

_____
### L

**L** 98:19,22
  100:11
**laboratory**
  150:10,20
  152:5,9,10
  153:15
**lack** 109:4,13
  142:11 171:8
  176:9
**large** 114:17
  118:17,19,22
  119:20 120:2,5
**larger** 131:1
**late** 190:8
**leave** 151:11
  179:18
**let's** 109:10
  118:14 126:13
  128:6 151:16
  166:10 172:4
  182:13 184:5
  193:12
**level** 108:12

120:16 165:14
**levels** 187:22
**likelihood**
  143:16
**likes** 138:13
**Likewise** 181:18
**limit** 160:16
**limitation** 192:6
  192:11,17
  193:4 194:13
**line** 103:5
  105:15
**linked** 132:22
**lipids** 119:12
  121:5
**liquid** 108:22
  110:17 116:16
  116:19 126:20
  132:16 138:12
  178:3
**list** 103:9,15
  144:13 189:21
  190:22 191:3
**listed** 103:22
  104:4,8 105:14
  116:12 191:12
**litigation** 106:7
  165:17
**little** 113:14
  127:18
**LLP** 98:20 99:5
  99:12
**locally** 110:7
**long** 149:10,19
**look** 104:14
  112:17 115:14
  117:2 118:2
  134:17 158:11
  193:7,12 194:1
  194:16,21
**looking** 168:19
**low** 142:18
  143:15 179:17
  181:15
**lower** 142:15

**lung** 109:2 119:9
  120:17 122:10
  122:14 125:17
  137:11,20
  143:11
**lungs** 108:12,19
  116:1,5 123:15
  123:17 136:19
  137:10,22
  156:2 159:8
  191:5,16,20

_____
### M

**M** 119:3
**Madison** 100:7
**maintaining**
  111:15
**major** 121:14
  124:14 178:11
**making** 187:19
**maneuver**
  158:10 159:2,3
  159:7,14
  160:19 161:2,5
  161:18 162:7
  162:22 163:7
  163:15 166:22
  167:4
**maneuvers**
  188:9
**manner** 125:2
  134:20 136:16
  152:2 157:12
  158:13 159:21
**manufacturer**
  152:19
**MARGARET**
  99:3
**marked** 103:9
  104:11 186:17
**mass** 109:1
  116:8
**material** 159:20
**matter** 98:18
  102:11 172:10

Ronald G. Crystal, M.D.

Washington, DC

January 23, 2008

Page 206

| N | | | |
|---|---|---|---|

**maximum**
160:17
**mean** 104:7
110:20 111:1
113:1 117:9
122:21 123:18
125:15 126:17
127:2 145:3,16
146:5,16
152:18 154:17
159:3 161:9
162:12 163:14
166:19 170:10
171:19 177:13
178:18,18
182:17 183:12
187:10 188:16
**meaning** 192:16
193:4
**means** 131:18
195:9
**meant** 157:17
177:22
**measure** 152:7
187:13,14,15
187:18
**measuring**
187:20
**mechanics**
169:16
**mechanisms**
109:22 110:5
119:18
**medicine** 191:19
**mentioned**
110:2 113:21
116:13 117:12
126:2,3 131:10
152:13
**met** 190:7
**micrometers**
114:4,5,6
170:7
**micron** 114:8,9
114:12,12

**microns** 115:9,9
170:14,14
**mind** 120:2
149:3 156:7
158:6
**minutes** 117:16
**misspoke** 157:5
**modeling** 188:13
**modelling**
188:17
**moderate** 120:7
120:9 142:19
**modulate** 174:9
**molecular** 119:3
120:1,14
**molecule** 119:7
121:10,20
135:7,8,9,13
135:22 136:7
136:10 138:5
138:19 139:13
140:22 143:17
**molecules**
110:17 118:8
118:16 121:3,7
135:9 141:1
**morning** 102:9
102:10,13,17
102:22
**mouth** 138:2
143:9
**move** 111:20
182:13
**movement**
119:19
**moving** 132:12
**multiple** 110:4
124:6 146:13
146:17,22
149:15 153:13
179:19,22
180:11,22
181:1
**M.D** 98:18 101:3
102:3 197:10

**name** 189:19
**names** 189:21
**narrow** 124:1
128:16 133:3
170:12
**NASH** 99:4
**naturally** 119:2
**necessarily**
107:19 116:20
116:22 127:14
140:17
**need** 117:18
128:12 131:8
143:11 153:13
179:2 192:8
**needed** 194:8
195:8
**negative** 121:4
**negotiate** 137:15
137:16
**neutral** 121:5
**never** 137:2
179:18
**New** 99:14,14,21
99:21
**night** 102:12,16
**nine** 117:4
**Nordisk** 98:4
106:1,5 191:2
**normal** 182:20
**notary** 98:19
102:5 197:17
**notice** 98:19
**Novo** 98:4 106:1
106:5 191:2
**number** 105:1
119:10 120:21
128:21 169:3
**numbers** 105:6
114:17
**N.W** 98:20 99:6
100:13

| O | | | |
|---|---|---|---|

**oath** 102:20
**Objection** 106:2
106:18 107:21
108:6,14 109:4
109:13 112:2
112:12 113:3
113:19 116:14
117:21 118:10
118:20 120:6
121:13 122:1
122:15 123:11
123:16 124:13
125:12 126:9
127:4,11,21
129:9 130:13
132:17 133:14
133:22 134:10
134:21 135:5
135:18 136:11
137:6 139:3,18
140:12 141:12
142:5,11 143:1
143:7,18 144:5
144:11,22
145:7 146:4
147:4,16 148:3
148:13,20
149:18 150:8
150:16 151:4
151:10 152:17
153:18 154:8
155:4 156:22
157:20 158:3
159:15 160:3
160:20 161:6
161:20 162:10
163:10 164:6
164:11 165:9
166:4,15 167:5
167:10 168:3
168:11,18
169:9,15 170:3
171:1,8,17
172:9,16,20
173:6,18 174:4

174:17 175:6
175:18,22
176:9 177:17
178:16 179:11
180:4,14 181:9
182:10 183:11
183:19 184:12
184:22 185:14
186:3,11,19
188:8,15
189:18 190:2
190:16 191:9
192:12 193:6
193:18 194:15
195:11
**obstructive**
110:2
**obtain** 169:21
**obviate** 138:8
**occur** 117:12
**Office** 98:11
100:5,6,12
**offices** 98:20
**Oh** 168:21
190:22
**Okay** 105:2,15
105:22 110:8
110:11 112:18
115:14,16
118:3 126:13
129:4 136:18
136:20 138:22
141:17 156:11
156:16 160:15
160:18 165:5
167:20 178:4
182:2 183:16
185:5 190:12
191:1,22 192:2
193:12 194:2
**Once** 136:5
**ones** 105:14
116:12,13
121:14 124:14
**opinion** 103:6

Ronald G. Crystal, M.D.

Washington, DC

January 23, 2008

Page 207

| | | | | |
|---|---|---|---|---|
| 103:16 104:1,6 | 113:17 114:2 | 117:11,17,18 | 159:7,11,17 | 121:13 122:1 |
| 104:21 105:13 | 115:15,17 | 122:8,11,14 | 160:18 161:2,5 | 122:15 123:11 |
| 105:20 165:12 | 116:12 117:2,3 | 125:5 126:8 | 161:10,17,19 | 123:16 124:13 |
| 192:15,16,19 | 118:2,5,5,7,13 | 132:14,14,15 | 162:2,14,22 | 125:12 126:9 |
| 193:3 194:11 | 118:15 121:3 | 136:2,10,18,19 | 163:5,7,14 | 127:4,11,21 |
| 195:5 | 122:5,6 123:22 | 137:9,10,17 | 165:4 166:11 | 129:9 130:13 |
| **opinions** 105:17 | 124:1,19,20 | 138:6,13,17 | 166:13 167:1,3 | 132:17 133:14 |
| 190:15 | 126:14,15 | 168:15,20 | 167:6,9,15,22 | 133:22 134:10 |
| **opposed** 166:18 | 128:15,22 | 169:2,3,6,13 | 168:8 182:15 | 134:21 135:5 |
| **optimal** 170:6 | 129:12 130:8 | 169:18 170:22 | 182:18 183:2,7 | 135:18 136:11 |
| 170:11 173:9 | 130:12 131:13 | 171:7,14 172:5 | 183:17,21 | 137:6 139:3,18 |
| **order** 117:19 | 131:17,20 | 172:14 173:3 | 184:7,17 185:7 | 140:12 141:12 |
| 144:2 163:8 | 141:15,18 | 173:14 174:1 | 185:11,21 | 142:5,11 143:1 |
| 168:9 169:21 | 146:11 156:15 | 174:13 175:3 | 186:8 192:9 | 143:7,18 144:5 |
| 170:1 171:7 | 156:17 163:21 | 175:15,16 | 194:9 195:9 | 144:11,22 |
| 172:6,17 173:4 | 166:12 168:14 | **particles** 110:15 | **patient's** 128:17 | 145:7 146:4 |
| 173:15 178:13 | 168:20 175:9 | 110:15,17 | 129:15,17 | 147:4,16 148:3 |
| 180:2 185:9 | 182:14 186:17 | 112:19 115:19 | 132:1 161:18 | 148:13,20 |
| 186:9 | 189:7 191:22 | 115:22 116:5,6 | **pending** 103:10 | 149:18 150:8 |
| **ordering** 162:14 | 192:3,4 194:20 | 133:13,18,21 | **Pennsylvania** | 150:16 151:4 |
| **ordinary** 115:6 | 195:18 | 136:21,22 | 98:20 99:6 | 151:10 152:17 |
| 121:18 122:12 | **parameter** | 137:4,14,19,20 | **percent** 120:16 | 153:18 154:8 |
| 123:7,13 | 128:11 133:8 | 137:22 138:1 | **perform** 163:1 | 155:4 156:22 |
| 150:12 151:6 | 136:13 138:5 | 139:1 169:20 | **period** 176:12 | 157:20 158:3 |
| 164:14,19,22 | 150:2 158:17 | 170:9 | **person** 115:6 | 159:15 160:3 |
| 165:14,19,22 | **parameters** | **particular** | 121:18 122:12 | 160:20 161:6 |
| 167:20 168:6 | 116:9 131:7 | 107:16 108:4 | 123:7,13 | 161:20 162:10 |
| 174:12,19,20 | 136:14 139:20 | 108:22 120:1 | 150:12,19 | 163:10 164:6 |
| 175:2 181:4 | 140:19 150:21 | 145:12 150:14 | 151:6 164:14 | 164:11 165:9 |
| 182:5 185:19 | 152:8,10,22 | 160:19 163:15 | 164:19,22 | 166:4,15 167:5 |
| 186:6 | 155:11 161:22 | 167:8 184:4,6 | 165:19,22 | 167:10 168:3 |
| **overall** 157:10 | 167:14 178:21 | 185:6 | 167:20 168:6 | 168:11,18 |
| | **paraphrase** | **partly** 139:11 | 174:12,19 | 169:9,15 170:3 |
| **P** | 157:14 | **parts** 123:15,17 | 175:2 181:4 | 171:1,8,17 |
| **page** 104:14 | **paraphrasing** | **pass** 119:17 | 182:5 185:19 | 172:9,16,20 |
| 110:9,10 | 129:6 | **patent** 98:11 | 186:6 | 173:6,18 174:4 |
| 115:18 117:4 | **part** 106:13 | 100:5 103:9 | **PFEIFFER** 99:3 | 174:17 175:6 |
| 146:11 156:15 | 109:2 124:20 | 105:16,17 | 106:2,18 | 175:18,22 |
| 193:13 194:20 | 137:19 141:18 | 106:3 165:17 | 107:21 108:6 | 176:9 177:17 |
| **paragraph** | 147:8 151:13 | **path** 137:17 | 108:14 109:4 | 178:16 179:11 |
| 103:2,5,22 | 159:7 | **patient** 124:7 | 109:13 112:2 | 180:4,14 181:9 |
| 104:9 105:14 | **particle** 111:13 | 125:4,7,21 | 112:12 113:3,9 | 182:10 183:11 |
| 105:21 110:9 | 111:13 114:3 | 126:3 142:1 | 113:19 116:14 | 183:19 184:12 |
| 110:10,12 | 114:10,19 | 156:20 158:1 | 117:21 118:10 | 184:22 185:14 |
| 112:17 113:5 | 115:8,20 117:5 | 158:10,12 | 118:20 120:6 | 186:3,11,19 |

Ronald G. Crystal, M.D.

January 23, 2008

Washington, DC

Page 208

| | | | | |
|---|---|---|---|---|
| 188:8,15 | 185:12,20 | **pretty** 189:3 | 110:2 | 116:4 124:7 |
| 189:18 190:2 | 186:7 | **previous** 127:19 | **purely** 140:17 | 125:3,18,21 |
| 190:16 191:9 | **points** 138:3 | **previously** 102:4 | **purpose** 109:3 | 126:3 142:1,3 |
| 192:12 193:6 | 183:3,12 184:2 | 170:5 | 109:11 154:17 | 142:8,18 143:5 |
| 193:18 194:15 | **pose** 146:9 | **prior** 155:1 | **purposes** 113:15 | 143:15 147:10 |
| 195:11,22 | **posed** 182:3 | 174:9 181:11 | **pursuant** 98:18 | 156:20 157:7,8 |
| **Pfizer** 106:7 | **positive** 121:4 | 191:7,11 | **put** 120:10,15 | 157:9,11,19 |
| 191:3 | **possible** 135:1 | **probably** 144:13 | 140:22 150:22 | 158:1,15,17,19 |
| **pH** 111:16 121:6 | 158:16 163:18 | 170:11 | 152:6 154:3,12 | 160:2 163:22 |
| 132:14 133:20 | 171:22 172:2 | **proceedings** | 154:14,16,20 | 164:3,15 165:6 |
| 134:9,20 | 185:15 | 98:21 103:12 | 154:21,22 | 165:20 166:1 |
| 138:11 139:6 | **possibly** 139:21 | **process** 124:4 | 155:7,8,18 | **rates** 143:9 |
| 139:17 140:6,9 | 160:11 175:19 | 159:9,9 182:19 | 162:16 180:16 | **reach** 111:5,6,18 |
| 141:10 | **powder** 110:18 | 182:20 | 180:17 | 112:22 116:19 |
| **phrase** 194:6,13 | 110:20 111:1,3 | **produced** | **P-R-O-C-E-E-...** | 116:21 129:16 |
| 195:5 | 116:15,18 | 110:18 | 102:1 | 130:19 131:4,9 |
| **phrased** 149:13 | 117:5,14 | **produces** 150:6 | | 136:16 137:2 |
| **physical** 111:15 | 126:20 139:2 | 150:14 151:7,7 | **Q** | 137:17 158:21 |
| 126:21 | 143:16 144:3 | **product** 111:17 | **qualities** 138:19 | 159:10 188:5 |
| **physically** | 146:22 148:2 | **professional** | **quantities** | **reaches** 116:2 |
| 134:12 | 172:5,6,15 | 103:7 | 111:18 | 117:14,15 |
| **physician** | 173:15 174:1 | **proper** 176:15 | **question** 109:6 | 128:8 141:6 |
| 162:14 165:3,5 | 175:17 176:7 | **properties** | 113:12 140:5,5 | 143:17 186:21 |
| 165:12,13,18 | 176:19 177:2,5 | 111:16 139:12 | 140:6,8 146:10 | **reaching** 114:3 |
| **physiology** | 177:16 178:2 | 139:13 | 149:2,13 151:1 | 114:11 115:8 |
| 125:18 143:10 | 179:21 180:10 | **Property** 98:9 | 151:11 157:22 | **read** 103:18 |
| **Plaintiff** 98:5 | 180:22 | **protein** 118:19 | 179:3 180:16 | 104:2,22 |
| 99:2 | **practical** 166:20 | 119:7 120:2,4 | 180:18,20 | 105:11,19 |
| **play** 116:7,8 | 166:22 172:1 | 120:5,7,10,13 | 181:11 182:2 | 113:4 140:5 |
| **please** 103:3 | **precise** 130:4 | 120:20 | **questions** 197:5 | 194:13 197:3 |
| 110:9 112:17 | 131:4 132:10 | **proteins** 110:22 | **quick** 189:2 | **reading** 115:17 |
| 115:15 117:2 | 136:13,16 | 118:17,21 | **quickly** 189:3 | **reason** 151:16 |
| 118:2 123:22 | 141:6 145:16 | 119:9,13,13,13 | **quote** 192:6,9 | **reasons** 117:18 |
| 124:19 126:14 | 147:8 161:12 | 119:17,19,20 | 195:5,9 | **recall** 103:21 |
| 141:16 156:15 | 161:15 167:12 | 176:13 | | 107:16 108:5 |
| 190:20 | 195:17 | **provided** 191:7 | **R** | 108:13 114:21 |
| **point** 107:14 | **precisely** 131:8 | 191:11 | **range** 114:20 | 115:4 |
| 115:4 125:6 | 133:5,9 149:12 | **PTO** 103:13 | 124:2 128:16 | **recess** 156:12 |
| 132:4 144:18 | **predictability** | **Public** 98:19 | 131:6 133:3 | 189:4 |
| 158:11 159:10 | 128:20 | 197:17 | 153:5,9 170:6 | **record** 103:12 |
| 160:6 170:6 | **predictable** | **publication** | 170:8,10,12,17 | 113:7 194:14 |
| 182:14,16,17 | 124:3 128:18 | 107:17 | 170:18 179:4 | 196:1 |
| 182:22 183:6 | 129:16 | **publications** | **ranges** 171:21 | **recorded** 197:5 |
| 183:16 184:4,6 | **preparation** | 108:1 | 172:12 | **refer** 125:17 |
| 184:16 185:8 | 190:13 | **pulmonary** | **rate** 115:20 | 157:15 177:19 |

Ronald G. Crystal, M.D.

