## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

NOVO NORDISK A/S            )
                           )
          Plaintiff,        )
                           )
     v.                     )          Case No: 06-1896 (CKK)
                           )
JON W. DUDAS                )
     Under Secretary of Commerce for )
     Intellectual Property and )
     Director of the United States Patent )
     & Trademark Office,     )
                           )
          Defendant.        )
_____)

## DEFENDANT USPTO'S COMBINED MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT OF PLAINTIFF NOVO NORDISK A/S

Pursuant to Rule 56, Federal Rules of Civil Procedure, Defendant Jon W. Dudas, Under Secretary of Commerce for Intellectual Property and Director of the U.S. Patent and Trademark Office ("USPTO" or "Defendant") respectfully moves that summary judgment be entered in favor of Defendant. Plaintiff Novo Nordisk A/S ("Novo" or "Plaintiff") brought this action under 35 U.S.C. § 145 to challenge the decision of the Board of Patent Appeals and Interferences ("Board"), which affirmed the rejection of claims 22-23, 25-26, 31 and 35 (the "Appealed Claims") of Novo's U.S. Patent Application No. 09/848,774 ("the '774 application") as unpatentable under 35 U.S.C. § 103. Novo moved for summary judgment as to the patentability of the Appealed Claims, which Defendant hereby opposes. As set forth in Defendant USPTO's Statement of Points and Authorities in Support of its Combined Motion for Summary Judgment and in Opposition to Novo's Motion for Summary Judgment, there are no genuine issues of

material fact as to the unpatentability of the Appealed Claims under 35 U.S.C. § 103. Further,

the Board's decision is supported by substantial evidence, and Defendant is entitled to judgment

as a matter of law. Accordingly, Defendant respectfully requests that this Court grant its motion

for summary judgment.

Respectfully submitted,


___/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


___/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


___/s/_____
BLANCHE BRUCE, D.C. BAR # 960245
Assistant United States Attorney
555 Fourth Street, N.W., Room E-4417
Washington, D.C. 20530
(202) 514-9150 (telephone)
(202) 514-8780 (facsimile)

Date:  May 19, 2008                    ATTORNEYS FOR DEFENDANT

OF COUNSEL:

STEPHEN WALSH
Acting Solicitor
MARY L. KELLY
FRANCES LYNCH
BENJAMIN WOOD
Associate Solicitors
U.S. Patent & Trademark Office

2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| _____ | ) | |
| NOVO NORDISK A/S | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No: 06-1896 (CKK) |
| | ) | |
| JON W. DUDAS | ) | |
| Under Secretary of Commerce for | ) | |
| Intellectual Property and | ) | |
| Director of the United States Patent | ) | |
| & Trademark Office, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## DEFENDANT USPTO'S STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF ITS COMBINED MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT OF PLAINTIFF NOVO NORDISK A/S

JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

BLANCHE BRUCE, D.C. BAR # 960245
Assistant United States Attorney

Of Counsel:

STEPHEN WALSH
Acting Solicitor
MARY L. KELLY
FRANCES LYNCH
BENJAMIN D. M. WOOD
Associate Solicitors
U.S. Patent & Trademark Office

May 19, 2008

## TABLE OF CONTENTS

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     OVERVIEW OF PATENT LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        A.      The '774 Application and Family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

                1.      The Invention Disclosure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

                2.      The Appealed Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        B.      The Prior Art. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

                2.      Velasquez. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

                3.      Harrison. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        C.      The Examination of the '774 Application. . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        D.      Novo's Brief to the Board. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        E.      The Board Decision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        F.      The Present Action and Novo's New Evidence. . . . . . . . . . . . . . . . . . . . . . . . 16

IV.     SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

V.      ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        A.      Standard for Summary Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        B.      35 U.S.C. § 145 Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

                1.      Novo Bears the Burden of Showing Reversible Error by the Board. . . . . 20

                2.      Novo's Ability To Present New Evidence In This Court Is Limited By
                        Novo's Conduct Before The USPTO. . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        C.      The Determination of Obviousness Under 35 U.S.C. § 103. . . . . . . . . . . . . . . 23

i

D.      The Board Correctly Found That Claim 25 Would Have Been Obvious in View of
        Schenk and Velasquez. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        1.      The Schenk Device Is Capable of Generating an Aerosol of Dry Insulin
                Powder That Can Reach the Peripheral Areas of the Lungs, Including
                the Alveoli.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        2.      Valesquez Teaches That Dry Insulin Powder Existed at the Time of the
                Invention and That it Can Be Used in a Device Also Used for the Delivery
                of Asthma Medication. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        3.      Novo Admits That One of Ordinary Skill Would Know How to Control
                the Flow Rate and Volume of Inhalation, and Other Factors, to Achieve a
                Reproducible Dose to the Bloodstream. . . . . . . . . . . . . . . . . . . . . . . . . . . 29

E.      The Board Correctly Found That Claim 22 Would Have Been Obvious in View of
        Schenk, Velasquez and Harrison. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        1.      The 2-10 Range Limitation in Claim 22 Does Not Patentably Distinguish
                Claim 22 from the Prior Art.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

                a.      The '774 Application Admits That Prior Art Inhalers Fell Within
                        the 2-10 Range. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

                b.      The Examiner Correctly Found That a Person of Ordinary Skill
                        Could Have Determined the 2-10 Range Limitation Through
                        Routine Experimentation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

                c.      Novo Has Failed to Show Any Legal Criticality as to the 2-10
                        Range Limitation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

        2.      The 1-50 Units of Insulin Limitation in Claim 22 Is Also Insufficient to
                Patentably Distinguish Claim 22 from the Prior Art. . . . . . . . . . . . . . . . . 41

F.      Novo's New Argument as to Long Felt Need Should Not Be Admitted. . . . . . . . 42

VI.     CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

ii

## TABLE OF AUTHORITIES

### CASES

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*California Research Corp. v. Ladd*,
356 F.2d 813 (D.C. Cir. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Consolidated Edison Co. v. NLRB*,
305 U.S. 197 (1938). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Constant v. Advanced Micro-Devices*,
848 F.2d 1560 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*DeSeversky v. Brenner*,
424 F.2d 857 (D.C. Cir. 1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Dickinson v. Zurko*,
527 U.S. 150 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Fregeau v. Mossinghoff*,
776 F.2d 1034 (Fed. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

*Gallagher v. Quigg*,
8 USPQ 2d 1437 (D.D.C. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Graham v. John Deere Co.*,
383 U.S. 1 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*Hyatt v. Dudas*,
No. 03-0901, 2005 WL 5569663 (D.D.C. Sept. 30, 2005). . . . . . . . . . . . . . . . . . . 2, 22

*Holloway v. Quigg*,
9 USPQ2d 1751 (D.D.C. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 42

*In re Aller*,
220 F.2d 454 (CCPA 1955). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*In re Cruciferous Sprout Litig.*,
301 F.3d 1343 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

iii

*In re Gartside*,
    203 F.3d 1305 (Fed. Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Geisler*,
    116 F.3d 1465 (Fed. Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 40

*In re Jolley*,
    308 F.3d 1317 (Fed. Cir. 2002)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re Merck & Co., Inc.*,
    800 F.2d 1091 (Fed. Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Killian v. Watson*,
    121 USPQ 507 (D.D.C. 1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*KSR Int'l Co. v. Teleflex, Inc.*,
    __ U.S. __, 127 S. Ct. 1727 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 33

*Laningham v. U.S. Navy*,
    813 F.2d 1236 (D.C.Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*MacKay v. Quigg*,
    231 USPQ 907 (D.D.C. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Mazzari v. Rogan*,
    323 F.3d 1000 (Fed. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-22

*Merck & Co. Inc. v. Biocraft Laboratories, Inc.*,
    874 F.2d 804 (Fed. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Monsanto Co. v. Kamp*,
    269 F. Supp. 818 (D.D.C. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*National Steel Car, Ltd. v. Canadian Pacific Railway, Ltd..*,
    357 F.3d 1319 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Para-Ordnance*,
    73 F.3d 1085 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Pfizer, Inc. v. Apotex, Inc.*,
    480 F.3d 1348 (Fed. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Stratoflex, Inc. v. Aeroquip Corp*,
    713 F.2d 1530 (Fed. Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Syntex (U.S.A.) LLC v. Apotex, Inc.*,
    407 F.3d 1371 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Takeda Pharma. Co. v. Dudas*,
    511 F.Supp.2d 81 (D.D.C. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Titanium Metals Corp. v. Banner*,
    778 F.2d 775 (Fed. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 41

*United States v. Diebold, Inc.*,
    369 U.S. 654 (1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Telectronics, Inc.*,
    857 F.2d 778 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## STATUTES

35 U.S.C. § 102. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

35 U.S.C. § 103. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 23

35 U.S.C. § 112, first para.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

35 U.S.C. § 112, second para.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

35 U.S.C. § 134. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

35 U.S.C. § 141. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

35 U.S.C. § 145. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 20

5 U.S.C. § 706. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## RULES

Fed. R. Civ. P. 56 (c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## <u>LIST OF EXHIBITS</u>

Exhibit 1:    Patents claiming priority to '281 application (cover sheets only

Exhibit 2:    Transcript of Deposition of Dr. Ronald Crystal

Exhibit 3:    U.S. Patent No. 5,320,094 to Laube *et al.*

Exhibit 4:    John Patton, Pulmonary Delivery of Peptides and Proteins (1992)

Exhibit 5:    Novo Press Release

Exhibit 6:    Pfizer Press Release

Exhibit 7:    Lilly & Co. Press Release

Exhibit 8:    Amendment After Final (June 13, 1994), filed in connection with the '281 application

Exhibit 9:    Declaration of Reid Rubsamen (June 13, 1994), filed in connection with the '281 application

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

NOVO NORDISK A/S                                    )
                                                    )
                        Plaintiff,                  )
                                                    )
            v.                                      )        Case No: 06-1896 (CKK)
                                                    )
JON W. DUDAS                                        )
        Under Secretary of Commerce for             )
        Intellectual Property and                   )
        Director of the United States Patent        )
        & Trademark Office,                          )
                                                    )
                        Defendant.                  )
_____)

**DEFENDANT USPTO'S STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF ITS COMBINED MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT OF PLAINTIFF NOVO NORDISK A/S**

**I.      INTRODUCTION**

This is a patent case.  At issue is U.S. Patent Application No. 09/848,774 ("the '774 application").  The '774 application is but the most recent attempt of Plaintiff Novo Nordisk A/S ("Novo") to exploit a 15-year-old patent application – to which the '774 application claims priority – that Novo says fully describes the pending claims in the '774 application.  While Novo has already received almost two dozen patents based on this 15-year-old application, the appealed claims of the '774 application do not deserve the same protection.  As discussed in detail below, the claimed methods impermissibly extend to what would have been obvious to a person of ordinary skill when the invention was made:  the claims are directed to methods that encompass a huge variation in the amount of medicine delivered to a patient; they can be performed by known inhalation devices; they use known dry powder insulin formulations and

known dosage guidelines for the treatment of diabetes by injection; and they rely on breathing techniques (primarily controlling the volume and flow rate of the patient's inhalation) and other factors (primarily the size of the particles comprising the aerosol) that Novo's *own expert* admits were well known by those of ordinary skill at the time of the invention. Accordingly, the appealed claims are unpatentable under 35 U.S.C. § 103, and Defendant Jon W. Dudas, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office ("USPTO" or "Defendant") respectfully requests that summary judgment be entered for Defendant.

## II.    OVERVIEW OF PATENT LAW

An inventor seeking a patent must file a patent application with the USPTO. The application is, essentially, a draft patent. Like a patent, it contains two primary parts: (1) a "specification" or "disclosure;" and (2) one or more "claims." The specification describes what the invention is. By law, it must describe the invention, and how to make and use it, in sufficient detail to enable "any person skilled in the art [technology] to which [the invention] pertains" to make and use the invention. 35 U.S.C. § 112, first para.

The claims, on the other hand, identify what the applicant regards as his invention; *i.e.*, the scope of legal protection the applicant believes his invention is entitled to receive. 35 U.S.C. § 112, second para. Each claim is a single sentence that contains a number of "limitations" directed to the various features of the subject matter claimed. 35 U.S.C. § 112; *Hyatt v. Dudas*, No. 03-0901, 2005 WL 5569663, at *2 (D.D.C. Sept. 30, 2005). Several claims in a single application may share many of the same limitations. *Id.*

When the application is received by the USPTO, it is given to a patent examiner for

2

examination.  The examiner determines whether each claim satisfies certain statutory patentability requirements.  For example, the examiner will determine whether each claim is "novel," *i.e.*, new, and also whether it would have been "nonobvious" to a person of ordinary skill in the relevant art.  35 U.S.C. §§ 102, 103.  Section 102 of the Patent Statute sets forth the types of evidence – *e.g.*, earlier-issued patents, articles published in relevant technical journals, etc. – that the examiner may properly rely upon in rejecting a claim as "anticipated" (not novel) or obvious.  This evidence is referred to as "prior art."  *See* 37 C.F.R. § 1.104(a)(1).

If the examiner believes that a claim does not comply with the statutory patentability requirements, the examiner will reject the claim and issue an "office action" setting forth the grounds for the rejection.  37 C.F.R. § 1.104(a).  In response, the applicant may (i) amend the rejected claim to distinguish it over the prior art that the examiner relied upon; and/or (ii) argue against the rejection.  37 C.F.R. § 1.111.  The examiner will eventually issue a "final office action" (or "final rejection") if the examiner and the applicant cannot agree on the patentability of one or more claims.  Otherwise, the examiner will "allow" the pending claims, and the USPTO will issue a patent for the claimed invention.

An applicant may appeal a final office action to the Board.  35 U.S.C. § 134.  The Board will either affirm or reverse the examiner's rejections.  35 U.S.C. § 134(a).  If the Board affirms the examiner's rejections, the applicant may either appeal directly to the Court of Appeals for the Federal Circuit ("Federal Circuit") under 35 U.S.C. § 141 or, as in the present case, proceed with an action in the District Court for the District of Columbia under 35 U.S.C. § 145.

## III.    STATEMENT OF FACTS

### A.    The '774 Application and Family

At issue in this case are claims 22-23, 25-26, 31 and 35 of U.S. patent application no. 09/848,774 ("the '774 application").

Novo filed the '774 application on May 3, 2001.[1]  The '774 application "claims priority," via a long chain of intermediate applications, to U.S. Patent Application No. 08/011,281 ("the '281 application"), which was filed on January 29, 1993.[2]  Novo has obtained 23 patents based on the '281 application.  *See* Exhibit 1 hereto (cover pages of Novo's patents that claim priority to the '281 application).

In prosecuting the '281 application, the named inventor of that application, Dr. Reid Rubsamen, filed a declaration with the USPTO.  *See* Declaration Under 37 CFR 1.132 of Reid Rubsamen (June 13, 1994) ("Rubsamen Decl.") (Exhibit 9 hereto).  In his declaration Dr. Rubsamen disclosed that he conducted certain experiments to "demonstrate the usefulness of [his] invention" for inhalable insulin.  Ex. 9 (Rubsamen Decl.) at NN-625.  Instead of administering insulin to human patients, however, he administered radio labeled albuterol, a bronchodilator useful for the treatment of lung diseases such as asthma.  *Id.*; *see also* the Deposition of Dr. Ronald G. Crystal, M.D. ("Crystal Tr.") (Exhibit 2 hereto) at 91:14-92:14.

Also in prosecuting the '281 application, the applicant admitted that many aspects of the

---

[1]  The '774 application was actually filed by Aradigm Corp., Novo's predecessor in interest in the '774 application.  *See* Novo Mem., Ex. I (showing chain of assignment of the '774 application).  For simplicity, both Aradigm and Novo will be referred to as Novo.

[2]  The USPTO disputes Novo's claim of priority to the '281 application.  However, for purposes of this motion only, the USPTO assumes that the effective filing date for the '774 application is January 29, 1993.

4

invention were known in the art: "The claims generally cover a method of administering a specific drug (i.e., insulin) to lung tissue. . . . Insulin is a known drug having a known utility and is known to enter the circulatory system when brought into contact with lung tissue." Amendment After Final filed in connection with the '281 application (June 13, 1994) ("Amendment After Final") (Exhibit 8 hereto) at 1310. The applicant further admitted that "[t]he ability to provide for intrapulmonary delivery of insulin is known and old. References previously cited by the Examiner clearly disclosed that insulin can be delivered by the intrapulmonary route." *Id.* at NN-1311. Finally, the applicant admitted that Dr. Rubsamen's declaration "shows that the device actually delivers [insulin] to the lungs and based on what is known with respect to insulin (via the prior art), the insulin will enter the circulatory system." *Id.* at NN-1313.

### 1.    The Invention Disclosure

The specification of the '774 application (Admin. R., Tab 2) describes a method of controlling the dosage of aerosolized insulin delivered to a patient's circulatory system by measuring and controlling the total volume of air inhaled by the patient. Tab 2 at A5, ¶ 10; A7, ¶ 17. According to the specification, the "primary factor addressed by the present invention relating to the consistency of dosing insulin by inhalation is the total air volume inhaled by the patient." Tab 2 at A17, ¶ 83; *see also* A47, ¶¶ 173-76 (discussing the effect on repeatability of dosing due to total inhaled volume); Tab 2 at A18, ¶ 83 ("if the patient merely inhales the same volume for each drug delivery event, the dosing will be consistent"). The specification also identifies the inspiratory flow rate, or speed,[3] of the patient's inhalation at which the device fires

---

[3] The disclosure defines "inspiratory flow rate" as "a value of air flow rate measured, calculated and/or determined based on the ***speed*** of the air passing a given point in a measuring device assuming atmospheric pressure +- .5% and a temperature in the range of about 10.degree.

as another factor affecting the repeatability of dosing.  Tab 2 at A52, ¶¶ 187, 190.  The specification acknowledges that even when these factors are controlled, variations in doses administered to the patient will occur, and teaches that such variations "are calculated by monitoring serum glucose levels in response to known amounts of insulin released from the device."  Tab 2 at A25 at ¶ 116.

The specification teaches that "different mechanisms will be necessary in order to deliver different formulations. . . .  [A] device suitable to carry out the methods of the invention would be one that "provide[s] for the mechanical movement of a predetermined amount of dry powder to a given area," and energy from compressed gas would "cause the dry powder to form a dry dust cloud" for inhalation.  Tab 2 at A66, ¶ 238.

The specification also states that "[d]elivery is improved by providing a system which creates particles for systemic delivery wherein the particles are in the range of about 0.5 to about 12.0 microns, preferably 0.5 to 6 microns and more preferably 0.5 to about 3 microns."  Tab 2 at A53, ¶ 191; *see also* Tab 2 at A60, ¶ 222 ("Regardless of the type of drug or the form of the drug formulation, it is preferable to create drug particles having a size in the range of about 0.5 to 12 microns.").  The specification asserts that "[w]hen insulin is deposited on mucus membranes of the respiratory tract and particularly in the peripheral areas of the lung it is later absorbed into the circulatory system."  Tab 2 at A17, ¶ 81.  The '774 application never mentions the word "alveoli," but instead teaches the need to deliver insulin particles "peripherally into the lung" (A5), "deeply into the lung (A6), "in the peripheral areas of the lung" (A17) or "on the outer peripheral areas of the lung." (A24).

---

C. to 40.degree. C."  Tab 2 at A13, ¶ 64 (emphasis added).

The specification describes using the invention in conjunction with the administration of insulin by injection. Tab 2 at A36, ¶ 149. It teaches that "it will be understood by those skilled in the art that a plurality of different treatments and means of administration can be used to treat a single patient. For example, a patient can be simultaneously treated with insulin by injection, insulin via intrapulmonary administration in accordance with the present invention, and sulfonylurea drugs, which are orally administered." Tab 2 at A36, ¶ 149; *see also* (stating that an object of the invention is to provide a method of delivering insulin that is sufficiently consistent to "eliminate, at least in part, the need for injecting insulin"). Tab 2 at A7, ¶ 19.

The invention makes use of insulin formulations known as of January 29, 1993 (Tab 2 at A23, ¶ 110; A45-46, ¶¶ 169-72; A59, ¶ 220). The invention also makes use of conventional dosing methodologies for dosing insulin via injection known to a person of ordinary skill in the art at that time, particularly those set forth in Harrison. *See, e.g.*, A26-27, ¶¶ 121-122; A51, ¶ 186; A65, ¶ 235 (incorporating Harrison by reference for its disclosure of "conventional information regarding dosing insulin via injection"). For example, the specification states that "[b]ased on the information disclosed *in combination with what is known about insulin dosing* and serum glucose levels, computer readable programs can be readily developed which can be used in connection with the insulin delivery device of the present invention." A57, ¶ 211 (emphasis added); *compare* Tab 2, A22-23, ¶ 109 (specific insulin dosages and protocols taught by '774 specification) *with* Tab 13 at A268 (virtually identical insulin dosages and protocols taught by Harrison).

The specification states that:

The differential between the amount of insulin actually released

7

from the device and the amount actually delivered to the patient varies due to a number of factors.  In general, devices used with the present invention can have an efficiency as low as 10% and as high as 50% or more meaning that as little as 10% of the released insulin may actually reach the circulatory system of the patient and as much as 50% or more might be delivered.  The efficiency of the delivery will vary somewhat from patient to patient and ***must be taken into account when programming the device for the release of insulin***.  In general, a conventional metered (propellant-driven) dose inhaling device is about 10% efficient.

Tab 2 at A64-65, ¶ 233 (emphasis added).

## 2.    The Appealed Claims

There are six claims on appeal:  claims 22, 23, 25, 26, 31, and 35 (the "Appealed Claims").  Each of the Appealed Claims relates to a method for treating diabetes mellitus with inhaled dry insulin powder.  Novo has agreed that claims 25 and 22 are exemplary.  Novo Mem. at 9.  Claim 25, Novo's broadest claim, which is not limited to any particular quantity of insulin, reads as follows:

> 25.  A repeatable method of regulating blood glucose levels in a human patient, the method comprising the steps of:
>
> a.  supplying a fixed quantity of dry insulin powder to a portion of a hand held inhalation delivery device;
>
> b.  propelling a gas over the fixed quantity of dry powder to produce, in a repeatable manner, an aerosolized suspension of insulin, the aerosolized suspension containing more insulin than is required in the bloodstream of the patient to achieve satisfactory blood glucose level; and
>
> c.  flowing at least a portion of the aerosolized suspension through a mouth piece on the device and into the lungs of the patient in a manner sufficient to cause the patient to absorb in the patient's bloodstream a sufficient, controlled quantity of insulin to achieve acceptable blood glucose level following treatment.

8

Tab 24 at A372-A373.

Claim 22 contains two additional limitations not found in claim 25: First, claim 22 limits the amount of dry powder insulin in the aerosolized suspension to "2-10 times higher than the amount needed to be absorbed in the bloodstream of the patient" ("2-10 range limitation"). Second, claim 22 defines the amount of insulin needed to be absorbed into the bloodstream as "between 1-50 units of insulin." Claim 22 reads as follows:

> 22. A method for treating diabetes mellitus in a patient comprising the steps of:
>
> a. supplying a predetermined amount of dry insulin powder to an inhalation device;
>
> b. releasing a pressurized gas over the predetermined amount of dry insulin powder to create an aerosolized suspension comprising powder suspended in air, wherein the aerosolized suspension contains an amount of insulin that is 2-10 times higher than the amount needed to be absorbed in the bloodstream of the patient; and
>
> c. inhaling the aerosolized suspension at a flow rate and volume sufficient to allow the patient to absorb in the bloodstream a controlled dose of insulin that comprises between 1-50 units of insulin.

Tab 24 at A372.

Claim 26, which depends from and further limits claim 25, indicates that the steps of claim 25 may be "repeated periodically as needed to treat the patient" provided that the amount of insulin delivered to the bloodstream remains "relatively constant." Tab 24 at A373. Similarly, claim 23, which depends from and further limits claim 22, indicates that the steps of claim 22 may be "repeated periodically as needed to treat the patient" provided that the amount of insulin delivered to the bloodstream remains "relatively constant." Tab 24 at A372.

9

B.    The Prior Art

1.    Schenk

International Patent Publication No. WO 90/07351 to Schenk *et al.* ("Schenk") (Admin

R., Tab 17, A298-A321) discloses an "oral inhaler for use in inhaling a powdered or particulate

medical product." *See* Tab 17 at A300, ll.1-2. Schenk teaches that his inhaler is designed to

deliver dry powder medicines to treat "bronchial asthma and *other diseases*." Tab 17 at A300,

ll.4-5 (emphasis added).

As depicted in Figure 1 of Schenk (Tab 17 at A317), the metering chamber **14** has a fixed

volume, so it measures out a fixed, precise, and controlled dose of powdered medicine with each

inhalation. The metering chamber **14** connects to a gas flow passage **17** via a connecting passage

**15**; the gas flow passage **17** has a restriction or throat **18** at the point of connection. A302, A307,

A317. In operation, the Schenk inhaler is positioned with the mouthpiece pointing upward,

which allows the powdered medical product to flow from the product reservoir **11** and fill the

metering chamber **14**. A308-09. The patient places her mouth on the mouthpiece **20** and

operates an actuator.[4] This causes piston **12** to move toward restriction **18** to "obtain a short,

quick pressure stroke," which creates fast-moving air, and a consequent drop in pressure, in

restriction **18**. A308-09; A317. The resulting vacuum causes the powdered product to be drawn

from the metering chamber **14** and into the air flow through passage **15** and restriction **18**, and

then into the mixing chamber **16**, where the particles move more slowly. A306, A309, A317. In

the process, the powder is broken up into "respirable" particles: "The high velocity of the air

---

[4] The actuator is shown best in Figure 3, Tab 17 at A317.

10

flow and the vigorous turbulence created thereby cause that almost all of the product is disintegrated into respirable particles." A309. Schenk defines "respirable particles" as those particles of less than 7 μm in diameter. A300.

Schenk discloses that his inhaler is superior to others because it creates a "drastic increase of the proportion of respirable particles dispersed in the gas or air flow." A302, ll.19-22. Further, the "provision of such dispersed respirable particles is not dependent on the ability of the patient to inhale vigorously," but instead permits the patent to inhale the medicine slowly, a breathing technique known to facilitate the drug reaching the peripheral areas of the lungs. A302, ll.19-22; *see also* A301, ll.20-24 ("it is necessary to inhale rather slowly in order to get particles into the outer branches of the bronchial tubes.").

### 2. Velasquez

U.S. Patent No 5,192,548 to Velasquez *et al.* ("Velasquez") (Tab 18 at A322-A331) relates to a dimpled sheet material to be used in an inhaler for dry powder drug delivery. (*See*, *e.g.*, Tab 18 at A322, Abstract.) Velasquez teaches that his invention is "particularly useful with medicaments having high potency for either local treatment of, for example, the lung or *systemic treatment*." Tab 18 at A328, col.2, ll.29-32 (emphasis added). Velasquez specifically lists insulin as an "exemplary drug" that may be employed in the practice of the invention, as well as drugs for the treatment of respiratory disorders such as bronchodilators. Velasquez also expressly teaches the administration of particles that are "preferably in the particle size range of 1 to 10 μm." Tab 18 at A330, col.6, ll.32-45.

### 3. Harrison

Harrison (Tab 13, A266-A269) is a standard text book of internal medicine, and is cited

11

multiple times in the '774 application as a resource for "information regarding dosing with insulin" via injection. *See, e.g.*, Tab 2 at A51, ¶ 186. Harrison discloses that "conventional insulin therapy" involved "one or two injections a day of intermediate-acting insulin." Tab 13 at A268, lt.col., ¶ 3. However, Harrison discloses that "[n]o single standard exists for patterns of administration of insulin, and treatment plans vary from physician to physician and with a given physician in different patients." *Id.* Consequently, Harrison recommends (1) that normal weight patients be "started on 15 to 20 units [of insulin] a day;" (2) that "it is preferable to use the same quantity of insulin for several days before changing," and (3) that such changes should be made of "no more than 5 or 10 units per step." *Id.* Similar guidance is given for obese patients, with the initial insulin dose starting at "25 to 30 units a day." *Id.*

Harrison also teaches that a variety of factors other than weight can affect the number and size of doses administered each day, including food intake, activity levels, and insulin responsiveness. Tab 13 at A268, rt.col., para.1. Consequently, Harrison advises that the proper dose adjustment in response to these factors "must be determined by *trial and error* . . . ." *Id.* (emphasis added.) Harrison concludes by stating that "[m]ost insulin-requiring patients now monitor control and alter therapy based on self-measurement of the capillary blood sugar." A269, rt.col., para.4.

The specific insulin dosages and protocols taught by the specification of the '774 application are virtually identical to those taught by Harrison. *Compare* Tab 2 at A22-23, ¶ 9 *with* Tab 13 at A268.

C.    The Examination of the '774 Application

Following an initial rejection and amendment, the Examiner rejected Novo's claims as being obvious under 35 U.S.C. § 103 over the combined teachings of Schenk and Velasquez. Tab 16 at A292-A295.  The Examiner cited Schenk for disclosing "a method of treating a patient comprising the steps of: supplying a predetermined amount of dry powder (11) to an inhalation device; releasing a pressurized gas (figs. 1-6) over a predetermined amount of dry powder to create an aerosolized suspension (16) comprising powder suspended in air; and inhaling the aerosolized suspension at a flow rate and volume sufficient to allow the patient to absorb in the bloodstream a controlled dose of medicament." Tab 16 at A292.  The Examiner cited Velasquez for teaching "dry powder medicaments as inhalable powders including insulin as a dry powder medicament for inhalation by a patient." *Id.*  In the Examiner's view, it would have been obvious to use the dry powder insulin of Velasquez with Schenk's inhaler "because it would have provided an easy and painless manner of delivering insulin to patients." *Id.*  As to the 2-10 range limitation, the Examiner stated that "the amount of insulin employed and the amount absorbed can be arrived at through mere routine obvious experimentation and observations . . . Consequently, one of ordinary skill would realize that the amount stored and absorbed would need to be tailored to the particular patient's medical needs." Tab 16 at A293.

With respect to the requirement for repeated administrations in claims 23 and 26 (Tab 24 at A372-A373), the Examiner reasoned that Schenk, as modified by Velasquez's teaching of dry insulin powder, would be used to treat diabetes, a disease that requires repeated administration of insulin: "[it] stands to reason that the administration protocol would have included repeated inhalation (administration) of insulin to maintain adequate concentration of medicament in a

13

patient's bloodstream" Tab 16 at A293.

In his answer to Novo's appeal brief, the Examiner cited Harrison as extrinsic evidence regarding the use of insulin to treat diabetes mellitus. Tab 25 at A383. The Examiner then stated that "[w]hile the prior art combination [*i.e.*, Schenk and Velasquez] may not expressly disclose a particular amount [of insulin] one of ordinary skill being equipped with known medical guidelines for treatment of diabetes mellitus would know to make adjustments in the quantity of powdered medicament in order to provide a dose which would effectively bring a patient's blood glucose within a 'normal' range." Tab 25 at A385. Further, the Examiner stated that upon examining the '774 application, he could find "no criticality" to either the 2-10 range limitation or the limitation in claim 22 that "the dose of insulin [is] 1-50 units." Tab 25 at A386.