Washington, DC

January 23, 2008

Page 209

| | | | | |
|---|---|---|---|---|
| 192:10 | 105:1,2 106:21 | 169:7,21 170:1 | 171:10 172:22 | 128:15,22 |
| **reference** | 107:7 113:12 | 170:8 171:15 | 173:19 174:7 | 129:4,12 130:7 |
| 104:19 105:16 | **repeatability** | 172:7,11,18 | 176:1 | 130:11 131:13 |
| **referenced** | 158:7 | 173:4,11,15 | **reviewing** 105:2 | 131:16,21,22 |
| 192:5 | **rephrase** 157:22 | 174:2,14 175:4 | **right** 103:21 | 132:1 133:10 |
| **referred** 141:19 | 165:13 | 175:11 177:9 | 104:14 113:16 | **separate** 142:4 |
| 160:8 195:14 | **report** 103:1,11 | 178:5,9,14 | 115:14 117:11 | **set** 189:9 |
| 195:17 | 104:12 110:9 | 179:4,8 180:2 | 121:2 126:2,6 | **seven** 110:9 |
| **referring** 111:8 | 115:18 117:4 | 181:7 182:7 | 132:12 136:3 | **shape** 108:22 |
| 113:17 114:15 | 146:12 186:17 | 183:8 184:8,18 | 146:16 148:12 | 121:6 126:20 |
| 117:13 128:8 | 190:14 192:1 | 185:9,22 186:9 | 151:1 166:10 | 132:15 133:12 |
| 135:21,22 | 193:17 194:20 | 186:14,20,21 | 193:16 | 135:8,13 137:9 |
| 136:9 141:18 | **reproducibility** | 187:5 188:2,7 | **role** 116:7,8 | 138:4,11 |
| 154:15,21 | 124:5,12 | 188:14,19 | **Ronald** 98:17 | 139:10 140:6 |
| 157:6 166:6,12 | 127:10,14 | **reproducibly** | 101:3 102:3 | **shapes** 116:7 |
| 192:20,21 | 128:5,7,19,20 | 131:5 143:12 | 103:2 197:10 | **sheet** 197:7 |
| **refers** 114:5 | 129:8 130:2,10 | 153:8,9 159:18 | **Rubsamen** | **show** 149:10 |
| 126:8,19,19 | 132:21 146:1 | 178:21 180:7 | 189:15,22 | **shown** 114:2,10 |
| 127:1 132:1,13 | 146:12 147:2 | **require** 149:11 | | **significant** |
| 169:3 182:19 | 148:9,12,18 | 153:11 | —— **S** —— | 113:8 |
| **regard** 158:19 | 153:1 158:7,18 | **required** 129:16 | **S** 99:17 | **significantly** |
| 167:14 170:8 | 159:1 161:15 | 130:2 132:11 | **sacs** 137:14 | 179:6,9 |
| 171:3 | 162:18 163:19 | **reread** 113:6 | **safe** 144:1 | **sir** 117:7 |
| **Regarding** | 165:21 166:5 | **research** 106:12 | **SAMUEL** 99:17 | **sitting** 112:6 |
| 189:6 | 167:17 170:13 | 107:5 | **saying** 129:7 | 137:16 141:9 |
| **regardless** 163:2 | 170:19 179:10 | **respirable** | 133:2 163:22 | 162:21 177:1,4 |
| **Reid** 189:15,22 | **reproducible** | 112:21 115:19 | 177:1,22 195:2 | **six** 114:12 115:9 |
| **related** 104:16 | 111:19 124:3 | 116:4 122:8,10 | 195:12 | 170:7 |
| 107:10,11 | 124:21 125:10 | 122:14,21 | **Schenk** 103:14 | **size** 111:5,13 |
| 108:1 | 128:18 129:16 | 123:1,5,9,15 | **second** 104:15 | 112:20,21 |
| **relates** 107:8 | 129:22 131:2,8 | **respiration** | 124:20 189:19 | 113:1,17 114:3 |
| **relating** 102:15 | 132:7,9 141:20 | 125:7 158:12 | **Secretary** 98:8 | 114:11,19 |
| 119:16 165:17 | 142:9 143:11 | 182:15,17,19 | **section** 104:15 | 115:8,20 116:3 |
| 190:9 194:22 | 144:3,9,20 | 183:3,7,17 | **see** 107:5 114:13 | 118:15 119:1 |
| **relation** 105:20 | 149:11,20 | 184:6,17 185:8 | 117:7 129:21 | 119:15,17 |
| **relative** 142:19 | 152:2 156:18 | 185:12,21 | 137:22 144:18 | 120:7,9 123:8 |
| 170:9 | 157:12 158:11 | 186:8 | 146:14 154:14 | 123:14 125:5 |
| **relevant** 104:6 | 158:13,21 | **respiratory** | 154:14 168:20 | 126:8 130:20 |
| 116:9,16 | 159:14,21 | 142:15 183:1 | 168:21 175:13 | 131:6 137:2 |
| 119:15 136:7 | 160:22 161:12 | 183:13 184:2 | 195:21 | 168:15 169:2,6 |
| 138:5 142:14 | 162:3,8 163:1 | **results** 188:19 | **sentence** 103:5 | 169:14,18,20 |
| 142:17 151:17 | 163:8 164:1,4 | **review** 102:15 | 113:5 114:1 | 170:22 171:7 |
| 151:21,22 | 164:16 165:7 | 104:20 105:16 | 117:3,7 118:5 | 171:14 172:6 |
| 178:21 | 166:2 167:16 | 107:22 109:15 | 118:15 124:20 | 172:14 173:3 |
| **remember** 104:5 | 168:1,9,16 | 112:3 115:1 | 126:14 128:9 | 173:14 174:1 |

Ronald G. Crystal, M.D.

Washington, DC

January 23, 2008

174:13 175:3
175:15,16
sizes 170:10
174:10
skill 115:6
121:18 122:12
123:7,13
150:12 151:1
164:14,19,22
165:14,16,19
165:22 167:20
168:6 174:12
175:2 181:4
182:5 185:19
186:6
skilled 174:19
174:20
small 110:15
119:2,7 147:8
soda 156:8
Solicitor 100:6
solid 108:22
solubility 121:5
sorry 152:14
168:19,21
184:5
sort 185:2
speaking 112:8
134:18 135:14
136:20 139:21
140:15,17
141:2 161:11
specific 114:21
115:4 117:1
130:1 135:17
145:2 151:1
162:1,7,12,22
163:6 171:6
173:13 176:19
177:2,5
specifically
104:5 111:8
131:11 172:4
176:20,22
193:8 194:3,17

195:19
spectrum 119:6
119:20,21
speed 125:5,15
125:17 157:3,6
157:10,14
158:20
sphere 113:15
stabilized
111:15
standard 152:9
153:7
start 118:14
122:8 155:7
165:21 184:5
state 110:12
112:19 118:13
124:1 141:19
146:12 192:3
stated 113:4
states 98:1,10
100:5,12 103:6
117:4 118:15
124:20
stating 192:4
stay 138:6
Stenotype 98:22
step 153:11,13
Stephen 189:16
189:22
steps 153:13
162:19
steroid 107:2
108:20
steroids 106:15
106:21 107:3,6
107:9,11,13,17
108:2,11,18
109:3,12,17
strategies
158:16
strategize 158:5
185:17
strategy 145:19
158:9 162:18

169:17 185:2
187:11
Street 99:13,20
100:7,13
strike 118:14
159:2 176:22
185:6
structures
118:17 119:8
studies 114:2,10
114:15,17
115:11 188:11
188:20
study 107:10
114:21 115:4
156:1
subject 102:11
169:3
subparagraph
194:3
Subscribed
197:12
subset 184:20
subtract 155:18
sufficiency
153:21
sufficient
111:18 144:9
sugar 187:22
Suite 98:20 99:7
Sullivan 98:20
99:5,12
suppress 110:5
110:6
sure 105:5
127:17 138:9
146:5 155:5
160:12 164:21
170:7 178:17
180:15 187:12
surfactants
121:5
SUSAN 99:4
suspended
110:15

suspension
112:20 124:8
192:7,22 194:7
195:6
sworn 98:19
102:5 197:12
symbol 114:4

## T

T 99:11
take 115:3 156:9
183:2 189:2
193:12
taken 98:20,21
154:1
talk 146:20
147:9 166:10
talked 106:15,21
117:15 120:15
122:7,9 130:21
136:3 138:10
160:6 165:1
169:2 190:12
194:19
talking 129:1,1
130:3 136:8
140:1,2,4,18
151:14,20
152:11 160:5
165:3 179:12
186:21 195:19
talks 195:1
taught 192:6
194:22
teach 195:16
techniques
171:6 173:13
technology
176:13
tell 109:16
120:12 143:5
143:15 187:4
188:1 190:21
telling 161:18
term 113:17

120:2 131:12
152:13 155:1
166:5
terms 105:6,12
111:17 119:15
125:18 128:10
130:18 132:8
136:8,14 138:5
138:10 140:6
144:20 149:13
152:8 159:8
160:8 167:17
170:12,19
185:2,16
194:19
testified 102:5
testimonies
190:22
testimony
102:12,16
191:7,11
Thank 121:2
122:18 126:13
Thanks 104:10
105:22
theoretically
112:8 134:18
134:22 135:14
136:20 137:5,7
139:21 140:17
141:3 158:14
159:16 160:11
160:12 161:11
163:18 166:16
171:19,22
172:2 174:7,8
183:5,20,22
185:15
therapeutic
124:2 128:16
133:3 145:9,18
thing 125:20
126:5 128:14
128:19 129:14
131:22 132:6

Ronald G. Crystal, M.D.

Washington, DC

January 23, 2008

Page 211

136:1 141:4,6
153:3 158:6,18
161:10,11
162:1,19
163:19 172:11
180:6 195:2
things 104:3,8,8
105:12,19
109:1 111:12
111:22 112:7
117:17,19
120:12 122:2
141:3
think 107:9,14
109:7 110:1
116:11 121:10
121:16 124:16
125:9 140:4
157:5,17
180:18 190:8
194:3 195:2
third 114:1
117:3
thought 157:5
thousands 108:1
three 170:14
190:3
time 107:16
108:5 114:22
121:16 124:17
125:2,19
134:19 135:17
137:21 157:7
157:10,13,15
158:20 159:19
times 137:14
192:8 194:8
195:1,7,18
titration 124:4
today 112:6
141:9,19
162:21 177:1,4
total 155:17,19
155:22 157:15
trachea 138:2

tract 142:15
Trade 99:19
Trademark
98:11 100:5
transcribed
98:22
transcription
197:4
treating 151:15
151:22
tree 137:12
true 181:14
193:22
try 180:21 195:4
trying 127:16
132:4 158:19
158:20 160:22
turn 102:22
103:2 104:10
110:8,10
123:22 124:19
126:13 141:15
155:9 156:14
190:19 191:22
two 126:22
131:20 137:12
142:4 155:11
170:14
type 119:10

_____ U _____

ultimate 133:8
unaerosolized
155:15,20
understand
102:19 106:16
115:7 121:19
122:13 123:8
127:17,18
130:5,7 138:10
164:15 165:6
165:20 166:1
167:21 174:13
178:17 180:15
181:5 185:20

186:7 194:18
understanding
118:6 140:1
155:6 163:21
understood
105:3 131:11
unit 125:19
United 98:1,10
100:5,12
urea 119:6
use 113:16
131:19 132:2
134:3,7 139:12
139:15 146:21
150:1 153:7
155:1 180:10
180:21 185:3
188:13,16
uses 163:5
usually 125:17
U.S 104:16

_____ V _____

v 98:6
Vague 122:1
161:6
validate 149:19
variable 119:21
153:3
varies 149:22
157:7
variety 116:8
120:12 161:22
various 117:17
126:21 137:22
144:12 146:19
158:4 166:20
178:20
vary 129:19
133:1 147:18
157:11 185:2,3
varying 119:17
Velasquez
103:14 192:5
192:20 194:21

194:22 195:13
195:14,16
versus 126:20
132:15 138:14
142:19 153:20
154:2,11 155:2
155:15,18,22
191:2
view 194:22
Virginia 100:8
vitae 107:13,18
107:20
volume 98:11
115:21 116:4
124:7 125:3,18
142:1,4 143:12
147:10 158:19
166:10,13
167:2,15,21
168:7

_____ W _____

W 98:7
wall 119:18
121:11,21
136:6
walls 111:20,21
117:6 118:8
138:2,7 179:19
181:15
want 111:5
113:10 128:13
130:15 131:19
132:20 147:19
153:8 157:11
157:12 158:9
164:21 167:15
169:20 170:7
170:17 173:8
173:11 176:6
188:19
wanted 171:22
Washington
98:14,21 99:8
100:14

wasn't 193:8
water 111:3
117:10 138:13
way 105:18
114:6 134:8,16
138:22 139:7,9
143:5 151:12
153:16 159:18
159:19,19
166:22 171:13
179:22 181:1
185:17 195:4
ways 158:4
166:20 173:22
188:1
Wednesday
98:15,21
weight 119:3
120:1,14 121:4
West 100:7
widely 176:14
WILLIAMS
99:11
witness 98:19
101:2 102:4
106:3 107:22
108:8,15
109:15 112:3
112:13 113:20
116:15 117:22
118:11,21
120:7 121:14
122:3,16
123:17 124:14
125:13 126:10
127:5,22
130:14 132:18
133:15 134:1
134:11,22
135:6,19
136:12 137:7
139:4,19
140:13 141:13
142:6,13 143:2
143:8,19 144:6

Ronald G. Crystal, M.D.

Washington, DC

January 23, 2008

Page 212

| | | | | |
|---|---|---|---|---|
| 144:12 145:1,8 | 122:17 123:12 | 190:5,18 | 165:1,16 | 177:6 181:5 |
| 146:5 147:5,17 | 123:19 124:15 | 191:10 192:14 | **York** 99:14,14 | 185:20 186:7 |
| 148:4,14,21 | 125:14 126:12 | 193:11,19 | 99:21,21 | |
| 149:19 150:9 | 127:6,12 128:1 | 195:3,21 | | **2** |
| 150:17 151:13 | 129:10 132:19 | **WOODLEY** | **0** | **2** 192:7,10,16 |
| 152:18 153:19 | 133:16 134:6 | 99:17 | **0.5** 114:4,12 | 193:4 194:7,12 |
| 154:9 155:5 | 134:14 135:2 | **word** 128:7 | 115:9 | 195:1,7,14,18 |
| 156:7,11 157:1 | 135:11,20 | 131:16,20 | **06-1896** 98:7 | **20** 197:13,21 |
| 158:4 159:16 | 136:17 137:8 | 132:2,12,22 | **08/011,281** | **20006** 98:21 |
| 160:4,21 | 139:5 140:3 | 148:14 168:20 | 104:20 | 99:8 |
| 161:21 162:11 | 141:14 142:7 | 186:20 | | **2003** 191:7,11 |
| 163:11 164:7 | 142:16 143:4 | **words** 139:20 | **1** | **2008** 98:15,21 |
| 164:12 165:10 | 143:14,22 | 140:16,22 | **1** 103:1 186:18 | **202** 99:9 100:15 |
| 166:5,16 167:6 | 144:7,17 145:5 | 149:22 179:5 | **1,000** 120:22 | **20530** 100:14 |
| 167:11 168:4 | 145:10 146:7 | **work** 106:1,9 | **10** 146:12 192:8 | **212** 99:15,22 |
| 168:12,19 | 147:12,21 | 162:9 184:10 | 192:10,16 | **22** 110:9 194:1,4 |
| 169:10,16 | 148:6,16 149:1 | 184:20 | 193:4 194:8,12 | 195:10,18 |
| 170:5 171:2,10 | 150:4,11,18 | **works** 135:7 | 195:1,7,14,18 | **22314** 100:8 |
| 171:18 172:10 | 151:5,11 152:3 | **World** 99:19 | **100** 141:1 | **23** 98:15,21 |
| 172:21 173:8 | 152:20 154:4 | **wrapper** 103:17 | **10004-2498** | 137:13 |
| 173:19 174:6 | 154:13 155:13 | 103:19,22 | 99:14 | **24** 110:10,12 |
| 174:18 175:7 | 156:9,13 157:2 | 104:22 105:11 | **10007-0042** | **25** 112:17 |
| 175:19 176:1 | 157:21 159:22 | 105:19 | 99:21 | 113:17 114:2 |
| 176:11 177:18 | 160:14 161:3,7 | **wrong** 129:6 | **102** 101:5 | **250** 99:20 |
| 178:17 179:12 | 162:6 163:12 | 130:8 | **11:02** 196:2 | **26** 115:15,17 |
| 180:5,15 | 164:9,13 | **wrote** 131:17 | **12** 194:20 | 116:13 122:5,6 |
| 181:10 182:11 | 165:11 166:7 | 157:18 190:8 | **125** 99:13 | 122:9 |
| 183:12,20 | 166:17 167:7 | | **14** 103:2,5,22 | **27** 117:2,3 118:5 |
| 184:13 185:1,6 | 167:19 168:5 | **X** | 104:9 105:14 | **272-8734** 100:9 |
| 185:15 186:4 | 168:13 169:1 | **X** 98:3,13 | 105:21 | **28** 118:2,5,7,13 |
| 186:12,20 | 169:12,19 | | **15** 109:19 | 118:15 121:3 |
| 188:9,16 | 171:5,12 172:3 | **Y** | **16** 156:15 | **29** 104:20 105:4 |
| 189:19 190:3 | 172:13 173:2 | **Yeah** 105:11 | **1701** 98:20 99:6 | |
| 190:17 192:13 | 173:12,21 | 138:16 | **19** 121:19 | **3** |
| 193:7 194:16 | 174:11,21 | **year** 106:4 | **1993** 104:20 | **30** 123:22 124:1 |
| 195:12 | 175:8,20 176:5 | **years** 109:19 | 105:4 109:11 | 126:14 128:15 |
| **Wood** 100:3 | 176:17 177:20 | 190:11 | 112:11 115:7 | 129:12 130:8 |
| 101:5 102:8 | 179:14 180:9 | **yesterday** | 115:12 121:19 | 130:12 131:13 |
| 106:6,19 108:3 | 180:19 182:1 | 102:13 106:15 | 122:16,18 | 131:17 146:11 |
| 108:9,16 109:6 | 182:12 183:15 | 106:20 108:10 | 123:8,14 | **307-6078** 100:15 |
| 109:9 112:5,14 | 184:3,15 185:4 | 110:2,22 | 150:13 164:15 | |
| 113:6,11,22 | 185:18 186:5 | 111:10 113:13 | 165:6,20 166:1 | **4** |
| 116:17 118:1 | 186:13 187:1 | 113:21 116:6 | 167:21 168:7 | **4** 103:10 104:11 |
| 118:12 120:8 | 188:12,21 | 117:12 120:15 | 174:13 175:3 | 190:19 191:12 |
| 121:15 122:4 | 189:2,5,20 | 120:20 137:11 | 176:7,19,21 | **4th** 100:13 |
| | | | | **40** 191:22 192:3 |

Ronald G. Crystal, M.D.
Washington, DC
January 23, 2008

Page 213

192:4 194:20

**5**
**5** 103:11 104:11
120:16 193:17
**5,364,838**
105:16
**50,000** 120:4,13
120:19
**500** 121:1
**52** 124:19,20
141:15,18
156:15,17
163:21 166:12
168:14,20
175:9 182:14
186:17 189:7
**527-7700** 99:22
**555** 100:13
**558-3130** 99:15
**571** 100:9

**6**
**6** 193:13,16
**6,000** 120:21,22
**600** 100:7

**7**
**7** 99:19
**700** 98:20 99:7
**700,000** 119:4
**774** 103:9,13,19
103:20 105:9

**8**
**8D21** 100:7
**8:24** 98:21
**80s** 190:8

**9**
**956-7055** 99:9

Exhibit 3

US005320094A

# United States Patent [19]

## Laube et al.

[11] **Patent Number:** **5,320,094**

[45] **Date of Patent:** **Jun. 14, 1994**

[54] **METHOD OF ADMINISTERING INSULIN**

[75] Inventors: **Beth L. Laube**, Baltimore, Md.; **G. Kenneth Adams, III**, Bloomfield, N.J.; **Angeliki Georgopoulos**, Minneapolis, Minn.

[73] Assignee: **The Johns Hopkins University**, Baltimore, Md.

[21] Appl. No.: **819,234**

[22] Filed: **Jan. 10, 1992**

[51] Int. Cl.⁵ .................... **A61M 15/00; A61M 16/10; A61M 11/00; A62B 7/00**

[52] U.S. Cl. .......................... **128/203.12; 128/200.24; 128/200.14; 128/200.21; 128/200.23**

[58] Field of Search ................ 128/200.14, 200.24, 128/203.12, 200.23, 200.21

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,788,784 | 4/1967 | Birch et al. . | |
| 2,944,546 | 7/1960 | Ziherl et al. | 128/205.17 |
| 4,119,097 | 10/1978 | Spector . | |
| 4,484,577 | 11/1984 | Sackner et al. | 128/203.28 |
| 4,534,343 | 8/1985 | Nowacki et al. | 128/200.23 |
| 4,612,929 | 9/1986 | Boiarski et al. | 128/200.21 |
| 4,624,251 | 11/1986 | Miller | 128/200.14 |
| 4,635,627 | 1/1987 | Gam | 128/200.14 |
| 4,677,975 | 7/1987 | Edgar et al. | 128/203.12 |
| 4,790,305 | 12/1988 | Zoltan | 128/200.23 |
| 4,796,614 | 1/1989 | Nowacki et al. | 128/200.14 |
| 4,829,996 | 5/1989 | Noakes et al. | 128/200.14 |
| 4,929,852 | 5/1990 | Zoltan et al. | 128/200.23 |
| 5,027,806 | 7/1991 | Zoltan et al. | 128/200.23 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0933216 | 12/1947 | France . | |
| 1524904 | 11/1989 | U.S.S.R. | 128/200.24 |

2110543  6/1983  United Kingdom ........... 128/200.23

### OTHER PUBLICATIONS

Harrison & Cantab; Insulin in Alcoholic Solution by the Mouth; The British Medical Journal; Dec. 22, 1923 pp. 1204–1205.

Shichiri et al; Increased Intestinal Absorbtion of Insulin in a Micellar Solution; Water-in-Oil-in-Water Insulin Micelles; First Department of Medicine; Oct. 20, 1977; pp. 175–183.

Newman et al; Deposition of Pressurised Aerosols in the Human Respiratory Tract; Department of Medical Physics; 1981; pp. 52–55.

Wigley, et al–Insulin Across Respiratory Mucosae by Aerosol Delivery–Diabetes, vol. 20, No. 8, Aug., 1971, pp. 552–556.