### D.    Novo's Brief to the Board

Novo appealed the examiner's final rejection to the Board of Patent Appeals and Interferences ("Board"). Tab 24 at A354-74. Novo argued, *inter alia*, that the Schenk reference does not refer to diabetes or insulin or any other substance for use in controlling blood glucose. Tab 24 at A361-2; A368. Novo criticized Velasquez for only making a single reference to insulin among a list of other drugs, and further argued that neither Schenk nor Velasquez disclose the treatment of diabetes using inhaled insulin. Tab 24 at A362.[5] Novo did not submit any evidence to the Board, in the form of an expert declaration, test data, or otherwise, to show that the Schenk device was not capable of producing a controlled, repeatable dose of insulin to the

---

[5] Novo also argued to the Board that the examiner's rejections were based on improper "obvious to try" and "inherency" standards. Tab 24 at A364-66. Novo has apparently abandoned these legal arguments in the present proceeding.

14

bloodstream.  Moreover, Novo did not disagree with the examiner's statement that "[g]iven that Schenk *et al.* disclose aerosolizing most of the medicament within the aerosolization chamber 16, the amount of medicament available for inhalation by a patient is predictable."  Tab 24 A369; *see also* A370 (acknowledging that the combination of Schenk and Velasquez may "disclose the possibility of delivering insulin into the patient's lungs").

### E.    The Board Decision

The Board rejected Novo's argument that the applied art fails to show how insulin is to be inhaled in controlled delivery, finding that "both applied references describe structural devices to precisely control the amount of a medicament delivered."  Tab 36 at A449-50.[6]  In particular, the Board found that Velasquez uses "precise measuring of small amounts in equal sized depressions for use in an inhaler," and Schenk uses "a metering chamber."  *Id.*  The Board also found that Schenk's device is "inherently repeatable in operation."  Tab 36 at A450.

Although the Board acknowledged that "neither reference teaches how to translate [its] structural controls into the precise amounts of insulin needed to be deposited for inhalation," the Board found that the broad ranges recited in Novo's claims suggest that "the precise amount is not critical to the invention, or more properly, *the precise amount* is highly dependent on the individual patient and therefore *cannot be claimed with precision*."  Tab 36 at A450 (emphasis added).  On similar grounds, the Board also rejected Novo's arguments related to claim limitations requiring lowering glucose to an "acceptable level," and "controlling glucose levels."  Tab 36 at A450.  Specifically, the Board found that "lowering of glucose levels to an acceptable level and controlling the glucose levels are both highly dependent upon the particular patient,"

---

[6]  As Novo notes, the examiner's final rejection and answer are incorporated into the Board's decision.  Novo Mem. at 3 n.4 (citing *In re Webb*, 916 F.2d 1553, 1556 (Fed. Cir. 1990).

and that one would have to "monitor the patient's vital statistics to achieve the desired results in view of the high variability among patients as a matter of course."  *Id.*.

Turning to claims 22, 23, and 31, the Board rejected Novo's arguments regarding the limitation that the aerosolized suspension is inhaled in such a manner that the dose absorbed into a patient's bloodstream "comprises between 1-50 units of insulin."  Tab 36 at A448.  The Board found that the '774 application admits that a person of ordinary skill would "ordinarily use" such a dose.  Tab 36 at 449 (citing the '774 application at 21 (Tab 2 at A22)).

Finally, the Board rejected Novo's arguments regarding the limitation recited in claims 22, 23, and 35 that "the aerosolized suspension contains 2-10 times higher than needed to be absorbed into the bloodstream of a patient."  Tab 36 at A448.  Citing legal precedent holding that "it is not inventive to discover the optimum or workable ranges by routine experimentation" (A450, citing *In re Geisler*, 116 F.3d 1465 (Fed. Cir. 1997)), the Board expressly noted that it was "known . . . in the art that not all of the amount [of insulin] that is inhaled will be absorbed. " A449.  The Board also opined that Velasquez may describe the claimed range.  A449.

## F.    The Present Action and Novo's New Evidence

In the present action Novo proffers new evidence in the form of the testimony of its expert, Dr. Ronald Crystal, that the Board did not have the opportunity to consider.  *See* Expert Witness Report of Dr. Ronald G. Crystal ("Crystal Report," or "Crystal Rep.") (Novo Mem., Ex. A).  In his report Dr. Crystal describes the general physiology of the lung as comprised of the trachea, bronchi, bronchioles and alveoli.  Crystal Rep. at 8, ¶ 23.  He asserts that in order to treat diabetes through the inhalation of insulin, "the insulin must reach the alveoli in order to be absorbed into the bloodstream in a sufficient quantity to be effective."  *Id.*  He states that insulin

16

must be "aerosolized" to be administered by inhalation, meaning that it is converted into small particles and impacted with compressed air. *Id*. at 8, ¶ 24.

Dr. Crystal goes on to identify several factors that he believes must be controlled to accomplish "predictable and reproducible" doses of insulin by inhalation: (1) the volume with which the patient inhales the dose of insulin; (2) the flow rate with which the patients inhales the dose of insulin; (3) the size of the insulin particles inhaled; (4) the speed of the inhalation;[7] and (5) the point in the respiration cycle where the patient initiates inhalation. *Id.* at 16, ¶ 52 (citing '774 application, ¶¶ 86-111).

At his deposition, Dr. Crystal testified that at the time of the invention a person of ordinary skill in the art would have known that each of the above factors affected the reproducibility of administering insulin by inhalation, and would also have known how to control these factors to achieve reproducibility. Ex. 2 hereto (Crystal Tr.) at 164:14-18; 165:22-166:9; 167:20-168:12; 174:12-175:7; 181:4-10; 182:5-11; 185:19-186:12.

## IV.    SUMMARY OF THE ARGUMENT

Novo's claims 25 and 22 are exemplary of all of the appealed claims. Claim 25 is generally directed to a method for delivering a "controlled" and "repeatable" dose of insulin to the bloodstream of a diabetic patient via inhalation of an aerosol of dry insulin powder containing more insulin than is needed in the bloodstream. According to the specification of the '774 application and Novo's expert, this can be accomplished by (1) an inhaler device that generates

---

[7]    At his deposition Dr. Crystal initially defined speed "in terms of flow rate, that is, volume per unit time." Crystal Tr. at 125:17-19. As noted above, this is consistent with the specification of the '774 application, which equates speed and flow rate. Tab 2 at A13, ¶ 64. Later in the deposition he changed his testimony, defining speed as the overall "time" of the inhalation. Crystal Tr. at 156:17-157:18.

17

aerosolized insulin powder containing sufficiently small, *i.e.*, "respirable," particles, and (2) controlling the flow rate and volume of the inhalation, as well as other factors, to facilitate deposition of the respirable particles in the peripheral areas of the lungs where the insulin can then be absorbed into the bloodstream.

There is no genuine dispute that the Schenk inhaler, using the dry insulin powder disclosed by Velasquez, meets the first requirement, in that it would generate a controlled quantity of aerosolized insulin containing respirable particles, *i.e.*, those that can reach the peripheral areas of the lungs for absorption into the bloodstream. Further, since it is always the case that some aerosolized medicine is lost between its generation in an inhaler and absorption into the bloodstream, it is necessarily true that the quantity of aerosolized medicine generated by the Schenk device would need to be greater than that needed to be absorbed in the bloodstream.

There is also no genuine dispute that a person of ordinary skill would have been well aware of all of the factors, including the flow rate and volume of inhalation, necessary to deliver a controlled and repeatable dose of insulin to the bloodstream. Novo's own expert witness testified that a person of ordinary skill would know how to control all of the factors necessary to deliver a "reproducible" (*i.e.*, controlled and repeatable) dose of insulin to the bloodstream.

Novo's claim 22 mirrors claim 25, and is further limited by (1) the "2-10 range limitation," *i.e.*, creating an aerosol of insulin powder that is 2-10 greater than the amount needed to be absorbed in the bloodstream; and (2) delivering 1-50 units of insulin to the bloodstream.

As to the 2-10 range limitation of claim 22, a person of ordinary skill would have been able to determine this limitation via routine experimentation, as the examiner properly found. Additionally, the '774 application *admits* that conventional inhalers in the prior art fell within

18

this range and thus satisfied this limitation.  Thus, the 2-10 range limitation cannot patentably

distinguish claim 22.  As to the limitation of claim 22 calling for the administration of between

1-50 units of insulin to the bloodstream, administration of such doses was well known in the art

before the claimed invention was made, as made clear by Harrison.

Finally, Novo's arguments as to the secondary consideration of long-felt need are

unpersuasive.  Novo cannot show that its claimed invention has met any alleged long-felt need,

because, among other things, it has no commercial product encompassing the claimed invention:

as a result of the commercial failure of the inhalable insulin product of one of its competitors,

Novo has shelved its own commercial inhalable insulin product.

## V.    ARGUMENT

### A.    Standard for Summary Judgment

Summary judgment is appropriate when the "pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (c).

In deciding a motion for summary judgment, the Court must view all facts, and inferences

drawn therefrom, in the light most favorable to the non-moving party.  *United States v. Diebold,*

*Inc.*, 369 U.S. 654, 655 (1962).  The mere existence of a factual dispute will not defeat summary

judgment; it must be genuine and material to the case.  A factual dispute is genuine when the

non-moving party presents evidence such that a reasonable jury could return a verdict in its favor.

*Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C.Cir. 1987).  Thus, "[m]ere denials or

conclusory statements" by the non-moving party are insufficient to create a genuine issue of

material fact.  *See, e.g., Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731

F.2d 831, 836 (Fed. Cir. 1984).

    **B.**    **35 U.S.C. § 145 Review**

        **1.**    **Novo Bears the Burden of Showing Reversible Error by the Board**

A §145 action "is conducted as a trial; however, it is in essence a suit *to set aside* the final decision of the board, like the bill in equity from which it was derived." *Fregeau v. Mossinghoff*, 776 F.2d 1034, 1037 (Fed. Cir. 1985) (emphasis in original). As such, Novo carries the burden of showing that the board committed reversible error. *Id.* at 1038 ("the applicant has the laboring oar to establish error by the board.")

When no new evidence supplements the administrative record, the board's legal conclusions can only be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. The board's findings of fact are reviewed for substantial evidence. *Mazzari v. Rogan*, 323 F.3d 1000, 1005 (Fed. Cir. 2003). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938). Where "two different, inconsistent conclusions may reasonably be drawn from the evidence in record, an agency's decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence." *In re Jolley*, 308 F.3d 1317, 1328-9 (Fed. Cir. 2002).

Even if this Court decides to admit new evidence, the record before the USPTO remains the "evidentiary nucleus" of the case. *Fregeau*, 776 F.2d at 1037. Novo is not entitled to "start over" prosecution of its application before this Court "unfettered by what happened in the PTO." *Id.* at 1038. Only where new evidence offered by the parties is conflicting is the Court permitted

to make *de novo* factual findings.  *Mazzari*, 323 F.2d at 1005.

### 2.    Novo's Ability To Present New Evidence In This Court Is Limited By Novo's Conduct Before The USPTO

In order to encourage "full disclosure to the administrative tribunals primarily responsible for just decision-making," *Killian v. Watson*, 121 USPQ 507, 508 (D.D.C. 1958), this Court has established two limitations on the ability of Section 145 plaintiffs to present new evidence in district court.

First, a Section 145 plaintiff cannot present new evidence on new issues - that is, issues not raised before the Examiner or the Board.  *See, e.g., DeSeversky v. Brenner*, 424 F.2d 857, 858 (D.C. Cir. 1970).  Novo agrees that "no new issues may be raised in a Section 145 action." Novo Mem. at 22, fn. 26.

Second, a Section 145 plaintiff cannot present new evidence that was "previously available to a party but, either because of intentional suppression by or negligence of the party, was withheld during the initial patent proceedings." *See, e.g., California Research Corp. v. Ladd*, 356 F.2d 813, 821, n.18 (D.C. Cir. 1966) ("[a]lthough each side may strengthen its case with additional material, the plaintiff may not submit for the first time evidence which he was negligent in failing to submit to the Patent Office");  *Monsanto Co. v. Kamp*, 269 F. Supp. 818, 822 (D.D.C. 1967) (evidence available to the parties but "withheld from the Patent Office as a result of fraud, bad faith, or gross negligence, may be excluded at the trial"); *Holloway v. Quigg*, 9 USPQ2d 1751, 1752 (D.D.C. 1988) ("evidence has been excluded if it was available to the plaintiff during the PTO proceeding but was either intentionally or negligently withheld").

When plaintiffs fail to offer a reasonable explanation for withholding evidence from the

agency, Courts in this district have precluded them from presenting new evidence in district court. *Killian*, 121 USPQ at 508 ("Plaintiff has not here made any explanation of his apparent refusal to offer, during this extended period in which the administrative decisions were consistently against him, the evidence which might have proven him right. Accordingly, this court must consider him grossly negligent in that failure, and refuse to consider it now."); *Hyatt v. Dudas*, No. 3-0901, 2006 WL 4606037, at *3 (D.D.C. 2006) (Hyatt's declaration "properly excluded" because the information in his declaration was "available to him during the PTO proceedings" and he has not "provided a persuasive explanation for why he withheld that information").

Novo seeks to introduce the expert report of Dr. Crystal, even though Novo failed to present it – or any other evidence – to the Board in the proceedings below. But the failure to present expert testimony that could have been presented during patent prosecution is the sort of negligent behavior that prevents a §145 plaintiff from later introducing new evidence on that same issue. *Hyatt*, 2006 WL 4606037, at *3. Without this limitation, a patent applicant could simply avoid the technical expertise of the USPTO by presenting it with only broad general arguments about patentability and then bringing its evidence to the District Court to be examined in the first instance. This is exactly what Novo is attempting to do here.

Novo cites five cases in support of its argument that its new evidence should be admitted. Novo Mem. at 21-22. But in four of the cases, admissibility of new evidence was not at issue. *See, Mazzari v. Rogan*, 323 F.3d 1000 (Fed. Cir. 2003); *Gallagher v. Quigg*, 8 USPQ 2d 1437 (D.D.C. 1988); *Dickinson v. Zurko*, 527 U.S. 150 (1999); *Fregeau v. Mossinghoff*, 776 F.2d 1034 (Fed. Cir. 1985). In the one case where admissibility was at issue, the district court admitted

plaintiff's declaration discussing two patents because the plaintiff had submitted one patent to the Board and did not learn of the second patent until after briefing to the Board was complete. *Takeda Pharma. Co. v. Dudas*, 511 F.Supp.2d 81, 87 (D.D.C. 2007).  Novo makes no such argument about its new evidence here and, accordingly, *Takeda*, along with the other cases on which Novo relies, is inapposite.

### C.    The Determination of Obviousness Under 35 U.S.C. § 103

Section 103 of the Patent Act, 35 U.S.C. § 103, forbids issuance of a patent when "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  35 U.S.C. § 103; *KSR Int'l Co. v. Teleflex, Inc.*, __ U.S. __, 127 S. Ct. 1727, 1734 (2007).

Whether a claimed invention is unpatentable as obvious under 35 U.S.C. § 103 is a question of law based on underlying findings of fact.  *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000).  These factual inquiries include: (a) the scope and content of the prior art; (b) differences between the prior art and the claims at issue; (c) the level of ordinary skill in the pertinent art; and (d) objective indicia of nonobviousness.  *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966).  "What a reference teaches or suggests must be examined in the context of the knowledge, skill, and reasoning ability of a skilled artisan."  *Syntex (U.S.A.) LLC v. Apotex, Inc.*, 407 F.3d 1371, 1380 (Fed. Cir. 2005).  Where "the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate" notwithstanding the presence in the record of contrary expert testimony.  *KSR*, 127 S. Ct. at

1745-46.

The obviousness analysis must be performed on a claim-by-claim basis. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001). Because claim 25 is broader than claim 22, it will be discussed first.

### D.    The Board Correctly Found That Claim 25 Would Have Been Obvious in View of Schenk and Velasquez

The Board correctly found that claim 25 would have been obvious in view of Schenk as modified by Velasquez. First, Schenk describes specific structure for generating a precise quantity of aerosolized powder. Second, Schenk produces particles of a "respirable" size, such that they may travel deeply into the lung where absorption to the bloodstream may occur. Third, Velasquez teaches that dry insulin powder was known in the art at the time of the invention, and would have given a person of ordinary skill at that time the reasonable expectation that dry insulin powder would behave no differently in prior art inhalation devices than dry powder medicines used for the treatment of asthma. (Indeed, one of the named inventors of the '774 application used an asthma drug to predict the behavior of inhaled aerosolized insulin). Fourth, as Novo's expert admits, all of the factors that must be taken into account to ensure that a controlled and repeatable dose of inhaled medicine reaches the bloodstream of the patient – primarily the volume and flow rate of inhalation, and the size of the medicine particles in the aerosol – were known by those skilled in the art at the time of the invention.

1.    **The Schenk Device Is Capable of Generating an Aerosol of Dry Insulin Powder That Can Reach the Peripheral Areas of the Lungs, Including the Alveoli**

The Schenk device, as depicted in various forms in figures 1-4 of Schenk, is capable of generating an aerosol of dry insulin powder that can reach the peripheral areas of the lungs, including the alveoli, for absorption into the bloodstream. As the Board found, Schenk describes structure that "precisely control[s]" the amount of medicine delivered to a patent, *i.e.*, the fixed-volume metering chamber from which each dose of powdered medicine is efficiently drawn and turned into particles of respirable size. Tab 36 at A450.[8] Schenk defines as "respirable" those particles less than 7 μm in diameter. Tab 17 at A300; A302, ll.19-20; A309, ll.14-16.

It is undisputed that particles of the size generated by the Schenk device are suitable for delivering insulin to the peripheral areas of the lungs, and from there to the bloodstream. The specification of Novo's '774 application makes clear that particles less than 7 μm are capable of reaching deeply into the lung so that medicine can be absorbed into the bloodstream:

> Delivery [of insulin powder] is improved by providing a system which creates particles for systemic delivery wherein the particles are in the range of about 0.5 to about 12 microns, preferably 0.5 to 6 microns and more preferably 0.5 to about 3 microns."

Tab 2 at A53, ¶ 191; *see also* Tab 2 at A60, ¶ 222 ("regardless of the type of drug or the form of the drug formulation, it is preferable to create drug particles having a size in the range of about 0.5 to 12 microns."). Novo's expert, Dr. Crystal, agrees that particles of the size generated by the Schenk inhaler are capable of reaching that part of the lung at which absorption into the bloodstream takes place. Crystal Rep at 8, ¶¶ 23, 25 (particles must reach the alveoli to be

---

[8]  Because Novo has proffered no evidence to rebut this finding, and because it is supported by substantial evidence (specifically, Tab 17 at A300-09, where the Schenk inhalers are described, and Tab 17 at A317, where they are depicted), it must be affirmed.

absorbed into the bloodstream, and "Studies have shown that the *ideal* particle size for reaching the alveoli is approximately 0.5 μm - 6 μm in diameter" (emphasis added)).

In his expert report Dr. Crystal focuses needlessly on whether absorption occurs exclusively in the alveoli. He asserts that it is "critical that the insulin particles reach the alveoli" and that "particles of insulin that reach only the airways of the lungs are not available to the bloodstream and cannot effect systemic treatment." Novo Mem. at 11. In contrast, the USPTO's expert, Prof. Dolovich, believes that the absorption of insulin takes place in the alveoli and may also take place in the peripheral lung where "alveoli are starting to appear." Dolovich Tr. 107.

As an initial matter, Prof. Dolovich's position is more closely aligned with that of the inventors of the '774 application. In fact, the '774 application never even mentions the word "alveoli," but instead, teaches the need to deliver insulin particles "peripherally into the lung" (Tab 2 at A5), "deeply into the lung" (Tab 2 at A6), "in the peripheral areas of the lung" (Tab 2 at A17) or "on the outer peripheral areas of the lung." (A24). It is also more closely aligned with that of the applicant prosecuting the '281 application. The applicant admitted that "[i]nsulin is a known drug having a known utility and is known to enter the circulatory system when brought into contact with lung tissue. Ex. 8 (Amendment After Final) at NN-1310.

But more importantly, this difference of opinion between the experts is an immaterial dispute that this Court need not resolve in order to grant summary judgment for the USPTO. This is because there is *no* dispute that particles up to 6 microns in diameter – the size of particles generated by the Schenk inhaler – are respirable, *i.e.*, that they can reach *that part of the lung from which insulin can be absorbed into the bloodstream*. *See* Novo Mem. at 19 n.23 ("Both parties' experts agree that particles in the size range of .5 -6 micrometers are in the

26

respirable range"); Novo Mem. at 12 ("Particle size is perhaps one of the most important factors in determining whether the aerosolized drug reaches beyond the airways and into the alveoli in sufficient quantities to treat diabetes. Only particles that are of respirable size – .5 to 5 micrometers (perhaps up to 6 micrometers) – are of a size that *may* reach the alveoli" (emphasis in original)). Thus, the issue whether the absorption of particles up to 6 μm takes place exclusively from the alveoli, or whether it may also take place in the small peripheral airways leading up to the alveoli – while perhaps interesting to the experts – is not a genuine issue of material fact that this Court need resolve in rendering summary judgment.[9]

---

[9]  Novo engages in a bit of cut-and-paste creativity with the transcript of Prof. Dolovich's deposition in order to cast doubt on whether Prof. Dolovich believes the Schenk inhaler could be used to practice the claimed methods. On page 30, footnote 33 of Novo's Memorandum, Novo alleges that Prof. Dolovich testified as follows: "'Do you believe that if you put insulin into Schenk it would produce powder having the same particle range as asthma medicine put into Schenk?' (DT 98:19-21.) Do you know whether that would happen as a result?' (DT 99:3-4.) 'My answer would be no.'" (DT 99:10.). Setting it up this way naturally would lead the reader to believe that Prof. Dolovich answered "no" to both questions. But this is not the case. The transcript actually reads:

> Q.    All right. Do you believe that if you put insulin into Schenk it would produce powder having the same particle range as asthma medicine put into Schenk?
>
> Mr. Wood: Objection as to form.
>
> The Witness: ***It is possible***.
>
> Q.    Do you know whether that would happen as a result?
>
> A.    The Schenk patent was filed in 1990. I have had no hands-on experience with this prototype inhaler. So I, myself, have not used it as a test inhaler for insulin.
>
> Q.    Okay. So the answer to my question is no?
>
> A.    No – yes, it is. My answer would be no, but yes, to your question.

2.    **Valesquez Teaches That Dry Insulin Powder Existed at the Time of the Invention and That it Can Be Used in a Device Also Used for the Delivery of Asthma Medication**

Velasquez discloses a mechanism by which precise doses of a variety of dry powdered medicines, including dry insulin powder, can be delivered to a patient via inhalation. Tab 18 at A330, col. 5, lines 47-51. Velasquez specifically lists insulin as an "exemplary drug" that may be employed in the practice of the invention, as well as drugs for the treatment of respiratory disorders such as bronchodilators. Tab 18 at A330, col. 6, lines 25-41. In so doing, Velasquez teaches a person of ordinary skill in the art that dry insulin powder existed at the time of Novo's invention, and that it can be used in a device that is also useful for the administration of other powdered medicines, including asthma medicines. Considering that it was also well known that at least a portion of inhaled dry insulin powder would be absorbed into the bloodstream, Velasquez would have given a person of ordinary skill in the art the reasonable expectation that aerosolized insulin powder will behave in a manner similar to those of the other drugs listed in Velasquez in a device such as the Schenk inhaler.

Indeed, there is no genuine dispute as to this point. Novo concedes the possibility that Schenk and Velasquez "allow one of ordinary skill in the art to control the amount of insulin that comes out of an inhalation device." Novo Mem. at 27. Further, in demonstrating the usefulness of the *very invention* at issue in this case, the inventor of the '281 application used an *asthma* drug (albuterol) to show how inhaled aerosolized *insulin* would behave in the lungs. Ex. 9 (Rubsamen Decl.) at NN-625.

_____

Dolovich Tr. at 98:19-1 (emphasis added).

**3.      Novo Admits That One of Ordinary Skill Would Know How to Control the Flow Rate and Volume of Inhalation, and Other Factors, to Achieve a Reproducible Dose to the Bloodstream**

Novo's expert, Dr. Crystal, does not disagree that "Schenk and Velasquez may allow one of ordinary skill in the art to control the amount of insulin that is coming out of the device." Crystal Rep. at 15-16, ¶ 50.  However, Novo argues that Schenk and Velasquez "do not control the amount inhaled that actually reaches the alveoli or will actually be absorbed into the bloodstream."  Crystal Rep. at 16, ¶¶ 50, 52; Novo Mem. at 27-28.  Dr. Crystal sets forth various factors that he believes are necessary to achieve a controlled, reproducible dose of insulin to the bloodstream:

> [M]any factors influence whether a reproducible dose is administered to the bloodstream by insulin inhalation, even if the same amount of insulin is aerosolized in a device in the same manner each time.  These factors include, among others, the ***flow rate*** and ***volume*** with which a patient would inhale each dose of insulin, the speed[10] of the inhalation, the ***particle size***, the ***concentration*** of the drug in the carrier, and the ***point in the respiration cycle*** where the patient initiates inhalation.

Crystal Rep. at 16, ¶ 52 (emphasis added); *see also* Mem. at 27-28.

However, Dr. Crystal admitted at his deposition, unequivocally, that a person of ordinary skill in the art in 1993 would not only have been aware of all of these factors, but *would have known how to control them to achieve controlled insulin dosing by inhalation*:

> Q.      Would a person of ordinary skill in the art in 1993 understand that a ***flow rate*** is a factor that influences whether a reproducible dose is administered to the bloodstream by insulin inhalation?

---

[10]   While Dr. Crystal was equivocal as to whether the "speed" of the inhalation is the same thing as the "flow rate" of the inhalation, Crystal Tr. at 125:15-19; 157:3-13, Novo's '774 application is not:  It defines "flow rate" *as* the speed.  Tab 2 at A13, ¶ 64.  Thus, these terms are synonymous.

A.      Yes.

* * * *

Q:      Would a person of ordinary skill in the art as of January 1993 understand how *flow rate* influences whether a reproducible dose is administered to the bloodstream by inhalation?

MS. PFEIFFER:       Objection to form.

THE WITNESS:        Using the term reproducibility referring to dosing to the blood?

BY MR. WOOD:

Q:      Yes.

A:      Yes.

* * * *

Q.      Okay.  Would a person of ordinary skill in the art as of January 1993 understand that the *volume* with which a patient inhales each dose of insulin influences whether a reproducible dose is administered to the bloodstream by insulin inhalation?

MS. PFEIFFER:       Objection to form.

THE WITNESS:        Yes.

Q:      Would a person of ordinary skill in the art in January 1993 know how to *control the volume* with which a patient would inhale each dose of insulin in order to achieve a reproducible dose administered to the bloodstream by inhalation?

MS. PFEIFFER:       Objection to form.

THE WITNESS:        Yes.

* * * *

30

Q:      Would a person of ordinary skill in the art as of January 1993 understand that **particle size** is a factor that influences whether a reproducible dose of insulin is administered to the bloodstream by inhalation?

MS. PFEIFFER:      Objection to form.

THE WITNESS:      Again, for all of this discussion, I can assume the ordinary skilled person or ordinary skilled in the art as we have defined it?

BY MR. WOOD:

Q.      Yes.

A.      Yes. Then the answer is yes.

Q.      Would a person of ordinary skill in the art as of January 1993 know how to control **particle size** to influence whether a reproducible dose of insulin is administered to the bloodstream by inhalation?

MS. PFEIFFER:      Objection to form.

THE WITNESS:      Yes.

\* \* \* \*

Q:      Would a person of ordinary skill in the art in January 1993 understand that **the concentration of the drug in the carrier** influences whether a reproducible dose of insulin is administered to the bloodstream by inhalation?

MS. PFEIFFER:      Objection to form.

THE WITNESS:      Yes.

\* \* \* \*

Q.      Would a person of ordinary skill in the art know how to control **the concentration of the drug in the carrier** to influence whether a reproducible dose of insulin is

31

administered to the bloodstream by inhalation?

MS. PFEIFFER:      Objection to form.

THE WITNESS:      Yes.

\* \* \* \*

Q:     Would a person of ordinary skill in the art as of January 1993 understand that ***the point in the respiration cycle where the patient initiates inhalation*** influences whether a reproducible dose of insulin is administered to the bloodstream by inhalation?

MS. PFEIFFER:      Objection to form.

THE WITNESS:      Yes.

BY MR. WOOD:

Q.     Would a person of ordinary skill in the art as of January 1993 understand how to control ***the point in the respiration cycle where the patient initiates inhalation*** in order to achieve a reproducible dose of insulin administered to the bloodstream by inhalation?

MS. PFEIFFER:      Objection to form.

THE WITNESS:      Yes.

Crystal Tr. at 164:14-18; 165:22-166:9; 167:20-168:12; 174:12-175:7; 181:4-10; 182:5-11; 185:19-186:12 (emphasis added).[11]

A conclusion of obviousness can be supported by the express teaching of a prior art reference in combination with the general knowledge of a person of ordinary skill.  *See Para-*

---

[11]  While Dr. Crystal did not specifically testify as to the "speed" of inhalation, as noted above, inhalation speed is the same as inhalation flow rate, to which he did testify.  To the extent that he maintains that "speed" means time, he has stated that flow rate is simply "volume per unit time," so controlling the flow rate and volume of the inhalation, as he admits a person of ordinary skill would have known how to do, would be tantamount to controlling the time of the inhalation.

*Ordnance*, 73 F.3d 1085, 1090 (Fed. Cir. 1995) (finding no error in the district court basing its

conclusion of obviousness on the teachings of the prior art in combination with the general

knowledge of one skilled in the art); *KSR*, 127 S. Ct. at 1739 ("The combination of familiar

elements according to known methods is likely to be obvious when it does not more than yield

predictable results.").

Here, the conclusion of obviousness as to claim 25 is based on the combination of (1) the

express teachings of Schenk and Velasquez – which Novo concedes may teach a person of

ordinary skill to control the amount of insulin generated by an inhalation device (Novo Mem. at

27) – with (2) the general knowledge of a person of ordinary skill as to all of the factors that Dr.

Crystal identified as necessary to achieve a controlled dose of insulin to the bloodstream – which

is admitted by Novo's own expert.  There are thus no genuine issues of material fact as to the

obviousness of claim 25.

> **E.    The Board Correctly Found That Claim 22 Would Have Been Obvious in View of Schenk, Velasquez and Harrison**
>
> > **1.    The 2-10 Range Limitation in Claim 22 Does Not Patentably Distinguish Claim 22 from the Prior Art**

As noted above, claim 22 recites, in addition to those limitations  present in claim 25, the

so-called 2-10 range limitation:  the amount of insulin aerosolized in the device must be 2-10

times higher than the amount of insulin needed to be absorbed in bloodstream.  This limitation

recognizes that losses will occur as the aerosol cloud progresses from the device to the peripheral

areas of the lungs, and then as the insulin is absorbed from the lungs to the bloodstream.  The

2-10 range limitation cannot patentably distinguish claim 22 from the prior art for three reasons:

(1) the specification admits that prior art inhalers fell within the 2-10 range; (2) as the examiner

found, a person of ordinary skill could have determined the 2-10 range by routine

experimentation; and (3) Novo has failed to show any legal criticality with respect to the 2-10

range limitation.[12]

**a.    The '774 Application Admits That Prior Art Inhalers Fell Within the 2-10 Range**

The 2-10 range limitation cannot patentably distinguish claim 22 from the prior art

because the specification of the '774 application admits that prior art inhalers fell within the 2-10

range. *See Constant v. Advanced Micro-Devices*, 848 F.2d 1560, 1570 (Fed. Cir. 1988) ("A

statement in a patent that something is in the prior art is binding on the applicant and patentee for

determinations of anticipation and obviousness."). The specification expressly states:

> There is a differential between the amount of insulin actually
> released from the device and the amount of insulin actually
> delivered to the patient. The present device is two to ten times
> more efficient than *conventional inhalation devices (i.e., MDIs or
> metered dose inhalers) which have an efficiency as low as 10%
> meaning that as little as 10% of the released insulin may actually
> reach the circulatory system of the patient*.