Elliott et al–Parental Absorption of Insulin from the Lung in Diabetic Children–Aust. Paediatr. J. (1987), pp. 293–297.

*Primary Examiner*—Edgar S. Burr
*Assistant Examiner*—Kimberly L. Asher
*Attorney, Agent, or Firm*—Cushman, Darby & Cushman

[57] **ABSTRACT**

A method of delivering a protein, in particular insulin, to the lungs. The method is characterized in that an aerosolized mist of small particles is produced in an associated medicament delivery chamber, the distance from the chamber to the patient's mouth is set to slow the speed of aerosol particles entering the mouth and the flow rate through the chamber is regulated to a low rate of less than about 30 liters per minute. It has been found that administering insulin in accordance with the invention may advantageously produce a penetration of medication into the lungs of about 90%.

**3 Claims, 3 Drawing Sheets**





F I G. IA (PRIOR ART)

(PRIOR ART)
F I G. IB

F I G. 2
(PRIOR ART)



*F I G. 2B* (PRIOR ART)

*F I G. 2C*

(PRIOR ART)

*F I G. 3*

(PRIOR ART)



F I G. 4A

(PRIOR ART)

F I G. 4B

(PRIOR ART)

F I G. 5A (PRIOR ART)

F I G. 5B

(PRIOR ART)

5,320,094

1

# METHOD OF ADMINISTERING INSULIN

## BACKGROUND OF THE INVENTION

The physical discomfort associated with subcutaneous injection of insulin causes many type II diabetic patients to refuse insulin therapy entirely, while type I patients may refuse intensive treatment. A number of investigators have explored various alternative routes of administration of insulin in the hope of developing a substitute for injection.

Harrison and Cantab, "Insulin in Alcoholic Solution by Mouth", Br Med J, pp. 1204–1205 (1923), and Shichiri et al., "Increased Intestinal Absorption of Insulin in a Micellar Solution: water-in-oil-in-water insulin micelles", Acta Diabetol Lat, 15:175–183 (1978), examined the effect of delivering insulin enterically on blood glucose levels in humans and rabbits, respectively. Harrison et al. found that oral administration in alcohol would be too uncertain and too expensive to be of little therapeutic value in treating diabetics. Similarly, Shichiri et al. showed that the possibility of insulin absorption in a micellar form was impractical, since a reduction in blood glucose was only accomplished through intrajejunal administration and the required dose was 25–50 times that of an intramuscular dose.

Yamasaki et al., "The Effectiveness of Rectal Administration of Insulin Suppository in Normal and Diabetic Subjects", Diabetes Care. 4:454–458 (1981), tested the effectiveness of insulin administration by rectal suppository in normal and non-insulin-dependent non-obese diabetic subjects. They found that a dose 10 times the subcutaneous dose was necessary to lower blood glucose levels significantly, and some subjects complained of abdominal discomfort or a feeling of rectal urgency.

N. F. Fisher, "The Absorption of Insulin from the Intestine, Vagina, and Scrotal sac", Am J Physiol, 67:65–71 (1923), found that blood glucose levels in dogs were only temporarily reduced when insulin was administered through fistulae into the intestine or through vaginal administration. He found that scrotal administration of insulin resulted in a more sustained lowering of blood glucose in rabbits than with the other two routes of administration. However, this method of insulin delivery required injection into the scrotal sac and was not recommended for treatment of human diabetic patients.

Moses et al., "Insulin Administered Intranasally as an Insulin-bile salt Aerosol. Effectiveness and Reproducibility in Normal and Diabetic Subjects", Diabetes 32:1040–1047 (1983) reported that insulin administered intranasally as a bile-salt aerosol was effective in lowering blood glucose levels in diabetic subjects. Nevertheless, the amount of insulin absorbed through the nasal mucosa was approximately 10% of the dose delivered by intravenous injection and 2.5 times the subcutaneous dose was required to lower blood glucose. In addition, subjects reported nasal irritation and nasal congestion following administration, probably due to the presence of the bile acid.

Because of lower serum absorption and/or local irritation, none of these alternative routes of administration have been developed to replace insulin injection in the treatment of diabetes.

Creasia et al., "Efficacy of Inhaled Insulin: Effect of Adjuvant",FASEB J. 2: A537 (1988), and Almer et al. "Insulin Inhalation—at last a break-through", Diabetes Research and Clinical Practice, XIII Congress of the

2

International Diabetes Federation: Sydney, Australia, S163 (1988), demonstrated that insulin aerosol delivered through the rat lung was effective in lowering serum glucose. Wigley et al., "Insulin Across Respiratory Mucosae by Aerosol Delivery", Diabetes, 20:552–556 (1971), and Elliott et al., "Parenteral Absorption of Insulin from the lung in Diabetic Children", Aust Paediatr J. 23:293–297 (1987), showed that insulin delivered to the human lung as an aerosol crosses the respiratory mucosa and retains biologic activity, since plasma insulin levels increased after insulin inhalation and blood glucose levels were lowered. Nevertheless, only one patient in the Wigley study achieved a normal blood glucose level following insulin inhalation, and none of the patients in the Elliott study responded with lowering of the blood glucose to within the normal range. The authors concluded that variable and inefficient absorption of insulin across the lung mucosa could account for their results. The dose of insulin available for inhalation at the mouth and the distribution of the available dose within the respiratory tract were not quantified in either study.

All U.S. patents and publications referred to herein are hereby incorporated by reference.

## SUMMARY OF THE INVENTION

The inventors have discovered that it is possible to administer insulin as an orally inhaled aerosolized medication. An aerosol mist of small particles is produced in a medication delivery chamber. The distance from the chamber to the inhalation mouthpiece is set to slow the speed of aerosol particles entering the mouth and the respiratory flow rate is regulated at low rates. This combination of features are produced by providing an inhalation spacer and a device for regulating the flow rate into the patient's mouth to a rate of below about 30 liters per minute. It has been found that administering insulin in accordance with the invention may advantageously produce a penetration of medication into the lungs of about 90%.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1A is a perspective view of the mouthpiece which may be advantageously used in accordance with the method of the invention;

FIG. 1B is a cross-sectional view of the mouthpiece of FIG. 1A;

FIG. 2A is a view of the rigid chamber which may be advantageously used in accordance with the method of the invention;

FIG. 2B is a cross-sectional view of the chamber of FIG. 2A;

FIG. 2C is a detailed elevational view of the apertures in the end of the rigid chamber;

FIG. 3 is a perspective view of the assembled device;

FIG. 4A is a cross-sectional view of an alternate device which may be advantageously used in accordance with the method of the invention;

FIG. 4B is an elevational view of the end of the chamber of FIG. 4A;

FIG. 5A is an elevational view of another alternate device which may be advantageously used in accordance with the method of the invention; and

FIG. 5B shows the device of FIG. 5A in its collapsed configuration.

## DETAILED DESCRIPTION OF THE PRESENTLY PREFERRED EXEMPLARY EMBODIMENTS

The present inventors hypothesized that another explanation for the poor response to insulin delivered to the lungs as an aerosol in the above-noted previous studies by Wigley et al and Elliott et al was an inadequate dose of insulin, as the result of loss of drug in the delivery system and/or in the oropharynx. In experiments described below, the inventors used an aerosol delivery system that maximized deposition within the lungs. The inventors then determined the number of actuations and inhalations necessary to administer a mean dose of approximately 0.2 U/kg body weight (BW) of aerosolized insulin to the mouth using this delivery system, and monitored the plasma glucose response in normal subjects and non-insulin dependent diabetic (NIDDM) subjects. They chose to deliver 0.2 U/kg body weight (BW) because this is the dose given by subcutaneous administration.

In accordance with the currently preferred method, a particular medication delivery system, described in U.S. Pat. No. 4,926,852, is used to achieve the low flow rate which the inventors have discovered is critical to the effective delivery of insulin, in particular, to the lungs. The preferred device is illustrated in FIGS. 1–5. The device includes a medication chamber for receiving a protein, or the like, an outlet aperture through which the material is withdrawn and flow rate limiting orifices.

A mouthpiece is preferably coupled to the outlet aperture. Such mouthpiece is to space the users mouth from the chamber. One such mouthpiece is shown in FIGS. 1A and 1B. The proximal end 12 of the mouthpiece 10 is shaped to be accommodated in the mouth of the patient. In the preferred embodiment, a standard aerosol medication is administered from a metered dose inhaler 14 which is mounted to a coupling 16, which is designed to accommodate metered dose inhalers. Passage 18 directs the aerosol from the metered dose inhaler 14 out through the distal end of the mouthpiece. The distal end of the mouthpiece also has keys 20a and 20b, for example, which allow the mouthpiece 10 to be attached to the rigid chamber 30.

As shown in FIG. 2A, rigid chamber 30 which may be expandable and collapsible as described below, preferably has cut outs 32 which allow chamber 30 to be rigidly attached via keys 20A and 20B to the mouthpiece 10 (FIG. 3). Outlet aperture 34 allows the contents of metered dose inhaler 14 to be directed into chamber 30. End wall 33 of chamber 30 opposite end 31 has a plurality of small, rate limiting orifices 36a–i defined therethrough as can be seen in FIGS. 2B and 2C. In the preferred embodiment nine orifices, each about 0.020 inches in diameter are used. Depending on the age and health of the patient, orifices can be covered in any suitable manner, one at a time, until the volumetric flow rate for the patient is below 30 liters per minute. The covered orifices may be permanently sealed for a particular patient.

FIGS. 4A and 4B show an alternate embodiment of the invention. A rigid chamber 50, is provided having a proximal end 52, and a distal end 54, and a main body 58 therebetween. The proximal end 52 has an aperture 56, which is sized to accept standard disposable mouthpieces currently in use with hospital nebulizers. The body of the device 58 also has an opening 62 of a size

suitable for coupling to an external source of aerosolized medication thereto. A means for closing the opening is further provided in accordance with the present invention. If the external source of aerosolized medication is retained in the opening, then that container will close the opening. In the alternative, the opening can be closed after delivery of medicament to the chamber. The means for closing is shown schematically by phantom box 57 and may be any conventional means for closing such as, for example, a piece of tape or a one-way valve structure. As yet a further alternative, the medicament can be delivered into the chamber through aperture 56. The distal end of the device 54, having a multiplicity of flow restricting orifices 60a–i (FIG. 4B).

Another alternate embodiment of the invention is shown in FIGS. 5A and 5B. The rigid chamber in this embodiment is collapsible, thereby making the invention more portable, and less noticeable when carried. Many patients, especially pediatric patients are embarrassed by their need to take medication, and this embodiment minimizes size and obtrusiveness. In FIG. 5A, the device is shown in its extended form, ready for use. The largest component piece, a truncated cone segment 70, has rate limiting orifices shown as 86a, 86i, and 86e. Other similar offices are provided but not shown in particular.

Truncated cone segments 70–78, nest inside one another and are thereby collapsible. Segment 78 also preferably has a circular flange 79, the diameter of which is at least the size of the small diameter of the largest piece 70. With this arrangement the pieces cannot inadvertently fall apart. A mouthpiece 80 is provided with a flared end sized to fit inside piece 78, and with an opening of sufficient diameter to allow a patient to inhale therethrough in an unrestricted manner. In the alternative the unit can be adapted to receive a mouthpiece or the mouthpiece of FIG. 1. The medicament can be delivered through mouthpiece 80, through an aperture in the chamber wall (not shown) or through the mouthpiece 10 if used therewith.

In the Examples which appear below, regular U-500 pork insulin (Eli Lilly) was aerosolized by a jet nebulizer (Raindrop: Puritan Bennett) connected to a compressed air source set at 30 psi. The timing of each aerosol actuation was controlled by a Rosenthal-French dosimeter and lasted for one second. In order to minimize oropharyngeal deposition of the insulin, aerosol was delivered to a holding chamber of the type described above which served as an extension device between the subject's mouth and the nebulizer. The distance between the subject's mouth and the nebulizer reduced aerosol velocity and, thus, impaction of particles in the mouth. Inspiratory flow rate at the time of aerosol inhalation was regulated to less than 30 and, preferably about 17 liters/minute by rate limiting orifices of the type described above. During inhalation, patients inspired from residual volume to total lung capacity.

Insulin units available to the mouth per inhalation from the delivery system were quantified prior to the beginning of the studies with human subjects. Insulin aerosol was generated during six consecutive actuations from 2 ml of U-500 pork insulin solution as described above into the holding chamber. After the sixth actuation, aerosol was inhaled from the holding chamber through a mouthpiece. Extraction of insulin from absolute filters attached to the mouthpiece indicated that $1.36 \pm 0.23$ U was available for inhalation at the mouth

5

following six actuations. To administer a dose of 0.2 U/kg body weight pork insulin to the mouth, subjects inhaled 6–13 times from the holding chamber, depending on their body weights. Each inhalation was proceeded by six actuations of the nebulizer.

As is illustrated by the Examples, a mean dose of approximately 0.2 U/kg BW of aerosolized insulin, delivered to the mouth for inhalation, effectively lowered blood glucose levels in the normal subjects and shifted blood glucose levels of five of the six NIDDM subjects to within the normal range (4.20–6.44 System International (SI) units). In the sixth subject (No. 8), the blood glucose level was lowered to 6.78 SI units, nearly within the normal range. A much smaller decrease in blood glucose levels was observed in three NIDDM subjects (Nos. 6–8) who inhaled saline aerosol (placebo) during another visit. These results indicate that the findings were not due to fasting per se. Variability in the magnitude of the glucose response between subjects was directly related to the dose of insulin deposited in the lungs, when the insulin dose was calculated on a per kilogram basis.

The results observed are in contrast to those reported by Wigley et al. and Elliott et al., who found that only one diabetic patient in the two studies combined achieved a normal blood glucose level after inhaling insulin. Those authors indicated that they delivered 240 U (0.5 ml of U 500/ml) and 50 U (50 breaths×2 ul/-breath of U 500/ml) insulin, respectively, and concluded that variable and inefficient absorption of insulin across the lung mucosa could account for their poor results. These doses of insulin were estimated either from running the nebulizer dry of solution, or by determinations of weight loss in the nebulizer after each administration. Yet, it has been shown by Newman et al., "Deposition of Pressurized Aerosols in the Human Respiratory Tract", *Thorax*, 36: 52–55 (1981), using radioaerosol imaging techniques, that when pressurized aerosols are delivered directly into the mouth, only 10% of the inhaled fraction deposits beyond the oro-pharynx. The losses occur primarily because of impaction, resulting from high aerosol velocity and high inspiratory flow rate. In addition, in the study by Eliott et al., it is likely that most of the 50 U of insulin were lost in the holding chamber and testing of the delivery system. Because of these losses, the does delivered to the lungs in both studies was probably inadequate for normalization of blood glucose levels.

In contrast, in the present invention, a delivery system is utilized that adds distance between the patient's mouth and the aerosol generator, thereby decreasing aerosol velocity and impaction of particles at the mouth. More importantly, the present invention regulates inspiratory flow to a low flow rate of about 30 l/m or less and preferably as low as 17 l/m. The fraction of aerosol that deposits within the lungs is then quantified using, for example, gamma camera imaging technology. In particular, the present inventors calculated that a mean of 89.8±5% of the inhaled dose was actually deposited in the lungs. With a dose of 0.2 U/kg BW of insulin available at the mouth for inhalation, the deposited dose of insulin was similar to that given by subcutaneous administration, which probably accounts for the shift of blood glucose levels of the NIDDM subjects into the normal range.

The exact pharmacokinetics of insulin delivered through the lungs are not clear. The results of the Examples shown below illustrate that insulin absorption

6

across the lung mucosa was more rapid than following subcutaneous administration, with serum insulin levels peaking at 35±31 minutes. With the exception of subjects 6 and 8, peak plasma insulin levels occurred within the first forty minutes after inhalation. Yet, blood levels did not return to baseline by the time the experiment was concluded in seven of the study subjects after a dose of approximately 0.2 U/kg BW of insulin. These findings may indicate both a fast and a slow component of insulin release across the lung mucosa. Variability in the kinetics of absorption of insulin across the lung mucosa was observed between individuals, but there did not appear to be any difference in absorption between the two normal subjects and the six NIDDM subjects. In addition, the drop in plasma glucose occurred in every subject and correlated closely to the insulin dose in a curvilinear relationship.

Aerosolized insulin administration was very well tolerated by the normal and NIDDM subjects, and there was a lack of any signs or symptoms, including adrenergic symptoms.

The present invention allows for the administration of a dose of 0.2 U/kg BW of aerosolized insulin that is deposited predominantly within the lungs and is well-tolerated. Administration of insulin in this manner, effectively lowered blood glucose levels in normal subjects and shifted blood glucose levels of NIDDM subjects to within the normal range. The glucose response to the dose of insulin administered as an aerosol was predictable when the dose was calculated on a per kilogram basis, and there did not appear to be significant variability between normal subjects and NIDDM subjects in absorption of insulin across the lung mucosa. These findings suggest a potentially new approach for controlling plasma sugar in human subjects.

The present invention can be illustrated by the use of the following non-limiting examples:

EXAMPLE I

Aerosol Delivery of Insulin to Subjects

The goal was to deliver between 0.1 and 0.2 U/kg BW pork insulin to the mouth for inhalation in these experiments. To accomplish this dosing regime, volunteers inhaled 5–13 times from the holding chamber. Each inhalation was preceded by six actuations of the nebulizer.

The precise protocol utilized for delivery of the insulin was as follows:

Two normal volunteers aged 39 and 44 years, respectively (subjects Nos. 1 and 2, Table 1), and six NIDDM volunteers aged 35–62 years (subjects Nos. 3–8, Table 1, shown below) participated in these studies. During a screening visit, subjects underwent routine spirometry testing and a diffusing capacity test (DLCO), in order to quantify their pulmonary functions. On the screening day, subjects also underwent a gamma camera imaging procedure in order to determine percent aerosol deposited within the lungs, using the holding chamber and nebulizer as described above. Subjects first inhaled one breath of a radioaerosol, generated from a 0.9% saline solution containing 8–12 millicuries of technetium 99-m sulfur colloid by the above delivery system, through an absolute filter. Activity detected on this filter was used to quantify the dose of radioactivity available per inspiration at the mouth. Then, subjects inhaled one to two breaths without the filter. After each inhalation, they exhaled into another absolute filter to collect the ex-

7

haled fraction. The total amount of radioaerosol delivered to the mouth did not exceed 60 microcuries (uCi), which resulted in a radiation absorbed lung dose <22.5 mrads.

Immediately following radioaerosol inhalation, patients were scanned with a large field of view GE STARCAM camera for ten minute imaging of the anterior chest and oropharynx. Images were acquired and processed in a 256×256 picture element matrix using a GE STARCAM computer. Activity (counts per minute) detected on the exhalation filter, within the oropharynx, and within the stomach (activity which could only have originated from aerosol deposited in the mouth) was expressed as a percent of the inhaled fraction and added together. The difference between this total and 100% was determined to be the percent of aerosol deposited below the larynx.

Insulin aerosol was later generated and delivered by the same type of nebulizer and holding chamber used to generate and deliver the radioaerosol. Inspiratory flow was also regulated at the same low rates. Because the delivery system and flow rates were the same, it was assumed that the fraction of insulin aerosol deposited within the lungs was the same as that of the radioaerosol.

None of the subjects had a history of asthma or other lung diseases and all were nonsmokers. No one was on or had ever been on insulin treatment. Subjects 3, 4 and 6 were medicated with Glyburide 10 mg/day, 15 mg/day, and 5 mg/day, respectively. Subject No. 5 was treated with Diabinese 750 mg/day. Subject No. 7 was medicated with Glyburide 20 mg/day and Subject No. 8 was unmedicated. Insulin administration was carried out in a fasting state. Patients were off oral Glyburide for 2 days and off Diabinese for 4 days, prior to inhaling insulin. During the study, blood samples were collected every 5 minutes for 60 minutes and every 10 minutes, thereafter, for up to 200 minutes from an indwelling venous line in order to measure blood glucose and insulin levels. Blood samples were assessed at the time of collection for glucose levels with a glucose meter (Accuchek). Determinations of plasma glucose levels were also obtained from photometric reaction with glucose hexokinase using an Hitachi 736 and 737 chemical analyzer (Boehringer Mannheim Diagnostics). The reference range for fasting adults using this technique and equipment is 3.92–6.44 SI units. Serum insulin levels were determined by antibody-coated tube RIA kits as described above. The expected range of values for normals in the fasting state, as provided by Diagnostics Products Corp., is 18–210 SI units. An IV saline solution was running, 50% glucose was available in case the blood glucose level decreased rapidly, and a diabetologist was present during the study. Normal subjects inhaled approximately a 0.1 U/kg BW dose and a 0.2 U/kg BW dose of insulin on two different occasions.