Tab 2 at A24, ¶ 112 (emphasis added).

In admitting that for conventional inhalers "as little as" 10% of the released insulin may

actually reach the circulatory system (*i.e.*, the bloodstream), the '774 specification admits that the

amount of the insulin aerosolized in a "conventional inhalation device" must be "10 times higher

than the amount needed to be absorbed in the bloodstream." Tab 24 at A372 (claim 22). Thus,

the specification admits that a conventional inhalation device fell within the 2-10 range specified

---

[12]  In addition to affirming the examiner's finding that a person of ordinary skill would be
able to determine the 2-10 limitation through routine experimentation, the Board presented an
alternative argument why the 2-10 limitation does not patentability distinguish claim 22: That the
2-10 limitation is taught by Velasquez. Tab 36 at A449. For purposes of this summary judgment
motion, the USPTO does not rely on this alternative argument.

34

in claim 22, because disclosure in the prior art of *any* specific value within a claimed range

expressly discloses the claimed range. *See Titanium Metals Corp. v. Banner*, 778 F.2d 775, 781-

2 (Fed. Cir. 1985) (holding that prior art disclosing titanium base alloy containing 0.25% Mo and

0.75% Ni anticipates claims to a titanium base alloy containing from 0.2 - 0.4% Mo and from

0.6-0.9% Ni); *In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1350-51 (Fed. Cir. 2002) (applying

*Titanium Metals* to method claims).

> **b.     The Examiner Correctly Found That a Person of Ordinary
> Skill Could Have Determined the 2-10 Range Limitation
> Through Routine Experimentation**

In addition, the examiner correctly recognized that the 2-10 range limitation is

insufficient to confer patentability on claim 22 because "the amount of insulin employed and the

amount absorbed can be arrived at through mere routine obvious experimentation and

observation." Tab 16 at A293. In his Answer (Tab 25), the examiner specifically identifies U.S.

Patent No. 5,320,094 to Laube et al. ("Laube") for its teaching of "known losses" of aerosolized

insulin administered to human patients (*e.g.*, on the surfaces of the inhaler, inside the patient's

mouth, etc.), which would make it a *necessity* to put more insulin in the inhaler than is intended

to be absorbed in the bloodstream. Tab 25 at A385-6.

Novo argues that the examiner is wrong as a matter of law because a routine-

experimentation rejection "is appropriate only when 'one skilled in the art would have had a

reasonable expectation of success at the time the invention was made, and merely had to verify

that expectation.'" Novo Mem. at 28-29 (citing *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1367

(Fed. Cir. 2007)). Novo asserts that a "person of ordinary skill in the art could not have

conducted routine experimentation using insulin powder (listed in Velasquez) with the Schenk

inhaler to determine the claimed '2-10 range'" because there is no "administration protocol" for inhaled insulin.  Novo Mem. at 29.  Novo further argues that "guidelines for dosage of *injectable* insulin, *e.g.*, in Harrison, do not provide doses for *inhalable* insulin.  *Id.* (emphasis in original).  As a result, argues Novo, "such experimentation would be unethical and dangerous."  Novo Mem. at 29-30.

As an initial matter, Novo's argument is based primarily on the testimony of its expert, Dr. Crystal.  Novo could have, but did not, present such testimony to the Board, because the examiner had made the routine-experimentation argument below.  Novo should be precluded from presenting this evidence here for the first time because it has offered no reason why it did not submit it to the USPTO.  *See supra*, section V.B.2.

Even considering Dr. Crystal's testimony in this regard, Novo cannot prevail.  Far from being "unethical and dangerous," the type of experimentation contemplated by the Examiner, dose response studies, are routine to one skilled in the art.  *Merck & Co. Inc. v. Biocraft Laboratories, Inc.*, 874 F.2d 804, 809 (Fed. Cir. 1989) (rejecting nonobviousness argument based upon dosage calculations because "though requiring time and care, the experimentation needed to arrive at the claimed dosages was nothing more than routine"); *United States v. Telectronics, Inc.*, 857 F.2d 778, 786 (Fed. Cir. 1988) (no undue experimentation because the "only impediments are the time and cost of a dose response study, which the district court found could be performed by . . . those skilled in the art").  Indeed, researchers had been experimenting with the administration of inhalable insulin in humans for decades prior to January 1993.  The prior art is replete with examples, including the administration of aerosolized insulin to humans as early as 1925.  *See* Gänsslen, M., *Über Inhalation von Insulin* (Ex. D to Novo's Memorandum).

36

In fact, the Laube patent, cited by the Examiner, sets forth a very detailed example of such a study:  insulin was administered by inhalation to eight subjects, and measurements of blood glucose and insulin levels were taken.  Laube, col. 6, line 47- col.7, line 25.  The eight subjects gave informed consent, and the study was approved by the Institutional Review Board at Johns Hopkins.  Laube, col. 8, ln.6-10.  There was nothing "unethical"or "dangerous" about her study or any other properly designed study.[13]

More importantly, Dr. Crystal's argument about "administration protocols" rests on a false assumption:  that there must be an "administration protocol" in place to meet the standard of routine experimentation.  This is not the case.  Instead, as Novo acknowledges, the standard of "routine experimentation" is met when "one skilled in the art would have had a reasonable expectation of success at the time the invention was made, and merely had to verify that expectation."  *Pfizer*, 480 F.3d at 1367.  Obviousness under 35 U.S.C. § 103 does *not* require "absolute predictability."  *In re Merck & Co., Inc.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986).  Here, the parties agree that one of skill in the art was a person with a "M.D. or a Ph.D. in a related field, and several years of experience in pharmaceutical aerosols, lung physiology, and

_____

[13]  Moreover, the USPTO identified three additional pieces of prior art that contain protocols for administering inhalable insulin; namely, U.S. Patent No. 5,643,868, U.S. Patent No. 5,843,886 and U.S. Patent No. 5,763,396 to Weiner *et al.* (collectively "Weiner").  USPTO Response to RTA No. 7.  Novo complains that the USPTO "buried" these references in its document production.  Novo Mem. at 29, n.31.  On the contrary, counsel for the USPTO only learned of these references in January of this year, when Novo identified them in an "Information Disclosure Statement" that Novo submitted with a related patent application.  Novo further argues that Weiner does not teach the claimed invention because the claims require inhaling insulin to control blood glucose levels.  *Id.*  However, claims 22 and 23 do not have this requirement.  *See* Tab 24 at A372.  Finally, Novo argues that Weiner "teaches away" from the claimed invention because it will not eliminate the need for insulin injection in diabetic patients.  Novo Mem. at 29 n.31.  But Novo's claims do not require the total elimination of insulin injections; indeed, the '774 specification specifically contemplates using the invention in conjunction with such injections.  Tab 2 at A36, ¶ 149.

pulmonary drug delivery or the equivalent training and experience." Crystal Rep. at 11, para. 33. This is a high level of skill indeed, and such a person would have the necessary skills to safely expose humans to inhalable insulin.

In addition, Novo's assertion that the injectable dosing taught in Harrison is irrelevant to determining doses of inhalable insulin is flatly contradicted by the evidence in the record. Laube specifically states that she "chose to deliver" a particular dose "because this is the dose given by subcutaneous administration." Laube, col.3, ln 19-21. This subcutaneous dose is set forth in Harrison. Harrison is also relevant because both Harrison and Novo's claims are directed to the administration of insulin to the *bloodstream*, and it is clear from the disclosure of the invention that the inventors sought to emulate, via inhalation, Harrison's teaching of the administration by injection of insulin to the bloodstream. Indeed, the specification of the '774 application cites to Harrison no less than three times. *See* Tab 2 at A27, ¶ 122; A51, ¶ 185; A65, ¶ 235. Even more significantly, the specification's teaching of the proper doses to be administered via the claimed *inhalation* methods is copied practically *verbatim* from Harrison, as evidenced by a comparison of the following excerpts shown in this table:

38

| From the '774 application (Tab 2 at A22-23, ¶ 109). | From Harrison (Tab 13 at A268) |
|---|---|
| "A normal-weight adult may be started on about a **15-20 units a day** in that the estimated daily insulin production rate in non-diabetic subjects of normal size is approximately **25 units per day**." | "Adults of normal weight may be started on **15 to 20 units a day** (the estimated daily insulin production rate in nondiabetic subjects of normal size is about **25 units a day**)." |
| "It is preferable to administer approximately **the same quantity of insulin for several days** before changing the dosing regime . . ." | "It is preferable to use **the same quantity of insulin for several days** before changing, . . ." |
| ". . . except with hypoglycemic patients for which **the dose should be immediately decreased** . . ." | ". . . the one exception being the hypoglycemic patient, for whom **the dose should be decreased immediately** . . ." |
| " . . . unless a clearly evident **nonrecurrent cause of hypoglycemia** (such as not eating, i.e., missing a typical meal) is present." | ". . . unless a **nonrecurrent cause of hypoglycemia** (such as excessive exercise) is present." |
| "In general, the changes should not be more than **five to ten units** per day." | "Generally, changes should be no more than **5 or 10 units** per step." |
| "It is typical to administer **about two-thirds of the total insulin** daily dosage **before breakfast** and administer the **remainder before supper**." | "Poorly controlled patients should be placed on split therapy, with **about two-thirds of the total insulin** given **before breakfast** and the **remainder before supper**." |

The '774 application thus makes abundantly clear that not only is Harrison relevant to the Appealed Claims, it is the very source of the '774 application's disclosure of the dosage guidelines.

Finally, Novo's own application concedes that even one practicing Novo's claimed invention would not know whether the efficiency would be as low as 10% or as high as 50% and would *need* to experiment for each patient and each inhalation device. As Novo's application states:

> [T]he differential between the amount of insulin actually released

> from the device and the amount actually delivered to the patient varies due to a number of factors.  In general, devices used with the present invention can have an efficiency as low as 10% and as high as 50% or more meaning that as little as 10% of the released insulin may actually reach the circulatory system of the patient and as much as 50% or more might be delivered.  **The efficiency of the delivery will vary somewhat from patient to patient and must be taken into account when programming the device for the release of insulin.**

Tab 2 at A64-65 (emphasis added).

### c.    Novo Has Failed to Show Any Legal Criticality as to the 2-10 Range Limitation

Finally, as the Examiner correctly noted, there is no evidence of any "criticality for the amount of insulin in the aerosolized suspension being 2-10 times higher than the amount needed to be absorbed into a patient's bloodstream."  Tab 25 at A386.  If an applicant seeking to avoid a finding of obviousness of a claim that includes a range that overlaps with a range disclosed in the prior art (as the '774 application admits), the applicant must "show that the [claimed] range is *critical*, generally by showing that the claimed range achieves unexpected results relative to the prior art range."  *In re Geisler*, 116 F.3d 1465, 1469-70 (Fed. Cir. 1997) (emphasis in original); *see also In re Aller*, 220 F.2d 454, 456 (CCPA 1955).

Novo has not put forth any evidence that the 2-10 range limitation is critical in this regard.  Indeed, as the Examiner also noted, this limitation is simply a consequence of the inherent losses of medicine from the inhaler to the lungs and bloodstream, which *requires* more medicine to be aerosolized in the inhaler than is desired to be absorbed in the bloodstream.

40

### 2. The 1-50 Units of Insulin Limitation in Claim 22 Is Also Insufficient to Patentably Distinguish Claim 22 from the Prior Art

Claim 22 recites an additional limitation not present in claim 25: the absorption into the bloodstream of a controlled dose of insulin that comprises between 1-50 units of insulin. Tab 24 at A372. As discussed above, a person of ordinary skill would have been able to produce a controlled, reproducible dose of insulin to the bloodstream. *See supra*, section V.D. Further, it has long been known to deliver doses of 1-50 units to the bloodstream. Harrison, for example, discloses that total daily doses of 50-60 units of insulin are administered in two injections, or 25-30 units per individual dose. Tab 13 at A268. As noted above, disclosure of any value within a claimed range constitutes disclosure of the entire range. *See supra* at 34 (citing *Titanium Metals*, 778 F.2d at 781-2).

Novo argues that the Board made the "shocking wrong" statement that the precise amount [of insulin] is not critical to the invention." Novo Mem. at 26. Novo counters that "the absolute amount of insulin administered to a diabetic patient is critical." Novo misses the point entirely. The Board's point was that the precise amount of insulin was not critical to the *claim* ("invention"). *See Geisler*, 116 F.3d at 1469-70. The Board was not referring to the criticality of a specific dose to a specific patient. The lack of criticality of the 1-50 units limitation to claim 22 is clear, since the huge range of doses claimed (1-50 units) encompasses practically *all* reasonable doses that might be administered to a patient's bloodstream. *See* Harrison, Tab 13 at A268-69.

### F.    Novo's New Argument as to Long Felt Need Should Not Be Admitted

In its summary judgment papers, Novo argues, for the first time, that its claimed invention met a "long felt but unsolved need." Novo Mem. at 31. Novo never argued long felt need (or any other secondary consideration) before the agency. Because long felt need is a new issue, this Court should preclude Novo from presenting this new evidence on long felt need here. *See DeSeversky*, 424 F.2d at 858.

Moreover, even if long felt need is not determined to be a new issue, this Court should still preclude Novo from presenting this evidence. Novo's new evidence was available to Novo during prosecution, yet Novo withheld it from the agency with no explanation. *Holloway v. Quigg*, 9 USPQ2d 1751, 1752 (D.D.C. 1988) (excluding new evidence of secondary considerations because "plaintiff has not demonstrated that either the issue of unsuccessful attempts by others or the issue of surprise, skepticism or disbelief was raised in the proceeding below," or "demonstrated that the failure to raise these issues was neither intentional nor negligent."); *MacKay v. Quigg*, 231 USPQ 907, 909 (D.D.C. 1986) (excluding new evidence of secondary considerations "because plaintiffs failed to present and support contentions of commercial success or copying during the PTO proceedings, and have not set forth any reasons for this omission").

Even if this Court admits Novo's new evidence, Novo would still not prevail.

First, Novo argues that others had failed to administer insulin by inhalation because of "the poor reproducibility of the inhaled dose [of insulin]." Novo Mem at 32. Contrary to Novo's arguments, Laube had succeeded in administering a reproducible dose of insulin by inhalation before January 1993. Laube administered a specific dose of insulin by inhalation to both normal

42

and non-insulin dependant diabetic (NIDDM) subjects and calculated that a "mean of 89.8  +/-
5% of the inhaled dose was actually deposited in the lungs." Laube, col.5 , lines 58-60.  Laube
concluded that the "glucose response to the dose of insulin administered as an aerosol was
*predictable* when the dose was calculated on a per kilogram basis, and there *did not appear to be
significant variability* between normal subjects and NIDDM subjects in absorption across the
lung mucosa."  Laube, col 6, lines 28-33 (emphasis added).

Second, Novo has not demonstrated a nexus between the merits of its claimed invention
and the alleged long felt need.  *Stratoflex, Inc. v. Aeroquip Corp*, 713 F.2d 1530 (Fed. Cir. 1983).
In other words, Novo failed to show that its claimed invention *met* the alleged long-felt need by,
for example, achieving some sort of commercial success with its claimed invention.

Indeed, Novo does not even attempt to establish the required nexus.  Nor could it.  Novo
has never commercialized the claimed invention, and, in January of this year, Novo abandoned
all attempts to do so.  Novo's press release announcing the termination of its inhalable insulin
product, AERx®, acknowledged that AERx® was "unlikely to offer significant clinical or
convenience benefits" over insulin injections.  Exhibit 5 hereto, Novo January 14, 2008 Press
Release.  Thus, Novo admits that AERx® fails to meet any long felt need that may have existed
among patients treated with injections of insulin.

Novo's press release merely confirms what others in the industry had already discovered:
that inhalable insulin is a commercial failure.  For example, Pfizer pulled its inhalable insulin
product, Exubera®, off the market, stating that it "did not meet customers' needs or financial
expectations."  Exhibit 6 hereto, Pfizer press release, October, 2007.  Lilly & Co., Inc. recently
followed suit, terminating the development of its inhalable insulin product in March of this year.

Exhibit 7 hereto, Lilly Press Release, March, 2008.

Novo's acknowledgment of the lack of customer demand for AERx®, as well as similar acknowledgments from Novo's competitors as to their respective inhalable insulin products, dooms its argument that its claimed invention meets a long felt need. *See National Steel Car, Ltd. v. Canadian Pacific Railway, Ltd.*., 357 F.3d 1319 (Fed. Cir. 2004) (a "finding of no customer demand is flatly contradictory with [the] conclusion that a long-felt need existed.") It also raises serious questions about whether such a need existed in the first place. Accordingly, Novo has not - and cannot - establish a long-felt need for its claimed invention.

## VI.    CONCLUSION

For the foregoing reasons, defendant requests that the Court enter an order granting summary judgment to defendant.

Respectfully submitted,


/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


/s/_____
BLANCHE BRUCE, D.C. BAR # 960245
Assistant United States Attorney
555 Fourth Street, N.W., Room E-4417
Washington, D.C. 20530
(202) 514-9150 (telephone)
(202) 514-8780 (facsimile)

Date:   May 19, 2008                    ATTORNEYS FOR DEFENDANT

OF COUNSEL:

STEPHEN WALSH
Acting Solicitor
MARY L. KELLY
FRANCES LYNCH
BENJAMIN WOOD
Associate Solicitors
U.S. Patent & Trademark Office

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| NOVO NORDISK A/S ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No: 06-1896 (CKK) |
| ) | |
| JON W. DUDAS ) | |
| Under Secretary of Commerce for ) | |
| Intellectual Property and ) | |
| Director of the United States Patent ) | |
| & Trademark Office, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## DEFENDANT USPTO'S RESPONSE TO NOVO NORDISK'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE

Pursuant to Local Civil Rule 56.1, the USPTO respectfully submits the following response to Plaintiff Novo Nordisk A/S's ("Novo's") Statement of Material Facts as to Which There Is No Genuine Issue In Support of Novo's Motion For Summary Judgment.

In opposing Novo's motion, the USPTO relies in large part on the administrative record, which itself is not in dispute. Many of the "facts" upon which Novo purports to rely are characterizations and arguments of the facts, rather than actual facts themselves. In some cases, its assertions appear to be cut from whole cloth. (*See, e.g.,* ¶¶ 143, 158, 159, 136.) In other cases, several paragraphs simply reword or paraphrase alleged facts with little if any meaningful distinction. (*See,* e.g., ¶¶97-98, 91,94.) As a result, the USPTO may indicate that it relies upon (and cites to) the same portions of the administrative record as Novo, without adopting Novo's characterization and arguments about the facts. To the extent not otherwise cited, the USPTO relies upon the same portions of the administrative record as Novo.

1.     Novo is a corporation organized and existing under the laws of the Kingdom of Denmark, and has its principal place of business at Novo Allé, 2880 Bagsvaerd, Denmark.

The USPTO is without information to admit or deny.

2.    The Defendant is the Honorable Jon W. Dudas, in his official capacity as Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office ("PTO"), having offices at 600 Dulany Street, Alexandria, Virginia, 22314.

The USPTO does not dispute the facts set forth in Paragraph No. 2.

3.    In filing this Motion, Novo relies upon:

(i)    its Memorandum of Points and Authorities in Support of its Motion for Summary Judgment Adjudging that Novo Is Entitled to a Patent and Authorizing the Director to Issue Letters Patent;

(ii)    this Statement of Material Facts as to Which There is No Genuine Issue in Support of Novo's Motion for Summary Judgment Adjudging that Novo Is Entitled to a Patent and Authorizing the Director to Issue Letters Patent;

(iii)    Declaration of Susan K. Nash, executed April 2, 2008, and Exhibits thereto:

(a)    Expert Witness Report of Novo's expert Ronald G. Crystal, dated Jan. 7, 2008, attached as Ex. A ("CR");

(b)    Expert Witness Report of the PTO's expert Professor Myrna B. Dolovich dated Feb. 4, 2008, attached as Ex. B ("DR");

(c)    Transcript of Myrna B. Dolovich's Deposition, taken Feb. 12, 2008, attached as Ex. C ("DT");

(d)    Gänsslen, M., *Über Inhalation von Insulin,* Klin. Wochenschr. 4 (1925) and English translation, attached as Ex. D;

(e)    Myrna A. [sic] Dolovich, *Influence of lnspiratory Flow Rate, Particle Size, and Airway Caliber on Aerosolized Drug Delivery to the Lung*, 45 Respiratory Care 597 (June 2000), Exhibit 3 to Deposition of the USPTO's Expert Professor Myrna B. Dolovich, attached as Ex. E;

(f)    Defendant USPTO's Second Supplemental Objections and Responses to Plaintiff's Requests for Admission, dated March 14,2008, attached as Ex. F ("Def. Resp. to Req. for Admis.");

(g)    Defendant USPTO's Second Supplemental Objections and Responses to Plaintiff's Interrogatories, dated Feb. 19, 2008, attached as Ex. G ("Def. Resp. to P1's Interrog.");

(h)    U.S. Patent No. 5,643,868 (filed on Jun. 6, 1995), attached as Ex. H; and

(i) Recorded Assignments of U.S. Patent Application 09/848,774, attached as Ex. I; and

(iv)    the Administrative Record for Application No. 09/848,774, filed by the PTO on March 21, 2008 (referenced by Tab and consecutive pagination numbers).

The USPTO does not dispute the facts set forth in Paragraph No. 3, but does not admit

that it is proper for Novo to rely on evidence that it could have introduced at the USPTO.

2

4.     The experts are in agreement as to all material facts.  At the deposition of the PTO's expert, Myrna B. Dolovich, a professional engineer, Ms. Dolovich testified that she had addressed all of the statements in Dr. Crystal's Report that she considered to be "both important and incorrect."  (DT 93:11 - 94:5.)  She addressed only specific points in paragraphs 35, 36, 37, 53 and 54 of Dr. Crystal's Report in her own Report.  (DR ¶¶12-17.)  Even as to the minor parts of Dr. Crystal's Report with which she took issue in her Report, on cross-examination Ms. Dolovich retracted these criticisms.  (*See* DT 135:10-18 (admitting Schenk was designed to treat diseases of the lung and to reach only the airways, not the alveoli); DT 171:11 - 172:5 (factors other than size of particles affect deposition in the lungs); DT 227:12 - 232:15 (cannot rely on Harrison for dosing without extensive experimentation in laboratory); DT 162:1-12 (Ms. Dolovich did not make the statement that "all of the medication on the peripheral airways is absorbed into the bloodstream," much less that all medication *inhaled* is absorbed (as the Board declared).  She said only that a "portion" of medication that reaches the peripheral airways "may be absorbed."  She was not prepared to take "a leap of faith" to say that even once all of the medication that reaches and is deposited on the peripheral airways is absorbed into the bloodstream); DT 109:17-21, 106:16 – 107:5 (admitting that her Report's use of the term "peripheral airways" *excludes the* alveoli and that she does not mean that any device that is designed to treat asthma is necessarily designed to deliver medication to the alveoli.  Since Dr. Crystal addresses delivery of medication to the alveoli, Ms. Dolovich does not contradict him); and DT 191:11-14 (the "methods" referred to in her Report as being in existence by January 29, 1993, and "familiar" to persons of skill in the art were methods "of being able to characterize an aerosol," for "capturing an emitted dose" and for "assaying drugs," not methods for administering insulin by inhalation to control blood glucose levels.).

The USPTO disputes Paragraph No. 4 as purely attorney argument.  For simplicity's sake, the USPTO will address each of the assertions made in the remaining sentences in more detail below.

(a)     *See* DT 135:10-18 (admitting Schenk was designed to treat diseases of the lung and to reach only the airways, not the alveoli);

The USPTO disputes this statement as attorney argument lacking evidentiary support and mischaracterizing Ms. Dolovich's testimony.  First, Schenk expressly teaches that his device relates to an oral inhaler for use in inhaling a powdered or particulate medical products [for] treatment of bronchial asthma and other diseases."  (Admin. R. Tab 17 at A300, ll.1-4 (emphasis added).)  Thus, there is no limitation to diseases of the lung in Schenk.  Second, when asked to show where Schenk states that his device was "designed to deliver medication to the alveoli to

3

provide systemic treatment" (DT 95: 14-16), Ms. Dolovich correctly stated that she didn't

"believe Schenk uses those words in his patent. Those are Dr. Crystal's words." (DT 95:17-18).

When specifically asked to show whether Schenk states that "his device was designed to deliver

medication to the alveoli for systemic treatment" (DT 95:19-22), Ms. Dolovich responded that

she thought that "the concepts in Schenk don't preclude that . . . the property's powder [*sic*]

released from his inhaler are such that they could be viewed as providing delivery to the alveoli

surface" (DT 96:4-9). Ms. Dolovich similarly states that "the Schenk devices deliver particles of

less than 7   m in size, Schenk at 1, which is consistent with the particle size that Dr. Crystal

stated would be suitable for deposition in the alveoli (up to 6   m)." (DR ¶13.) Thus, Ms.

Dolovich's testimony is the opposite of what Novo now suggests.

> (b)    DT 171:11 - 172:5 (factors other than size of particles affect deposition in
> the lungs);

The USPTO disputes this statement as attorney argument lacking evidentiary support.

Ms. Dolovich never opined that particle size was the only factor affecting deposition of drugs in

the lungs. Thus, she could not have contradicted herself by acknowledging that factors other

than particle size can also affect drug deposition.

> (c)    DT 227:12 - 232:15 (cannot rely on Harrison for dosing without extensive
> experimentation in laboratory);

The USPTO disputes this statement as attorney argument lacking evidentiary support.

Novo cites DT 227:12-232:15 to support this assertion. However, DT 228:21 - 232.15 shows no

characterization by Ms. Dolovich that "extensive" experimentation would be needed to calculate

dose, or that the experimentation required would be different from that required to determine the

dose of <u>any</u> drug. To the contrary, at DT 231-232, Ms. Dolovich describes that when collecting

information to support a method of inhaling insulin that is different from the subcutaneous route:

4

You need to obtain a body of data that characterizes that system that tests it in a number of patients so that you can go out there and say, I have a system that works; I can provide unit doses containing X milligrams of insulin; I know what the efficiency of delivery of my system is over X number of subjects; and we have enough clinical data using that system to say that is it workable.  In my understanding, you assess the patient; you measure certain clinical outcomes from experience.  The physician would be able to interpret those outcomes and select a dose of a drug that would be effective.  He would select that dose – he or she would select that dose.  And I am assuming you give it a trial run.  You make more measurements.  If it is too low, you can have an opportunity to increase it.  If it is too high, then one could assume there might be some clinical outcomes that would indicate that the dose is too high – a side effect perhaps.  And you titrate.  In other words, you titrate the dose to maintain control of the disease for that particular patient.  <u>That is the format that is followed extensively, for example, when treating asthma</u>.

(DT 231-232 (emphasis added).)

        (d)      DT 162:1-12 (Ms. Dolovich did not make the statement that "all of the medication on the peripheral airways is absorbed into the bloodstream," much less that all medication *inhaled* is absorbed (as the Board declared).  She said only that a "portion" of medication that reaches the peripheral airways "may be absorbed."  She was not prepared to take "a leap of faith" to say that even once all of the medication that reaches and is deposited on the peripheral airways is absorbed into the bloodstream);

The USPTO disputes this statement as attorney argument lacking evidentiary support, a mischaracterization of Ms. Dolovich's testimony, and immaterial.  When asked whether she was willing to state that "<u>all</u> of the medication on the peripheral airways <u>is</u> absorbed into the bloodstream" (DT 161:22-162:2 (emphasis added)), Ms. Dolovich replied that "[she] didn't say <u>is</u>; [she] said <u>may</u>" be absorbed. DT 162:5 (emphasis added).  Novo then asked, "[s]o you are not willing to say that all of it in any – even once – [objection omitted] that all of it is; is that right?" (DT 162:6-10.)  To which, Ms. Dolovich responded, "[t]hat is correct.  That is a leap of faith that I am not prepared to make."  (DT 162:11-12.)  Thus, a distinction was made regarding whether inhaled medication could or does in fact get absorbed into the bloodstream.

        (e)      DT 109:17-21, 106:16 – 107:5 (admitting that her Report's use of the term "peripheral airways" *excludes the* alveoli and that she does not mean that any device that

5

is designed to treat asthma is necessarily designed to deliver medication to the alveoli. Since Dr. Crystal addresses delivery of medication to the alveoli, Ms. Dolovich does not contradict him); and

The USPTO disputes this statement as attorney argument lacking evidentiary support. It is assumed that this statement relates to an assertion in Dr. Crystal's report that Schenk's device is "not designed to treat deliver medication to the alveoli to provide systemic treatment." (CR ¶36.) Ms. Dolovich's testimony is that: "Schenk designed a powder inhaler that produces powder that is expected, given its properties, to be inhaled and deposited within the lung." (DT 106:1-4) There is no mention of alveoli or peripheral airways. When Ms. Dolovich was expressly asked whether Schenk's device was designed to deliver drugs to the alveoli (DT 135:15), Ms. Dolovich responded, "[a]s I said earlier, in the very peripheral airways, the alveoli start to appear. So yes." (DT 135:16-18). In the cited portion of her report, Ms. Dolovich similarly states that "the Schenk devices deliver particles of less than 7 m in size, Schenk at 1, which is consistent with the particle size that Dr. Crystal stated would be suitable for deposition in the alveoli (up to 6 m)." (DR ¶13.) Thus, Ms. Dolovich's testimony is the opposite of what Novo now suggests.

Moreover, even if this allegation were true, it is irrelevant whether Schenk's device was "designed to deliver drugs to the alveoli" (emphasis added). The relevant question is whether Schenk can deliver drugs to the alveoli, and Schenk says his device can. For example, Schenk discloses that his inhaler is able to deliver respirable (i.e., inhalable) dry powder medicines at doses of 25-500 micrograms, and that "substantially greater doses may efficiently be sucked from the product chamber [of his device] into [its] restriction of the gas flow passage and dispersed in the air flow in a respirable condition." (Admin. R. Tab 17 at A303, ll.30-37.) Schenk also discloses that, in this manner, his inhaler is superior to other inhalers because it

6

creates a "drastic increase of the proportion of respirable particles dispersed in the gas or air

flow." (Admin. R. Tab 17 at A302, ll.19-22.)

(f)    DT 191:11-14 (the "methods" referred to in her Report as being in
existence by January 29, 1993, and "familiar" to persons of skill in the art were methods
"of being able to characterize an aerosol," for "capturing an emitted dose" and for
"assaying drugs," not methods for administering insulin by inhalation to control blood
glucose levels.).)

The USPTO disputes this statement as attorney argument lacking evidentiary support.

Ms. Dolovich discusses methods of characterizing aerosols measuring emitted dose, and assay

drugs generally at DT 191:11-193:18, but specifically discusses Laube's work with inhaled

insulin, which occurred prior to 1993, immediately afterward at DT 193:19 -194:10. (*See* Laube

*et al.*, U.S. Patent No. 5,320,094 ("Laube"), which teaches a method of treating diabetes mellitus

using aerosolized liquid insulin. (Admin. R. Tab 12 at A250-A252.).)

5.    Novo is the assignee, from Aradigm Corporation, of U.S. Patent
Application No. 09/848,774 ("the '774 Application"), entitled "Method of Treating
Diabetes Mellitus in a Patient," which was filed with the PTO on May 3, 2001. (Admin.
R. Tabs 1-2; *see also* '774 Application as published, attached as Ex. 4 to Ex. A of the
Nash Declaration.)

The USPTO does not dispute that an assignment of the '774 application to Novo is

recorded in the USPTO files.