8

NIDDM subjects inhaled approximately a 0.2 U/kg BW dose of insulin once. Three NIDDM subjects (Nos. 6–8 ) inhaled saline aerosol (placebo) delivered using the same protocol as insulin aerosol, in order to determine percent decrease in blood glucose during the fasting period. Studies were performed in the Johns Hopkins Outpatient Clinical Research Center. All patients who participated in these experiments gave informed consent to a written description of the study, which was approved by the Institutional Review Board.

When averaging decreases in blood glucose levels the data were normalized in terms of percent change from baseline. When averaging increases in blood insulin levels, the geometric mean (base $\log_{10}$) was determined after the data were normalized by logarithmic transformation. Mean values for blood glucose levels, blood insulin levels, and average time to peak insulin levels or maximum decrease in glucose levels include data following the second dose of insulin for subjects No. 1 and 2 and the single dose for subjects Nos. 3–8. A Spearman-rank correlation test was used to determine the relationship between maximum percent decrease in glucose and the dose of inhaled insulin.

All subjects demonstrated normal pulmonary functions and DLCO measurements. Gamma camera scans of the respiratory tract indicated that deposition of the radioaerosol was maximized in the lungs of each of these subjects. The fraction of aerosol deposited below the larynx ranged from 82.4 to 96.0% of the inhaled dose. Mean ($\pm$s.d.) deposition was 89.8$\pm$5.0% of the inhaled fraction. A mean of 4.2$\pm$2.9% was exhaled.

The dose of insulin that was delivered to the mouth, for each of the normal subjects and NIDDM subjects as determined from the filter experiments described above, was calculated in terms of body weight and is shown in Table 2, below. Subjects inspired regular U-500 pork insulin in doses that ranged from 0.09 U/kg BW to 0.23 U/kg BW. Mean insulin dose was 0.21$\pm$0.01 U/kg BW.

TABLE 1

| Subject Number | Age (years) | Height (meters) | Weight (kg) | Sex | Medications |
|---|---|---|---|---|---|
| NORMAL SUBJECTS | | | | | |
| 1 | 39 | 1.90 | 86.62 | M | — |
| 2 | 44 | 1.66 | 64.40 | F | — |
| NIDDM SUBJECTS | | | | | |
| 3 | 42 | 1.80 | 78.68 | M | Glyburide 10 mg/day |
| 4 | 43 | 1.79 | 70.75 | M | Glyburide 15 mg/day |
| 5 | 62 | 1.55 | 57.14 | F | Glyburide 750 mg/day |
| 6 | 47 | 1.79 | 87.08 | M | Glyburide 5 mg/day |
| 7 | 35 | 1.68 | 54.40 | M | Glyburide 20 mg/day |
| 8 | 53 | 1.83 | 90.30 | M | — |
| x = | 46 | 1.75 | 73.7 | | |
| ±d = | 8 | 0.11 | 14.1 | | |

TABLE 2

| Subject Number | Baseline Insulin Level (SI units) | log | Insulin Dose Delivered by MDS (u/kgBW) | Peak Insulin Level (SI units) | log | Time to Peak Insulin Level (minutes) |
|---|---|---|---|---|---|---|
| NORMAL SUBJECTS | | | | | | |
| 1 (first dose) | 54* | 1.7324* | 0.09* | 138* | 2.1399* | 10* |
| 1 (second dose) | 66* | 1.8195 | 0.19 | 216 | 2.3345 | 35 |
| 2 (first dose) | 60* | 1.7782* | 0.11* | 300* | 2.4771* | 5 |
| 2 (second dose) | 87 | 1.9395 | 0.21 | 216 | 2.3345 | 5 |
| NIDDM SUBJECTS | | | | | | |
| 3 | 150 | 2.1761 | 0.21 | 588 | 2.7694 | 5 |
| 4 | 72 | 1.8573 | 0.23 | 198 | 2.2967 | 15 |
| 5 | 81 | 1.9085 | 0.21 | 204 | 2.3096 | 40 |

12/8/2006, EAST Version: 2.0.3.0

NN-2151

TABLE 2-continued

| Subject Number | Baseline Insulin Level (SI units) | log | Insulin Dose Delivered by MDS (u/kgBW) | Peak Insulin Level (SI units) | log | Time to Peak Insulin Level (minutes) |
|---|---|---|---|---|---|---|
| 6 | 75 | 1.8751 | 0.20 | 246 | 2.3909 | 52 |
| 7 | 48 | 1.6812 | 0.20 | 114 | 2.0569 | 25 |
| 8 | 42 | 1.6232 | 0.20 | 564 | 2.7513 | 100 |
| - | geometric | | | geometric | | |
| x = | mean = 72 | 1.8601 | 0.21 | mean = 254 | 2.4055 | 35 |
| s.d. = | | 0.1684 | 0.01 | | 0.2405 | 31 |

*Not included in mean calculations
MDS = Medication Delivery System

## EXAMPLE II

### Comparison of Blood Insulin Levels Prior and Subsequent to Insulin Inhalation

After the protocol described in Example I was carried out, a comparison was made between the level of insulin found in the blood before and after aerosol administration of the insulin. (Table 2)

In particular, the average fasting blood insulin level for normal subject No. 1 was 54 and 66 SI units for study days 1 and 2, and for subject No. 2 was 60 and 87 SI units on the two study days, respectively. Baseline levels for the six NIDDM subjects were 150, 72, 81, 75, 48 and 42 SI units respectively. The geometric mean fasting insulin level for the eight subjects was 72 SI units.

Insulin levels for subject No. 1 peaked at 138 and 216 SI units after inhaling 0.09 and 0.19 U/kg BW of insulin, respectively. Insulin levels for subject No. 2 peaked at 300 and 216 SI units after inhaling 0.11 and 0.21 U/kg BW of insulin, respectively. Peak insulin levels for the NIDDM subjects were 588, 198, 204, 246, 114 and 564 SI units after inhaling 0.21, 0.23, 0.21, 0.20, 0.20 and 0.20 U/kg BW of insulin, respectively. Blood insulin levels peaked between five and one hundred minutes post inhalation. The average time to peak insulin level was 35±31 minutes. After insulin inhalation, the geometric mean blood insulin level for the eight subjects rose to 254 SI units.

It should also be noted that insulin aerosol was well-tolerated. No adverse symptoms from the respiratory tract were reported or signs observed. Moreover, none of the subjects had adrenergic, hypoglycemic symptoms following insulin administration. Only one normal subject complained of being hungry.

## EXAMPLE III

### Comparison of Blood Glucose Levels Prior and Subsequent to Insulin Inhalation

After the method described in Example I was performed, a comparison of blood glucose levels prior and subsequent to the aerosol administration of the insulin was undertaken.

The average fasting blood glucose levels for normal subject No. 1 was 4.70 SI units on both study days, and for subject No. 2 was 3.95 and 4.34 SI units on study days one and two, respectively. The baseline levels for the six NIDDM subjects were 10.58, 16.58, 12.12, 9.27, 13.94 and 13.30, respectively.

Glucose levels for normal subject No. 1 decreased to 4.09 and 3.08 SI units after inhaling 0.09 and 0.19 U/kg BW of aerosolized insulin, respectively. Glucose levels for normal subject No. 2 decreased to 3.14 and 2.24 SI units after inhaling 0.11 and 0.21 U/kg BW of insulin, respectively. Glucose levels for the NIDDM subjects decreased to 6.05, 4.82, 5.71, 4.26, 5.49, and 6.78 SI units after inhaling 0.21, 0.23, 0.21, 0.20, 0.20 and 0.20 U/kg BW of insulin, respectively. The time to 10% decrease in plasma glucose averaged 36±15 minutes (Table 3, shown below). The maximum effect of inhaled insulin on glucose levels in both normal and NIDDM subjects occurred slowly over a variable time period ranging from 40 to 200 minutes. The average time to maximum decrease in blood glucose was 138±46 minutes. Maximum decrease in glucose from baseline for all subjects is shown in Table 3, and ranged from 13 to 71%. Mean decrease was 52±10%:41±10% for the normals subjects and 55±10% for the NIDDM subjects, following the administration of 0.2 U/kg BW of insulin.

Maximum percent decrease in glucose was significantly correlated with the dose of inhaled insulin, calculated on a per kilogram basis ($r_S = 0.68$; $p < 0.05$).

TABLE 3

| Subject Number | Maximum Decrease in Glucose (% of Baseline) | Time to 10% Decrease in Glucose (Minutes) | Time to Lowest Glucose Level (Minutes) |
|---|---|---|---|
| NORMAL SUBJECTS | | | |
| 1 (first dose) | 13* | 35* | 80* |
| 1 (second dose) | 34 | 50 | 140 |
| 2 (first dose) | 20* | 5* | 40* |
| 2 (second dose) | 48 | 15 | 40 |
| NIDDM SUBJECTS | | | |
| 3 | 43 | 30 | 150 |
| 4 | 71 | 30 | 160 |
| 5 | 53 | 40 | 200 |
| 6 | 54 | 42 | 140 |
| 7 | 61 | 20 | 120 |
| 8 | 49 | 60 | 150 |
| - | | | |
| x = | 52 | 36 | 138 |

**11**                                                                                    **12**

TABLE 3-continued

| Subject Number | Maximum Decrease in Glucose (% of Baseline) | Time to 10% Decrease in Glucose (Minutes) | Time to Lowest Glucose Level (Minutes) |
|---|---|---|---|
| sd = | 11 | 15 | 46 |

*Not included in mean calculations

### EXAMPLE IV

Blood Glucose Levels Subsequent to Saline Inhalation

As a control, several subjects were administered saline (placebo) in aerosol form rather than insulin. Fasting blood glucose levels were 16.35, 17.70 and 12.01 SI units, respectively. Glucose levels decreased to 15.57, 13.89 and 10.70 SI units after saline inhalation. These decreases represented a 5, 22 and 11% change in blood glucose levels from baseline, respectively. Percent decrease in blood glucose was substantially greater following insulin inhalation, with 54, 61 and 49%, respectively.

While the invention has been described in connection with what is presently considered to be the most practical and preferred embodiment, it is to be understood that the invention is not limited to the disclosed embodiment, but, on the contrary, is intended to cover various modifications and equivalent arrangements included within the spirit and scope of the appended claims.

What is claimed is:

1. A method for delivering insulin for absorption via the lungs of a patient, comprising the steps of:

determining a therapeutically effective amount of said insulin, consistent with the body weight and condition of the patient;

determining an effective number of inhalations required by a patient for inspiration of said therapeutically effective amount of insulin;

providing an inhaler device having a chamber for receiving aerosolized insulin to be inhaled and means for selectively restricting gas flow into said chamber;

providing aerosolized insulin at a regulated inspiratory flow rate of below 30 liters/minute;

delivering a mean dose of aerosolized insulin comprising said therapeutically effective amount of insulin to the patient for inspiration;

inhaling said mean does of aerosolized insulin from said inhaler device at said regulated inspiratory flow rate, said regulated inspiratory flow being selected to maximize the amount of aerosolized insulin deposited for absorption via the lungs into the bloodstream of the patient, whereby a therapeutically effective amount of said insulin, consistent with the body weight and condition of the patient, is inhaled and absorbed into the bloodstream of the patient.

2. The method of claim 1, wherein said flow rate is 17 liters/min.

3. The method of claim 1, wherein the patient's mouth is positioned in fluid communication with the chamber at a present distance from the chamber.

\* \* \* \* \*

# Exhibit 4

*Advanced Drug Delivery Reviews*, 8 (1992) 179–196
Elsevier Science Publishers B.V.

179

ADR 00114

# (D) Routes of Delivery: Case Studies

## (2) Pulmonary delivery of peptides and proteins for systemic action

John S. Patton and Robert M. Platz

*Inhale, Inc.\*, Palo Alto, CA, USA*

(Received November 19, 1990)
(Accepted May 6, 1991)

Key words: Aerosol; Alveolar; Hormone; Lung; Peptide; Protein; Pulmonary absorption

## Contents

Summary .................................................................................................... 180

I. Overview .............................................................................................. 180

II. Mechanism of absorption and clearance ......................................................... 182
   1.   Absorption from the airways ................................................................ 182
   2.   Absorption from the alveoli.................................................................. 184
   3.   Clearance mechanisms........................................................................ 185

III. Case studies of systemic delivery.................................................................. 186
   1.   Insulin............................................................................................. 186
       (a) Summary ................................................................................... 188

Abbreviations: ACE, angiotensin-converting enzyme; AUC, area under the curve; bGH, bovine growth hormone; DDAVP, 1-deamino-8-D-arginine vasopressin; EM, electron microscopy; FDA, Food and Drug administration; FSH, follicle-stimulating hormone; GH, growth hormone; GI, gastrointestinal; hGH, human growth hormone; IgE, immunoglobulin ε; IgG, immunoglobulin γ; IRI, immunoreactive insulin; IRMA, immunoreactive monoclonal assay; i.v., intravenous; LH, luteinizing hormone; LHRH, luteinizing hormone-releasing hormone; MDI, metered dose inhaler; PDR, Physicians' Desk Reference; s.c., subcutaneous; VIP, vasoactive intestinal peptide.
\*Inhale, Inc. is a new company specializing in the development of aerosol delivery systems for proteins, peptides and traditional drugs.

Correspondence: J.S. Patton, Inhale, Inc., 301 University Avenue, Palo Alto, CA 94301, USA. Fax: (1) (415) 327-5488.

|    | 2. | Human growth hormone | 188 |
|    |    | (a) Experimental | 188 |
|    |    | (b) Results and Discussion | 189 |
|    |    | (i) Aerosol characterization | 189 |
|    |    | (ii) Growth | 190 |
|    |    | (iii) Immunogenicity | 190 |
|    |    | (c) Summary | 191 |
|    | 3. | Leuprolide acetate | 191 |
|    |    | (a) Summary | 191 |
| IV. Concluding remarks | | | 192 |
| Acknowledgements | | | 193 |
| References | | | 193 |

### Summary

The columnar epithelium of the gastrointestinal tract, nasal and pulmonary airways is virtually impermeable to most peptides, proteins and other macromolecules. However, the very thin (0.1–0.2 μm) alveolar epithelium of the deep lung appears to be unique among the body's ports of entry in that it is permeable to some peptides and proteins. A dense network of endocytic vesicles in the type-1 alveolar epithelial cells offers a possible mechanism to explain how the airsacs remain nearly free of fluid and how macromolecules are subsequently absorbed. Three therapeutic peptides (leuprolide: nine amino acids, insulin: 51 amino acids and growth hormone: 192 amino acids) are absorbed in biologically active form from the lungs with bioavailabilities of 10%–25%. Inefficient aerosol delivery, aggregation and enzymatic degradation reduce bioavailability. Long-term safety remains a concern, although no serious effects have been observed in studies to date.

### I. Overview

Pulmonary delivery of peptide and protein biotherapeutics[*] is a rapidly growing new area in drug delivery [1]. Although most potential aerosol products are still in the early stages of development, there appear to be a variety of opportunities for the systemic delivery of peptides and proteins that otherwise must be injected, as well as local delivery for the treatment of lung disease. It has been known for some time that the lung is permeable to macromolecules [2–5], so why, until recently, has it been ignored for non-injection, systemic delivery? There is a variety of reasons:

---

[*]For the purpose of this discussion peptides are defined as linear chains of up to about 30–35 amino acids which can be chemically synthesized. Proteins are defined as chains of amino acids greater than 30–35 residues which often have interchain bonding and which must be isolated from natural sources or by recombinant DNA technology.

(1) Aerosol delivery requires sophisticated methods [6] – drug delivery scientists have sought more convienent routes for biotherapeutics. After tremendous effort and cost, however, there is dawning recognition that the gastrointestinal tract, nose and skin are formidable barriers to biotherapeutic absorption. While some small ($M_r$ 1000–1200), very potent peptides such as vasopressin and its analogue DDAVP, oxytocin and LHRH and its analogue buserelin can be delivered by the nasal route with bioavailabilities from 1 to 10% [7–9], enhancers are required to obtain significant absorption of larger proteins such as calcitonin ($M_r$ 3400), insulin ($M_r$ 5700) and growth hormone ($M_r$ 22,000) [10–12]. The use of enhancers to breach these barriers faces an uphill regulatory battle because of possible irritation and other safety concerns and companies that specialize in oral, nasal and transdermal delivery strategies for biotherapeutics face difficult challenges.

(2) Crude devices produce low and variable dosing. Despite the deep lung's tremendous surface area (approximately 143 $m^2$ in adults) and broad permeability characteristics, it is difficult to get drugs efficiently and reproducibly into the lung and into the alveolar region of the lung, beyond the airways, where permeability is thought to be highest [13]. Indeed the current aerosol devices are inefficient, not standardized, used differently by different patients and variability of dosing has posed a serious problem [14–16]. If this route is to be exploited, better delivery devices must be developed.

(3) Safety. There is a general concern that biotherapeutics will cause an immune reaction or some other adverse effect in the lung. Although the concern about safety is warranted and each drug's safety must be assessed on a case-by-case basis, evidence to date suggests that same-species biotherapeutics will not cause significant immune problems when chronically administered by aerosol (see the case study with growth hormone below). In fact, the healthy lung may be designed to be particularly unresponsive to protein antigens compared to other sites in the body (such as the subcutaneous injection site).

(4) Few biotherapeutics have been available. Insulin was one of the few commercially important injectable proteins or peptides that could have been developed as an aerosol before the advent of recombinant DNA technology.

(5) The unique permeability of the lung to peptides and proteins is not well known. The few number of articles on the permeability of the lung to macromolecules is scattered and has been reviewed only a few times [17, 18]. The fact that the lung is permeable to proteins is not widely known as evidenced by the standard text for medical students on the lung by Murray and Nadel which states "the alveoli are impermeable to proteins". Now the field is expanding fast and awareness of the potential of this route of delivery is rapidly spreading.

## II. Mechanisms of absorption and clearance

### II.1. Absorption from the airways

When air enters the lung through the trachea it travels through a branching system of airways (bronchi and broncheoles) that conduct air to the alveoli [19, 20]. The airways are covered with a thick columnar epithelium (30–40 µm) that is roughly similar to that which lines the nose and gastrointestinal tract (Fig. 1). Like the epithelium of the nose and GI tract, the airways are virtually impermeable to proteins but presumably slightly permeable to smaller peptides. Although it is easy for air to flow into the lungs to the alveoli, the branching airways act like an impaction filter for inhaled particles. When a particle lands on the surface of an airway a continuously moving blanket of mucous sweeps it out of the lung and into the throat where it is swallowed. This airway particle trap is a critical 'barrier' to aerosol delivery of peptides and proteins to the alveoli. Particle size is thus one of the most important considerations for aerosol delivery. Byron suggests that maximal alveolar deposition occurs with particles with diameters between 1.5 and 2.5 and between 2.5 and 4 µm, with and without breathholding, respectively [21]

The mechanism of small peptide absorption from the airways is uncertain but may occur via the tight junctions between cells [22]. In the intestine, where more is known about tight junctions, the junctions are an effective seal for molecules 2.3 nm in diameter or greater [23]. Fig. 2 illustrates schematically the approximate size of a 'spherical' insulin molecule and other macromolecules, relative to the maximally opened, tight junction 'pore'. Presumably for a molecule to freely diffuse through a tight junction opening of 2.3 nm the



Fig. 1. Relative scale drawing of the thickness of columnar epithelium of airways, nose and gastrointestinal (GI) tract versus the thickness of alveolar type-1 epithelium cells.