6.    The '774 Application claims methods whereby dry powder insulin is
supplied to an inhalation device, aerosolized, and inhaled by the patient, in a way that
allows the patient to absorb a controlled dose of insulin into his or her bloodstream.
(Amendment After Final, dated May 10, 2004, Admin. R. Tab 23.) These methods
achieve consistent, reproducible dosing of the inhaled insulin. (CR ¶31.)

The USPTO does not dispute the facts set forth in the first sentence of Paragraph No. 6,

except Novo's characterization that its rejected patent claims state that they "allow the patient to

absorb a controlled dose of insulin into his or her bloodstream." There are no data in either the

administrative record or in the report of Novo's expert, Dr. Ronald Crystal, to substantiate the

assertion that Novo's rejected patent claims "allow the patient to absorb a controlled dose of insulin into his or her bloodstream." Moreover, the enablement of Novo's claims is not at issue in this case. For these same reasons, the USPTO disputes the entirety of the second sentence in Paragraph No. 6.

7.      As presently amended by the Amendment After Final, dated May 10, 2004, the '774 Application contains pending claims 22, 23, 25, 26, 31, and 35, of which 22, 25, 31, and 35 are independent. (Admin. R. Tab 23.)

The USPTO does not dispute the facts set forth in Paragraph No. 7.

8.      The pending claims are as follows:

22.      A method for treating diabetes mellitus in a patient comprising the steps of:

a.  supplying a predetermined amount of dry insulin powder to an inhalation device;

b.  releasing a pressurized gas over the predetermined amount of dry insulin powder to create an aerosolized suspension comprising powder suspended in air, wherein the aerosolized suspension contains an amount of insulin that 2-10 times higher than the amount needed to be absorbed in the bloodstream of the patient; and

c.  inhaling the aerosolized suspension at a flow rate and volume sufficient to allow the patient to absorb in the bloodstream a controlled dose of insulin that comprises between 1-50 units of insulin.

23.      The method of claim 22, wherein steps a-c may be repeated periodically as needed to treat the patient and wherein the amount of insulin supplied to the bloodstream in step c remains relatively constant for each repetition of steps a-c.

25.      A repeatable method of regulating blood glucose levels in a human patient, the method comprising the steps of:

a.  supplying a fixed quantity of dry insulin powder to a portion of a hand held inhalation delivery device;

8

b. propelling a gas over the fixed quantity of dry power to produce, in a repeatable manner, an aerosolized suspension of insulin, the aerosolized suspension containing more insulin than is required in the bloodstream of the patient to achieve a satisfactory blood glucose level; and

c. flowing at least a portion of the aerosolized suspension through a mouth piece on the device and into the lungs of the patient in a manner sufficient to cause the patient to absorb in the patient's bloodstream a sufficient, controlled quantity of insulin to achieve acceptable blood glucose level following treatment.

26. The method of claim 25, wherein steps a-c may be repeated periodically as needed to treat the patient and wherein the amount of insulin supplied to the bloodstream in step c remains relatively constant for each repetition of steps a-c.

31. A repeatable method of lowering a patient's serum glucose level to acceptable value, the method comprising the steps of:

a. supplying a predetermined amount of dry insulin powder to a medical device;

b. releasing a compressed gas over the dry insulin powder to form a suspension comprised of dry insulin powder and air; and

c. inhaling at least a portion of the suspension at a flow rate and volume sufficient to deposit a sufficient controlled quantity of insulin in the patient's lungs so that the patient absorbs into the blood between 1 and 50 units of insulin, thereby lowering the patient's blood glucose level to an acceptable value between 50 mg/dl and 300 mg/dl.

35. A method of administering insulin to a diabetic patient to control serum glucose levels via a hand held inhalation device, the method comprising the steps of:

a. supplying a predetermined quantity of insulin powder to a portion of the device;

9

      b. aerosolizing the insulin powder to form a cloud of insulin within the device, the cloud comprised of air and suspended insulin particles, the quantity of insulin particles being 2-10 times the dosage of insulin required to be delivered into the patient's blood to achieve acceptable blood glucose level;

      c. administering to the patient's bloodstream via the patient's lungs a sufficient controlled and repeatable quantity of insulin from the cloud to produce an acceptable blood glucose level in the patient.  (Admin. R. Tab 23.)

The USPTO does not dispute the facts set forth in Paragraph No. 8.

      9.  The '774 Application claims priority from an application filed on January 29, 1993, now U.S. Patent No. 5,364,838. ('774 App. ¶0001, Admin. R. Tab 2.)

The USPTO does not dispute the facts set forth in Paragraph No. 9, but otherwise

disputes that the '774 application is entitled to claim benefit of the filing date of its January 29,

1993 application.

      10.  The effective date for evaluating the prior art is January 29, 1993, and Novo's expert, Dr. Ronald G. Crystal, and the PTO's expert, Myrna B. Dolovich, assumed January 29, 1993 as the priority date. (CR ¶12; DR ¶10.)

For purposes of this summary judgment motion only, the USPTO will use January 29,

1993 as the date to evaluate prior art for the '774 application.  (*See* Response to Paragraph No. 9

*supra*.)

      11.  Ms. Dolovich, the PTO's expert, formed her own "views as to whether [the claims in the '774 application] were unique and novel."  (DT 18:11-12.)  She concluded that "[t]his is a new method of delivering a drug — a novel method of delivering insulin by aerosol."  (DT 227:14-16.)

The USPTO does not dispute that Ms. Dolovich recited each of the quoted passages in

her deposition testimony.  (DT 18:11-12; 227:14-16.)  The USPTO does, however, dispute any

characterization that Ms. Dolovich's second statement somehow relates to her first statement,

*i.e.*, that Ms. Dolovich concluded that Novo's claims are unique and novel.  When making the

10

first statement, Ms. Dolovich was asked only if she had views on the novelty of Novo's claims.

(DT 18:11-12) However, Novo never asked Ms. Dolovich for testimony about the nature of her

views.  When making the second statement, Ms. Dolovich was speaking in general terms

regarding inhalable insulin dosing, and how those of ordinary skill in the art would have used the

data provided in Harrison's regarding injectable insulin as a starting point for determining the

appropriate dose to be given to a patient via inhalation therapy.  (DT 226:13-228:14.)

> 12.     Novo's expert has opined that the claimed invention is not obvious.  (CR ¶
> 55).  The PTO's only expert has not disagreed with him on this point, although she filed a
> Report taking issue with—as she said—everything in Dr. Crystal's Report that she
> believed to be incorrect and important.  (DT 6:15 - 7:21; 93:11 - 94:5 (*see* DR ¶¶12-17);
> *see supra* ¶4.)

The USPTO disputes this purported fact as lacking any evidentiary support.  Novo's

expert did not opine that the claimed invention is not obvious.  He made this very clear at his

deposition:

> Q.     Would a person of ordinary skill in the art in
> January 1993 understand how to perform the method
> of claim 22?
>
> MS. PFEIFFER:     Objection to form.
>
> THE WITNESS:     I didn't look at this – these
> claims in the context of whether or not in terms of
> the way you are asking the question.  I looked at
> these claims in the context of the decisions relating
> to this case only.  ***And so I can't answer your
> questions regarding as to whether these are valid,
> not valid***, understandable or not in terms of – ***I just
> didn't look at them in that context***.

Crystal Tr. at 24:18-25:7 (emphasis added).

Moreover, Ms. Dolovich was never asked by Novo's counsel during her deposition
whether she believed Novo's claims to be obvious.  Accordingly, Ms. Dolovich's opinion is
limited to "everything in Dr. Crystal's report that she believed to be incorrect and important"
with respect to technical issues only.  Ms. Dolovich's silence on the legal issues of this case
would not imply that she is in agreement with Dr. Crystal on those points, even if he had
rendered such a legal opinion.

11

13.    Ms. Dolovich had an opportunity to offer an opinion on obviousness, but has never asserted or opined that the claims are obvious.

The USPTO disputes this purported fact as lacking any evidentiary support and as argumentative.  Ms. Dolovich was also never asked by Novo's counsel during her deposition whether she believed Novo's claims to be obvious.  Accordingly, Ms. Dolovich did not have "an opportunity to offer an opinion on obviousness."  Accordingly, Ms. Dolovich's silence on the legal issues of this case does not imply that she is in agreement with Novo Nordisk on those points.

14.    Diabetes mellitus is a disease in which there is a lack of or insufficient production of insulin in the human body.  (CR ¶15.)  Because insulin regulates blood sugar, diabetes is characterized by persistently high blood sugar levels.  Diabetic patients often require frequent insulin replacement treatment, which has traditionally been administered by injection, either subcutaneously or intravenously.  (CR ¶¶15, 18, 19; DT: 78:3-6; *see also* '774 App., Admin. R. Tab 2 at ¶0003.)

The USPTO does not dispute the facts set forth in Paragraph No. 14.

15.    Patients need to receive relatively precise amounts of insulin in the bloodstream, because either too much or too little insulin has harmful or even potentially fatal effects.  (CR ¶¶16-17; DT 80:10-20.)

The USPTO does not know what Novo means by "relatively precise" as it is used in Paragraph No. 15, but does not dispute that too much or too little insulin may have harmful or even fatal effects.

16.    Insulin exhibits a narrow therapeutic range when compared to most other drugs, meaning that the difference between the maximum and minimum amounts of insulin that can be safely administered to a given patient is small.  (CR ¶16.)

The USPTO does not know what Novo means by "narrow therapeutic range when compared to most other drugs" as it is used in Paragraph No. 16, but does not dispute that too much or too little insulin may have harmful or even fatal effects.

17.    If a diabetic patient receives too little insulin, the blood glucose will not be effectively lowered, which can lead to serious conditions such as cardiovascular

12

disease, circulatory problems, kidney failure and blindness. On the other hand, too much insulin may cause hypoglycemia, a dangerous condition in which low blood sugar levels can cause a patient to lapse into a coma, suffer permanent brain damage, or even die. (CR ¶16; DT 80:10-20.)

The USPTO does not dispute the facts set forth in Paragraph No. 17.

18.    The dose of insulin administered to the patient's bloodstream must be carefully monitored each time the patient takes insulin. (Harrison, Admin. R.Tab 13 at A268-69; CR ¶18)

The USPTO does not dispute the facts set forth in Paragraph No. 18.

19.    In treating diabetes, it is critical to control the amount that reaches the patient's bloodstream. (CR ¶17, 29; DT 206:7-11.)

Assuming that the sentence properly reads, "the amount <u>of insulin</u>," the USPTO does not

dispute the facts set forth in Paragraph No. 19.

20.    Traditional insulin replacement therapy has historically involved the injection of insulin. This treatment supplies a consistent, reproducible and controlled dose of insulin into the bloodstream of the patient. (*See* Harrison, Admin. R. Tab 13 at A268-69.)

The USPTO does not dispute the facts set forth in Paragraph No. 20.

21.    The PTO's expert described this method as one in which "the patient is drawing up an aliquot of insulin into a syringe and injecting it" (DT 87:3-7), or perhaps using a pre-filled pump from which the patient dispenses insulin via injection (DT 87:9-11.)

The USPTO does not dispute the facts set forth in Paragraph No. 21.

22.    Use of injection to deliver insulin means that the amount of insulin to be injected is readily reproducible as a means of controlling a patient's blood glucose within acceptable levels. (DT 85:2, 85:10-11, 86:1-11.)

The USPTO does not dispute the facts set forth in Paragraph No. 22.

23.    Over the many years that this therapy has been in use, certain principles have been identified and accepted for determining how often to monitor a patient's blood sugar levels, and how much insulin to administer. *(See* CR ¶¶17-18; Harrison, Admin. R.Tab 13 at A268-69.)

The USPTO does not dispute the facts set forth in Paragraph No. 23.

13

24.     In administering insulin by injection, the treating physician and the patient must work together to "titrate" the insulin dose appropriate for that patient.  (CR ¶18.)

The USPTO does not dispute the facts set forth in Paragraph No. 24.

25.     In order to titrate insulin dosage, it is essential that the insulin be administered in a manner that achieves a reproducible dose to the bloodstream.  (CR ¶18; DT 206:7-11.)

The USPTO does not dispute the facts set forth in Paragraph No. 25.

26.     As described by Novo's expert, Dr. Crystal (and agreed by Ms. Dolovich, the PTO's expert in this action (DT 93:11 - 94:5), titration is a process in which the physician starts the patient at a low dose, monitors the effect on blood sugar levels, and adjusts the dose as necessary.  (CR ¶18.)  This process is then repeated until the physician is able to arrive at a dosage range that is safe and effective.  (_Id._)

The USPTO does not dispute the facts set forth in Paragraph No. 26.

27.     Even after the dosage range is established, the patient must measure his or her own blood glucose levels and make adjustments in the predetermined amount administered as needed.  (CR ¶18.)  It is, for example, not uncommon for a patient to take an injection of short-acting insulin before a meal in order to counteract the expected rise in blood sugar levels associated with eating.  (_Id._)

The USPTO does not dispute the facts set forth in Paragraph No. 27.

28.     So that the patient can achieve reproducible dosing, it is critical to control not only the absolute amount of insulin administered to the patient, but also the amount of insulin that reaches the patient's bloodstream.  (CR ¶17.)

The USPTO does not dispute the facts set forth in Paragraph No. 28.

29.     The lungs are made up of the trachea, bronchi, and bronchioles (collectively 'the airways'), and approximately 300 million alveoli (the air sacs), where gases are exchanged between the bloodstream and the air within the lung.  The airways divide dichotomously, that is by twos, 23 times before the alveoli.  The structure can be analogized to an up-side-down tree, in which the trachea is the trunk, the bronchi and bronchioles are the branches and the alveoli are the leaves. (CR ¶23; DT 107:8-22, 134:17-18.)

The USPTO does not dispute the facts set forth in Paragraph No. 29.

30.     Gas exchange between the bloodstream and the air within the lung takes place only through the alveoli; no gas exchange takes place through the airways, which act as conduits of air to the alveoli.  (CR ¶23; DT 107:11-13; 110:6-18.)

The USPTO disputes this alleged fact as not material.  It assumes that gas exchange is necessary for insulin to be absorbed into the bloodstream.  This is not true.  Insulin is absorbed into the bloodstream from the lungs through the "epithelium" (the thin membrane covering the lung tissue) of the lungs via "fluid phase transcytosis."  (*See* Patton *et al*., Routes of Delivery: Case Studies: Pulmonary delivery of peptides and proteins for systemic action, *Advanced Drug Delivery Reviews*, 8 (1992), pp.182-84.)  And while the USPTO agrees that it is likely that the vast majority of insulin that is absorbed from the lungs to the bloodstream does so from the alveoli where the epithelium is the thinnest, absorption through the tiny bronchioles adjacent to the alveoli cannot be ruled out.  This is likely why Novo's '774 application teaches the need to get insulin particles to the "peripheral areas" of the lungs, which includes both the alveoli and the adjacent small bronchial tubes, rather than exclusively to the alveoli.  (*See* Admin. R. Tab 2 at A17, para. 81; A24, para. 113.)

Further, it does not matter whether insulin absorption takes place exclusively in the alveoli, as Novo maintains, or whether it may also take place in the small bronchial tubes adjacent to the alveoli, as Prof. Dolovich supposes.  This is because Both Novo and the USPTO agree that particles up to 6 microns can reach that part of the lung from which insulin can then be absorbed.  (*See*, *e.g*., the expert report of Dr. Crystal, where he states that the "ideal" particle size for reaching the alveoli is up to 6 microns.  Obviously if a particle can reach the alveoli it must also be able to reach and pass through the bronchial tubes leading to the alveoli.)  Whether "that part of the lung" means exclusively the alveoli or instead includes some of the bronchial tubes is an immaterial technical debate that this Court need not resolve in deciding this case.

31.    Gas exchange, which is necessary for a drug to be absorbed from the lungs into the bloodstream, takes place at the "alveoli surface."  (DT 107:8-13.)

The USPTO disputes para. 31 as not supported by the record and as not material.  (*See* USPTO's response to para. 30, *supra.*)

32.     The peripheral airways and the "peripheral areas of the lung," referred to in the Expert Report of the PTO's expert witness Myrna B. Dolovich, are not the same thing as the alveoli.  (DT 106:16-21; 106:22 - 109:9; 110:19-21.)

The USPTO disputes para. 32 as not material, for reasons set for in the USPTO's response to Paragraph No. 30, *supra*.  The USPTO further disputes para. 32 as not supported by the record.  The "peripheral areas of the lung" includes the alveoli and the small peripheral airways that lead to the alveoli.  (DT 107:11-22.)

33.     It has long been known to treat diseases of the lung airways, such as asthma, by delivering medication in aerosol form to the affected airways.  (CR ¶20; DR ¶13.)

The USPTO disputes para. 33 as not material.  Prior art directed to a person of ordinary skill at the time of the invention, even if exclusively directed toward the treatment of lung diseases such as asthma (which Schenk and Velasquez are not) can inform such a person as to the treatment of other diseases via inhalation of medication.  As the Supreme Court has said recently:

> [The Court's obviousness analysis] need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ. . . Common sense teaches . . . that familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle. . . . A person of ordinary skill is also a person of ordinary creativity, not an automaton"

*KSR*, 127 S. Ct. at 1741-42.  *See also Merck & Co., Inc.*, 800 F.2d at 1097 ("Nonobviousness cannot be established by attacking references individually where the rejection is based upon the teachings of a combination of references. . . References must be read, not in isolation, but for what it fairly teaches in combination with the prior art as a whole.").

16

34.     Respiratory disease is susceptible to treatment by aerosols so long as the inhaled medication reaches the part of the lung that is affected by the disease, which, in the case of respiratory disease, is the airways.  (DR ¶13.)

The USPTO disputes Paragraph No. 34 as not material.  (*See* USPTO response to para.

33, *supra.*)

35.     In determining the dose of medication to treat lung conditions, the focus is simply on getting medication to the airways, no farther.  (DR ¶13.)  Additionally, the exact location in the airways where the medication needs to be deposited is not necessarily critical for treating asthma.  (DR ¶13; DT 106:9-21.)

The USPTO disputes Paragraph No. 35 as not material, for reasons set forth in USPTO's

response to Paragraph No. 33, *supra*.  The USPTO further disputes Novo's characterization that

asthma medication does not go beyond the major airways to the peripheral lung and alveoli,

where it is absorbed into the bloodstream.

36.     It has also long been known that some inhaled medicines may end up in the bloodstream.  As early as 1925, experimental data was published indicating that administering insulin by inhalation could cause a reduction in blood glucose level.  (Gänsslen, M., Über Inhalation von Insulin, Klin. Wochenschr. 4, 71(1925), Ex. D to the Nash Declaration; see also CR ¶21.)

The USPTO does not dispute the facts set forth in Paragraph No. 36.

37.     Because the frequent injections entailed by traditional insulin therapy can be painful and invasive, there has been extensive research into alternative methods for administering insulin, including oral, buccal and nasal administration.  Research into other methods such as oral, buccal, and nasal have been unsuccessful.  (CR ¶19; *see also, e.g.,* Harrison, Admin. R. Tab 13 at A269; '774 Application at ¶¶0004 - 0006.)

The USPTO does not dispute that there has been research into alternative methods for

administering insulin, and the USPTO is unaware of any currently marketed products for the

administration of insulin by oral, buccal or nasal routes.

38.     Although research has been ongoing for decades, no success in administering insulin by inhalation had been achieved prior to January 29, 1993, the priority date to which the '774 application is entitled.  (CR ¶¶21, 12; '774 Application at ¶ 0007.)

17

The USPTO does not dispute that research into inhaled insulin has occurred "for decades." However, the USPTO strongly disagrees that "no success in administering insulin by inhalation had been achieved prior to January 29, 1993." (*See, e.g.*, U.S. Patent No. 5,320,094 to Laube *et al.* ("Laube"), attached to the USPTO's Statement of Points and Authorities as Exhibit 3.)

39.    To be administered by inhalation, insulin must be "aerosolized," that is, the insulin formulation must be converted into small particles suspended in air. (CR ¶24.)

The USPTO does not dispute the fact set forth in Paragraph No. 39.

40.    The resulting aerosol will have particles that vary in size, and contain many millions of insulin molecules. (CR ¶24.)

The USPTO does not dispute the facts set forth in Paragraph No. 40.

41.    To treat diabetes, the insulin aerosol must be inhaled by the patient and must reach the alveoli in order to be absorbed into the bloodstream in a sufficient quantity to be effective. (CR ¶23.)

The USPTO disputes the assertion as not material. (*See* USPTO Response to para. 30, *supra*.)

42.    Lung physiology presents a challenge to aerosolized insulin that is inhaled in order to treat diabetes. (CR ¶¶23-26; DT 118:7-12, 130:4-10, 139:8-16, 146:2.) Much of an aerosol that is inhaled remains in the mouth and trachea. (DT 130:4-5.)

While the USPTO generally agrees that losses occur in the mouth and trachea, among other places -- thus necessitating aerosolizing more medicine in the inhaler than is needed to be absorbed in the bloodstream -- the USPTO objects to Paragraph No. 42 as vague as to "much."

43.    In 1993, then-current research showed that only about 3-15 percent of inhaled medication could get beyond the trachea into the peripheral airways, "due mainly to the efficient aerodynamic filtration of the airways." (DT 139:2 - 140:1.) Medication that makes it into the airways is likely to remain there. (DR ¶15.)

While the USPTO does not dispute that Prof. Dolovich testified as to the first sentence of Paragraph No. 43, the USPTO notes that Laube was able to achieve higher efficiencies through the control of particle size, inhalation volume, and inhalation flow rate.  *See* Laube (USPTO Stmt., Ex. 3) at col. 5, lines 53-60.  The USPTO objects to the second sentence of Paragraph No. 43 unsupported by the cited reference.

44.    Ms. Dolovich stated that as one breathes, the "breath travels through the lung [and] particles reign [*sic*] out depending on their properties in different parts of the lung."  (DT 118:9-12.)

The USPTO does not dispute the facts set forth in Paragraph No. 44.

45.    Particle size is one of the most important factor [*sic*] in determining whether an aerosolized drug reaches the alveoli.  (DT 173:19 - 174:1, 118:2-22.)

The USPTO does not dispute the facts set forth in Paragraph No. 45.

46.    The "respirable fraction" is the fraction of the particles in an aerosol suspension that are of a size that are respirable, *i.e.,* that when inhaled, *may* reach the alveoli.  Only particles that are of respirable size-- .5 to 5 micrometers (perhaps up to 6 micrometers) -- are of a size that *may* reach the alveoli.  (CR ¶25; DT 66:11-17; DT 67:14-20, 77:4-15.)

The USPTO does not dispute the facts set forth in the first sentence of Paragraph No. 46. The USPTO disputes the assertion set forth in the second sentence of this paragraph that only particles of ".5 to 5 micrometers (perhaps up to 6 micrometers)" are respirable.  Schenk teaches that "particles having a diameter of less than 7 m have a chance to penetrate completely into the bronchiole tubes," and that "[p]articles having such a small size that they may be deposited in the bronchial tree by aspiration are called 'respirable particles.'"  (Admin. R. Tab 17 at A300, ll.9-13.)  Similarly, Novo's own expert, Dr. Crystal, stated in his report that "[s]tudies have shown that the ***ideal*** particle size for reaching the alveoli is approximately 0.5 m – ***6  m*** in diameter."  (CR ¶25. (emphasis added)).

19

47.     Consistent with her published work, Ms. Dolovich testified that the respirable particle size is "below five micrometers." (DT 65:8-10.) For example, in her publication Myrna A.[*sic*] Dolovich, *Influence of Inspiratory Flow Rate, Particle Size, and Airway Caliber on Aerosolized Drug Delivery to the Lung,* 45 Respiratory Care 597-608 (June 2000), attached as Ex. E to the Nash Decl., she defines this size as "less than five micrometers, sometimes defined as less than six micrometers." (DT 66:11-17.) According to Dr. Crystal, 6 micrometers is the outer boundary of the respirable particle range. (CR ¶25.)

Since Novo has correctly stated in its brief that "[b]oth parties agree that particles in the size range of .5-6 micrometers [µm] are in the respirable range," Novo Mem. at 19 n.23," para. no. 47 is not material. *See also* Crystal Rep., ¶ 25 ( "[s]tudies have shown that the ideal particle size for reaching the alveoli is approximately 0.5   m – 6   m in diameter.")

48.     Once inhaled, particles grow in size by taking up water, a process called hygroscopic growth. Such growth may render particles no longer respirable. (DT 143:9-145:22.)

The USPTO objects to para. 48 as not material, since Novo's claims do not recite controlling hygroscopic growth of particles during inhalation. Further, there is no dispute that particles of dry insulin powder of up to 6 µm may reach a part of the lung from which the absorption of insulin may occur. *See, e.g.,* Crystal Rep., ¶¶ 23, 25.

49.     Because of hygroscopic growth, particles of aerosolized drugs that are initially within the respirable fraction may no longer be of a respirable size after they get below the larynx. (DT 143:16-20.)

The USPTO objects to para. 49 as not material, since Novo's claims do not recite controlling  hygroscopic growth during inhalation, and the '774 application does not teach any solution to such growth. Further, there is no dispute that particles of dry insulin powder of up to 6 µm may reach a part of the lung from which the absorption of insulin may occur. *See, e.g.,* Crystal Rep., ¶¶ 23, 25.

50.     Whether hygroscopic growth occurs and to what degree it affects the number of respirable particles depends on the drug itself. (DT 144:5 – 144:4.)

The USPTO objects to para. 50 as a mischaracterization of Prof. Dolovich's testimony. Prof. Dolovich testified that it depends on the "formulation you are working with," and "can depend on the drug itself" as well. Dolovich Tr. at 143:9-144:5. The USPTO further objections to para. 50 for the reasons set forth in the USPTO's response to paras. 48 and 49, *supra*.

51.     The humidity inside the lung is 100 percent. (DT 145:21-22.)

The USPTO objects to para. 51 for the reasons set forth in the USPTO's response to paras. 48 and 49, *supra*.

52.     Not all respirable particles are carried to the alveoli. (CR ¶26.)

The USPTO does not dispute the fact set forth in Paragraph No. 52.

53.     In addition to particle size, the flow rate and volume of inhalation of air and aerosolized insulin directly affect where the particles are deposited in the lungs and therefore the amount of insulin that reaches the alveoli. (CR ¶26.)

The USPTO does not dispute the fact set forth in Paragraph No. 53.

54.     Among the other factors affecting whether the aerosolized insulin particles that are inhaled reach the alveoli are:  velocity of inhalation, the nature or health of the patients' airways, and the charge and shape of the aerosol particles. (CR ¶26; DT 130:20 -131:3.)

The USPTO disputes that "velocity" of inhalation is a factor separate from the "flow rate" of inhalation. And while "charge can play a role, [it is] not a huge role." Dolovich Tr. at 131:2-3. Also, while "shape could influence [the] size" of a particle, Dolovich Tr. at 97:1-10, "[w]hen you measure a particle in terms of its aerodynamic size, shape and density are taken into consideration." Dolovich Tr. at 4-6. Thus, the shape of the particle is not properly considered to be a factor separate from the size of the particle.

55.     Not all insulin particles that are deposited in the alveoli are absorbed into the bloodstream. (CR ¶27.)

The USPTO does not dispute the facts set forth in Paragraph No. 55.

56.    Insulin particles must impact the alveolar walls for insulin molecules to be absorbed into the bloodstream.  When the dry powder particle comes into contact with the alveolar walls, it dissolves.  (CR ¶27; DT 118:13-22.)

The USPTO disputes the first sentence of para. 56 for the reasons set forth in the

USPTO's response to para. 30.  The USPTO does not dispute the second sentence of para. 56.

57.    Unless insulin enters the bloodstream, it cannot act to lower blood glucose levels.  (CR ¶23, 27.)
The USPTO does not dispute the facts set forth in Paragraph No. 57.

58.    When an insulin particle dissolves after coming into contact with the alveolar walls, whether the molecules from that particle are absorbed from the alveoli into the bloodstream depends on a number of factors, of which the principal ones relate to the characteristics of the insulin molecules themselves.  (CR ¶27.)  These factors include, *e.g.,* molecular weight, the molecule's electrical charge, solubility in lipids due to surfactants, shape, hydrophilicity, hydrophobicity, and pH.  (CR ¶28.)

The USPTO objects to  para. 58 as not material.  Neither the appealed claims nor the

'774 application address the properties of the insulin molecule or the factors affecting what

happens to the insulin molecules once they impact the alveolar surface.

59.    Even where an inhaled drug reaches "the receptor site"—the area where treatment is to be effected—it may not absorbed, effective or bioavailable to treat the target condition.  (CR ¶¶27-28; DT 118:13-22, 140:10-143:8.)

The USPTO objections to para. 59 as not material.  Neither the appealed claims nor the

'774 application address what happens to an "inhaled drug" once it reaches "the receptor site."

60.    Ms. Dolovich testified that receptors for asthma medicine are located on the airways but not on the alveoli.  (DT 102:9-16).

The USPTO objects to para. 60 as not material.  There is no dispute that particles of up to

6 µm can reach that part of the lung from which absorption can occur.  *See, e.g.*, CR ¶¶ 23, 25.

61.    There is a considerable difference between the aerosol of medicine generated by an inhaler and the medicine's bioavailability, that is, its availability at the target site where it is needed to treat a medical condition.  (CR ¶25-28; DT 140:10-143:8.)

The USPTO objects to para. 61 as argumentative and as vague as to "considerable." The

USPTO agrees that not all inhalable medicine generated by an inhaler is bioavailable.

> 62.    Various factors affect the absorption of insulin into the bloodstream and
> the reproducibility of a dose of inhaled insulin. These include molecular size, weight,
> charge (positive or negative), solubility in lipids or surfactants, shape, affinity or aversion
> to water, and relative acidity. (CR ¶¶27-28.) Even small changes in any of these
> molecular properties can profoundly alter the molecule's ability to be absorbed from the
> alveolar regions of the lungs into the bloodstream. (CR ¶28.) The PTO's expert has not
> disagreed. (DT 93:11 – 94:5; 172:7-8, 12-20.)

The USPTO objects to para. 62 as argumentative, as vague as to "profoundly," as not

supported by the cited references, and as not material. It was well known at the time of the

invention that insulin is absorbed into the bloodstream from the lungs. *See, e.g.*, USPTO Stmt,

Ex. 3 (Laube). Neither the claims at issue nor the '774 application address in any way the

factors – which are the inherent molecular characteristics of the insulin molecule – that affect

whether the insulin molecule is absorbed into the bloodstream from the alveolar surface.

The USPTO also disputes that Ms. Dolovich testified or otherwise expressly agreed with

the assertions set forth in the first three sentences of this paragraph. Novo cites DT 93:11-94:5;

172:7-8, 12-20 to support its assertion that Dr. Dolovich does not disagree on these matters. At

DT 172:7-8, 12-20, Ms. Dolovich is speaking only about factors affecting drug <u>deposition</u> in the

lung, and not drug <u>absorption</u> in the lung. (*See, e.g.*, DT 172:14 "Charge can affect how it is

deposited in the lung.") At DT 93:11 – 94:5, Ms. Dolovich is merely asked whether expert her

report addressed "all of the statements in Dr. Crystal's report that [she] considered to be both

important and incorrect." (DT 93:11-14.) Thus, there is no evidence that Ms. Dolovich has

agreed or disagreed with the statements made in the first three sentences of Paragraph No. 62.

> 63.    The amount of insulin absorbed in the bloodstream must be within a
> reproducible, narrow, safe, and effective therapeutic range. (CR ¶¶17, 29; DT 206:7-11.)