PULMONARY DELIVERY OF PEPTIDES AND PROTEINS                                    183



Fig. 2. Tight junctions in the GI tract under maximum physiological opening (during absorption of a meal) exclude molecules with diameters greater than 2.3 nm [23]. The slit width of pulmonary tight junctions is unknown.

molecule must be much smaller than the diameter of the opening. The tight junction 'pores' in the intestine are thought to open and close and to contain fixed negative charges [23]. It is clear that tight junctions can become leaky during inflammatory and allergic conditions [24] and that their structure varies according to epithelial cell type [25]. Since the lung is thought to be composed of over 40 cell types, it may be some time before we know where, in the airway epithelium, the most permeable junctional sites for peptide absorption occur. It also may be risky to extrapolate insight obtained from tight junctions in the intestine to the lung, since the intestine is filled with fluid and the lung is filled



Fig. 3. Schematic scale drawing of the alveolar wall showing the proposed mechanism of protein and peptide absorption by fluid phase transcytosis through the type-1 alveolar epithelial cell and the capillary endothelial cell. Step 1 – formation of endocytic pit that carries fluid and solutes from the alveolar lining fluid. Step 2 – the forming vesicle pinches off and is entirely inside the type-1 cell. Step 3 – the vesicle fuses with the internal plasma membrane allowing fluid and solutes to diffuse into the interstitium. Material may then traverse the capillary endothelial cell in the same way it passed through the alveolar cell (Step 4a, 5 and 6) or it may pass paracellularly between the cells (Step 4b) or if it is of larger molecular weight (greater than 25,000), it may enter the lymphatic system.

184                                                                                          J.S. PATTON



Fig. 4. Schematic scale drawing of a type-1 cell endocytic vesicle showing the approximate size of a ferritin, growth hormone and insulin molecule. Ferritin molecules do not enter type-1 cell vesicles [31] and may be restricted by the glycocalyx shown here as a network of fibers on the surface of the membrane and inside the vesicle. Little is known about the glycocalyx of the alveolar lining. Angiotensin-converting enzyme (ACE) of enkephalinase is known to be located on the surface of the alveolar lining and is probably within the glycocalyx. This enzyme hydrolyzes some small peptides.

with air. Transepithelial transport of proteins through airway cells [26] is not likely to be a useful pathway for the delivery of biotherapeutics because of low capacity.

*II.2. Absorption from the alveoli*

At the end of the airways lie the alveoli which are covered by a very thin epithelium (0.1–0.2 μm in most regions) (Fig. 1). More than 95% of the lung's huge surface area resides in the alveoli and it is the alveolar region where peptides and proteins are thought to be absorbed by a process of transcytosis [13, 27–30]. Fig. 3 shows a schematic scale drawing of a section of alveolar wall with the different steps of the hypothetical transport process numbered. According to this hypothesis, macromolecules enter one of the numerous

endocytic vesicles (approximately 70 nm diameter) (greater than 1.5 million/cell) that occur in type-1 epithelial cells (Step 1). These vesicles often have an opening (approximately 40 nm diameter) either to the alveolar lumen or to the interstitium (but not to both) [30]. The entrance to these vesicles may be covered by a diaphragm or by the glycocalyx because ferritin, an electron-dense particle that can be seen directly by electron microscopy, does not readily enter the type-1 cell vesicles [31] (Fig. 4). In endothelial cells uncoated vesicle diaphragms have positive charges and exclude neutral or cationic proteins [32, 33]. In Step 2 the vesicle pinches off from the plasma membrane and exists for an instant completely inside the type-1 cell. Accordingly, the vesicle then fuses with the internal plasma membrane and releases its contents into the interstitium (Step 3) which is technically 'inside the body'. The interstitium is where subcutaneous injections are deposited. The interstitium is a gel-like structure through which lymph flows. It contains all of the plasma proteins but at a lower concentration (about 70%) than that of blood [34, 35]. Once in the interstitium the macromolecule, if it has a molecular weight greater than about 25,000, may percolate primarily into the lymphatic system of the lung [4, 36, 37] (Step 4b); if it is smaller it may primarily traverse the capillary endothelial cell and enter the blood by a process of transcytosis (Steps 4a, 5 and 6) similar to that in the epithelial cell. In addition, small proteins may also be absorbed from the interstitium by the paracellular route through the 'leaky' tight junctions of the capillary endothelial cells [38–41] (Step 4c). The tight junctions of the alveolar epilthelium are thought to be quite impermeable to proteins [38, 41].

Although the rate of absorption of proteins and peptides is thought to be roughly dependent upon molecular weight [17, 18], e.g., the larger the size the slower the absorption; pH, charge, ions, surface activity, solubility and other physical/chemical factors may also affect the rate of absorption. When absorption rates of proteins and peptides are considered, case by case, the relationship between molecular weight and absorption is not so clear. For example, aerosol leuprolide acetate ($M_r \approx 1200$) peaks in human plasma at about 90 min [42]; aerosol insulin ($M_r$ 5700), peaks in humans at 15–30 min [43–46]; aerosol growth hormone ($M_r \approx 22,000$) peaks in rats at 30 min–4 h [47]; aerosol $\alpha_1$-antitrypsin ($M_r$ 51,000) peaks in sheep between 4 and 12 h [37]; and intratracheal albumin ($M_r$ 68,000) peaks in guinea pigs at about 5 h [4] and in sheep it appears to take longer [34]. The above studies differed in their formulations, protein concentrations, species, volumes and other ways. A more systematic study in the same species would be valuable. Clearly, there is much we don't know about the determinants of peptide and protein absorption in the lung.

## II.3. Clearance mechanisms

We have already mentioned the mucociliary clearance mechanism which keeps the airways free of particulates. There are no cilia or mucus blankets in the alveoli but if a particle does reach the alveoli it must rapidly dissolve into

the alveolar lining fluid [48, 49]. If not, it will be engulfed by the resident alveolar macrophages which keep the alveolar epithelium free of particulates [50]. The rapidity of this process was illustrated to us in rat experiments with aerosolized 0.5 μ fluorescent beads (Duke Scientific, Palo Alto, CA). Rats were exposed to an aqueous aerosol containing 1% beads for 10 min then killed and their lungs frozen as quickly as possible and viewed by fluorescence microscopy. Greater than 98% of beads in the alveolar spaces were seen in alveolar macrophages (unpublished observations). Thus aerosol particles must be readily soluble in alveolar fluid for maximum bioavailability. Small molecules that resist metabolism may still be bioavailable following phagocytosis by alveolar macrophages but it is hard to imagine that exogenous, protease-sensitive proteins and peptides inside a macrophage lysosome would be able to exit the cell. Both the mucus layer in the airways (1–10 μm thick) and the thin surfactant-covered aqueous layer (0.1–0.2 μm thick) of the alveoli [48, 51–52] have high concentrations of protease inhibitors [53, 54], so presumably proteins and peptides are reasonably protected from degradation in solution. Hydrolysis of peptides and proteins by membrane-associated peptidases, however, is another matter and considerable degradation may occur by cell associated enzymes [55].

### III. Case studies of systemic delivery

The following case studies illustrate 3 examples where systemic delivery of a peptide or protein has been achieved by aerosol delivery to the lung. Although these three examples are very encouraging *not all peptides and proteins are absorbed or effective in the lung*. For example, vasoactive intestinal peptide (VIP), a 28 amino acid peptide which induces smooth muscle relaxation, is degraded and inactive in the lung [81]. Unfortunately it is not yet possible to predict, based on a peptide or protein's structure, whether or not it can be absorbed or be effective in the lung. Thus each molecule must be screened for efficacy or absorbability before a development project can be initiated. Other examples of proteins and peptides delivered to the lung for local and systemic effect which will not be discussed here include studies of peptidase resistant peptides [56], $\alpha_1$-antitrypsin [37, 57, 58], $\gamma$-interferon and tumor necrosis factor [59], superoxide dismutase and catalase [60] and enkephalinase [61].

### *III.1. Insulin*

The first demonstration of the efficacy of an aerosol protein was in Germany in 1925 when insulin was administered to diabetic patients and a fall in blood glucose was recorded [2]. Presumably, the insulin was a crude extract of animal pancreas. It is uncertain if there was further development of the approach at that time. It was not until 1971 that a second report on the efficacy of aerosol insulin in humans appeared [43]. Wigley et al. [43] first verified that aerosol insulin lowered blood glucose in rabbits, then they tried it on themselves (three

normal subjects). They used regular pork-bovine insulin (500 U/ml) in a Devilbiss No. 40 glass nebulizer which produced a mean particle size of approximately 2 μm. They noted that an ultrasonic nebulizer destroyed the biological activity of the insulin molecule. The normal subjects inhaled the insulin for 2–10 min and their blood glucose levels all fell within 30 min from about 85 mg/100 ml to about 65 mg/100 ml. They then did a more detailed study with four adult diabetic patients and measured plasma immunoreactive insulin (IRI) with a new assay developed by Berson and Yalow [43]. Based on comparisons of plasma IRI levels following aerosol administration to those seen with intravenous insulin, about 10% of the aerosolized insulin was absorbed during the 5-min nebulization period. The absorption was rapid but variable with an increase in plasma IRI detected as early as 15 min in one patient and peaks occurring within 30–60 min. In one patient the decrease in plasma glucose was as rapid as that seen following i.v. administration. The variability in the shape of each subjects' plasma IRI profile was in part caused by variable cooperation of the patients and lack of training with the nebulizer.

In a 1987 study, Elliott et al. [45] used Actrapid, semi-synthetic human insulin (U500) and a patented, patient activated aerosol device to deliver uniform doses ($\pm 5\%$) of insulin to six diabetic children. Blood glucose control was at least as good as a control day when they received their usual dose of subcutaneous insulin. The aerosol dose was given before each meal in 30–50 breaths (approximately 2 μl/breath) from the nebulizer. The efficiency of absorption in non-diabetic subjects was between 20% and 25%, but was difficult to estimate in diabetics because of anti-insulin antibodies and poor matching of results on the day subcutaneous insulin was given as compared to the day nebulized insulin was delivered [45]. Elliott et al. stressed that efficiency and reproducibility of delivery could be improved by (a) optimizing compressor flow rates and degree of filling of the nebulizer bowl to obtain optimal particle size nebulae and (b) regularizing depth and duration of inspiration.

At the same time Elliott and coworkers were studying aerosol insulin in New Zealand, Köhler et al. [44] in Germany were using aerosol insulin to measure lung permeability in five healthy smokers and seven healthy non-smokers. Like Elliott, they developed a new device. They state that their device produced "a monodispersional (particle size smaller than 2.5 μm) aerosol" [46]. Subjects inhaled $23.1 \pm 2.8$ U human insulin ($\pm$ S.E.M.). The peak of insulin in the peripheral blood was achieved in both groups 15 min after inhalation: $45.6 \pm 9.8$ μU/ml in the five smokers, $13.6 \pm 1.1$ μU/ml in the seven non-smokers ($\pm$ SEM). Areas under the curve (AUCs) for the two groups were: smokers, $2874 \pm 523$ μU·min$^{-1}$; non-smokers $1534 \pm 168$ μU·min$^{-1}$. Blood glucose began to fall at 5 min reaching nadirs between 40 and 90 min. The pulmonary absorption of human insulin aerosol was approximately 75% for smokers and 25% for non-smokers (100% = absorption after subcutaneous injection). In type-1-diabetics insulin kinetics were similar to controls.

### III.1(a). Summary

There are more human data on aerosol insulin than on any other protein and from a bioavailability standpoint the aerosol route is feasible. Aerosol insulin is more rapidly absorbed (peak at 15 min) and cleared from the blood than it is from the subcutaneous injection site (peak at 45–90 min) [43–45, 62–66]. More rapid glycemic control at meal times with aerosol insulin, in combination with once daily injections of long-acting insulin, may provide better control of the disease. Regular insulin injected half an hour before a meal is absorbed too slowly to simulate the effect of insulin secreted endogenously in response to a meal [67, 68]. But insulin represents one of the most challenging drugs for aerosol delivery because of its narrow therapeutic index. Although both Elliott and Köhler appear to have come up with devices that give reliable dosing [44, 45], they are not portable and it is doubtful that a propellant-driven MDI [69] would provide reliable dosing. Thus for commercial development to proceed, long term safety must be established and a convenient and precise 'pocket' device developed.

### III.2. Human growth hormone

Human growth hormone (hGH) $M_r$ 22,000) is currently given as daily or every-other day subcutaneous (s.c.) injections (50 $\mu g \cdot kg^{-1} \cdot day^{-1}$) to growth hormone deficient children. The nasal bioavailability of hGH in rats is smaller than 1% but can be markedly improved with detergent enhancers which temporarily alter the permeability of the mucosa [12]. Since the chronic effect of enhancers in children is uncertain, we decided to investigate the feasibility of aerosol delivery of hGH. In an earlier study [70] we had shown that intratracheal hGH in rats had a relative (to s.c.) bioavailability of approximately 36%. In a more recent study [47], which is summarized below, we further examined the feasibility of aerosol hGH in rats.

### III.2(a). Experimental

Met-hGH or bovine growth hormone (bGH), a generous gift from Monsanto, were formulated in 5 mM $PO_4$ buffer at a concentration of 25 mg/ml. Animals were exposed to aerosols in a nose-only exposure chamber (In-Tox Products, Albuquerque, NM) which holds up to 48 rats. Two jet nebulizers (Acorn II) were filled with 5 ml of GH and both run simultaneously at a flow rate of 9 l/min through the chamber. Nebulization was carried out until there was no visible output of aerosol (approximately 18 min). This constituted a standard exposure. The particle size of the aerosol in the breathing zone was determined with a Mercer-style seven-stage cascade impactor with a flow intake of 2 l/min. Concentration of drug in the breathing zone was determined by drawing a sample of aerosol at 2 l/min across a glass fiber filter (0.3 $\mu m$). The filter was allowed to dry and weighed.

Both normal and hypophysectomized (hypox) rats were studied [71] (hypox rats have their pituitary gland surgically removed and their weight gain is the

standard bioassay for hGH). At selected times after an 18-min aerosol exposure, animals were euthanized and their serum and lungs analyzed for hGH or their lungs were examined histologically. Aliquots of serum or extracts from homogenized lungs [70] were analyzed for immunoreactive hGH by IRMA assay (Hybritech). In chronic studies rats were placed in the chamber once or twice a day for 18 min exposures and then returned to their cages.

### III.2(b). Results and Discussion

(i) Aerosol characterization. The concentration of hGH in the aerosol at the breathing zone was $270 \pm 60$ µg/l air. The mass median aerodynamic diameter of the aerosol in the chamber was 1.9 µm with a geometric mean of 2.5 µm. Scanning EM of the cascade impactor stages showed that the aerosol particles were dry spheres.

Absorption and elimination of hGH from the lung were studied in both normal and hypox rats after single 18 min aerosol exposures. Elimination was similar in both groups; after 4 h 68–75% of the 0 h deposition value ($44 \pm 9$ µg/g normal lung, $23 \pm 7$ µg/g hypox lung) was still recoverable from the lungs and by 24 h less than 5% remained. Serum profiles were markedly different between the two groups. In normal rats peak blood levels after a single exposure were $12 \pm 8$ ng/ml and occurred at or shortly after cessation of the aerosol exposure. In hypox animals peak levels occurred within 1 h after exposure but these levels persisted for at least 4 h before declining. Elimination of hGH was also slower in hypox rats following intravenous and subcutaneous injection of hGH.

TABLE I

Data are taken from Ref. 47.

| Group | SC injection | Aerosol | Wt.gain (g) |
|-------|--------------|---------|-------------|
| 1 | Buffer | Buffer | 1.5 |
| 2 | hGH, 0.01 mg/kg | Buffer | 4.4 |
| 3 | hGH, 0.03 mg/kg | Buffer | 9.1 |
| 4 | hGH, 0.10 mg/kg | Buffer | 15.3 |
| 5 | Buffer | hGH, $1\chi$ | 15.5 |
| 6 | Buffer | hGH, $2\chi$ | 18.4 |
| 7 | Buffer | none | 3.7 |
| 8 | hGH, 0.03 mg/kgm | none | 13.3 |

TABLE II

CALCULATION OF BIOEQUIVALENCE

| | Once daily | Twice Daily |
|---|------------|-------------|
| Growth (11 days) | 15.5 g | 18.4 g |
| SC equivalent | 110 µg/kg/day | 200 µg/kg/day |
| Lung Deposition | 275 µg/kg/day | 550 µg/kg/day |
| Bioequivalence | 40% | 36% |
| Bioavailability (relative to IV) | 10% | 9% |

*(ii). Growth.* In order to verify that inhaled hGH was biologically active, hypox rats were exposed to aerosol hGH once or twice a day for 11 days and their growth compared to groups that received s.c. injections. Table I shows the groups (8–9 rats/group), their treatments and growth after 11 days.

Hypox rats responded to once-daily inhalation of hGH by growing 15.5 g and to twice-daily inhalation by growing 18.4 g. The bioequivalence of s.c. and aerosol routes was assessed by using the lung content of hGH, immediately at the termination of aerosol exposure, as the aerosol dose. Total growth over 11 days in response to s.c. injection was found to be linearly dependent on the log of the injected dose. By recording the growth observed after once- or twice-daily aerosol exposure, the s.c. dose required to produce that amount of growth was determined. According to these calculations aerosol hGH that reached the lungs, had a bioequivalence relative to s.c. injection of approximately 40% (Table II). According to Jorgensen et al. [72], in hypox rats, s.c.-hGH has a bioavailability relative to i.v. administration of 25%. Using this value the bioavailability of aerosol hGH deposited in the lungs of hypox rats is therefore approximately 10% (Table II).

At the conclusion of growth studies, organ weights were obtained to determine if hGH altered the magnitude of lung growth relative to selected other tissues. No differences in lung weight to total body weight ratios were observed between injected and aerosolized animals after 11 days of treatment. Organ weight-to-body weight ratios in normal rats were also unaffected by hGH injection or aerosol delivery during the course of chronic daily treatment for 28 days. Although GH receptors are present in a variety of cells and tissues in both young and adult animals [73–75] there is no evidence in the literature that elevated lung GH levels cause disease or dysfunction of the lung [76–78]. In situ hybridization techniques were used to label GH receptor message in rabbit lung. No receptor message was seen in the cell layers which face the air spaces in the lung (Cy Wilcox, personal communication).

*(iii). Immunogenicity.* Histological sections were also examined to assess whether significant cellular changes in lung were demonstrable. In all rats studied during chronic therapy, there was no evidence of airway or alveolar inflammation or edema. Nor was there evidence of pulmonary fibrosis or increased parenchymal cellularity. In non-hypox rats, perivascular accumulations of mononuclear leukocytes (cuffs) developed in the adventia of small and medium-sized pulmonary veins in animals that inhaled hGH but were infrequent in those injected with hGH. There was no associated destruction of vessel integrity and no evidence of leukocytoclasis. To determine if the histology was caused by the immunogenicity of hGH, bovine GH which is much closer in amino acid sequence to rat GH and not significantly immunogenic in rats [71] was aerosolized for 7 days and the cuffing response compared to that seen in groups exposed to buffer, rat serum and hGH. Cuffing did not develop in rats chronically exposed to bGH, rat serum and buffer, but it did in most animals chronically exposed to hGH.

These results are typical of a mild immune reaction in the lung [79]. The systemic immune response to inhaled or injected hGH was quantitated by measurement of serum immunoglobulins during the course of chronic exposure of rats to hGH. The injected dose was lowered to match the amount absorbed following inhalation. Maximal GH-specific IgG antibody titers that developed after 3 weeks of daily treatment with hGH were lower after inhalation than after injection in both normal and hypox rats. None of the rats treated with hGH developed IgE antibodies during the course of chronic therapy [47].

### III.2(c) Summary

Aerosolized hGH induces growth of hypox rats and has an estimated s.c. bioequivalence of 40% and an absolute bioavailability of 10%. There were no abnormal growth effects in the lungs following chronic aerosol-hGH exposure to normal and hypox rats for 28 days. A mild immune response in the lung that was seen when rats were exposed chronically to aerosol-hGH was not seen when bovine GH was used. No evidence of inflammation or edema was seen in any of the studies. Although rats are obligate nose breathers and could have thus absorbed the hGH from their nose, previous studies showed that even in the presence of very high concentrations of intranasal hGH there was very little absorption [12]. Unlike insulin, which requires a portable aerosol device, growth hormone, which is taken once a day or less, could be administered from a home aerosol device.