The USPTO does not dispute that the "amount of insulin absorbed in the bloodstream must be within a reproducible, safe, and effective therapeutic range," but does not know what Novo means by "narrow."

64.    Whereas traditional dosing by injection is predictable, easily repeatable, and well documented (*e.g.,* in Harrison), with inhaled insulin, only a potentially variable fraction of the insulin inhaled by a patient will ultimately reach the alveoli and be absorbed into the bloodstream.  (CR ¶29.)

The USPTO does not dispute that the "with inhaled insulin, only a fraction of the insulin inhaled by a patient will ultimately reach the alveoli and be absorbed into the bloodstream," but does not know what Novo means by "potentially variable."  The USPTO also disputes any characterization that only drug that reach the alveoli will be absorbed into the bloodstream (verses drug reaching the peripheral lung.  (*See*, *e.g.*, Answer to Paragraph No. 31.)

65.    The amount of insulin that needs to be delivered via inhalation to achieve an effective reproducible dose is a complex determination.  (CR ¶29.)

The USPTO disputes the facts set forth in Paragraph No. 65 as mere attorney argument.  Novo cites CR ¶29 to support this assertion.  Although Dr. Crystal makes the above statement, he provides no reasons why he believes that inhaled insulin dosing is "a complex determination" nor does he (or Novo) define the term "complex."  More importantly, whether it is complex to determine the exact "amount of insulin that needs to be delivered via inhalation to achieve an effective reproducible dose" is irrelevant to Novo's claims on appeal, *e.g.*, claim 25, which recites no limitation regarding the actual amount of insulin that must be inhaled except that the amount must "fixed" and "a sufficient, controlled quantity of insulin to achieve acceptable blood glucose level."  (Admin. R. Tab 24 at A372-A373, claim 25.)

66.    In determining the dose of medication to treat respiratory conditions such as asthma, the focus is simply on getting medication to the airways, rather than causing it to be absorbed into the bloodstream.  (DR ¶13.)

The USPTO objects to para. 66 as not material.  *See* USPTO's response to para. 30, *supra.* The USPTO also disputes Novo's characterization that asthma medication does not go beyond the major airways to the peripheral lung and alveoli, where it is absorbed into the bloodstream.

> 67.    As of January 1993, no reference taught how to determine the amount of insulin that needs to be delivered via inhalation to achieve an effective reproducible dose. (DT 88:6-9.)  As Ms. Dolovich, the PTO's expert testified, knowing the traditional dosages set out in Harrison would, at best, suggest that some portion or "fraction" of those doses -- "[m]aybe 50 percent, maybe 25 percent" -- could be used as a starting point to determine the proper dosage for administering inhaled insulin.  (DT 227:9 - 228:14.)  Using this fractional dose as a starting point would entail extensive follow-on experimentation.  (DT 228:21 - 232.15.)

The USPTO objects to the first sentence of para. 67 as not supported by the record. Novo cites DT 88:6-9 in support of this assertion.  However, Ms. Dolovich merely acknowledges that *Harrison* does not teach how to determine the amount of insulin that needs to be delivered via inhalation to achieve an effective reproducible dose.  Moreover, Laube teaches a method of treating diabetes mellitus using aerosolized insulin.  USPTO Stmt, Ex. 3. Accordingly, as of January 1993, at least one reference taught how to determine the amount of insulin that needs to be delivered via inhalation to achieve an effective reproducible dose.

The USPTO objects to the second sentence of para. 67 as argumentative as to the use of the term "at best."  It is also important to note that Novo's '774 application does *not* specifically teach "how to determine the amount of insulin that needs to be delivered via inhalation to achieve an effective reproducible dose."  The specification of the '774 application teaches (1) the *same* doses as Harrison teaches for *injection* of insulin (Tab 2 at A22-23, ¶ 109); (2) that the efficiency of "devices used with the present invention" can vary from "as low as 10% [to] as high as 50% meaning that as little as 10% of the released insulin may actually reach the circulatory system of the patient and as much as 50% or more might be delivered;" (Tab 2 at 63-

64, ¶ 233); and (3) The efficiency of the delivery will vary somewhat from patient to patient (*Id.*).  So even using the claimed invention and the teachings of the '774 application, one cannot know how much insulin to aerosolize in an inhaler in order to get a particular amount of insulin in the bloodstream without doing the kind of experimentation that Novo's expert calls "dangerous."

The USPTO disputes the assertion in the third sentence of para. 67 that using the insulin doses described in Harrison "as a starting point would entail extensive follow-on experimentation."  Novo cites DT 228:21 - 232.15 in support of this assertion.  However, DT 228:21 - 232.15 shows no characterization by Ms. Dolovich that "extensive" experimentation would be needed to calculate dose, or that the experimentation required would be different from that required to determine the dose of <u>any</u> drug, or even to practice the claimed invention (see preceding paragraph).

> 68.    Taking into account, as one treating diabetes must, the narrow therapeutic range of insulin (as compared to the broad range of drugs used to treat lung disease), means that dosages used in inhalation devices designed to treat asthma are of little or no use.  (DT 78:10 - 80:3.)

The USPTO objects to para. 68 as not material, since none of the claims on appeal recite "specific dosages used in inhalation devices."  The USPTO further objects to para. 68 as attorney argument lacking factual basis.  Further, the USPTO does not know what Novo means by "narrow," "broad," and "little or no use."  Novo cites DT 78:10 - 80:3.  Novo never asked Ms. Dolovich nor did Ms. Dolovich ever opine about whether "dosages used in inhalation devices designed to treat asthma are of little or no use."  To the contrary, Ms. Dolovich explained that the methods of "titrating" (*i.e.*, determining) drug doses used for the treatment of asthma are relevant to determining the dose to use for the treatment of diabetes with inhaled insulin:

> [I]n my understanding, you assess the patient; you measure certain clinical
> outcomes from experience.  The physician would be able to interpret those
> outcomes and select a dose of a drug that would be effective.  He would
> select that dose – he or she would select that dose.  And I am assuming
> you give it a trial run.  You make more measurements.  If it is too low,
> you can have an opportunity to increase it.  If it is too high, then one could
> assume there might be some clinical outcomes that would indicate that the
> dose is too high – a side effect perhaps.  And you titrate.  In other words,
> you titrate the dose to maintain control of the disease for that particular
> patient.  <u>That is the format that is followed extensively, for example, when
> treating asthma</u>.

(DT 78:17-79:13 (emphasis added.).)

       69.    In her Report, Ms. Dolovich states that "the doses administered by
subcutaneous injection that are discussed in Harrison, or some fraction thereof, would
suggest a starting point for the administration of inhalable insulin."  (DR ¶17.)  In her
deposition, however, she did not support this statement.  When asked how one would use
Harrison, Ms. Dolovich explained that, to determine an inhaled dose, it would be
necessary to perform a series of experiments using Harrison as a benchmark for the
maximum amount of insulin that could end up in the bloodstream.  (DT 227:3 - 230:5.)
She in no way explained how much insulin would be put in an inhaler.  (*Id.*)  And she
stated that even the elaborate experiments she described as needed to translate Harrison
into a treatment using inhaled insulin could not be used "to treat [patients] at the time."
(DT 230:10-11.)  "We are talking about collecting information to support a method of
inhaling insulin *that is different from the subcutaneous route*."  (DT 232:1-3 (emphasis
added).)  As she explained, "it is a leap from a laboratory set of experiments to . . .
treat[ing]" diabetes. (DT 216:4-6.)

The USPTO objects to para. 69 as argumentative and as not supported by the record.

The USPTO does not dispute that Ms. Dolovich made the statement set forth in the first

sentence of Paragraph No. 69.

The USPTO disputes the assertion set forth in the second sentence of Paragraph No. 69

that Ms. Dolovich did not support the quoted statement.

The USPTO disputes the characterization of Prof. Dolovich's testimony in the third

sentence of para. 69.  Specifically, Prof. Dolovich testified that:

> You need to obtain a body of data that characterizes that system that tests
> it in a number of patients so that you can go out there and say, I have a
> system that works; I can provide unit doses containing X milligrams of

insulin; I know what the efficiency of delivery of my system is over X number of subjects; and we have enough clinical data using that system to say that is it workable. In my understanding, you assess the patient; you measure certain clinical outcomes from experience. The physician would be able to interpret those outcomes and select a dose of a drug that would be effective. He would select that dose – he or she would select that dose. And I am assuming you give it a trial run. You make more measurements. If it is too low, you can have an opportunity to increase it. If it is too high, then one could assume there might be some clinical outcomes that would indicate that the dose is too high – a side effect perhaps. And you titrate. In other words, you titrate the dose to maintain control of the disease for that particular patient. <u>That is the format that is followed extensively, for example, when treating asthma</u>.

(DT 231-232 (emphasis added).)

The USPTO disputes the assertion set forth in the fourth sentence of Paragraph No. 69 as mere attorney argument without evidentiary support. At DT 228:1-7, Ms. Dolovich "explained how much insulin would be put in an inhaler" as "[m]aybe 50 percent, maybe 25 percent [of the maximum dose in Harrison]. You would -- if I were going through this exercise, I might start off at 25 percent, get some measurements, see that it was not a problem, and then double the dose. And if that was not a problem, then go to the full dose, knowing all along what my clinical response measurements would be -- my pharmacokinetic parameters."

The USPTO disputes the assertion set forth in the fifth and sixth sentences of Paragraph No. 69 as a mischaracterization of Ms. Dolovich's testimony and as attorney argument. At DT 230:10-11, Ms. Dolovich actually stated that "we are not doing these experiments to treat at the time," meaning that the experiments she was discussing were experiments to determine a safe and effective dose of inhaled insulin rather than to actually treat patients. Moreover, Ms. Dolovich expressly testified that "Harrison, as you know, describes a method for treating diabetes that is the standard method – the subcutaneous injections of insulin and the units that

are used . . . But provide a starting point if anybody is going to consider delivering insulin in an alternative way."  (DT 78:2-8.)

Finally, the USPTO objects to para. 69 as not material, for the reasons set forth in the USPTO's response to para. 67, *supra*.

> 70.     If a patient is given an insufficient dose of an asthma medication, *e.g.*, another dose can be given, with the ultimate risk of side-effects such as bruising or thinning of the skin or tremors (from an overdose).  A risk to the life of the patient is not a side-effect of asthma medications. (DT 79:5-13, 80:21-82:10, 89:16-22, 91:6-9.)

The USPTO objects to para. 70 as not material.  The USPTO further objects to para. 70 as not supported by the record; specifically, Prof. Dolovich testified that death could occur as a result of an underdose of asthma medication.  Dolovich Tr. at 80:21-81:10.

> 71.     In a Final Office Action, dated April 15, 2003, the patent examiner ("Examiner") assigned to examine the '774 Application rejected all of the claims then pending, on the ground that they were unpatentable as obvious to a person having ordinary skill, under 35 U.S.C. § 103(a), in light of two prior art references: U.S. Letters Patent No. 5,192,548 to Velasquez *et al.*, issued on March 9, 1993 ("Velasquez") (Admin. R. Tab 18) and International Patent Publication No. WO 90/07351 to Schenk, *et al.*, published on July 12, 1990 ("Schenk") (Admin. R. Tab 17). (Admin. R. Tab 16 at A292.)

The USPTO does not dispute the facts set forth in Paragraph No. 71.

> 72.     The Examiner stated that the "differences between Schenk *et al.* and claim 22 are [1] insulin as the dry powder medicament and [2] the recited intended result of the insulin containing 2-10 times higher the amount needed to be absorbed in the bloodstream of a patient."  (Admin. R. Tab 16 at A292.)

The USPTO does not dispute that the final Office action contains the language quoted in Paragraph No. 72.

> 73.     The Examiner concluded that Velasquez satisfies the difference of dry insulin powder because "Velasquez et al. teach a variety of dry powder medicaments as inhalable powders including insulin," and therefore "[i]t would have been obvious to modify the dry powder in Schenk et al. to employ dry powder insulin."  (Admin. R. Tab 16 at A292.)

The USPTO does not dispute that the final Office action contains the language quoted in

Paragraph No. 73.

      74.     The Examiner concluded that "[a]s to the recited intended result of the amount of insulin employed and the amount of insulin being employed . . . [this]. . . can be arrived at through mere routine obvious experimentation and observation. . . to be tailored to the particular patient's medical needs." (Admin. R. Tab 16 at A293.)

The USPTO does not dispute that the final Office action contains the language quoted in

Paragraph No. 74.

      75.     The Examiner also stated that "[a]s to the recited claimed limitations defining a controlled quantity of insulin which is sufficient to achieve the desired result, Schenk et al. (page 3, lines 5-3 [sic]; page 4, lines 27-37) disclose a device which facilitate[es] maximum amounts of medicament inhaled and absorbed into a patient's bloodstream. That is, given that Schenk *et al.* disclose aerosolizing most of the medicament within the aerosolization chamber (16), the amount of medicament available for inhalation by a patient is predictable." (Admin. R. Tab 16 at A294.)
The USPTO does not dispute that the final Office action contains the language quoted in

Paragraph No. 75.

      76.     As for the limitation of repeating the administration of insulin in a reproducible, consistent manner, without citation, the Examiner stated, "is [*sic*] stands to reason that the administration protocol would have included: repeated inhalation (administration) of insulin." (Admin. R. Tab 16 at A293.) The Examiner stated this three times. (*Id.* at A293, A293-94, A294.)

The USPTO does not dispute that the final Office action contains the language quoted in

Paragraph No. 76, but further notes that it is undisputed that treatment of diabetes requires

repeated administration of insulin to the patient. *See, e.g.*, para. 14, *supra*.

      77.     In an Amendment After Final, dated May 10, 2004, Novo amended the claims for appeal. (Admin. R. Tab 23, A346-348), as set out *supra* ¶8.

The USPTO does not dispute the facts set forth in Paragraph No. 77.

      78.     Also on May 10, 2004, Novo appealed the Examiner's rejection to the Board of Patent Appeals and Interferences ("Board"). (Appeal Brief, Admin. R. Tab 24.)

The USPTO does not dispute the facts set forth in Paragraph No. 78.

79.    In the Examiner's Answer, dated January 25, 2006, the Examiner cited Harrison's Principles of Internal Medicine, Ch. 337 "Diabetes Mellitus" (Kurt Isselbacher *et al.* eds., 13th ed., Vol.2 1994) pp. 1986-87 ("Harrison") (Admin. R. Tab 13) as "[e]xtrinsic evidence to support the positions taken in the rejection." in addition to Schenk and Velasquez.  (Examiner's Answer, Admin. R. Tab 32 at A421.)

The USPTO does not dispute that the Examiner's Answer contains the language quoted in Paragraph No. 79.

80.    In his Answer, with the same typographical error, the Examiner reiterated his argument for rejecting the repetition limitations by stating that "is [sic] stands to reason that the administration protocol would have included repeated inhalation (administration) of insulin to maintain an adequate concentration of medicament in a patient's bloodstream."  (Admin. R. Tab 32 at A420.)

The USPTO does not dispute that the Examiner's Answer contains the language quoted in Paragraph No. 80.

81.    The Board, in its Decision mailed Sept. 7, 2006, in Appeal No. 2006-1762, focused on Claim 22 in sustaining the Examiner's rejection of all of the pending claims, rejecting "Claims 22 through 38" (even though Novo had appealed only pending claims 22, 23, 25, 26, 31, and 35).  (Board Decision, Admin. R. Tab 36 at A447, A451.)

The USPTO does not dispute the facts set forth in Paragraph No. 81, except to note that the Board's analysis focused only on those claims actually on appeal (*i.e.*, claims 22, 23, 25, 26, 31 and 35).  Thus, any error appearing in the numbering of the claims on appeal in the Board's summary of its opinion is harmless and, more importantly, irrelevant.

82.    The Board found all rejected claims to be unpatentable under 35 U.S.C. § 103 as "obvious over Schenk in view of Velasquez."  (Admin. R. Tab 36 at A447, A451.)

The USPTO does not dispute that the Board's Decision contains the language quoted in Paragraph No. 82, but further notes that the examiner's rejection of some of the appealed claims, and thus the Board's affirmance of such rejection, was also based on Harrison.

83.    The Board concluded that, by using dry insulin powder, as suggested in Velasquez, with a standard asthma drug inhaler, like those in Schenk, and by consulting

Harrison, the claims of the '774 Application would have been obvious to one of skill in the art.  (Admin. R. Tab 36; CR ¶39.)

The USPTO does not dispute the facts set forth in Paragraph No. 83 except for Novo's

characterization of Schenk's device as a "standard asthma drug inhaler."  Schenk (Admin. R.

Tab 17 at A298-A321) states that his invention relates to an "oral inhaler for use in inhaling a

powdered or particulate medical product" without limitation to medical products to treat any

particular disease.  (See Admin. R. Tab 17 at A300, ll.1-2.)  Schenk also expressly states that his

inhaler is designed to deliver dry powder medicines to treat          "bronchial asthma and other

diseases."  (Admin. R. Tab 17 at A300, ll.4-5 (emphasis added).)

> 84.    In support of its obviousness determination, the Board also cited "the evidentiary value of Harrison's recitation of amounts" of insulin to treat diabetes by injection.  (Admin. R. Tab 36 at A449.)

The USPTO does not dispute that the Board's Decision contains the language quoted in

Paragraph No. 84.

> 85.    Schenk describes oral inhalers used to administer aerosolized medicine into the bronchi to treat diseases of the lungs, such as asthma.  (Admin. R. Tab 17 at A300, ll. 4-7; CR ¶35; DT 133:1-15.)

The USPTO does not dispute that "Schenk describes oral inhalers used to administer

aerosolized medicine into the bronchi to treat diseases of the lungs, such as asthma."  However,

the USPTO disputes any characterization that Schenk is limited to only the treatment of

"diseases of the lungs, such as asthma."  Schenk (Admin. R. Tab 17 at A298-A321) states that

his invention relates to an "oral inhaler for use in inhaling a powdered or particulate medical

product" without limitation to medical products to treat any particular disease.  (*See* Admin. R.

Tab 17 at A300, ll.1-2.)  Schenk also expressly states that his inhaler is designed to deliver dry

powder medicines to treat "bronchial asthma and other diseases."  (Admin. R. Tab 17 at A300,

ll.4-5 (emphasis added).)

86.    Schenk's oral inhalers operate by supplying a product reservoir with powdered medicine, which medicine is drawn into a gas flow passage containing a throat (or restriction) through which air is propelled at a high velocity by a pressure gas source. The medical product is thereby aerosolized and flows into a mouthpiece for inhalation by the patient.  (CR ¶35; Admin. R. Tab 17, A302, ll. 8-25, *see* DT 61:17 - 62:15.)

The USPTO does not dispute the facts set forth in Paragraph No. 86.

87.    Schenk is not designed to deliver drugs to the alveoli, but only to the peripheral airways.  (DT 106: 1-4; 133:6 - 135:18; DR ¶13.)

The USPTO disputes this statement as attorney argument without supporting factual basis.  (*See also* USPTO's responses to paras. 88 and 89.)  Novo cites DT 106:1-4 in support of this statement, however, the entirety of Ms. Dolovich's testimony is that:  "Schenk designed a powder inhaler that produces powder that is expected, given its properties, to be inhaled and deposited within the lung."  (DT 106:1-4)  There is no mention of alveoli or peripheral airways. When Ms. Dolovich was expressly asked whether Schenk's device was designed to deliver drugs to the alveoli (DT 135:15), Ms. Dolovich responded, "[a]s I said earlier, in the very peripheral airways, the alveoli start to appear.  So yes." (DT 135:16-18).  In the cited portion of her report, Ms. Dolovich similarly states that "the Schenk devices deliver particles of less than 7   m in size, Schenk at 1, which is consistent with the particle size that Dr. Crystal stated would be suitable for deposition in the alveoli (up to 6   m)."  (DR ¶13.)  Thus, Ms. Dolovich's testimony is the opposite of what Novo now suggests.

Moreover, even if this allegation were true, it is immaterial for two reasons.  First, insulin is absorbed into the bloodstream from the lungs through the "epithelium" (the thin membrane covering the lung tissue) of the lungs via "fluid phase transcytosis."  (*See* Patton *et al.*, Routes of Delivery:  Case Studies:  Pulmonary delivery of peptides and proteins for systemic action, *Advanced Drug Delivery Reviews*, 8 (1992), pp.182-84.)  And while the USPTO agrees that it is likely that the vast majority of insulin that is absorbed from the lungs to the bloodstream does so

33

from the alveoli where the epithelium is the thinnest, absorption through the tiny bronchioles adjacent to the alveoli cannot be ruled out.  This is likely why Novo's '774 application teaches the need to get insulin particles to the "peripheral areas" of the lungs, which includes both the alveoli and the adjacent small bronchial tubes, rather than exclusively to the alveoli.  (*See* Admin. R. Tab 2 at A17, para. 81; A24, para. 113.)

Further, it does not matter whether insulin absorption takes place exclusively in the alveoli, as Novo maintains, or whether it may also take place in the small bronchial tubes adjacent to the alveoli, as Prof. Dolovich supposes.  This is because Both Novo and the USPTO agree that particles up to 6 microns can reach that part of the lung from which insulin can then be absorbed.  (*See*, *e.g*., the expert report of Dr. Crystal, where he states that the "ideal" particle size for reaching the alveoli is up to 6 microns.  Obviously if a particle can reach the alveoli it must also be able to reach and pass through the bronchial tubes leading to the alveoli.)  Whether "that part of the lung" means exclusively the alveoli or instead includes some of the bronchial tubes is an immaterial technical debate that this Court need not resolve in deciding this case.

Second, this allegation is immaterial because whether Schenk's device was "designed to deliver drugs to the alveoli" (emphasis added).  The relevant question is whether Schenk can deliver drugs to the alveoli, and Schenk says his device can.  For example, Schenk discloses that his inhaler is able to deliver respirable (*i.e.*, inhalable) dry powder medicines at doses of 25-500 micrograms, and that "substantially greater doses may efficiently be sucked from the product chamber [of his device] into [its] restriction of the gas flow passage and dispersed in the air flow in a respirable condition."  (Admin. R. Tab 17 at A303, ll.30-37.)  Schenk also discloses that, in this manner, his inhaler is superior to other inhalers because it creates a "drastic increase of the

proportion of respirable particles dispersed in the gas or air flow."  (Admin. R. Tab 17 at A302, ll.19-22.)

       88.    Ms. Dolovich could not identify any statement in Schenk that describes his invention as "designed to deliver medication to the alveoli to provide systemic treatment."  (DT 95:14-18.)

The USPTO disputes this statement as attorney argument without supporting factual basis.  (*See also* USPTO's responses to paras. 87 and 89.)  When asked to show where Schenk states that his device was "designed to deliver medication to the alveoli to provide systemic treatment" (DT 95: 14-16), Ms. Dolovich correctly stated that she didn't "believe Schenk uses those words in his patent.  Those are Dr. Crystal's words."  (DT 95:17-18).  When specifically asked to show whether Schenk states that "his device was designed to deliver medication to the alveoli for systemic treatment" (DT 95:19-22), Ms. Dolovich responded that she thought that "the concepts in Schenk don't preclude that . . . the property's powder [*sic*] released from his inhaler are such that they could be viewed as providing delivery to the alveoli surface" (DT 96:4-9).  Ms. Dolovich similarly states that "the Schenk devices deliver particles of less than 7 m in size, Schenk at 1, which is consistent with the particle size that Dr. Crystal stated would be suitable for deposition in the alveoli (up to 6  m)."  (DR ¶13.)  Thus, Ms. Dolovich's testimony is the opposite of what Novo now suggests.

      Moreover, even if this allegation were true, it is immaterial for two reasons.  First, insulin is absorbed into the bloodstream from the lungs through the "epithelium" (the thin membrane covering the lung tissue) of the lungs via "fluid phase transcytosis."  (*See* Patton *et al*., Routes of Delivery:  Case Studies:  Pulmonary delivery of peptides and proteins for systemic action, *Advanced Drug Delivery Reviews*, 8 (1992), pp.182-84.)  And while the USPTO agrees that it is likely that the vast majority of insulin that is absorbed from the lungs to the bloodstream does so

from the alveoli where the epithelium is the thinnest, absorption through the tiny bronchioles adjacent to the alveoli cannot be ruled out. This is likely why Novo's '774 application teaches the need to get insulin particles to the "peripheral areas" of the lungs, which includes both the alveoli and the adjacent small bronchial tubes, rather than exclusively to the alveoli. (*See* Admin. R. Tab 2 at A17, para. 81; A24, para. 113.)

Further, it does not matter whether insulin absorption takes place exclusively in the alveoli, as Novo maintains, or whether it may also take place in the small bronchial tubes adjacent to the alveoli, as Prof. Dolovich supposes. This is because Both Novo and the USPTO agree that particles up to 6 microns can reach that part of the lung from which insulin can then be absorbed. (*See*, *e.g*., the expert report of Dr. Crystal, where he states that the "ideal" particle size for reaching the alveoli is up to 6 microns. Obviously if a particle can reach the alveoli it must also be able to reach and pass through the bronchial tubes leading to the alveoli.) Whether "that part of the lung" means exclusively the alveoli or instead includes some of the bronchial tubes is an immaterial technical debate that this Court need not resolve in deciding this case.

Second, it is immaterial whether Schenk's device was "designed to deliver drugs to the alveoli" (emphasis added). The relevant question is whether Schenk can deliver drugs to the alveoli, and Schenk says his device can. As previously stated, Schenk discloses that his inhaler is able to deliver respirable (*i.e.*, inhalable) dry powder medicines at doses of 25-500 micrograms, and that "substantially greater doses may efficiently be sucked from the product chamber [of his device] into [its] restriction of the gas flow passage and dispersed in the air flow in a respirable condition." (Admin. R. Tab 17 at A303, ll.30-37.) Schenk also discloses that, in this manner, his inhaler is superior to other inhalers because it creates a "drastic increase of the

36

proportion of respirable particles dispersed in the gas or air flow."  (Admin. R. Tab 17 at A302, ll.19-22.)

        89.     Schenk is not designed to deliver medication to the alveoli to provide systemic treatment.  (CR ¶36; DT 133:6 - 135:18.)

The USPTO disputes this statement as attorney argument without supporting factual basis.  (*See also* USPTO's Responses to Novo's Paragraphs Nos. 87 and 88.)  Novo cites DT 133:6 - 135:18 as support for this statement, however, when Ms. Dolovich was expressly asked whether Schenk's device was designed to deliver drugs to the alveoli (DT 135:15), Ms. Dolovich responded, "[a]s I said earlier, in the very peripheral airways, the alveoli start to appear.  So yes." (DT 135:16-18).  Ms. Dolovich similarly states that "the Schenk devices deliver particles of less than 7  m in size, Schenk at 1, which is consistent with the particle size that Dr. Crystal stated would be suitable for deposition in the alveoli (up to 6  m)."  (DR ¶13.)  Thus, Ms. Dolovich's testimony is the opposite of what Novo now suggests.

Moreover, even if this allegation were true, it is immaterial for two reasons.  First, insulin is absorbed into the bloodstream from the lungs through the "epithelium" (the thin membrane covering the lung tissue) of the lungs via "fluid phase transcytosis."  (*See* Patton *et al*., Routes of Delivery:  Case Studies:  Pulmonary delivery of peptides and proteins for systemic action, *Advanced Drug Delivery Reviews*, 8 (1992), pp.182-84.)  And while the USPTO agrees that it is likely that the vast majority of insulin that is absorbed from the lungs to the bloodstream does so from the alveoli where the epithelium is the thinnest, absorption through the tiny bronchioles adjacent to the alveoli cannot be ruled out.  This is likely why Novo's '774 application teaches the need to get insulin particles to the "peripheral areas" of the lungs, which includes both the alveoli and the adjacent small bronchial tubes, rather than exclusively to the alveoli.  (*See* Admin. R. Tab 2 at A17, para. 81; A24, para. 113.)

Further, it does not matter whether insulin absorption takes place exclusively in the alveoli, as Novo maintains, or whether it may also take place in the small bronchial tubes adjacent to the alveoli, as Prof. Dolovich supposes.  This is because Both Novo and the USPTO agree that particles up to 6 microns can reach that part of the lung from which insulin can then be absorbed.  (See, e.g., the expert report of Dr. Crystal, where he states that the "ideal" particle size for reaching the alveoli is up to 6 microns.  Obviously if a particle can reach the alveoli it must also be able to reach and pass through the bronchial tubes leading to the alveoli.)  Whether "that part of the lung" means exclusively the alveoli or instead includes some of the bronchial tubes is an immaterial technical debate that this Court need not resolve in deciding this case.

Second, it is immaterial whether Schenk's device was "designed to deliver drugs to the alveoli" (emphasis added).  The relevant question is whether Schenk can deliver drugs to the alveoli, and Schenk says his device can.  As previously stated, Schenk discloses that his inhaler is able to deliver respirable (i.e., inhalable) dry powder medicines at doses of 25-500 micrograms, and that "substantially greater doses may efficiently be sucked from the product chamber [of his device] into [its] restriction of the gas flow passage and dispersed in the air flow in a respirable condition."  (Admin. R. Tab 17 at A303, ll.30-37.)  Schenk also discloses that, in this manner, his inhaler is superior to other inhalers because it creates a "drastic increase of the proportion of respirable particles dispersed in the gas or air flow."  (Admin. R. Tab 17 at A302, ll.19-22.)

90.    The design of the inhaler affects its function:  the percentage of an aerosol that gets below the larynx "depends on your inhaler - inhaler design."  (DT 120:1-11.)

The USPTO does not dispute the facts set forth in Paragraph No. 90.

91.    The PTO's expert admitted that there is no indication that Schenk contemplated treatment of any systemic disease, that is, of any disease outside the lung.  (DT 133:6 - 135:18.)  As the PTO's expert also testified, a device designed to treat

asthma is not necessarily a design that will deliver medication to the alveoli.  (DT 109:17 - 110:10.)

The USPTO disputes this statement made in the first sentence of this paragraph as attorney argument without supporting factual basis.  (*See also* USPTO's Responses to Novo's Paragraphs Nos. 87, 88 and 89.)  Novo cites DT 133:6 - 135:18 as support for this statement, however, Novo never asked Ms. Dolovich nor did she opine on whether Schenk contemplated treatment of any systemic disease.  When asked to show where Schenk states that his device was "designed to deliver medication to the alveoli to provide systemic treatment" (DT 95: 14-16), Ms. Dolovich correctly stated that she didn't "believe Schenk uses those words in his patent.  Those are Dr. Crystal's words."  (DT 95:17-18).  When specifically asked to show whether Schenk states that "his device was designed to deliver medication to the alveoli for systemic treatment" (DT 95:19-22), Ms. Dolovich responded that she thought that "the concepts in Schenk don't preclude that . . . the property's powder [*sic*] released from his inhaler are such that they could be viewed as providing delivery to the alveoli surface" (DT 96:4-9).  Thus, Ms. Dolovich's testimony is the opposite of what Novo now suggests.

Moreover, even if the statement made in the first sentence were true, it is irrelevant whether Schenk "contemplated treatment of any systemic disease." (emphasis added).  The relevant question is whether Schenk's device can be used to treat systemic disease, and Schenk says his device can.  (*See* Admin. R. Tab 17 at A303, ll.30-37; A302, ll.19-22.)

The USPTO does not dispute the fact set forth in the second sentence, but disputes the characterization that a device that is designed to deliver asthma medications cannot be used to deliver other drugs for systemic treatment.  When specifically asked whether "any device that's designed to treat asthma is design[ed] to deliver medication to the alveoli [*i.e.*, for systemic treatment]" (DT 109:17-20), Ms. Dolovich responded that "to be effective, asthma medication

39

must reach both the central and peripheral airways . . . but doesn't have to reach the gas-exchanging region of the lung to be effective" (DT 109:21 – 110:5). Thus, Ms. Dolovich's response was not directed to Schenk's device. Further Ms. Dolovich did not state that Schenk's device or devices used to deliver asthma medication <u>could not</u> be used to deliver drugs, like insulin, to the alveoli for systemic treatment, only that asthma medication delivery devices <u>were not required to</u> deliver drugs to the alveoli.