### III.3. Leuprolide acetate

Leuprolide acetate is a potent luteinizing hormone-releasing hormone (LHRH) agonist ($M_r \approx 1200$, nine amino acids) which when introduced to the portal circulation, induces the release of luteinizing hormone (LH) and follicle-stimulating hormone (FSH) from the anterior pituitary [42]. With continuous daily subcutaneous injection, however, the opposite effect occurs within a few weeks, gonadotropin secretion is inhibited and testicular and ovarian steroidogenesis is suppressed. For this reason, systemic administration of leuprolide is used to inhibit the growth of abnormal reproductive tissue and tumors that require reproductive hormones for growth, e.g., prostate cancer. Leuprolide acetate is more potent and more protease resistant than the natural hormone. Its oral bioavailability is approximately 0.05% and nasal and transdermal bioavailabilities are less than 2% [42].

### III.3(a). Summary

Adjei and Garren [42] have shown absolute bioavailability of aerosol leuprolide acetate in healthy human volunteers of up to 18%. They found that the standard suspension formulation for propellant MDIs gave the best results. Bioavailability corrected for respirable fraction (particle diameters, 0.43–4.7 μm) ranged from 35% to 55%. Subjects were trained in the proper use of the MDI and took two puffs per dose (0.5–1.0 mg leuprolide/puff). Plasma maxima



Fig. 5. *Typical doses for different classes of drugs taken from the PDR. The compounds were chosen at random and there are exceptions in some classes. With the exception of the hormones, all agents included in this figure are typical small molecular weight drugs. The error bars are 1 standard deviation.*

($T_{max}$) were achieved in about 90 min and levels were detectable for over 12 h [42]. This is an interesting result because most peptides are cleared rapidly from the blood and insulin, with a larger molecular weight of 5700, reaches a plasma maximum from an aqueous aerosol in 15 min [44, 45, 62]. Leuprolide acetate may have been slowly released in the lung from the MDI aerosol particles (which also contained an oily surfactant, sorbitan trioleate) and/or bound to serum components following pulmonary absorption, which could have prolonged its plasma lifetime.

## IV. Concluding remarks

The above case studies show that the lung, that well-known 'tennis court' of surface area, is naturally permeable to peptides and proteins. The two important issues for commercial exploitation are safety and dosing. Whether or not it is safe to have peptides and proteins absorbed from the lung must be examined on a case by case basis. According to the 1990 Physicians' Desk Reference (PDR) [80] there are more than 20 approved aerosol drugs in the USA, all but one for local lung action and none of them peptides or proteins. So, although the FDA is comfortable with putting some drugs in the lung, safety is a key issue and must be addressed as early as possible in the development process of a potential new aerosol drug.

The other important issue, dosing, has several components. Some drugs will be dose limited. Fig. 5 shows average doses for different classes of drugs taken from the PDR. Note that the existing aerosol bronchodilators and bronchosteroids are some of the most potent drugs available. A high output nebulizer can deliver about 10 μl per deep breath. If a peptide is soluble to 1% in the aqueous formulation (10 mg/ml) then each breath will contain about 100 μg peptide. MDIs deliver more drug per actuation, 0.5–2.0 mg, but only about 10% or 50–200 μg makes it into the lung. So with both devices multiple breaths

NN-5333

are needed to put a single milligram of drug into the lung. If hundreds of milligrams of drug must be taken per dose, the lung may not be convenient. Dosing also needs to be more precise. At this time aerosol delivery to the lung is semi-quantitative at best. Better devices will be the key to the successful commercialization of most new peptides and proteins.

## Acknowledgements

The aerosol hGH work was generously supported by Genentech, South San Francisco, CA.

## References

1 Byron, P. (1990) Determinants of drug and polypeptide bioavailability from aerosols delivered to the lung, Adv. Drug Deliv. Rev. 5, 107–132.

2 Gansslen, M. (1925) Über Inhalation von Insulin, Klin. Wochenschr. 4, 71.

3 Bensch, K.G., Dominquez, E.A.M. and Liebow, A.A. (1967) Absorption of intact protein molecules across the pulmonary air–tissue barrier, Science 157, 1204–1206.

4 Dominquez, E.A.M., Liebow, A.A. and Bensch, K.G. (1967) Studies on the pulmonary air–tissue barrier. I. Absorption of albumin by the alveolar wall, Lab. Invest. 16, 905–911.

5 Enna, S.J. and Schanker, L.S. (1972) Absorption of saccharides and urea from the rat lung, Am. J. Physiol. 222, 409–414.

6 Gonda, I. (1990) Aerosols for delivery of therapeutic and diagnostic agents to the respiratory tract, CRC Crit. Rev. Ther. Drug Carrier Syst. 6, 273–312.

7 Lee, W.A. and Longenecker, J.P. (1988) Intranasal delivery of proteins and peptides, Biopharm. (April) 30, 37.

8 Raehs, S.C., Sandow, J., Wirth, K. and Merkle, H.P. (1988) The adjuvant effect of bacitracin on nasal absorption of gonadorelin and buserelin in rats, Pharm. Res. 5, 689–693.

9 Chien, Y.W. and Chang, S.-F. (1987) Intranasal drug delivery for systemic medications, CRC Crit. Rev. Ther. Drug Carrier Syst. 4, 67–194.

10 Pontiroli, A.E., Alberetto, M., Calderara, A., Pajetta, E. and Pozza, G. (1989) Nasal administration of glucagon and human calcitonin to healthy subjects: a comparison of powders and spray solutions and of different enhancing agents, Eur. J. Clin. Pharmacol. 7, 427–430.

11 Gordon, G.S., Moses, A.C., Silver, R.D., Flier, J.S. and Carey, M.C. (1985) Nasal absorption of insulin: enhancement by hydrophobic bile salts, Proc. Natl. Acad. Sci. 82, 7419–7423.

12 Daugherty, A.L., Liggitt, H.D., McCabe, J.G., Moore, J.A., and Patton, J.S. (1988) Absorption of recombinant methionyl-human growth hormone (Met-hGH) from rat nasal mucosa, Int. J. Pharm. 45, 197–206.

13 Schneeberger, E.E. (1978) Structural basis for some permeability properties of the air–blood barrier, Fed. Proc. 37, 2471–2478.

14 De Blaquiere, P., Christensen, D.B., Carter, W.B. and Martin, T.R. (1989) Use and misuse of metered-dose inhalers by patients with chronic lung disease, Am. Rev. Respir. Dis. 140, 910–916.

15 Matthys, H. and Köhler, D. (1985) Pulmonary deposition of aerosols by different mechanical devices, Respiration 48, 269–276.

16 Phipps, P.R. and Pharm, B. and Gonda, I. (1990) Droplets produced by medical nebulizers: some factors affecting their size and solute concentration, Chest 97, 13–1332.

17 Schanker, L.S. and Hemberger, J.A. (1983) Relation between molecular weight and pulmonary absorption rate of lipid-insoluble compounds in neonatal and adult rats, Biochemical Pharmacol. 32, 2599–2601.

18 Effros, R.M. and Mason, G.R. (1983) Measurements of pulmonary epithelial permeability in vivo, Am. Rev. Resp. Disease 127, S59–S65.

19 Weibel, E.R. (1963) Morphometry of the Human Lung, Springer Verlag, Berlin, pp.1–151.

20 Bouhuys, A. (1977) The Physiology of Breathing, Grune and Stratton, New York, pp. 60–79 and 173–232.

21 Byron, P.B. (1986) Prediction of drug residence times in regions of the human respiratory tract following aerosol inhalation, J. Pharm Sci. 75, 433–438.

22 McMartin, C., Hutchinson, L.E.F., Hyde, R. and Peters, G.E. (1987) Analysis of structural requirements for the absorption of drugs and macromolecules from the nasal cavity, J. Pharm Sci. 76, 535–540.

23 Madara, J.L. (1989) Loosening tight junctions: lessons from the intestine, J. Clin. Invest. 83, 1089–1094.

24 Inagaki, M., Sakakura, Y., Itoh, H., Ukai, K. and Miyoshi, Y. (1985) Macromolecular permeability of the tight junction of the human nasal mucosa, Rhinology 23, 213–221.

25 Marcial, M.A., Carlson, S.L. and Madara, J.L. (1984) Partitioning of paracellular conductance along the ileal crypt-villus axis: a hypothesis based on structural analysis with detailed consideration of tight junction structure–function relationships, J. Membr. Biol. 80, 59–70.

26 Richardson, J., Bouchard, T. and Ferguson, C.C. (1976) Uptake and transport of exogenous proteins by respiratory epithelium, Lab. Invest. 35, 307–314.

27 Bensch, K.G. and Dominguez, E.A.M. (1971) Studies on the pulmonary air–tissue barrier. Part IV: Cytochemical tracing of macromolecules during absorption, Yale J. Biol. Med. 43, 236–241.

28 Schneeberger, E.E. (1976) Ultrastructural basis for alveolar-capillary permeability to protein, Ciba Found. Symp. 38, 3–28.

29 DeFouw, D.O. (1983) Ultrastructural features of alveolar epithelial transport, Am. Rev. Resp. Disease 127, S9–S13.

30 Gil, J. (1983) Number and distribution of plasmalemmal vesicles in the lung, Fed. Proc. 42, 2414–2418.

31 Williams, M.C. (1984) Endocytosis in alveolar type-2 cells: effect of charge and size of tracers, Proc. Natl. Acad. Sci. 81, 6054–6058.

32 Simionescu, N., Simionescu, M. and Palade, G.E. (1981) Differentiated microdomains on the luminal surface of the capillary endothelium 1. Preferential distribution of anionic sites, J. Cell Biol. 90, 605–613.

33 Bearer, E.L. and Orci, L. (1985) Endothelial fenestral diaphragms: a quick-freeze, deep-etch study, J. Cell Biol. 100, 418–428.

34 Matthay, M.A., Landolt, C.C. and Staub, N.C. (1982) Differential liquid and prtoein clearance from the alveoli of anesthetized sheep, J. Appl. Physiol., Respir. Environ. Exerc. Physiol. 53, 96–104.

35 Berthiaume, Y., Albertine, K., Grady, M., Fick, G. and Matthay, M.A. (1989) Protein clearance from the air spaces and lungs of anesthetized sheep over 144 hrs, J. Appl. Physiol. 67, 1887–1897.

36 Supersaxo, A., Hein, W.R. and Steffen, H. (1990) Effect of molecular weight on the lymphatic absorption of water-soluble compounds following subcutaneous administration, Pharm. Res. 7, 167–169.

37 Hubbard, R.C., Casolaro, M.A., Mitchell, M., Sellers, S.E., Arabia, F., Matthay, M.A. and Crystal, R.G. (1989) Fate of aerosolized recombinant DNA-producing α-1-antitrypsin: use of the epithelial surface of the lower respiratory tract to administer proteins of therapeutic importance, Proc. Natl. Acad. Sci. 86, 680–684.

38 Schneeberger-Keeley, E.E. and Karnovsky, M.J. (1968) The ultrastructural basis of alveolar-capillary membrane permeability to peroxidase used as a tracer, J. Cell Biol. 37, 781–793.

39 Taylor, A.E. and Gaar Jr., K.A. (1970) Estimation of equivalent pore radii of pulmonary capillary and alveolar membranes, Am. J. Physiol. 218, 1133–1140.

40 Bartels, H. (1979) The air–blood barrier in the human lung: a freeze fracture study, Cell Tissue Res. 198, 269–285.

41 Fishman, A.P. and Pietra, G.G. (1976) Permeability of pulmonary vascular endothelium, Ciba Found. Symp. 38, 29–38.

42 Adjei, A. and Garren, J. (1990) Pulmonary delivery of peptide drugs: effect of particle size on bioavailability of leuprolide acetate in healthy male volunteers, Pharm. Res. 7, 565–569.

43 Wigley, F.M., Londono, J.H., Wood, S.H., Shipp, J.C. and Waldman, R.H. (1971) Insulin across respiratory mucosae by aerosol delivery, Diabetes 20, 552–556.

44 Köhler, D., Schluter, K.J., Kerp, L. and Matthys, H. (1987) Nicht radioaktives Verfahren zur Messung der Lungenpermeabilität: Inhalation von Insulin, Atemw. Lungenkrkh. 13, 230–232.

45 Elliott, R.B., Edgar, B.W., Pilcher, C.C., Quested, C. and McMaster, J. (1987) Parenteral absorption of insulin from the lung in diabetic children, Aust. Paediatr. J. 23, 293–297.

46 Schluter, K.J., Köhler, D., Enzmann, F. and Kerp, L. (1984) Pulmonary administration of human insulin in volunteers and type I-Diabetics, Diabetes (abstract).

47 Fuchs, H.J., Moore, J., Toy, K., Daugherty, A.L., Gustafson, H., Liggitt, H. Denny and Patton, J.S. (1990) Therapeutic doses of inhaled human growth hormone produce minimal pulmonary changes in rats. J. Endocrinol., submitted.

48 Untersee, P., Gil, J. and Weibel, E.R. (1971) Visualization of extracellular lining layer of lung alveoli by freeze-etching, Respir. Physiol. 13, 171–185.

49 Nielson, D.W. and Lewis, M.B. (1988) Calcium increases in pulmonary alveolar fluid in lambs at birth, Pediatr. Res. 24, 322–325.

50 Adamson, I.Y.R. and Bowden, D.H. (1981) Dose response of the pulmonary macrophagic system to various particulates and its relationship to transepithelial passage of free particles, Exp. Lung Res. 2, 165–175.

51 Yoneda, K. (1976) Mucous blanket of rat bronchus: an ultrastructure study, Am. Rev. Respir. Disease. 114, 837–842.

52 Luchtel, D.L. (1976) Ultrastructural observations on the mucous layer in pulmonary airways, J. Cell Biol. 70, 350a.

53 Mooren, H.W.D., Kramps, J.A., Franken, C., Meijer, C.J.L.M. and Dijkman, J.A. (1983) Localization of a low-molecular weight bronchial protease inhibitor in the peripheral human lung, Thorax 38, 180–183.

54 Boudier, C., Pelletier, A., Gast, A., Tournier, J.M., Pauli, G. and Bieth, J.G. (1987) The elastase inhibitory capacity and the $\alpha_1$-proteinase inhibitor and bronchial inhibitor content of bronchoalveolar lavage fluids from healthy subjects, Biol. Chem. Hoppe-Seyler 368, 981–990.

55 Gillespie, M.N., Krechniak, J.W., Crooks, P.A., Altiere, R.J. and Olson, J.W. (1985) Pulmonary metabolism of exogenous enkephalins in isolated perfused rat lungs, J. Pharmacol. Exp. Ther. 232, 675–678.

56 Niven, R.W., Rypacek, F. and Byron, P.R. (1990) Solute absorption from the airways of the isolated rat lung. III. Absorption of several peptidase resistant, synthetic polypeptides: poly(2-hydroxy-ethyl) aspartamides, Pharm Res. 7, 900–994.

57 mith, R.M., Traber, L.D., Traber, D.L. and Spragg, R.G. (1989) Pulmonary deposition and clearance of aerosolized $\alpha_1$-proteinase inhibitor administered to dogs and sheep, J. Clin. Invest. 84, 1145–1154.

58 Hubbard, R.C., McElvaney, N.G., Sellers, S.E., Healy, J.T., Czerski, D.B. and Crystal, R.G. (1989) Recombinant DNA-produced $\alpha_1$-antitrypsin administered by aerosol augments lower respiratory tract antineutrophil elastase defenses in individuals with $\alpha_1$-antitrypsin deficiency, J. Clin. Invest. 84, 1349–1354.

59 Debs, R.J., Fuchs, H.J., Philips, R., Montgomery, A.B., Brunette, E.N., Liggitt, D., Patton, J.S. and Shellito, J.E. (1988) Lung-specific delivery of cytokines induces sustained pulmonary and systemic immunomodulation in rats, J. Immunol. 140, 3482–3488.

60 Padmanabhan, R.V., Gudapaty, R., Liener, I.E., Schwartz, B.A. and Hoidal, J.R. (1985) Protection against pulmonary oxygen toxicity in rats by the intratracheal administration of liposome-encapsulated superoxide dismutase or catalase, Am. Rev. Respir. Disease 132, 164–167.

61 Kohrogi, H., Nadel, J.A., Malfroy, B., Gorman, C., Bridenbaugh, R., Patton, J.S. and Borson, D.B. (1989) Recombinant human enkephalinase (neutral endopeptidase) prevents cough induced by tachykinins in awake guinea pigs, J. Clin. Invest. 84, 781–786.

62 Yoshida, H., Okumura, K., Hori, R., Anmo, T. and Yamaguchi, H. (1979) Absorption of insulin delivered to rabbit trachea using aerosol dosage form, J. Pharm. Sci. 68, 670–671.

63 Guerra, S.M.O. and Kitabchi, A.E. (1976) Comparison of the effectiveness of various routes of

insulin injection: insulin levels and glucose response in normal subjects, J. Clin. Endocrinol. Metab. 42, 869–874.

64  Berger, M., Cuppers, H.J., Hegner, H., Jorgens, V. and Berchtold, P. (1982) Absorption kinetics and biologic effects of subcutaneously injected insulin preparations, Diabetes Care 5, 77–91.

65  Murat, A. and Slama, G. (1985) Influenece of concentration on the kinetics of SC-infused insulin. Comparison between square-wave SC infusion and bolus SC injection. Metabolism 34, 120–123.

66  Edsberg, B., Herly, D., Hildebrandt, P. and Kuhl, C. (1987) Insulin bolus given by sprinkler needle: effect on absorption and glycaemic response to a meal, Br. Med. J. 294, 1373–1376.

67  Ellenberg, M. and Rifkin, H. (1983) Diabetes Mellitus, Medical Examination Publishing, Amsterdam, 1983, 3rd edn., 119–150.

68  Dimitriadis, G.D. and Gerish, J.E. (1983) Importance of timing of preprandial subcutaneous insulin administration in the management of diabetes mellitus, Diabetes Care 6, 374–377.

69  Lee, S.W. and Sciarra, J.J. (1976) Development of an aerosol dosage form containing insulin, J. Pharm Sci. 65, 567–572.

70  Patton, J.S., McCabe, J.G., Hansen, S.E. and Daugherty, A.L. (1990) Absorption of human growth hormone from the rat lung, Biotech. Ther. 1, 213–228.

71  Groesbeck, M.D. and Parlow, A.P. (1987) Highly improved precision of the hypophysectomized female rat body weight gain bioassay for growth hormone by increasing frequency of injections, avoidance of antibody formation and other simple modifications, Endocrinology 120, 2582–2590.

72  Jorgensen, K.D., Monrad, J.D., Brondum, L. and Dinesen, B. (1988) Pharmacokinetics of biosynthetic and pituitary human growth hormones in rats, Pharm. Toxicol. 63, 129–134.

73  Tiong, T.S., Freed, K.A. and Herrington, A.C. (1989) Identification and tissue distribution of messenger RNA for the growth hormone receptor in the rabbit, Biochem. Biophys. Res. Commun. 158, 141–148.

74  Amit, T., Barkey, R.J., Guy, J. and Youdin, M.B.H. (1987) Specific binding sites for prolactin and growth hormone in the adult rabbit lung, Mol. Cell. Endo. 49, 17–24.

75  Murphy, L.J., Vrhousek, E. and Lazarus, L. (1983) Identification and characterization of specific growth hormone receptors in cultured human fibroblasts, J. Clin. Endo. Metab. 57, 1117–1124.

76  Brody, J.S. and Buhain, W.J. (1973) Hormonal influence on post-pneumonectomy lung growth in the rat, Resp. Physiol. 19, 344–355.

77  Toppell, K.L., Atkinson, R. and Whitcomb, M.E. (1973) Lung growth in acromegaly, Am. Rev. Resp. Dis. 108, 1254–1258.

78  De Troyer, A., Desir, D. and Copinschi, G. (1980) Regression of lung size in adults with growth hormone deficiency, Q. J. Med. 195, 329–340.

79  Kaltreider, H.B., Curtis, J.L. and Arraj, S.M. (1987) The mechanism of appearance of specific antibody forming cells in lungs of inbred mice after intratracheal immunization with sheep erythrocytes. II. Dose dependence and kinetics, Am. Rev. Resp. Dis. 135, 87–92.

80  Physicians' Desk Reference (1990) Barnhart, E.R., Medical Economics, Oradell, NJ 07649, 44th edn.

81  O'Donnel, M. (1990) Aerosol vasoactive intestinal peptide. In: Proceedings of the 3rd International Conference on Medicinal Aerosols, Keystone, CO.