Moreover, <u>both Novo and the USPTO agree</u> that particles up to 6 microns can reach that part of the lung from which insulin can then be absorbed. (*See*, *e.g.*, the expert report of Dr. Crystal, where he states that the "ideal" particle size for reaching the alveoli is up to 6 microns. Obviously if a particle can reach the alveoli it must also be able to reach and pass through the bronchial tubes leading to the alveoli.) Whether "that part of the lung" means exclusively the alveoli or instead includes some of the bronchial tubes is an immaterial technical debate that this Court need not resolve in deciding this case.

> 92.     Schenk states that "only particles having a diameter of less than 7 μm have a chance to penetrate completely into the bronchial tubes." (Admin. R. Tab 7 at A300, ll. 9-11.)

The USPTO does not dispute that Schenk contains the language quoted in Paragraph No. 92.

> 93.     The PTO's expert testified that there is no way to determine whether Schenk would produce the same respirable fraction of insulin that it produced of asthma medicine. (DT 98:9 - 99:11.)

The USPTO disputes this statement as attorney argument without supporting factual basis. Novo cites DT 98.9-99.11 in support of this statement. When asked whether Ms. Dolovich "believe[d] that if you put insulin into Schenk it would produce powder having the same particle range as asthma medicine put into Schenk" (DT 98:19-21), Ms. Dolovich stated

40

that she believed "[i]t is possible" (DT 99:1), but acknowledged that she "had no hands-on

experience with this prototype inhaler.  So I, myself, have not used it as a test inhaler for insulin"

(DT 99:5-8).  Thus, Ms. Dolovich did <u>not</u> testify that there was "no way to determine whether

Schenk would produce the same respirable fraction of insulin that it produced of asthma

medicine," just that she had not done so personally.

> 94.    The Schenk devices are designed to deliver drug to the peripheral airways,
> (DR ¶13), which does not refer to alveoli, (DT 133: 6-15).  They are not designed to
> deliver medication to the alveoli to provide systemic treatment.  (CR ¶36; DT 133:6 -
> 135:18.)

The USPTO disputes the statement made in the first sentence of this paragraph as

attorney argument without supporting factual basis.  (*See also* USPTO's Responses to Novo's

Paragraphs Nos. 87, 88, 89, and 91.)  Novo cites DR ¶13 as support for the statement that "[t]he

Schenk devices are designed to deliver drug to the peripheral airways."  Ms. Dolovich's

statements regarding the ability of Schenk's device (and asthma inhalers in general) to deliver

medication to the peripheral airways at DR ¶13 were made in response to the statement in Dr.

Crystal's Report that "Schenk describes oral inhalers which are used for inhaling powdered or

particulate medical product into the bronchi, to treat diseases of the lungs, such as asthma."  (DR

¶12 citing CR ¶¶35-36.)  Further, Ms. Dolovich explained at her deposition that "[t]hose are Dr.

Crystal's words" (DT 95:17-18), not her own.  Thus, Ms. Dolovich did not characterize the

Schenk device as an asthma inhaler, Novo's expert, Dr. Crystal, did.

The USPTO disputes the statement made in the second sentence of this paragraph as

attorney argument without supporting factual basis.  (*See also* USPTO's responses to paras. 87,

88 and 89.)

> 95.    The behavior of insulin in inhalers like Schenk's is not predictable.  (DT
> 98:19-21, 99:3-4, 99:9.)

41

The USPTO disputes this statement as attorney argument without supporting factual

basis.  (*See also* USPTO's Response to Novo's Paragraph No. 93.)  Novo cites DT 98.19-21,

99:3-4, 99.9 in support of this statement.  When asked whether Ms. Dolovich "believe[d] that if

you put insulin into Schenk it would produce powder having the same particle range as asthma

medicine put into Schenk" (DT 98:19-21), Ms. Dolovich stated that she believed "[i]t is

possible" (DT 99:1), but acknowledged that she "had no hands-on experience with this prototype

inhaler.  So I, myself, have not used it as a test inhaler for insulin" (DT 99:5-8).  Thus, Ms.

Dolovich did <u>not</u> testify that the "behavior of insulin in inhalers like Schenk's is not

predictable," just that she had not personally tested the behavior of insulin in an inhaler like

Schenk's.

> 96.    The amount of medication the Schenk device would cause to be carried to
> the alveoli -- and thus, into the bloodstream -- is also unpredictable.  (DT 119:11-12,
> 119:21-22, DT 120:3, DT 120:10-11.)

The USPTO disputes this statement as attorney argument without supporting factual

basis.  (*See also* USPTO's Responses to Novo's Paragraphs Nos. 87, 88, 89, 91, 93 and 95.)

Novo cites 119:11-12, 119:21-22, DT 120:3, DT 120:10-11 in support of this statement.  Ms.

Dolovich's testimony at DT 118-120 shows that she was speaking <u>generally</u> about the path a

drug takes from an inhaler into the lungs and eventually into the bloodstream.  Ms. Dolovich's

statements were not made <u>specifically</u> about Schenk's device.  In these general terms, Ms.

Dolovich stated that the percentage of drug emitted from an inhaler that is eventually absorbed

into the bloodstream "depends on your inhaler – inhaler design.  In general, the maximum

percentage of dose that passes the lips and gets into the lung has been measured at 57 percent."

(DT 120:10-13.)  Thus, Ms. Dolovich opined that the amount of drug delivered from <u>any</u> inhaler

into the lungs and eventually absorbed into the bloodstream could not be predicted without testing.

Further, both Novo and the USPTO agree that particles up to 6 microns can reach that part of the lung from which insulin can then be absorbed. (*See*, *e.g.*, the expert report of Dr. Crystal, where he states that the "ideal" particle size for reaching the alveoli is up to 6 microns. Obviously if a particle can reach the alveoli it must also be able to reach and pass through the bronchial tubes leading to the alveoli.) Whether "that part of the lung" means exclusively the alveoli or instead includes some of the bronchial tubes is an immaterial technical debate that this Court need not resolve in deciding this case.

97. Velasquez describes a sheet material having discrete depressions that are filled with powdered medicine, referred to in Velasquez as "medicament." According to Velasquez, this sheet material allows for aerosolization of the medicine "in a relatively deagglomerated state so that such may be administered by inhalation." (CR ¶37; Admin. R. Tab 18 at A328, Abstract and col. 2, ll 21-25; DT 93:11 - 94:5.)

The USPTO does not dispute the facts set forth in Paragraph No. 97.

98. The sheet material dispenser, in which the depression depths can be varied, is filled with dry powder medicament, and then when placed in an inhaler, the material is impacted from the back causing the powder to be forced out of the sheet material into the air to become aerosolized. (Velasquez, Admin. R. Tab 18 at A330, col. 5, ll. 52-54.)

The USPTO does not dispute the facts set forth in Paragraph No. 98.

99. Velasquez lists insulin as one of approximately fifty "[e]xemplary drugs which may be employed" in the use of his sheet material. (Admin. R. Tab 18 at A330, col. 6, ll. 25-41; CR ¶37.) All the drugs listed by Velasquez, except insulin, are simpler and much smaller molecules than insulin, and none except insulin is a protein. (CR ¶37.)

The USPTO does not dispute the facts set forth in the first sentence of Paragraph No. 99. With respect to the second sentence of Paragraph No. 99, the USPTO does not know what Novo means by "simpler" and "much smaller." The USPTO does not dispute that insulin is the only protein drug recited in Velasquez at Admin. R. Tab 18 at A330, col. 6, ll. 25-41.

43

100.    One of skill in the art is taught by Velasquez that the respirable fraction generated by Velasquez's sheet material will vary based on varying substrate depression depths.  (CR ¶46.)

The USPTO does not dispute the facts set forth in Paragraph No. 100.  (*See also*

USPTO's response to para. 123.)

101.    Ms. Dolovich testified, using Velasquez as a reference, that the percentage of insulin that one could get deposited in the lungs and absorbed into the bloodstream is "anybody's guess at this point.  We are not saying that - I am not saying that I know what percentage of a drug inhaled is actually picked up in the blood."  (DT 224:10 - 225:4.)

The USPTO does not dispute this statement except to the extent that it characterizes Ms.

Dolovich's comments as referring to Velasquez's device in particular versus inhalers in general.

Novo cites DT 224:10-225:4 in support of this statement.  Ms. Dolovich's testimony at DT 224-

225 shows that Ms. Dolovich stated that one could not predict how much drug emitted from <u>any</u>

inhaler would be absorbed into the blood based on particle size, *i.e.*, the respirable fraction,

alone.  Using Velasquez as an example at DT 223:15-21, Ms. Dolovich discusses how Velasquez

provides data regarding the variance in the respirable fraction – the amount of drug particles

small enough (< 7  m) to reach the alveolar surfaces – depending upon the depth of the

depressions in his sheet material.  (*See, e.g.*, DT 223:15-18 ("And he is saying that that emitted

does goes from 5 percent to 65 percent if he varies the depth from 14 micrometers to 45

micrometers.  Of that 5 percent, 65 percent is in the respirable range.")  In Ms. Dolovich's

words, the respirable fraction "gives you an idea of how much drug, in fact, would be inhaled

into the lung.  It gives you an upper limit."  (DT 224:5-7.)  Ms. Dolovich then states that, in

order to determine how much drug must be in the respirable fraction relative to how much drug

is going to be absorbed into the bloodstream, one "would need to do another set of experiments

using human subjects."  (DT 224: 8-19.)

44

102.    Harrison discusses the treatment of diabetes by conventional injection, multiple subcutaneous injections, and continuous subcutaneous infusion of insulin. (Harrison, Admin. R. Tab 13 at A268-69.)

The USPTO does not dispute the facts set forth in Paragraph No. 102.

103.    Harrison does not teach anything about the use of inhaled insulin to treat diabetes.  (CR ¶38; First Amended Response to Req. for Admis. No. 4.)

The USPTO does not dispute that Harrison does not teach the use of inhaled insulin to treat diabetes.

104.    The PTO admitted that "Harrison does not teach the administration of insulin through inhalation."  (Def. Resp. to Req. for Admis, Response to Req. for Admis. No. 5.)

The USPTO does not dispute the facts set forth in Paragraph No. 104.

105.    The PTO's expert admitted that Harrison would not teach the administration of insulin through inhalation because "nobody was using inhalable insulin in 1994 . . . [s]o it would not be in there."  (DT 88:6-9, 232:1 - 235:10; see CR ¶21.)

The USPTO does not dispute the facts set forth in Paragraph No. 105.

106.    As the Harrison reference (relied upon by the Examiner and the Board) itself states, as of January 29, 1993, "[n]o single standard exist[ed] for patterns of administration of insulin, and treatment plans var[ied]."  (Harrison, Admin. R. Tab 13 at A268.)

The USPTO does not dispute that Harrison contains the language quoted in Paragraph No. 106.

107.    The amount of insulin needed to be put in an inhaler for eventual absorption into the bloodstream cannot be determined by consulting Harrison.  ( CR ¶38; DT 227:3 - 230:11.)

The USPTO does not dispute that the "amount of insulin needed to be put in an inhaler for eventual absorption into the bloodstream" could not be determined *solely* by consulting Harrison.  However, the amount of insulin needed to be put in an inhaler for eventual absorption into the bloodstream cannot be determined solely by consulting the '774 application either.  The

45

'774 application (1) teaches the same dosages as that taught by Harrison, and (2) notes that even when practicing the invention efficiencies can vary widely from device to device and even from patient to patient. Tab 2 at A22-23, ¶ 109; A64-65, ¶233. Therefore, the user must determine how much insulin to put in the inhaler for each different device and each patient.

> 108.    The Board attached no significance to the fact that both Schenk and Velasquez deal with delivery of drugs to the lungs for treatment of lung conditions, and not for systemic treatment of any disease, let alone diabetes.  (Admin. R. Tab 36; CR ¶¶39, 47; Schenk, Admin. R. Tab 17, at A300, ll. 4-5; Velasquez, Admin. R. Tab 18 at 328, col. 1, ll.9-10.)

The USPTO disputes the facts set forth in Paragraph No. 108 as mere attorney argument lacking evidentiary support.  Schenk also expressly states that his inhaler is designed to deliver dry powder medicines to treat "bronchial asthma and other diseases." (Admin. R. Tab 17 at A300, ll.4-5 (emphasis added).)  Thus, there is no limitation to diseases of the lung in Schenk. Velasquez expressly states that his sheet material is particularly useful with medicaments having high potency for either local treatment of, for example, the lung or systemic treatment.  (Admin. R. Tab 18 at A328, col.2, ll.29-32.)  Velasquez also expressly lists insulin as an exemplary drug which may be used in his inhaler.  (Admin. R. Tab 18 at A330, col.6, l.32.)  Thus, there is no limitation to diseases of the lung in Velasquez.  Accordingly, the Board could not have attached significance to a fact that was not true, i.e., that both Schenk and Velasquez deal only with delivery of drugs to the lungs for treatment of lung conditions.

> 109.    In combining Velasquez's suggestion of putting insulin into his sheet material, with Schenk's inhaler designed to deliver asthma medicine to the lungs, the Board incorrectly equated the amount of insulin supplied to the inhaler with the amount of insulin available to the patient's bloodstream to treat diabetes.  (CR ¶39, 47.)

The USPTO disputes the facts set forth in Paragraph No. 109 as mere attorney argument lacking evidentiary support.  First, the USPTO objects to the characterization that Schenk's inhaler is designed only to deliver asthma medicine to the lungs.  Schenk expressly teaches that

his device relates to an oral inhaler for use in inhaling a powdered or particulate medical

products [for] treatment of bronchial asthma <u>and other diseases</u>."  (Admin. R. Tab 17 at  A300,

ll.1-4 (emphasis added).)  Second, the Board did not "equate[] the amount of insulin supplied to

the inhaler with the amount of insulin available to the patient's bloodstream to treat diabetes."

The Board "note[d] that with inhaled substances, it is known to a person of ordinary skill in the

art that not all of the amount that is inhaled will be absorbed."  (Admin. R. Tab 36 at A449, 3d

para.)

> 110.    The Board stated, in rejecting the claims of the '774 Application, that
> "medicament that is inhaled is absorbed into the bloodstream by the lungs."  (Admin. R.
> Tab 36 at A449; CR ¶41.)

The USPTO does not dispute that the Board's decision contains the statement that:

"medicament that is inhaled is absorbed into the bloodstream by the lungs."  However, the

USPTO objects to the characterization that the Board did not acknowledge that a portion of the

medicament that is inhaled is not absorbed into the bloodstream.  To the contrary, the Board

expressly "note[d] that with inhaled substances, it is known to a person of ordinary skill in the

art that <u>not all of the amount that is inhaled will be absorbed</u>."  (Admin. R. Tab 36 at A449, 3d

para. (emphasis added).)

> 111.    This statement incorrectly assumes that all medicine of all kinds that is
> inhaled will be absorbed into the patient's bloodstream.  (CR ¶41; DT 93:11 - 94:5 (*see*
> DR¶¶12-17); DT 161:22 - 162:12, 129:21 - 130:7.)

The USPTO disputes the facts set forth in Paragraph No. 109 as mere attorney argument

lacking an evidentiary basis.  The Board expressly stated that "with inhaled substances, it is

known to a person of ordinary skill in the art that <u>not all of the amount that is inhaled will be</u>

<u>absorbed</u>."  (Admin. R. Tab 36 at A449, 3d para. (emphasis added)).)  Thus, the Board did <u>not</u>

assume that "all medicine . . . that is inhaled will be absorbed into the patient's bloodstream."

Further, it is irrelevant whether <u>any</u> kind of medicine that is inhaled can be absorbed into the bloodstream because it was well known in the art that inhaled insulin <u>is</u> absorbed into the bloodstream.  (*See*, *e.g.*, Admin. R. Tab 12  at A250-A252, Laube, which teaches a method of treating diabetes mellitus using aerosolized liquid insulin.)

> 112.    The Board cited no authority for the statement quoted in ¶110.  (Def. Resp. to Pl.'s Interrogs., Resp. to Interrog. No. 8.)

The USPTO does not dispute that the Board did not provide a citation for the statement that: "medicament that is inhaled is absorbed into the bloodstream by the lungs."  However, it was well known in the art that inhaled insulin <u>is</u> absorbed into the bloodstream.  (*See*, *e.g.*, Admin. R. Tab 12 at A250-A252, Laube, which teaches a method of treating diabetes mellitus using aerosolized liquid insulin.)

> 113.    In this action, the PTO admitted that "when medicament is inhaled, a portion of the medicament may not reach the alveoli," thus admitting that not all inhaled medicine is absorbed into the bloodstream.  (Def. Resp. to Req. for Admis., First Amended Resp. to Req. for Admis. No. 8.)

The USPTO does not dispute that the USPTO's Response to Novo's Request for Admission No. 8 contains the language quoted in Paragraph No. 113.  However, the USPTO disputes the assertion that the USPTO equated medicament "reach[ing] the alveoli" with medicament being "absorbed into the bloodstream."  <u>Both Novo and the USPTO agree</u> that particles up to 6 microns can reach that part of the lung from which insulin can then be absorbed.  (*See*, *e.g.*, the expert report of Dr. Crystal, where he states that the "ideal" particle size for reaching the alveoli is up to 6 microns.  Obviously if a particle can reach the alveoli it must also be able to reach and pass through the bronchial tubes leading to the alveoli.)  Whether "that part of the lung" means exclusively the alveoli or instead includes some of the bronchial tubes is an immaterial technical debate that this Court need not resolve in deciding this case.

48

114.    In this action, the PTO also admitted that "of the medicament that does reach the alveoli, a portion. . . may not be absorbed into the bloodstream." (Def. Resp. to Req. for Admis., First Amended Resp. to Req. for Admis. No. 8 and Resp. to Req. for Admis. No. 9.)

The USPTO does not dispute that the USPTO's Response to Novo's Request for

Admission No. 8 contains the language quoted in Paragraph No. 114.

115.    Much less aerosolized medicine is deposited on the peripheral airways than is inhaled. (*See generally* CR ¶¶22-29; DT 129:21 - 130:7.) The "peripheral airways" do not include the alveoli. (DT 135:10-18.)

The USPTO does not dispute that "less aerosolized medicine is deposited on the

peripheral airways than is inhaled," but does not know what Novo means by "much less." (*See*

*also* USPTO's response to para. 116.)

The USPTO further objects to para. 115 as not material. *See* the USPTO Response to

para. 30, *supra.*

116.    Although the Report of the PTO's expert appeared at first blush to support the Board, by stating that "[a]ll or a portion" of "medication" that "reaches the peripheral airways" and that "may be deposited on peripheral airway surfaces" "may be absorbed into the bloodstream," (DR ¶13), she admitted, when questioned at her deposition, that the peripheral airways are, by definition, different from the alveoli. (DT106:16 - 107:5, 135:10-18.)

The USPTO objects to these alleged facts as immaterial for the reasons provided in

Paragraph No. 115 *supra*. Both Novo and the USPTO agree that particles up to 6 microns can

reach that part of the lung from which insulin can then be absorbed. (*See*, *e.g.*, the expert report

of Dr. Crystal, where he states that the "ideal" particle size for reaching the alveoli is up to 6

microns. Obviously if a particle can reach the alveoli it must also be able to reach and pass

through the bronchial tubes leading to the alveoli.) Whether "that part of the lung" means

exclusively the alveoli or instead includes some of the bronchial tubes is an immaterial technical

debate that this Court need not resolve in deciding this case. Nonetheless, the USPTO does not

dispute that Ms. Dolovich's report contains the following sentences: "Once medication reaches the peripheral airway surfaces it may be deposited on peripheral airway surfaces and effect. All or a portion thereof may be absorbed into the bloodstream." (DR ¶13.)

> 117. The "treatment" that the PTO's expert referred to in ¶13 of her Report as being "effect[ed]" by the deposit of medicine on the "peripheral airway surfaces" was the treatment of asthma by asthma medicine, not a medicine that acts by being absorbed into the bloodstream. (DT 106:6-21.)

The USPTO disputes the facts set forth in Paragraph No. 117 as attorney argument and a mischaracterization of Ms. Dolovich's report. In ¶13 of her report, Ms. Dolovich stated that "any device that is designed to treat asthma necessarily is designed to deliver medication to the peripheral areas of the lung, since to be effective, asthma medication must reach both the central airways and the peripheral airways." However, Ms. Dolovich was responding to a statement in Dr. Crystal's report that which characterized the Schenk device as limited to the delivery of asthma medication, and the assertion that devices used to deliver asthma medication could not be used to deliver insulin. In particular, in ¶12 of her report, Ms. Dolovich stated that "I have been asked to respond to Dr. Crystal's statement in his report that 'Schenk describes oral inhalers which are sued for inhaling powdered or particular medicine product into the bronchi, to treat diseases of the lungs, such as asthma' and that Schenk's devices 'are not designed to deliver medication to the alveoli to provide systemic treatment.'" (DR ¶12 quoting CR ¶¶35-36.) Thus, in the proper context, Ms. Dolovich was expressing disagreement with Dr. Crystal that Schenk's device was limited to the delivery of asthma medication and that, even if this were true, devices used to deliver asthma medication could not be used to deliver insulin.

> 118. The PTO's expert admitted that it would take a "leap of faith" to say that "all" medication that is inhaled reaches the bloodstream. (DT 161:22 - 162:12.)

The USPTO disputes the fact set forth in Paragraph No. 118 as attorney argument and a mischaracterization of Ms. Dolovich's testimony.  When asked whether she was willing to state that "all of the medication on the peripheral airways is absorbed into the bloodstream" (DT 161:22-162:2 (emphasis added)), Ms. Dolovich replied that "[she] didn't say is; [she] said may" be absorbed. DT 162:5 (emphasis added).  Novo then asked, "[s]o you are not willing to say that all of it in any – even once – [objection omitted] that all of it is; is that right?"  (DT 162:6-10.)  To which, Ms. Dolovich responded, "[t]hat is correct.  That is a leap of faith that I am not prepared to make."  (DT 162:11-12.)  Thus, a distinction was made regarding whether inhaled medication could or does in fact get absorbed into the bloodstream.

119.    The Board purported to find in Velasquez the claim limitations regarding the amount of insulin in the aerosolized suspension, including the limitation of claim 22 that "the aerosolized suspension contains an amount of insulin that is 2-10 times higher than the amount needed to be absorbed in the bloodstream of the patient" ("the 2-10 range").  (Admin. R. Tab 36 at A448-449.)

The USPTO does not dispute the fact set forth in Paragraph No. 119 but objects to the characterization that the Board "purported to find" rather than "found" the 2-10 times higher limitation, which is recited only in three of Novo's claims on appeal.

The USPTO further objects that it is immaterial whether, in addition to affirming the examiner's finding that a person of ordinary skill would be able to determine the 2-10 limitation through routine experimentation, the Board presented an alternative argument as to why the 2-10 limitation does not patentability distinguish claim 22:  That the 2-10 limitation is taught by Velasquez. Tab 36 at A449.  For purposes of this summary judgment motion, the USPTO does not rely on this alternative argument.  (*See* USPTO Br. at p.34, n.12.)

120.    The Board also stated that the "2-10 range" and controlled delivery limitations of the claim could be determined by "routine experimentation" in light of the references.  (Admin. R. Tab 36 at A450.)

The USPTO does not dispute the facts set forth in Paragraph No. 120.

     121.    The Board relied on the statement quoted in ¶110 in finding the claims obvious.  (Admin. R. Tab 36 at A449.)

The USPTO does not dispute that the Board's decision contains the statement that "medicament that is inhaled is absorbed into the bloodstream by the lungs," and that the Board relied on this fact when affirming the rejection of Novo's claims.

     122.    The passage from Velasquez that the Board relied upon simply describes the change in the respirable fraction that is produced by increasing or decreasing the depth of the substrate depressions in the claimed sheet material:

> [t]he percentage of medicament retained on the sheet material . . . decreases as depression depth increases, this being about 95% at 14 µm, about 60% at 28 µm and about 35% at 45 µm.  Further, the respirable fraction . . . similarly decreases as depression depth increases, this being about **65% at 14 µm,** about 30% at 28 µm and about **10% at 37 µm**.  These two trends result in the proportion of total medicament released in particles of respirable size remaining generally similar for the depression depths studied (this being about 5% to 15% of total medicament).

Velasquez, Tab 18 at col. 5, ll. 7-19 (emphasis added).  (Board Decision, Admin. R. Tab 36 at A449.)

The USPTO does not dispute that the Board relied on the language from Velasquez quoted in Paragraph No. 122 in affirming the rejection of Novo's claims on appeal, but does not know what Novo means by "simply."

The USPTO further objects that it is immaterial whether, in addition to affirming the examiner's finding that a person of ordinary skill would be able to determine the 2-10 limitation through routine experimentation, the Board presented an alternative argument as to why the 2-10 limitation does not patentability distinguish claim 22:  That the 2-10 limitation is taught by Velasquez.  Tab 36 at A449.  For purposes of this summary judgment motion, the USPTO does not rely on this alternative argument.  (*See* USPTO Br. at p.34, n.12.)

123.    The passage cited above in ¶122 from Velasquez teaches one of skill in the art that "the respirable fraction generated by Velasquez's sheet material will vary based on varying substrate depression depths.  (CR ¶46.)

The USPTO does not dispute the facts set forth in Paragraph No. 123.  (*See also*

USPTO's Response to Novo's Paragraph No. 100.)

124.    The Board created its own definition of "respirable fraction," stating that the term meant "[t]he fraction that will be absorbed relative to the total amount inhaled." (Admin. R. Tab 36 at A449.)

The USPTO does not dispute that the Board defined the term "respirable fraction" as

"[t]he fraction that will be absorbed relative to the total amount inhaled."

The USPTO further objects that it is immaterial whether, in addition to affirming the

examiner's finding that a person of ordinary skill would be able to determine the 2-10 limitation

through routine experimentation, the Board presented an alternative argument as to why the 2-10

limitation does not patentability distinguish claim 22:  That the 2-10 limitation is taught by

Velasquez.  Tab 36 at A449.  For purposes of this summary judgment motion, the USPTO does

not rely on this alternative argument.  (*See* USPTO Br. at p.34, n.12.)

125.    The "term 'respirable fraction,' as generally understood by persons of ordinary skill in the art, is the percentage of aerosolized particles that are of respirable size, *i.e.,* that are of a size that, when inhaled, *may* reach the alveoli."  (CR ¶42; DT 66:11-17; 67:1-5; 67:21 - 68:7; *see supra* ¶44.)

The USPTO does not dispute that those of ordinary skill in the art define the term

"respirable fraction" in terms of particle size.  (*See also* USPTO's Response to para. 122.)  For

example, Schenk teaches that "particles having a diameter of less than 7   m have a chance to

penetrate completely into the bronchiole tubes," and that "[p]articles having such a small size

that they may be deposited in the bronchial tree by aspiration are called 'respirable particles.'"

(Admin. R. Tab 17 at A300, ll.9-13.)  Velasquez defines the term  "respirable fraction" as "the

percentage of drug which is in particles of aerodynamic diameter of equal to or less than about

53

6.4  m." (Admin. R. Tab 18 at A330, col. 5, ll. 11-13.)  Similarly, Novo's expert, Dr. Crystal,

stated in his expert report that "[s]tudies have shown that the ideal particle size for reaching the

alveoli is approximately 0.5  m – 6  m in diameter." (CR ¶25.)  Ms. Dolovich also stated that

Schenk's teaching regarding the range of particles that are respirable is consistent with that of

Dr. Crystal:  "the Schenk devices deliver particles of less than 7  m in size, Schenk at 1, which

is consistent with the particle size that Dr. Crystal stated would be suitable for deposition in the

alveoli (up to 6  m)." (DR¶ 13.) Accordingly, the commonly accepted definition of the term

"respirable fraction" in the art of record is the portion of inhaled medication containing particles

approximately 0.5  m – 6  m in diameter (perhaps up to 7  m).

> 126.    Velasquez defines "respirable fraction" as "the percentage of drug which
> is in particles of aerodynamic diameter of equal to or less than about 6.4" micrometers.
> (Admin. R. Tab 18 at A330, col. 5, ll. 11-13.)

The USPTO does not dispute that Velasquez contains the language quoted in

Paragraph No. 126.

> 127.    The Board used its own definition, not Velasquez's, as a basis for deciding
> that Velasquez taught the "2-10 limitation." (Admin. R. Tab 36 at A449).

The USPTO does not dispute that the Board defined the "respirable fraction" as "[t]he

fraction that will be absorbed relative o the total amount inhaled." (Admin. R. Tab 36 at A449,

3d para.; s*ee also* USPTO's Responses to paras. 124 and 128.)

The USPTO further objects that it is immaterial whether, in addition to affirming the

examiner's finding that a person of ordinary skill would be able to determine the 2-10 limitation

through routine experimentation, the Board presented an alternative argument as to why the 2-10

limitation does not patentability distinguish claim 22:  That the 2-10 limitation is taught by

Velasquez.  Tab 36 at A449.  For purposes of this summary judgment motion, the USPTO does

not rely on this alternative argument.  (*See* USPTO Br. at p.34, n.12.)

54

128.    The Board Decision did not refer to Velasquez's definition of "respirable fraction," although it used the term in the context of its discussion of Velasquez.  (CR ¶43; Admin. R. Tab 36 at A449.)

The USPTO does not dispute that the Board used a different definition of respirable fraction than Velasquez when it decided that Velasquez teaches the "2-10" limitation found in only three of Novo's claims on appeal, *e.g.*, claim 22.  (Admin. R. Tab 36 at A449, 3d para.; *see also* USPTO's Responses to paras. 124 and 127.)

The USPTO further objects that it is immaterial whether, in addition to affirming the examiner's finding that a person of ordinary skill would be able to determine the 2-10 limitation through routine experimentation, the Board presented an alternative argument as to why the 2-10 limitation does not patentability distinguish claim 22:  That the 2-10 limitation is taught by Velasquez. Tab 36 at A449.  For purposes of this summary judgment motion, the USPTO does not rely on this alternative argument.  (*See* USPTO Br. at p.34, n.12.)

129.    The Board did not use the definition of "respirable fraction" used by persons of ordinary skill in the art.  (CR ¶43; DT 66:11-17; 67:1-5; 67:21 - 68:7.)

The USPTO does not dispute that the Board defined the "respirable fraction" as "[t]he fraction that will be absorbed relative to the total amount inhaled."  (Admin. R. Tab 36 at A449, 3d para.; *see also* USPTO's Responses to paras. 124, 125 and 130.)  However, para. 129 is not material for reasons set forth in the USPTO's response to para. 127.

130.    The Board's definition of "respirable fraction" differs from the understanding of that term by persons of ordinary skill in the art.  (CR ¶42; DT 77:6-7.)

The USPTO does not dispute that the Board defined "respirable fraction" in functional terms as "the fraction that will be absorbed relative to the total amount inhaled."  (Admin. R. Tab 36 at A449, 3d para.; *see also* USPTO's Responses to paras. 124, 125 and 129.)  Those of ordinary skill in the art define the term "respirable fraction" in terms of particle size, *i.e.*, the

fraction of inhaled particles that are of a size that they may be deposited in the peripheral

airways and alveoli.  For example, Schenk teaches that "particles having a diameter of less than

7  m have a chance to penetrate completely into the bronchiole tubes," and that "[p]articles

having such a small size that they may be deposited in the bronchial tree by aspiration are called

'respirable particles.'"  (Admin. R. Tab 17 at A300, ll.9-13.)  Velasquez defines the term

"respirable fraction" as "the percentage of drug which is in particles of aerodynamic diameter of

equal to or less than about 6.4  m."  (Admin. R. Tab 18 at A330, col. 5, ll. 11-13.)  Further, the

USPTO objects to para. 130 as not material, for reasons set forth in the USPTO's response to

para. 127.