Exhibit 5



novo nordisk®

# Stock Exchange Announcement

14 January 2008

## Novo Nordisk refocuses its activities within inhaled insulin and discontinues the development of AERx®

Based on a detailed analysis of the future prospects for inhaled insulin and a review of the medical and commercial potential of the AERx® iDMS inhaled insulin system (AERx®), Novo Nordisk has decided to refocus its inhaled insulin activities and discontinue all further development of AERx®. The decision to discontinue the development of AERx® is not due to safety concerns. The decision impacts the company's 2007 operating profit with a non-recurring cost of around DKK 1.3 billion.

"The AERx® system has been developed for delivering fast-acting insulin in connection with meals, and we have concluded that fast-acting inhaled insulin in the form it is known today is unlikely to offer significant clinical or convenience benefits over injections of modern insulin with pen devices such as Novo Nordisk's FlexPen®," says Lars Rebien Sørensen, president & CEO of Novo Nordisk. He continues: "In general, people with type 2 diabetes start insulin therapy with long-acting or premixed insulin, and experience shows that they want very simple, very convenient devices for administering their insulin. This requires a completely new approach to inhalation of insulin."

Against this background, Novo Nordisk will increase research and development activities targeted at inhalation systems for long-acting formulations of insulin and GLP-1. The activities will take place at two centres of excellence in Hayward, California, and Hillerød, Denmark.

The people with diabetes who are currently participating in phase 3 clinical trials with AERx® will be switched to the treatment alternative recommended by their doctors. Subject to local regulations, Novo Nordisk will fund medication and medical supervision for the planned duration of the trials.

Stock Exchange Announcement no 2 / 2008                                Page 1 of 3

**Novo Nordisk A/S**      Novo Allé        Telephone:         Internet:              CVR Number:
Investor Relations        2880 Bagsværd    +45 4444 8888      novonordisk.com        24256790
                          Denmark          Telefax:
                                           +45 4444 6626

"We regret the inconvenience caused by the termination of the trials and will do our utmost to support doctors and medical staff in ensuring as smooth a transition as possible for the affected patients," says Lars Rebien Sørensen.

Activities related to clinical development and manufacturing of AERx® devices and insulin strips will be discontinued. As a consequence of this decision, a significant number of employees at Novo Nordisk's site in Hayward, California, are expected to become redundant.

**Financial implications**

For 2007, a non-recurring cost of discontinuing all clinical development and manufacturing activities related to the AERx® system is expected to amount to around DKK 1.3 billion which will negatively impact operating profit in 2007. Around DKK 900 million relates to write-down and impairment of tangible and intangible assets, around DKK 300 million relates to the discontinuation of clinical trials and, finally, around DKK 100 million relates to other exit costs such as leasing and investment commitments. For 2007, the discontinuation will not impact the reported cash flow.

Novo Nordisk will provide financial results for 2007 and detailed financial guidance for 2008 in connection with the release of the full-year 2007 financial results on 31 January 2008.

However, at the current point in time, Novo Nordisk can reconfirm the sales growth guidance given in connection with the release of the financial results for the first nine months of 2007 on 31 October 2007. For 2007, sales growth measured in local currencies is now expected to be realised in the middle of the 11-14% range indicated as part of the release of the financial results for the first nine months of 2007. Furthermore, as the discontinuation primarily impacts R&D costs in 2007, Novo Nordisk now expects the R&D to sales ratio for 2007 to be slightly more than 20%.

For 2008, the discontinuation of further development of AERx® is expected to result in an R&D to sales ratio of around 17% including a non-recurring cost of around DKK 300 million related to severance payments and other costs.

**Conference call**

At 10 am CET tomorrow (15 January), corresponding to 4 am EDT, a conference call for investors will be held. Investors will be able to listen in via a link on novonordisk.com, which can be found under 'Investors – Download centre'.

*AERx® is a registered trademark of Aradigm Corporation or its affiliates in the United States and other countries. FlexPen® is a registered trademark of Novo Nordisk A/S.*

*Novo Nordisk is a healthcare company and a world leader in diabetes care. The company has the broadest diabetes product portfolio in the industry, including advanced products within the area of insulin delivery*

**Novo Nordisk A/S**     Novo Allé          Telephone:          Internet:          CVR Number:
Investor Relations     2880 Bagsværd      +45 4444 8888       novonordisk.com    24256790
                       Denmark            Telefax:
                                          +45 4444 6626

*systems. In addition, Novo Nordisk has a leading position within areas such as haemostasis management, growth hormone therapy and hormone replacement therapy. Novo Nordisk manufactures and markets pharmaceutical products and services that make a significant difference to patients, the medical profession and society. With headquarters in Denmark, Novo Nordisk employs approximately 25,800 employees in 79 countries, and markets its products in 179 countries. Novo Nordisk's B shares are listed on the stock exchanges in Copenhagen and London. Its ADRs are listed on the New York Stock Exchange under the symbol 'NVO'. For more information, visit novonordisk.com.*

**Further information:**

Media:
*Outside North America:*
Mike Rulis
Tel (direct): (+45) 4442 3573
mike@novonordisk.com

Investors:
*Outside North America:*
Mads Veggerby Lausten
Tel (direct): (+45) 4443 7919
mlau@novonordisk.com

Hans Rommer
Tel (direct): (+45) 4442 4765
hrmm@novonordisk.com

*In North America:*
Lori Moore
Tel (direct): (+1) 609 919 7991
lrmo@novonordisk.com

*In North America:*
Christian Qvist Frandsen
Tel (direct): (+1) 609 919 7937
cqfr@novonordisk.com

**Novo Nordisk A/S**      Novo Allé        Telephone:         Internet:            CVR Number:
Investor Relations        2880 Bagsværd    +45 4444 8888      novonordisk.com      24256790
                          Denmark          Telefax:
                                           +45 4444 6626

Exhibit 6

> Print This Page    > Back to Web site

E

**Availability of EXUBERA® (insulin human [rDNA origin]) Inhalation Powder**

As previously announced, Pfizer stopped marketing Exubera in January 2008 because it did not meet customers' needs or financial expectations. No new supplies of Exubera have been manufactured in 2008, and remaining supplies will expire soon. As a result, **Exubera will no longer be available as of September 1, 2008.**

**What do you need to know?**

> Those pharmacies that still have Exubera stocks will stop dispensing Exubera as of  01  September 2008.   In addition, the Exubera Extended Transition Program will be discontinued as of 01 September 2008.

**What does this mean for you?**

> You will no longer be able to obtain Exubera after September 1, 2008. If your pharmacy runs out of Exubera,  you  should contact your physician as soon as possible to discuss other options for lowering your blood sugar. You should not stop taking Exubera without first discussing this with your doctor.

This information does not take the place of talking with your doctor about your condition or treatment. Please speak with your doctor about any questions or concerns you may have.

Sincerely,

*Rochelle L. Chaiken M.D.*

Rochelle L. Chaiken, MD
Vice President,
Global Medical Cardiovascular and Metabolic Disease
Pfizer Inc

Important Safety Information About Exubera® (insulin human [rDNA origin]) Inhalation Powder

Uninsured? Need help paying for medicine? Pfizer has programs that can help, no matter your age or income. You may even qualify for free Pfizer medicines. Call 1-866-706-2400. Click here for more information www.pfizerhelpfulanswers.com.



EXUBERA is a prescription medicine that you breathe in through your mouth using the EXUBERA® Inhaler. It is a short-acting insulin that helps to control high blood sugar in adults with diabetes. If you have Type 1 diabetes, you will have to take longer-acting insulin in addition to EXUBERA. If you have Type 2 diabetes, you may use EXUBERA by itself, or with diabetes pills. Some patients with Type 2 diabetes will need to take some longer-acting insulin in addition to EXUBERA.

**Important Safety Information**

EXUBERA may lower your lung function, so you will need to take a breathing test before you start treatment and, from time to time, as you keep taking EXUBERA.

You should not take EXUBERA if you have an unstable or poorly controlled lung disease (such as unstable or poorly controlled asthma, chronic obstructive pulmonary disease) or if you smoke, start smoking, or quit smoking less than 6 months ago. You should not take EXUBERA if you are under 18 years of age or if you are allergic to insulin or any of the inactive ingredients in EXUBERA.

Tell your health care provider about all your health and medical conditions, including if you have any lung disease or breathing problems, if you are pregnant, or plan to become pregnant.

As with all forms of insulin, a possible side effect of EXUBERA is low blood sugar (hypoglycemia), which can be mild to severe. It is important to check your blood sugar as your health care provider has advised you. Other common side effects are cough, dry mouth and chest discomfort.

For more information about EXUBERA , please see the Medication Guide for the full Prescribing Information.

The health information contained herein is provided for educational purposes only and is not intended to replace discussions with a health care provider. All decisions regarding patient care must be made with a health care provider, considering the unique characteristics of the patient.



Copyright © 2007 Pfizer Inc. All rights reserved.
This information is intended only for residents of the United States.
Home   Contact Us   Terms of Use   Privacy Statement   Site map

The health information contained herein is provided for educational purposes only and is not intended to replace discussions with a health care provider. All decisions regarding patient care must be made with a health care provider, considering the unique characteristics of the patient.



EXU00350G

# Exhibit 7



This news release was issued in the United States and is intended for use by U.S. journalists. Additional information about our products may be found in the products section of this site. Countries outside the United States may have different regulatory requirements governing how pharmaceutical companies may communicate medical or product information to journalists and the public. Links to our affiliate sites can be found in the drop-down menu entitled "choose country" in the upper right-hand corner of this Web page.

## Lilly Announces Termination of AIR Insulin Program

*March 7, 2008*

INDIANAPOLIS, March 7, 2008 /PRNewswire-FirstCall via COMTEX News Network/ -- Eli Lilly and Company (NYSE: LLY) today announced the termination of development of its AIR® Insulin program, which was being conducted in partnership with Alkermes, Inc. The program has been in phase III clinical development as a potential treatment for type 1 and type 2 diabetes. The company noted that this decision is not a result of any observations during AIR Insulin trials relating to the safety of the product, but rather was a result of increasing uncertainties in the regulatory environment, and a thorough evaluation of the evolving commercial and clinical potential of the product compared to existing medical therapies.

"This decision, though difficult, is the right one to make at this time," commented John Lechleiter, Ph.D., Lilly president and chief operating officer. "Over the past several months we have conducted a thorough review of all aspects of our efforts to develop our AIR Insulin product and have now made the decision that it would be inappropriate for the company to continue development activities in connection with this project. Without the prospect of a new drug application, keeping the patient foremost in mind, it would not be consistent with our medical principles to continue the clinical trials. As a result, we are now beginning the process of halting our ongoing clinical studies and transitioning the AIR Insulin patients in these studies to other appropriate therapies. We wish to reassure patients currently receiving AIR Insulin in our ongoing clinical trials that they should have no health or safety concerns about continuing to use AIR Insulin during their transition to other well-established diabetes therapies."

Steven M. Paul, M.D., executive vice president, science and technology for Lilly, added "While we are confident in our decision, we also recognize the disappointment of those patients who saw the potential benefit of AIR Insulin. As a leader in diabetes care, we remain committed to our mission to develop innovative, beneficial and cost-effective treatments for diabetic patients. It is also important to emphasize that our decision is not due to any safety concerns observed by Lilly or raised by the independent data safety monitoring board during our development of AIR Insulin."

Lilly is in the process of contacting the clinical investigators conducting the current AIR Insulin clinical trials. Subject to protocols, the trials will be halted and the patients currently enrolled will be moved to other insulin therapy under the supervision of their physicians. In the U.S., Lilly will implement a patient assistance program to provide current clinical trial patients with appropriate financial support to fund their medications and diagnostic supplies through the end of 2008. Based upon further analysis, the company may also pursue a similar program in other regions.

As a result of the decision to terminate the development of AIR Insulin, Lilly will recognize a first-quarter 2008 charge to earnings related to the impairment of Lilly assets, as well as wind-down costs associated with the termination of clinical trials and certain development activities, and costs associated with the patient assistance program. The exact amount of the charge has not yet been determined, but is estimated to be in the range of $90 million to $120 million, or $0.05 to $0.07 per share. Lilly's pro forma adjusted earnings per share guidance remains unchanged at $3.85 to $4.00. On a reported basis, including the charge related to the termination of the AIR Insulin program, as well as the previously announced charge related to the BioMS in-licensing, Lilly now expects 2008 earnings per share to be in the range of $3.73 to $3.90. See the reconciliation table below for further detail.

```
     Reconciliation of 2008 Earnings Per Share Expectations:
```

| | 2008 Expectations | 2007 Results | % Growth |
|---|---|---|---|
| E.P.S. (reported) | $3.73 to $3.90 | $2.71 | |
| Eliminate estimated charge related to asset impairments and certain wind-down costs associated with the termination of the AIR Insulin program | .05 to .07 | | |
| Eliminate estimated in-process research and development charge associated with BioMS Medical in-licensing | .05 | | |
| Eliminate asset impairments, restructuring and other special charges | - | .15 | |

```
Eliminate charge for a
  reduction in expected
  insurance recoveries          -              .06
Eliminate in-process research
  & development charges
  associated with ICOS, Hypnion,  -            .63
  and Ivy acquisitions and OSI,
  MacroGenics and Glenmark in-
  licensing transactions
Include pro forma as if the
  ICOS acquisition was completed
  on January 1, 2006            -            (.01)
                             --------------   ---------
E.P.S. (pro forma adjusted)  $3.85 to $4.00    $3.54    9% to 13%
                             --------------   ---------
```

## About Lilly

Lilly, a leading innovation-driven corporation, is developing a growing portfolio of first-in-class and best-in-class pharmaceutical products by applying the latest research from its own worldwide laboratories and from collaborations with eminent scientific organizations. Headquartered in Indianapolis, Ind., Lilly provides answers - through medicines and information - for some of the world's most urgent medical needs. Additional information about Lilly is available at www.lilly.com. P-LLY

This press release contains forward-looking statements that are based on management's current expectations, but actual results may differ materially due to various factors. There are significant risks and uncertainties in pharmaceutical research and development. There can be no guarantees with respect to pipeline products that the products will receive the necessary clinical and manufacturing regulatory approvals or that they will prove to be commercially successful. The company's results may also be affected by such factors as competitive developments affecting current products; rate of sales growth of recently launched products; the timing of anticipated regulatory approvals and launches of new products; regulatory actions regarding currently marketed products; other regulatory developments and government investigations; patent disputes and other litigation involving current and future products; the impact of governmental actions regarding pricing, importation, and reimbursement for pharmaceuticals; changes in tax law; asset impairments and restructuring charges; acquisitions and business development transactions; and the impact of exchange rates. For additional information about the factors that affect the company's business, please see the company's latest Form 10-K filed February 2008. The company undertakes no duty to update forward-looking statements.

(Logo: http://www.newscom.com/cgi-bin/prnh/20031219/LLYLOGO )

SOURCE Eli Lilly and Company

Copyright © 2008 PR Newswire. All rights reserved

News Provided by COMTEX

Copyright © 2008 Eli Lilly and Company | All rights reserved | Privacy Statement | Site Map

Exhibit 8

MAIL ROOM
JUN 10
PAT. & TRADEMARK

BOX AF RECEIVED

JUN 1 3 1994

GROUP 1800

\18C

Amdt. #case
6-16-94
PATENT

ATTORNEY DOCKET NO. 06513/002001

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant : Reid M. Rubsamen          Art Unit: 1811
Serial No.: 08/011,281                Examiner: A. Davenport
Filed     : January 29, 1993
Title     : METHOD OF TREATING DIABETES MELLITUS

**Box AF**

Commissioner of Patents and Trademarks
Washington, DC  20231

Dear Sir:

<u>AMENDMENT AFTER FINAL</u>

<u>RESPONSIVE TO PAPER #7</u>

This amendment is responsive to the Final Office Action
dated April 19, 1994 for which a three-month period for response
was given, making this response due on or before July 19, 1994.
In view of the remarks put forth below, reconsideration and
allowance are respectfully requested.

For the convenience of the Examiner, all the pending claims
are reiterated below along with amended claims 9, 11, 14, 18 and
19.

1. (Reiterated)  A method of intrapulmonary administration
of insulin, comprising:

measuring the inspiratory flow of a patient and
calculating a threshold level in an inhalation cycle at which
release of drug is to take place, the threshold level being
determined in a manner so as to maximize the repeatability of the
amount of insulin delivered to the patient on releasing insulin;

releasing a metered dose of aerosolized insulin from a
pressurized canister containing insulin in combination with a low

Date of Deposit ___6/7/94___
I hereby certify under 37 CFR 1.8(a) that this correspondence is
being deposited with the United States Postal Service as **first class
mail** with sufficient postage on the date indicated above and is
addressed to the Commissioner of Patents and Trademarks,
Washington, D.C. 20231.

Michelle Stagner

NN-1305

boiling point propellant, the releasing being carried out upon reaching the threshold level generated by the patient inhaling;

inhaling the metered dose of aerosolized insulin into the lungs of a patient; and

monitoring serum glucose levels within the patient;

wherein the measuring, releasing, inhaling and monitoring steps are continuously repeated in a manner so as to maintain a desired serum glucose level in the patient. --

    (Reiterated) The method of claim 22, wherein information obtained from the monitoring is electronically processed by a microprocessor programmed to release insulin in a manner so as to maintain a desired serum glucose level in the patient.

    (Reiterated) The method of claim 23, further comprising:

repeating the measuring prior to each releasing, inhaling and monitoring step over a period of time so as to maintain a desired serum glucose level in the patient.

    (Reiterated) The method of claim 23, wherein the insulin is recombinantly produced human insulin.

    (Reiterated) The method of claim 23, wherein the insulin is extracted from an animal source selected from the group consisting of bovine and porcine.

    (Twice Amended) A method of intrapulmonary administration of insulin [treating a patient suffering from diabetes mellitus], comprising:

measuring the inspiratory flow of a patient during an inhalation cycle prior to administering insulin and calculating a threshold level of airflow prior to administering insulin, wherein the threshold level of inspiratory flow is determined in

a manner so as to maximize repeatability of the amount of insulin delivered to the patient on releasing insulin;

administering insulin to the patient by the intrapulmonary route, the insulin being administered from a hand-held, self-contained device which releases insulin on detecting the threshold level of inspiratory flow created by patient inhalation;

monitoring serum glucose levels in the patient; and

repeating the measuring, administering and monitoring steps a plurality of times over a period of time so as to maintain a desired serum glucose level in the patient.

10. (Reiterated) The method as claimed in claim 8, wherein the amount of insulin administered and the glucose level monitored are continually recorded electronically by the self-contained device and adjustments are made in the amount of insulin administered based on the effect of insulin administration on the glucose levels of the patient.

11. (Amended) The method as claimed in claim 9 [wherein the threshold level of inspiratory flow is determined in a manner so as to maximize repeatability of the amount of insulin delivered to the patient on releasing insulin and] wherein the amount of insulin administered is in the range of 1 unit per day to 50 units per day.

12. (Reiterated) The method as claimed in claim 8, wherein the desired serum glucose level in the patient is within the range of 50 mg/dl to 300 mg/dl.

13. (Reiterated) The method as claimed in claim 8, wherein the insulin is recombinantly produced human insulin.

14. (Amended) The method as claimed in claim 8, wherein the insulin is insulin extracted from an animal source

[or from the] group consisting of a bovine source and a porcine source.

25. (Reiterated)    The method of claim 8, further comprising:

orally administering a sulfonylurea drug to the patient.

26. (Reiterated)    The method of claim 15, wherein the sulfonylurea drug is selected from the group consisting of acetohexamide, chlorpropamide, tolazamide, tolbutamide, glipzide and glyburide.

18. (Amended)    The method of claim 8, wherein the monitoring is carried out prior to each dosing event, wherein insulin is administered to the patient [and wherein the threshold level is a level calculated to obtain reproducibility in the amount of insulin delivered to the patient with each release of insulin].