> 131.    The PTO's expert agrees that "[t]he fraction of the aerosol containing
> particles, less than five micrometers, sometimes defined as less than six micrometers in
> diameter is termed the fine particle or respirable fraction (FPF), and has been used more
> widely recently to describe the quality of the aerosol and its potential for delivery to the
> lower respiratory tract."  (DT 66:11-17.)  The lower respiratory tract means the
> bronchioles and the alveoli.  (DT 67:6-13.)

The USPTO does not dispute the facts set forth in this paragraph except for the

characterization that, in 1993, those of ordinary skill in the art considered the respirable fraction

to be below 5 or 6  m.  The quoted statements appear in a paper Ms. Dolovich authored in 2000.

(DT 66:5-22.)  In explaining why the size of particles in the respirable fraction in her 2000 paper

differs from the particle sizes used to define the respirable fraction in 1993, Ms. Dolovich

testified that "[w]ell, as everything -- as information evolves over time within a field of

discipline, you have better information, better technology for doing what you do.  And so at one

time the respirable fraction, which is where you are heading, was defined in one way.  And then

over time and with understanding, that range changed."  (DT 65:1-7.)

In July 1990, Schenk taught that "particles having a diameter of less than 7  m have a

chance to penetrate completely into the bronchiole tubes," and that "[p]articles having such a

small size that they may be deposited in the bronchial tree by aspiration are called 'respirable particles.'" (Admin. R. Tab at A300, ll.9-13.) Similarly, in April 1990, Velasquez defined the term "respirable fraction" as "the percentage of drug which is in particles of aerodynamic diameter of equal to or less than about 6.4 m." (Admin. R. Tab 18 at A330, col. 5, ll. 11-13.) Novo's own expert, Dr. Crystal, stated in his 2008 expert report that "[s]tudies have shown that the ideal particle size for reaching the alveoli is approximately 0.5 m – 6 m in diameter." (CR ¶25.) Ms. Dolovich also stated that Schenk's teaching regarding the range of particles that are respirable is consistent with that of Dr. Crystal: "the Schenk devices deliver particles of less than 7 m in size, Schenk at 1, which is consistent with the particle size that Dr. Crystal stated would be suitable for deposition in the alveoli (up to 6 m)." (DR ¶13.) Accordingly, at the very least, the undisputed range of respirable particle size in 2008 is approximately 0.5 m – 6 m in diameter (and up to 7 m in 1993).

132.    The Board cited no authority for its definition. (Def. Resp. to Pl.'s Interrog., Resp. to Interrog. No. 7.)

The USPTO does not dispute the fact set forth in Paragraph No. 132.

133.    "Respirable fraction" is different from the concept of the fraction of medicaments that reach the alveoli that *may* be absorbed. (CR ¶42.)

The USPTO objects to para. 133, to the extent that it can be discerned, as inconsistent with the record, and also objects to any characterization that the Board or any other authority of record defined the "respirable fraction" as "the concept of the fraction of medicaments that reach the alveoli that *may* be absorbed" as attorney argument lacking evidentiary support. Further, the USPTO objects to this para. 133 as not material for the reasons set forth in the USPTO's response to para. 127.

57

134.    The Board confused the percentage of inhaled insulin particles that *may* reach the alveoli with the percentage of inhaled insulin that is absorbed into the bloodstream.  These concepts are entirely different.  (CR ¶44; DT 93:11 - 94.5; DR ¶¶12-17.)

The USPTO disputes the characterization that the Board "confused the percentage of inhaled insulin particles that *may* reach the alveoli with the percentage of inhaled insulin that is absorbed into the bloodstream" as attorney argument lacking evidentiary support.  The Board expressly noted that "it is known to a person of ordinary skill in the art that not all of the amount that is inhaled will be absorbed."  (Admin. R. Tab 36 at A449, 3d para. (emphasis added).)

135.    Deposition and absorption are two separate processes.  (DT 183:19 - 184:2.)

The USPTO does not dispute the fact set forth in Paragraph No. 135.

136.    The PTO admitted that the respirable fraction which Velasquez observed as varying with the depth of the depression in the sheet material pertains only to "albuterol sulfate," and refused to "comment on the respirable fraction for drugs other than 'albuterol sulfate,' including insulin.  (Resp. to Req. for Admis., Res. to Req. for Admis. No. 12.)

The USPTO disputes the fact set forth in Paragraph No. 135 as attorney argument and a mischaracterization of the USPTO's response to Novo's Request for Admission No. 12. Novo's Request for Admission No. 12, in its entirety, reads:

**REQUEST FOR ADMISSION NO. 12**
Velasquez states that the respirable fraction of albuterol sulfate particles that become aerosolized decreases as the depth of the depressions in the substrate increases, and sets out a range of 65% of the particles that become respirable at a depth of 14 μm to 10% of the particles that become respirable at a depth of 37 μm.

(Res. to Req. for Admis. No. 12 (emphasis added).)  Thus, Novo's request was limited to a passage from Velasquez which refers only to the use of albuterol sulfate.  Accordingly, the USPTO limited its response to a discussion of albuterol sulfate, but expressly stated that is was "not comment[ing] on the respirable fraction for drugs other than albuterol sulfate":

Defendant admits that Velasquez contains the statement that when "using albuterol sulfate with a mean particle size of 1.7 μm" (col.5, ll.2-3), "[t]he respirable fraction (i.e., the percentage of drug which is in particles of aerodynamic diameter of equal to or less than about 6.4 μm) similarly decreases as the depression depth increases, this being about 65% at 14 μm, about 30% at 28 μm and about 10% at 37 μm" (col.5, ll.7-10). <u>Defendant does not comment on the respirable fraction for drugs other than albuterol sulfate</u>.

Thus, there was no admission that Velasquez's teachings regarding the respirable fraction "pertains only to 'albuterol sulfate,'" only an acknowledgment that Novo's Request for Admission No. 12 related only to albuterol sulfate.

137.    The PTO admitted that "albuterol sulfate and insulin have different chemical compositions and molecular weights" and that the two drugs "likely differ in other chemical properties." (Resp. to Req. for Admis., Res. to Req. for Admis. No. 13.)

The USPTO does not dispute the facts set forth in Paragraph No. 137.

138.    The Board noted that "Velasquez describes the range that such respirable fractions may embrace for the various medicaments it describes at col. 5 lines 7-15. Velasquez mentions the fraction may be in the range of 10% to 65%. Taking the inverse of this range to determine the amount of medicament that would need to be inhaled yields a range of 1.54 to 10 times the amount needed to be absorbed, which we note substantially overlaps the claimed 2 to 10 times." (Board Decision, Admin. R. Tab 36 at A449.)

The USPTO does not dispute that the Board's decision contains the language quoted in Paragraph No. 138. However, the USPTO objects that it is immaterial whether, in addition to affirming the examiner's finding that a person of ordinary skill would be able to determine the 2-10 limitation through routine experimentation, the Board presented an alternative argument as to why the 2-10 limitation does not patentability distinguish claim 22: That the 2-10 limitation is taught by Velasquez. Tab 36 at A449. For purposes of this summary judgment motion, the USPTO does not rely on this alternative argument. (*See* USPTO Br. at p.34, n.12.)

The USPTO further objects that it is immaterial whether, in addition to affirming the examiner's finding that a person of ordinary skill would be able to determine the 2-10 limitation

through routine experimentation, the Board presented an alternative argument as to why the 2-10

limitation does not patentability distinguish claim 22:  That the 2-10 limitation is taught by

Velasquez.  Tab 36 at A449.  For purposes of this summary judgment motion, the USPTO does

not rely on this alternative argument.  (*See* USPTO Br. at p.34, n.12.)

> 139.    The Board treated the calculations in ¶138, *supra,* as pertaining to insulin.
> (Admin. R. Tab 36 at A449.)

The USPTO does not know what Novo means by "pertaining to insulin," and further

disputes any characterization that that the Board mistakenly believed that the calculations recited

in Velasquez were made using insulin.  The Board was aware that Velasquez did not use insulin

in these aforementioned studies.  In the sentence preceding its discussion of Velasquez's data

obtained with albuterol sulfate, the Board indicated that it believed that the results obtained by

Velasquez using albuterol sulfate were relevant or analogous to results that would be obtained

using the other powdered drugs described by Velasquez, such as insulin, in place of albuterol

sulfate:

> We note that Velasquez describes a range that such respirable fractions
> may embrace for the various medicaments it describes at col.5 lines 7-15."

(Board Decision, Admin. R. Tab 36 at A449, 3d para.)

Nonetheless, the USPTO objects that it is immaterial whether, in addition to affirming

the examiner's finding that a person of ordinary skill would be able to determine the 2-10

limitation through routine experimentation, the Board presented an alternative argument as to

why the 2-10 limitation does not patentability distinguish claim 22:  That the 2-10 limitation is

taught by Velasquez.  Tab 36 at A449.  For purposes of this summary judgment motion, the

USPTO does not rely on this alternative argument.  (*See* USPTO Br. at p.34, n.12.)

> 140.    Dr. Crystal pointed out the following errors in the Board's attempt to find
> support for the claimed "2-10 range" in Velasquez:

60

For simplicity's sake, the USPTO will respond to each portion of subsection of this paragraph individually.  Before doing so, the USPTO notes its general objection that it is immaterial whether, in addition to affirming the examiner's finding that a person of ordinary skill would be able to determine the 2-10 limitation through routine experimentation, the Board presented an alternative argument as to why the 2-10 limitation does not patentability distinguish claim 22: That the 2-10 limitation is taught by Velasquez.  Tab 36 at A449.  For purposes of this summary judgment motion, the USPTO does not rely on this alternative argument.  (*See* USPTO Br. at p.34, n.12.)  This objection applies to all of the USPTO's responses to Novo's Paragraph No. 140.

Referring to the opening sentence, the USPTO disputes the characterization that Dr. Crystal pointed out errors in the Board's decision as attorney argument rather than a fact.

> (a)    The Board misinterpreted Velasquez's teaching that respirable fractions ranging from 65% to 10% can be obtained by increasing the depth of the sheet depressions from 14 μm to 37 μm.  Based on its erroneous view that *all* medicament of a respirable size that is produced in an inhaler ends up in the bloodstream, it arbitrarily decided that the inverse of the Velasquez percentages—which it calculated as 'a range of 1.54 to 10 times the amount needed to be absorbed'—represented the amount of a medicament that should be placed in an inhaler to treat diabetes.  The Board incorrectly declared that this range could be meaningfully compared to the claimed 2-10 range.  (CR ¶47.)

The USPTO disputes the facts set forth in Paragraph No. 140(a) as primarily attorney argument lacking an evidentiary basis.  The Board did not state that : "*all* medicament of a respirable size that is produced in an inhaler ends up in the bloodstream."  In contrast, the Board expressly noted that "it is known to a person of ordinary skill in the art that not all of the amount that is inhaled will be absorbed."  (Admin. R. Tab 36 at A449, 3d para. (emphasis added).)  The Board also did not decide that "the inverse of the Velasquez percentages represented the amount of a medicament that should be placed in an inhaler to treat diabetes."  In its decision, the Board

stated that "the amount [of insulin] that will be absorbed relative to the total amount inhaled is

referred to as the 'respirable fraction.'" (Admin. R. Tab 36 at A449, 3d. para.)  Thus, the Board

discussed a relationship between the amount of insulin inhaled –*i.e.*, the amount of drug supplied

<u>by</u> the inhaler to the patient, not the amount supplied <u>to</u> the inhaler itself – and the amount

absorbed.  Notably, it was well known in the art that inhaled insulin <u>is</u> absorbed into the

bloodstream.  (*See*, *e.g.*, Admin. R. Tab 12 at A250-A252, Laube, which teaches a method of

treating diabetes mellitus using aerosolized liquid insulin.)

> (b)    The ranges of respirable fractions described in Velasquez do not
> prescribe an 'amount' of medicament to be used to treat a patient, in part because the
> percentage has no predictable relationship to the amount to be absorbed in the
> bloodstream.  (CR ¶48; DT 223:1-10; 224:8-10.)

The USPTO disputes Paragraph No. 140(b)'s characterization that there is no relationship

at all between the percentage of particles within the respirable range and the amount to be

absorbed in the bloodstream.  Novo cites DT 223:1-10; 224:8-10 in support of this assertion.

However, Ms. Dolovich testified that the respirable fraction gives you an estimate of how much

medicament will be inhaled into the lung and may be absorbed into the bloodstream, but that this

estimate must be confirmed by experimentation.  (DT 224:2 – 225:11.)

> (c)    The supposed overlap of the 1.54 to 10 times range that the Board
> purported to derive from Velasquez and the 2 to 10 range claimed in the '774 Application
> is not correlative.  A person of ordinary skill in the art would not read Velasquez as the
> Board did.  (CR ¶49.)

The USPTO does not dispute that the Board used a different definition for "respirable

fraction" than Velasquez or other persons of ordinary skill in the art of record.  However, the

USPTO disputes the characterization that a person of ordinary skill in the art "would not read

<u>Velasquez</u> as the Board did."  Although a person of ordinary skill in the art might not have made

the same calculation that the Board did regarding the "2-10" limitation, which is recited only in

62

some of Novo's claims on appeal, Novo has failed to provide any evidence showing that those of ordinary skill in the art would not read the <u>remainder of Velasquez</u> as the Board did. Paragraph No. 140(c) quotes CR ¶49 in its entirety. We note that the first sentence of CR ¶49 is limited to the calculation the Board made regarding the respirable range recited in Velasquez, and that the broad statement appearing in the next sentence includes no reasoning to support an assertion that persons of ordinary skill in the art would not read the remainder of Velasquez as the Board did.

> 141. The PTO's expert does not disagree with Dr. Crystal's statements *supra* ¶140. (DT 93:11 –94:5 (*see* DR ¶¶12-17).)

The USPTO disputes the facts set forth in Paragraph No. 141 as attorney argument lacking evidentiary support. Novo cites DT 93:11 – 94:5 to support its assertion that Ms. Dolovich does not disagree with Dr. Crystal's statements made in Paragraph No. 140, which are taken from Dr. Crystal's report at DR ¶¶12-17. However, at DT 93:11 – 94:5, Ms. Dolovich is merely asked whether expert her report addressed "all of the statements in Dr. Crystal's report that [she] considered to be both important and incorrect." (DT 93:11-14.) In response, Ms. Dolovich said, "I believe so, yes." Although Ms. Dolovich's report did not address DR ¶¶12-17, the testimony upon which Novo relies simply cannot be candidly characterized as a blanket agreement by Ms. Dolovich with every word of Dr. Crystal's report that is not discussed in her report. As Ms. Dolovich stated, her report addressed only the statements in Dr. Crystal's report that she considered to be "<u>both important and incorrect</u>." (DT 93:11-14 (emphasis added).) Thus, there is no evidence that Ms. Dolovich has either agreed or disagreed with the statements made in Paragraph No. 141.

> 142. The PTO's expert could not explain the Board's reasoning regarding the "inverse" of the Velasquez percentages, or replicate it. (DT 218:14-224:10.)

The USPTO objects to para. 142 as not material, for reasons set forth in the USPTO's response to para. 127. Further, the USPTO disputes the fact set forth in Paragraph No. 142 as attorney argument lacking evidentiary support. At DT 223:11-224:21, Ms. Dolovich explains how one of ordinary skill would conclude from Velasquez's teaching of a 65 to 10 percent efficiency when depression depth is varied that 2 to 10 times as how much drug must be in the respirable fraction to get an appropriate amount of insulin inhaled into the peripheral lung. (DT 223:11-224:21.)

> 143.    Both the PTO's expert and the PTO have admitted that "Velasquez does not teach specific dosages of insulin to be administered through inhalation to treat diabetes." (Resp. to Req. for Admis., First Am. Resp. to Req. for Admis. No. 10.) The PTO's expert at first testified that Velasquez does teach how much inhaled medicine will be absorbed into the bloodstream. (DT 224:8-10.) Later she admitted, "[y]ou would need to do another set of experiments using human subjects, taking this delivery system, measuring the dose -- the emitted dose at the mouth, deposition and guesstimating or estimating what percentage would get into the lung." (DT 224:15-19.)

The USPTO does not dispute the fact set forth in the first sentence of Paragraph No. 143, *i.e.*, that Velasquez does not teach specific dosages of insulin to be administered through inhalation to treat diabetes.

The USPTO disputes the fact set forth in the second sentence of Paragraph No. 143 as false. Novo cites DT 224:8-10 for the assertion that "[t]he PTO's expert at first testified that Velasquez does teach how much inhaled medicine will be absorbed into the bloodstream." In fact, when asked by Novo "how does [Velasquez] tell you how much [insulin inhaled into the lung] will be absorbed into the bloodstream" (DT 224:8-9), Ms. Dolovich responded, "It doesn't." (DT 224:10.) It is not plausible that this statement is an error in the transcript because Novo's counsel repeated Ms. Dolovich's statement in the very next sentence of the transcript, "It doesn't. So how does it tell you how much drug you need to deliver to the inhaler relative to how much drug is going to be absorbed in the bloodstream?"

The USPTO does not dispute the fact set forth in the third sentence of Paragraph No. 143, *i.e.*, that in the quoted passage Ms. Dolovich explained how one would determine how much drug you need to deliver to the inhaler relative to how much drug is going to be absorbed in the bloodstream.

> 144.    The Board purported to find the limitation regarding controlled delivery of inhaled insulin in Schenk and Velasquez.  (Bd. Dec., Admin. R. Tab 36 at A450.)

The USPTO disputes the fact set forth in Paragraph No. 144 as a mischaracterization of the Board's decision.  (*See also* USPTO's responses to paras. 145 and 146.)  The Board rejected Novo's argument that the applied art fails to show how insulin is to be inhaled in controlled delivery, finding that "both applied references describe structural devices to precisely control the amount of a medicament delivered."  (Admin. R. Tab 36 at A449-50.)  In particular, the Board found that Velasquez uses "precise measuring of small amounts in equal sized depressions for use in an inhaler," and Schenk uses "a metering chamber."  *Id.*  The Board also found that Schenk's device is "inherently repeatable in operation."  (Admin. R. Tab 36 at A450.)  In responding to Novo's arguments regarding "controlling the glucose levels (claims 25, 26, 31 and 35 [citations omitted])," the Board noted that "the lowering of glucose levels to an acceptable level and controlling the glucose levels are both highly dependent upon the particular patient and a person of ordinary skill in the art would monitor the patient's vital statistics to achieve the desired result in view of the high variability among patients as a matter of course."  (Admin. R. Tab 36 at A450, 3d para. (emphasis added).)

> 145.    The Board also purported to find the limitation regarding the "repeatable" nature of the method was taught by Schenk and Velasquez.  (Admin. R. Tab 36 at A449-450.)

The USPTO does not dispute that, in responding to Novo's arguments regarding "claim limitations of repetition (claims 25, 26 and 31 [citations omitted])," the Board noted that

"Schenk's inhaler is inherently repeatable in operation." (Admin. R. Tab 36 at A450, last para.; *see also* USPTO's responses to paras. 144 and 146.) ) In particular, the Board found that Schenk's device is "inherently repeatable in operation." (Admin. R. Tab 36 at A450.) The Board also found that Velasquez uses "precise measuring of small amounts in equal sized depressions for use in an inhaler," and Schenk uses "a metering chamber." *Id.* The Board also noted that "the lowering of glucose levels to an acceptable level and controlling the glucose levels are both highly dependent upon the particular patient and a person of ordinary skill in the art would monitor the patient's vital statistics to achieve the desired result in view of the high variability among patients <u>as a matter of course</u>." (Admin. R. Tab 36 at A450, 3d para. (emphasis added).)

Further, Novo's expert Dr. Crystal admitted at his deposition, unequivocally, that a person of ordinary skill in the art in 1993 would have known how to control them to achieve controlled insulin dosing by inhalation:

Q.    Would a person of ordinary skill in the art in 1993 understand that a <u>flow rate</u> is a factor that influences whether a <u>reproducible dose</u> is administered to the bloodstream by insulin inhalation?

A.    Yes.

* * * *

Q:    Would a person of ordinary skill in the art as of January 1993 understand how <u>flow rate</u> influences whether a <u>reproducible dose</u> is administered to the bloodstream by inhalation?

MS. PFEIFFER:    Objection to form.

THE WITNESS:    Using the term reproducibility referring to dosing to the blood?

BY MR. WOOD:

Q:    Yes.

A:      Yes.

\* \* \* \*

Q.      Okay.  Would a person of ordinary skill in the art as of January 1993 understand that the volume with which a patient inhales each dose of insulin influences whether a reproducible dose is administered to the bloodstream by insulin inhalation?

MS. PFEIFFER:      Objection to form.

THE WITNESS:      Yes.

Q:      Would a person of ordinary skill in the art in January 1993 know how to control the volume with which a patient would inhale each dose of insulin in order to achieve a reproducible dose administered to the bloodstream by inhalation?

MS. PFEIFFER:      Objection to form.

THE WITNESS:      Yes.

\* \* \* \*

Q:      Would a person of ordinary skill in the art as of January 1993 understand that particle size is a factor that influences whether a reproducible dose of insulin is administered to the bloodstream by inhalation?

MS. PFEIFFER:      Objection to form.

THE WITNESS:      Again, for all of this discussion, I can assume the ordinary skilled person or ordinary skilled in the art as we have defined it?

BY MR. WOOD:

Q.      Yes.

A.      Yes.  Then the answer is yes.

Q.      Would a person of ordinary skill in the art as of January 1993 know how to control particle size to influence whether a reproducible dose of insulin is administered to the bloodstream by inhalation?

MS. PFEIFFER:      Objection to form.

THE WITNESS:      Yes.

\* \* \* \*

67

Q:      Would a person of ordinary skill in the art in January 1993 understand that the <u>concentration of the drug</u> in the carrier influences whether a <u>reproducible dose</u> of insulin is administered to the bloodstream by inhalation?

MS. PFEIFFER:      Objection to form.

THE WITNESS:      Yes.

* * * *

Q.      Would a person of ordinary skill in the art know how to <u>control the concentration of the drug</u> in the carrier to influence whether a <u>reproducible dose</u> of insulin is administered to the bloodstream by inhalation?

MS. PFEIFFER:      Objection to form.

THE WITNESS:      Yes.

* * * *

Q:      Would a person of ordinary skill in the art as of January 1993 understand that <u>the point in the respiration cycle where the patient initiates inhalation influences</u> whether a <u>reproducible dose</u> of insulin is administered to the bloodstream by inhalation?

MS. PFEIFFER:      Objection to form.

THE WITNESS:      Yes.

BY MR. WOOD:

Q.      Would a person of ordinary skill in the art as of January 1993 understand how to <u>control the point in the respiration cycle where the patient initiates inhalation</u> in order to achieve a <u>reproducible dose</u> of insulin administered to the bloodstream by inhalation?

MS. PFEIFFER:      Objection to form.

THE WITNESS:      Yes.

(CT 164:14-18; 165:22-166:9; 167:20-168:12; 174:12-175:7; 181:4-10; 182:5-11; 185:19-186:12

(emphasis added).)

146.    The Board stated that Schenk and Velasquez "describe structural devices to precisely control the amount of a medicament delivered." (Admin. R. Tab 36 at A450.)

The USPTO does not dispute that the Board's decision contains the language quoted in Paragraph No. 146.

147.    Schenk may control the amount of a powder that is aerosolized, but that is the extent of its control.  (CR ¶50.)

The USPTO disputes Paragraph No. 147 as mere attorney argument lacking evidentiary support.

148.    Velasquez describes how much medicament should be put into the subject sheet material, and describes how much of the aerosolized medicament will be of respirable size, depending on the depth of the depressions in the sheet material, but that is the extent of its control.  (CR ¶50.)

The USPTO does not dispute that "Velasquez describes how much medicament should be put into the subject sheet material, and describes how much of the aerosolized medicament will be of respirable size, depending on the depth of the depressions in the sheet material." However, the USPTO objects to the characterization that "but that is the extent of its control" as mere attorney argument lacking evidentiary support.

149.    While Schenk and Velasquez may allow one of ordinary skill in the art to control the amount of insulin that is coming out of a device, they do not control in any way the amount of insulin that is inhaled by the patient and, in particular, do not control the amount inhaled that reaches the alveoli or will actually be absorbed into the bloodstream.  (CR ¶50; DT 224:18 - 225:4.)

The USPTO disputes the fact set forth in Paragraph No. 149.  Obviously, if Schenk and Velasquez control the amount of insulin "coming out of a device," they control in a least that way the amount of insulin that is inhaled by the patient.  Moreover, Novo's expert Dr. Crystal admitted at his deposition, unequivocally, that a person of ordinary skill in the art in 1993 would have known how to any other factors necessary to ensure that a reproducible dose gets to the bloodstream.  CT 164:14-18; 165:22-166:9; 167:20-168:12; 174:12-175:7; 181:4-10; 182:5-11; 185:19-186:12 (emphasis added).)

69

150.    In its discussion of whether the element of controlling the dosage is taught by Schenk and Velasquez, the Board makes the statement that the "precise amount is not critical to the invention."  (CR ¶51; Admin. R. Tab 36 at A450.)

The USPTO disputes the fact set forth in Paragraph No. 150 as a mischaracterization of the Board's decision.  In expressly responding to Novo's arguments regarding "controlling the glucose levels (claims 25, 26, 31 and 35 [citations omitted])," the Board noted that "the lowering of glucose levels to an acceptable level and controlling the glucose levels are both highly dependent upon the particular patient and a person of ordinary skill in the art would monitor the patient's vital statistics to achieve the desired result in view of the high variability among patients <u>as a matter of course</u>."  (Admin. R. Tab 36 at A450, 3d para. (emphasis added).)  With respect to the cited art, the Board also found that Velasquez uses "precise measuring of small amounts in equal sized depressions for use in an inhaler," and Schenk uses "a metering chamber."  *Id.*  The Board further found that Schenk's device is "inherently repeatable in operation."  (Admin. R. Tab 36 at A450.)  Thus, the Board found the "controlling glucose levels" limitation within the common knowledge of a person of ordinary skill in the art.

The partial statement quoted by Novo in Paragraph No. 150 is actually taken from a portion of the Board's decision preceding the Board's discussion of the "controlling glucose limitation" of claims 25, 26, 31 and 35.  Further, when the entire quote is examined, it can be seen that the portion cited by Novo mischaracterizes the Board's response to a hypothetical argument by Novo.  The Board determined that, because the precise amount of insulin delivered is highly dependent upon the individual patient, Novo could not claim the amount delivered with precision:

> To the extent the appellants mean to argue that neither [Schenk of Velasquez] teaches how to translate those structural controls into the precise amounts of insulin needed to be deposited for inhalation, we again note the broad ranges both disclosed and claimed in appellants'

> application that suggest the precise amount is not critical to the invention,
> or <u>more properly, the precise amount is highly dependent upon the
> individual patient and therefore cannot be claimed with precision</u>.

(Admin. R. Tab 36 at A450, 1st para. (emphasis added).)

    151.    The amounts of insulin administered to each patient for absorption are absolutely critical.  (CR ¶51; DT 80:10-20; 232:3-8.)

The USPTO does not dispute that it is critical that the amount of inhaled insulin absorbed into a patient's bloodstream fall within a safe and effective range, but further notes that this point is not responsive to the Board's statement that the "precise amount" in not critical to the *invention*" (emphasis added).

    152.    The Board stated that "S[c]henk's inhaler is inherently repeatable in operation," so that claim limitations of repeatability were taught by Schenk.  (Admin. R. Tab 36 at A450.)

The USPTO does not dispute that in referring to the "claim limitations of repetition (claim 25, 26 and 31[citations omitted])," the Board stated, "[w]e note Schenk's inhaler is inherently repeatable in operation."  (Admin. R. Tab 36 at A450, 3d para.)  (*See also* USPTO's Response to Novo's Paragraph No. 145.)

    153.    The Board's statement to which reference is made in ¶152 is incorrect, because many factors influence whether a reproducible dose is administered to the bloodstream by insulin inhalation, even if the same amount of insulin is aerosolized in a device in the same manner each time.  These factors include, among others, the flow rate and volume with which a patient would inhale each dose of insulin, the speed of the inhalation, the particle size, the concentration of the drug in the carrier, and the point in the respiration cycle where the patient initiates inhalation.  (CR¶52; DT 93:11 - 94:5, 96:22 - 98:1, 130:20 - 131:3, 172:7-8, 172:12-20.)

The USPTO disputes the facts set forth in Paragraph No. 153 as attorney argument lacking an evidentiary basis and mischaracterizing Novo's claims on appeal.  When the Board stated, "[w]e note Schenk's inhaler is inherently repeatable in operation," it was expressly referring to the "claim limitations of repetition (claim 25, 26 and 31[citations omitted]),"

71

(Admin. R. Tab 36 at A450, 3d para.)  At step (b), claim 25 recites a step of "propelling a gas

over the fixed quantity of dry insulin powder to produce, in a repeatable fashion, an aerosolized

suspension of insulin . . . . "  (Admin. R. Tab 36 at A372 (emphasis added.)  Thus, the

"repeatable" limitation of claim 25 refers only to producing an aerosolized suspension of insulin

in a repeatable fashion.  Accordingly, it is irrelevant that the Board made no findings concerning

whether Schenk taught a "reproducible dose is administered to the bloodstream by insulin

inhalation."  The Board found that Schenk produced an aerosolized suspension of insulin in a

repeatable fashion, which was all that it was required to do to show that Schenk taught the

repeatable limitation of claim 25.

Moreover, Novo's expert Dr. Crystal admitted at his deposition, unequivocally, that a

person of ordinary skill in the art in 1993 would have known how to control the factors identified

in this paragraph to achieve a reproducible dose of insulin to the bloodstream:

> Q.    Would a person of ordinary skill in the art in 1993
> understand that a flow rate is a factor that influences whether a reproducible dose
> is administered to the bloodstream by insulin inhalation?
>
> A.    Yes.
>
> * * * *
>
> Q:    Would a person of ordinary skill in the art as of January
> 1993 understand how flow rate influences whether a reproducible dose is
> administered to the bloodstream by inhalation?
>
> MS. PFEIFFER:    Objection to form.
>
> THE WITNESS:    Using the term reproducibility referring to
> dosing to the blood?
>
> BY MR. WOOD:
>
> Q:    Yes.
>
> A:    Yes.
>
> * * * *

72

Q.     Okay.  Would a person of ordinary skill in the art as of January 1993 understand that the <u>volume</u> with which a patient inhales each dose of insulin influences whether a <u>reproducible dose</u> is administered to the bloodstream by insulin inhalation?

MS. PFEIFFER:     Objection to form.

THE WITNESS:     Yes.

Q:     Would a person of ordinary skill in the art in January 1993 know how to <u>control the volume</u> with which a patient would inhale each dose of insulin in order to achieve a <u>reproducible dose</u> administered to the bloodstream by inhalation?

MS. PFEIFFER:     Objection to form.

THE WITNESS:     Yes.

* * * *

Q:     Would a person of ordinary skill in the art as of January 1993 understand that <u>particle size</u> is a factor that influences whether a <u>reproducible dose</u> of insulin is administered to the bloodstream by inhalation?