19. (Amended)    A method of <u>intrapulmonary administration of insulin</u> [treating a patient suffering from diabetes mellitus], comprising:

placing a mouthpiece of a hand-held, metered dose inhaler device in the mouth of a patient, wherein the device is comprised of a container having therein insulin and a low boiling point propellant, a valve for releasing insulin and propellant from the container to the mouthpiece, a means for measuring airflow created by drawing air from the mouthpiece and a means for opening the valve in response to a measured threshold of airflow;

drawing air from the mouthpiece until [the] <u>a</u> threshold is reached so as to cause the valve to open and release a controlled amount of insulin and propellant which is drawn into the lungs of the patient, wherein the device includes a microprocessor connected to the means for measuring airflow and

means for opening the valve, the microprocessor being programmed
to control the amount of insulin released, based on the needs of
the patient, wherein the threshold level is a level calculated to
obtain maximum reproducibility in the amount of insulin delivered
to the patient with each release of insulin.

## REMARKS

Claims 4, 6-16, 18, 19 and 23 are now pending in this
application.

### Formal Matters (Claim Amendments)

Claims 9, 11, 14, 18 and 19 have been amended in order to
more particularly point out and distinctly claim the invention.
The amendments are believed to be a formal in nature, and not
create new issues which would require further searching.
Further, the amendments will narrow any issues on appeal and
therefore their entry is respectfully requested under 37 CFR §
1.116.

Specifically, claim 9 has been amended to include the same
preamble language already contained within the claim 23.    The
same amendment has been made to the preamble of claim 19.    All of
the claims now specifically claim a method of intrapulmonary
administration of insulin, i.e., are not specifically claiming a
method of treating diabetes mellitus.    Claim 11 is amended to
delete superfluous language, i.e., delete language already
contained within claim 9.    A similar amendment was made to claim
18.    The amendment to claim 14 is formal in nature and has been
made to eliminate superfluous language.    No new matter has been
added by these amendments.

5

The Invention

All the claims are now directed to a method of intrapulmonary administration of insulin. More specifically, the claims are no longer specifically directed to a "method of treating a patient suffering from diabetes mellitus." The claims generally cover a method of administering a specific drug (i.e. insulin) to lung tissue. The attached declaration shows that the device can administer any drug to a human via the intrapulmonary route. It appears as though the claim amendments have rendered moot all issues with respect to utility under 35 USC § 101 and enablement under 35 USC § 112, first paragraph. Insulin is a known drug having a known utility and is known to enter the circulatory system when brought into contact with lung tissue. In that Applicant's invention brings the insulin into contact with lung tissue (shown by the declaration under 37 CFR 1.132) and in that Applicant is claiming a method of intrapulmonary delivery of insulin, the claimed method is clearly useful and enabled.

The claims are directed to a method wherein the inspiratory flow of the patient is measured and, based on the measurement, a threshold level in the inhalation cycle is calculated wherein the threshold level is determined in a manner so as to maximize repeatability of the amount of insulin delivered to the patient. The optimal point or threshold level in the inspiratory cycle is not calculated based on a point within the cycle likely to result in the maximum delivery of insulin, but rather the point in the cycle most likely to result in the delivery of the same amount of insulin to the patient at each release of insulin from the device. This feature alone (i.e. notwithstanding other distinguishing features) distinguishes applicant's invention from the prior art, and provides for a step within applicant's claimed method which makes it possible to administer drugs by the intrapulmonary route even though it is important to administer the drug within a fairly narrow therapeutic window.

6

Individual different patients will have individual and different inhalation profiles. Applicant's invention makes it possible to take such into consideration and measures the inspiratory flow of each patient, and takes such measurement prior to and/or concurrently with each release of insulin so as to take into consideration differences in the inhalation profile of even the same patient at different points in time. By measuring the inspiratory flow and determined the inspiratory flow profile of the patient, it is possible to calculate a point within the flow profile curve at which maximum repeatability in administration of a drug will occur. At this point in the inhalation cycle, the insulin is released. The concept of calculating an optimal release point to maximize repeatability in dosing is not disclosed within the prior art.

Rejection under 35 USC § 101

Claims 4, 6-16, 18, 19 and 23 were rejected under 35 USC § 101. The rejection is traversed as applied and as it might be applied to the presently pending claims.

The claimed method is to administering insulin. This can be done by placing the device (as shown within the figures and described within the specification) into the mouth of the patient, and inhaling after which insulin will be automatically released in an aerosolized form and brought into contact with lung tissue. At this point, intrapulmonary delivery of insulin will take place. The ability to provide for intrapulmonary delivery of insulin is known and old. References previously cited by the Examiner clearly disclosed that insulin can be delivered by the intrapulmonary route. Applicant has provided a vastly improved method of administering insulin which essentially provides for a substantially higher degree of control of the dosing. Notwithstanding as such, the intrapulmonary delivery of insulin is useful and known by those skilled in the art to be useful.

Within the final action, the Examiner noted that the prior art did disclose methods of intrapulmonary delivery of insulin.

7

Thus, it appears to Applicant that the only manner in which the claims can be rejected under 35 USC § 101 is if the Examiner believes that Applicant's device is incapable of administering insulin even though prior art devices are capable of such. Although such appears to be a curious position, Applicant's respond thereto by the attached declaration under 37 CFR § 1.132.

The attached declaration demonstrates how a specific embodiment of a device described within the present application delivered a radioactively labelled drug to five different human patients. Although the details of such are described further within the declaration, in essence, the declaration shows how the methodology of the invention makes it possible to substantially increase the repeatability of dosing of any drug by releasing drug at an optimal point or threshold point calculated from measuring inspiratory flow and volume. Drugs such as insulin would be expected to be administered in the same manner as shown within the exhibits attached to the declaration under 37 CFR § 1.132. In view of such reconsideration and withdrawal of the rejection under 35 USC § 101 is respectfully requested.

## Rejection under 35 USC § 112, first paragraph

The specification was objected to under 35 USC § 112, first paragraph. Based on the objection to the specification, claims 4, 6-16, 18, 19 and 23 were rejected under 35 USC § 112, first paragraph. The rejection is traversed as applied and as it might be applied to the presently pending claims.

The arguments put forth above traversing the 35 USC § 101 rejection are applied here with respect to applicant's traversal of the 35 USC § 112, first paragraph rejection. In order to disclose the invention within the meaning of 35 USC § 112, first paragraph, an Applicant needs to describe how to make and use the invention. In that the claimed invention is a method, the rejection must be arguing that Applicant has not taught how to use and or carry out the method. The method is easily carried out by placing the device as shown and described within the

8

specification into the user's mouth and inhaling. Upon inhaling the device measures inspiratory flow and volume, calculates a threshold or optimal point within the inspiratory profile and automatically releases drugs from the pressurized container which includes insulin and a low boiling point propellant.

If the rejection is questioning whether applicant's invention would actually be operative the attached declaration under 37 CFR § 1.132 shows that the methodology can be readily "used" to provide for intrapulmonary delivery of a drug to a patient. The declaration shows that the device actually delivers drug to the lungs and based on what is known with respect to insulin (via the prior art), the insulin will enter the circulatory system. Insulin is known to be useful in regulating glucose levels.

In view of the comments put forth above and the attached declaration under 37 CFR § 1.132 reconsideration and withdrawal of the rejection under 35 USC § 112, first paragraph is respectfully requested.

## SUMMARY

The claims have been amended to indicate that Applicant is claiming a method of intrapulmonary administration of insulin. Further, other claimed amendments have been entered to correct informalities. The 35 USC § 101 and 35 USC § 112, first paragraph rejections have been traversed. Applicant has pointed out that the invention is useful in that it is capable of administering insulin as claimed via the intrapulmonary route. Further, those skilled in the art would readily know how to use and or carry out the method. Definitive proof as to utility and enablement is apparent from Applicant's disclosure. Notwithstanding such Applicant's has attached a declaration under 37 CFR § 1.132 which shows how a device as described within the present application delivered a radio labelled drug to a human patient. In view of such, reconsideration and withdrawal of the rejections is respectfully requested.

9

In the event that the Examiner finds that minor issues remained unresolved, the Examiner is respectfully requested to contact the undersigned attorney at the indicated telephone number to arrange for an interview to expedite the disposition of this application.

This amendment is filed within the three-month period for response and with a transmittal letter/fee sheet.  In the unlikely event the transmittal letter is separated from this document and/or the Patent Office determines that petitions and/or fees are required, applicant petitions for any required relief, including extensions of time, and authorizes the Commissioner to charge the cost of such petitions and/or other fees required to our Deposit Account No. 06,1050.  The Commissioner is not authorized to charge issue fees to our deposit account.

Respectfully submitted,

Date:  6/7/94

Karl Bozicevic
Reg. No. 28,807

FISH & RICHARDSON
2200 Sand Hill Road, Suite 100
Menlo Park, CA 94025

Telephone No.:  415/854-5277
Facsimile No.:  415/854-0875

KB/scp

Attached:  Declaration Under 37 CFR 1.132

12966.P11

10

Exhibit 9



#13
Decl. w/attach
6-16-94
PATENT

ATTORNEY DOCKET NO. 06513/002001

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant : Reid M. Rubsamen          Art Unit: 1811
Serial No.: 08/011,281               Examiner: A Davenport
Filed     : January 29, 1993
Title     : METHOD OF TREATING DIABETES MELLITUS

Box AF

Commissioner of Patents and Trademarks
Washington, DC  20231

**RECEIVED**
JUN. 1 3 1994
GROUP 1800

Dear Sir:

<u>DECLARATION UNDER 37 CFR 1.132</u>

(1)  I, Reid M. Rubsamen, M.D., being duly sworn, declare and say that I am a resident of the State of California and have the following address:  Reid M. Rubsamen, Miris Medical Corporation, 26219 Eden Landing Road, Hayward, California 94545.

(2)  I concurrently received an M.D. degree and a Masters degree in Computer Science from Stanford University in 1985.  I have been licensed to practice medicine in the State of California since 1986.  Further, I am a diplomat of the American Board of Anesthesiology since 1990, and I have been a Clinical Instructor of Anesthesia at Stanford Medical School.

(3)  I am familiar with the above-referenced patent application, the technology and methodology described and claimed therein, and I am the sole inventor of the invention now claimed within the application.

Date of Deposit ___6/7/94___
I hereby certify under 37 CFR 1.8(a) that this correspondence is being deposited with the United States Postal Service as first class mail with sufficient postage on the date indicated above and is addressed to the Commissioner of Patents and Trademarks, Washington, D.C. 20231.

_Michelle Stagner_
Michelle Stagner

**BEST AVAILABLE COPY**

(4)  I am currently Vice President, Chief Technical Officer and Medical Director at Miris Medical Corporation. In my current position, I am involved in the research and development of computer-controlled intrapulmonary drug delivery devices and aerosol drug formulations research.

(5)  Actual experiments with human patients were carried out under my control and direction and demonstrate the usefulness of my invention.  The experiments (Exhibits I, II(a-f) and III(a-f)) indicate that the inspiratory flow rate and lung volume affected the amount of a drug delivered to the patient by the intrapulmonary route, i.e. if the drug is released at different inspiratory flow rates and at different lung volumes, the amount of drug delivered to the patient will vary.

(6)  The experiments were carried out using the basic methodology and device of the present invention but with a radio labeled drug (specifically with radio labeled albuterol which is a bronchodilator) in order to demonstrate the effects which can be obtained by varying the inspiratory flow and the lung volume relative to the time of release of drug to the patient when providing for intrapulmonary administration.

(7)  In order to conduct the experiments nine different patients each inhaled radio labeled albuterol on five different days.  An intrapulmonary drug delivery device as per the present application was used to deliver the radio labeled albuterol.  To carry out the experiment, the device was programmed to deliver the drug at one of five different flow volumes points to different patients on different days. Each of the patients was given two puffs of the drug within about a two minute period.  Thereafter, the patients' lungs were scanned with a gamma camera of the type commercially available from General Electric under the trademark MaxiCamera.  The geometric mean from the back and front views of the lung images of each of the patients were computed and quantitative indices corresponding to the percentage of drug deposited in the lung (based on the total

-2-

amount of drug administered) were derived and these numbers
are tabulated within the table shown as Exhibit I.  The
images obtained with the gamma camera were electronically
stored and the stored data was entered into a program shown
on II(a) to generate digital images shown in II(a-f) and
III(a-f).

(8)  The nine patients are indicated in Exhibit I by
their initials.  The numbers within the table of Exhibit I
correspond to the percent of total drug delivered to the
patients' lungs based on a total amount of drug released
from the drug delivery device.

(9)  Exhibits II (a-f) and III (a-f) are images of two
of the nine patients (PR and BN) listed in the table of
Exhibit I.  For each patient a control image is shown as
Exhibit II(a) and III(a).  The control image of II(a) is
shown with the program used to generate all of the images.
The control image shows the patients' lungs with different
colors shown moving from the center of each of the lungs
outward.  The color in the center which is a lighter purple
indicates the highest concentration of drug.  The darker
purple indicates a somewhat lower concentration with the
blue, green and yellow indicating lower and lower
concentrations respectively.

(10) For each of the two patients (PR and BN), five
different test images are shown.  The images appear as
Exhibits II(b-f) and III(b-f) which respectively show the
images taken when the drug was released at five different
points with respect to inspiratory flow rate and inspiratory
volume.  Specifically, images II(b) and III(b) indicate that
the drug was released at a "slow" inspiratory flow rate and
a "late" lung volume.  As can be seen, with both patients
the drug is not effectively delivered to a large percentage
area of the lung.  The last image shown for both patients
(i.e., the image shown as Exhibits II(f) and III(f)) show
the best dispersion of drug into the lungs.  By viewing all
the images (b-f) it can be seen that it is important to
measure both inspiratory flow and inspiratory volume and

-3-

take both measurements into consideration when determining the point of release of drug.

(11) The terms "slow", "medium", and "fast" relate to inspiratory flow rate and are specifically defined numerically within Exhibit IV. The terms "early" and "late" relate to lung volume. These terms are also specifically defined within Exhibit IV.

(12) The results in Exhibits II(b-f) and III(b-f) clearly demonstrate that a patient could be administered the same dose of a drug, but actually receive greatly different amounts of drug depending upon the inspiratory flow rate and lung volume at the point drug is released, i.e., the amount of drug reaching the lung is greatly affected by the patients inspiratory flow rate and lung volume at the point of release of drug. Specifically, the highest amount delivered is 16.1, whereas the lowest amount delivered is 7.61. Thus, the higher amount is 211% higher than the lowest amount. The present invention, unlike the prior art, takes into consideration inspiratory flow rate and lung volume, thereby demonstrating that the methodology of the present invention can provide for greater consistency in the dosing.

(13) The experiments and the data within Exhibits I-IV show that the amount of drug delivered to the patient by the intrapulmonary route can vary substantially based on the inspiratory flow rate and lung volume at the time drug is released to the patient. In that the methodology of the present invention makes it possible to release drug at the same point with respect to inspiratory flow and lung volume, the methodology of the present invention can provide for a high degree of consistency in the dosing of a drug such as insulin being delivered by the intrapulmonary route. Accordingly, the present invention makes it possible to provide insulin to a patient very quickly, efficiently, and with a high degree of assurance with respect to repeatability of dosing.

-4-

(14) I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title XVIII of the United States Code, and that such willful false statements may jeopardize the validity of this application or any patent issuing thereon.

JUNE 6, 1994
Date

Reid M. Rubsamen, M.D.

Attachments:
     Exhibit I
     Exhibit II(a-f)
     Exhibit III(a-f)
     Exhibit IV

12975.P11

-5-

| TREATMENT | MEAN DEPOSITION (%) | | | | | | | | | |
| | VOLUNTEERS | | | | | | | | | |
| | KA | LB | SB | CL | BN | PR | MT | RK | SG | MBAN |
|---|---|---|---|---|---|---|---|---|---|---|
| Slow/Early = Low Flow/Low Volume | 21.81 | 17.10 | 15.57 | 5.44 | 2.42 | 11.31 | 8.08 | 10.30 | 12.20 | 11.58 |
| Slow/Late = Low Flow/High Volume | 10.44 | 16.94 | 5.90 | 3.17 | 4.03 | 12.38 | 17.57 | 10.40 | 14.50 | 10.59 |
| Med/Early = Med Flow/Low Volume | 14.45 | 20.37 | 8.62 | 11.56 | 20.71 | 24.28 | 11.70 | 16.70 | 16.60 | 16.11 |
| Fast/Early = High Flow/Low Volume | 8.94 | -- | 10.80 | 4.34 | 3.11 | 7.68 | 9.94 | 11.10 | 7.70 | 7.95 |
| Fast/Late = High Flow/High Volume | 9.02 | 7.28 | 3.34 | 16.47 | 1.88 | 10.91 | 10.77 | 4.60 | 4.20 | 7.61 |

EXHIBIT I

```
In[1]:=
    SetDirectory["c:\wnmath22\images"];
In[2]:=
    image = ReadList["bndta.krp",Number];
In[3]:=
    image = Map[If[#<4.,0.,#+10.]&,image];
In[4]:=
    newpic = Partition[image,128];
In[5]:=
    newpic = Reverse[newpic];
In[6]:=
    ListDensityPlot[newpic,ColorFunction -> Hue,
            Mesh -> False];
```



Subject BN :     Krypton Image

EXHIBIT  II(a)



Subject BN :    15 - 45 liters/minute
                1800 - 4200 cc volume
                (Slow/Late)

EXHIBIT II(b)



Subject BN :    200 - 600 liters/minute
                180 - 420 cc volume
                (Fast/Early)

EXHIBIT  II(c)



Subject BN :    15 - 45 liters/minute
                180 - 420 cc volume
                (Slow/Early)

EXHIBIT  II(d)



Subject BN :    200 - 600 liters/minute
                1800 - 4200 cc volume
                (Fast/Late)

EXHIBIT II(e)



Subject BN :    68 - 112 liters/minute
                180 - 420 cc volume
                (Medium/Early)

EXHIBIT  II(f)



Subject PR :    Krypton Image

EXHIBIT  III(a)



Subject PR :    15 - 45 liters/minute
                1800 - 4200 cc volume
                (Slow/Late)

EXHIBIT III(b)



Subject PR :    200 – 600 liters/minute
                180 – 420 cc volume
                (Fast/Early)

EXHIBIT  III(c)



Subject PR :    **15 - 45 liters/minute**
**180 - 420 cc volume**
**(Slow/Early)**

**EXHIBIT III(d)**



Subject PR :    200 - 600 liters/minute
                1800 - 4200 cc volume
                (Fast/Late)

EXHIBIT  III(e)

NN-640



```
Subject PR :     68 - 112 liters/minute
                 180 - 420 cc volume
                 (Medium/Early)
```

EXHIBIT  III(f)

| Flow Rate/Volume Firing Point | Target Flow Rate | Allowable Flow Rate Range | Target Volume | Allowable Volume Range |
|---|---|---|---|---|
| Slow/Early | 30 liters/min | 15-45 liters/min | 300cc | 180cc-420cc |
| Fast/Early | 270 liters/min | 200-600 liters/min | 300cc | 180cc-420cc |
| Slow/Late | 30 liters/min | 15-45 liters/min | 3000cc | 1800cc-4200cc |
| Fast/Late | 270 liters/min | 200-600 liters/min | 3000cc | 1800cc-4200cc |
| Medium/Early | 90 liters/min | 68-112 liters/min | 300cc | 180cc-420cc |

EXHIBIT IV

over

**This Page is Inserted by IFW Indexing and Scanning
Operations and is not part of the Official Record**

## BEST AVAILABLE IMAGES

Defective images within this document are accurate representations of the original
documents submitted by the applicant.

Defects in the images include but are not limited to the items checked:

❑ **BLACK BORDERS**

❑ **IMAGE CUT OFF AT TOP, BOTTOM OR SIDES**

❑ **FADED TEXT OR DRAWING**

❑ **BLURRED OR ILLEGIBLE TEXT OR DRAWING**

❑ **SKEWED/SLANTED IMAGES**

❑ **COLOR OR BLACK AND WHITE PHOTOGRAPHS**

❑ **GRAY SCALE DOCUMENTS**

❑ **LINES OR MARKS ON ORIGINAL DOCUMENT**

❑ **REFERENCE(S) OR EXHIBIT(S) SUBMITTED ARE POOR QUALITY**

❑ **OTHER:** _____

**IMAGES ARE BEST AVAILABLE COPY.
As rescanning these documents will not correct the image
problems checked, please do not report these problems to
the IFW Image Problem Mailbox.**