MS. PFEIFFER:     Objection to form.

THE WITNESS:     Again, for all of this discussion, I can assume the ordinary skilled person or ordinary skilled in the art as we have defined it?

BY MR. WOOD:

Q.     Yes.

A.     Yes.  Then the answer is yes.

Q.     Would a person of ordinary skill in the art as of January 1993 know how to <u>control particle size</u> to influence whether a <u>reproducible dose</u> of insulin is administered to the bloodstream by inhalation?

MS. PFEIFFER:     Objection to form.

THE WITNESS:     Yes.

* * * *

Q:     Would a person of ordinary skill in the art in January 1993 understand that the <u>concentration of the drug</u> in the carrier influences whether a <u>reproducible dose</u> of insulin is administered to the bloodstream by inhalation?

73

MS. PFEIFFER:          Objection to form.

THE WITNESS:          Yes.

* * * *

Q.          Would a person of ordinary skill in the art know how to control the concentration of the drug in the carrier to influence whether a reproducible dose of insulin is administered to the bloodstream by inhalation?

MS. PFEIFFER:          Objection to form.

THE WITNESS:          Yes.

* * * *

Q:          Would a person of ordinary skill in the art as of January 1993 understand that the point in the respiration cycle where the patient initiates inhalation influences whether a reproducible dose of insulin is administered to the bloodstream by inhalation?

MS. PFEIFFER:          Objection to form.

THE WITNESS:          Yes.

BY MR. WOOD:

Q.          Would a person of ordinary skill in the art as of January 1993 understand how to control the point in the respiration cycle where the patient initiates inhalation in order to achieve a reproducible dose of insulin administered to the bloodstream by inhalation?

MS. PFEIFFER:          Objection to form.

THE WITNESS:          Yes.

(CT 164:14-18; 165:22-166:9; 167:20-168:12; 174:12-175:7; 181:4-10; 182:5-11; 185:19-186:12

(emphasis added).)

Claim 26 depends from claim 25 and, therefore, Novo's assertions on this point suffer the same defects of claim 25.  Novo's arguments on this point with respect to claim 31 fails for the same reasons that its arguments with respect to the repeatability of the method of claims 25 and 26 fail.

74

154.    These factors in ¶153 could differ widely with a device such as those in Schenk.  Such differences would result in a wide and unpredictable range of insulin that would reach the bloodstream.  (CR ¶52; DT 93:11 - 94:5; DR ¶¶12-17.)

The USPTO disputes the facts set forth in Paragraph No. 154 as attorney argument lacking an evidentiary basis, mischaracterizing Novo's claims on appeal, and irrelevant in any case.  Novo's expert, Dr. Crystal, admitted that "Schenk and Velasquez may allow one of ordinary skill in the art to control the amount of insulin that is coming out of a device,"  Crystal Rep. at 15-16, ¶ 50, and that a person of ordinary skill at the time of the invention would know how to control the factors necessary to get the controlled dose of insulin from the device to the bloodstream.  Crystal Tr. at 164:14-18; 165:22-166:9; 167:20-168:12; 174:12-175:7; 181:4-10; 182:5-11; 185:19-186:12.

Further, the USPTO does not know what Novo means by "wide" or "unpredictable."  It is irrelevant that the Board made no findings concerning whether Schenk taught that a "reproducible dose is administered to the bloodstream by insulin inhalation."  When the Board stated, "[w]e note Schenk's inhaler is inherently repeatable in operation," it was expressly referring to the "claim limitations of repetition (claim 25, 26 and 31[citations omitted])," (Admin. R. Tab 36 at A450, 3d para.)  Claim 25 recites a step of "propelling a gas over the fixed quantity of dry insulin powder to produce, in a repeatable fashion, an aerosolized suspension of insulin . . . . "  (Admin. R. Tab 36 at A372 (emphasis added.)  Thus, the "repeatable" limitation of claim 25 refers only to producing an aerosolized suspension of insulin in a repeatable fashion.  Accordingly, the Board found that Schenk produced an aerosolized suspension of insulin in a repeatable fashion, which was all that it was required to do to show that Schenk taught the repeatable limitation of claim 25.

Claim 26 depends from claim 25 and, therefore, Novo's assertions on this point suffer the same defects of claim 25. Novo's arguments on this point with respect to claim 31 fails for the same reasons that its arguments with respect to the repeatability of the method of claims 26 and 25 fail.

Moreover, Novo's expert Dr. Crystal admitted at his deposition, unequivocally, that a person of ordinary skill in the art in 1993 would have known how to achieve a reproducible dose of insulin by inhalation irrespective of the device used. (*See* USPTO's response to para. 153.)

> 155.   The Board implicitly concluded that the inventions claimed in the '774 Application could be realized with "routine experimentation." (Admin. R. Tab 36 at A450.)

The USPTO disputes this fact and states that the Board found that the inventions claimed in the '774 Application could be realized with "routine experimentation." In addition, the Board found that it is not necessary for Schenk and Velasquez to teach "how to translate [their] structural controls into the precise amounts of insulin needed to be deposited for inhalation," noting that "[the Board's] reviewing court has stated that 'it is not inventive to discover the optimum or workable ranges by routine experimentation.'" (Admin. R. Tab 36 at A450, 1st and 2d para., quoting *In re Geiseler*, 116 F.3d 1465 (Fed. Cir. 1997).)

Further, Novo's expert Dr. Crystal admitted at his deposition, unequivocally, that a person of ordinary skill in the art in 1993 would have known how to achieve a reproducible dose of insulin by inhalation irrespective of the device used. (CT 164:14-18; 165:22-166:9; 167:20-168:12; 174:12-175:7; 181:4-10; 182:5-11; 185:19-186:12 (emphasis added).)

> 156.   As for the limitation of achieving acceptable blood glucose level following treatment, the Board stated that one of ordinary skill in the art "would monitor the patient's vital statistics to achieve the desired result in view of the high variability among patients." (Admin. R. Tab 36 at A450.)

The USPTO does not dispute that the Board's decision contains the language quoted in

Paragraph No. 156.

> 157.    The Board also cited the Examiner's position that "standard guidelines for the number of units [of insulin] that are needed to be absorbed" were known to one of ordinary skill in the art, who "would adjust the amount inhaled to achieve that amount." (Admin. R. Tab 36 at A448.)

The USPTO does not dispute the fact set forth in Paragraph No. 157.

> 158.    Concerning the so-called "standard guideline" as referred to in ¶157, the Board did not identify any such guidelines.  (Admin. R. Tab 36 at A448.)

The USPTO disputes the fact set forth in Paragraph No. 158 as false.  The Examiner

identified Harrison's a source of guidelines for insulin dosing, *i.e.*, the amount of insulin

required in a patient's bloodstream to control glucose levels.  (Admin. R. Tab 32 at para.

spanning A421-A422.)  In addition, at page 21 of its application (Admin. R. Tab 2 at A22-A23,

¶109), Novo cites the very same dosing regimen as that recited in Harrison's (Admin. Tab 13 at

A268, para. spanning the lt. and rt. cols.).  Accordingly, in affirming the Examiner's rejection,

the Board expressly noted that Novo's application recites the same insulin dosing range as

Harrison, "confirm[ing] the findings of the examiner as to the evidentiary value of Harrison":

> As to the limitation regarding the number of units [of insulin] to be absorbed, we further note that the appellants' disclosure supports the examiner's findings that an absorption of 1-50 units would be that which a person of ordinary skill in the art would use.  (See specification at p. 21 [Admin. R. Tab 2 at A22-A23, ¶109]).  This recitation confirms the findings of the examiner as to the evidentiary value of Harrison.

(Admin. R. Tab 36 at A448, 2d para. (emphasis added).)  Thus, in contrast to Novo's assertions,

the Board did identify guidelines for determining the amount of insulin required in the

bloodstream to control glucose levels:  Harrison's.  The USPTO notes that the amount of insulin

needed in the bloodstream to control glucose levels is the same whether the insulin is injected

into the bloodstream or absorbed into the bloodstream from by the lungs.

77

159.    The Examiner did not cite any such guidelines in his reference to them, which was cited by the Board.  (Examiner's Answer, Admin. R. Tab 25 at A384.)

The USPTO disputes the fact set forth in Paragraph No. 159 as false.  The Examiner identified Harrison's a source of guidelines for insulin dosing, *i.e.*, the amount of insulin required in a patient's bloodstream to control glucose levels, in his Examiner's Answer although he did not specifically use the word "guidelines."  (Admin. R. Tab 32 at para. spanning A421-A422.)  In addition, at page 21 of its application (Admin. R. Tab 2 at A22-A23, ¶109), Novo cites the very same dosing regimen as that recited in Harrison's (Admin. Tab 13 at A268, para. spanning the lt. and rt. cols.).  Accordingly, in affirming the Examiner's rejection, the Board expressly noted that Novo's application recites the same insulin dosing range as Harrison, "confirm[ing] the findings of the examiner as to the evidentiary value of Harrison":

> As to the limitation regarding the number of units [of insulin] to be absorbed, we further note that the appellants' disclosure supports the examiner's findings that an absorption of 1-50 units would be that which a person of ordinary skill in the art would use.  (See specification at p. 21 [Admin. R. Tab 2 at A22-A23, ¶109]).  This recitation confirms the findings of the examiner as to the evidentiary value of Harrison.

(Admin. R. Tab 36 at A448, 2d para. (emphasis added).)  Thus, in contrast to Novo's assertions, the Examiner did identify guidelines for determining the amount of insulin required in the bloodstream to control glucose levels, and the Board agreed with the Examiner's citation.

160.    The PTO has failed to identify such guidelines, just as the Board failed to cite them.  (Def. Resp. to Pl.'s Interrog, First Supp. Resp. to Interrog. No. 6; Resp. to Req. for Admis., First Amended Resp. to Request for Admission No. 7.)

The USPTO disputes the fact set forth in Paragraph No. 160 as false.  Novo's Undisputed Fact Paragraph No. 157 concerns a statement by the Board that "standard guidelines for the number of units [of insulin] that are needed to be absorbed" were known to one of ordinary skill in the art, who "would adjust the amount inhaled to achieve that amount."  (Admin. R. Tab 36 at

A448.)  In contrast, Novo's Interrogatory No. 6 and its Request for Admission No. 7 concern guidelines for the administration of powdered insulin to the bloodstream via inhalation:

**INTERROGATORY NO. 6:**
    Identify any documents known to the USPTO, including any prior art or other references, that set out any protocol or guidelines for the administration of insulin for the treatment of diabetes mellitus by the inhalation of powdered insulin that the USPTO believes are prior art to this application or are otherwise relevant to the patentability of the claims of the Patent Application.

**REQUEST FOR ADMISSION NO. 7**
    The relevant prior art contains no specific protocol or guidelines for the administration of powdered insulin to the bloodstream via inhalation for the treatment of diabetes mellitus.

Thus, Novo's Undisputed Fact Paragraph No. 157 concerns different subject matter than Novo's Interrogatory No. 6 and its Request for Admission No. 7, and Novo has mischaracterized the USPTO's responses to its discovery requests and/or the Board's decision.

    Moreover, as the USPTO pointed out in its responses to Novo's Interrogatory No. 6 and its Request for Admission No. 7, whether the prior art contains specific protocols and guidelines for the administration of powdered insulin to the bloodstream via inhalation is irrelevant because none of Novo's claims on appeal recite or require a "protocol" or "guidelines."

    161.    After discovery closed, the PTO provided for the first time specific citations to three related references, that were buried in the 5,000 pages previously provided without explanation.  (Resp. to Req. for Admis., First Amended Resp. to Req. for Admis. No 7.)  These do not teach the claimed invention, which requires inhaling insulin to control blood glucose levels.  Each reference states that the claimed invention will *not* eliminate the need for insulin injections in diabetic patients.  *See, e.g.* U.S. Patent No. 5,643,868, col. 6 ll. 3-6, attached as Ex. H to the Nash Declaration ("the methods of the present invention will not eliminate the need for parenteral insulin therapy").

    The USPTO disputes that it produced three references after the close of discovery as part of its ongoing obligation to update its responses to Novo's discovery requests under Fed. R. Civ. P. 26(e)(1)(A), and objects to the characterization that these references were previously

79

unknown to Novo.  The three references provided by the USPTO are:  U.S. Patent Nos. 5,643,868; 5,843,886; and 5,763,396.  On November 11, 2006, Novo filed an Information Disclosure Statement with the USPTO, *i.e.*, after the Board's decision issued.  In the statement, Novo identified six co-pending applications "which may be related to the ['774] application," including *inter alia* U.S. Serial No. 11/130,986.  (Admin. R. Tab 37 at A454.)  On January 14, 2008, Novo filed an Information Disclosure Statement in the related application U.S. Serial No. 11/130,986 which listed each of U.S. Patent Nos. 5,643,868; 5,843,886; and 5,763,396.  Thus, the USPTO counsel promptly updated its responses to Novo's discovery requests after Novo filed the January 14, 2008 Information Disclosure Statement in the related application U.S. Serial No. 11/130,986.  Accordingly, Novo cannot candidly assert that the USPTO somehow blind-sided it with the presentation of these references.

With respect to the teachings of the three patents, Novo argues that they do not teach the claimed method because the claims require inhaling insulin to control blood glucose levels.  *Id.* However, claims 22 and 23 do not have this requirement.  (*See* Tab 24 at A372.)  However, Novo's claims do not require the total elimination of insulin injections; indeed, the '774 application specifically contemplates using the invention in conjunction with such injections. (Admin. R. Tab 2 at A36, ¶149.)

With respect to the language cited by Novo supra, U.S. Patent No. 5,643,868 (the "'868 patent") states that it discloses "methods for treating or preventing a disease in mammals having the characteristics of Type 1 diabetes comprising administering insulin . . . in <u>oral or aerosol forms</u> to said animals."  (U.S. Patent No. 5,643,868, Abstract, attached as Ex. H to the Nash Declaration (emphasis added).)  The language in the '868 patent quoted by Novo appears in the portion of the Detailed Description of the Invention describing <u>oral</u> treatments for Type I

diabetes, beginning at col.5; l.52.  Notably, this language does not appear in the portion of the

Detailed Description of the Invention describing <u>aerosol</u> treatments for Type I diabetes,

beginning at col.7, l.29.  (*See* U.S. Patent No. 5,643,868, col.7, l.29, attached as Ex. H to the

Nash Declaration ("In the alternative preferred embodiment of the present invention the

pharmaceutical formulations or dosage forms of the present invention can also be <u>administered</u>

to mammals suffering from diseases having the characteristics of Type I diabetes <u>in aerosol</u>

<u>form</u>." (emphasis added).)

   162. Dr. Crystal attests to the lack of such guidelines and the PTO's expert has
not identified any.  (CR ¶54; DT 93:11 - 94:5 (*see* DR ¶¶12-17); *see also* DT 87:21 - 88:9
(stating that Harrison does not discuss inhalable insulin).)

The USPTO disputes the fact set forth in Paragraph No. 162 as false for the same reasons

it disputed the alleged fact set forth in Paragraph No. 160 as false.

   163. The reason that a person of ordinary skill could not experiment with the
insulin powder, suggested in Velasquez and used in conjunction with the inhaler taught in
Schenk, to determine the claimed "2-10 range," or to lower or control glucose levels, is
the lack of guidelines or an "administration protocol" for administering inhaled insulin.
(CR ¶54.)

The USPTO disputes the fact set forth in Paragraph No. 163 as false.  There was no

"'lack of guidelines or an 'administration protocol' for administering inhaled insulin."  To the

contrary, others had administered aerosolized insulin via inhalation to successfully lower blood

glucose levels before 1993.  (*See*, *e.g.*, Laube, which teaches a method of treating diabetes

mellitus using aerosolized liquid insulin; Admin. R. Tab 12 at A250-A252.)  Laube specifically

states that she "chose to deliver" a particular dose "because this is the dose given by

subcutaneous administration."  (Laube, col.3, ln 19-21.)  This subcutaneous dose is set forth in

Harrison.

Further, Ms. Dolovich expressly testified that "Harrison, as you know, describes a method for treating diabetes that is the standard method – the subcutaneous injections of insulin and the units that are used . . . But provide a starting point if anybody is going to consider delivering insulin in an alternative way."  (DT 78:2-8.)  In fact, it is clear from the disclosure of the invention that the inventors sought to emulate, via inhalation, Harrison's teaching of the administration by injection of insulin to the bloodstream.  Indeed, the specification of the '774 application cites to Harrison no less than three times.  (*See* Admin. R. at Tab 2 at A27, ¶122; A51, ¶185; A65,¶ 235.)  Even more significantly, the specification's teaching of the proper doses to be administered via the claimed *inhalation* methods is copied practically *verbatim* from Harrison, as evidenced by a comparison of the following excerpts shown in this table:

| From the '774 application (Tab 2 at A22-23, ¶ 109). | From Harrison (Tab 13 at A268) |
|---|---|
| "A normal-weight adult may be started on about a **15-20 units a day** in that the estimated daily insulin production rate in non-diabetic subjects of normal size is approximately **25 units per day**." | "Adults of normal weight may be stared on **15 to 20 units a day** (the estimated daily insulin production rate in nondiabetic subjects of normal size is about **25 units a day**)." |
| "It is preferable to administer approximately **the same quantity of insulin for several days** before changing the dosing regime . . ." | "It is preferable to use **the same quantity of insulin for several days** before changing, . . ." |
| ". . . except with hypoglycemic patients for which **the dose should be immediately decreased** . . ." | ". . . the one exception being the hypoglycemic patient, for whom **the dose should be decreased immediately** . . ." |
| " . . . unless a clearly evident **nonrecurrent cause of hypoglycemia** (such as not eating, i.e., missing a typical meal) is present." | ". . . unless a **nonrecurrent cause of hypoglycemia** (such as excessive exercise) is present." |
| "In general, the changes should not be more than **five to ten units** per day." | "Generally, changes should be no more than **5 or 10 units** per step." |
| "It is typical to administer **about two-thirds of the total insulin** daily dosage **before breakfast** and administer the **remainder before supper**." | "Poorly controlled patients should be placed on split therapy, with **about two-thirds of the total insulin** given **before breakfast** and the **remainder before supper**." |

82

Thus, the '774 application thus makes abundantly clear that not only is Harrison relevant to the

claims on appeal, it is the very source of the '774 application's disclosure of the dosage

guidelines.  Accordingly, in contrast to Novo's assertions, a person of ordinary skill could

experiment with the insulin powder, as suggested in Velasquez and used in conjunction with the

inhaler taught in Schenk.  For this same reason, the USPTO disputes that a person of ordinary

skill in the art could not have used these same protocols to determine the "2-10" limitation found

in three of Novo's claims on appeal.

> 164.    Dosage administration of *injectable* insulin is well known, and the
> effective and safe dosage of injectable insulin can be arrived at by titration using various
> techniques, as described in Harrison.  But injectable dosing as taught in Harrison has no
> relevance to, and cannot be applied to, *inhalable* insulin.  (CR ¶54; DT 226:13 - 235:10.)

The USPTO does not dispute that "[d]osage administration of *injectable* insulin is well

known, and the effective and safe dosage of injectable insulin can be arrived at by titration using

various techniques, as described in Harrison."

The USPTO disputes that "injectable dosing as taught in Harrison has no relevance to,

and cannot be applied to, *inhalable* insulin" as attorney argument lacking evidentiary support.

Novo relies on DT 226:13 - 235:10 to support this assertion.  However, at DT 228:1-7, Ms.

Dolovich explained that one would determine how much insulin to put into an inhaler to treat

diabetes would be "[m]aybe 50 percent, maybe 25 percent [of the maximum dose in Harrison].

You would -- if I were going through this exercise, I might start off at 25 percent, get some

measurements, see that it was not a problem, and then double the dose.  And if that was not a

problem, then go to the full dose, knowing all along what my clinical response measurements

would be -- my pharmacokinetic parameters."  Moreover, Ms. Dolovich expressly testified that

"Harrison, as you know, describes a method for treating diabetes that is the standard method –

the subcutaneous injections of insulin and the units that are used . . . But provide a starting point

83

if anybody is going to consider delivering insulin in an alternative way." (DT 78:2-8.)

Moreover, the '774 application thus makes abundantly clear that not only is Harrison relevant to

the claims on appeal, it is the very source of the '774 application's disclosure of the dosage

guidelines. (*See* USPTO's response to para. 163.) Indeed, the specification of the '774

application cites to Harrison no less than three times. (*See* Admin. R. at Tab 2 at A27, ¶122;

A51, ¶185; A65,¶ 235.) Even more significantly, the specification's teaching of the proper doses

to be administered via the claimed *inhalation* methods is copied practically *verbatim* from

Harrison, as evidenced by the table *supra*.

Thus, the '774 application thus makes abundantly clear that not only is Harrison relevant

to the claims on appeal, it is the very source of the '774 application's disclosure of the dosage

guidelines. Accordingly, in contrast to Novo's assertions, Harrison is relevant and can be

applied to inhalable insulin.

> 165.   A person of ordinary skill in the art, with the information available in Schenk, Velasquez, and Harrison could not have engaged in routine experimentation to arrive at the claimed 2-10 limitation, or have been able to safely, effectively, and reproducibly lower or control glucose levels to treat diabetes mellitus in a patient. (CR ¶54; DT 93:11 - 94:5.)

The USPTO disputes the facts set forth in Paragraph No. 165 as attorney argument

lacking evidentiary support. The Examiner correctly recognized that the 2-10 range limitation is

insufficient to confer patentability on claim 22 because "the amount of insulin employed and the

amount absorbed can be arrived at through mere routine obvious experimentation and

observation." (Admin. R. Tab 16 at A293.) In his Answer, the Examiner specifically identifies

U.S. Patent No. 5,320,094 to Laube *et al*. ("Laube") for its teaching of "known losses" of

aerosolized insulin administered to human patients (*e.g.*, on the surfaces of the inhaler, inside the

patient's mouth, etc.), which would make it a *necessity* to put more insulin in the inhaler than is

intended to be absorbed in the bloodstream.  (Admin. R. Tab 25 at A385-36.)  Ms. Dolovich also

expressly testified that "Harrison, as you know, describes a method for treating diabetes that is

the standard method – the subcutaneous injections of insulin and the units that are used . . . But

provide a starting point if anybody is going to consider delivering insulin in an alternative way."

(DT 78:2-8.)  Accordingly, in contrast to Novo's assertions, a person of ordinary skill could

experiment with the dry insulin powder suggested in Velasquez and in conjunction with the

inhaler taught by Schenk.  For this same reason, a person of ordinary skill in the art could have

used these same protocols to determine the "2-10" limitation found in three of Novo's claims on

appeal.  Further, a  person of ordinary skill in the art, with the information available in Schenk,

Velasquez, and Harrison could have engaged in routine experimentation to safely, effectively,

and reproducibly lower or control glucose levels to treat diabetes mellitus, and to arrive at the 2-

10 limitation found in three of the claims on appeal.

> 166.    Ms. Dolovich testified that one of skill could not treat diabetes with the
> inhaler in Schenk and the suggestion of insulin in Velasquez:  "[J]ust show[ing] up at the
> door, so to speak, with an inhaler filled with insulin and say[ing], I am going to treat you
> with this . . . would be foolish."  (DT 232:3-8.)

The USPTO objects to para. 166 as argumentative and based on a mischaracterization of

the evidence, particularly a quotation is taken out of context.  Ms. Dolovich did <u>not</u> state or

imply that "one of skill <u>could not</u> treat diabetes with the inhaler in Schenk and the suggestion of

insulin in Velasquez" (emphasis added).  Quite the contrary.  See Dolovich Tr. at 98:19-99:1.

Moreover, a fair reading of Ms. Dolovich's testimony at DT 232 shows that she testified that a

person of ordinary skill in the art would need to collect data characterizing a given system for

administering inhaled insulin prior to treating patients:

> You need to obtain a body of data that characterizes that system that tests
> it in a number of patients so that you can go out there and say, I have a
> system that works; I can provide unit doses containing X milligrams of

85

insulin; I know what the efficiency of delivery of my system is over X
number of subjects; and we have enough clinical data using that system to
say that it is workable . . . [a]nd successful.

(DT 232:8-15.)  Importantly, this testimony was made in follow up to testimony at DT 228:1-7,

in which Ms. Dolovich explained that one would determine how much insulin to put into an

inhaler to treat diabetes would be "[m]aybe 50 percent, maybe 25 percent [of the maximum dose

in Harrison].  You would -- if I were going through this exercise, I might start off at 25 percent,

get some measurements, see that it was not a problem, and then double the dose.  And if that was

not a problem, then go to the full dose, knowing all along what my clinical response

measurements would be -- my pharmacokinetic parameters."  (DT 228:1-7.) Ms. Dolovich also

expressly testified that "Harrison, as you know, describes a method for treating diabetes that is

the standard method – the subcutaneous injections of insulin and the units that are used . . . But

provide a starting point if anybody is going to consider delivering insulin in an alternative way."

(DT 78:2-8.)  Thus, in contrast to Novo's assertions, there was no assertion by Ms. Dolovich that

"one of skill could not treat diabetes with the inhaler in Schenk and the suggestion of insulin in

Velasquez."

Further, Laube specifically states that she "chose to deliver" a particular dose "because

this is the dose given by subcutaneous administration."  (Laube, col.3, ln 19-21.)  This

subcutaneous dose is set forth in Harrison.  Although Laube does not discuss to dry powder

insulin, it is clear from the disclosure of the invention that the inventors sought to emulate, via

inhalation, Harrison's teaching of the administration by injection of insulin to the bloodstream.

Indeed, the specification of the '774 application cites to Harrison no less than three times.  (*See*

Admin. R. at Tab 2 at A27, ¶122; A51, ¶185; A65,¶ 235.)  Even more significantly, the

specification's teaching of the proper doses to be administered via the claimed *inhalation*

86

methods is copied practically *verbatim* from Harrison, as evidenced by a comparison of the

following excerpts shown in this table:

| From the '774 application (Tab 2 at A22-23, ¶ 109). | From Harrison (Tab 13 at A268) |
| --- | --- |
| "A normal-weight adult may be started on about a **15-20 units a day** in that the estimated daily insulin production rate in non-diabetic subjects of normal size is approximately **25 units per day**." | "Adults of normal weight may be stared on **15 to 20 units a day** (the estimated daily insulin production rate in nondiabetic subjects of normal size is about **25 units a day**)." |
| "It is preferable to administer approximately **the same quantity of insulin for several days** before changing the dosing regime . . ." | "It is preferable to use **the same quantity of insulin for several days** before changing, . . ." |
| ". . . except with hypoglycemic patients for which **the dose should be immediately decreased** . . ." | ". . . the one exception being the hypoglycemic patient, for whom **the dose should be decreased immediately** . . ." |
| " . . . unless a clearly evident **nonrecurrent cause of hypoglycemia** (such as not eating, i.e., missing a typical meal) is present." | ". . . unless a **nonrecurrent cause of hypoglycemia** (such as excessive exercise) is present." |
| "In general, the changes should not be more than **five to ten units** per day." | "Generally, changes should be no more than **5 or 10 units** per step." |
| "It is typical to administer **about two-thirds of the total insulin** daily dosage **before breakfast** and administer the **remainder before supper**." | "Poorly controlled patients should be placed on split therapy, with **about two-thirds of the total insulin** given **before breakfast** and the **remainder before supper**." |

Thus, Novo's own specification indicates that one of skill <u>could</u> treat diabetes with the inhaler in

Schenk and the suggestion of insulin in Velasquez.

> 167.    Given the narrow therapeutic range within which insulin must be administered, such experimentation would be unethical and dangerous.  (CR ¶54; DT 232:1-8.)

The USPTO disputes the fact set forth in Paragraph No. 167 as attorney argument lacking

an evidentiary foundation.  Further, the USPTO does not know what Novo means by "narrow."

Novo cites DT 232:1-8 in support of this assertion.  However, at DT 232:1-8, Ms. Dolovich did

not state or otherwise imply that experimentation to determine the dose range of inhaled insulin

would be "unethical" or "dangerous."   Ms. Dolovich merely stated the need to collect

information supporting a method of inhaling insulin that is different from the subcutaneous route

prior to treating patients with inhalable insulin:

> Well we are talking about collecting information to support a method of
> inhaling insulin that is different from the subcutaneous route. And, in
> order to do that, you cannot just show up at the door, so to speak, with an
> inhaler filled with insulin and say, I am going to treat you with this. That
> would be foolish. You need to obtain a body of data that characterizes
> that system that tests it in a number of patients so that you can go out there
> and say, I have a system that works; I can provide unit doses containing X
> milligrams of insulin; I know what the efficiency of delivery of my system
> is over X number of subjects; and we have enough clinical data using that
> system to say that it is workable . . .   [a]nd successful.

(DT 232:1-15.)

Further, the Examiner expressly noted that dose response studies are routine to one skilled in the

art. *Merck & Co. Inc. v. Biocraft Laboratories Inc.*, 874 F.2d 804 (Fed. Cir. 1989) (rejecting

nonobviousness argument based upon dosage calculations because "though requiring time and

care, the experimentation needed to arrive at the claimed dosages was nothing more than

routine"); *United States v. Telectronics Inc*., 857 F.2d 778, 786 (Fed. Cir. 1988) (no undue

experimentation because "the only impediments are the time and cost of a dose response study,

which the district court found could be performed by . . . those skilled in the art"). Indeed,

researchers had been experimenting with the administration of inhalable insulin in humans for

decades prior to January 1993. The prior art is replete with examples, including the

administration of aerosolized insulin to humans as early as 1925. *See* Gänsslen, M., *Über

Inhalation von Insulin* (Ex. D to Novo's Memorandum).

The Laube patent, cited by the Examiner, sets forth a very detailed example of such a

study:  insulin was administered by inhalation to eight subjects, and measurements of blood

glucose and insulin levels were taken. Laube, col. 6, line 47- col.7, line 25. The eight subjects

gave informed consent, and the study was approved by the Institutional Review Board at Johns

88

Hopkins.  Laube, col. 8, ln.6-10.  There was nothing "unethical"or "dangerous" about her study

or any other properly designed study.  Moreover, if Novo's assertion were true, then it would be

unethical and dangerous to determine the dose range within which any drug with a narrow

therapeutic range must be administered!  However, the dose range for any new drug or method

of treatment <u>must</u> be determined through such experimentation.

      168.   As of 1993, a person of ordinary skill in the art would have been one who had either an M.D. or a Ph.D. in a related field, and several years of experience in pharmaceutical aerosols, lung physiology, and pulmonary drug delivery or the equivalent training and experience. (CR ¶33; DR ¶16; DT 190:1-6.)  Both experts applied this standard.

The USPTO does not dispute that both experts applied the standard that "a person of

ordinary skill in the art would have been one who had either an M.D. or a Ph.D. in a related

field, and several years of experience in pharmaceutical aerosols, lung physiology, and

pulmonary drug delivery or the equivalent training and experience."

                        Respectfully submitted,


                      ___/s/_____
                      JEFFREY A. TAYLOR, D.C. BAR # 498610
                      United States Attorney


                      ___/s/_____
                      RUDOLPH CONTRERAS, D.C. BAR # 434122
                      Assistant United States Attorney


                      ___/s/_____
                      BLANCHE BRUCE, D.C. BAR # 960245
                      Assistant United States Attorney
                      555 Fourth Street, N.W., Room E-4417
                      Washington, D.C. 20530
                      (202) 514-9150 (telephone)
                      (202) 514-8780 (facsimile)


Date:  May 19, 2008            ATTORNEYS FOR DEFENDANT

OF COUNSEL:

Benjamin Wood
Mary L. Kelly
Frances Lynch
Associate Solicitors
U.S. Patent & Trademark Office